# EXHIBIT A

**Neon - Shrapnel Sum of Parts Valuation**



○ **Calvin Zhou <calvinz@the4dfactory.com>**
**To:** ◉ Cort Javarone;  **Cc:** ○ David Vicini  ⌄

Thursday, May 13, 2021 at 8:06 PM

Neon – Sum of Parts...
18 KB

Download  ·  Preview

Cort, see the Neon valuation range and 4D's share of the SHRAP token valuation. Neon valuation of $90-400m. The attached spreadsheet has the comps and details.

|  | Valuation range ($m) | | |
|---|---|---|---|
|  | **Bear** | **Base** | **Bull** |
| Shrapnel Entity | 30 | 50 | 150 |
| SHRAP Token | 30 | 50 | 150 |
| Rest of Neon | 30 | 50 | 100 |
| **Neon Total** | **90** | **150** | **400** |

|  | Total Tokens |  |  |  |
|---|---|---|---|---|
| **4D Tokens** | 342,222,222 |  |  |  |
|  |  |  |  |  |
|  | **Price/Token** | **Valuation ($m)** |  |  |
| F&F Round (Pre-Seed) | $0.0033 | 10 |  |  |
| VC Round (Seed) | $0.0100 | 30 |  |  |
| Strategic Round | $0.0167 | 50 |  |  |
| ICO Round | $0.0500 | 150 |  |  |
|  |  |  |  | **Per Month (24** |
| **Cash on cash return from Strategic Round** | **Price per token** | **Market Cap ($m)** | **4D Token Valuation ($m)** | **Month Vesting in $m)** |
|  | $0.003 | $10,000,000 | $1,140,741 | $47,531 |

**Neon - Shrapnel Sum of Parts Valuation**



 ○ **Calvin Zhou** <calvinz@the4dfactory.com>

Thursday, May 13, 2021 at 8:06 PM

**To:** ⊙ Cort Javarone; **Cc:** ○ David Vicini    ⌄

 Neon – Sum of Parts...
18 KB

Download    •    Preview

| Cash on cash return from Strategic Round | Price per token | Market Cap ($m) | 4D Token Valuation ($m) | Per Month (24 Month Vesting in $m) |
|---|---|---|---|---|
| | $0.003 | $10,000,000 | $1,140,741 | $47,531 |
| | $0.010 | $30,000,000 | $3,422,222 | $142,593 |
| | $0.017 | $50,000,000 | $5,703,704 | $237,654 |
| 3x | $0.050 | $150,000,000 | $17,111,111 | $712,963 |
| 9x | $0.150 | $450,000,000 | $51,333,333 | $2,138,889 |
| 15x | $0.250 | $750,000,000 | $85,555,556 | $3,564,815 |
| 21x | $0.350 | $1,050,000,000 | $119,777,778 | $4,990,741 |
| 27x | $0.450 | $1,350,000,000 | $154,000,000 | $6,416,667 |
| 33x | $0.550 | $1,650,000,000 | $188,222,222 | $7,842,593 |
| 39x | $0.650 | $1,950,000,000 | $222,444,444 | $9,268,519 |
| 45x | $0.750 | $2,250,000,000 | $256,666,667 | $10,694,444 |
| 51x | $0.850 | $2,550,000,000 | $290,888,889 | $12,120,370 |
| 57x | $0.950 | $2,850,000,000 | $325,111,111 | $13,546,296 |
| 63x | $1.050 | $3,150,000,000 | $359,333,333 | $14,972,222 |
| 69x | $1.150 | $3,450,000,000 | $393,555,555 | $16,398,148 |
| 75x | $1.250 | $3,750,000,000 | $427,777,778 | $17,824,074 |
| 81x | $1.350 | $4,050,000,000 | $462,000,000 | $19,250,000 |
| 87x | $1.450 | $4,350,000,000 | $496,222,222 | $20,675,926 |
| 93x | $1.550 | $4,650,000,000 | $530,444,444 | $22,101,852 |
| 99x | $1.650 | $4,950,000,000 | $564,666,666 | $23,527,778 |
| 105x | $1.750 | $5,250,000,000 | $598,888,889 | $24,953,704 |

| Valuation range ($m) | | | |
|---|---|---|---|
| | **Bear** | **Base** | **Bull** |
| Shrapnel Entity | 30 | 50 | 150 |
| SHRAP Token | 30 | 50 | 150 |
| Rest of Neon | 30 | 50 | 100 |
| **Neon Total** | **90** | **150** | **400** |

| SHRAP Token Comparables | Valuation ($m) | | | |
|---|---|---|---|---|
| | **Seed Round** | **ICO** | **Current** | **Premium to ICO** |
| Illuvium Seed Round Valuation | 33 | 380 | 750 | 2.0x |
| Axie Infinity | 30 | 27 | 2,000 | 74.1x |
| Decentraland | | 62 | 2,700 | 43.5x |
| My Neighbor Alice | | 13 | 1,200 | 92.3x |
| The Sandbox | | 25 | 1,900 | 76.0x |
| Revv | | 20 | 1,000 | 50.0x |
| | | | | **56.3x** |

| SHRAP Entity Comparables | EST. 2020 Revenues | EBITDA Margin | EST. EBITDA | Revenue Multiple | Valuation |
|---|---|---|---|---|---|
| CS:GO | 500 | 40% | 200 | | |
| Escape From Tarkov | 500 | 40% | 200 | | |
| Valorant | 1,000 | 40% | 400 | | |
| PUBG | 2,700 | 40% | 1,080 | | |
| Fortnite | 1,800 | 40% | 720 | 16.1x | 29,000 |
| Call of Duty | 1,950 | 40% | 780 | | |
| Roblox | 920 | NA | NA | 45.5x | 41,900 |

| | Peak Revenue | 3 Year Revenue | Peak EBITDA | 3 year EBITDA |
|---|---|---|---|---|
| **Shrapnel Entity** | 851 | 1,438 | 422 | 650 |
| **Rest of Neon** | 144 | 316 | 43 | 96 |

| Neon Valuation Analysis | | | | |
|---|---|---|---|---|
| Revenue Multiple | | | | |
| | **1x** | **2x** | **3x** | **4x** |
| Shrapnel Entity Valuation Range | 851 | 1,702 | 2,553 | 3,404 |
| **95% Discount to full valuation** | **43** | **85** | **128** | **170** |
| | | | | |
| Rest of Neon Valuation Range | 144 | 288 | 432 | 576 |
| **75% Discount to full valuation** | **36** | **72** | **108** | **144** |

| | Seed | ICO | Bear Market | Bull Market |
|---|---|---|---|---|
| **SHRAP Token Valuation Range** | **30** | **150** | **300** | **3,000** |

|  | Total Tokens |  |
|---|---|---|
| **4D Tokens** | 342,222,222 |  |

|  | Price/Token | Valuation ($m) |
|---|---|---|
| F&F Round (Pre-Seed) | $0.0033 | 10 |
| VC Round (Seed) | $0.0100 | 30 |
| Strategic Round | $0.0167 | 50 |
| ICO Round | $0.0500 | 150 |

| **Cash on cash return from Strategic Round** | Price per token | Market Cap ($m) | **4D Token Valuation ($m)** | **Per Month (24 Month Vesting in $m)** |
|---|---|---|---|---|
|  | $0.003 | $10,000,000 | $1,140,741 | $47,531 |
|  | $0.010 | $30,000,000 | $3,422,222 | $142,593 |
|  | $0.017 | $50,000,000 | $5,703,704 | $237,654 |
| 3x | $0.050 | $150,000,000 | $17,111,111 | $712,963 |
| 9x | $0.150 | $450,000,000 | $51,333,333 | $2,138,889 |
| 15x | $0.250 | $750,000,000 | $85,555,556 | $3,564,815 |
| 21x | $0.350 | $1,050,000,000 | $119,777,778 | $4,990,741 |
| 27x | $0.450 | $1,350,000,000 | $154,000,000 | $6,416,667 |
| 33x | $0.550 | $1,650,000,000 | $188,222,222 | $7,842,593 |
| 39x | $0.650 | $1,950,000,000 | $222,444,444 | $9,268,519 |
| 45x | $0.750 | $2,250,000,000 | $256,666,667 | $10,694,444 |
| 51x | $0.850 | $2,550,000,000 | $290,888,889 | $12,120,370 |
| 57x | $0.950 | $2,850,000,000 | $325,111,111 | $13,546,296 |
| 63x | $1.050 | $3,150,000,000 | $359,333,333 | $14,972,222 |
| 69x | $1.150 | $3,450,000,000 | $393,555,555 | $16,398,148 |
| 75x | $1.250 | $3,750,000,000 | $427,777,778 | $17,824,074 |
| 81x | $1.350 | $4,050,000,000 | $462,000,000 | $19,250,000 |
| 87x | $1.450 | $4,350,000,000 | $496,222,222 | $20,675,926 |
| 93x | $1.550 | $4,650,000,000 | $530,444,444 | $22,101,852 |
| 99x | $1.650 | $4,950,000,000 | $564,666,666 | $23,527,778 |
| 105x | $1.750 | $5,250,000,000 | $598,888,889 | $24,953,704 |
| 111x | $1.850 | $5,550,000,000 | $633,111,111 | $26,379,630 |
| 117x | $1.950 | $5,850,000,000 | $667,333,333 | $27,805,556 |
| 123x | $2.050 | $6,150,000,000 | $701,555,555 | $29,231,481 |
| 129x | $2.150 | $6,450,000,000 | $735,777,777 | $30,657,407 |
| 135x | $2.250 | $6,750,000,000 | $770,000,000 | $32,083,333 |
| 141x | $2.350 | $7,050,000,000 | $804,222,222 | $33,509,259 |
| 147x | $2.450 | $7,350,000,000 | $838,444,444 | $34,935,185 |
| 153x | $2.550 | $7,650,000,000 | $872,666,666 | $36,361,111 |
| 159x | $2.650 | $7,950,000,000 | $906,888,888 | $37,787,037 |
| 165x | $2.750 | $8,250,000,000 | $941,111,111 | $39,212,963 |
| 171x | $2.850 | $8,550,000,000 | $975,333,333 | $40,638,889 |
| 177x | $2.950 | $8,850,000,000 | $1,009,555,555 | $42,064,815 |

183x          $3.050    $9,150,000,000          $1,043,777,777      $43,490,741

**Subject:** Shrapnel Cap Table
**Date:** Saturday, May 22, 2021 at 4:10:44 PM Eastern Daylight Time
**From:** Calvin Zhou
**To:** Cort Javarone, David Vicini
**Attachments:** Shrapnel Cap Table.xlsx

-----------------------------------------------
Calvin Zhou
Director
4D Factory LLC
e.   calvinz@the4dfactory.com
m.  +1.949.933.5713

| $SHRAP Tokens | | |
|---|---|---|
| **Team** | | **Tokens** |
| Mark L | 1.19% | 35,555,556 |
| Don | 1.19% | 35,555,556 |
| Colin | 1.19% | 35,555,556 |
| Aaron Nonis | 1.19% | 35,555,556 |
| Mark Y | 1.19% | 35,555,556 |
| Naomi | 1.19% | 35,555,556 |
| Gianna | 0.30% | 8,888,889 |
| Calvin Zhou | 1.19% | 35,555,556 |
| 4D | 11.41% | 342,222,222 |
| **Shareholders of Shrapnel Inc.** | **20.00%** | **600,000,000** |
| | | |
| **Advisors** | | **Tokens** |
| Shroud | 0.03% | 1,000,000 |
| Derek Kolstad | 0.03% | 1,000,000 |
| Dmitri Johnson | 0.03% | 1,000,000 |
| Joanna Alexander | 0.03% | 1,000,000 |
| Adam Barlam | 0.25% | 7,500,000 |
| Helpers/Volunteers | 0.17% | 5,000,000 |
| Finders/Brokers (James Z, etc) | 1.75% | 52,500,000 |
| Advisor 1 | 0.25% | 7,500,000 |
| Advisor 2 | 0.25% | 7,500,000 |
| Advisor 3 | 0.25% | 7,500,000 |
| Advisor 4 | 0.25% | 7,500,000 |
| Advisor 5 | 0.25% | 7,500,000 |
| All Others | 1.45% | 43,500,000 |
| **Total** | **5.00%** | **150,000,000** |

| Shrapnel Inc. | Equity |
|---|---|
| Calvin Zhou | 5.4% |
| 4D LLC | 50.8% |
| Neon C Corp | 33.8% |
| VCs | 10.0% |
| **Total** | **100.0%** |
| | |
| Mark L | 5.4% |
| Don | 5.4% |
| Aaron | 5.4% |
| Colin | 5.4% |
| Mark Y | 5.4% |
| Naomi | 5.4% |
| Gianna | 1.4% |
| **Neon C Corp Subtotal** | **33.8%** |

| FUNDING SOURCES | | | AMOUNT RAISED | TOKENS ISSUED | PRICE/TOKEN | % TOTAL SUPPLY | FULLY DILUTED VALUATION | Discount To Public sale |
|---|---|---|---|---|---|---|---|---|
| Pre-Seed (Friends and Family) | | | $ 1,061,000 | 318,300,000 | $ 0.0033 | 10.6% | $ 10,000,000 | 93% |
| Seed | | | $ 1,000,000 | 100,000,000 | $ 0.0100 | 3.3% | $ 30,000,000 | 80% |
| Strategic 1 | | | $ 110,000 | 6,600,000 | $ 0.0167 | 0.2% | $ 50,000,000 | 67% |
| Strategic 2 | | | $ 500,000 | 25,000,000 | $ 0.0200 | 0.8% | $ 60,000,000 | 60% |
| Public Sale | | | $ 37,329,000 | 746,580,000 | $ 0.0500 | 24.9% | $ 150,000,000 | 0% |
| **TOTAL RAISED** | | | **$ 40,000,000** | **1,196,480,000** | **$ 0.0500** | **39.9%** | **$ 100,294,196** | |

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| Max Amt Raised If No Private Round | | $ | 22,495,000 |
| Private Round Raise | | $ | 2,671,000 |
| Dollar Amt of Discount to Public Round | | $ | 19,824,000 |

| Name | Accredited? | Affiliation | Contribution | Tokens Issued | Price/Token | % Total Supply | Fully Diluted Valuation |
|---|---|---|---|---|---|---|---|
| **Pre-Seed (Friends and Family)** | | | | | | | |
| Mark L | Y | Team | $ 100,000 | 30,000,000 | $0.0033 | 1.00% | $ 10,000,000 |
| Don | Y | Team | $ 100,000 | 30,000,000 | $0.0033 | 1.00% | $ 10,000,000 |
| Calvin | Y | Team | $ 100,000 | 30,000,000 | $0.0033 | 1.00% | $ 10,000,000 |
| Colin | Y | Team | $ 50,000 | 15,000,000 | $0.0033 | 0.50% | $ 10,000,000 |
| Aaron Nonis | Y | Team | $ 50,000 | 15,000,000 | $0.0033 | 0.50% | $ 10,000,000 |
| Cort * | Y | Team | $ 10,000 | 3,000,000 | $0.0033 | 0.10% | $ 10,000,000 |
| Kevin Conroy * | Y | Team | $ 10,000 | 3,000,000 | $0.0033 | 0.10% | $ 10,000,000 |
| Jon Miller * | Y | Team | $ 25,000 | 7,500,000 | $0.0033 | 0.25% | $ 10,000,000 |
| David Vicini | Y | Team | $ 5,000 | 1,500,000 | $0.0033 | 0.05% | $ 10,000,000 |
| Andrew Grossman * | Y | Team | $ 5,000 | 1,500,000 | $0.0033 | 0.05% | $ 10,000,000 |
| Gianna | N | Team | $ 1,000 | 300,000 | $0.0033 | 0.01% | $ 10,000,000 |
| Cort's Investor * | Y | Cort's Investor | $ 50,000 | 15,000,000 | $0.0033 | 0.50% | $ 10,000,000 |
| John Gaudiosi | Y | Mark Long's Friend | $ 50,000 | 15,000,000 | $0.0033 | 0.50% | $ 10,000,000 |
| John Benyamine | Y | Mark Long's Friend | $ 50,000 | 15,000,000 | $0.0033 | 0.50% | $ 10,000,000 |
| Edmund Shern | Y | Mark Long's Friend | $ 50,000 | 15,000,000 | $0.0033 | 0.50% | $ 10,000,000 |
| Nick Simpson | Y | Mark Long's Friend | $ 5,000 | 1,500,000 | $0.0033 | 0.05% | $ 10,000,000 |
| Bill Anker | Y | Mark Long's Friend | $ 25,000 | 7,500,000 | $0.0033 | 0.25% | $ 10,000,000 |
| Joe Minton | Y | Mark Long's Friend | $ 50,000 | 15,000,000 | $0.0033 | 0.50% | $ 10,000,000 |
| Brad Bond | Y | Mark Long's Friend | $ 25,000 | 7,500,000 | $0.0033 | 0.25% | $ 10,000,000 |
| Matthew Paik | Y | 4D investment banker at Pinnacle Capital | $ 5,000 | 1,500,000 | $0.0033 | 0.05% | $ 10,000,000 |
| Leath Bing | Y | Calvin's Friend, who is bringing Rob Leshner to the table | $ 10,000 | 3,000,000 | $0.0033 | 0.10% | $ 10,000,000 |
| Irvin Hu | Y | Calvin's Friend, who is bringing Andy Do to the table | $ 10,000 | 3,000,000 | $0.0033 | 0.10% | $ 10,000,000 |
| Andy Do | Y | Calvin's Friend | $ 10,000 | 3,000,000 | $0.0033 | 0.10% | $ 10,000,000 |
| Think VC | Y | Calvin's crypto group inner circle | $ 50,000 | 15,000,000 | $0.0033 | 0.50% | $ 10,000,000 |
| Tom Mcgowan | Y | Calvin's Crypto Friend | $ 30,000 | 9,000,000 | $0.0033 | 0.30% | $ 10,000,000 |
| Mikhail | Y | Calvin's trader friend- ex-Soros. | $ 20,000 | 6,000,000 | $0.0033 | 0.20% | $ 10,000,000 |
| Matthias Reist | Y | Calvin's friend in Switzerland | $ 20,000 | 6,000,000 | $0.0033 | 0.20% | $ 10,000,000 |
| Justin Chow | Y | Calvin's Friend who is at DRW Cumberland | $ 10,000 | 3,000,000 | $0.0033 | 0.10% | $ 10,000,000 |
| Brad Bond | Y | Mark Long's Friend | $ 25,000 | 7,500,000 | $0.0033 | 0.25% | $ 10,000,000 |
| Joe Miton | Y | DDM President | $ 60,000 | 18,000,000 | $0.0033 | 0.60% | $ 10,000,000 |
| Joshua Davis | Y | Don's Friend | $ 50,000 | 15,000,000 | $0.0033 | 0.50% | $ 10,000,000 |
| | | **Total Friends and Family** | **$ 1,061,000** | **318,300,000** | **$0.0033** | **10.61%** | **$ 10,000,000** |
| | | | | | | | |
| | | **Seed (VCs)** | | | | | |
| | Y | a16z | $ 250,000 | 25,000,000 | 0.0100 | 0.8% | $ 30,000,000 |
| | Y | Pantera | $ 250,000 | 25,000,000 | 0.0100 | 0.8% | $ 30,000,000 |
| | Y | Blockchain Capital | $ 250,000 | 25,000,000 | 0.0100 | 0.8% | $ 30,000,000 |
| | Y | Galaxy | $ 250,000 | 25,000,000 | 0.0100 | 0.8% | $ 30,000,000 |
| | Y | Tim Draper | $ 250,000 | 25,000,000 | 0.0100 | 0.8% | $ 30,000,000 |
| | | **Total Seed** | **$ 1,250,000** | **125,000,000** | **$0.0100** | **4.17%** | **30,000,000** |
| | | | | | | | |
| | | **Strategic** | | | | | |
| James Zhang | Y | Advisor | $ 25,000 | 1,500,000 | $ 0.0167 | 0.1% | $ 50,000,000 |
| Matthew C. Le Merle | Y | Advisor | $ 10,000 | 600,000 | $ 0.0167 | 0.0% | $ 50,000,000 |
| Klark | Y | Advisor | $ 25,000 | 1,500,000 | $ 0.0167 | 0.1% | $ 50,000,000 |
| DDM | Y | Company | $ 50,000 | 3,000,000 | $ 0.0167 | 0.1% | $ 50,000,000 |
| | | **Total Strategic** | **$ 110,000** | **6,600,000** | **$0.0167** | **0.2%** | **$ 50,000,000** |

* Estimated. Not verified

# EXHIBIT B

**BYLAWS**

**OF**

**NEON MACHINE, INC.**
**(a Delaware corporation)**

**Adopted as of August 20, 2021**

US-DOCS\126055529.1

## TABLE OF CONTENTS

Page

ARTICLE I. IDENTIFICATION; OFFICES .............................................................. 1

SECTION 1.    NAME ............................................................................ 1
SECTION 2.    PRINCIPAL AND BUSINESS OFFICES ...................................... 1
SECTION 3.    REGISTERED AGENT AND OFFICE ......................................... 1
SECTION 4.    CORPORATE RECORDS ...................................................... 1

ARTICLE II. STOCKHOLDERS ........................................................................ 1

SECTION 1.    ANNUAL MEETING ........................................................... 1
SECTION 2.    SPECIAL MEETING ........................................................... 1
SECTION 3.    PLACE OF STOCKHOLDER MEETINGS ................................... 1
SECTION 4.    NOTICE OF MEETINGS ..................................................... 2
SECTION 5.    QUORUM ...................................................................... 2
SECTION 6.    ADJOURNED MEETINGS ................................................... 2
SECTION 7.    FIXING OF RECORD DATE ................................................. 3
SECTION 8.    VOTING LIST ................................................................. 3
SECTION 9.    VOTING ........................................................................ 4
SECTION 10.   PROXIES ...................................................................... 4
SECTION 11.   RATIFICATION OF ACTS OF DIRECTORS AND OFFICERS ............. 4
SECTION 12.   CONDUCT OF MEETINGS .................................................. 5
SECTION 13.   ACTION WITHOUT MEETING .............................................. 5

ARTICLE III. DIRECTORS ............................................................................. 6

SECTION 1.    GENERAL POWERS .......................................................... 6
SECTION 2.    NUMBER AND TENURE OF DIRECTORS ................................. 6
SECTION 3.    ELECTION OF DIRECTORS ................................................. 6
SECTION 4.    CHAIRMAN OF THE BOARD; VICE CHAIRMAN OF THE BOARD ..... 6
SECTION 5.    QUORUM ...................................................................... 7
SECTION 6.    VOTING ........................................................................ 7
SECTION 7.    VACANCIES ................................................................... 7
SECTION 8.    REMOVAL OF DIRECTORS ................................................. 7
SECTION 9.    RESIGNATION ................................................................ 7
SECTION 10.   REGULAR MEETINGS ....................................................... 7
SECTION 11.   SPECIAL MEETINGS ........................................................ 8
SECTION 12.   NOTICE OF SPECIAL MEETINGS OF THE BOARD OF DIRECTORS ... 8
SECTION 13.   WRITTEN ACTION BY DIRECTORS ....................................... 8
SECTION 14.   PARTICIPATION BY CONFERENCE TELEPHONE ........................ 8
SECTION 15.   COMMITTEES ................................................................ 8
SECTION 16.   COMPENSATION OF DIRECTORS ......................................... 9

ARTICLE IV. OFFICERS ............................................................................... 9

SECTION 1.    GENERAL PROVISIONS ..................................................... 9
SECTION 2.    ELECTION AND TERM OF OFFICE ........................................ 9
SECTION 3.    RESIGNATION AND REMOVAL OF OFFICERS ........................... 10

i

SECTION 4.     VACANCIES ................................................................................ 10
SECTION 5.     THE CHIEF EXECUTIVE OFFICER.......................................... 10
SECTION 6.     THE PRESIDENT........................................................................ 10
SECTION 7.     THE VICE PRESIDENT ............................................................. 11
SECTION 8.     THE SECRETARY ...................................................................... 11
SECTION 9.     THE ASSISTANT SECRETARY ................................................ 11
SECTION 10.    THE TREASURER ...................................................................... 11
SECTION 11.    THE ASSISTANT TREASURER ................................................ 12
SECTION 12.    OTHER OFFICERS, ASSISTANT OFFICERS AND AGENTS ................ 12
SECTION 13.    ABSENCE OF OFFICERS .......................................................... 12
SECTION 14.    COMPENSATION....................................................................... 12

ARTICLE V. CAPITAL STOCK.................................................................................... 12

SECTION 1.     ISSUANCE OF STOCK .............................................................. 12
SECTION 2.     CERTIFICATES OF SHARES; UNCERTIFICATED SHARES ................ 13
SECTION 3.     SIGNATURES OF FORMER OFFICER, TRANSFER AGENT OR
                        REGISTRAR........................................................................... 13
SECTION 4.     TRANSFER OF SHARES ............................................................ 13
SECTION 5.     LOST, DESTROYED OR STOLEN CERTIFICATES................. 14
SECTION 6.     REGULATIONS .......................................................................... 14

ARTICLE VI. RESTRICTIONS ON TRANSFER AND RIGHT OF FIRST REFUSAL. ......... 14

SECTION 1.     TRANSFERS ............................................................................... 14
SECTION 2.     CONSENT TO TRANSFER......................................................... 15
SECTION 3.     RIGHT OF FIRST REFUSAL ..................................................... 15
SECTION 4.     EXCEPTIONS.............................................................................. 16
SECTION 5.     TERMINATION ........................................................................... 17
SECTION 6.     VOID TRANSFERS ..................................................................... 17
SECTION 7.     LEGENDS.................................................................................... 17

ARTICLE VII. INDEMNIFICATION ........................................................................... 18

SECTION 1.     RIGHT TO INDEMNIFICATION OF DIRECTORS AND OFFICERS..... 18
SECTION 2.     PREPAYMENT OF EXPENSES OF DIRECTORS AND OFFICERS....... 18
SECTION 3.     CLAIMS BY DIRECTORS AND OFFICERS............................. 18
SECTION 4.     INDEMNIFICATION OF EMPLOYEES AND AGENTS ........... 18
SECTION 5.     ADVANCEMENT OF EXPENSES OF EMPLOYEES AND AGENTS .... 19
SECTION 6.     NON-EXCLUSIVITY OF RIGHTS .............................................. 19
SECTION 7.     OTHER INDEMNIFICATION..................................................... 19
SECTION 8.     INSURANCE ............................................................................... 19
SECTION 9.     AMENDMENT OR REPEAL ...................................................... 19

ARTICLE VIII. DIVIDENDS ....................................................................................... 19

SECTION 1.     DECLARATIONS OF DIVIDENDS ........................................... 19
SECTION 2.     SPECIAL PURPOSES RESERVES ............................................. 20

ARTICLE IX. NOTICE BY ELECTRONIC TRANSMISSION.................................... 20

SECTION 1.     NOTICE BY ELECTRONIC TRANSMISSION ......................... 20

ii

SECTION 2.    DEFINITION OF ELECTRONIC TRANSMISSION .................................. 21
SECTION 3.    INAPPLICABILITY ......................................................................... 21

ARTICLE X. GENERAL PROVISIONS ...................................................................... 21

SECTION 1.    FISCAL YEAR .............................................................................. 21
SECTION 2.    SEAL ........................................................................................... 21
SECTION 3.    WRITTEN WAIVER OF NOTICE ................................................... 21
SECTION 4.    ATTENDANCE AS WAIVER OF NOTICE ...................................... 21
SECTION 5.    WAIVER OF SECTION 1501. ......................................................... 22
SECTION 6.    CONTRACTS ................................................................................ 22
SECTION 7.    LOANS ........................................................................................ 22
SECTION 8.    CHECKS, DRAFTS, ETC. .............................................................. 22
SECTION 9.    DEPOSITS ................................................................................... 22
SECTION 10.   ANNUAL STATEMENT ................................................................ 22
SECTION 11.   VOTING OF SECURITIES ............................................................ 22
SECTION 12.   EVIDENCE OF AUTHORITY ........................................................ 22
SECTION 13.   CERTIFICATE OF INCORPORATION ........................................... 22
SECTION 14.   SEVERABILITY ........................................................................... 22
SECTION 15.   PRONOUNS ................................................................................ 23

ARTICLE XI. AMENDMENTS ................................................................................ 23

SECTION 1.    BY THE BOARD OF DIRECTORS ................................................ 23
SECTION 2.    BY THE STOCKHOLDERS ........................................................... 23

US-DOCS\126055529.1

## ARTICLE I.
## IDENTIFICATION; OFFICES

SECTION 1.  NAME. The name of the corporation is NEON MACHINE, INC. (the "Corporation").

SECTION 2.  PRINCIPAL AND BUSINESS OFFICES. The Corporation may have such principal and other business offices, either within or outside of the state of Delaware, as the Board of Directors may designate or as the Corporation's business may require from time to time.

SECTION 3.  REGISTERED AGENT AND OFFICE. The Corporation's registered agent may be changed from time to time by or under the authority of the Board of Directors. The address of the Corporation's registered agent may change from time to time by or under the authority of the Board of Directors, or the registered agent. The business office of the Corporation's registered agent shall be identical to the registered office. The Corporation's registered office may be but need not be identical with the Corporation's principal office in the state of Delaware. The Corporation's initial registered office shall be in the City of Wilmington, County of New Castle, State of Delaware.

SECTION 4.  CORPORATE RECORDS. Any records and documents required by law to be kept by the Corporation permanently or administered by the Corporation in the regular course of business may be kept on, or by means of, or be in the form of, any information storage device, method, or one more electronic networks or databases, provided that the records so kept can be converted into clearly legible paper form within a reasonable time and, with respect to the stock ledger, the records so kept comply with Section 224 of the Delaware General Corporation Law. The Corporation shall so convert any records so kept upon the request of any person entitled to inspect such records pursuant to applicable law.

## ARTICLE II.
## STOCKHOLDERS

SECTION 1.  ANNUAL MEETING. An annual meeting of the stockholders shall be held on such date as may be designated by the Board of Directors, the Chairman of the Board, the Chief Executive Officer or the President. At each annual meeting, the stockholders shall elect directors to hold office for the term provided in Section 2 of Article III of these Bylaws and transact such other business as may properly be brought before the meeting.

SECTION 2.  SPECIAL MEETING. A special meeting of the stockholders for any purpose or purposes may be called at any time only by the President, the Board of Directors, the Chairman of the Board, the Chief Executive Officer or any other person designated by the Board of Directors. The Board of Directors may postpone or reschedule any previously scheduled special meeting of stockholders. Business transacted at any special meeting of stockholders shall be limited to matters relating to the purpose or purposes stated in the notice of meeting.

SECTION 3.  PLACE OF STOCKHOLDER MEETINGS. The Board of Directors, the Chairman of the Board, the Chief Executive Officer or the President may designate any place, either within or without the State of Delaware, as the place of meeting for any annual meeting or

for any special meeting. If no such place is designated by the Board of Directors, the place of meeting will be the principal business office of the Corporation or the Board of Directors may, in its sole discretion, determine that the meeting shall not be held at any place, but will instead be held solely by means of remote communication as provided under Section 211 of the Delaware General Corporation Law.

SECTION 4.   NOTICE OF MEETINGS. Except as otherwise provided by law or waived as herein provided, whenever stockholders are required or permitted to take any action at a meeting, whether annual or special, notice of the meeting shall be given stating the place, if any, date and hour of the meeting, the means of remote communications, if any, by which stockholders may be deemed to be present in person and vote at such meeting and, in the case of a special meeting, the purpose or purposes for which the meeting is called. Such notice shall be given unless otherwise required by law not less than 10 days nor more than 60 days before the date of the meeting to each stockholder entitled to vote at the meeting.

When a meeting is adjourned to reconvene at the same or another place, if any, or by means of remote communications, if any, in accordance with Section 6 of Article II of these Bylaws, notice need not be given of the adjourned meeting if the time and place thereof are announced at the meeting at which the adjournment is taken.

SECTION 5.   QUORUM. Unless otherwise provided by law, the Corporation's Certificate of Incorporation or these Bylaws, the holders of a majority in voting power of the shares of the capital stock of the Corporation issued and outstanding and entitled to vote at the meeting, present in person, present by means of remote communication in a manner, if any, authorized by the Board of Directors in its sole discretion, or represented by proxy, shall constitute a quorum for the transaction of business; provided, however, that where a separate vote by a class or classes or series of capital stock is required by law or the Certificate of Incorporation, the holders of a majority in voting power of the shares of such class or classes or series of the capital stock of the Corporation issued and outstanding and entitled to vote on such matter, present in person, present by means of remote communication in a manner, if any, authorized by the Board of Directors in its sole discretion, or represented by proxy, shall constitute a quorum entitled to take action with respect to the vote on such matter. If a quorum is present in person or represented by proxy at such meeting, such stockholders may continue to transact business until adjournment, notwithstanding the withdrawal of such number of stockholders as may leave less than a quorum.

SECTION 6.   ADJOURNED MEETINGS. Any meeting of stockholders may be adjourned from time to time to any other time and to any other place (or by means of remote communications, if any) at which a meeting of stockholders may be held under these Bylaws by the chairman of the meeting or by a majority of the stockholders present or represented at the meeting and entitled to vote, although less than a quorum. It shall not be necessary to notify any stockholder of any adjournment of less than 30 days if the time and place, if any, of the adjourned meeting, and the means of remote communication, if any, by which stockholders and proxyholders may be deemed to be present in person and vote at such adjourned meeting, are announced at the meeting at which adjournment is taken, unless after the adjournment a new record date is fixed for the adjourned meeting. At the adjourned meeting, the Corporation may transact any business which might have been transacted at the original meeting.

2

SECTION 7.   FIXING OF RECORD DATE.

(a)      The Board of Directors may fix in advance a date as a record date for the determination of the stockholders entitled to notice of or to vote at any meeting of stockholders or any adjournment thereof. Such record date shall not precede the date upon which the resolution fixing the record date is adopted by the Board of Directors, and which record date shall not be more than 60 days nor less than 10 days before the date of such meeting. If no record date is fixed by the Board of Directors, the record date for determining stockholders entitled to notice of or to vote at a meeting of stockholders shall be at the close of business on the day next preceding the day on which notice is given, or, if notice is waived, at the close of business on the day next preceding the day on which the meeting is held. A determination of stockholders of record entitled to notice of or to vote at a meeting of stockholders shall apply to any adjournment of the meeting; provided, however, that the Board of Directors may fix a new record date for the adjourned meeting.

(b)      For the purpose of determining stockholders entitled to consent to corporate action in writing without a meeting, the Board of Directors may fix a record date, which record date shall not precede the date upon which the resolution fixing the record date is established by the Board of Directors, and which date shall not be more than 10 days after the date on which the resolution fixing the record date is adopted by the Board of Directors. If no record date has been fixed by the Board of Directors, the record date for determining stockholders entitled to consent to corporate action in writing without a meeting, when no prior action by the Board of Directors is required by law, shall be the first date on which a signed written consent setting forth the action taken or proposed to be taken is delivered to the Corporation by delivery to its registered office in the State of Delaware, its principal office, or an officer or agent of the Corporation having custody of the book in which the proceedings of meetings of stockholders are recorded. Delivery to the Corporation's registered office shall be by hand or by certified or registered mail, return receipt requested. If no record date has been fixed by the Board of Directors and prior action by the Board of Directors is required by law, the record date for determining stockholders' consent to corporate action in writing without a meeting shall be the close of business on the day on which the Board of Directors adopts the resolution taking such prior action.

(c)      For the purpose of determining the stockholders entitled to receive payment of any dividend or other distribution or allotment of any rights or the stockholders entitled to exercise any rights in respect to any change, conversion or exchange of stock, or for the purpose of any other lawful action, the Board of Directors may fix the record date, which record date shall not precede the date upon which the resolution fixing the record date is adopted, and which record date shall be not more than 60 days prior to such action. If no record date is fixed, the record date for determining the stockholders for any such purpose shall be the close of business on the day on which the Board of Directors adopts the resolution relating thereto.

SECTION 8.   VOTING LIST. The officer who has charge of the stock ledger of the Corporation shall prepare and make, at least 10 days before every meeting of stockholders, a complete list of stockholders entitled to vote at the meeting, arranged in alphabetical order, and showing the address of each stockholder and the number of shares registered in the name of each stockholder. Such list shall be open to the examination of any stockholder, for any purpose

3

germane to the meeting, for a period of at least 10 days prior to the meeting, (i) by a reasonably accessible electronic network, provided that the information required to gain access to such list is provided with the notice of the meeting, or (ii) during ordinary business hours, at the principal place of business of the Corporation. In the event that the Corporation determines to make the list available on an electronic network, the Corporation may take reasonable steps to ensure that such information is available only to the stockholders of the Corporation. If the meeting is to be held at a place, then the list shall be produced and kept at the time and place of the meeting during the whole time thereof and may be inspected by any stockholder who is present. If the meeting is to be held solely by means of remote communication, then the list shall also be open to the examination of any stockholder during the whole time of the meeting on a reasonably accessible electronic network, and the information required to access such list shall be provided with the notice of the meeting. Except as otherwise provided by law, such list shall be the only evidence as to the identity of stockholders entitled to examine the list of stockholders required by this Section 8 or to vote in person or by proxy at any meeting of the stockholders. The Corporation shall not be required to include electronic mail addresses or other electronic contact information on such list.

SECTION 9.  VOTING. Unless otherwise provided by the Certificate of Incorporation, each stockholder shall be entitled to one vote for each share of capital stock held by each stockholder. When a quorum is present at any meeting, in all matters other than the election of directors, the affirmative vote of the majority of shares present in person or represented by proxy at the meeting and entitled to vote on the subject matter shall be the act of the stockholders, except when a different vote is required by law, the Certificate of Incorporation or these Bylaws. When a quorum is present at any meeting, directors shall be elected by plurality of the votes of the shares present in person or represented by a proxy at the meeting entitled to vote on the election of directors.

SECTION 10. PROXIES. Each stockholder entitled to vote at a meeting of stockholders or to express consent or dissent to corporate action in writing without a meeting (including by means of remote communications, if any, by which stockholders may be deemed to be present in person and vote at such meeting) may authorize another person or persons to act for him or her by proxy (executed or transmitted in a manner permitted by the Delaware General Corporation Law), but no such proxy shall be voted or acted upon after three years from its date, unless the proxy provides for a longer period. A duly executed proxy shall be irrevocable if it states that it is irrevocable and if, and only as long as, it is coupled with an interest sufficient in law to support an irrevocable power. A proxy may remain irrevocable regardless of whether the interest with which it is coupled is an interest in the stock itself or an interest in the Corporation generally.

SECTION 11. RATIFICATION OF ACTS OF DIRECTORS AND OFFICERS. Except as otherwise provided by law or by the Certificate of Incorporation of the Corporation, any transaction or contract or act of the Corporation or of the directors or the officers of the Corporation may be ratified by the affirmative vote of the holders of the number of shares which would have been necessary to approve such transaction, contract or act at a meeting of stockholders, or by the written consent of stockholders in lieu of a meeting.

US-DOCS\126055529.1

SECTION 12. CONDUCT OF MEETINGS.

(a)    <u>Chairman of Meeting</u>. Meetings of stockholders shall be presided over by the Chairman of the Board, if any, or in the Chairman's absence by the Vice Chairman of the Board, if any, or in the Vice Chairman's absence by the Chief Executive Officer, or in the Chief Executive Officer's absence, by the President, or in the President's absence by a Vice President, or in the absence of all of the foregoing persons by a chairman designated by the Board of Directors, or in the absence of such designation by a chairman chosen by vote of the stockholders at the meeting. The Secretary shall act as secretary of the meeting, but in the Secretary's absence the chairman of the meeting may appoint any person to act as secretary of the meeting.

(b)    <u>Rules, Regulations and Procedures</u>. The Board of Directors may adopt by resolution such rules, regulations and procedures for the conduct of any meeting of stockholders of the Corporation as it shall deem appropriate including, without limitation, such guidelines and procedures as it may deem appropriate regarding the participation by means of remote communication of stockholders and proxyholders not physically present at a meeting. Except to the extent inconsistent with such rules, regulations and procedures as adopted by the Board of Directors, the chairman of any meeting of stockholders shall have the right and authority to prescribe such rules, regulations and procedures and to do all such acts as, in the judgment of such chairman, are appropriate for the proper conduct of the meeting. Such rules, regulations or procedures, whether adopted by the Board of Directors or prescribed by the chairman of the meeting, may include, without limitation, the following: (i) the establishment of an agenda or order of business for the meeting; (ii) rules and procedures for maintaining order at the meeting and the safety of those present; (iii) limitations on attendance at or participation in the meeting to stockholders of record of the Corporation, their duly authorized and constituted proxies or such other persons as shall be determined; (iv) restrictions on entry to the meeting after the time fixed for the commencement thereof; and (v) limitations on the time allotted to questions or comments by participants. Unless and to the extent determined by the Board of Directors or the chairman of the meeting, meetings of stockholders shall not be required to be held in accordance with the rules of parliamentary procedure.

SECTION 13. ACTION WITHOUT MEETING.

(a)    Any action required or permitted to be taken at any annual or special meeting of stockholders of the Corporation, may be taken without a meeting, without prior notice and without a vote, if a consent or consents in writing, setting forth the action so taken, shall be delivered to the Corporation signed by the holders of outstanding stock having not less than the minimum number of votes that would be necessary to authorize or take such action at a meeting at which all shares entitled to vote thereon were present and voted.

(b)    Prompt notice of the taking of the corporate action without a meeting by less than unanimous consent shall be given to those stockholders who have not consented in writing and who, if the action had been taken at a meeting, would have been entitled to notice of the meeting if the record date for such meeting had been the date that written consents signed by a sufficient number of holders to take the action were delivered to the Corporation.

5

(c)    An electronic transmission consenting to an action to be taken and transmitted by a stockholder or proxy holder, or by a person or persons authorized to act for a stockholder or proxy holder, shall be deemed to be written, signed and dated for the purposes of this section, provided that any such electronic transmission sets forth or is delivered with information from which the Corporation can determine (i) that the electronic transmission was transmitted by the stockholder or proxy holder or by a person or persons authorized to act for the stockholder or proxy holder and (ii) the date on which such stockholder or proxy holder or authorized person or persons transmitted such electronic transmission. A consent given by electronic transmission is delivered to the Corporation upon the earliest of: (i) when the consent enters an information processing system, if any, designated by the Corporation for receiving consents, so long as the electronic transmission is in a form capable of being processed by that system and the Corporation is able to retrieve that electronic transmission; (ii) when a paper reproduction of the consent is delivered to the Corporation's principal place of business or an officer or agent of the Corporation having custody of the book in which proceedings of meetings of stockholders or members are recorded; (iii) when a paper reproduction of the consent is delivered to the Corporation's registered office in this State by hand or by certified or registered mail, return receipt requested; or (iv) when delivered in such other manner, if any, provided by resolution of the Board of Directors or governing body of the Corporation. Any copy, facsimile or other reliable reproduction of a consent in writing may be substituted or used in lieu of the original writing for any and all purposes for which the original writing could be used, provided that such copy, facsimile or other reproduction shall be a complete reproduction of the entire original writing.

## ARTICLE III.
## DIRECTORS

SECTION 1.   GENERAL POWERS. The business and affairs of the Corporation shall be managed by or under the direction of a Board of Directors, who may exercise all of the powers of the Corporation except as otherwise provided by law or the Certificate of Incorporation.

SECTION 2.   NUMBER AND TENURE OF DIRECTORS. Subject to the rights of holders of any class or series of capital stock of the Corporation to elect directors, the number of directors of the Corporation shall be determined from time to time by the stockholders or the Board of Directors in a resolution adopted by the Board of Directors. Each director shall hold office until the next annual meeting of stockholders and until such director's successor is elected and qualified or until such director's earlier death, resignation or removal.

SECTION 3.   ELECTION OF DIRECTORS. Except as otherwise provided in these Bylaws, directors shall be elected at the annual meeting of stockholders by such stockholders as have the right to vote on such election. Directors need not be residents of the State of Delaware. Directors need not be stockholders of the Corporation. Elections of directors need not be by written ballot.

SECTION 4.   CHAIRMAN OF THE BOARD; VICE CHAIRMAN OF THE BOARD. The Board of Directors may appoint from its members a Chairman of the Board and a Vice Chairman of the Board, neither of whom need be an employee or officer of the Corporation. If

US-DOCS\126055529.1

the Board of Directors appoints a Chairman of the Board, such Chairman shall perform such duties and possess such powers as are assigned by the Board of Directors. If the Board of Directors appoints a Vice Chairman of the Board, such Vice Chairman shall perform such duties and possess such powers as are assigned by the Board of Directors. Unless otherwise provided by the Board of Directors, the Chairman of the Board or, in the Chairman's absence, the Vice Chairman of the Board, if any, shall preside at all meetings of the Board of Directors.

SECTION 5.   QUORUM. The greater of (a) a majority of the directors at any time in office and (b) one-third of the number of directors fixed pursuant to Section 2 of Article III of these Bylaws shall constitute a quorum of the Board of Directors. If less than a quorum are present at a meeting of the Board of Directors, a majority of the directors present may adjourn the meeting from time to time without further notice other than announcement at the meeting, until such quorum shall be present.

SECTION 6.   VOTING. The vote of the majority of the directors present at a meeting at which a quorum is present shall be the act of the Board of Directors, unless the Delaware General Corporation Law or the Certificate of Incorporation requires a vote of a greater number.

SECTION 7.   VACANCIES. Subject to the rights of holders of any series of Preferred Stock to elect directors, unless and until filled by the stockholders, any vacancy or newly-created directorship on the Board of Directors, however occurring, may be filled by vote of a majority of the directors then in office, although less than a quorum, or by a sole remaining director. A director elected to fill a vacancy shall be elected for the unexpired term of such director's predecessor in office, and a director chosen to fill a position resulting from a newly-created directorship shall hold office until the next annual meeting of stockholders and until a successor is elected and qualified, or until such director's earlier death, resignation or removal.

SECTION 8.   REMOVAL OF DIRECTORS. Except as otherwise provided by the General Corporation Law of the State of Delaware, a director, or the entire Board of Directors, may be removed, with or without cause, by the holders of a majority of the shares then entitled to vote at an election of directors, except that the directors elected by the holders of a particular class or series of stock may be removed without cause only by vote of the holders of a majority of the outstanding shares of such class or series.

SECTION 9.   RESIGNATION. Any director may resign by delivering a resignation in writing or by electronic transmission to the Corporation at its principal office or to the Chairman of the Board, the Chief Executive Officer, the President or the Secretary. Such resignation shall be effective upon delivery unless it is specified to be effective at some later time or upon the happening of some later event.

SECTION 10. REGULAR MEETINGS. Regular meetings of the Board of Directors may be held without notice at such time, place and manner as shall be determined from time to time by the Board of Directors; provided that any director who is absent when such a determination is made shall be given notice of the determination. A regular meeting of the Board of Directors may be held without notice immediately after and at the same place as the annual meeting of stockholders.

US-DOCS\126055529.1

SECTION 11. SPECIAL MEETINGS. Special meetings of the Board of Directors may be called by or at the request of the Chairman of the Board, the Chief Executive Officer, the President, two or more directors or by one director in the event that there is only a single director in office. The person or persons authorized to call special meetings of the Board of Directors may fix any time, date or place, either within or without the State of Delaware, for holding any special meeting of the Board of Directors called by them.

SECTION 12. NOTICE OF SPECIAL MEETINGS OF THE BOARD OF DIRECTORS. Notice of the date, place, if any, and time of any special meeting of the Board of Directors shall be given to each director by the Secretary or by the officer or one of the directors calling the meeting. Notice shall be duly given to each director (a) in person, by telephone, fax or by electronic transmission at least 24 hours in advance of the meeting, (b) by sending written notice by reputable overnight courier or delivering written notice by hand, to such director's last known business, home or facsimile address at least 48 hours in advance of the meeting, or (c) by sending written notice by first-class mail to such director's last known business or home address at least 72 hours in advance of the meeting. A notice or waiver of notice of a meeting of the Board of Directors need not specify the purposes of the meeting.

SECTION 13. WRITTEN ACTION BY DIRECTORS. Unless otherwise restricted by the Certificate of Incorporation or these Bylaws, any action required or permitted to be taken at any meeting of the Board of Directors, or of any committee thereof, may be taken without a meeting if all members of the Board of Directors or committee, as the case may be, consent thereto in writing, or by electronic transmission. Without limiting the manner by which consent may be given, members of the Board of Directors may consent by delivery of an electronic transmission when such transmission is directed to a facsimile number or electronic mail address at which the Corporation has consented to receive such electronic transmissions, and copies of the electronic transmissions are filed with the minutes of proceedings of the Board of Directors or committee. After an action is taken, the consent or consents relating thereto shall be filed with the minutes of the proceedings of the Board of Directors, or the committee thereof, in the same paper or electronic form as the minutes are maintained.

SECTION 14. PARTICIPATION BY CONFERENCE TELEPHONE. Members of the Board of Directors, or any committee designated by such board, may participate in a meeting of the Board of Directors, or committee thereof, by means of conference telephone or similar communications equipment as long as all persons participating in the meeting can speak with and hear each other, and participation by a director pursuant to this section shall constitute presence in person at such meeting.

SECTION 15. COMMITTEES. The Board of Directors may designate one or more committees, each committee to consist of one or more of the directors of the Corporation with such lawfully delegable powers and duties as the Board of Directors thereby confers, to serve at the pleasure of the Board of Directors. The Board may designate one or more directors as alternate members of any committee, who may replace any absent or disqualified member at any meeting of the committee. In the absence or disqualification of a member at any meeting of a committee, the member or members thereof present at any meeting and not disqualified from voting, whether or not such member or members constitute a quorum, may unanimously appoint another member of the Board of Directors to act at the meeting in the place of any such absent or

8

disqualified member. Any such committee, to the extent provided in the resolution of the Board of Directors, shall have and may exercise all the powers and authority of the Board of Directors in the management of the business and affairs of the Corporation, and may authorize the seal of the Corporation to be affixed to all papers which may require it, but no such committee shall have the power or authority in reference to the following matters: (i) approving or adopting, or recommending to the stockholders, any action or matter (other than the election or removal of directors) expressly required by law to be submitted to stockholders for approval or (ii) adopting, amending or repealing any bylaw of the Corporation. Each such committee shall keep minutes and make such reports as the Board of Directors may from time to time request. Except as the Board of Directors may otherwise determine, any committee may make rules for the conduct of its business, but unless otherwise provided by the directors or in such rules, its business shall be conducted as nearly as possible in the same manner as is provided in these Bylaws for the Board of Directors. Except as otherwise provided in the Certificate of Incorporation, these Bylaws, or the resolution of the Board of Directors designating the committee, a committee may create one or more subcommittees, each subcommittee to consist of one or more members of the committee, and delegate to a subcommittee any or all of the powers and authority of the committee.

SECTION 16. COMPENSATION OF DIRECTORS. Unless otherwise restricted by the Certificate of Incorporation or these Bylaws, the Board of Directors shall have the authority to fix the compensation of directors. The directors may be paid their expenses, if any, of attendance at each meeting of the Board of Directors and may be paid a fixed sum for attendance at each meeting of the Board of Directors or a stated salary as director. No such payment shall preclude any director from serving the Corporation in any other capacity and receiving compensation therefore. Members of special or standing committees may be allowed like compensation for attending committee meetings.

## ARTICLE IV.
## OFFICERS

SECTION 1.  GENERAL PROVISIONS. The officers of the Corporation shall consist of a Chief Executive Officer, a President, a Secretary, a Treasurer and such other officers with such other titles as the Board of Directors shall determine, including one or more Vice Presidents, Assistant Treasurers and Assistant Secretaries. The Board of Directors may appoint such other officers as it may deem appropriate. No officer need be a stockholder. Any two or more offices may be held by the same person. The officers elected by the Board of Directors shall have such duties as are hereafter described and such additional duties as the Board of Directors may from time to time prescribe.

SECTION 2.  ELECTION AND TERM OF OFFICE. The Chief Executive Officer, President, Treasurer and Secretary shall be elected annually by the Board of Directors at the regular meeting of the Board of Directors held after each annual meeting of the stockholders. If the election of officers is not held at such meeting, such election shall be held as soon thereafter as may be convenient. Other officers may be appointed at any time, at a meeting or by the written consent of the Board of Directors. Except as otherwise provided by law, by the Certificate of Incorporation or by these Bylaws, each officer shall hold office until his or her successor has been duly elected and qualified, unless a different term is specified in the

resolution electing or appointing such officer, or until his or her earlier death, resignation or removal. Election or appointment of an officer or agent shall not of itself create contract rights.

SECTION 3.   RESIGNATION AND REMOVAL OF OFFICERS. Any officer may resign by delivering a written resignation to the Corporation at its principal office or to the Chief Executive Officer, the President or the Secretary. Such resignation shall be effective upon receipt unless it is specified to be effective at some later time or upon the happening of some later event. Any officer may be removed at any time, with or without cause, by vote of a majority of the directors then in office. Except as the Board of Directors may otherwise determine, no officer who resigns or is removed shall have any right to any compensation as an officer for any period following such officer's resignation or removal, or any right to damages on account of such removal, whether such officer's compensation be by the month or by the year or otherwise, unless such compensation is expressly provided for in a duly authorized written agreement with the Corporation.

SECTION 4.   VACANCIES. The Board of Directors may fill any vacancy occurring in any office for any reason and may, in its discretion, leave unfilled for such period as it may determine any offices other than those of Chief Executive Officer, President, Treasurer and Secretary. Each such successor shall hold office for the unexpired term of such officer's predecessor and until a successor is elected and qualified, or until such officer's earlier death, resignation or removal.

SECTION 5.   THE CHIEF EXECUTIVE OFFICER. Unless the Board of Directors has designated another person as the Corporation's Chief Executive Officer, the President shall be the Chief Executive Officer of the Corporation. The Chief Executive Officer shall have general charge and supervision of the business and affairs of the Corporation subject to the direction of the Board of Directors, and shall perform all duties and have all powers that are commonly incident to the office of chief executive or that are delegated to such officer by the Board of Directors. The Chief Executive Officer shall preside at all meetings of the Board of Directors and shall see that orders and resolutions of the Board of Directors are carried into effect. The Chief Executive Officer may sign bonds, mortgages, certificates for shares and all other contracts and documents whether or not under the seal of the Corporation except in cases where the signing and execution thereof shall be expressly delegated by law, by the Board of Directors or by these Bylaws to some other officer or agent of the Corporation. The Chief Executive Officer shall have general powers of supervision and shall be the final arbiter of all differences between officers of the Corporation and his or her decision as to any matter affecting the Corporation shall be final and binding as between the officers of the Corporation subject only to the Board of Directors.

SECTION 6.   THE PRESIDENT. In the absence of the Chief Executive Officer or in the event of his or her inability or refusal to act, the President shall perform the duties of the Chief Executive Officer, and when so acting, shall have all the powers of and be subject to all the restrictions upon the Chief Executive Officer. At all other times the President shall have the active management of the business of the Corporation under the general supervision of the Chief Executive Officer or the Board of Directors. The President shall have concurrent power with the Chief Executive Officer to sign bonds, mortgages, certificates for shares and other contracts and documents, whether or not under the seal of the Corporation except in cases where the signing and execution thereof shall be expressly delegated by law, by the Board of Directors, or by these

10

Bylaws to some other officer or agent of the Corporation. In general, the President shall perform all duties incident to the office of president and such other duties as the Chief Executive Officer (if the President is not the Chief Executive Officer) or the Board of Directors may from time to time prescribe.

SECTION 7.   THE VICE PRESIDENT. In the absence of the President or in the event of his or her inability or refusal to act, the Vice President (or in the event there be more than one Vice President, the Executive Vice President and then the other Vice President or Vice Presidents in the order designated, or in the absence of any designation, then in the order of their election) shall perform the duties of the President, and when so acting, shall have all the powers of and be subject to all the restrictions upon the President. The Vice Presidents shall perform such other duties and have such other powers as the Chief Executive Officer or the Board of Directors may from time to time prescribe.

SECTION 8.   THE SECRETARY. The Secretary shall perform such duties and shall have such powers as the Board of Directors or the Chief Executive Officer may from time to time prescribe. The Secretary shall perform such duties and have such powers as are incident to the office of the secretary, including without limitation the duty and power to attend all meetings of the Board of Directors and all meetings of the stockholders and record all the proceedings in a book to be kept for that purpose and shall perform like duties for the standing committees when required and to maintain a stock ledger and prepare lists of stockholders and their addresses as required. The Secretary shall give, or cause to be given, notice of all meetings of the stockholders and special meetings of the Board of Directors, and shall perform such other duties as may be prescribed by the Board of Directors or the Chief Executive Officer, under whose supervision he or she shall be. The Secretary shall have custody of the corporate records and the corporate seal of the Corporation and the Secretary, or an Assistant Secretary, shall have authority to affix the same to any instrument requiring it and when so affixed, it may be attested by his or her signature or by the signature of such Assistant Secretary. The Board of Directors may give general authority to any other officer to affix the seal of the Corporation and to attest the affixing by his or her signature.

SECTION 9.   THE ASSISTANT SECRETARY. The Assistant Secretary, or if there be more than one, the Assistant Secretaries in the order determined by the Board of Directors (or if there be no such determination, then in the order of their election), shall, in the absence of the Secretary or in the event of his or her inability or refusal to act, perform the duties and exercise the powers of the Secretary and shall perform such other duties and have such other powers as the Chief Executive Officer, the Board of Directors or the Secretary may from time to time prescribe. In the absence of the Secretary or any Assistant Secretary at any meeting of stockholders or directors, the chairman of the meeting shall designate a temporary secretary to keep a record of the meeting.

SECTION 10. THE TREASURER. The Treasurer shall perform such duties and shall have such powers as may from time to time be assigned by the Board of Directors or the Chief Executive Officer. In addition, the Treasurer shall perform such duties and have such powers as are incident to the office of treasurer, including without limitation, the duty and power to have the custody of the corporate funds and securities and to keep full and accurate accounts of receipts and disbursements in books belonging to the Corporation and deposit all moneys and

US-DOCS\126055529.1

other valuable effects in the name and to the credit of the Corporation in such depositories as may be designated by the Board of Directors. The Treasurer shall disburse the funds of the Corporation as may be ordered by the Board of Directors, taking proper vouchers for such disbursements, and shall render to the President and the Board of Directors, as required by the Board of Directors, an account of all his or her transactions as Treasurer and of the financial condition of the Corporation. If required by the Board of Directors, the Treasurer shall give the Corporation a bond (which shall be renewed every six years) in such sum and with such surety or sureties as shall be satisfactory to the Board of Directors for the faithful performance of the duties of his or her office and for the restoration to the Corporation, in case of his or her death, resignation, retirement or removal from office, of all books, papers, vouchers, money and other property of whatever kind in his or her possession or under his or her control belonging to the Corporation.

SECTION 11. THE ASSISTANT TREASURER. The Assistant Treasurer, or if there shall be more than one, the Assistant Treasurers in the order determined by the Board of Directors (or if there be no such determination, then in the order of their election), shall, in the absence of the Treasurer or in the event of his or her inability or refusal to act, perform the duties and exercise the powers of the Treasurer and shall perform such other duties and have such other powers as the Chief Executive Officer, the Board of Directors or the Treasurer may from time to time prescribe.

SECTION 12. OTHER OFFICERS, ASSISTANT OFFICERS AND AGENTS. Officers, Assistant Officers and Agents, if any, other than those whose duties are provided for in these Bylaws, shall have such authority and perform such duties as may from time to time be prescribed by resolution of the Board of Directors.

SECTION 13. ABSENCE OF OFFICERS, DELEGATION OF AUTHORITY. In the absence of any officer of the Corporation, or for any other reason the Board of Directors may deem sufficient, the Board of Directors may from time to time delegate the powers or duties, or any of such powers or duties, of any officers or officer to any other officer or to any director.

SECTION 14. COMPENSATION. The Board of Directors shall have the authority to establish reasonable salaries, compensation or reimbursement of all officers for services to the Corporation.

## ARTICLE V.
## CAPITAL STOCK

SECTION 1.  ISSUANCE OF STOCK. Subject to the provisions of the Certificate of Incorporation, the whole or any part of any unissued balance of the authorized capital stock of the Corporation or the whole or any part of any shares of the authorized capital stock of the Corporation held in the Corporation's treasury may be issued, sold, transferred or otherwise disposed of by vote of the Board of Directors in such manner, for such lawful consideration and on such terms as the Board of Directors may determine.

US-DOCS\126055529.1

SECTION 2.   CERTIFICATES OF SHARES; UNCERTIFICATED SHARES.

(a)     The shares of the Corporation shall be represented by certificates, provided that the Board of Directors of the Corporation may provide by resolution or resolutions that some or all of any or all classes or series of its stock shall be uncertificated shares. Any such resolution shall not apply to shares represented by a certificate until such certificate is surrendered to the Corporation. Every holder of stock represented by certificates shall be entitled to have a certificate, in such form as may be prescribed by law and by the Board of Directors, signed in a manner that complies with Section 158 of the Delaware General Corporation Law, representing the number of shares held by such holder registered in certificate form. Any or all the signatures on the certificate may be a facsimile or pdf.

(b)     Each certificate for shares of stock which are subject to any restriction on transfer pursuant to the Certificate of Incorporation, these Bylaws, applicable securities laws or any agreement among any number of stockholders or among such holders and the Corporation shall have conspicuously noted on the face or back of the certificate either the full text of the restriction or a statement of the existence of such restriction.

(c)     If the Corporation shall be authorized to issue more than one class of stock or more than one series of any class, the powers, designations, preferences and relative, participating, optional or other special rights of each class of stock or series thereof and the qualifications, limitations or restrictions of such preferences and/or rights shall be set forth in full or summarized on the face or back of each certificate representing shares of such class or series of stock, provided that in lieu of the foregoing requirements there may be set forth on the face or back of each certificate representing shares of such class or series of stock a statement that the Corporation will furnish without charge to each stockholder who so requests a copy of the full text of the powers, designations, preferences and relative, participating, optional or other special rights of each class of stock or series thereof and the qualifications, limitations or restrictions of such preferences and/or rights.

(d)     Within a reasonable time after the issuance or transfer of uncertificated shares, the Corporation shall send to the registered owner thereof a written notice containing the information required to be set forth or stated on certificates pursuant to Sections 151, 156, 202(a) or 218(a) of the General Corporation Law of the State of Delaware or, with respect to Section 151 of the General Corporation Law of the State of Delaware, a statement that the Corporation will furnish without charge to each stockholder who so requests the powers, designations, preferences and relative participating, optional or other special rights of each class of stock or series thereof and the qualifications, limitations or restrictions of such preferences and/or rights.

SECTION 3.  SIGNATURES OF FORMER OFFICER, TRANSFER AGENT OR REGISTRAR. In case any officer, transfer agent, or registrar who has signed or whose facsimile signature has been placed upon a certificate shall have ceased to be such officer, transfer agent or registrar before such certificate is issued, it may be issued by the Corporation with the same effect as if such person or entity were such officer, transfer agent or registrar at the date of issue.

SECTION 4.   TRANSFER OF SHARES. Transfers of shares of the Corporation shall be made only on the books of the Corporation, or by transfer agents designated to transfer shares of

13

the Corporation. Subject to applicable law, shares of stock represented by certificates shall be transferred only on the books of the Corporation by the surrender to the Corporation or its transfer agent of the certificate representing such shares properly endorsed or accompanied by a written assignment or power of attorney properly executed, and with such proof of authority or the authenticity of signature as the Corporation or its transfer agent may reasonably require. Except as may be otherwise required by law, by the Certificate of Incorporation or by these Bylaws, the Corporation shall be entitled to treat the record holder of stock as shown on its books as the owner of such stock for all purposes, including the payment of dividends and the right to vote with respect to such stock, regardless of any transfer, pledge or other disposition of such stock until the shares have been transferred on the books of the Corporation in accordance with the requirements of these Bylaws.

SECTION 5. LOST, DESTROYED OR STOLEN CERTIFICATES. Whenever a certificate representing shares of the Corporation has been lost, destroyed or stolen, the holder thereof may file in the office of the Corporation an affidavit setting forth, to the best of his or her knowledge and belief, the time, place, and circumstance of such loss, destruction or theft together with a statement of indemnity and posting of such bond sufficient in the opinion of the Board of Directors to indemnify the Corporation against any claim that may be made against it on account of the alleged loss of any such certificate. Thereupon the Board may cause to be issued to such person or such person's legal representative a new certificate or a duplicate of the certificate alleged to have been lost, destroyed or stolen. In the exercise of its discretion, the Board of Directors may waive the indemnification and bond requirements provided herein.

SECTION 6. REGULATIONS. The issue, transfer, conversion and registration of shares of stock of the Corporation shall be governed by such other regulations as the Board of Directors may establish.

## ARTICLE VI.
## RESTRICTIONS ON TRANSFER AND RIGHT OF FIRST REFUSAL.

SECTION 1. TRANSFERS. If a holder of any shares of stock of the Corporation (a "Holder") proposes to, directly or indirectly, sell, assign, transfer, pledge, hypothecate or otherwise dispose of, by operation of law or otherwise (collectively "Transfer") any such shares, or any right or interest therein (including, without limitation, the entering into of any swap or other arrangement that Transfers to another, in whole or in part, any of the economic consequences of ownership of the common stock of the Corporation, whether any such transaction described above is to be settled by delivery of common stock of the Corporation or other securities, in cash or otherwise), pursuant to a bona fide offer acceptable to such Holder, then Holder shall first give written notice of the proposed Transfer (the "Transfer Notice") to the Corporation. The Transfer Notice shall state the name of the proposed transferee, the number of shares Holder proposes to Transfer (the "Offered Shares"), whether the Offered Shares are vested or unvested shares, the price per share and all other material terms and conditions of the Transfer, including any available exemption set forth in Section 4 below from the restrictions set forth in Sections 2 and 3 below and shall include a confirmation from the Holder that the proposed transferee is an accredited investor as defined in Rule 501(a) of Regulation D promulgated under the Securities Act of 1933, as amended (the "Securities Act").

14

SECTION 2.   CONSENT TO TRANSFER. Following receipt of the Transfer Notice, the prior written consent of the Corporation (upon duly authorized action of its Board of Directors) shall be required (and such consent may be withheld) if such Transfer (a) would be to an individual, company or any other form of entity identified by the Corporation as a competitor or potential competitor; (b) increases the risk of the Corporation having a class of equity security (other than an exempted security) held of record by either (i) 2,000 or more persons, provided, however, that such restriction shall only apply after the Corporation has a class of equity security (other than an exempted security) held of record by more than 1,000 persons or (ii) 500 or more persons who are not accredited investors, as described in Section 12(g) of the Securities and Exchange Act of 1934 (the "1934 Act"), and Rule 12g5-1 promulgated thereunder, or otherwise requiring the Corporation to register any class of securities under the 1934 Act; (c) would result in the loss of any federal or state securities law exemption relied upon by the Corporation in connection with the initial issuance of such shares or the issuance of any other securities; (d) is facilitated in any manner by any public posting, message board, trading portal, internet site or similar method of communication, including without limitation any trading portal or internet site intended to facilitate secondary Transfers of securities; (e) is to be effected in a brokered transaction; (f) represents a Transfer of less than all of the shares then held by the stockholder and its affiliates or is to be made to more than a single transferee or (g) is determined by the Corporation's Board of Directors to require such consent for any legitimate corporate purpose. The provisions of subsections (f) and (g) of this Section 2 shall not apply to any Transfer of Preferred Stock of the Corporation or the shares of Common Stock issued upon conversion thereof. The Corporation shall notify Holder within 30 days of receipt of the Transfer Notice indicating whether the proposed Transfer requires such consent and if so, whether such consent has been provided (a "Transfer Approval") or withheld (a "Transfer Denial" and together with "Transfer Approval", the "Transfer Determination"). For purposes of clarity, (i) if the Corporation determines no consent is required for the proposed Transfer, then this determination shall constitute a Transfer Approval and (ii) a Holder shall not be entitled to Transfer any shares if such proposed Transfer results in a Transfer Denial. Any Transfer made following a Transfer Determination that results in a Transfer Approval shall be effected pursuant to a transfer agreement in a form reasonably acceptable to the Corporation (which form shall include, without limitation, a release in favor of the Corporation and representations from the Holder and transferee that the Corporation is not a party to the transaction and has made no representations to the transferee).

SECTION 3.   RIGHT OF FIRST REFUSAL.

(a)    Subject to the exceptions set forth in Section 3(e) below, for 30 days following a Transfer Determination that results in a Transfer Approval, the Corporation or its assigns shall have the option to purchase all or part of the Offered Shares at the price and upon the terms set forth in the Transfer Notice (the "Right of First Refusal"). In the event the Corporation or its assigns, as applicable, elects to purchase all or part of the Offered Shares, it shall give written notice of such election to the Holder within such 30 day period. Within 10 days after Holder's receipt of such notice, Holder shall tender to the Corporation at its principal offices the certificate or certificates representing the Offered Shares to be purchased by the Corporation, duly endorsed in blank by Holder or with duly endorsed stock powers attached thereto, all in a form suitable for Transfer of the Offered Shares to the Corporation. Promptly following receipt of such certificate or certificates, the Corporation or its assigns, as applicable,

US-DOCS\126055529.1

shall deliver or mail to Holder a check in payment of the purchase price for such Offered Shares; provided that if the terms of payment set forth in the Transfer Notice were other than cash against delivery, the Corporation or its assigns, as applicable, may pay for the Offered Shares on the same terms and conditions as were set forth in the Transfer Notice.

(b)    If the Corporation or its assigns, as applicable, does not elect to acquire any of the Offered Shares, Holder may, within the 30-day period following the expiration of the option granted to the Corporation under Section 3(a) above, Transfer the Offered Shares that the Corporation has not elected to acquire to the proposed transferee, provided that such Transfer shall not be on terms and conditions more favorable to the transferee than those contained in the Transfer Notice, such Transfer shall be only to a prospective transferee that is an accredited investor as defined in Rule 501(a) of Regulation D promulgated under the Securities Act and such Transfer shall comply with the Securities Act. Notwithstanding any of the above, all Offered Shares transferred pursuant to this Section 3 shall remain subject to these Bylaws and any equity grant agreement such Offered Shares were subject to and such transferee shall, as a condition to such Transfer, deliver to the Corporation a written instrument confirming that such transferee shall be bound by all of the terms and conditions of these Bylaws and any applicable equity grant agreement.

(c)    After the time at which the Offered Shares are required to be delivered to the Corporation for Transfer to the Corporation pursuant to subsection 3(a) above, the Corporation shall not pay any dividend to Holder on account of such Offered Shares or permit Holder to exercise any of the privileges or rights of a stockholder with respect to such Offered Shares, but shall, insofar as permitted by law, treat the Corporation as the owner of such Offered Shares.

(d)    The Corporation may assign its Right of First Refusal in any particular transaction under this Section 3 to one or more persons or entities.

(e)    The provisions of this Section 3 shall not apply to any Transfer of Preferred Stock of the Corporation or the shares of Common Stock issued upon conversion thereof.

(f)    To the extent the Corporation has entered into any written agreement with the stockholder attempting to Transfer shares that grants the Corporation a right of first refusal with respect thereto ("Separate ROFR Terms"), then such Separate ROFR Terms shall supersede this Section 3 of Article VI and shall control such stockholder's proposed Transfer of shares following a Transfer Determination that results in a Transfer Approval.

SECTION 4.    EXCEPTIONS.

(a)    The provisions of this Article VI may be waived with respect to any Transfer upon duly authorized action of its Board of Directors.

(b)    The following transactions shall be exempt from the restrictions set forth in Article VI, Section 3:

16

(A)    any Transfer to or for the benefit of (i) any spouse, children, parents, uncles, aunts, siblings or grandchildren of the Holder or any other relatives of the Holder that have been approved by the Board of Directors (collectively, "Approved Relatives"), (ii) a trust established solely for the benefit of the Holder and/or Approved Relatives or (iii) where the Holder is a trust, (x) a trust established solely for the benefit of one or more beneficiaries of the Holder trust and/or Approved Relatives of any such beneficiaries or (y) one or more beneficiaries of the Holder trust and/or Approved Relatives of any such beneficiaries;

(B)    any Transfer made as part of the sale of all or substantially all of the shares of capital stock of the Corporation (including pursuant to a merger or consolidation);

(C)    any Transfer pursuant to an effective registration statement filed by the Corporation under the Securities Act;

(D)    a stockholder's bona fide pledge or mortgage of any Common Stock with a commercial lending institution;

(E)    a corporate stockholder's Transfer of any or all of its shares pursuant to and in accordance with the terms of any merger, consolidation, reclassification of common stock or capital reorganization of the corporate stockholder, or pursuant to a sale of all or substantially all of the stock or assets of a corporate stockholder;

(F)    a corporate stockholder's Transfer of any or all of its shares to any or all of its stockholders; and

(G)    a Transfer of any or all of the shares held by a stockholder which is a limited or general partnership to any or all of its partners.

(c)    In the case of a Transfer pursuant to Sections 4(b)(A) and (D)-(G) above, such shares shall remain subject to these Bylaws and any existing equity grant agreement and such transferee shall, as a condition to such Transfer, deliver to the Corporation a written instrument confirming that such transferee shall be bound by all of the terms and conditions of these Bylaws and any applicable equity grant agreement and there shall be no further Transfer of such shares except in accordance with these Bylaws.

SECTION 5.    TERMINATION. The provisions of Article VI shall terminate upon the closing of the sale of shares of common stock in an underwritten public offering pursuant to an effective registration statement filed by the Corporation under the Securities Act.

SECTION 6.    VOID TRANSFERS. The Corporation shall not be required (a) to Transfer on its books any shares which shall have been sold or otherwise transferred in violation of any of the provisions of this Article VI or (b) to treat as owner of such shares or to accord the right to vote or pay dividends to any purchaser or other transferee to whom any such shares shall have been so sold or transferred.

SECTION 7.    LEGENDS. The books and records of the Corporation and any certificates representing shares of stock of the Corporation shall contain or bear the following legend so long as the foregoing Transfer restrictions are in effect:

17

THE SHARES REPRESENTED BY THIS CERTIFICATE ARE SUBJECT TO (i) TRANSFER RESTRICTIONS AND (ii) A RIGHT OF FIRST REFUSAL OPTION IN FAVOR OF THE CORPORATION AND/OR ITS ASSIGNEE(S), EACH AS PROVIDED IN THE BYLAWS OF THE CORPORATION.

## ARTICLE VII.
## INDEMNIFICATION

SECTION 1.  RIGHT TO INDEMNIFICATION OF DIRECTORS AND OFFICERS. The Corporation shall indemnify and hold harmless, to the fullest extent permitted by applicable law as it presently exists or may hereafter be amended, any person (an "Indemnified Person") who was or is made or is threatened to be made a party or is otherwise involved in any action, suit or proceeding, whether civil, criminal, administrative or investigative (a "Proceeding"), by reason of the fact that such person, or a person for whom such person is the legal representative, is or was a director or officer of the Corporation or, while a director or officer of the Corporation, is or was serving at the request of the Corporation as a director, officer, employee or agent of another corporation or of a partnership, joint venture, limited liability company, trust, enterprise or nonprofit entity, including service with respect to employee benefit plans, against all liability and loss suffered and expenses (including attorneys' fees) reasonably incurred by such Indemnified Person in such Proceeding. Notwithstanding the preceding sentence, except as otherwise provided in Section 3 of this Article VII, the Corporation shall be required to indemnify an Indemnified Person in connection with a Proceeding (or part thereof) commenced by such Indemnified Person only if the commencement of such Proceeding (or part thereof) by the Indemnified Person was authorized in advance by the Board of Directors.

SECTION 2.  PREPAYMENT OF EXPENSES OF DIRECTORS AND OFFICERS. The Corporation shall pay the expenses (including attorneys' fees) incurred by an Indemnified Person in defending any Proceeding in advance of its final disposition, provided, however, that, to the extent required by law, such payment of expenses in advance of the final disposition of the Proceeding shall be made only upon receipt of an undertaking by the Indemnified Person to repay all amounts advanced if it should be ultimately determined that the Indemnified Person is not entitled to be indemnified under this Article VII or otherwise.

SECTION 3.  CLAIMS BY DIRECTORS AND OFFICERS. If a claim for indemnification or advancement of expenses under this Article VII is not paid in full within 30 days after a written claim therefor by the Indemnified Person has been received by the Corporation, the Indemnified Person may file suit to recover the unpaid amount of such claim and, if successful in whole or in part, shall be entitled to be paid the expense of prosecuting such claim. In any such action the Corporation shall have the burden of proving that the Indemnified Person is not entitled to the requested indemnification or advancement of expenses under applicable law.

SECTION 4.  INDEMNIFICATION OF EMPLOYEES AND AGENTS.  The Corporation may indemnify and advance expenses to any person who was or is made or is threatened to be made or is otherwise involved in any Proceeding by reason of the fact that such person, or a person for whom such person is the legal representative, is or was an employee or agent of the Corporation or, while an employee or agent of the Corporation, is or was serving at

18

the request of the Corporation as a director, officer, employee or agent of another corporation or of a partnership, joint venture, limited liability company, trust, enterprise or nonprofit entity, including service with respect to employee benefit plans, against all liability and loss suffered and expenses (including attorneys' fees) reasonably incurred by such person in connection with such Proceeding. The ultimate determination of entitlement to indemnification of persons who are non-director or officer employees or agents shall be made in such manner as is determined by the Board of Directors in its sole discretion. Notwithstanding the foregoing sentence, the Corporation shall not be required to indemnify a person in connection with a Proceeding initiated by such person if the Proceeding was not authorized in advance by the Board of Directors.

SECTION 5.  ADVANCEMENT OF EXPENSES OF EMPLOYEES AND AGENTS. The Corporation may pay the expenses (including attorneys' fees) incurred by an employee or agent in defending any Proceeding in advance of its final disposition on such terms and conditions as may be determined by the Board of Directors.

SECTION 6.  NON-EXCLUSIVITY OF RIGHTS. The rights conferred on any person by this Article VII shall not be exclusive of any other rights which such person may have or hereafter acquire under any statute, provision of the Certificate of Incorporation, these bylaws, agreement, vote of stockholders or disinterested directors or otherwise.

SECTION 7.  OTHER INDEMNIFICATION. The Corporation's obligation, if any, to indemnify any person who was or is serving at its request as a director, officer or employee of another corporation, partnership, limited liability company, joint venture, trust, organization or other enterprise shall be reduced by any amount such person may collect as indemnification from such other corporation, partnership, limited liability company, joint venture, trust, organization or other enterprise.

SECTION 8.  INSURANCE. The Board of Directors may, to the full extent permitted by applicable law as it presently exists, or may hereafter be amended from time to time, authorize an appropriate officer or officers to purchase and maintain at the Corporation's expense insurance: (a) to indemnify the Corporation for any obligation which it incurs as a result of the indemnification of directors, officers and employees under the provisions of this Article VII; and (b) to indemnify or insure directors, officers and employees against liability in instances in which they may not otherwise be indemnified by the Corporation under the provisions of this Article VII.

SECTION 9.  AMENDMENT OR REPEAL. Any repeal or modification of the foregoing provisions of this Article VII shall not adversely affect any right or protection hereunder of any person in respect of any act or omission occurring prior to the time of such repeal or modification. The rights provided hereunder shall inure to the benefit of any Indemnified Person and such person's heirs, executors and administrators.

## ARTICLE VIII.
## DIVIDENDS

SECTION 1.  DECLARATIONS OF DIVIDENDS. Dividends upon the capital stock of the Corporation, subject to the provisions of the Certificate of Incorporation, if any, may be

declared by the Board of Directors at any regular or special meeting, pursuant to law. Dividends may be paid in cash, in property, or in shares of the capital stock, subject to the provisions of the Certificate of Incorporation.

SECTION 2.   SPECIAL PURPOSES RESERVES. The Board of Directors may set apart out of any of the funds of the Corporation available for dividends a reserve or reserves for any proper purpose and may abolish any such reserve.

## ARTICLE IX.
## NOTICE BY ELECTRONIC TRANSMISSION

SECTION 1.   NOTICE BY ELECTRONIC TRANSMISSION. Without limiting the manner by which notice otherwise may be given effectively to stockholders, any notice to stockholders given by the Corporation under the Delaware General Corporation Law, the Certificate of Incorporation, or these Bylaws may be given in writing directed to the stockholder's mailing address (or by electronic transmission directed to the stockholder's electronic mail address, as applicable) as it appears on the records of the Corporation and shall be given (1) if mailed, when the notice is deposited in the U.S. mail, postage prepaid, (2) if delivered by courier service, the earlier of when the notice is received or left at such stockholder's address or (3) if given by electronic mail, when directed to such stockholder's electronic mail address unless the stockholder has notified the Corporation in writing or by electronic transmission of an objection to receiving notice by electronic mail or such notice is prohibited by Section 3 of this Article. A notice by electronic mail must include a prominent legend that the communication is an important notice regarding the Corporation.

Without limiting the manner by which notice otherwise may be given effectively to stockholders, but subject to Section 3 of this Article, any notice to stockholders given by the Corporation under any provision of the Delaware General Corporation Law, the Certificate of Incorporation or these Bylaws shall be effective if given by a form of electronic transmission consented to by the stockholder to whom the notice is given. Any such consent shall be revocable by the stockholder by written notice or electronic transmission to the Corporation.

Any notice given pursuant to the preceding paragraph shall be deemed given:

(a)      if by facsimile telecommunication, when directed to a number at which the stockholder has consented to receive notice;

(b)      if by a posting on an electronic network together with separate notice to the stockholder of such specific posting, upon the later of (A) such posting and (B) the giving of such separate notice; and

(c)      if by any other form of electronic transmission, when directed to the stockholder.

Notwithstanding the foregoing, a notice may not be given by an electronic transmission from and after the time that (1) the Corporation is unable to deliver by such electronic transmission 2 consecutive notices given by the Corporation and (2) such inability becomes known to the secretary or an assistant secretary of the Corporation or to the transfer agent, or other person

20

responsible for the giving of notice, provided, however, the inadvertent failure to discover such inability shall not invalidate any meeting or other action.

An affidavit of the secretary or an assistant secretary or of the transfer agent or other agent of the Corporation that the notice has been given shall, in the absence of fraud, be *prima facie* evidence of the facts stated therein.

SECTION 2.  DEFINITION OF ELECTRONIC TRANSMISSION; ELECTRONIC MAIL; ELECTRONIC MAIL ADDRESS. An "electronic transmission" means any form of communication, not directly involving the physical transmission of paper, that creates a record that may be retained, retrieved, and reviewed by a recipient thereof, and that may be directly reproduced in paper form by such a recipient through an automated process. An "electronic mail" means an electronic transmission directed to a unique electronic mail address (which electronic mail shall be deemed to include any files attached thereto and any information hyperlinked to a website if such electronic mail includes the contact information of an officer or agent of the Corporation who is available to assist with accessing such files and information). An "electronic mail address" means a destination, commonly expressed as a string of characters, consisting of a unique user name or mailbox (commonly referred to as the "local part" of the address) and a reference to an internet domain (commonly referred to as the "domain part" of the address), whether or not displayed, to which electronic mail can be sent or delivered.

SECTION 3.  INAPPLICABILITY. Notice by a form of electronic transmission shall not apply to Sections 164, 296, 311, 312 or 324 of the Delaware General Corporation Law.

## ARTICLE X.
## GENERAL PROVISIONS

SECTION 1.  FISCAL YEAR. The fiscal year of the Corporation shall be fixed by resolution of the Board of Directors.

SECTION 2.  SEAL. The corporate seal shall have inscribed thereon the name of the Corporation, the year of its organization and the words "Corporate Seal, Delaware" or such other form as shall be approved by the Board of Directors. Said seal may be used by causing it or a facsimile thereof to be impressed or affixed or reproduced or otherwise.

SECTION 3.  WRITTEN WAIVER OF NOTICE. A written waiver of any notice required to be given by law, the Certificate of Incorporation or by these Bylaws, signed by or electronically transmitted by the person entitled to notice, whether before, at or after the time of the event for which notice is to be given, shall be deemed equivalent to notice required to be given to such person. Neither the business to be transacted at, nor the purpose of, any regular or special meeting of stockholders, directors or members of a committee of directors need be specified in any written waiver of notice.

SECTION 4.  ATTENDANCE AS WAIVER OF NOTICE. Attendance of a person at a meeting shall constitute a waiver of notice of such meeting, except when the person attends a meeting for the express purpose of objecting at the beginning of the meeting, and objects, to the transaction of any business because the meeting is not lawfully called or convened.

US-DOCS\126055529.1

SECTION 5.   WAIVER OF SECTION 1501.

To the fullest extent provided by the law, the Corporation shall not be required to cause annual reports to be delivered to its stockholders under Section 1501 of the California General Corporation Law.

SECTION 6.   CONTRACTS. The Board of Directors may authorize any officer or officers, agent or agents, to enter into any contract or execute and deliver any instrument in the name of and on behalf of the Corporation, and such authority may be general or confined to specific instances.

SECTION 7.   LOANS. No loans shall be contracted on behalf of the Corporation and no evidences of indebtedness shall be issued in its name unless authorized by a resolution of the Board of Directors. Such authority may be general or confined to specific instances.

SECTION 8.   CHECKS, DRAFTS, ETC. All checks, drafts or other orders for the payment of money, notes or other evidences of indebtedness issued in the name of the Corporation shall be signed by one or more officers or agents of the Corporation and in such manner as shall from time to time be determined by resolution of the Board of Directors.

SECTION 9.   DEPOSITS. The funds of the Corporation may be deposited or invested in such bank account, in such investments or with such other depositaries as determined by the Board of Directors.

SECTION 10. ANNUAL STATEMENT. The Board of Directors shall present at each annual meeting, and at any special meeting of the stockholders when called for by vote of the stockholders, a full and clear statement of the business and condition of the Corporation.

SECTION 11. VOTING OF SECURITIES. Except as the Board of Directors may otherwise designate, the Chief Executive Officer, the President or the Treasurer may waive notice of, vote, or appoint any person or persons to vote, on behalf of the Corporation at, and act as, or appoint any person or persons to act as, proxy or attorney-in-fact for this Corporation (with or without power of substitution) at, any meeting of stockholders or securityholders of any other entity, the securities of which may be held by this Corporation.

SECTION 12. EVIDENCE OF AUTHORITY. A certificate by the Secretary, or an Assistant Secretary, or a temporary Secretary, as to any action taken by the stockholders, directors, a committee or any officer or representative of the Corporation shall as to all persons who rely on the certificate in good faith be conclusive evidence of such action.

SECTION 13. CERTIFICATE OF INCORPORATION. All references in these Bylaws to the Certificate of Incorporation shall be deemed to refer to the Certificate of Incorporation of the Corporation, as amended and in effect from time to time.

SECTION 14. SEVERABILITY. Any determination that any provision of these Bylaws is for any reason inapplicable, illegal or ineffective shall not affect or invalidate any other provision of these Bylaws.

US-DOCS\126055529.1

SECTION 15. PRONOUNS. All pronouns used in these Bylaws shall be deemed to refer to the masculine, feminine or neuter, singular or plural, as the identity of the person or persons may require.

## ARTICLE XI.
## AMENDMENTS

SECTION 1.  BY THE BOARD OF DIRECTORS. These Bylaws may be altered, amended or repealed, in whole or in part, or new Bylaws may be adopted by the Board of Directors, when such power is conferred upon the Board of Directors by the Certificate of Incorporation.

SECTION 2.  BY THE STOCKHOLDERS. These Bylaws may be altered, amended or repealed, in whole or in part, or new Bylaws may be adopted, by the affirmative vote of the holders of a majority of the shares of the capital stock of the Corporation issued and outstanding and entitled to vote at any annual meeting of stockholders, or at any special meeting of stockholders, provided notice of such alteration, amendment, repeal or adoption of new Bylaws shall have been stated in the notice of such special meeting. If the power to adopt, amend or repeal Bylaws is conferred upon the Board of Directors by the Certificate of Incorporation it shall not divest or limit the power of the stockholders to adopt, amend or repeal Bylaws.

US-DOCS\126055529.1

# EXHIBIT C

## ACTION BY WRITTEN CONSENT IN LIEU OF THE ORGANIZATIONAL MEETING BY THE SOLE DIRECTOR OF

## NEON MACHINE, INC.

August 20, 2021

The undersigned, being the sole member of the Board of Directors (the "Board") of NEON MACHINE, INC., a Delaware corporation (the "Corporation"), and acting in accordance with Section 141(f) of the General Corporation Law of the State of Delaware, consent to the adoption of the following resolutions:

Action by Sole Incorporator

**RESOLVED**, that the original Certificate of Incorporation of the Corporation, filed in the office of the Delaware Secretary of State on August 3, 2021, is hereby ratified and shall be inserted in the minute book of the Corporation (the "Minute Book").

**RESOLVED FURTHER**, that all actions taken by the sole incorporator of the Corporation as set forth in the Action by Sole Incorporator, attached hereto as Exhibit A, be, and they hereby are, approved, ratified and confirmed.

**RESOLVED FURTHER**, that the bylaws of the Corporation (the "Bylaws"), in the form attached to the Action by Sole Incorporator, be, and they hereby are, ratified and approved, and shall be inserted in the Minute Book.

Election of Officers

**RESOLVED,** that the following person be, and such person hereby is, elected to serve in the office of the Corporation set forth opposite such person's name, to hold such office until his or her successor is elected and qualified or until his or her earlier resignation or removal:

Mark Long                           President, Chief Executive Officer, Chief Financial Officer, Treasurer, Secretary

Selection of Annual Accounting Period

**RESOLVED**, that the fiscal year of the Corporation shall end on December 31 of each calendar year.

Designation of Depository

**RESOLVED**, that the President, Chief Executive Officer, Chief Financial Officer and Treasurer of the Corporation be, and each hereby is, authorized:

(a)     to designate such bank or banks as depositories (the "Depository" or "Depositories") for the funds of the Corporation as he may deem necessary or advisable;

(b)     to open, maintain and close general and special bank accounts and safe deposit boxes with any Depository;

(c)     to cause to be deposited in accounts with any Depository from time to time such funds of the Corporation as he may deem necessary or advisable;

(d)     to designate, change or revoke the designation, from time to time, of the officers or agents of the Corporation authorized to sign or countersign checks, drafts or other orders for the payment of money issued in the name of the Corporation against any such account;

(e)     to authorize the use of facsimile signatures for the signing or countersigning of checks, drafts or other orders for the payment of money, and to enter into such agreements as the Depositories customarily require as a condition for permitting the use of facsimile signatures; and

(f)     to make such general and special rules and regulations with respect to such accounts as he may deem necessary or advisable and to complete, execute and certify any customary printed blank signature card forms in order to exercise conveniently the authority granted by this resolution (and any resolutions printed on such cards are deemed adopted as a part of this resolution).

**RESOLVED FURTHER**, that, if any Depository requires a prescribed form of preamble, preambles, resolution or resolutions relating to such accounts or to any application, statement, instrument or other documents connected therewith, each such preamble or resolution shall be deemed to be adopted by the Board, and the Secretary of the Corporation is authorized to certify the adoption of any such preamble or resolution as though it were presented to the Board at the time of adopting this resolution, and to insert all such preambles and resolutions in the Minute Book immediately following this resolution.

Employer Tax Identification Number

**RESOLVED**, that the officers of the Corporation be, and each of them acting singly hereby is, authorized and empowered to apply to the Internal Revenue Service for a federal employer identification number on Form SS-4.

Payment of Organizational Expenses

**RESOLVED**, that any officer of the Corporation is hereby authorized to pay all fees and expenses incident and necessary to the organization of the Corporation and to reimburse the persons who have made any disbursements therefor.

Adoption of Stock Certificate

**RESOLVED**, that the form of electronic stock certificate generated by the Corporation's electronic capitalization management system or any other form of stock certificate approved by the President, Chief Executive Officer, Treasurer, Chief Financial Officer or Secretary of the Corporation (each an "Authorized Officer" and collectively, the "Authorized Officers") be, and it hereby is, adopted and prescribed as the form of stock certificate for the common stock, $0.0001 par value, of the Corporation ("Common Stock").

Sale and Issuance of Common Stock

**WHEREAS**, the Board has determined that it is in the best interest of the Corporation to sell and issue shares of Common Stock to the following individual (the "Founder") in the aggregate amount and for the cash purchase price, as set forth below:

| Name of Founder | State of Residency | Number of Shares | Vesting Schedule | Cash Amount |
|---|---|---|---|---|
| Mark Long | Washington | 543,405 | Four-year vesting with a one-year "cliff" | $54.34 |
| Don Norbury | Washington | 543,405 | Four-year vesting with a one-year "cliff" | $54.34 |
| Colin Foran | Washington | 543,405 | Four-year vesting with a one-year "cliff" | $54.34 |
| Aaron Nonis | Washington | 543,405 | Four-year vesting with a one-year "cliff" | $54.34 |
| Mark Yeend | Washington | 543,405 | Four-year vesting with a one-year "cliff" | $54.34 |
| Naomi Lackaff | Washington | 543,405 | Four-year vesting with a one-year "cliff" | $54.34 |
| Calvin Zhou | Tennessee | 543,405 | Four-year vesting with a one-year "cliff" | $54.34 |
| Andy Chung-An Chang | Washington | 110,484 | 100% vested up front | $11.05 |

| Name of Founder | State of Residency | Number of Shares | Vesting Schedule | Cash Amount |
|---|---|---|---|---|
| James Zhang | California | 85,681 | 100% vested up front | $8.57 |
| The 4D Factory LLC | California | 6,000,000 | 100% vested up front | $600.00 |

**NOW, THEREFORE, BE IT RESOLVED**, that the Authorized Officers be, and each hereby is, authorized, empowered and directed to sell and issue to the Founder the number of shares of Common Stock set forth opposite the Founder's name above for the aggregate consideration set forth opposite the Founder's name above.

**RESOLVED FURTHER**, that the Authorized Officers be, and each of them hereby is, authorized and directed, for and on behalf of the Corporation, to execute and deliver a Restricted Stock Purchase Agreement, the form of which is attached hereto as Exhibit B (the "Restricted Stock Purchase Agreement"), with the Founder and to sell an aggregate of 10,000,000 shares of Common Stock at the purchase prices set forth above.

**RESOLVED FURTHER**, that the shares of Common Stock authorized to be sold and issued by the Corporation shall be offered and sold in accordance with the exemption from qualification provided for in Section 4(a)(2) of the Securities Act of 1933, as amended.

**RESOLVED FURTHER**, that upon the issuance and sale in accordance with the foregoing resolutions, such shares of Common Stock shall be duly and validly issued, fully-paid and nonassessable shares of the Corporation.

**RESOLVED FURTHER**, that the offer and sale of said shares will not be accompanied by the publication of any advertisement, that no selling expenses will be given, paid or incurred in connection therewith, and that no promotional consideration will be given, paid or incurred in connection therewith.

**RESOLVED FURTHER**, that upon receipt of consideration from the Founder for the Founder's shares, the Authorized Officers of the Corporation are authorized, empowered and directed to issue a stock certificate (by electronic means or otherwise) to the Founder representing the Founder's shares.

Form of Employee Proprietary Information and Inventions Assignment Agreement

**RESOLVED**, that the form of Employee Proprietary Information and Inventions Assignment Agreement, substantially in the form attached hereto as Exhibit C (the "PIIAA"), be, and hereby is, adopted, ratified and approved for use by the Corporation and, unless otherwise approved by the Board, all of the Corporation's employees shall execute the PIIAA.

Qualifications

>**RESOLVED**, that the Authorized Officers are each authorized to execute and deliver such documents, and to take such actions, as the Authorized Officer so acting deems necessary or appropriate to qualify the Corporation to do business as a foreign corporation in any jurisdiction deemed necessary or advisable; to appoint all necessary agents or attorneys for service of process and to substitute new agents or attorneys for such purpose; to designate the location of all necessary statutory offices and to change the location thereof; to make and file all necessary certificates, reports, powers of attorney and other instruments, under the corporate seal, as may be required to qualify the Corporation to do business as a foreign corporation therein; and, whenever it is expedient for the Corporation to cease doing business therein and withdraw therefrom, to revoke any appointment of agent or attorney for service of process, and to file such certificates, reports, revocation of appointment or surrender of authority of the Corporation to do business as a foreign corporation therein.

Additional Filings

>**RESOLVED**, that the Authorized Officers of the Corporation be, and each of them hereby is, authorized and directed, for and on behalf of the Corporation, to make such filings and applications, to execute and deliver such documents and instruments, and to do such acts and things as such officer deems necessary or advisable in order to obtain such licenses, authorizations and permits as are necessary or desirable for the Corporation's business, and to fulfill such legal requirements as are applicable to the Corporation and its business and to complete the organization of the Corporation.

Management Powers

>**RESOLVED**, that the Authorized Officers be, and each of them hereby is, authorized to sign and deliver any agreement in the name of the Corporation relating to matters arising in the ordinary course of business of the Corporation and otherwise to obligate the Corporation in any regard relating to matters arising in the ordinary course of business of the Corporation, within any general guidelines and budget approved by the Board from time to time, provided, however, that the Board may from time to time adopt specific limitations on such authority of such officers as granted herein.

General Authority and Ratification

>**RESOLVED**, that the Authorized Officers of the Corporation be, and each of them hereby is, authorized, empowered and directed, in the name of and on behalf of the Corporation, to prepare or cause to be prepared and to execute, deliver, verify, acknowledge, file or record any documents, instruments, certificates, statements, papers, or any amendments thereto, as may be deemed necessary or advisable in order to effectuate the transactions contemplated by the agreements and actions

approved herein, and to take such further steps and do all such further acts or things as shall be necessary or desirable to carry out the transactions contemplated by the foregoing resolutions.

**RESOLVED FURTHER**, that the authority and power given hereunder be deemed retroactive and any and all acts authorized hereunder performed prior to the passage of these resolutions, are hereby ratified, approved and confirmed.

*(Signature Page Follows)*

**IN WITNESS WHEREOF**, the undersigned, being the sole director of the Corporation, does hereby consent to the foregoing action on the date set forth below. This action shall be filed with the minutes of the proceedings of this Board. Any copy, facsimile or other reliable reproduction of this action (including, without limitation, transmission by .pdf) may be substituted or used in lieu of the original writing for any and all purposes for which the original writing could be used, provided that such copy, facsimile or other reproduction be a complete reproduction of the entire original writing.

Mark Long
Date: August 20, 2021

**SIGNATURE PAGE TO NEON MACHINE, INC.**
**ORGANIZATIONAL BOARD CONSENT**

<u>EXHIBIT A</u>

**ACTION OF SOLE INCORPORATOR**

EXHIBIT B

**FORM OF RESTRICTED STOCK PURCHASE AGREEMENT (FOUNDER)**

<u>EXHIBIT C</u>

**FORM OF PROPRIETARY INFORMATION AND INVENTION ASSIGNMENT AGREEMENT**

# EXHIBIT D

**Subject:** Griffin/Polychain Agreement in Principle

**Date:** Thursday, September 2, 2021 at 6:42:07 PM Eastern Daylight Time

**From:** Mark Long

**To:** Jon Miller, Cort Javarone, Kevin Conroy, Don Norbury

**CC:** Andrew Grossman, David Vicini, Calvin Zhou

I walked Griffin through our redlines yesterday and got confirmation today that the Managing Director, Phil Sanderson, approved what we tentatively agreed to.

Griffin rejected a pre-money valuation increase to $20M. I let them know we had a competing offer for $30M and a large number of VCs vying to syndicate. They were unmoved and said $15M was their final offer.

I did get control of the board, however. We agreed to 5 seats - 3 for Neon/4D, 2 for Griffin/Polychain - plus 1 observer from Griffin. I asked for observer. The 2 young partners at Griffin I've been working with are super knowledgeable about the intersection of blockchain and gaming. I'd like both of them in the day long monthly board meetings I intend to schedule.

**So, I believe we have an agreement in principle.**

Because Griffin went straight to definitive docs like the SAFE rather than a term sheet, we've been advised by our legal team to include them in the negotiation of the remaining redlines. They've been adamant that we don't sign until they have worked with Griffin/Polychain to avoid making any mistakes in the SAFE that could have unintended tax or regulatory consequences. Andrew is leading that effort for us and we expect it to take another two weeks to finalize.

I'm going to continue to work with Dragonfly on their syndicate as a back up until we actually execute the SAFE. We had a Zoom meeting last night to keep them warm.

Thanks for your support in getting this funding secured. Big up to Andrew who worked super late Tuesday night to collate the redlines!

**mark long I ceo**
neon media
www.neonmedia.io
+01 206 669 5940
mark.long@neonmedia.io

**zoom link**
https://us02web.zoom.us/j/4321511612

**calendy link**
https://calendly.com/markvlong/mark-neon

# EXHIBIT E

24-01319-mew    Doc 4-1    Filed 03/14/24    Entered 03/14/24 23:46:35    Exhibits A through M    Saturday, July 02, 2023 at 23:40:51 Eastern Daylight Time

Pg 53 of 116

**Subject:** Neon Founders Pledge of Dividends

**Date:** Friday, October 1, 2021 at 3:47:25 PM Eastern Daylight Time

**From:** Mark Long

**To:** Cort Javarone

**CC:** Jon Miller, Kevin Conroy, Andrew Grossman

Cort,

I was able to call a meeting of the Neon members and get a unanimous vote to approve the pledge of any dividends to 4D to be able to recoup up to the $2.3M investment to date. Details TBD by Andrew in an agreement to be drafted next week.

**mark long I ceo**
neon media
www.neonmedia.io
+01 206 669 5940
mark.long@neonmedia.io

**zoom link**
https://us02web.zoom.us/j/4321511612

**calendy link**
https://calendly.com/markvlong/mark-neon

# EXHIBIT F

DocuSign Envelope ID: 6944BF9B-37D8-45CA-8048-E440B0F687B0

## NEON MACHINE INC.

October 1, 2021

Neon Machine, Inc.
1700 Westlake Avenue North
Suite #200
Seattle, WA 98109

Re:    Offer of Employment by Neon Machine, Inc.

Dear Mark:

I am very pleased to confirm our offer to you of employment with Neon Machine, Inc. (the "**Company**").  The terms of our offer and the benefits currently provided by the Company are as follows:

1.    <u>**Position and Start Date**</u>.  You are being offered the position of Chief Executive Officer.  This is an exempt position based in our Seattle office.  Your anticipated start date will be October 4, 2021.

2.    <u>**Starting Salary and Paydays**</u>.  Your starting salary will be $200,000 per year and will be subject to periodic review.  You will be paid in accordance with the Company's regular payroll schedule, which is subject to change.

3.    <u>**Benefits**</u>.  In addition, you will be eligible to participate in regular health insurance and other employee benefit plans established by the Company for its employees from time to time.

The Company reserves the right to change or otherwise modify, in its sole discretion, the preceding terms of employment.

4.    <u>**Future Token Interests**</u>.  Additionally, subject to the Company's approval of a Token Incentive Plan (the "***Token Plan***"), the Company will recommend that the Board grant you a future token interest representing the conditional right to receive:

4.1    First Grant: 70,001,845 SHRAP Tokens from the Company (the "***First Grant***"), subject to the terms of the Token Plan and the applicable token agreement.  The First Grant you will be given the opportunity to receive will be fully vested. Any other terms of the First Grant (including lock-up) will be determined by the Board at the time of such grant.  The First Grant (and the vesting and settlement thereof) will be subject to the Company's applicable withholding obligations and you authorize the Company to withhold in any manner the Company deems appropriate.]

Employment Offer
Page 2

**4.2**    Second Grant: No later than January 1, 2022, 21,327,014 SHRAP Tokens from the Company (the "***Second Grant***"), subject to the terms of the Token Plan and the applicable token agreement. The Second Grant you will be given the opportunity to receive will be fully vested upon grant and shall fully satisfy and terminate the promissory note dated August 3, 2021 and assigned to and assumed by the Company. Any other terms of the Second Grant (including lock-up) will be determined by the Board at the time of such grant. The Second Grant (and the vesting and settlement thereof) will be subject to the Company's applicable withholding obligations and you authorize the Company to withhold in any manner the Company deems appropriate.

**5.**    **Protection of Confidential and Proprietary Information**.  As an employee of the Company, you will have access to certain confidential information of the Company and you may, during the course of your employment, develop certain information or inventions that will be the property of the Company.  To protect the Company's interests, as a condition of employment, you must sign and abide by the Company's standard "Employee Invention Assignment and Confidentiality Agreement."

**6.**    **No Breach of Obligations to Prior Employers**.  We wish to impress upon you that we do not want you to, and we hereby direct you not to, bring with you any confidential or proprietary material of any former employer or violate any other obligations you may have to any former employer.  You represent that your signing of this offer letter, agreement(s) concerning stock options granted to you, if any, under the Plan and/or tokens granted to you, if any, under the Token Plan and the Company's Employee Invention Assignment and Confidentiality Agreement and your commencement of employment with the Company will not violate any agreement currently in place between yourself and current or past employers.

**7.**    **No Competition During Employment**.  During the period that you render services to the Company, you agree to not engage in any employment, business or activity that is in any way competitive with the business or proposed business of the Company.  You will disclose to the Company in writing any other gainful employment, business or activity that you are currently associated with or participate in that competes with the Company.  You will not assist any other person or organization in competing with the Company or in preparing to engage in competition with the business or proposed business of the Company. Notwithstanding the foregoing, the Company acknowledges, agrees and consents to your (i) association as a member of and activity with Neon Media LLC; and (ii) acting as an advisor to third parties from time to time, subject to the Employee Invention Assignment and Confidentiality Agreement signed by you and provided that you promptly inform the CEO of the Company (or his designee) of such advisor work. The CEO of the Company (or his designee) may, in his sole discretion, decline to allow you to act as an advisor to a third party.

**8.**    **At Will Employment**.  Employment with the Company is for no specific period of time.  Should you accept our offer, you will be an at-will employee of the Company, which means the employment relationship can be terminated by either of us for any reason, at any time, with or without prior notice and with or without cause.  Any statements or representations to the contrary (and, indeed, any statements contradicting any provision in this letter) are superseded by this agreement.  Further, your participation in any stock option or benefit program is not to be

DocuSign Envelope ID: 8944BE9B-37D8-45GA-8048-E440B0F687B9

Employment Offer
Page 3

regarded as assuring you of continuing employment for any particular period of time.  Although your job duties, title, compensation and benefits, as well as the Company's personnel policies and practices, may change from time to time, the "at-will" nature of your employment may be changed only in an express, written employment agreement signed by you and a duly authorized officer of the Company (other than you).

9.    **Tax Matters**.  All forms of compensation referred to in this agreement are subject to reduction to reflect applicable withholding and payroll taxes and other deductions required by law.

10.    **Authorization to Work**.  Please note that because of employer regulations adopted in the Immigration Reform and Control Act of 1986, within three (3) business days of starting your new position you will need to present documentation demonstrating that you have authorization to work in the United States.  If you have questions about this requirement, which applies to U.S. citizens and non-U.S. citizens alike, you may contact our personnel office.

11.    **Arbitration and Class Action Waiver**.  You and the Company agree to submit to mandatory binding arbitration, governed by the Federal Arbitration Act ("***FAA***"), any and all claims arising out of or related to your employment with the Company and the termination thereof, including, but not limited to, claims for unpaid wages, wrongful termination, torts, stock or stock options or other ownership interest in the Company, and/or discrimination (including harassment) based upon any federal, state or local ordinance, statute, regulation or constitutional provision except that each party may, at its, his or her option, seek injunctive relief in court related to the improper use, disclosure or misappropriation of a party's private, proprietary, confidential or trade secret information (collectively, "***Arbitrable Claims***").  Further, to the fullest extent permitted by law, you and the Company agree that no class or collective actions can be asserted in arbitration or otherwise.  All claims, whether in arbitration or otherwise, must be brought solely in your or the Company's individual capacity, and not as a plaintiff or class member in any purported class or collective proceeding.  **Nothing in this Arbitration and Class Action Waiver section, however, restricts your right to pursue claims in court: (a) on a representative action basis under applicable law, or (b) arising under the Washington State Law Against Discrimination (RCW 49.60, *et seq.*) or any federal anti-discrimination law.**

SUBJECT TO THE ABOVE PROVISO, THE PARTIES HEREBY WAIVE ANY RIGHTS THEY MAY HAVE TO TRIAL BY JURY IN REGARD TO ARBITRABLE CLAIMS. THE PARTIES FURTHER WAIVE ANY RIGHTS THEY MAY HAVE TO PURSUE OR PARTICIPATE IN A CLASS OR COLLECTIVE ACTION PERTAINING TO ANY CLAIMS BETWEEN YOU AND THE COMPANY.

This agreement to arbitrate does not restrict your right to file administrative claims you may bring before any government agency where, as a matter of law, the parties may not restrict the employee's ability to file such claims (including, but not limited to, the National Labor Relations Board, the Equal Employment Opportunity Commission and the Department of Labor). However, the parties agree that, to the fullest extent permitted by law, arbitration shall be the exclusive remedy for the subject matter of such administrative claims, except for the resolution of claims of discrimination.  The arbitration shall be conducted in Seattle, Washington through

DocuSign Envelope ID: 8944BF9B-37D8-45CA-8048-E440B0F687B9

Employment Offer
Page 4

JAMS before a single neutral arbitrator, in accordance with the JAMS employment arbitration rules then in effect, provided however, that the FAA, including its procedural provisions for compelling arbitration, shall govern and apply to this arbitration agreement.  The JAMS rules may be found and reviewed at http://www.jamsadr.com/rules-employment-arbitration.  If you are unable to access these rules, please let me know and I will provide you with a hardcopy.  The arbitrator shall issue a written decision that contains the essential findings and conclusions on which the decision is based.  If, for any reason, any term of this Arbitration and Class Action Waiver provision is held to be invalid or unenforceable, all other valid terms and conditions herein shall be severable in nature and remain fully enforceable.

     12.    **Background Check**.  This offer is contingent upon a satisfactory verification of criminal, education, driving and/or employment background.  This offer can be rescinded based upon data received in the verification.

     13.    **Entire Agreement**.  This offer, once accepted, constitutes the entire agreement between you and the Company with respect to the subject matter hereof and supersedes all prior offers, negotiations and agreements, if any, whether written or oral, relating to such subject matter.  You acknowledge that neither the Company nor its agents have made any promise, representation or warranty whatsoever, either express or implied, written or oral, which is not contained in this agreement for the purpose of inducing you to execute the agreement, and you acknowledge that you have executed this agreement in reliance only upon such promises, representations and warranties as are contained herein.

     14.    **Severability**.  The provisions of this offer letter are severable, and if any part of it is found to be invalid or unenforceable, including, but not limited to, the arbitration provision above, the other parts shall remain fully valid and enforceable.

     15.    **Acceptance**.  This offer will remain open until November 1, 2021.  If you decide to accept our offer, and I hope you will, please sign the enclosed copy of this letter in the space indicated and return it to me.  Your signature will acknowledge that you have read and understood and agreed to the terms and conditions of this offer letter and the attached documents, if any.  Should you have anything else that you wish to discuss, please do not hesitate to call me.

     We look forward to the opportunity to welcome you to the Company.

Very truly yours,

*Aaron Nonis*

Aaron Nonis, Chief Operating Officer

DocuSign Envelope ID: 8944BF9B-37D8-45CA-8048-E440B0E687B9

Employment Offer
Page 5


I have read and understood this offer letter and hereby acknowledge, accept and agree to the terms as set forth above and further acknowledge that no other commitments were made to me as part of my employment offer except as specifically set forth herein.  **I further acknowledge that I have received and read, or have had the opportunity to read, the arbitration agreement herein.  I understand that this arbitration agreement requires that disputes that involve the matters subject to the agreement be submitted to arbitration pursuant to the arbitration agreement rather than to a judge and jury in court.**

*Mark Long*

DocuSigned by:

4B1C0B3D000B48A...

Mark Long

Date signed: 10/14/2021

# EXHIBIT G

*THE TOKEN INTERESTS PURCHASED HEREUNDER HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED, AND HAVE BEEN ACQUIRED TO HOLD FOR THE LONG TERM AND NOT WITH A VIEW TO, OR IN CONNECTION WITH, THE SALE OR DISTRIBUTION THEREOF, EXCEPT AS EXPRESSLY PERMITTED HEREIN. NO TRANSFER MAY BE EFFECTED WITHOUT AN EFFECTIVE REGISTRATION STATEMENT RELATED THERETO UNLESS SUCH REGISTRATION IS NOT REQUIRED UNDER THE SECURITIES ACT OF 1933, AS AMENDED.*

## ARGON PROTOCOL FOUNDATION

### TOKEN SUBSCRIPTION AGREEMENT

This Token Subscription Agreement (this "***Agreement***") is made and entered into as of November 8, 2021 (the "***Effective Date***") by and between Argon Protocol Foundation, a Republic of Panama foundation (the "***Foundation***"), and the undersigned purchaser (the "***Purchaser***").

**WHEREAS**, it is the mission of the Foundation to support the growth and development of the Shrapnel Protocol (the "***Protocol***") with units of value on the Protocol denominated as "***SHRAP Tokens***";

**WHEREAS**, the Purchaser desires to contribute to the initial startup and operating costs of the Foundation by purchasing, and the Foundation desires accept such contribution by selling, the right to receive SHRAP Tokens (the "***Token Rights***" and, collectively with any securities received in substitution or fulfilment of the Token Rights, or in replacement of the Token Rights, as may be applicable, the "***Token Interests***") (for the avoidance of doubt, the term "Token Interests" only include SHRAP Tokens to the extent such SHRAP Tokens are securities under applicable law) from the Foundation all on the terms and conditions set forth in this Agreement; and

**WHEREAS**, Purchaser understands and agrees that the Token Interests purchased hereunder are nonrefundable, and agrees to assume all risks and liabilities in connection therewith.

**NOW THEREFORE, BE IT RESOLVED**, that in consideration of the mutual representations, warranties and agreements contained herein, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Foundation and the Purchaser agree as follows:

1. **PURCHASE.** Subject to the terms and conditions of this Agreement, the Purchaser hereby purchases from the Foundation, and the Foundation hereby sells to Purchaser, the right to receive, automatically and without requiring any future payment, that number of SHRAP Tokens set forth on the signature page hereto (the "***Tokens***") for that aggregate purchase price set forth on the signature page hereto (the "***Aggregate Purchase Price***").

2. **PAYMENT OF AGGREGATE PURCHASE PRICE; CLOSING.**

   2.1 **Deliveries by Purchaser.** Purchaser hereby delivers, or has delivered, to the Foundation (a) a duly executed copy of this Agreement, and (b) payment of the Aggregate Purchase Price. The Aggregate Purchase Price may be paid in USDC, USDT or any other U.S.

1

Dollar-denominated stablecoin, ETH or BTC on an as converted to U.S. Dollar basis, or U.S. Dollars.

2.2    **Deliveries by the Foundation.** Upon the Foundation's receipt of all the documents and payment to be executed and delivered by Purchaser under <u>Section 2.1</u>, the Foundation (a) shall deliver, or will have delivered to the Purchaser a duly executed copy of this Agreement and (b) agrees to distribute the Tokens to the Purchaser as soon as practicable after the date of bona fide public release of the Protocol by the Foundation (as determined by the Foundation in its reasonable discretion), provided that such Tokens are subject to the transfer restrictions and the Lockup Provisions set forth herein. The Purchaser shall provide to the Foundation a network/wallet address compatible with receiving Tokens (the "***Wallet***"), in writing to which the Tokens will be sent.

3.    **REPRESENTATIONS AND WARRANTIES OF PURCHASER.** Purchaser hereby represents and warrants to the Foundation as follows:

3.1    **Entirely for Own Account.** Purchaser is purchasing the Token Interests entirely for Purchaser's own account to hold for the long term, not as a nominee or agent, and not with a view to, or for sale in connection with, a distribution of the Token Interests within the meaning of the Securities Act of 1933, as amended (the "***1933 Act***"). Purchaser has no present intention of selling or otherwise disposing of all or any portion of the Token Interests and no one other than Purchaser has any beneficial ownership of any of the Token Interests. By executing this Agreement, the Purchaser further represents that the Purchaser does not presently have any contract, undertaking, agreement or arrangement with any individual, corporation, partnership, trust, limited liability company, association or other entity ("***Person***") to sell, transfer or grant participations to such Person or to any third Person, with respect to any of the Token Interests.

3.2    **Access to Information.** Purchaser has had access to all information that Purchaser reasonably considers important in making the decision to purchase the Token Interests, and Purchaser has had ample opportunity to ask questions concerning such matters and this purchase.

3.3    **Understanding of Risks.** Purchaser is fully aware of: (a) the highly speculative nature of the Token Interests; (b) the financial hazards involved; (c) the lack of liquidity of the Token Interests and the restrictions on transferability of the Token Interests (<u>e.g.</u>, that Purchaser may not be able to sell or dispose of the Token Interests or use them as collateral for loans); and (d) the tax consequences of purchasing the Token Interests, including the tax consequences of receiving the Tokens in accordance with the terms of this Agreement. Further, the Purchaser understands that the Token Interests involve risks, all of which the Purchaser fully and completely assumes, including, but not limited to, the risk that (i) the technology associated with the Protocol, the Tokens and associated ecosystem (collectively, the "***Network***") will not function as intended; (ii) the Network will not be completed and the Tokens will not be distributed; (iii) the Protocol will fail to attract sufficient interest from key stakeholders; (iv) the Network will not gain adoption and acceptance; and (v) the Foundation, Purchaser, the Network and/or third party entities participating in the development of the Network (the "***Third Parties***") may be subject to investigation and punitive actions from governmental authorities. The Purchaser understands and expressly accepts that the Tokens will be delivered to the Purchaser at the sole risk of the

2

Purchaser on an "AS IS" and "UNDER DEVELOPMENT" basis. The Purchaser understands and expressly accepts that the Purchaser has not relied on any oral or written statements, representations or warranties made by the Foundation, any Third Parties, or any of their officers, directors, employees, consultants, advisors, equity holders or other agents outside of this instrument, including, but not limited to, conversations of any kind, whether through oral or electronic communication, or any white paper. WITHOUT LIMITING THE GENERALITY OF THE FOREGOING, THE PURCHASER ASSUMES ALL RISK AND LIABILITY FOR THE RESULTS OBTAINED BY THE USE OF ANY TOKENS AND REGARDLESS OF ANY ORAL OR WRITTEN STATEMENTS MADE BY THE FOUNDATION, BY WAY OF TECHNICAL ADVICE OR OTHERWISE, RELATED TO THE USE OF THE TOKENS.

       **3.4**    **Understanding and Experience.** Purchaser has sufficient understanding of the functionality, usage, storage, transmission mechanisms and other material characteristics of cryptographic tokens, token wallets and other token storage mechanisms, public and private key management, blockchain technology, and blockchain-based software systems to understand the terms of this instrument. Purchaser understands, acknowledges and agrees that such knowledge allows the Purchaser to appreciate the implications and risks of acquiring the Tokens Interests herein.

       **3.5**    **Accredited Investor and Sophistication.** Purchaser is either an accredited investor (as defined in Rule 501(a) of Regulation D promulgated under the 1933 Act); or Purchaser is a sophisticated purchaser and has appointed a purchaser representative (as defined in Rule 501(i) of Regulation D promulgated under the 1933 Act).

       **3.6**    **Qualifications.** Purchaser has a preexisting personal or business relationship with the Foundation and/or certain of its officers and/or directors of a nature and duration sufficient to make Purchaser aware of the character, business acumen and general business and financial circumstances of the Foundation. If Purchaser is not an accredited investor, the Purchaser, alone or with its purchaser representative, is a sophisticated purchaser and has made its own independent investigation, review and analysis regarding the Foundation and the transactions contemplated hereby, which investigation, review and analysis were conducted by the Purchaser, alone or with its purchaser representative, and together with other expert advisors that it has engaged for such purpose. By reason of its business or financial experience, Purchaser and its purchaser representative, as applicable, is capable of evaluating the merits and risks of this purchase, has the ability to protect Purchaser's own interests in this transaction and is financially capable of bearing a total loss of the Aggregate Purchase Price.

       **3.7**    **Information Statement.** If Purchaser is not an accredited investor (as defined in Rule 501(a) of Regulation D promulgated under the 1933 Act), Purchaser has received a confidential information statement from the Foundation setting forth such information required to be provided under Rule 502(b) of Regulation D promulgated under the 1933 Act and has had ample opportunity to review such documents with Purchaser's purchaser representative and ask questions concerning such matters and this purchase.

       **3.8**    **No General Solicitation.** At no time was Purchaser presented with or solicited by any publicly issued or circulated newspaper, mail, radio, television or other form of

3

general advertising or solicitation in connection with the offer, sale and purchase of the Token Interests.

       **3.9**      **Compliance with Securities Laws.** Purchaser understands and acknowledges that, to the extent the Token Interests are considered securities, in reliance upon the representations and warranties made by Purchaser herein, the Token Interests have not been, and will not be, registered with the Securities and Exchange Commission ("*SEC*") under the 1933 Act or any applicable state securities law, but instead are being issued under an exemption or exemptions from the registration and qualification requirements of the 1933 Act and other applicable state securities laws which impose certain restrictions on Purchaser's ability to transfer the Token Interests.

       **3.10**      **No Public Market.** The Purchaser understands that no public market now exists for the Token Interests, and that the Foundation has made no assurances that a public market will ever exist for the Token Interests.

       **3.11**      **Restrictions on Transfer.** The Token Interests may constitute securities in various jurisdictions, although the Foundation does not concede this point in any jurisdiction. Accordingly, Purchaser understands and agrees as follows:

> **Purchaser may not transfer any Token Interests unless (1) such Token Interests are registered under the 1933 Act and qualified under other applicable state securities laws, (2) exemptions from such registration and qualification requirements are available, or (3) such Token Interests do not constitute securities under applicable law or SEC rules.**

Purchaser understands that only the Foundation may file a registration statement with the SEC or other applicable state securities commissioners and that the Foundation is under no obligation to do so with respect to the Token Interests. Purchaser has also been advised that exemptions from registration and qualification may not be available or may not permit Purchaser to transfer all or any of the Token Interests in the amounts or at the times proposed by Purchaser. The Purchaser further acknowledges that if an exemption from registration or qualification is available, it may be conditioned on various requirements including, but not limited to, the time and manner of sale, the holding period for the Token Interests, and on requirements relating to the Foundation which are outside of the Purchaser's control, and which the Foundation is under no obligation and may not be able to satisfy.

       **3.12**      **Legends.** The Purchaser understands that the Token Interests may bear any legend required by the securities laws of any state to the extent such laws are applicable to the Token Interests, to the extent such interests may contain a legend, and the following legend (and even without such legend the following restrictions apply):

> *"THE TOKEN INTERESTS PURCHASED HEREUNDER HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED, AND HAVE BEEN ACQUIRED TO HOLD FOR THE LONG TERM AND NOT WITH A VIEW TO, OR IN CONNECTION WITH, THE SALE OR DISTRIBUTION*

4

*THEREOF, EXCEPT AS EXPRESSLY PERMITTED UNDER A TOKEN SUBSCRIPTION AGREEMENT BETWEEN THE ISSUER AND THE ORIGINAL PURCHASER OF THE TOKEN INTERESTS. NO TRANSFER MAY BE EFFECTED WITHOUT AN EFFECTIVE REGISTRATION STATEMENT RELATED THERETO UNLESS SUCH REGISTRATION IS NOT REQUIRED UNDER THE SECURITIES ACT OF 1933, AS AMENDED."*

**4.** **LOCKUP.** The Token Interests acquired herein and the Tokens deliverable in fulfillment thereto (as applicable as of the applicable date of determination, the "***Restricted Tokens***") shall be subject to the following restrictions (collectively, the "***Lockup Provisions***"):

**4.1** **Lockup Period.** Prior to the twelve-month anniversary of the Effective Date, Purchaser agrees that it will not, without the prior written consent of the Foundation, offer, sell, contract to sell, pledge, grant any option to purchase, make any short sale of, or place any liens or security interests in, hypothecate, encumber or otherwise transfer or dispose of ("***Transfer***") any Restricted Tokens or any interest therein, any options to purchase any Restricted Tokens, or any instruments convertible into, exchangeable for, or that represent the right to receive Restricted Tokens, including the Token Interests acquired herein, whether now or hereinafter acquired by the Purchaser; ***provided that,*** subject to Section 3.9, on the twelve-month anniversary of the Effective Date, 1/2 of the Restricted Tokens shall be released from these Lockup Provisions, and 1/12th of the Restricted Tokens shall be released on each monthly anniversary thereafter, such that all Restricted Tokens will be released from these Lockup Provisions on the two-year anniversary of the Effective Date.

**4.2** **Restrictions.** To ensure compliance with these Lockup Provisions, the Foundation may impose technological lockups or restrictions on the Restricted Tokens, or withhold delivery of the Restricted Tokens until such restrictions expire or termination.

**5.** **RIGHTS AS OWNER OF TOKEN INTERESTS.** The Purchaser is not entitled, as a holder of the Token Interests, to vote or receive dividends or be deemed the holder of equity of the Foundation for any purpose, nor will anything contained herein be construed to confer on the Purchaser, as such, any of the rights of an equity holder of the Foundation or any right to vote for the election of board members or upon any matter submitted to council members of the Foundation at any meeting thereof, or to give or withhold consent to any corporate or foundation action or to receive notice of meetings, or to receive subscription rights or otherwise.

**6.** **DISCLAIMER AND LIMITATION OF LIABILITY.** The Foundation shall not be liable or responsible to the Purchaser, nor be deemed to have defaulted under or breached this Agreement, for any failure or delay in fulfilling or performing any term of this Agreement, including without limitation, launching, developing and maintaining the Protocol and/or the Network, launching the SHRAP Tokens, selling the Token Interests, sending the Tokens to the Wallet, or distributing the Tokens, when and to the extent such failure or delay is caused by or results from acts beyond the affected party's commercially reasonable control, including, without limitation: (a) acts of God; (b) flood, fire, earthquake, pandemic or explosion; (c) war, invasion, hostilities (whether war is declared or not), terrorist threats or acts, or other civil unrest; (d) applicable law or regulations; or (e) action by any governmental authority. THE FOUNDATION MAKES NO WARRANTY WHATSOEVER WITH RESPECT TO THE TOKENS,

INCLUDING ANY (A) WARRANTY OF MERCHANTABILITY; (B) WARRANTY OF FITNESS FOR A PARTICULAR PURPOSE; (C) WARRANTY OF TITLE; OR (D) WARRANTY AGAINST INFRINGEMENT OF INTELLECTUAL PROPERTY RIGHTS OF A THIRD PARTY; WHETHER ARISING BY LAW, COURSE OF DEALING, COURSE OF PERFORMANCE, USAGE OF TRADE, OR OTHERWISE. EXCEPT AS EXPRESSLY SET FORTH HEREIN, PURCHASER ACKNOWLEDGES THAT IT HAS NOT RELIED UPON ANY REPRESENTATION OR WARRANTY MADE BY THE FOUNDATION, OR ANY OTHER PERSON ON THE FOUNDATION'S BEHALF.

The Purchaser understands that Purchaser has no right against the Foundation or any other individual or legal entity except in the event of the Foundation's material breach of this instrument or intentional fraud. THE FOUNDATION'S (OR ANY OTHER INDIVIDUAL'S OR LEGAL ENTITY'S) AGGREGATE LIABILITY ARISING OUT OF OR RELATED TO THIS AGREEMENT, WHETHER ARISING OUT OF OR RELATED TO BREACH OF CONTRACT, TORT OR OTHERWISE, SHALL NOT EXCEED THE AGGREGATE PURCHASE PRICE (IN U.S. DOLLARS). NEITHER THE FOUNDATION NOR ITS REPRESENTATIVES SHALL BE LIABLE FOR CONSEQUENTIAL, INDIRECT, INCIDENTAL, SPECIAL, EXEMPLARY, PUNITIVE OR ENHANCED DAMAGES, LOST PROFITS OR REVENUES OR DIMINUTION IN VALUE, ARISING OUT OF OR RELATING TO ANY BREACH OF THIS INSTRUMENT.

**7.** **TAX CONSEQUENCES.** PURCHASER UNDERSTANDS THAT PURCHASER MAY SUFFER ADVERSE TAX CONSEQUENCES AS A RESULT OF THE PURCHASER'S PURCHASE OR DISPOSITION OF THE TOKEN INTERESTS AND THE TOKENS HEREUNDER. PURCHASER REPRESENTS (a) THAT IT HAS CONSULTED WITH A TAX ADVISER THAT IT DEEMS ADVISABLE IN CONNECTION WITH THE PURCHASE, RECEIPT, VESTING, AND DISPOSITION OF THE TOKEN INTERESTS AND THE TOKENS HEREUNDER, AND (b) THAT PURCHASER IS NOT RELYING ON THE FOUNDATION, OR ANY AGENTS, REPRESENTATIVES, OR ADVISORS OF THE FOUNDATION FOR ANY TAX ADVICE.

THE FAIR MARKET VALUE OF THE TOKEN INTERESTS HEREUNDER HAS BEEN DETERMINED IN GOOD FAITH IN ACCORDANCE WITH A VALUATION REPORT RECEIVED BY THE FOUNDATION, A COPY OF WHICH IS AVAILABLE TO PURCHASER UPON REQUEST. THERE IS NO GUARANTEE THAT SUCH DETERMINATION OF FAIR MARKET VALUE WILL NECESSARILY REFLECT OR EQUAL ANY DETERMINATION OF FAIR MARKET VALUE BY A TAXING AUTHORITY (SUCH AS THE IRS). PURCHASER AGREES TO BE FULLY RESPONSIBLE FOR ANY TAXES RESULTING FROM THE RECEIPT AND DISPOSITION OF THE TOKEN INTERESTS AND TOKENS HEREUNDER, INCLUDING ANY ADDITIONAL TAXES RESULTING FROM A DIFFERENT DETERMINATION OF FAIR MARKET VALUE.

**8.** **COMPLIANCE WITH LAWS AND REGULATIONS.** The issuance and transfer of the Token Interests will be subject to and conditioned upon compliance by the Foundation and Purchaser with all applicable state and federal laws and regulations and with all applicable requirements of any exchange on which Tokens may be listed or quoted at the time of such issuance or transfer. Notwithstanding the foregoing, there is no guarantee that there will be any exchange or market available for the Token Interests or the Tokens.

## 9.    GENERAL PROVISIONS.

9.1    **Notices.** All notices and other communications given or made pursuant to this Agreement shall be in writing and shall be deemed effectively given upon the earlier of actual receipt, or (a) personal delivery to the party to be notified, or (b) when sent, if sent by electronic mail or facsimile during normal business hours of the Purchaser, and if not sent during normal business hours, then on the Purchaser's next Business Day, or (c) three (3) Business Days after deposit in the United States mail by certified mail (return receipt requested) for United States deliveries. All notices for delivery outside the United States will be sent by express courier. All notices for delivery will be sent by express courier. All notices not delivered personally will be sent with postage and/or other charges prepaid and properly addressed to the party to be notified at the address set forth below the signature lines of this Agreement or at such other address as such other party may designate by one of the indicated means of notice herein to the other party hereto. A "***Business Day***" shall be a day, other than Saturday or Sunday, when the banks in the Republic of Panama are open for business.

9.2    **Further Assurances.** The parties agree to execute such further documents and instruments and to take such further actions as may be reasonably necessary to carry out the purposes and intent of this Agreement.

9.3    **Titles and Headings.** The titles, captions and headings of this Agreement are included for ease of reference only and will be disregarded in interpreting or construing this Agreement. Unless otherwise specifically stated, all references herein to "sections" and "exhibits" will mean "sections" and "exhibits" to this Agreement.

9.4    **Governing Law; Dispute Resolution.** Any unresolved controversy or claim arising out of or relating to this Agreement, except any such controversies or claims arising out of either party's intellectual property rights for which a provisional remedy or equitable relief is sought, shall be determined by arbitration administered by the Center of Arbitration and Conciliation of Panama in accordance with its rules. All disputes shall be heard by a single arbitrator. The law of the arbitration shall be the law of the Republic of Panama. The language of the arbitration shall be English. The arbitration shall take place in San Francisco, California, unless such venue is not mutually agreeable to the parties, in which case the arbitration shall be administered by the Panama Conciliation and Arbitration Centre in accordance with its procedural rules. The arbitration shall be commenced following the aggrieved party's notification to the other of the particulars of the controversy or claim along with the aggrieved party's proposed arbitrator obtained from a list of potential arbitrators maintained by the American Arbitration Association (the "***AAA***"). Where the notified party does not agree with the choice of arbitrator or if no agreement on the choice of arbitrator can be reached within thirty (30) days, then an arbitrator will be one chosen by the AAA having reasonable experience in transactions of the type provided for in this Agreement. The arbitrator shall render the award within three (3) months of the commencement of the arbitration, unless such time limit is extended by the arbitrator. Prior to the issue or delivery of arbitral award, each party will bear its own costs in respect the arbitration, following which the prevailing party shall be entitled to reasonable attorney's fees, costs, and necessary disbursements in addition to any other relief to which such party may be entitled. An award by the arbitrator shall be final and conclusive and binding upon the parties and shall not be subject to further a ppeal. Each party may enforce any award granted in accordance with this

Section 9.4 in any court of competent jurisdiction. The arbitrator shall be required to provide in writing to the parties the basis for the award or order of such arbitrator, and all hearings shall be recorded, with such record constituting the official transcript of such proceedings.

       **9.5**      **Assignments; Successors and Assigns.** The Foundation may assign any of its rights and obligations under this Agreement. Any assignment of rights and obligations by any other party to this Agreement requires the Foundation's prior written consent. This Agreement, and the rights and obligations of the parties hereunder, will be binding upon and inure to the benefit of their respective successors, permitted assigns, heirs, executors, administrators and legal representatives.

       **9.6**      **Entire Agreement.** This Agreement and the documents referred to herein constitute the entire agreement and understanding of the parties with respect to the subject matter of this Agreement, and supersede all prior understandings and agreements, whether oral or written, between or among the parties hereto with respect to the specific subject matter hereof.

       **9.7**      **Amendment and Waivers.** This Agreement may be amended only by a written agreement executed by each of the parties hereto. No amendment of or waiver of, or modification of any obligation under this Agreement will be enforceable unless set forth in a writing signed by the party against which enforcement is sought. Any amendment effected in accordance with this Section 9.7 will be binding upon all parties hereto and each of their respective successors and assigns. No delay or failure to require performance of any provision of this Agreement shall constitute a waiver of that provision as to that or any other instance or of any other provision of this Agreement. No waiver granted under this Agreement as to any one provision herein shall constitute a subsequent waiver of such provision or of any other provision herein, nor shall it constitute the waiver of any performance other than the actual performance specifically waived.

       **9.8**      **Severability.** If any provision of this Agreement is determined by any court or arbitrator of competent jurisdiction to be invalid, illegal or unenforceable in any respect, such provision will be enforced to the maximum extent possible given the intent of the parties hereto. If such clause or provision cannot be so enforced, such provision shall be stricken from this Agreement and the remainder of this Agreement shall be enforced as if such invalid, illegal or unenforceable clause or provision had (to the extent not enforceable) never been contained in this Agreement. Notwithstanding the foregoing, if the value of this Agreement based upon the substantial benefit of the bargain for any party is materially impaired, which determination as made by the presiding court or arbitrator of competent jurisdiction shall be binding, then both parties agree to substitute such provision(s) through good faith negotiations.

       **9.9**      **Counterparts; Facsimile Signatures.** This Agreement may be executed in any number of counterparts, each of which when so executed and delivered will be deemed an original, and all of which together shall constitute one and the same agreement. This Agreement may be executed and delivered by facsimile or electronic mail (including .pdf or any electronic signature, e.g., www.docusign.com) and upon such delivery the signature will be deemed to have the same effect as if the original signature had been delivered to the other party.

*[Signature page follows]*

8

**IN WITNESS WHEREOF**, the Foundation has caused this Token Subscription Agreement to be executed by its duly authorized representative and Purchaser has executed this Agreement, each as of the date first set forth above.

**FOUNDATION:**

**ARGON PROTOCOL FOUNDATION**

By: _____

Name: Diana Aidee Muñoz Maclao de Camargo

Title: Director

Address: Oceania Business Plaza, 21st floor, Tower 1000, Issac Hanono Missri Street, Punta Pacifica, Panama City, Republic of Panama.

**IN WITNESS WHEREOF**, the Foundation has caused this Token Subscription Agreement to be executed by its duly authorized representative and Purchaser has executed this Agreement, each as of the date first set forth above.


**PURCHASER:**

**[INVESTOR]**


By:      _____

Name:   Mark Long_____

Title:    _____

Address: _____


| Number of SHRAP Tokens | Aggregate Purchase Price | Price per Token |
|---|---|---|
| 70,001,845 | $1,831.25 | $0.00002616 |

*THE TOKEN INTERESTS PURCHASED HEREUNDER HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED, AND HAVE BEEN ACQUIRED TO HOLD FOR THE LONG TERM AND NOT WITH A VIEW TO, OR IN CONNECTION WITH, THE SALE OR DISTRIBUTION THEREOF, EXCEPT AS EXPRESSLY PERMITTED HEREIN. NO TRANSFER MAY BE EFFECTED WITHOUT AN EFFECTIVE REGISTRATION STATEMENT RELATED THERETO UNLESS SUCH REGISTRATION IS NOT REQUIRED UNDER THE SECURITIES ACT OF 1933, AS AMENDED.*

## ARGON PROTOCOL FOUNDATION

### TOKEN SUBSCRIPTION AGREEMENT

This Token Subscription Agreement (this "***Agreement***") is made and entered into as of November 8, 2021 (the "***Effective Date***") by and between Argon Protocol Foundation, a Republic of Panama foundation (the "***Foundation***"), and the undersigned purchaser (the "***Purchaser***").

**WHEREAS**, it is the mission of the Foundation to support the growth and development of the Shrapnel Protocol (the "***Protocol***") with units of value on the Protocol denominated as "***SHRAP Tokens***";

**WHEREAS**, the Purchaser desires to contribute to the initial startup and operating costs of the Foundation by purchasing, and the Foundation desires accept such contribution by selling, the right to receive SHRAP Tokens (the "***Token Rights***" and, collectively with any securities received in substitution or fulfilment of the Token Rights, or in replacement of the Token Rights, as may be applicable, the "***Token Interests***") (for the avoidance of doubt, the term "Token Interests" only include SHRAP Tokens to the extent such SHRAP Tokens are securities under applicable law) from the Foundation all on the terms and conditions set forth in this Agreement; and

**WHEREAS**, Purchaser understands and agrees that the Token Interests purchased hereunder are nonrefundable, and agrees to assume all risks and liabilities in connection therewith.

**NOW THEREFORE, BE IT RESOLVED**, that in consideration of the mutual representations, warranties and agreements contained herein, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Foundation and the Purchaser agree as follows:

1. **PURCHASE.** Subject to the terms and conditions of this Agreement, the Purchaser hereby purchases from the Foundation, and the Foundation hereby sells to Purchaser, the right to receive, automatically and without requiring any future payment, that number of SHRAP Tokens set forth on the signature page hereto (the "***Tokens***") for that aggregate purchase price set forth on the signature page hereto (the "***Aggregate Purchase Price***").

2. **PAYMENT OF AGGREGATE PURCHASE PRICE; CLOSING.**

    2.1 **Deliveries by Purchaser.** Purchaser hereby delivers, or has delivered, to the Foundation (a) a duly executed copy of this Agreement, and (b) payment of the Aggregate Purchase Price. The Aggregate Purchase Price may be paid in USDC, USDT or any other U.S.

1

Dollar-denominated stablecoin, ETH or BTC on an as converted to U.S. Dollar basis, or U.S. Dollars.

      **2.2**     **Deliveries by the Foundation.** Upon the Foundation's receipt of all the documents and payment to be executed and delivered by Purchaser under Section 2.1, the Foundation (a) shall deliver, or will have delivered to the Purchaser a duly executed copy of this Agreement and (b) agrees to distribute the Tokens to the Purchaser as soon as practicable after the date of bona fide public release of the Protocol by the Foundation (as determined by the Foundation in its reasonable discretion), provided that such Tokens are subject to the transfer restrictions and the Lockup Provisions set forth herein. The Purchaser shall provide to the Foundation a network/wallet address compatible with receiving Tokens (the "***Wallet***"), in writing to which the Tokens will be sent.

      **3.**     **REPRESENTATIONS AND WARRANTIES OF PURCHASER.** Purchaser hereby represents and warrants to the Foundation as follows:

      **3.1**     **Entirely for Own Account.** Purchaser is purchasing the Token Interests entirely for Purchaser's own account to hold for the long term, not as a nominee or agent, and not with a view to, or for sale in connection with, a distribution of the Token Interests within the meaning of the Securities Act of 1933, as amended (the "***1933 Act***"). Purchaser has no present intention of selling or otherwise disposing of all or any portion of the Token Interests and no one other than Purchaser has any beneficial ownership of any of the Token Interests. By executing this Agreement, the Purchaser further represents that the Purchaser does not presently have any contract, undertaking, agreement or arrangement with any individual, corporation, partnership, trust, limited liability company, association or other entity ("***Person***") to sell, transfer or grant participations to such Person or to any third Person, with respect to any of the Token Interests.

      **3.2**     **Access to Information.** Purchaser has had access to all information that Purchaser reasonably considers important in making the decision to purchase the Token Interests, and Purchaser has had ample opportunity to ask questions concerning such matters and this purchase.

      **3.3**     **Understanding of Risks.** Purchaser is fully aware of: (a) the highly speculative nature of the Token Interests; (b) the financial hazards involved; (c) the lack of liquidity of the Token Interests and the restrictions on transferability of the Token Interests (e.g., that Purchaser may not be able to sell or dispose of the Token Interests or use them as collateral for loans); and (d) the tax consequences of purchasing the Token Interests, including the tax consequences of receiving the Tokens in accordance with the terms of this Agreement. Further, the Purchaser understands that the Token Interests involve risks, all of which the Purchaser fully and completely assumes, including, but not limited to, the risk that (i) the technology associated with the Protocol, the Tokens and associated ecosystem (collectively, the "***Network***") will not function as intended; (ii) the Network will not be completed and the Tokens will not be distributed; (iii) the Protocol will fail to attract sufficient interest from key stakeholders; (iv) the Network will not gain adoption and acceptance; and (v) the Foundation, Purchaser, the Network and/or third party entities participating in the development of the Network (the "***Third Parties***") may be subject to investigation and punitive actions from governmental authorities. The Purchaser understands and expressly accepts that the Tokens will be delivered to the Purchaser at the sole risk of the

2

Purchaser on an "AS IS" and "UNDER DEVELOPMENT" basis. The Purchaser understands and expressly accepts that the Purchaser has not relied on any oral or written statements, representations or warranties made by the Foundation, any Third Parties, or any of their officers, directors, employees, consultants, advisors, equity holders or other agents outside of this instrument, including, but not limited to, conversations of any kind, whether through oral or electronic communication, or any white paper. WITHOUT LIMITING THE GENERALITY OF THE FOREGOING, THE PURCHASER ASSUMES ALL RISK AND LIABILITY FOR THE RESULTS OBTAINED BY THE USE OF ANY TOKENS AND REGARDLESS OF ANY ORAL OR WRITTEN STATEMENTS MADE BY THE FOUNDATION, BY WAY OF TECHNICAL ADVICE OR OTHERWISE, RELATED TO THE USE OF THE TOKENS.

       3.4      **Understanding and Experience.** Purchaser has sufficient understanding of the functionality, usage, storage, transmission mechanisms and other material characteristics of cryptographic tokens, token wallets and other token storage mechanisms, public and private key management, blockchain technology, and blockchain-based software systems to understand the terms of this instrument. Purchaser understands, acknowledges and agrees that such knowledge allows the Purchaser to appreciate the implications and risks of acquiring the Tokens Interests herein.

       3.5      **Accredited Investor and Sophistication.** Purchaser is either an accredited investor (as defined in Rule 501(a) of Regulation D promulgated under the 1933 Act); or Purchaser is a sophisticated purchaser and has appointed a purchaser representative (as defined in Rule 501(i) of Regulation D promulgated under the 1933 Act).

       3.6      **Qualifications.** Purchaser has a preexisting personal or business relationship with the Foundation and/or certain of its officers and/or directors of a nature and duration sufficient to make Purchaser aware of the character, business acumen and general business and financial circumstances of the Foundation. If Purchaser is not an accredited investor, the Purchaser, alone or with its purchaser representative, is a sophisticated purchaser and has made its own independent investigation, review and analysis regarding the Foundation and the transactions contemplated hereby, which investigation, review and analysis were conducted by the Purchaser, alone or with its purchaser representative, and together with other expert advisors that it has engaged for such purpose. By reason of its business or financial experience, Purchaser and its purchaser representative, as applicable, is capable of evaluating the merits and risks of this purchase, has the ability to protect Purchaser's own interests in this transaction and is financially capable of bearing a total loss of the Aggregate Purchase Price.

       3.7      **Information Statement.** If Purchaser is not an accredited investor (as defined in Rule 501(a) of Regulation D promulgated under the 1933 Act), Purchaser has received a confidential information statement from the Foundation setting forth such information required to be provided under Rule 502(b) of Regulation D promulgated under the 1933 Act and has had ample opportunity to review such documents with Purchaser's purchaser representative and ask questions concerning such matters and this purchase.

       3.8      **No General Solicitation.** At no time was Purchaser presented with or solicited by any publicly issued or circulated newspaper, mail, radio, television or other form of

3

general advertising or solicitation in connection with the offer, sale and purchase of the Token Interests.

**3.9** **Compliance with Securities Laws.** Purchaser understands and acknowledges that, to the extent the Token Interests are considered securities, in reliance upon the representations and warranties made by Purchaser herein, the Token Interests have not been, and will not be, registered with the Securities and Exchange Commission ("*SEC*") under the 1933 Act or any applicable state securities law, but instead are being issued under an exemption or exemptions from the registration and qualification requirements of the 1933 Act and other applicable state securities laws which impose certain restrictions on Purchaser's ability to transfer the Token Interests.

**3.10** **No Public Market.** The Purchaser understands that no public market now exists for the Token Interests, and that the Foundation has made no assurances that a public market will ever exist for the Token Interests.

**3.11** **Restrictions on Transfer.** The Token Interests may constitute securities in various jurisdictions, although the Foundation does not concede this point in any jurisdiction. Accordingly, Purchaser understands and agrees as follows:

> **Purchaser may not transfer any Token Interests unless (1) such Token Interests are registered under the 1933 Act and qualified under other applicable state securities laws, (2) exemptions from such registration and qualification requirements are available, or (3) such Token Interests do not constitute securities under applicable law or SEC rules.**

Purchaser understands that only the Foundation may file a registration statement with the SEC or other applicable state securities commissioners and that the Foundation is under no obligation to do so with respect to the Token Interests. Purchaser has also been advised that exemptions from registration and qualification may not be available or may not permit Purchaser to transfer all or any of the Token Interests in the amounts or at the times proposed by Purchaser. The Purchaser further acknowledges that if an exemption from registration or qualification is available, it may be conditioned on various requirements including, but not limited to, the time and manner of sale, the holding period for the Token Interests, and on requirements relating to the Foundation which are outside of the Purchaser's control, and which the Foundation is under no obligation and may not be able to satisfy.

**3.12** **Legends.** The Purchaser understands that the Token Interests may bear any legend required by the securities laws of any state to the extent such laws are applicable to the Token Interests, to the extent such interests may contain a legend, and the following legend (and even without such legend the following restrictions apply):

> *"THE TOKEN INTERESTS PURCHASED HEREUNDER HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED, AND HAVE BEEN ACQUIRED TO HOLD FOR THE LONG TERM AND NOT WITH A VIEW TO, OR IN CONNECTION WITH, THE SALE OR DISTRIBUTION*

*THEREOF, EXCEPT AS EXPRESSLY PERMITTED UNDER A TOKEN SUBSCRIPTION AGREEMENT BETWEEN THE ISSUER AND THE ORIGINAL PURCHASER OF THE TOKEN INTERESTS. NO TRANSFER MAY BE EF-FECTED WITHOUT AN EFFECTIVE REGISTRATION STATEMENT RELATED THERETO UNLESS SUCH REGISTRATION IS NOT REQUIRED UNDER THE SECURITIES ACT OF 1933, AS AMENDED."*

**4.**    **LOCKUP.** The Token Interests acquired herein and the Tokens deliverable in fulfillment thereto (as applicable as of the applicable date of determination, the "***Restricted Tokens***") shall be subject to the following restrictions (collectively, the "***Lockup Provisions***"):

**4.1**    **Lockup Period.** Prior to the twelve-month anniversary of the Effective Date, Purchaser agrees that it will not, without the prior written consent of the Foundation, offer, sell, contract to sell, pledge, grant any option to purchase, make any short sale of, or place any liens or security interests in, hypothecate, encumber or otherwise transfer or dispose of ("***Transfer***") any Restricted Tokens or any interest therein, any options to purchase any Restricted Tokens, or any instruments convertible into, exchangeable for, or that represent the right to receive Restricted Tokens, including the Token Interests acquired herein, whether now or hereinafter acquired by the Purchaser; ***provided that,*** subject to Section 3.9 on this Agreement, $1/12^{th}$ of the Restricted Tokens shall be released on each monthly anniversary of the Effective Date, such that on the twelve-month anniversary of the Effective Date all of the Restricted Tokens shall be released from these Lockup Provisions.

**4.2**    **Restrictions.** To ensure compliance with these Lockup Provisions, the Foundation may impose technological lockups or restrictions on the Restricted Tokens, or withhold delivery of the Restricted Tokens until such restrictions expire or termination.

**5.**    **RIGHTS AS OWNER OF TOKEN INTERESTS.** The Purchaser is not entitled, as a holder of the Token Interests, to vote or receive dividends or be deemed the holder of equity of the Foundation for any purpose, nor will anything contained herein be construed to confer on the Purchaser, as such, any of the rights of an equity holder of the Foundation or any right to vote for the election of board members or upon any matter submitted to council members of the Foundation at any meeting thereof, or to give or withhold consent to any corporate or foundation action or to receive notice of meetings, or to receive subscription rights or otherwise.

**6.**    **DISCLAIMER AND LIMITATION OF LIABILITY.** The Foundation shall not be liable or responsible to the Purchaser, nor be deemed to have defaulted under or breached this Agreement, for any failure or delay in fulfilling or performing any term of this Agreement, including without limitation, launching, developing and maintaining the Protocol and/or the Network, launching the SHRAP Tokens, selling the Token Interests, sending the Tokens to the Wallet, or distributing the Tokens, when and to the extent such failure or delay is caused by or results from acts beyond the affected party's commercially reasonable control, including, without limitation: (a) acts of God; (b) flood, fire, earthquake, pandemic or explosion; (c) war, invasion, hostilities (whether war is declared or not), terrorist threats or acts, or other civil unrest; (d) applicable law or regulations; or (e) action by any governmental authority. THE FOUNDATION MAKES NO WARRANTY WHATSOEVER WITH RESPECT TO THE TOKENS, INCLUDING ANY (A) WARRANTY OF MERCHANTABILITY; (B) WARRANTY OF

5

FITNESS FOR A PARTICULAR PURPOSE; (C) WARRANTY OF TITLE; OR (D) WARRANTY AGAINST INFRINGEMENT OF INTELLECTUAL PROPERTY RIGHTS OF A THIRD PARTY; WHETHER ARISING BY LAW, COURSE OF DEALING, COURSE OF PERFORMANCE, USAGE OF TRADE, OR OTHERWISE. EXCEPT AS EXPRESSLY SET FORTH HEREIN, PURCHASER ACKNOWLEDGES THAT IT HAS NOT RELIED UPON ANY REPRESENTATION OR WARRANTY MADE BY THE FOUNDATION, OR ANY OTHER PERSON ON THE FOUNDATION'S BEHALF.

The Purchaser understands that Purchaser has no right against the Foundation or any other individual or legal entity except in the event of the Foundation's material breach of this instrument or intentional fraud. THE FOUNDATION'S (OR ANY OTHER INDIVIDUAL'S OR LEGAL ENTITY'S) AGGREGATE LIABILITY ARISING OUT OF OR RELATED TO THIS AGREEMENT, WHETHER ARISING OUT OF OR RELATED TO BREACH OF CONTRACT, TORT OR OTHERWISE, SHALL NOT EXCEED THE AGGREGATE PURCHASE PRICE (IN U.S. DOLLARS). NEITHER THE FOUNDATION NOR ITS REPRESENTATIVES SHALL BE LIABLE FOR CONSEQUENTIAL, INDIRECT, INCIDENTAL, SPECIAL, EXEMPLARY, PUNITIVE OR ENHANCED DAMAGES, LOST PROFITS OR REVENUES OR DIMINUTION IN VALUE, ARISING OUT OF OR RELATING TO ANY BREACH OF THIS INSTRUMENT.

**7.** **TAX CONSEQUENCES.** PURCHASER UNDERSTANDS THAT PURCHASER MAY SUFFER ADVERSE TAX CONSEQUENCES AS A RESULT OF THE PURCHASER'S PURCHASE OR DISPOSITION OF THE TOKEN INTERESTS AND THE TOKENS HEREUNDER. PURCHASER REPRESENTS (a) THAT IT HAS CONSULTED WITH A TAX ADVISER THAT IT DEEMS ADVISABLE IN CONNECTION WITH THE PURCHASE, RECEIPT, VESTING, AND DISPOSITION OF THE TOKEN INTERESTS AND THE TOKENS HEREUNDER, AND (b) THAT PURCHASER IS NOT RELYING ON THE FOUNDATION, OR ANY AGENTS, REPRESENTATIVES, OR ADVISORS OF THE FOUNDATION FOR ANY TAX ADVICE.

THE FAIR MARKET VALUE OF THE TOKEN INTERESTS HEREUNDER HAS BEEN DETERMINED IN GOOD FAITH IN ACCORDANCE WITH A VALUATION REPORT RECEIVED BY THE FOUNDATION, A COPY OF WHICH IS AVAILABLE TO PURCHASER UPON REQUEST. THERE IS NO GUARANTEE THAT SUCH DETERMINATION OF FAIR MARKET VALUE WILL NECESSARILY REFLECT OR EQUAL ANY DETERMINATION OF FAIR MARKET VALUE BY A TAXING AUTHORITY (SUCH AS THE IRS). PURCHASER AGREES TO BE FULLY RESPONSIBLE FOR ANY TAXES RESULTING FROM THE RECEIPT AND DISPOSITION OF THE TOKEN INTERESTS AND TOKENS HEREUNDER, INCLUDING ANY ADDITIONAL TAXES RESULTING FROM A DIFFERENT DETERMINATION OF FAIR MARKET VALUE.

**8.** **COMPLIANCE WITH LAWS AND REGULATIONS.** The issuance and transfer of the Token Interests will be subject to and conditioned upon compliance by the Foundation and Purchaser with all applicable state and federal laws and regulations and with all applicable requirements of any exchange on which Tokens may be listed or quoted at the time of such issuance or transfer. Notwithstanding the foregoing, there is no guarantee that there will be any exchange or market available for the Token Interests or the Tokens.

9.    **GENERAL PROVISIONS.**

9.1    **Notices.** All notices and other communications given or made pursuant to this Agreement shall be in writing and shall be deemed effectively given upon the earlier of actual receipt, or (a) personal delivery to the party to be notified, or (b) when sent, if sent by electronic mail or facsimile during normal business hours of the Purchaser, and if not sent during normal business hours, then on the Purchaser's next Business Day, or (c) three (3) Business Days after deposit in the United States mail by certified mail (return receipt requested) for United States deliveries. All notices for delivery outside the United States will be sent by express courier. All notices for delivery will be sent by express courier. All notices not delivered personally will be sent with postage and/or other charges prepaid and properly addressed to the party to be notified at the address set forth below the signature lines of this Agreement or at such other address as such other party may designate by one of the indicated means of notice herein to the other party hereto. A "***Business Day***" shall be a day, other than Saturday or Sunday, when the banks in the Republic of Panama are open for business.

9.2    **Further Assurances.** The parties agree to execute such further documents and instruments and to take such further actions as may be reasonably necessary to carry out the purposes and intent of this Agreement.

9.3    **Titles and Headings.** The titles, captions and headings of this Agreement are included for ease of reference only and will be disregarded in interpreting or construing this Agreement. Unless otherwise specifically stated, all references herein to "sections" and "exhibits" will mean "sections" and "exhibits" to this Agreement.

9.4    **Governing Law; Dispute Resolution.** Any unresolved controversy or claim arising out of or relating to this Agreement, except any such controversies or claims arising out of either party's intellectual property rights for which a provisional remedy or equitable relief is sought, shall be determined by arbitration administered by the Center of Arbitration and Conciliation of Panama in accordance with its rules. All disputes shall be heard by a single arbitrator. The law of the arbitration shall be the law of the Republic of Panama. The language of the arbitration shall be English. The arbitration shall take place in San Francisco, California, unless such venue is not mutually agreeable to the parties, in which case the arbitration shall be administered by the Panama Conciliation and Arbitration Centre in accordance with its procedural rules. The arbitration shall be commenced following the aggrieved party's notification to the other of the particulars of the controversy or claim along with the aggrieved party's proposed arbitrator obtained from a list of potential arbitrators maintained by the American Arbitration Association (the "***AAA***"). Where the notified party does not agree with the choice of arbitrator or if no agreement on the choice of arbitrator can be reached within thirty (30) days, then an arbitrator will be one chosen by the AAA having reasonable experience in transactions of the type provided for in this Agreement. The arbitrator shall render the award within three (3) months of the commencement of the arbitration, unless such time limit is extended by the arbitrator. Prior to the issue or delivery of arbitral award, each party will bear its own costs in respect the arbitration, following which the prevailing party shall be entitled to reasonable attorney's fees, costs, and necessary disbursements in addition to any other relief to which such party may be entitled. An award by the arbitrator shall be final and conclusive and binding upon the parties and shall not be subject to further a ppeal. Each party may enforce any award granted in accordance with this

Section 9.4 in any court of competent jurisdiction. The arbitrator shall be required to provide in writing to the parties the basis for the award or order of such arbitrator, and all hearings shall be recorded, with such record constituting the official transcript of such proceedings.

       **9.5**       **Assignments; Successors and Assigns.** The Foundation may assign any of its rights and obligations under this Agreement. Any assignment of rights and obligations by any other party to this Agreement requires the Foundation's prior written consent. This Agreement, and the rights and obligations of the parties hereunder, will be binding upon and inure to the benefit of their respective successors, permitted assigns, heirs, executors, administrators and legal representatives.

       **9.6**       **Entire Agreement.** This Agreement and the documents referred to herein constitute the entire agreement and understanding of the parties with respect to the subject matter of this Agreement, and supersede all prior understandings and agreements, whether oral or written, between or among the parties hereto with respect to the specific subject matter hereof.

       **9.7**       **Amendment and Waivers.** This Agreement may be amended only by a written agreement executed by each of the parties hereto. No amendment of or waiver of, or modification of any obligation under this Agreement will be enforceable unless set forth in a writing signed by the party against which enforcement is sought. Any amendment effected in accordance with this Section 9.7 will be binding upon all parties hereto and each of their respective successors and assigns. No delay or failure to require performance of any provision of this Agreement shall constitute a waiver of that provision as to that or any other instance or of any other provision of this Agreement. No waiver granted under this Agreement as to any one provision herein shall constitute a subsequent waiver of such provision or of any other provision herein, nor shall it constitute the waiver of any performance other than the actual performance specifically waived.

       **9.8**       **Severability.** If any provision of this Agreement is determined by any court or arbitrator of competent jurisdiction to be invalid, illegal or unenforceable in any respect, such provision will be enforced to the maximum extent possible given the intent of the parties hereto. If such clause or provision cannot be so enforced, such provision shall be stricken from this Agreement and the remainder of this Agreement shall be enforced as if such invalid, illegal or unenforceable clause or provision had (to the extent not enforceable) never been contained in this Agreement. Notwithstanding the foregoing, if the value of this Agreement based upon the substantial benefit of the bargain for any party is materially impaired, which determination as made by the presiding court or arbitrator of competent jurisdiction shall be binding, then both parties agree to substitute such provision(s) through good faith negotiations.

       **9.9**       **Counterparts; Facsimile Signatures.** This Agreement may be executed in any number of counterparts, each of which when so executed and delivered will be deemed an original, and all of which together shall constitute one and the same agreement. This Agreement may be executed and delivered by facsimile or electronic mail (including .pdf or any electronic signature, e.g., www.docusign.com) and upon such delivery the signature will be deemed to have the same effect as if the original signature had been delivered to the other party.

*[Signature page follows]*

**IN WITNESS WHEREOF**, the Foundation has caused this Token Subscription Agreement to be executed by its duly authorized representative and Purchaser has executed this Agreement, each as of the date first set forth above.

**FOUNDATION:**

**ARGON PROTOCOL FOUNDATION**

By: _____

Name:     Diana Aidee Muñoz Maclao de Camargo

Title:     Director

Address:     Oceania Business Plaza, 21st floor, Tower 1000, Isaac Hanono Missri Street, Punta Pacifica, Panama City, Republic of Panama.

**IN WITNESS WHEREOF**, the Foundation has caused this Token Subscription Agreement to be executed by its duly authorized representative and Purchaser has executed this Agreement, each as of the date first set forth above.

**PURCHASER:**

**[INVESTOR]**

By: _____

Name: Mark Long_____

Title: _____

Address: _____

| Number of SHRAP Tokens | Aggregate Purchase Price | Price per Token |
|---|---|---|
| 21,327,014 | $557.91 | $0.00002616 |

# EXHIBIT H

DocuSign Envelope ID: 091168BB-C137-4C96-A5C6-5A137687B895

**INTELLECTUAL PROPERTY LICENSE AND ASSIGNMENT AND SERVICES AGREEMENT**

This Intellectual Property License and Assignment and Services Agreement (the "**Agreement**") by and between the Argon Asset Ventures Corp., a corporation under the laws of Panama (the "**Service Recipient**") and Neon Machine, Inc., a Delaware corporation (the "**Service Provider**") is made and entered into as of February 2, 2022 (the "**Effective Date**").

WHEREAS, the Service Recipient wishes to facilitate the issuance of a token ("**Token**") for use in the SHRAPNEL Protocol that will be built on blockchain technology (the "**Service Recipient Network**");

WHEREAS, Service Provider has necessary technology, expertise, staffing, infrastructure, and other resources needed by the Service Recipient in order to support the token issuance and the research, development, maintenance, marketing, and support of the Service Recipient Network; and

WHEREAS, the Service Recipient wishes to obtain, and Service Provider wishes to provide, the intellectual property licenses and services as such licenses and services are described herein and as may be subsequently agreed upon in statements of work (each a "**Statement of Work**") executed by the parties during the Term in accordance with this Agreement.

NOW THEREFORE, in consideration of the terms and conditions and mutual agreements contained herein, the receipt and sufficiency of which are hereby acknowledged, it is agreed as follows:

1.    **DEFINITIONS**.

1.1    "**Affiliate**" means, with respect to any party, any entity that directly or indirectly controls, is controlled by, or is under common control with a party, now or anytime in the future.  For purposes of this definition, "control" means having ownership of the majority of the voting securities of such party.

1.2    "**Change of Control**" means, with respect to a party: (a) the direct or indirect acquisition of either (i) the majority of voting securities of such party or (ii) all or substantially all of the assets of such party, by another entity in a single transaction or a series of transactions; or (b) the merger of such party with another entity

1.3    "**Deliverables**" means the deliverables specifically designated as "Deliverables" in Exhibit A, or in any Statement of Work, to be delivered by Service Provider to the Service Recipient under this Agreement, including without limitation the Service Recipient Network. For the avoidance of doubt, the Service Recipient Network refers solely to the decentralized blockchain technology and does not include any applications, products or services that utilize such protocol.

1.4    "**Intellectual Property Rights**" means all worldwide patent rights (including patent applications and disclosures), copyrights, industrial designs, mask work rights, know-how, trade secrets rights, and any and all other intellectual property or proprietary rights therein.

1.5    "**Service Recipient Data**" means all electronic data or information submitted by or on behalf of the Service Recipient to Service Provider for use, storage or processing for the Token issuance or in the Service Recipient Network.

1.6    "**Moral Rights**" mean any rights to claim authorship of a work, to object to or prevent the modification or destruction of a work, to withdraw from circulation or control the publication or distribution

DocuSign Envelope ID: 091469BB-C137-4C96-A5C6-FA137687B895

of a work, and any similar right, existing under judicial or statutory law of any country in the world, or under any treaty, regardless of whether or not such right is called or generally referred to as a "moral right."

1.7    "**Service Provider Domain Names**" means the following Internet domain names: www.shrapnel.com.

1.8    "**Service Provider IP**" means all (i) Intellectual Property Rights owned or controlled by Service Provider prior to the Effective Date; (ii) all Intellectual Property Rights developed, acquired or licensed by the Service Provider independent of this Agreement; and (iii) all enhancements, improvements, adaptations or modifications by Service Provider or its Affiliates to the Service Provider IP other than pursuant to this Agreement.

1.9    "**Services**" means the engineering, administrative, financial, technology and related operational services necessary to develop, launch, support and maintain the Service Recipient Network, including related documentation, and any other specified services or deliverables required, provided or to be provided by Service Provider under this Agreement as described in the Exhibit A hereto, as amended from time to time, or in any applicable Statement of Work.

2.    **SERVICES**.

2.1    **Services**. Subject to the terms and conditions of this Agreement, the Service Recipient hereby engages the Service Provider, and the Service Provider hereby agrees, to perform the Services as described in the attached Exhibit A or otherwise in an applicable Statement of Work. The Service Recipient and the Service Provider will periodically and in good faith (i) consult on the specific scope of the Services; and (ii) amend the specifications and descriptions of, and timelines for, the Services (and associated Deliverables and Fees) set forth in this Agreement to the extent reasonably necessary.

2.2    **Change in Services**. To the extent the Service Recipient requests any material modifications or adjustments to the Services, or any Services outside of the scope of the Services identified in Exhibit A or otherwise in an applicable Statement of Work, the parties will discuss such changes in good faith and increase any fees or other compensation due to the Service Provider.

2.3    **Performance**. Service Provider will provide the Services in a timely and professional manner. The Service Recipient acknowledges and agrees that delays or failure of the Service Recipient or its representatives to deliver required content, information, instructions or other materials in a timely manner will excuse Service Provider from related performance requirements under this Agreement to the extent such delay caused or contributed to delays or disruption in the performance of Services. Service Provider may subcontract the Services or any portion thereof, at the Service Provider's reasonable discretion.

2.4    **Limitation and Disclaimer**. For the avoidance of doubt, in no event will Service Provider perform any Services not agreed to in Exhibit A or in any Statement of Work unless agreed to in writing by Service Provider. Without limiting the foregoing, the Service Recipient specifically acknowledges and agrees that in no event will the Services to be performed by Service Provider under this Agreement involve or be construed to involve Service Provider, directly or indirectly, in the Service Recipient's Token issuance and distribution of tokens, or any subsequent sales, issuance, trading, or any other transactions by the Service Recipient relating to the Token or any other tokens, or any issuance of debt instruments, equity interests, or securities (registered or unregistered) of any sort by the Service Recipient. Neither Service Provider nor any person or entity associated with it, including but not limited to its Affiliates, officers, directors, managers, shareholders, members, employees, subcontractors, agents, representatives and successors and assigns, will be liable, whether in contract, tort (including negligence), or otherwise, for any damage, expense, or other loss that the

Service Recipient or any third party may suffer or claim arising out of or related to the Token issuance or distribution, or the legal status of the Service Recipient, and the Service Recipient agrees to defend, indemnify, and hold Service Provider and the Service Provider Indemnitees harmless as provided in <u>Section 9.2</u> for any breach of the provisions of this <u>Section 2.4</u>.

**3.      INTELLECTUAL PROPERTY ASSIGNMENTS AND LICENSES**

3.1      **Ownership of White Paper**. Subject to <u>Section 3.4</u>, Service Provider hereby irrevocably conveys, transfers and assigns to the Service Recipient all right, title and interest in and to the White Paper, including all Intellectual Property Rights therein. At the Service Recipient's request and expense, Service Provider will assist and cooperate with the Service Recipient in all reasonable respects, and will execute documents and will take such other acts reasonably requested by the Service Recipient in writing to enable the Service Recipient to acquire, transfer, maintain, perfect and enforce its Intellectual Property Rights and other legal protections for the White Paper. To the fullest extent permitted by applicable law, Service Provider also hereby irrevocably transfers and assigns to the Service Recipient, and agrees to irrevocably transfer and assign to the Service Recipient, and waives and agrees never to assert, and shall ensure that its employees and any other third parties who created the White Paper will waive and agree never to assert, any and all Moral Rights that Service Provider, its employees or any other third party may have in or with respect to the White Paper.

3.2      **Ownership of Deliverables**.  Service Provider agrees that, subject to <u>Section 3.4</u>, to the fullest extent legally possible, each Deliverable will be a work made for hire owned exclusively by the Service Recipient. Service Provider acknowledges that regardless of whether a Deliverable is a work made for hire, all Deliverables will be the sole and exclusive property of the Service Recipient. Service Provider hereby conveys, transfers and assigns and agrees to convey, transfer and assign to the Service Recipient all rights, title and interest in and to any and all Deliverables including all Intellectual Property Rights therein. To the extent any of the rights, title and interest in the Deliverables cannot be assigned by Service Provider to the Service Recipient, Service Provider hereby grants to the Service Recipient an exclusive, royalty-free, transferable, perpetual, irrevocable, unrestricted worldwide license (with rights to sublicense through one or more tiers of sublicensees) to such non-assignable rights. To the fullest extent permitted by applicable law, Service Provider also hereby irrevocably transfers and assigns to the Service Recipient, and agrees to irrevocably transfer and assign to the Service Recipient, and waives and agrees never to assert, and will ensure that its employees and any other third parties who created any Deliverables will waive and agree never to assert, any and all Moral Rights that Service Provider, its employees or any other third party may have in or with respect to any Deliverables.

3.3      **Perfection of Assignment for the Deliverables**. Service Provider will promptly disclose and deliver to the Service Recipient any Deliverables upon payment to the corresponding Fees to Service Provider. At the Service Recipient's request and expense, Service Provider will assist and cooperate with the Service Recipient in all reasonable respects, and will execute at Service Recipient's sole expense, documents and will take such other acts reasonably requested by the Service Recipient in writing to enable the Service Recipient to acquire, transfer, maintain, perfect and enforce its Intellectual Property Rights and other legal protections for the Deliverables.

3.4      **Service Provider IP**. As between the parties, all Service Provider IP will remain the sole and exclusive property of Service Provider. To the extent any Service Provider IP is included in or required to use any Deliverable provided hereunder, Service Provider hereby grants to the Service Recipient a worldwide, royalty-free, non-exclusive, perpetual license to the Service Recipient, to use, modify, and create derivate works of such Service Provider IP solely in connection with the Deliverables and solely for use of the Network. Except as expressly set forth in this Agreement, the Service Recipient acknowledges and agrees that nothing in this

DocuSign Envelope ID: 091468BB-C137-4C96-A5C6-5A137597B895

Agreement will be construed as granting any rights to the Service Recipient, by license, implication, estoppel or otherwise, in or to any Service Provider IP.

3.5    **License to Service Provider**. The Service Recipient hereby grants Service Provider a non-exclusive, royalty-free, transferable, perpetual, irrevocable, worldwide license (with rights to sublicense through one or more tiers of sublicensees) to the Deliverables to make, have made, use, offer to sell, sell, import, copy, modify, create derivative works based upon, distribute, sublicense, display, perform and transmit any products, software, hardware, methods or materials of any kind that are covered by such Deliverables, as part of Service Provider's business operations, including, without limitation, the provision of the Services, and the use, development, sale and exploitation of software applications, products and services.

3.6    **Feedback**. In connection with this Agreement, the Service Recipient may provide Service Provider with comments, suggestions, descriptions, and other information, either orally or in writing, including but not limited to, information that helps Service Provider to identify and resolve any errors or problems in the provision of the Services (collectively, "**Feedback**"). The Service Recipient acknowledges and agrees that all Feedback will be the sole and exclusive property of Service Provider. The Service Recipient hereby assigns to Service Provider  and agrees to assign to Service Provider all of the Service Recipient's right, title, and interest in and to all Feedback, including all Intellectual Property Rights therein.

3.7    **Trademark License**.  Each party expressly reserves all right, title, and interest in and to its own trademarks, service marks, branding and logos (the "**Marks**").  The Service Recipient hereby grants to Service Provider a limited, non-exclusive, worldwide, royalty-free, non-transferable (except as provided in <u>Section 11.6</u>), irrevocable license, with the right to grant sublicenses, to use the Service Recipient's Marks during the Term as necessary to perform the Services and for any promotional or marketing purposes. Service Provider hereby grants to Service Recipient a limited, non-exclusive, revocable right and license to use Service Provider's Marks solely in the manner approved by Service Provider in each instance. All uses of the Marks shall solely inure to the benefit of the licensor in each instance and neither party shall impair the other party's ownership or rights in and to its Marks or challenge or contest the validity or seek to register or file applications for the other party's Marks or any confusingly similar Marks.

3.8    **Domain Names**.  Service Provider hereby irrevocably conveys, transfers and assigns to the Service Recipient all right, title and interest in and to the Domain Names, including all Intellectual Property Rights therein. At the Service Recipient's expense, Service Provider will assist and cooperate with the Service Recipient in all reasonable respects, and will execute documents and will take such other acts reasonably requested by the Service Recipient in writing to enable the Service Recipient to acquire, transfer, maintain, perfect and enforce its Intellectual Property Rights and other legal protections for the Domain Names.

**4.**    **SECURITY AND ACCESS POLICIES**.

4.1    **Network Security**. Service Provider shall use commercially reasonable efforts consistent with industry standards to protect the physical security and electronic security of the Service Recipient Network and other systems utilized to provide the Services, including but not limited to using up-to-date anti-virus, security and firewall technology commonly used in the industry. The Service Recipient agrees that it and its Affiliates will not take actions that negatively affect the security, integrity, and as appropriate the availability of Service Provider's systems and information assets.

4.2    **Harmful Code**. If either party becomes aware that an unauthorized party has accessed Service Recipient Data, or Confidential Information, or that Harmful Code (as defined below) has infected a relevant network or system of such party, then it will notify the other party as soon as reasonably practical, so the

parties can work together to mitigate any potential adverse effect and undertake any further steps that may be applicable or required by law. For purposes of this Agreement, "**Harmful Code**" means computer instructions whose primary purpose or effect is to disrupt, damage or interfere with use of any computer or telecommunications facilities, including, without limitation, any automatic restraint, time-bomb, trap- door, virus, worm, Trojan horse, or other harmful code or instrumentality that will cause a system to cease to operate or to fail to conform to its specifications. Each party will take commercially reasonable precautions to avoid, prevent, stop, find and eliminate the spread of all Harmful Code on its hardware systems and networks.

4.3    **Export Restrictions**. The Service Recipient will not remove or export from the United States or re-export from anywhere any part of the Services or any direct product thereof to any prohibited country or party as specified by the export laws of the United States. Further, each party warrants to the other that it is not on the United States' prohibited party list and is not located in or a national resident of any country on the United States' prohibited country list. The Service Recipient acknowledges that the Services contain encryption technology, export of which is subject to regulation by the U.S. and certain foreign jurisdictions.

**5.    FEES; PAYMENT TERMS AND TAXES.**

5.1    **Fees**. The fees charged by Service Provider for the provision of the Services, and any other fees, expenses, and charges due to Service Provider under this Agreement (collectively, "**Fees**") are set forth on Exhibit B hereto. The parties may amend and update Exhibit B from time to time to reflect any increased costs in providing the Services.

5.2    **Payment Terms**. In accordance with Exhibit B, the Service Recipient will remit sufficient proceeds to be held as an advance against all Fees and other amounts due to Service Provider under this Agreement ("**Fee Advance**"). Unless otherwise agreed by the parties in writing, Service Provider will hold the Fee Advance in a separate interest-bearing account in U.S. dollars. Each month during the Term, Service Provider will deliver to the Service Recipient an invoice for all Fees due in U.S. dollars, and unless disputed in writing by the Service Recipient within ten (10) days from receipt of the invoice, Service Provider may withdraw undisputed amounts from the Fee Advance account as payment on the invoice. Invoices will be delivered as set forth in Exhibit B. In the event of any dispute relating to invoiced amounts or payments due, the parties shall work in good faith to resolve any disagreements as quickly and as reasonably possible, and in no event later than thirty (30) days after the invoice date. The Service Recipient will reimburse Service Provider for any expenses associated with the recovery of any payments that result from any such disputes, including reasonable attorneys' fees.

5.3.    **Taxes**. The Service Recipient will be responsible for the payment of any and all taxes applicable to the license and use of the Services under this Agreement (other than those based upon Service Provider's net income) including, without limitation, Service Recipient's income, payroll, sales, VAT, use, gross receipts, real estate, personal property, withholding or other taxes imposed upon transactions under this Agreement ("**Taxes**"), and will indemnify and hold harmless Service Provider and its Affiliates for any loss or damage (including without limitation any penalties and interest) sustained because of Service Recipient's failure to pay such Taxes. If Service Provider has the legal obligation to collect Taxes for which the Service Recipient is responsible under this Section 5.3, the appropriate amount shall be invoiced to and paid by the Service Recipient from the Fee Advance, unless the Service Recipient provides Service Provider with a valid tax exemption certificate authorized by the appropriate taxing authority. If any withholding taxes must be paid based on the payments to Service Provider specified in this Agreement, then the Service Recipient will pay all such taxes and the amounts payable to Service Provider under this Agreement will be increased such that the amounts actually paid to Service Provider will be no less than the amounts that Service Provider would have

received notwithstanding such tax.

## 6.    CONFIDENTIALITY.

6.1    **Definition**. For purposes of this Agreement, "**Confidential Information**" means any information, materials or knowledge regarding either party and its business, financial condition, products, programming techniques, customers, suppliers, technology or research and development, whether or not reduced to writing, that is disclosed to the other party or to which the other party has access in connection with this Agreement, which is designated in writing as confidential or which should be otherwise reasonably deemed to be confidential under the circumstances.

6.2    **Confidentiality Obligations**. Each party agrees that it and its Affiliates will hold in strict confidence and not disclose the Confidential Information of the other party to any third party and to use the Confidential Information of the other party for no purpose other than the purposes expressly permitted by this Agreement. Each party will only permit access to the other party's Confidential Information to those of its or its Affiliates' employees, contractors and advisors having a need to know and who have signed or are bound by confidentiality obligations or agreements containing terms at least as restrictive as those contained in this Agreement. Each party will maintain the confidentiality and prevent accidental or other loss or disclosure of any Confidential Information of the other party with at least the same degree of care as it uses to protect its own Confidential Information, but in no event with less than reasonable care.

6.3    **Exclusions**. A party's obligations of confidentiality under this Agreement will not apply to information which (a) is in or comes into the public domain without breach of this Agreement by the receiving party; (b) was in the possession of the receiving party prior to receipt from the disclosing party and was not acquired by the receiving party from the disclosing party under an obligation of confidentiality or non-use; (c) is acquired by the receiving party from a third party not under an obligation of confidentiality or non-use to the disclosing party; or (d) is independently developed by the receiving party without use of any Confidential Information of the disclosing party.

6.4    **Legally Required Disclosure**. In the event either party is required to disclose, pursuant to a judicial order, a requirement of a governmental agency or by operation of law, any Confidential Information provided to it by the other party then such party will provide the other party written notice of any such requirement immediately after learning of any such requirement, and take commercially reasonable measures at the other party's expense to avoid or limit disclosure under such requirements and to obtain confidential treatment or a protective order and allow the other party to participate in the proceeding.

6.5    **Injunctive Relief**. Each party recognizes and acknowledges that any use or disclosure of the Confidential Information of the other party in a manner inconsistent with the provisions of this Agreement will cause the other party irreparable damage for which remedies at law may be inadequate. Accordingly, the non-breaching party will have the right to seek an immediate injunction in respect of any breach of these confidentiality obligations to obtain such relief. Notwithstanding the foregoing, this <u>Section 6.5</u> will not in any way limit the remedies in law or equity otherwise available to the non-breaching party.

6.6    **Obligations Upon Termination**. Upon expiration or termination of this Agreement, each party will promptly cease all use of the other party's Confidential Information and destroy or return (in accordance with the disclosing party's instructions) all Confidential Information to the disclosing party except for any archived electronic communications, which shall continue to be stored on a confidential basis by the receiving party in accordance with its then-current document retention policies. As between the parties, each party will remain the sole and exclusive owner of any Confidential Information provided to the other party under this

Agreement.

**7.      TERM AND TERMINATION.**

7.1      **Term.** This Agreement will commence on the Effective Date and will continue for the period of one (1) year as of such date (the "**Initial Term**"), unless terminated earlier as provided in this Agreement.  This Agreement will automatically renew for subsequent one-year periods, unless either party notifies the other in writing of its intent not to renew at least thirty (30) days prior to the end of the then-current term. The Initial Term and renewal periods are collectively the "**Term**".

7.2      **Termination for Cause**.  If either party breaches any material terms or conditions of this Agreement, then the other party may give written notice to the breaching party that if the breach is not cured within thirty (30) days of the date of such written notice, the Agreement will be terminated.

7.3      **Termination for Insolvency.** Either party may terminate this Agreement immediately upon written notice to the other party if the other party (a) becomes insolvent, unable to pay debts when due, or the subject of bankruptcy proceedings not terminated within thirty (30) days of any filing; or (b) makes a general assignment for the benefit of creditors; or if a receiver is appointed  for  substantially  all  of  its  property.

7.4      **Effect of Termination**. All licenses and rights of the Service Recipient to use the Services hereunder will terminate as of the date of any termination or expiration of this Agreement. No refunds of any amounts paid, including the balance of the Fee Advance, will be made as a result of any termination or expiration of this Agreement; provided, however, that if this Agreement is terminated for a material breach of Service Provider and Service Provider further stipulates that termination for such breach was proper under this Agreement, then unearned amounts, if any, remaining from the Fee Advance, after payment of all amounts due to Service Provider, will be refunded to the Service Recipient within thirty (30) days of such termination for cause by the Service Recipient.

7.5      **Effect of Bankruptcy**. The parties intend that all licenses that are granted under this Agreement are, for purposes of section 365(n) of the Bankruptcy Code, licenses of rights to "intellectual property," as that term is defined in section 101 of the Bankruptcy Code. Nothing in this agreement limits either party's rights under section 365(n).

7.6      **Survival**. The provisions of Sections 3.4, 3.5, 3.7, 7.6, 9, 10 and 11 will survive the termination or expiration of this Agreement for any reason.

**8.      REPRESENTATIONS AND WARRANTIES**.

8.1.      **Mutual Representations and Warranties.** Each party represents and warrants to the other party that (a) it is duly organized and validly existing under the laws of its jurisdiction of organization; (b) it has the legal power and authority to execute and deliver this Agreement; (c) the execution, delivery and performance of this Agreement by it have been duly authorized by all necessary actions and do not violate its organizational documents or any other material agreements to which it is a party; and (d) this Agreement constitutes a legally valid and binding obligation of it enforceable against it in accordance with its terms, except as such enforcement may be limited by applicable law.

8.2      **Disclaimer**. EACH PARTY HEREBY ACKNOWLEDGES AND AGREES THAT THE SERVICES AND ALL DELIVERABLES ARE PROVIDED "AS IS," AND WITHOUT WARRANTY OF ANY KIND.  Service Provider MAKES NO REPRESENTATIONS OR WARRANTIES, EXPRESS OR IMPLIED, WITH RESPECT TO THE SERVICES OR

DELIVERABLES, AND DISCLAIMS ALL IMPLIED WARRANTIES, INCLUDING WITHOUT LIMITATION ANY WARRANTY OF MERCHANTABILITY, FITNESS FOR A PARTICULAR PURPOSE OR NONINFRINGEMENT.

**9.**    **INDEMNIFICATION.**

9.1    **Indemnification by Service Provider.** Service Provider will defend, indemnify and hold the Service Recipient, and its officers, directors, managers, shareholders, members, and employees, and successors and assigns ("**Service Recipient Indemnitees**") harmless from and against any out-of-pocket loss, liability, damage or expense (including, without limitation, reasonable attorney's fees (collectively, "**Losses**") incurred in connection with the defense of third-party claims, demands, suits, proceedings, investigations or inquiries (collectively, "**Claims**") made, brought or commenced by a third party (including without limitation, regulators) against such Service Recipient Indemnitees which arise, results from or relate to: (i) the assertion of any Claims that the Services, when used as delivered and as authorized under this Agreement (but excluding modifications made by third parties and excluding combination of the Services with any equipment, hardware, technology or services not provided by Service Provider) infringes any U.S. patent, copyright, or trademark, or misappropriates other Intellectual Property Rights of a third party in the United States;  or (ii) gross negligence or willful misconduct by Service Provider  or its Affiliates.

9.2    **Indemnification by the Service Recipient.** The Service Recipient will defend, indemnify, and hold Service Provider and its Affiliates, and its and their officers, directors, managers, shareholders,  members, employees, agents, representatives and successors and assigns ("**Service Provider  Indemnitees**") harmless against any Losses incurred in connection with Claims made, brought or commenced by a third party (including without limitation regulators) which arise, result from, or relate to (i) any failure or alleged failure of the Service Recipient to comply with any applicable law, rule or regulation in connection with Service Recipient's use or offering of the Services  hereunder; (ii) the negligent or willful acts or omissions of Service Recipient; (iii) Claims that any Service Recipient Data or other materials provided by Service Recipient to Service Provider infringe the Intellectual Property Rights of any third party; (iv) Claims relating to the legal status of Token or of the Service Recipient distribution, including without limitation Claims for which the Service Recipient is required to indemnify Service Provider  pursuant to <u>Section 2.4</u>; (v) the Service Recipient's breach of its obligations (including its representations and warranties) under this Agreement; and (vi) Claims relating to the Service Recipient which are not the result of the negligence or intentional misconduct of the Service Provider.

9.3    **Procedure for Service Provider Claims**. As an express condition to Service Provider's obligation under this <u>Section 9</u>, the Service Recipient, as a condition to seeking indemnification must: (a) promptly notify Service Provider in writing of the applicable Claim for which indemnification is sought; (b) tender control of the defense to the Service Provider; and (c) provide Service Provider with non-financial assistance, information, and authority reasonably required for the defense and settlement of such Claim. The Service Recipient may select its own counsel and participate in the defense of a Claim if it chooses to do so, but at its own expense. Service Provider may settle any such Claim, to the extent it seeks a money payment, with or without the consent of the Service Recipient. The Service Recipient must obtain Service Provider's prior written consent to any settlement to the extent it consents to injunctive relief or requires any admission of fault or any public statement or contains contract terms governing future activities that would materially affect the indemnified party's business or interests, said consent not to be unreasonably withheld, conditioned, or delayed.

9.4    **Procedure for Service Recipient Claims**. In the event the Service Provider reasonably seeks indemnification from the Service Recipient under this <u>Section 9</u>, Service Provider will provide notice to the Service Recipient, and may apply any Fee Advance to the costs of such Claim. Service Provider will select its

own counsel and control its own defense, all at the costs of the Service Recipient.

**10.      LIMITATION OF LIABILITY.**

10.1      EXCEPT FOR ANY BREACH OF <u>SECTION 6</u>, AND EITHER PARTY'S INDEMNIFICATION OBLIGATIONS UNDER <u>SECTION 9</u>, IN NO EVENT WILL EITHER PARTY BE LIABLE TO THE OTHER OR TO ANY THIRD PARTY FOR ANY, SPECIAL, INCIDENTAL, PUNITIVE OR CONSEQUENTIAL DAMAGES (INCLUDING LOSS OF USE, BUSINESS OR PROFITS) ARISING OUT OF OR IN CONNECTION WITH THIS AGREEMENT OR FOR ANY ERROR OR DEFECT IN THE SERVICES OR ANY DELIVERABLES WHETHER SUCH LIABILITY ARISES FROM ANY CLAIM BASED UPON CONTRACT, WARRANTY, TORT (INCLUDING NEGLIGENCE), STRICT LIABILITY OR OTHERWISE, AND WHETHER OR NOT SUCH PARTY HAS BEEN ADVISED OF THE POSSIBILITY OF SUCH LOSS OR DAMAGE. THE PARTIES HAVE AGREED THAT THESE LIMITATIONS WILL SURVIVE AND APPLY EVEN IF ANY LIMITED REMEDY SPECIFIED IN THIS AGREEMENT IS FOUND TO HAVE FAILED OF ITS ESSENTIAL PURPOSE.

10.2      EXCEPT FOR ANY BREACH OF <u>SECTION 6</u>, THE SERVICE RECIPIENT'S PAYMENT OBLIGATIONS UNDER THIS AGREEMENT, AND EITHER PARTY'S INDEMNIFICATION OBLIGATIONS UNDER <u>SECTION 9</u>, EACH PARTY'S AGGREGATE LIABILITY TO THE OTHER PARTY ARISING OUT OF, OR RELATING TO, THIS AGREEMENT (WHETHER IN CONTRACT, TORT OR OTHER LEGAL THEORY) WILL NOT EXCEED THE  LESSER  OF FIVE   HUNDRED THOUSAND DOLLARS (US$500,000.00) OR THE TOTAL AMOUNTS PAID BY THE SERVICE RECIPIENT TO SERVICE PROVIDER UNDER THIS AGREEMENT DURING THE PREVIOUS TWELVE (12) MONTHS.

10.3      <u>Allocation of Risk and Material Term</u>. THE PROVISIONS OF THIS SECTION 10 ALLOCATE THE RISKS UNDER THIS AGREEMENT BETWEEN THE PARTIES AND ARE AN INTRINSIC PART OF THE BARGAIN BETWEEN THE PARTIES. THE FEES PROVIDED FOR IN THIS AGREEMENT REFLECT THIS ALLOCATION OF RISKS AND THE LIMITATION OF LIABILITY AND SUCH LIMITATION WILL APPLY NOTWITHSTANDING A FAILURE OF ESSENTIAL PURPOSE OF ANY LIMITED REMEDY AND TO THE FULLEST EXTENT PERMITTED BY LAW.

**11.      GENERAL PROVISIONS.**

11.1      **Relationship of Parties**.  The parties to this Agreement will at all times and for all purposes be deemed to be independent contractors and no party or its employees, representatives, subcontractors or agents will have the right or power to bind the other.  This Agreement will not itself create or be deemed to create any relationship of joint venture, partnership, employment, franchise, agency, or similar association or relationship among the parties or their employees, subcontractors or agents. Each party specifically disclaims and waives the formation of any fiduciary relationship between them under or in relation to this Agreement and the Services.

11.2      **Governing Law and Jurisdiction**.  This Agreement will be construed and governed by the laws of Delaware, without reference to conflict of laws principles. Any proceeding relating to or arising from this Agreement may be brought only in the state and federal courts in Delaware, and the parties hereby waive any objections to jurisdiction or venue of any such court. Each party hereby waives any right to jury trial in connection with any action or litigation in any way arising out of or related to this Agreement.

11.3      **Notices**.  Any and all notices made under this Agreement will be in writing and will be (a) sent by email or (b) delivered personally or sent by registered or certified mail to the party at the address specified in this <u>Section 11.3</u> (or to such other address or individual as a party may designate by notice to the other party). In the case of any notice, election, offer, acceptance, or demand made pursuant to this Agreement, original signed documents will be available upon request.

DocuSign Envelope ID: 091169BB-C137-4C96-A5C6-FA137587B895

**Argon Asset Ventures Corp.**
Name: Mario Ernesto Garcia de Paredes E.
Title: Attorney at law
Address:
Oceanea Business Plaza
Torre 1000, 21st Floor
Isaac Hanono Missri Street
Punta Pacifica, Panama City, Republic of
Panama

Phone: + (507) 395-2021
E-mail:  team@gdeplaw.com

**Neon Machine, Inc.**
Name: Mark Long
Title: Chief Executive Officer
Address:
1700 Westlake Ave N.
Suite 200
Seattle, Washington 98109
USA

Phone: (206) 669-5940
E-mail:  mark.long@shrapnel.com

11.4    **Force Majeure**.  Nonperformance of either party will be excused to the extent that performance is rendered impossible by strike, fire, flood, governmental acts, orders or restrictions, or any other reason where failure to perform is beyond the reasonable control and not caused by the negligence of the non-performing party, provided that the non-performing party uses its best efforts to promptly resume performance once it is possible to do so.

11.5    **Third Party Beneficiaries**.  No provision of this Agreement or the performance thereof is intended to confer any rights, benefits, remedies, obligations or liabilities hereunder upon any person or entity other than the parties and their respective successors and permitted assigns.

11.6    **Assignment**. Neither party will, without the prior written consent of the other party, assign this Agreement in whole or in part or delegate any right or duty hereunder to any third party, except that Service Provider may assign this Agreement without the Service Recipient's consent (i) to an Affiliate of Service Provider, or (ii) connection with a Change of Control of Service Provider. Any attempted assignment in violation of this <u>Section 11.6</u> will be void and without effect. Subject to the foregoing restrictions, this Agreement will inure to the benefit of the successors and permitted assigns of the parties.

11.7    **Headings; Counterparts**.  Headings to Sections of this Agreement are to facilitate reference only, do not form a part of this Agreement, and will not in any way affect the interpretation hereof.  This Agreement may be executed in two (2) or more English language counterparts or duplicate originals, all of which will be regarded as one of the same instrument, and which will be the official and governing version in the interpretation of this Agreement.

11.8    **Severability**.  If any term of this Agreement is held invalid or unenforceable for any reason, the remainder of the provisions will continue in full force and effect, and the parties will substitute a valid provision with the same intent and economic effect.

11.9    **Entire Agreement**.  This Agreement sets forth the entire agreement and understanding of the parties relating to the subject matter herein and merges all prior discussions between them.  No modification of or amendment to this Agreement, nor any waiver of any rights under this Agreement, will be effective unless in writing and signed by the party to be charged.

11.10    **Force Majeure**. Neither party will be liable hereunder by reason of any failure or delay in the performance of its obligations hereunder (except for payment obligations) on account of events beyond the reasonable control of such party, which may include without limitation denial-of-service attacks, strikes, shortages, riots, insurrection, fires, flood, storm, explosions, acts of God, war, terrorism, governmental action,

labor conditions, earthquakes and material shortages (each a "**Force Majeure Event**").  Upon the occurrence of a Force Majeure Event, the non-performing party will be excused from any further performance of its obligations effected by the Force Majeure Event for so long as the event continues and such party continues to use commercially reasonable efforts to resume performance.

IN WITNESS WHEREOF the parties hereto have executed this Agreement as of the day and year first above written.

**Argon Asset Ventures Corp.**

By: _____

Name: _____
Diana Muñoz

Title: _____
Director

**Neon Machine, Inc.**

By: _____
Mark Long

Name: _____
Mark Long

Title: _____
CEO

DocuSign Envelope ID: 081369BB-C137-4C96-A5C6-5A137687B895

**EXHIBIT A**
**Services**

I.       **Generally**

In general terms, it is the parties' intent that Service Provider will provide to the Service Recipient research, development, and provision of technology and services necessary to successfully launch, support, market, and maintain the Service Recipient Network as generally described in the Whitepaper. Without limiting the foregoing, and subject to the parties' mutual agreement and specifications as they may change from time-to-time, the Services are anticipated to include the below.

II.       **Administrative Services ("Administrative Services")**

Service Provider will provide sales, marketing and administrative services for the Service Recipient and the Service Recipient Network. All deliverables provided in connection with the provision of the Administrative Services will be deemed "Deliverables" for the purposes of the Agreement.

III.       **Development / Engineering Services ("Engineering Services")**

Service Provider will provide engineering services to create, issue, maintain, and update the Network, including with respect to research and development for protocol improvements as set forth in the White Paper. All deliverables provided in connection with the provision of the Engineering Services will be deemed "Deliverables" for the purposes of the Agreement.

IV.       **Operational Services ("Operational Services")**

Service Provider will provide operational services to the Service Recipient, which will include (but is not limited to) management of the Service Recipient's social media accounts. All deliverables provided in connection with the provision of the Operational Services will be deemed "Deliverables" for the purposes of the Agreement.

DocuSign Envelope ID: 091169BB-C137-4C96-A5C6-5A137697D895

**Exhibit B**
Fees

**I.      Services**

The Service Recipient will pay Service Provider the following Fees for the Services:

| Services (see Exhibit A) | Fee (in USD/other currency) ** | Due Date | Form of Payment |
|---|---|---|---|
| Administrative Services | US $2,300,000.00 | Feb. 2, 2022 | USDC |
| Engineering Services | US $2,300,000.00 | Feb. 2, 2022 | USDC |
| Operational Services | US $2,300,000.00 | Feb. 2, 2022 | USDC |

**II.**      Invoices for payment of any of the above may be sent and delivered to the Service Recipient electronically.


** Subject to adjustment or amendment as agreed upon by the Parties.

**<u>Schedule 3.7</u>**
**Marks**

[Service Provider Marks to be added]

# EXHIBIT I

**Subject:** Neon Cap Tables

**Date:** Monday, February 14, 2022 at 12:44:49 PM Eastern Standard Time

**From:** Mark Long

**To:** Cort Javarone

**CC:** Andrew Grossman

**Attachments:** Neon Machine Cap Table Feb 2022.xlsx

Sorry this was delayed. Cap tables enclosed.

As we related in the board meeting, our designated market maker (DMM) Amber Group has priced their options at a fully diluted token market cap of ~$1.5B. The token treasury controlled by the board is ~41% of total supply, of which 4D's 39% equity interest could theorectically translate into ~$240M should the board elect to distribute on a pro rata basis.

The company has also granted you 15M tokens as an advisor and 1M as a board director. Again, at a theoretical DMM valuation, your personal stake could be worth ~$8M.

Of course it's impossible to predict how public sale will perform or what the price of the token will be a year later when lockup ends, but my personal opinion is that Amber's strike price of $.50 is the lower boundary of probability.

If we look at our closest comparable - Star Atlas - a AAA sci-fi shooter; they're at ~$3B. And that's in the current crypto down draft. They were worth twice that in November. I think ~$1.00 is a more likely probability in a year and that the upper boundary could be ~$3.00.


**mark long I ceo neon**

www.shrapnel.com

+01 206 669 5940

mark.long@shrapnel.com

**zoom link**

https://zoom.us/j/4787766268

**calendy link**

https://calendly.com/markvlong

# EXHIBIT J

**EQUITY**

| Neon Machine | # shares |
|---|---|
| 4D Factory | 6,000,000 |
| * Griffin | 3,333,333 |
| * Polychain | 2,000,000 |
| Founders | 4,000,000 |
| **Total** | **15,333,333** |

* When SAFE converts to preferred

**TOKENS**

| Neon Machine Treasury * | # tokens |
|---|---|
| 4D Factory | 480,927,488 |
| Griffin | 267,181,938 |
| Polychain | 160,309,163 |
| Founders | 320,618,325 |
| **Subtotal** | **1,229,036,913** |

| Private Sale | |
|---|---|
| Dragonfly | 60,000,000 |
| 3 Arrows Capital (3AC) | 22,500,000 |
| Defiance Capital | 22,500,000 |
| Sfermion | 15,000,000 |
| Mechanism Capital | 15,000,000 |
| Merit Circle | 7,500,000 |
| CMT Group | 7,500,000 |
| Finality Capital Partners | 3,000,000 |
| Spartan | 3,000,000 |
| Woodstock | 3,000,000 |
| Overwolf | 1,500,000 |
| Okex | 1,500,000 |
| Digital Development Management (DDM) | 1,500,000 |
| Angels, influencers, guilds | 46,500,000 |
| **Subtotal** | **210,000,000** |

| Insiders | |
|---|---|
| Seed Round Investors | 612,000,000 |
| Team, Advisors, Future Hires | 793,963,087 |
| Board Directors | 5,000,000 |
| **Subtotal** | **1,410,963,087** |

| **Public Sale** | **150,000,000** |
|---|---|

| **Total Supply** | **3,000,000,000** |
|---|---|

* Upon dividend or other distribution event

# EXHIBIT K

| | Number of Tokens | % Allocation |
|---|---|---|
| **Total Number of Tokens in Universe** | **3,000,000,000** | **100.0%** |
| Foundation Reserve | | |
|    Partner/Collaborator Incentives (if any) [1] | 90,000,000 | 3.0% |
| For Sale | | |
|    Pre-Sale [2] | 300,000,000 | 10.0% |
|    Public Sale (if any) [3] | 150,000,000 | 5.0% |
| Launch Partner | | |
|    Partner/Collaborator Incentives (if any) | 0 | 0.0% |
|    Employee/Advisor/Board Token Pool (if any) | 126,150,000 | 4.2% |
|    Equity Investors | 522,000,000 | 17.4% |
|    Tokens Reserved for Launch Partner Treasury [4] | 150,000,000 | 5.0% |
|    AirDrop | 0 | 0.0% |
| Founders and Early Advisors [5] | 673,313,087 | 22.4% |
| Future Mining | 988,536,913 | 33.0% |

**[1] Reserved for liquidity & market making**

**[2] 7% of total supply sold to VCs in strategic token round. 3% of total supply sold to Friends & Family Round**

**[3] Total allocation to public sale still TBD by board of directors. 5% is an estimation**

**[4] Reserved for Secondaries, Corp Dev, M&A, marketing and growth.**

**[5] Does NOT include 3% of total supply sold to founders in a F&F round, which was the first fundraising round internally funded**

| Token Cap Table (For internal purposes only) | | |
|---|---|---|
| **Team, Advisors, Future Hires** | 799,463,087 | 27% |
| **Investors** | 822,000,000 | 27% |
| **Tokens for Insiders** | **1,621,463,087** | **54%** |
| | | |
| **Public Sale** | 150,000,000 | 5% |
| **Market Making/Liquidity/Exchanges** | 90,000,000 | 3% |
| **Corporate Treasury** | 150,000,000 | 5% |
| **Future Mining** | 988,536,913 | 33% |
| **Tokens for Community Distribution** | **1,378,536,913** | **46%** |
| | | |
| **TOTAL** | 3,000,000,000 | 100% |

| | | |
|---|---|---|
| Team | 27% | 799,463,087 |
| Investors | 27% | 822,000,000 |
| Public | 8% | 240,000,000 |
| Corporate Activities | 5% | 150,000,000 |
| Future Mining | 33% | 988,536,913 |
| **TOTAL** | **100%** | **3,000,000,000** |

| **Name** | **Number of Tokens** |
|---|---|
| ***Founders FTIs*** | |
| Mark Long | 70,001,845 |
| Don Norbury | 70,001,845 |
| Colin Foran | 65,665,352 |
| Aaron Nonis | 65,665,352 |
| Mark Yeend | 61,415,589 |
| Naomi Lackaff | 62,196,158 |
| Calvin Zhou | 70,001,845 |
| Gianna Sulyma (In Founders Round) | 15,418,945 |
| **FOUNDERS SUBTOTAL** | **480,366,930** |
| | |
| ***Early Advisors*** | |
| David Vicini | 15,433,649 |
| Andrew Grossman | 15,433,649 |
| James Zhang | 1,000,000 |
| Andy Chang | 250,000 |
| Terrance Spier | 12,265,772 |
| Mike Wilson | 1,000,000 |
| Derek Kolstad | 1,000,000 |
| Dmitri Johnson | 1,000,000 |
| Stephan Bugaj | 1,000,000 |
| Jason Hollingshead | 1,000,000 |
| Brian Marchetti | 3,000,000 |
| Joshua Davis | 3,000,000 |
| Geoffrey Hayes | 1,000,000 |
| Joanna Alexander | 1,000,000 |
| Jesper Kyd (Jesper Jacobsen) | 1,000,000 |
| Stephen Bachmann | 27,000,000 |
| Steve Wade | 18,000,000 |
| Tammy McDonald | 15,000,000 |
| John Gaudiosi | 3,750,000 |
| John Benyamine | 3,750,000 |
| Leath Bing | 1,000,000 |
| Irvin Hu | 1,000,000 |
| Thinkspace (Peter Chee) | 1,000,000 |
| Ayman Moumina (Invest Group Ventures N.A., Inc.) | 50,000 |
| Vicki Anderson | 50,000 |
| Alex Beck | 48,963,087 |
| Reserved for 4D Factory | 15,000,000 |
| **EARLY ADVISORS SUBTOTAL** | **192,946,157** |

| *Employees FTIs* | |
|---|---:|
| Shelly Stewart | 125,000 |
| Joshua Davis | 3,000,000 |
| Marcus Jones | 2,275,000 |
| Tanner Ellison | 1,000,000 |
| Arun Rao | 3,000,000 |
| Alexander Veneruso | 275,000 |
| Francis Brankin | 250,000 |
| Ira Shokeen | 300,000 |
| Jonathan Schwartz | 1,500,000 |
| Karen Nicol | 1,000,000 |
| Muhammad Noman | 275,000 |
| Viren Khandelwal | 3,000,000 |
| Clint Bundrick | 2,000,000 |
| Reserved for Future Hires | 87,650,000 |
| **EMPLOYEES SUBTOTAL** | **105,650,000** |

| **Future and Late Stage Advisor FTIs** | |
|---|---:|
| Ken Cron | 1,000,000 |
| Justin Chow | 1,000,000 |
| Jay Chang | 1,000,000 |
| Andy Do | 250,000 |
| Reserved for Shroud | 3,000,000 |
| Reserved for Ron Bloom | 250,000 |
| Reserved for Razer | 1,000,000 |
| Reserved for Future Advisors | 8,000,000 |
| **FUTURE AND LATE STAGE ADVISOR SUBTOTAL** | **15,500,000** |

| **Board Members/Observers** | |
|---|---:|
| Cort Javarone | 1,000,000 |
| Ned Sherman | 1,000,000 |
| Ben Perszyk (Polychain) | 1,000,000 |
| Pierre-Edouard Planche (Griffin) | 1,000,000 |
| Anthony Palma (Griffin) | 1,000,000 |
| Mark Long (Common shareholder seat) | |
| **BOARD MEMBERS SUBTOTAL** | **5,000,000** |

| *Launch Partner Equity Investors* | |
|---|---:|
| Griffin Gaming Partners II, L.P. | 309,937,500 |
| Griffin Gaming Partners II Side Fund, L.P. | 16,312,500 |
| Polychain Venture Partners II LP | 195,750,000 |

| | |
|---|---|
| **EQUITY INVESTOR SUBTOTAL** | **522,000,000** |

| **Launch Partner Treasury** | |
|---|---|
| Reserved for Secondaries, Corp Dev, M&A, Marketing/Growth | **150,000,000** |

*Launch Partner*

Total

| **Friends and Family Round** | |
|---|---|
| Mark Long | 21,327,014 |
| Don Norbury | 21,327,014 |
| Colin Foran | 10,663,507 |
| Aaron Nonis | 10,663,507 |
| Mark Yeend | 213,270 |
| Naomi Lackaff | 2,132,701 |
| Calvin Zhou | 21,327,014 |
| Gianna Sulyma | 213,270 |
| David Vicini | 1,066,351 |
| Andrew Grossman | 1,066,351 |
| **TOTAL** | **90,000,000** |

| **Data for Argon Protocol Foundation (Founders Token PPM)** | |
|---|---|
| | **Total Tokens** |
| Total FTIs purchased by Neon or by Individuals/Entities direct from the Foundation | 1,561,463,087 |
| Total FTIs Neon Machine is purchasing from Foundation | 276,150,000 |
| FTIs reserved by Foundation for future sales (Token Round Investors + Public Sale) | 360,000,000 |
| Tokens are reserved by the Foundation to support the development of the Protocol | 1,438,536,913 |
| Tokens purchased directly by Individuals/Entities from the Foundation | 1,285,313,087 |
| FTIs allocated to current or future officers, employees or contractors of the Company | 121,150,000 |
| Team | 27% |
| Investors | 27% |
| Public | 8% |
| Corporate Activities | 5% |
| Future Mining | 33% |
| **TOTAL** | **100%** |

| **Data from Board Consent (Seed Token Subscriptions, Token Plan Ad** | |
|---|---|
| FTIs at Neon Machine allocated to current and future service providers of Neon Machine | 126,150,000 |
| FTIs at Neon Machine reserved for future service providers | 101,900,000 |

## Data for Argon Protocol Foundation (Founders Token PPM) - prev

| | Total Tokens |
|---|---|
| Total FTIs purchased by Neon or by Individuals/Entities direct from the Foundation | 1,560,963,087 |
| Total FTIs Neon Machine is purchasing from Foundation | 277,650,000 |
| FTIs reserved by Foundation for future sales (Token Round Investors + Public Sale) | 353,400,000 |
| Tokens are reserved by the Foundation to support the development of the Protocol | 1,439,036,913 |
| Tokens purchased directly by Individuals/Entities from the Foundation | 1,283,313,087 |
| FTIs allocated to current or future officers, employees or contractors of the Company | 122,650,000 |
| Team | 27% |
| Investors | 27% |
| Public | 8% |
| Corporate Activities | 5% |
| Future Mining | 33% |
| **TOTAL** | **100%** |

## Data from Board Consent (Seed Token Subscriptions, Token Plan Ad

| | |
|---|---|
| FTIs at Neon Machine allocated to current and future service providers of Neon Machine | 127,650,000 |
| FTIs at Neon Machine reserved for future service providers | 120,250,000 |

| Common Equity Cap Table | Shares | Vesting |
|---|---|---|
| 4D | 6,000,000 | No vesting |
| Mark Long | 543,405 | 4 years, monthly linear unlock, 1 year cliff |
| Don Norbury | 543,405 | 4 years, monthly linear unlock, 1 year cliff |
| Colin Foran | 543,405 | 4 years, monthly linear unlock, 1 year cliff |
| Aaron Nonis | 543,405 | 4 years, monthly linear unlock, 1 year cliff |
| Mark Yeend | 543,405 | 4 years, monthly linear unlock, 1 year cliff |
| Naomi Lackaff | 543,405 | 4 years, monthly linear unlock, 1 year cliff |
| Calvin Zhou | 543,405 | 4 years, monthly linear unlock, 1 year cliff |
| Andy Chang | 110,484 | No vesting |
| James Zhang | 85,681 | No vesting |
| **TOTAL** | **10,000,000** | |

| SAFE Notes (if converted to preferred shares) | | Vesting |
|---|---|---|
| Griffin II | 3,166,667 | No vesting |
| Griffin Side Fund | 158,333 | No vesting |
| Polychain | 2,000,000 | No vesting |
| **TOTAL** | **5,325,000** | |

| ESOP Plan (15% of common) | Shares | Vesting |
|---|---|---|
| Shelly Stewart | 2,000 | 4 years, monthly linear unlock, 1 year cliff |
| Marcus Jones | 5,000 | 4 years, monthly linear unlock, 1 year cliff |
| Tanner Ellison | 15,000 | 4 years, monthly linear unlock, 1 year cliff |
| Joshua Davis | 50,000 | 4 years, monthly linear unlock, 1 year cliff |
| Arun Rao | 50,000 | 4 years, monthly linear unlock, 1 year cliff |
| Alexander Veneruso | 5,000 | 4 years, monthly linear unlock, 1 year cliff |
| Ira Shokeen | 5,000 | 4 years, monthly linear unlock, 1 year cliff |
| Jonathan Schwartz | 30,000 | 4 years, monthly linear unlock, 1 year cliff |
| Karen Nicol | 30,000 | 4 years, monthly linear unlock, 1 year cliff |
| Muhammad Noman | 5,000 | 4 years, monthly linear unlock, 1 year cliff |
| Viren Khandelwal | 50,000 | 4 years, monthly linear unlock, 1 year cliff |
| Clint Bundrick | 50,000 | 4 years, monthly linear unlock, 1 year cliff |

| | | |
|---|---|---|
| **RUNNING SUBTOTAL** | **297,000** | |
| **MAX ESOP AUTHORIZED @15% of COMMON** | **1,764,706** | 15.00% |

# EXHIBIT L

**Subject:** Shrapnel Cap Table Questions

**Date:** Tuesday, May 10, 2022 at 5:07:58 PM Eastern Daylight Time

**From:** Cort Javarone

**To:** mark.long@neonmedia.io

**CC:** Jfmiller10@gmail.com

**Attachments:** Neon Machine Cap Table Feb 2022(1).xlsx, 4D Factory - Token Assignment Agreement.docx

Mark,

Counsel had a medical emergency that delayed him two days.  He's fine now and responses will go out by tomorrow, which I hope you recognize as timely after I also got back to you on Saturday.  Now we should return to business and follow up on *Foundation* project next steps per our correspondence this weekend.  I haven't seen your reply on that thread and will check in with you separately on it, as I have been gathering information and heard back from Skydance as well.

In the meantime, we've rarely discussed business at Neon Machine, and need to report on its status to our stakeholders as we proceed with our transactions and in advance of the Shrap public offering.  I've been catching up on outstanding paper that needs to be signed, and had the attached package Andrew sent me, that would grant Advisory tokens to 4D, not to me as your below email suggests (was this a typo?)  In any case, in researching I pulled up your below email with the cap table attached, and have several questions.  Please explain/clarify:

-> Who were the Pre-Seed and Seed Round investors and how much was invested by each?  I see "Seed" in one bucket on the attached, while in your recent White Paper you list two rounds at prices of $0.0033 and $0.0050 respectively.

-> We'd like to see the breakdown of the ~794 million tokens granted by individual.  How much is already granted vs. reserved for future hires and on what basis would they be granted?  Are there any vesting or other restrictions?

-> What was the price paid in the Private Sale, and how much has been closed?  Why is that round not listed in the table on p. 27 of the White Paper?

-> How and when were the two Seed round plans and pricing, and the Grants to Team, Advisors and Future Hires approved?  We were not made privy to a Board meeting or other process that signed off on either.

-> Please confirm lockup restrictions on the Seed round and Private Sale tokens issued.  Will there be any restrictions on public sale tokens?

-> 4D's only token allocation is in the "Treasury" category.  However in your decks you state *"The Shrapnel treasury consists of funds allocated to development costs, growth, marketing, & communications as well as a rewards program for staking and players who create good content or showcase good gameplay."*  This suggests our token is not actually ours but could be spent for other purposes.  Please clarify.

-> You footnoted the Treasury token as conditioned "Upon dividend or other distribution event", which we've never seen before in any of the decks.  This suggests that 4D is limited to a category that cannot access the token unless approved for distribution, while the rest who have been granted tokens for free or invited to purchase them for fractions of a cent are more liquid and accessible.  What was planned for how the Treasury tokens would be available and liquid?  Are there rules or other conditions related to the above white paper

description that impact whether they can be distributed, per your footnote?

-> When 4D and Neon approved this project, you stated that all of us would have the opportunity to buy into the pre-public rounds as Insiders. From what I understand, Andrew and David received invitations to buy in at the private sale price. Neither Jon nor Kevin nor I, nor 4D as an entity, can find any invitation to invest in any of the rounds. Was this an oversight?

Look forward your reply.

Thanks,

Cort



————————————

Cort Javarone
Founder & CEO
4D Factory LLC
m. 646.676.0070
e.  cort@the4dfactory.com


**From:** Mark Long <mark.long@shrapnel.com>
**Sent:** Monday, February 14, 2022 12:44 PM
**To:** Cort Javarone <cort@the4dfactory.com>
**Cc:** Andrew Grossman <andrew@the4dfactory.com>
**Subject:** Neon Cap Tables

Sorry this was delayed. Cap tables enclosed.

As we related in the board meeting, our designated market maker (DMM) Amber Group has priced their options at a fully diluted token market cap of ~$1.5B. The token treasury controlled by the board is ~41% of total supply, of which 4D's 39% equity interest could theorectically translate into ~$240M should the board elect to distribute on a pro rata basis.

The company has also granted you 15M tokens as an advisor and 1M as a board director. Again, at a theoretical DMM valuation, your personal stake could be worth ~$8M.

Of course it's impossible to predict how public sale will perform or what the price of the token will be a year later when lockup ends, but my personal opinion is that Amber's strike price of $.50 is the lower boundary of probability.

If we look at our closest comparable - Star Atlas - a AAA sci-fi shooter; they're at ~$3B. And that's in the current crypto down draft. They were worth twice that in November. I think ~$1.00 is a more likely probability in a year and that the upper boundary could be ~$3.00.


**mark long I ceo neon**
www.shrapnel.com
+01 206 669 5940

mark.long@shrapnel.com

**zoom link**
https://zoom.us/j/4787766268

**calendy link**
https://calendly.com/markvlong

# EXHIBIT M

**Subject:** Answers to Your Neon Machine Fundraising and Token Questions
**Date:** Friday, July 29, 2022 at 6:13:31 PM Eastern Daylight Time
**From:** Mark Long
**To:** Cort Javarone
**CC:** Andrew Grossman

Cort,

Andrew worked with our corporate council Fennwick to prepare these answers to your questions re Neon's fundraising history as well as token interest sales that have occurred at Argon Protocol Foundation, with whom Neon has a services relationship. I'll make any subsequent discussion of this subject you may want to have an agenda item at our next board meeting which I hope to hold in August in Seattle.

Mark


*Who were the Pre-Seed and Seed Round investors and how much was invested by each? I see "Seed" in one bucket on the attached, while in your recent White Paper you list two rounds at prices of $0.0033 and $0.0050 respectively.*

- In the Fall of 2021, Neon Machine, Inc. ("Neon") sold Simple Agreements for Future Equity ("SAFEs") to Griffin Gaming Partners and Polychain for a total raise of $8 million. In connection with the SAFE purchases, Griffin and Polychain each entered into a Side Letter with Neon, pursuant to which Griffin is directly entitled to 10.875% of the total network for each type of token and Polychain is directly entitled to 6.525% of the total network for each type of token.

  Additionally, Argon Protocol Foundation ("Argon") was formed and sold 1,591,463,087 SHRAP token interests, out of a total 3 billion possible tokens, to Neon and to its service providers, investors (including Griffin and Polychain) and stockholders in a "Founder Round" at a nominal purchase price based on a valuation report prepared by an independent third-party valuation firm, Redwood Valuation Partners. These direct allocations to Griffin and Polychain were to satisfy the obligations under each Side Letter. Argon is a Panamanian foundation (without any members or shareholders) that is developing the smart contract responsible for the SHRAP token and is expected to eventually deploy the smart contract that mints the tokens. Argon is a contractual counterparty of Neon, but is not owned or controlled by Neon.

  Separately, a group of founders and early service providers received an aggregate of 90 million SHRAP token interests in exchange for cancellation of debt in the aggregate amount of ~$422,000.

  Subsequently, Argon sold SHRAP token interests to a broad group of investors including Dragonfly Capital, Defiance Capital, Mechanism Capital and several other funds and angel investors at a price of ~$0.0333, for a total raise of $7 million. Such price was determined through negotiation with participating investors. Currently, Argon's sole development partner at this stage is Neon, and some of the proceeds of such token interest sales have been used by Argon to compensate Neon for the services Neon has provided via a Services Agreement between Argon and Neon.

*We'd like to see the breakdown of the ~794 million tokens granted by individual. How much is already granted vs. reserved for future hires and on what basis would they be granted? Are there any vesting or other restrictions?*

- Of the ~799 million SHRAP tokens that have been allocated for current and future employees, directors, consultants, advisors, etc. of Neon in connection with their services, interests in ~714.5 million SHRAP tokens have already been allocated and/or granted (including to The 4D Factory LLC), and interests in ~84.5 million SHRAP tokens remain reserved and available (note that the difference between ~794 million and ~799 million token interests is the 5 million token interests allocated for Neon board directors, including yourself).

Such token interests that were granted to the founders and early advisors are not subject to vesting, but they are subject to lock-up restrictions for 30 months after token generation event (i.e., a 6-month cliff after token generation, followed by equal monthly unlocks for the subsequent 24 months). The token interests granted to employees, later advisors and directors are subject to both vesting and lock-up provisions, which provisions vary between 2, 3 and 4 years.

*What was the price paid in the Private Sale, and how much has been closed? Why is that round not listed in the table on p. 27 of the White Paper?*

- The "Private Sale" is the previously mentioned SHRAP token interest sale among Argon, Dragonfly, Defiance Capital, Mechanism Capital and others, in which token interests were sold by Argon at a price of ~$0.0333, for a total raise of $7 million. The purchasers in the "Private Sale" are referred to as the "Strategic Token Holders" in the White Paper.

*How and when were the two Seed round plans and pricing, and the Grants to Team, Advisors and Future Hires approved? We were not made privy to a Board meeting or other process that signed off on either.*

- As discussed above, Neon raised $8 million through the sale of SAFEs to Griffin and Polychain. Concurrently with the SAFE investment, Griffin and Polychain entered into Side Letters entitling them directly to 10.875% and 6.525%, respectively, of the total token network. The Neon Board of Directors ratified this transaction in October 2021. In November 2021, the Neon Board of Directors also approved the assignment of ~127.7 million SHRAP token interests to then-current service providers, and the establishment of a Token Plan with ~120.25 million SHRAP token interests for future service provider use. (In January 2022, the Neon Board of Directors was expanded from 1 director to 5 directors and Pierre-Edouard, Benjamin, Ned and you were added to the Board.)

  Also, as discussed above, Argon raised $7 million through the sale of SHRAP token interests to Dragonfly, Defiance Capital, Mechanism Capital and others at a price of ~$0.0333. Prior to such SHRAP token interest sales, Argon sold SHRAP token interests directly to Neon service providers (who qualified as Accredited Inventors), investors (i.e., Griffin and Polychain) and stockholders at the price determined by Redwood. Such transactions were between Argon and the recipient of the token interests.

*Please confirm lockup restrictions on the Seed round and Private Sale tokens issued. Will there be any restrictions on public sale tokens?*

- The SHRAP token interests received by Neon SAFE investors and individuals who agreed to cancel the debt owed to them by Neon are subject to a 12-month lock-up from token generation (i.e., a 6-month cliff after token generation, followed by equal monthly unlocks for the subsequent 6 months).

  The SHRAP token interests purchased by investors from Argon are subject to an 18-month lock-up from token generation (i.e., a 6-month cliff after token generation, followed by equal monthly unlocks for the subsequent 12 months).

  It is not anticipated that SHRAP token interests purchased in a public sale will be subject to a lock-up.

*4D's only token allocation is in the "Treasury" category. However in your decks you state "The Shrapnel treasury consists of funds allocated to development costs, growth, marketing, & communications as well as a rewards program for staking and players who create good content or showcase good gameplay." This suggests our token is not actually ours but could be spent for other purposes. Please clarify.*

- In the first instance, 4D has a direct allocation of 15 million SHRAP token interests and its allocation is not limited to the Treasury category.

Separately, Neon currently holds ~264.5 million SHRAP token interests on its balance sheet. So, each Neon stockholder has an indirect interest in such SHRAP token assets, and each stockholder's stake in Neon is worth more as a result of Neon holding such asset. Neon could keep these SHRAP token interests as an asset on its balance sheet, use them as payment in development/growth transactions, or distribute such token interests to stockholders. Please note that this number is subject to adjustment for new hires.

*You footnoted the Treasury token as conditioned "Upon dividend or other distribution event", which we've never seen before in any of the decks.  This suggests that 4D is limited to a category that cannot access the token unless approved for distribution, while the rest who have been granted tokens for free or invited to purchase them for fractions of a cent are more liquid and accessible.  What was planned for how the Treasury tokens would be available and liquid?  Are there rules or other conditions related to the above white paper description that impact whether they can be distributed, per your footnote?*

- As discussed above, 4D has a direct allocation of 15 million SHRAP token interests, and a purchase agreement covering such token allocation was sent to 4D in December 2021 for signature.

  The specific way in which Neon uses the SHRAP token interests on its balance sheet will be determined over time, as dictated by business needs. So long as Neon complies with applicable law, there aren't restrictions on how Neon can use the SHRAP token interests. If approved by the Board, one of those use cases could be distributing some or all of the SHRAP token interests to Neon stockholders.

*When 4D and Neon approved this project, you stated that all of us would have the opportunity to buy into the pre-public rounds as Insiders.  From what I understand, Andrew and David received invitations to buy in at the private sale price.  Neither Jon nor Kevin nor I, nor 4D as an entity, can find any invitation to invest in any of the rounds.  Was this an oversight?*

- In May 2021, Calvin Zhou offered you the opportunity invest in the project, and Calvin recalls that you did not want to participate at that time. However, if you, Jon Miller, or Kevin Conroy would like to purchase token interests in the private sale, you are welcome to do so before the public sale.

**mark long I ceo**
neon

[mark.long@neonmedia.io](mailto:mark.long@neonmedia.io)
+01 206 669 590

**zoom**
https://us02web.zoom.us/j/4321511612

**calendly**
https://calendly.com/markvlong