**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---------------------------------------------------------------x

In re:

4D FACTORY, INC., *et al.*,[1]

                    Debtors.

---------------------------------------------------------------x

THE 4D FACTORY LLC,

                    Plaintiff,

v.

MARK LONG, *et al.*

                    Defendants,

and

NEON MACHINE, INC., *et al.,*

                    Nominal Defendants.

---------------------------------------------------------------x

MARK LONG, COLIN FORAN, NAOMI LACKAFF, AARON NONIS, DON NORBURY, MARK YEEND, CALVIN ZHOU,

                    Counterclaim-Plaintiffs,

v.

THE 4D FACTORY LLC,

                    Counterclaim-Defendant,

and

NEON MACHINE, INC.,

                    Nominal Defendant.

---------------------------------------------------------------x

Chapter 11
(Subchapter V)
Case No. 23-11618 (MEW)
(Jointly Administered)


Adv. Proceeding No. 24-01319

**Related to Adv. Docket Nos. 4 and 7**


**THIRD-PARTY COMPLAINT AND COUNTERCLAIMS OF MARK LONG, COLIN FORAN, NAOMI LACKAFF, AARON NONIS, DON NORBURY, MARK YEEND, AND CALVIN ZHOU**

---

1    The Debtors in these Chapter 11 Cases, along with the last four digits of each Debtors' federal tax identification number, are 4D Factory Inc. (6770), and The 4D Factory LLC (8935).

MARK LONG, COLIN FORAN, NAOMI LACKAFF,  :
AARON NONIS, DON NORBURY, MARK YEEND,  :
CALVIN ZHOU,                            :
                                        :
    Third-Party Plaintiffs,  :
                                        :
v.                                      :
                                        :
CORT JAVARONE, SCOTT HONOUR, and STEVE  :
HOROWITZ,                               :
                                        :
    Third-Party Defendants,  :
                                        :
and                                     :
                                        :
NEON MACHINE, INC.,                     :
                                        :
    Nominal Defendant,   :
-----------------------------------------------------------------------x

Defendants-Counterclaim Plaintiffs and Third-Party Plaintiffs Mark Long, Colin Foran, Naomi Lackaff, Aaron Nonis, Don Norbury, Mark Yeend, and Calvin Zhou (collectively, "Plaintiffs"),[2] by and through their undersigned counsel, for their counterclaims against The 4D Factory LLC ("4D" or the "Debtor"), and their claims against third-party defendants Cort Javarone, Scott Honour, and Steve Horowitz (collectively, the "Individual Defendants," and together with 4D, "Defendants"), allege as follows for declaratory relief, breaches of fiduciary duty, tortious interference, civil conspiracy, fraud, and unjust enrichment.

## NATURE OF THE ACTION

1.     This action involves the corporate hijacking of Neon Machine, Inc. ("Neon" or the "Company"), an emerging Web3 gaming company that has released its flagship game, by a rogue putative stockholder and its cohort of appointed directors who, in breach of their duties, continually and repeatedly make sham decisions and board resolutions that seek to use Neon as a piggy bank to raid and bailout the now bankrupt 4D.  Upon information and belief, defendant Javarone has used 4D as a flim-flam operation for years to line his pockets to the vast detriment of investors, lenders, counter-parties, and partners.  In fact, a simple review of public records reflects numerous lawsuits involving defendant Javarone that question both his ethics and business acumen.  Neon is just the latest in a long line of companies exploited by defendants Javarone and 4D.

2.     Indeed, instead of complying with their fiduciary obligations the Defendants have exploited the corporate form through illegitimate "control" of the Company's Board of Directors (the "Board") in order to extort the Company, its other stockholders, and its

---

2    Pursuant to the *Stipulation and Scheduling Order* [Adv. Dkt. No. 7], the Plaintiffs' *Third-Party Complaint and Counterclaims* is without prejudice to, and a not a waiver of, their right to file an answer, motion to dismiss, or plead in response to the *Amended Complaint* [Adv. Dkt. No. 4] or any other claims filed against them pursuant to the *Stipulation and Scheduling Order*.

investors into attempting to grant 4D and the Individual Defendants a financial windfall that lacks any legal or factual basis. These actions have, and continue, to cause severe damage to the Plaintiffs, Neon, and its investors.

3.       In August 2021, Plaintiffs – all veterans of the video game industry – co-founded Neon, an innovative blockchain-based gaming studio, to create and launch an industry-leading AAA Web3 video game – a sci-fi first-person shooter game called "Shrapnel." Shrapnel's blockchain technology powers a cryptocurrency token-based ecosystem in which tokens are made available to players, both inside and outside of the game, and players can use those tokens in the game to purchase, develop, and obtain digital in-game assets, and (unlike other games) own and transfer that token outside of the game on a public blockchain by utilizing Shrapnel's native blockchain network (the "Network"). The Shrapnel game's native token, SHRAP, and the Network it was created upon, were launched over a year ago—the first block of the Network was mined on or about March 17, 2023; on or around April 4, 2023, a SHRAP token generation event successfully minted SHRAP tokens to recipient addresses; and on or around April 12, 2023, the Network successfully executed SHRAP token transactions between other public blockchains. ***SHRAP tokens have been traded across public blockchains, and the Network has been operative, ever since***. The 30-day-average trading price for a SHRAP token as of March 25, 2024 is approximately $0.28. Also as of March 25, 2024, the popular Ethereum blockchain, the network associated with the second-largest cryptocurrency in the world by market capitalization, (Ether (ETH)), supported more than 5,350 unique wallet addresses that hold SHRAP tokens. But for the Shrapnel Network's launch and continuing successful operations, all of the foregoing would be impossible. Because of the Plaintiffs' pecuniary investments in Neon, dogged determination, and decades of game-development and digital asset expertise, Shrapnel, the SHRAP token, and the

operating Network that issued the SHRAP token are all a reality that is public, visible, and immutably recorded on numerous identifiable blockchain ledgers.

4.      At Neon's founding, Plaintiffs collectively contributed $550,000 of their own money to capitalize the new entity.  4D never invested a dollar into Neon.  Rather, 4D had invested in a prior entity known as Neon Media, LLC ("Neon Media"), and, because of that investment, Plaintiffs agreed to provide 4D with 6,000,000 shares of common stock in Neon – reflecting 60% of common stock issued under the Company's Articles of Incorporation – at par value of $0.0001 subject to the terms of a securities purchase agreement.  However, 4D *never paid* for the common stock, never invested any capital in Neon thereafter, and never contributed to the development of Shrapnel, the SHRAP token, or the Network.  4D's sole contribution in relation to Neon, was to transfer a trademark (that Mr. Long thought of) to Neon.  In other words, 4D and defendant Javarone claim partial ownership of Neon despite having effectively done absolutely nothing to help the Company nor having even paid for any stock under the relevant purchase agreement.

5.      Despite this complete failure of consideration, Defendants have attempted to take control of Neon and its bank accounts, as well as force the distribution of SHRAP tokens held on Neon's balance sheet via conflicted and void Board resolutions.  None of the Individual Defendants have ever set foot in Neon's offices or otherwise even tried to help the Company grow and develop Shrapnel.  Simply put, far from being a trusted team member, 4D was a belligerent and opportunistic "investor," led by its managing member defendant Javarone, that is seeking to profit from a prior investment in Neon Media.  While Plaintiffs were previously members in Neon Media (which is a *separate* game publishing company focused on the development of a *different* game called "Foundation"), the two companies *are not the same*.  4D's infrequent and uncertain

3

capital infusions into Neon Media led to distrust and toxicity between that company and its third party development and licensing partners. As Plaintiffs worked to complete Neon Media's primary gaming property, Foundation, 4D ultimately threatened (and then did) terminate its funding of Neon Media in July of 2021. The following month, and with 4D's and defendant Javarone's knowledge and approval, Plaintiffs founded Neon to pursue development of Shrapnel. Although 4D did not comply with its investment promises related to Neon Media and defendant Javarone took very little interest in helping that company develop, Plaintiffs offered 4D with a 60% interest in Neon subject to 4D's compliance with a securities purchase agreement.

6.      Then, instead of focusing on and trying to help Neon develop, and months after Neon was founded, 4D caused Neon Media to take on $4 million in secured debt, supposedly to fund Neon Media's operations, and all without the approval of the other Neon Media members as required in the operating agreement. However, on information and belief, nearly all of the funds were diverted from Neon Media to 4D (a secured guarantor of Neon Media's obligations to its lender) starving Neon Media of operational funding and in material breach of its loan documents. Stripped of necessary capital to continue its business, Neon Media's development of Foundation stalled; service providers were not paid and threatened lawsuits; and Neon Media was unable to service its debt. The lender sought repayment from 4D as guarantor.

7.      Meanwhile, Neon was thriving. Despite 4D's refusal to invest a dime in Neon, and following Plaintiffs' personal contributions, two tier-one venture capital firms, Griffin Gaming Partners ("Griffin") and Polychain Capital ("Polychain") – each considered industry leaders in the gaming and digital asset industries, respectively – recognized Neon's extraordinary potential, and together initially invested $8 million via Simple Agreements for Future Equity (each a "SAFE" or the "SAFEs" as context may require) through separate investment vehicles from

4

Griffin and Polychain.  Through the SAFEs, Griffin and Polychain obtained the right to receive future equity in Neon because the instruments had a clear feature that would "automatically convert" their contract rights into Neon preferred stock upon the occurrence of certain events – namely, as relevant here, 61 days following a "Network Launch."  "Network Launch" is defined, at a high level, in each SAFE as the time the native cryptocurrency token associated with access to and use of the Shrapnel Network is issued.

8.      Here, ***Network Launch occurred no later than April 29, 2023***.  In other words, the native cryptocurrency token associated with access to and use of the Shrapnel Network was issued by no later than that date (and, in fact, weeks earlier).  That Network Launch occurred is self-evident; the public, immutable, and transparent nature of the blockchain allows anyone to verify its existence and activity online simply by copying a URL into a web browser: https://avascan.info/blockchain/shrapnel/block/0x492381a997a697b593088b9ac65fb62f0ef1e0a 5e4b6b86a8c1301343c0dfbee (last accessed Mar. 19, 2024).  Thus, no later than June 29, 2023, the 61st day following Network Launch, Griffin's and Polychain's SAFEs automatically converted into Neon preferred shares.  Additional SAFE investors, buoyed by Griffin's and Polychain's multiple investments in Neon, joined as well.  In early 2023, Neon closed a Series A round investment.

9.      4D was well aware of Neon's success generally, as well as Griffin's and Polychain's SAFE investments and their terms specifically.  In fact, 4D was involved in the negotiations of the SAFEs and approved the initial investments by Griffin and Polychain in 2021, ***and defendant Javarone ratified*** the Series A SAFEs in January 2023.  4D and defendant Javarone were therefore aware that 4D's interests in Neon were subject to dilution both via the SAFEs that were approved as well as when additional new investors contributed additional Series A funding

to Neon under substantially similar agreements.[3]

10.    On information and belief, faced with substantial debt owed to the lender of Neon Media, a looming foreclosure and possible bankruptcy filing, and the knowledge that any purported ownership interest that it may have held in Neon would soon be diluted pursuant to the previously approved SAFEs with Griffin and Polychain, 4D (through its principal, defendant Javarone) demanded that Plaintiffs assist 4D in selling its purported interest in Neon at an excessive premium.  When Plaintiffs refused, 4D and defendant Javarone conspired, along with defendants Steve Horowitz and Scott Honour, to exploit their positions as purported directors of Neon to interfere with the Company's contractual obligations, holding Neon, its other stockholders, and its investors hostage.

11.    Specifically, in August 2023, while Plaintiffs were working diligently to finish the final pieces of the Shrapnel game and busy raising additional capital to fund core operations, defendant Javarone approached Plaintiff Mark Long and demanded that Mr. Long help defendant Javarone sell 4D's shares in Neon.  Mr. Long declined, concluding at the time that the price defendant Javarone sought to obtain was excessive and marketing 4D's interest (which was purportedly 60% of Neon's common stock) while at the same time undertaking critical fundraising efforts through Board-approved SAFE financings that would raise significant up-front capital in exchange for tokens and interests that convert to preferred shares of Neon (thus diluting 4D's interest), was counterproductive.

12.    Frustrated with their self-created financial distress, defendants 4D and Javarone immediately retaliated.  The very same month, defendant Javarone leveraged 4D's "control" of Neon's Board.  4D replaced Mr. Long with defendant Honour, an individual who had

---

3    The Debtor's schedules admit as much.

no relevant experience and no involvement with Neon.  Alarmed by Javarone's actions purportedly on behalf of Neon's Board, in September 2023, Griffin sent a letter to Neon demanding that it honor the SAFEs' conversion into preferred stock and take all necessary corporate actions to do so.  But the Defendants would not be deterred from their efforts to shakedown Neon.

13.     However by that time and following Mr. Long's purported removal, 4D "held" three of the five seats on the Board (then consisting of Javarone, Honour, and Ned Sherman, another 4D appointed director).  When Mr. Sherman eventually resigned, without explanation, 4D replaced him with defendant Horowitz.  These Individual Defendants, together with 4D, concocted and implemented a plan to enrich themselves at the expense of Plaintiffs, Neon, and Neon's investors.

14.     Defendants' scheme was simple.  Through asserted (but illegitimate) control of Neon's Board, Defendants (1) refused to acknowledge the existence of the occurrence of a condition precedent in the SAFEs that automatically triggered the SAFE investors' preferred share interests in Neon, diluting 4D's purported interest in Neon, and instead entrenched Defendants as purported controlling parties; (2) removed Mr. Long from Neon's Board; (3) suspended Mr. Long from his duties as the Company's Chief Executive Officer and replaced him with defendant Javarone, an individual with no relevant experience in the gaming industry; (4) acted to steal Neon's assets—indeed defendants Javarone and Honour demanded access to the Company's bank accounts; and (5) issued a Board resolution (via a 3 to 2 vote) to approve the distribution of the Company's treasury tokens on a *pro rata* basis, effectively approving the distribution of hundreds of millions of tokens to 4D that ***4D was never entitled to receive at any point in time, let alone all at once to fund its bankruptcy plan*** and enrich Defendants at Plaintiffs' and the Company's investor's expense.

15.     Defendants' self-dealing, including post-petition conduct of 4D, has harmed, and continues to harm Neon and Neon's stockholders and critical investors.  Plaintiffs have devoted the last two plus years to fulfilling their founding vision – one that 4D and the Defendants have contributed neither a dollar nor a day to.  The Plaintiffs have spent countless hours developing, fine-tuning, and marketing Shrapnel, investing hundreds of thousands of dollars of their own money to keep the lights on, and also raising tens of millions of dollars more from tier-one investors, the type of financing required to create a game that can compete with the biggest franchises in the industry.  Those efforts paid off.  Shrapnel was considered one of the most anticipated AAA Web3 games in development, has won multiple audience awards, is being played worldwide by thousands of users, and has widespread acclaim that only top franchises typically garner.

16.     The Defendants' illicit actions are clear breaches of their fiduciary duties of loyalty and care to Neon: they are acting only to entrench themselves as a putative controller of Neon with a Board majority, causing severe harm to Neon and exposing it to tens of millions of dollars in liability, disrupting its ongoing business operations, and hampering its ability to raise additional funds.  In this action, Plaintiffs seek straightforward relief: Defendants must (1) be ordered to take the necessary actions to recognize Neon's undisputed contractual obligations; (2) take all corporate actions necessary to recognize the SAFE conversions including issuing the preferred shares required under the SAFEs; and (3) compensate Plaintiffs and Neon for the substantial damages, including post-petition damages, caused to Neon as a result of their extortionate and tortious actions.

## **PARTIES**

17.     Neon is a Delaware corporation with its principal place of business in Seattle, Washington.  It was incorporated under Delaware law on August 3, 2021.

18.    Plaintiff Mark Long resides in Seattle, Washington.  Mr. Long is a co-founder of Neon, the first director of Neon's Board until defendant Javarone purported to remove him on August 22, 2023, and worked as Neon's CEO from its founding until defendant Javarone purported to remove him on November 13, 2023.  Mr. Long is an eight-year veteran Army officer and a recipient of the Meritorious Service Medal, did early virtual reality research at the Stanford Research Institute's laboratory in Princeton, New Jersey, and has worked for over 27 years in the video game industry, including leading teams at Microsoft and Home Box Office, Inc. ("HBO").  Mr. Long owns 543,405 shares, approximately 5.4%, of Neon's common stock.  In or around 1995, Mr. Long purchased the rights to the internet domain name for "shrapnel.com."

19.    Plaintiff Colin Foran resides in Seattle, Washington.  Mr. Foran is a co-founder of Neon and has been Neon's Chief Creative Officer from its founding to the present.  Mr. Foran has worked in the video game industry for over fifteen years, specializing in art design and content creation for some of the most popular video game franchises in the world, such as *Halo*.  Mr. Foran owns 543,405 shares, approximately 5.4%, of Neon's common stock.

20.    Plaintiff Naomi Lackaff resides in Seattle, Washington.  Ms. Lackaff is a co-founder of Neon, and since its founding has been its Head of Partnerships, managing all external development.  Ms. Lackaff has nearly twenty years of technological development experience and worked with the co-founders at Microsoft and HBO in gaming development.  Ms. Lackaff owns 543,405 shares, approximately 5.4%, of Neon's common stock.

21.    Plaintiff Aaron Nonis resides in Phoenix, Arizona.  Mr. Nonis is a co-founder of Neon, and since its founding has been its Chief Operating Officer.  Mr. Nonis has worked in the gaming industry for over twenty years, including creating a new line of business for HBO in interactive entertainment and, before that, nearly ten years in software tools and platform

9

leadership in the user generated content ecosystem.    Mr. Nonis owns 543,405 shares, approximately 5.4%, of Neon's common stock.

22.    Plaintiff Don Norbury resides in Seattle, Washington.  Mr. Norbury is a co-founder of Neon, and since its founding has been its Chief Technical Officer.  Mr. Norbury has worked in the gaming industry for nearly twenty years, on a wide variety of the most popular video game titles, including the National Football League's *Madden* franchise, *Indiana Jones*, *Bioshock*, and *Star Wars*.  Mr. Norbury owns 543,405 shares, approximately 5.4%, of Neon's common stock.

23.    Plaintiff Mark Yeend resides in Seattle, Washington.  Mr. Yeend is a co-founder of Neon, and since its founding has been its Chief Marketing Officer.  Mr. Yeend has worked in the video game industry for over twenty years and has worked on over 75 different gaming products.  Mr. Yeend owns 543,405 shares, approximately 5.4%, of Neon's common stock.

24.    Plaintiff Calvin Zhou resides in Los Angeles, California.  Mr. Zhou joined Neon in October of 2021, and serves as the Company's Chief Business Officer.  Mr. Zhou owns 543,405 shares, approximately 5.4% of Neon's common stock.

25.    The seven above-described Plaintiffs would collectively represent an approximate 37% share of the total common stockholders in Neon, on a pre-SAFE conversion basis.  The two other minority stockholders, who would hold the remaining approximately 2% of Neon's common stock (on a pre-SAFE conversion basis), are aligned with Plaintiffs in this action.

26.    Defendant The 4D Factory LLC is a Wyoming Limited Liability Company, which purports to own 60% of Neon's common shares.

27.    Defendant Cort Javarone is a director of Neon.  On information and belief, he resides in New York City.  Javarone is the Managing Member of 4D.

28.     Defendant Scott Honour is a purported director of Neon.  On information and belief, Honour resides in Minnesota and is the Managing Member of Northern Pacific Group, a Minnesota-based private equity firm, which holds 453,869 Membership Units in 4D.

29.     Defendant Steve Horowitz is a purported director of Neon.  On information and belief, Horowitz resides in New York City, and also owns equity interests in 4D.

30.     Plaintiffs did not make a demand on the Board to bring the claims for relief on behalf of Neon as such a demand would have been futile because the Individual Defendants are inherently conflicted, have demonstrated themselves to be incapable of acting in the best interests of Neon and its stockholders as demonstrated by taking self-interested actions to enrich 4D at the expense of other stockholders.  The Individual Defendants are further subject to liability for breaching fiduciary duties to Neon as described herein, lack any independence to exercise business judgment, and cannot be expected to prosecute claims against themselves.

## BACKGROUND

**I.       THE FORMATION AND LAUNCH OF NEON MACHINE, INC.**

31.     Up until early 2020, six of the Plaintiffs worked together at HBO in the Interactive and Immersive Group (Messrs. Long, Foran, Nonis, Norbury, and Yeend and Ms. Lackaff are collectively referred to as the "Neon Founders").  Each was a veteran of the video game and technology industries.  Before joining HBO, those founding members had individually worked on some of the most successful video games ever created, including *Halo*, *Madden NFL*, and *America's Army*.

32.     While at HBO, the Neon Founders created innovative digital products based on HBO's hit television series, including *Westworld* and *Game of Thrones*, among others.  Several Plaintiffs won Emmy awards for Outstanding Creative Achievement for creating an interactive virtual reality experience based on the show *Westworld*.

11

33.     In April 2020, as a result of the COVID-19 pandemic, HBO decided to close its Interactive and Immersive division, so the Neon Founders formed Neon Media, LLC, a Seattle-based production company, with the mission of bringing the best of game development to the world of film and television to elevate "transmedia" and audience experiences.  Neon Media's focus was to develop narrative-driven interactive media, including games.

34.     Mr. Long led Neon Media as its CEO.  Like any start-up company, because Neon Media was a new independent studio, a significant amount of the team's time and resources were spent fundraising.  Neon Media sought a steady source of capital that would allow the team to focus on developing its major projects without having to worry about financing, including making payroll.  As Neon Media was started while the world was reeling from the impact of the COVID-19 pandemic, finding investors at that time was a difficult process.

35.     Mr. Long and defendant Javarone were business acquaintances and began negotiations for a possible investment by defendant Javarone into Neon Media.  In September 2020, 4D acquired a majority stake in Neon Media and became the managing member of Neon Media, in exchange for a promise to fund Neon Media's operations.  However, over the course of the following year, 4D and defendant Javarone's funding of Neon Media was inconsistent with prior representations, erratic and insufficient, preventing that company from being able to develop its gaming projects, let alone make payroll or pay other expenses, such as to third-party service providers and counterparties.

36.     As Neon Media did not have the funds to develop its projects, Mr. Long began floating the idea of pivoting to his Shrapnel game in or around July 2021.  He discussed his vision not only with venture capitalists and game industry investors, but also with 4D, Defendant Javarone, and Defendant Javarone's informal advisors, including John Miller (a former CEO of

12

AOL) and Kevin Conroy (a former executive at MGM). When Mr. Long discussed Shrapnel's development with Mr. Miller, Mr. Miller raised the idea that it might be easier for all parties, including prospective investors, if a new entity was formed to help develop Shrapnel and attract financing. On information and belief, defendants 4D and Javarone agreed. Accordingly, in mid-2021, with 4D's knowledge and blessing, the Neon Founders formed a new separate entity with more formal corporate protections that would support outside fundraising and provide critical runway for launching a flagship, stand-out video game. On August 3, 2021, a Certificate of Incorporation was filed in Delaware to form Neon.

37.     At the start, Plaintiffs – recognizing that Neon needed critical funds to get the Company off the ground – personally funded Neon through promissory notes. The total investment by the Neon Founders was approximately $550,000. And as they worked to get Neon off the ground with limited resources, some Plaintiffs went months without a salary. 4D and Defendant Javarone, who had dismissed the Shrapnel idea and Web3 gaming more generally as "funny money," provided no support.

38.     Javarone was made aware of these launch efforts, as well as Plaintiffs' personal investments, but chose to invest no funds, time, or ideas to launch Neon. Although invited to team meetings, no representative of 4D would ever attend, including Javarone. Nonetheless, since 4D was an investor in Neon Media (although 4D never directly invested the full investment amount it promised and agreed to), 4D was offered the opportunity to purchase 6,000,000 shares of Neon common stock at par value of $0.0001 per share pursuant to a Stock Purchase Right Notice and Restricted Stock Purchase Agreement dated August 20, 2021 ("Stock Purchase Agreement").[4] Defendant Javarone, on behalf of 4D, executed the agreement via DocuSign.

---

[4] The Stock Purchase Agreement is affixed hereto as **Exhibit K**.

39.    The Stock Purchase Agreement included an unambiguous "Termination Date" which stated: "The right to purchase Shares under this Purchase Right Notice and the Restricted Stock Purchase Agreement shall terminate if not exercised prior to the 31st day following the Date of Grant set forth [in the agreement]."  In other words, 4D had until the end of the day on September 20, 2021 to exercise its purchase right and pay the $600 for the common shares.  As 4D failed to make that payment by the required time (or any time subsequent to it), on September 21, 2021, the Stock Purchase Agreement terminated pursuant to its own terms.

A.    **Plaintiffs Create "Shrapnel"**

40.    Neon was formed to develop a long-held concept of Mr. Long's: a sci-fi action, first-person-shooter game called "Shrapnel."  Whereas many prior efforts to incorporate blockchain technology into video games have fizzled, the Neon Founders committed their considerable experience and expertise into creating a successful model.  As they sought the necessary funding, a key selling point for Shrapnel was that it would be the world's first blockchain-enabled first-person shooter game, as well as the first so-called AAA game to incorporate a blockchain-supported ecosystem.  "AAA" is an industry term referring to the highest-quality and most successful games, such as *Halo* and *Assassin's Creed*, characterized by high quality visuals, compelling storylines, and the large budgets required to develop them.

41.    Shrapnel's storyline starts with a giant asteroid colliding with the moon, causing lunar meteorites to bombard a 500-kilometer-wide band around the Earth.  This area becomes known as "The Zone," and nations and corporations begin assembling their own Mercenary Extraction Forces ("MEFs") capable of venturing into The Zone and exploring it for valuable resources.  Players play as MEF operators battling each other for control over The Zone, as depicted in the below game image released during early marketing efforts:

14



42.     Another key innovation and selling point for the game is that whereas most modern games require players to purchase items, levels, and other assets key to playing the game by purchasing in-game "credits" or "points" with fiat currencies such as U.S. dollars, Shrapnel's blockchain technology powers a cryptocurrency token-based ecosystem, in which tokens are used as "utility" tokens and made available to players, both inside and outside of the game, and players can use those tokens (a) in the game and (b) unlike other games, own and transfer that token outside of the game on a public blockchain, including on more than eleven different cryptocurrency exchanges as of the time of this filing. Among other things, players are able to use these tokens to outfit their MEF Operators with their desired playstyles and weapons, purchase "callsigns" (which is the name players are identified by in the world of the game), and trade weapons, suits, and other assets, with other players.

43.     Yet another innovation in the Shrapnel world is that players can create their own content within the game, and then use the blockchain technology to "mint" that content – such as a new weapon, or a game map they created – as a non-fungible token ("NFT"). In other words, once created by the game-player and "minted" using SHRAP tokens, that content is represented on the blockchain as an NFT that belongs to that player, and which can be transferred or "sold" to

15

other players, as the creators receive more tokens based on how well their creations perform.  These in-game NFTs, like all representations or "inscriptions" on a public and immutable blockchain ledger, is available for anyone to review, at any time.

44.    Eventually, as the game was developed, Shrapnel and its innovative concepts gained purchase with the broader community.  Back in late summer 2021, like now, these concepts proved successful in attracting the attention of some of the most knowledgeable and successful investors in the video game and/or digital asset and blockchain industries.

**B.    Griffin and Polychain Provide Neon with Seed Capital in Exchange for Future Equity**

45.    In late summer 2021, Messrs. Long and Norbury, among others, were engaged in a series of fundraising meetings for Neon and Shrapnel, while themselves not taking a salary.  During that process, Mr. Long spoke with more than 60 venture capital firms.  Not only did 4D not put any money into Neon, defendant Javarone had no role or involvement in any of this fundraising, despite knowing of the need and that it was happening.

46.    Two particularly knowledgeable outside investors stood out during that process: Griffin and Polychain.  They saw Neon's potential, and in September 2021, they agreed to collectively invest $8 million.

47.    These agreements were formalized through standard, and often used in the cryptocurrency space, bilateral contracts called SAFEs, in which Griffin and Polychain each received future equity in Neon in exchange for their substantial investments.  The SAFEs were structured so that the equity would vest in the form of preferred shares of Neon upon the occurrence of certain events.  These SAFEs are discussed in more detail below.

48.    Griffin and Polychain publicly touted their investments in Neon.  Griffin issued a release about partnering with Neon, stating "[i]t is exciting to see a triple-A games team

16

of this caliber contribute to moving the blockchain gaming ecosystem forward with a focus on quality gameplay and long-term value."  And Polychain stated, "[W]e're extremely excited to see the experienced team at Neon push the envelope forward on what's possible in the crypto gaming industry by integrating crypto into a deep, immersive, triple-A-style [First Person Shooter] experience."

### C.    The Griffin and Polychain SAFEs Are Approved by the Board, Including Defendant Javarone

49.     As mentioned above, Neon raised outside funds from Griffin and Polychain by entering into materially similar SAFEs.  Attached hereto as **Exhibits A** and **B** are true and correct copies of the SAFEs dated September 29, 2021 with Griffin, and September 30, 2021 with Polychain, respectively.

50.     Griffin and Polychain negotiated these SAFEs in arms-length transactions with Neon *and 4D*.  Indeed, 4D offered comments and edits to drafts of the SAFEs and offered its input regarding the structure of the SAFE investments.  In fact, Mr. Long had provided Javarone and other non-party advisors to 4D with a comparative presentation regarding the proposed Griffin/Polychain investment and other possible funding opportunities.  Long recommended moving forward with the Griffin and Polychain proposal because of their reputation and expertise, but he also elicited the Debtor's views regarding the funding options, including because the different investment opportunities varied in their valuations of Neon—and dilution of 4D—that would eventually occur given the significant capital being offered.  Put simply, not only did 4D know about the SAFEs with Griffin and Polychain, *4D participated in negotiating the agreements and applauded the infusion of critical capital into the Company* to fund the development of Shrapnel.

51.     A central feature of the SAFEs is their "Automatic Conversion" to an

agreed-upon amount of preferred equity upon the occurrence of certain events; namely, "[i]f, by
the date that is sixty (60) days after Network Launch, (i) this instrument has not terminated and
(ii) no Qualified Financing has occurred, then, at 8:00 a.m. PT on the date that is sixty-one (61)
days after Network Launch, this instrument will ***automatically convert*** into that number of shares
of a newly created series of the Company's preferred stock" (emphasis added).

52.    The SAFEs were never terminated, and no "Qualified Financing," as
defined in the SAFEs, ever occurred.

53.    Pursuant to Section 141(f) of the General Corporation Law of Delaware, the
Neon Board adopted and approved multiple resolutions related to the SAFEs that were issued on
September 29, 2021 and September 30, 2021 to Griffin and Polychain, respectively, in the
aggregate principal amount of $8 million.

54.    First, Neon's Board ratified these actions in January 2022.

55.    Then, in January 2023, with Neon engaged in additional fundraising efforts,
and planning on engaging in further fundraising in the months to come, the Neon Board, including
Defendant Javarone, again approved the SAFEs in substance and form, including additional
SAFEs with Griffin and Polychain contemplating yet further SAFE financings.  Attached hereto
as **Exhibit C** is a true and correct copy of the Board Resolutions dated January 13, 2023.

56.    Specifically:

(a)    The Board resolved that the "SAFE Financing is hereby ratified,
confirmed, adopted and approved in all respects." The Board further
resolved "that the form, terms and conditions of each SAFE are
hereby ratified, confirmed, adopted and approved." The Board still
further resolved that it "ratifies, confirms, approves and adopts all
actions previously taken by officers or directors of the Corporation
in connection with the foregoing resolutions, including the
execution of the SAFEs."

(b)    The Board ratified certain letter agreements with Polychain in
connection with the SAFEs, resolving that "each of the Letter

Agreements is hereby ratified, confirmed and approved," and that the Board "hereby ratifies, confirms, approves and adopts all actions previously taken by officers or directors of the Corporation in connection with the foregoing resolutions, including the execution of the Side Letter Agreements."

(c)     The Board further "ratifies, confirms, approves and adopts all actions previously taken by officers or directors of the Corporation that are approved by the foregoing resolutions."

(d)     Finally, the Board resolved that "each of the officers of the Corporation is authorized to do or cause to be done any and all such further acts and to execute and deliver any and all such additional documents as such officer may deem necessary or appropriate in order to carry into effect the purposes and intent of the foregoing resolutions." *Id.*

57.     All five Directors at the time, including defendant Javarone, approved and executed the foregoing resolutions. *Id.*

**D.     Plaintiffs Build and Operate Neon, and Create the Network**

58.     Now having the financial backing the Neon Founders needed, they worked to build Neon. They hired other talented employees, including Calvin Zhou, a sophisticated cryptocurrency and blockchain specialist, who previously worked at 4D, and then began assisting on Shrapnel. In addition to putting in substantial time and hard work to grow Neon, some of these employees also invested personal amounts. In August 2021, Mr. Zhou, unlike any of the Defendants, invested $100,000 of his own money into Neon. Two months later, he joined the Neon development team, focusing on core issues related to the Shrapnel Network and the development and use of the SHRAP token.

59.     As they worked to build the Company, Messrs. Long, Nonis, and Norbury routinely consulted with Griffin and Polychain, discussing topics such as the game's blockchain technology, additional fundraising, and the overall development of the Shrapnel game.

60.     In recognition of its prior investment in Neon Media, Neon provided 4D

19

with two separate tranches of SHRAP tokens. 1 million SHRAP tokens were provided to 4D under

an Assignment and Assumption Agreement dated November 8, 2021 for 4D's participation as a

director of the Board. Separately, 15 million SHRAP tokens were provided to 4D for its

anticipated services as an advisor to Neon under an Assignment and Assumption Agreement dated

November 8, 2021. Upon information and belief, defendant Javarone changed the signature blocks

on both agreements so that the 16 million total tokens would be provided to defendant Javarone

personally rather than to 4D. Attached hereto as Exhibits **D** and **E** are true and correct copies of

both agreements.

61.    Notably, Sections 3.2 and 3.3 of the Assignment and Assumption

Agreement for the 15 million tokens, *see* Ex. E, contain an unlock schedule (meaning the SHRAP

tokens will not be provided or transferable until certain events have occurred and time has passed)

that is ***based on the occurrence of Network Launch***.

62.    Despite receiving the tranches of SHRAP tokens described above, 4D and

defendant Javarone had no involvement in Neon's development. He never visited the Company's

offices, only had sporadic interactions with any of Neon's personnel, and, despite being invited,

declined to attend any of the weekly meetings that Mr. Long held with Griffin and Polychain

representatives.

63.    For example, in a January 2022 Neon Board meeting, Neon officers such as

Messrs. Long and Norbury updated the Board regarding Neon's fundraising efforts, its

partnerships, hiring, Shrapnel's development, and other operational matters. Griffin and Polychain

representatives attended in person and made professional inquiry into important matters.

Defendant Javarone attended remotely, and had little to no involvement.

64.    Neon engaged in early public marketing as it developed Shrapnel, to begin

the process of building public interest in this nascent industry of blockchain enabled gaming. This included appearing at video game conventions, holding marketing events, and releasing other forms of media related to Shrapnel, including comic books and movie clips.

65.    On April 27, 2022, Neon published a White Paper describing the gameplay and the token ecosystem embedded in the game.[5]  The White Paper marketed Shrapnel's gameplay innovations, identified the development team (including the Neon Founders), and publicly marketed Shrapnel's investors, including most prominently, Griffin and Polychain, as well as a wide variety of other investors who made the game's development possible through financial or operational contributions to Neon.  In contrast, neither 4D nor defendant Javarone invested any resources (of any kind) into Neon or Shrapnel.

66.    Following the successful publication of the White Paper, Neon determined it could not build the world's first AAA Web3 game from the initial Fall 2021 investment round alone.  It needed a significant amount of additional funding, and from April 2022 through August 2023, Neon was able to raise an additional approximately $20 million in Series A funding, despite a difficult capital markets environment.

67.    Neon achieved this successful fundraising through the promise of preferred equity to its additional investors, through SAFEs.  The Board, including defendant Javarone, knew Neon was engaged in additional fundraising and that Neon had entered into additional SAFEs.  As the SAFEs are standard documents in the venture capital fundraising context, particularly in the blockchain and cryptocurrency spaces, all of the SAFEs were materially similar to those executed by Griffin and Polychain in 2021 and early 2023, and approved by Neon's Board, and each

---

[5]    The Shrapnel White Paper is available at: https://medium.com/@playSHRAPNEL/the-shrapnel-white-paper-is-now-live-33f10c1e024f (last accessed March 19, 2024).

contained comparable terms including the "Automatic Conversion" rights discussed above.

## II.    THE FIRST SHRAP TOKEN WAS ISSUED ON MARCH 17, 2023, AND "NETWORK LAUNCH" OCCURED NO LATER THAN APRIL 29, 2023

68.    The "Network Launch" – the key trigger within the SAFEs – is defined by the SAFEs as a "bona fide transaction or series of transactions pursuant to which the Token Issuer[6] issues the native Token [SHRAP] associated with access to and use of the Network."  This definition relates to a straightforward and important facet within Neon's business operations which is easily demonstrated and provable by review of immutable public information.

69.    Because one of the central innovations of the Shrapnel video game is its use of blockchain technology, Plaintiffs had to work long before the game's eventual launch to support development and launch of a cryptocurrency "token" that would be used within the game.

70.    As Defendants are well aware, upon the advice of experts in the digital asset field, Neon worked with a third-party partner and separately with Avalanche, a prominent blockchain platform similar to Ethereum, to support the creation of a unique token related to Shrapnel – the SHRAP token.

71.    The SHRAP token is a central part of the Shrapnel Network and has substantial utility and use within the Shrapnel game.  For the prospective players of Shrapnel, they can use SHRAP as currency for acquiring items during the game, such as weapons, special game maps, wearables or "skins," and other items.  Players can also use SHRAP to customize their experience, such as creating their own game maps that they would then own within the game's marketplace, or creating their own unique "Callsign," a form of "tag" or identification for when they play the game.  Players can even develop, improve, and tweak the weapons they use within

---

[6]  A "Token Issuer" is defined broadly as "[Neon], any parent, subsidiary, affiliate, or their respective successors or assigns of [Neon], or a third-party entity that is a contractual counterparty, that is issuing, or has issued any Tokens that operate on a Network."

the Shrapnel game and use SHRAP tokens to purchase similarly developed weapons, maps, or other assets from other players.

72.     For Neon, the launch of the SHRAP token and its corresponding Network was a key element of Shrapnel's promotional efforts that could drive gamers to the Shrapnel game and support the game's greater ecosystem.  After it was "mined" from the activation of the Network, some SHRAP tokens were "airdropped" (*i.e.*, given away for free) to potentially interested players around the world in order to build additional excitement about the game.

73.     For Neon's outside investors, including Griffin and Polychain, Network Launch and the airdrop of the SHRAP token signaled key development milestones for Neon and the Shrapnel Network in particular.  Critically, as described above and approved by the Board, absent a qualifying financing event, those investors' rights to Neon preferred shares vested on the 61st day following the Network Launch.

74.     And because the Avalanche blockchain, which interacts with the Shrapnel Network to facilitate all SHRAP token transactions, is a decentralized, peer-to-peer network, each transaction that occurs on its blockchain is recorded, immutable, and available publicly.  Thus, each step leading to the Network Launch, and every subsequent transaction involving the SHRAP token and the Shrapnel Network, including up to this present moment, has been and will be fully available and verifiable with reference to publicly available blockchain data that is immutable upon consummation of a transaction.

75.     Following years of hard work, the process of achieving Network Launch was completed over approximately two months of publically verifiable steps to establish the operation of the Shrapnel Network.  First, on February 17, 2023, the Shrapnel "subnet" was created: a network of blockchain validators on which the SHRAP token, identified by a specific

code to 18 decimal places, would be made available. As shown in the picture below, evidence of that "subnet" creation is available online on "Avascan," a tool used to view blockchain transactions.[7]



76.    Next, on or about March 17, 2023, the first native token (referred to as the SHRAP "gas" token) was generated on the Shrapnel subnet. This transaction can also be publicly viewed[8]:

---

[7]    *See* "Shrapnel on Avalanche," Avascan, *available at* https://avascan.info/blockchain/shrapnel/info (last accessed Mar. 19, 2024).

[8]    *See* "Shrapnel on Avalanche," Avascan, *available at* https://avascan.info/blockchain/shrapnel/block/0x492381a997a697b593088b9ac65fb62f0ef1e0a5e4b6b86a8c1301343c0dfbee (last accessed Mar. 19, 2024).



77.     Additional token transactions built up over the following month, and, not later than April 29, 2023, 3 billion SHRAP tokens had been generated using the Shrapnel Network and its transacting with Avalanche.[9]  *That is the total amount of SHRAP tokens that will ever be generated* – there will be no additional creation of SHRAP tokens.  From that time forward, the Shrapnel Network has been in continuing and growing operation.  Soon after the Network Launch date, a portion of the 3 billion SHRAP tokens were airdropped to potential players of Shrapnel throughout the world, and players were able to create their own Callsigns, *i.e.* unique in-game identifiers.

78.     Accordingly, by April 29, 2023 at the latest – if not earlier – the Network Launch as defined in the SAFEs had occurred: there had been a series of transactions pursuant to which the native token (SHRAP) associated with access to and use of the Shrapnel Network had been issued.  There will be no other token issuances.  And since that date, the SHRAP token has been exchanged across blockchains, used to create in-game digital assets, and traded on various cryptocurrency exchanges including Bybit, Kucoin, HTX Global, Bitget, BitMart, and CoinEx.

---

[9]     Similar to the Ethereum blockchain network, Avalanche is a blockchain network that interacts with other blockchain ledgers, such as the Shrapnel Network, and records transactions.

As of March 25, 2024, the popular Ethereum blockchain, the network associated with the second-largest cryptocurrency in the world by market cap value (Ether (ETH)), supported more than 5,350 unique wallet addresses that hold SHRAP tokens. There is simply no way in which this Network Launch can be disputed.

79.     In fact, following the Network Launch in late April 2023, interested players began using SHRAP tokens to buy their "callsigns" (player names) as early as May 16, 2023. Since then, more than 100,000 players have registered to play SHRAPNEL, and over 42,000 have competed with each other across its various maps and futuristic landscapes. Players access these competitions, or play the Shrapnel game at will, by simply downloading the game from the Epic Game Store (https://store.epicgames.com/en-US/) (last visited March 19, 2024).

80.     Shrapnel was formally made available in the Epic Games Store in or around January 22, 2024, however players had been creating and purchasing "callsigns", "operators" (player profile avatars), and "emblems" (decals) through shrapnel.com for approximately eleven months. Notwithstanding that the launch of the Shrapnel game is entirely detached from the definition of Network Launch, the Network having launched—a condition precedent to the SHRAP token being available for game-play and the creation of callsigns and modification of weapons, or maps—is a *sine qua non* of playing Shrapnel and using the SHRAP token to enhance the players' experience.

81.     At bottom, 61 days after Network Launch, on June 29, 2023, Griffin and Polychain's SAFEs automatically converted to preferred shares in Neon, pursuant to the agreements those investors entered into with Neon.

III.    **4D'S INSOLVENCY SPAWNS CONSPIRACY TO EXTORT PLAINTIFFS, TORTIOUSLY INTEFERE WITH NEON'S INVESTOR AGREEMENTS, AND ATTEMPT TO PILLAGE NEON'S COFFERS**

82.     On information and belief, by the summer of 2023, 4D's significant debt –

including an approximate $4 million loan from non-party lender MEP Capital Holdings III LP to Neon Media made in December of 2021 (after Neon was founded) and guaranteed by 4D – was causing 4D significant financial distress.

83.     As security for its guarantee to MEP Capital Holdings III LP, 4D pledged whatever common share interest 4D held in Neon, among other collateral.  4D did so without providing any notice to Neon, in violation of Neon's Right of First Refusal as set forth in Article VI of Neon's bylaws.

84.     At that time, defendant Javarone, seeking liquidity to satisfy 4Ds debts, approached Mr. Long and demanded that Neon or its investors purchase 4D's purported common share interests at a substantial premium.  Defendant Javarone's intentions were crystal clear:  either Mr. Long aided defendant Javarone in extracting payment for 4D's purported shares, or 4D and defendant Javarone would retaliate and harm the Company.  Mr. Long refused the extortion demand.

85.     The reasons Mr. Long refused to assist in the sales of 4D's purported equity interest were simple.  First, 4D never paid its consideration for the 6,000,000 common shares Neon offered to 4D.  By the very terms of the Stock Purchase Agreement, 4D was offered to purchase its shares at $0.0001.  The total consideration was $600, but the right to purchase was subject to termination "if not exercised prior to the 31st day following the Date of Grant[.]"  4D never paid the consideration and thus had no common shares to sell.

86.     Second, even assuming 4D had common shares to sell, Neon was then engaged in fundraising at an essential time for its game development.  A sale of a purported 19% block of illiquid common stock would confuse the market, as defendant Javarone well knew, since prospective investors were considering SAFE investments – contractual rights that automatically

convert to preferred shares in Neon (a different class of securities) – that were materially different from the securities which 4D purportedly sought to sell.

87.     Third, Mr. Long, a decorated U.S. Army veteran, was unwilling to cower to defendant Javarone's threats or subject himself to the possibility of personal liability by being complicit in 4D's scheme to sell securities it did not own, to the very investors Mr. Long had been working with for nearly two years, and while the Company was on the cusp of launching its flagship product.

88.     In August 2023, as threatened, defendant Javarone retaliated, and, purportedly acting as a director of Neon, took action to replace Mr. Long (then one of five directors) with defendant Honour, a personal friend and investor in 4D.

89.     On September 14, 2023, alarmed by defendant Javarone's actions purportedly on behalf of Neon's Board, Griffin sent a letter to Neon demanding that it honor the SAFE conversion and take all necessary corporate actions to do so.  Attached hereto as **Exhibit F** is a true and correct copy of Griffin's letter.

90.     At that time, the Neon Board consisted of five directors: defendant Javarone; defendant Honour; Ned Sherman, a former director of the Board who had been appointed by 4D; Pierre-Edouard Planche, a representative appointed by Griffin who routinely worked with Plaintiffs and Neon; and Josh Rosenthal, a representative appointed by Polychain who was also closely involved with Neon's operations.

91.     At the direction of the three 4D-appointed directors (Javarone, Honour, and Sherman), the Board ignored Griffin's demand letter.  And despite repeated demands including from the other Board members and Mr. Long that the SAFEs be recognized, they continued to refuse to do so, without even disputing that the Network Launch occurred.  As set forth above, the

occurrence of the Network Launch was, and is, an indisputable fact.

92.     The directors appointed by 4D, in violation of their fiduciary duties, were plainly motivated by their own self-interest rather than any consideration for or interest in Neon, a business with which they had no involvement.  On information and belief, each of the three Individual Defendants, as well as former 4D appointed director Sherman, held and hold equity in 4D, and they were and are concerned that if Neon performed its obligations under the SAFEs, and the SAFEs were converted and the preferred shares were issued (as the Board-approved agreements require), 4D's interests in Neon would be diluted and 4D would lose control of the Board.

93.     On October 5, 2023, the purported Neon Board convened a special meeting. At the meeting, the invalid Board "majority" members appointed by 4D (Javarone, Honour, and Sherman) first voted to appoint defendant Honour as Chairman of the Board and then voted to make "Chairman" an official officer position and approved Honour as Neon's "Executive Chairman."

94.     At the same meeting, the demand was made again on the Board to recognize the conversion of the SAFEs.  Trying to slow play 4D's loss of control in Neon (assuming 4D should even be considered a shareholder as it did not pay for any Neon securities) and to provide 4D with additional time to file its bankruptcy petition and thwart a foreclosure, defendant Honour stated that the Board needed additional time to "carefully consider" whether the Network Launch had occurred, and whether the SAFEs had converted.  He provided no reason to believe that either event had not, in fact, occurred – he has not, nor has any other Defendant, some five months later.

95.     Shortly after that meeting, on October 10, 2023, 4D filed a voluntary petition for relief under Chapter 11 of the Bankruptcy Code before this Court (the "Petition Date").

96.     On October 16, 2023, former director Ned Sherman abruptly resigned from the Board, without stating a reason for doing so.  Shortly thereafter, the Debtor, through defendants Javarone and Honour, used its purported majority common stock interest to replace Sherman with defendant Horowitz, another equity holder in 4D.

97.     On November 7, 2023, with Neon facing significant potential liability from its outside investors and a recalcitrant Board acting contrary to Neon's best interests, Mr. Long as CEO of Neon engaged counsel to provide advice to Neon and guide it through the issues.  Soon after, Neon, through counsel, sent a letter to defendant Javarone explaining the potential harm to Neon based on its refusal to recognize the SAFE conversion, and seeking a meeting to discuss and attempt to resolve the pressing issues.

98.     In retaliation for this action and his repeated demands to the Board that Neon abide by its contractual obligations to its key investors, the purported Board majority consisting of the Individual Defendants voted on November 13, 2023 to suspend Mr. Long as CEO and appointed defendant Javarone as his putative interim replacement.

99.     Despite this "appointment", defendant Javarone has still never stepped foot in Neon's offices, never attended a management meeting, never asked questions about the status of the Shrapnel game or the amount of players enjoying the game throughout the world, and never once inquired over Neon's employees.

100.    Instead, defendant Javarone, who was (and is) growing more and more desperate for cash to satisfy 4D's obligations as guarantor, immediately attempted to ransack Neon's coffers.  He called Neon's primary bank and demanded access to the accounts.  The bank denied him access.  He then attempted to impose a sweeping restriction on any expenditure over $5,000 without his and defendant Honour's approval.  He threatened disciplinary actions including

but not limited to termination of employment against Neon's key officers – including each of the Plaintiffs – if they did not concede to his threats to turn over access to critical records and to comply with his demands.[10]

101.    On information and belief, the Defendants then acted in concert to obtain Neon's insurance policies and made a false claim to the insurance carrier, causing the insurance carrier to pay out a claim to Defendants.

## IV.    THE DEFENDANTS EXECUTE A PLAN TO HIJACK NEON ASSETS FOR THEIR PERSONAL GAIN

102.    While Defendants had entrenched themselves and caused Neon to breach its agreements with critical seed investors Griffin and Polychain by denying the existence of "Network Launch" and refusing Griffin's demand to affirm Neon's compliance with the terms of the SAFEs, Defendants had yet to actually reap personal financial gain from their tortious conduct. To do so, the Defendants set in motion their scheme to claim entitlement to hundreds of millions of SHRAP tokens from Neon, including ransacking all SHRAP tokens held in Neon's Treasury – a plan that, if successful, would not only siphon from Neon more than a hundred million dollars' worth of cryptocurrency,[11] it would also crater the Company.  On information and belief, defendants Honour and Horowitz have agreements with 4D and defendant Javarone whereby defendants Honour and Horowitz will personally benefit from 4D's receipt of any financial payment (in any form) from Neon to 4D and, thus, all Defendants have a significant financial interest in bilking Neon to benefit 4D.  Of course, such tortious actions are completely in violation of the Individual Defendants' duties to Neon and its stockholders.

---

[10]    In addition to data room access, which the Plaintiffs made available to Javarone and the Debtor in Fall 2023, since the Petition Date, the Plaintiffs have produced hundreds of records to the Debtor regarding Neon, its operations, and its financial position.  Allegations to the contrary are categorically false.

[11]  As of March 25, 2024, the SHRAP token is trading at approximately $0.2881.

103.    First, on December 27, 2023, defendant Javarone's counsel sent a letter to the Argon Protocol Foundation demanding the issuance of 16 million SHRAP tokens under the terms of the two Assignment and Assumption Agreements described above.  Attached as **Exhibit G** is a true and correct copy of this letter.  The Argon Protocol Foundation is the third party – and a counterparty with Neon – that was recommended to Neon by outside experts to assist with the development of the SHRAP token and related Network.  Not only did this letter completely ignore the notice requirements of the relevant Assignment and Assumption Agreements, defendant Javarone and his counsel overlooked that the agreement for 15 million of those SHRAP tokens explicitly provides an unlock schedule based on the occurrence of Network Launch.  So, out of one side of his mouth, defendant Javarone claims Network Launch has not occurred, but out of the other side, claims entitlement to 15 million tokens that could **only be provided if Network Launch had occurred**.

104.    Second, not satisfied with only demanding 16 million SHRAP tokens, on January 4, 2024, 4D's counsel sent a letter to defendant Honour, purportedly in his capacity as the "Executive Chairman of the Board of Neon Machine, Inc.," demanding that Neon's Board – again now illegitimately controlled by the Individual Defendants – distribute 480,927,488 treasury tokens to 4D via a cryptocurrency wallet that 4D would provide.  A true and correct copy of this demand letter is attached hereto as **Exhibit H**.  This amount of SHRAP tokens claimed by 4D **was not supported** by any agreement with Neon but was solely based on an email that provided a pro forma capitalization table for Neon as of February 2022 and reflected that **post-SAFE conversion** (which the Debtor now refuses to concede ), 4D's diluted equity interest "could theoretically translate" into a certain amount of tokens if the Board elected a pro rata distribution – effectively liquidating the SHRAP tokens held in Neon's treasury for corporate purposes.  Such a pro rata

distribution, however, could only really occur if Neon were to sell or liquidate, since a pro rata distribution of all SHRAP tokens would mean no other tokens could be issued to use in the Shrapnel game.

105.    On January 9, 2024, the Debtor caused the Individual Defendants to notice a "special meeting of the board" of Neon for January 12, 2024.  One of the agenda items listed on the notice was "SHRAP Token Release Authorization."  A true and correct of this correspondence is attached hereto as **Exhibit I**.

106.    On January 12, 2024, the Individual Defendants then held the illegitimate "special meeting."  Neon Board members Josh Rosenthal and Pierre Planche attended and objected to the holding of the meeting and the actions of the Board as illegitimate.  Nevertheless, the Individual Defendants, in spite of the inherent conflicts and looking only to line their own pockets, approved the distribution of the 480,927,488 SHRAP tokens to 4D (again, which each Individual Defendant owns units in).

107.    Then, on January 31, 2024, defendant Honour emailed Plaintiffs Aaron Nonis (Neon's COO) and Don Norbury (Neon's CTO), as well as others, stating that he and defendant Javarone (acting as "Neon's Board") directed management to "work together to promptly execute the authorized distribution of SHRAP tokens" to 4D.  Defendant Honour stated that he "expect[ed] completion of the process within 72 hours[,]" and that there "are no restrictions in place on the tokens."  A true and correct copy of this correspondence is attached hereto as **Exhibit J**.

108.    On information and belief, and realizing 4D's claim to the 480 million SHRAP tokens is unsupported by any valid agreement or contract, 4D now also claims entitlement to "Initial Development Team" tokens that were provided to the Neon Founders.  Completely

ignoring, either intentionally or ignorantly, proposed guidance from the U.S. Securities and Exchange Commission ("SEC") related to token allocations to cryptocurrency network developers, 4D claims that it should be provided 60% of the SHRAP tokens that were issued to Neon Founders for their work in developing the Network and Shrapnel game. Commissioner Hester Peirce of the SEC proposed a token safe harbor related to the registration provisions of the securities laws.[12] Under that proposal, "Initial Development Teams," defined as "any person, group of persons, or entity that provides the ***essential managerial efforts for the development of the network prior to reaching Network Maturity*** . . . .," have a three year period to determine whether the token transactions involve the offer or sale of a security. Since neither 4D nor any of the Individual Defendants provided any "essential managerial efforts" (or even superficial involvement) in developing the Network (and, are actually arguing such Network has not launched), none of the Defendants are entitled to any of those tokens (other than tokens allocated to Mr. Javarone pursuant to executed agreements and based on his role as a director and advisor).

109.    Defendants' scheme to claim assets of Neon and the Plaintiffs was now complete. Together the Defendants had thwarted the Company's plain contractual obligations under the SAFEs that necessarily removed any controlling interest (and thus control of the Board) that 4D purports to have, caused the Debtor to send a demand to an illegitimate and highly conflicted Board that had both fiduciary duties to Neon ***and personal self-interest in 4D***, caused the approval of the distribution of more than 480 million SHRAP Tokens to 4D, ***directed the Company's management to implement the transfer within 72 hours*** to a cryptocurrency wallet controlled by 4D—a transaction that is by its very nature irreversible, and claimed entitlement to tokens that were issued to the Neon Founders for their work in developing the Shrapnel Network

---

[12] *See* https://www.sec.gov/news/public-statement/peirce-statement-token-safe-harbor-proposal-2.0.

necessary to make such a SHRAP token transfer.

110.    In addition to being tortious, this behavior completely ignores that if there truly was owed to 4D or the Individual Defendants any amount close to what they conspired to steal from Neon, 4D would not be in bankruptcy in the first place.

## V.    NEON FACES ONGOING SEVERE HARM FROM THE DEFENDANTS' ACTIONS

111.    The Defendants, by elevating their personal interests and those of 4D over Neon's rights and interests, have caused and continue to cause systematic and continuous harm to Neon as well as to Plaintiffs, all of whom own interests in Neon. These harms include, among other things, limiting Neon's ability to govern itself consistent with applicable corporate law, impeding its ongoing fundraising efforts, impeding business operations and its ability to execute, and depressing Neon's goodwill and the value of the Company at a critical juncture in the Company's evolution.

112.    Specifically, Defendants have caused harm by refusing to recognize the SAFEs' automatic conversion provisions. By their plain terms, the SAFEs' interests automatically converted to preferred shares in Neon. This conversion occurred *no later than June 29, 2023* – 61 days after Network Launch. By their refusal to accept unambiguous, public, and objectively dispositive facts that Network Launch has occurred, Neon is in anticipatory breach of its SAFE agreements with scores of SAFE investors, including non-parties, and unable to fulfill its contractual obligations, exposing it to significant legal risk and claims for substantial damages.[13]

113.    As a result of all of these harms, Neon has also suffered and will continue to suffer tremendous reputational harm, and will face significant damages if its outside investors are forced to take legal action to convert their claims to an enforceable judgment. Neon will not

---

[13] The Plaintiffs reserve their right to seek administrative expense priority with respect to any applicable damages.

survive.

114.    Defendants are causing these harms to Neon during a critical time related to the Shrapnel game, risking interference with a product that has been in development for over two years, and risking all of the substantial future economic benefits the product is certain to create for Neon and for those investors with real skin in the game.

**FIRST CLAIM FOR RELIEF**
**DECLARATORY JUDGMENT THAT NETWORK LAUNCH**
**OCCURRED BY NO LATER THAN APRIL 29, 2023**
**(AGAINST ALL DEFENDANTS)**

115.    Plaintiffs incorporate the foregoing allegations as if fully set forth herein.

116.    Plaintiffs bring this claim for relief derivatively on behalf and for the benefit of Neon to redress the injuries suffered, and to be suffered, by Neon.

117.    An actual, existing, and bona fide case and controversy exists regarding whether Network Launch has occurred.

118.    Plaintiffs contend that Network Launch, as defined in the SAFEs, occurred by no later than April 29, 2023.

119.    Defendants refuse to acknowledge that Network Launch has occurred.

120.    Plaintiffs desire a judicial declaration and determination of the parties' respective interests and rights.

121.    A declaratory judgment is necessary and appropriate at this time so that the parties may know their interests and rights with respect to the composition of the Board. A judicial declaration will eliminate uncertainties and controversies that might otherwise result in additional litigation.

## SECOND CLAIM FOR RELIEF
## DECLARATORY JUDGMENT THAT SAFES HAVE CONVERTED
## TO PREFERRED SHARES IN NEON MACHINE, INC.
## (AGAINST ALL DEFENDANTS)

122.    Plaintiffs incorporate the foregoing allegations as if fully set forth herein.

123.    Plaintiffs bring this claim for relief derivatively on behalf and for the benefit of Neon to redress the injuries suffered, and to be suffered, by Neon.

124.    An actual, existing, and bona fide case and controversy exists regarding whether preferred shares should issue to SAFE holders Griffin and Polychain.

125.    Plaintiffs contend that the preferred shares automatically issued 61 days after Network Launch—*i.e.*, by no later than July 29, 2023.

126.    Defendants contend that Network Launch has not occurred, and thus that no shares should issue.

127.    Based on the occurrence of Network Launch, Neon must comply with its obligations under the SAFEs, including recognizing the automatic conversion of the SAFEs into preferred shares, and Neon must take all relevant corporate actions necessary to effectuate the conversion of the SAFEs and issuance of preferred shares.  Defendants, however, are using their purported control over Neon and not allowing those actions.

128.    Plaintiffs desire a judicial declaration and determination of the parties' respective interests and rights, including Neon's obligations under the SAFEs with respect to the automatic conversion of the SAFEs into preferred shares in Neon.

129.    A declaratory judgment is necessary and appropriate at this time so that the parties may know their interests and rights with respect to the composition of the Board.  A judicial declaration will eliminate uncertainties and controversies that might otherwise result in additional litigation.

**THIRD CLAIM FOR RELIEF**
**DECLARATORY JUDGMENT THAT AUTOMATIC STAY IS INAPPLICABLE, OR,**
**IN THE ALTERNATIVE, CAUSE EXISTS TO LIFT THE STAY, SUCH THAT**
**NOMINAL DEFENDANT NEON MACHINE, INC. MAY COMPLY**
**WITH ITS CONTRACTUAL OBLIGATIONS, ISSUE PREFERRED SHARES,**
**AND RESOLVE ITS CORPORATE GOVERNANCE**
**(AGAINST ALL DEFENDANTS)**

130.    Plaintiffs incorporate the foregoing allegations as if fully set forth herein.

131.    Plaintiffs bring this claim for relief derivatively on behalf and for the benefit of Neon to redress the injuries suffered, and to be suffered, by Neon.

132.    An actual, existing, and bona fide case and controversy exists regarding whether the automatic stay prevents (a) non-debtor Neon from issuing preferred shares in compliance with its obligations under the SAFEs it entered into, and its Board approved, with Griffin and Polychain, among other counterparties to such agreements, and (b) non-debtors Griffin and Polychain then voting any shares in non-debtor Neon to replace or appoint non-debtor directors and officers of Neon.

133.    Plaintiffs contend that the automatic stay under section 362 of the Bankruptcy Code is inapplicable to the relief requested herein, or, in the alternative, that cause exists to lift the stay such that, to the extent Network Launch occurred not later than April 29, 2023, and the SAFEs automatically converted into Neon preferred shares 61 days later, non-debtor Neon may take all corporate actions necessary to issue such preferred shares, and Griffin and Polychain, among other preferred shareholders, may exercise their rights as stockholders of Neon.

134.    Defendants contend that Network Launch has not occurred, and thus that no shares should issue.

135.    The Debtor has twice opposed Plaintiffs' motions before the Court for an order determining that the stay is inapplicable to the foregoing relief or, in the alternative, that cause exists to lift the stay.

136.    Plaintiffs desire a judicial declaration and determination of the parties' respective interests and rights.

137.    A declaratory judgment is necessary and appropriate at this time so that the parties may know their interests and rights with respect to the composition of the Board. A judicial declaration will eliminate uncertainties and controversies that might otherwise result in additional litigation.

**FOURTH CLAIM FOR RELIEF**
**DECLARATORY JUDGMENT REGARDING**
**FAILURE OF CONSIDERATION**
**(AGAINST THE 4D FACTORY, LLC)**

138.    Plaintiffs incorporate the foregoing allegations as if fully set forth herein.

139.    Plaintiffs bring this claim for relief derivatively on behalf and for the benefit of Neon to redress the injuries suffered, and to be suffered, by Neon.

140.    An actual, existing, and bona fide case and controversy exists regarding whether 4D failed to pay consideration for the shares it purports to own of Neon such that all other shareholders of Neon, including Plaintiffs, all hold a higher percentage ownership of the Company.

141.    On August 20, 2021, 4D was offered 6,000,000 shares of Neon for a purchase price of $0.0001 pursuant to a Purchase Right Notice and the Restricted Stock Purchase Agreement.

142.    The Purchase Right Notice and the Restricted Stock Purchase Agreement terminated by its own terms if not exercised prior to the 31st day following the date of the grant (August 20, 2021). The expiration date was September 21, 2021.

143.    4D never exercised its right to purchase the shares.

144.    Since 4D never paid consideration for shares in Neon, it is not a Neon shareholder.

39

145.     Nevertheless, 4D has acted, and continues to act, as if it consummated the transaction before the termination deadline (it had not done so) and directed Neon's management to operate as if 4D was a 60% holder of Neon's common stock, entitled to three of five Board seats when it was not so entitled.

146.     Plaintiffs desire a judicial declaration and determination of the parties' respective interests and rights.  Specifically, the Plaintiffs request a judicial determination that 4D is not a shareholder of Neon, and as such, has no rights to vote, nor to appoint any member to Neon's Board.

147.     A declaratory judgment is necessary and appropriate at this time so that the parties may know their interests and rights with respect to the composition of the Board.  A judicial declaration will eliminate uncertainties and controversies that might otherwise result in additional litigation.

### FIFTH CLAIM FOR RELIEF
### BREACH OF FIDUCIARY DUTY OF LOYALTY
### (AGAINST INDIVIDUAL DEFENDANTS)

148.     Plaintiffs incorporate the foregoing allegations as if fully set forth herein.

149.     Plaintiffs bring this claim for relief derivatively on behalf and for the benefit of Neon to redress the injuries suffered, and to be suffered, by Neon.

150.     As directors, the Individual Defendants owe Neon and its stockholders the fiduciary duty of loyalty and the obligation to act in good faith in their conduct of Neon's business.

151.     As described above, the Individual Defendants have breached their fiduciary duties of loyalty in numerous ways.  For example, by failing to recognize the automatic conversion of Griffin's and Polychain's SAFEs into preferred stock of Neon, Neon has not fulfilled its clear contractual obligations to its investors, and the Individual Defendants have breached their fiduciary duties to Neon and its stockholders.

152.    In particular, the Individual Defendants have breached their fiduciary duty of loyalty by acting in bad faith to advance their own interests at the expense of Neon and its stockholders.  The Individual Defendants' failure to recognize the automatic conversion of the SAFEs has inflicted tremendous operational and reputational harm upon Neon, as well as exposed Neon to significant legal risk.

153.    In addition, the Individual Defendants' affirmative acts to attempt to liquidate Neon's SHRAP treasury tokens and maintain their unauthorized control over Neon's Board have breached their fiduciary duty of loyalty by acting in bad faith to advance their own interests at the expense of Neon and its stockholders such as Plaintiffs, including but not limited to their voting to pass a (void) Board resolution (a) to distribute the SHRAP tokens held in Neon's treasury and (b) approving a purported settlement offer submitted to the Board by 4D in spite of the Individual Defendants' obvious conflicts of interest and knowledge that they are unauthorized members of the Board.  The Individual Defendants' attempts to pass such self-interested and disloyal resolutions on behalf of Neon's Board is inflicting tremendous financial, operational, and reputational harm on Neon, and have been done by the Individual Defendants in order to retain additional value for a separate holding, and entrench themselves on Neon's Board.

154.    The Individual Defendants' failure to recognize the automatic conversion of the SAFEs benefits them personally because, among other reasons, they are all stakeholders in defendant Javarone's outside holding company 4D, and, if the SAFE holders take additional actions following the SAFE conversion, there is a likelihood that 4D's purported controlling share in Neon will be diluted from 60% to approximately 19%, which would have the additional effect of allowing the SAFE holders to control the Neon Board.  Thus, the Individual Defendants' refusal to do so is a self-interested, disloyal decision because they are inflicting tremendous financial,

operational, and reputational harm in order to retain additional value for a separate holding, and

entrench themselves on Neon's Board of Directors.

155.    Absent relief from the Court, Plaintiffs and the other stockholders of Neon

will be irreparably harmed by Individual Defendants' breaches of fiduciary duty due to the

significant liability faced by Neon from its investors, reputational harms it will face from refusing

to make whole its tier-one outside investors, limited ability to fundraise in the future, and

restrictions on its operational ability as it approaches a critical launch period for its flagship game.

156.    Plaintiffs have no adequate remedy at law.

**SIXTH CLAIM FOR RELIEF**
**BREACH OF FIDUCIARY DUTY OF CARE**
**(AGAINST INDIVIDUAL DEFENDANTS)**

157.    Plaintiffs incorporate the foregoing allegations as if fully set forth herein.

158.    Plaintiffs bring this claim for relief derivatively on behalf and for the benefit

of Neon to redress the injuries suffered, and to be suffered, by Neon.

159.    As directors, the Individual Defendants owe to Neon and its stockholders

the fiduciary duty of care and the obligation to act in good faith in their conduct of Neon's business.

160.    As described above, the Individual Defendants have breached their fiduciary

duties of care in numerous ways.  For example, by failing to recognize the automatic conversion of

Griffin's and Polychain's SAFEs into preferred stock of Neon, Neon has not fulfilled its clear

contractual obligations to its investors, and the Individual Defendants have breached their fiduciary

duties to Neon and its stockholders.

161.    In particular, the Individual Defendants breached their fiduciary duty of care

by engaging in gross negligence and failing to consider the direct harms that would befall Neon

should Neon not honor its contractual obligations.  The Individual Defendants' failure to recognize

the conversion of the SAFEs has inflicted tremendous financial, operational, and reputational harm

42

upon Neon, by (i) exposing Neon to a significant outstanding liability owed to current investors, (ii) sabotaging Neon's ability to engage in necessary additional fundraising by creating the perception Neon will not honor its obligations to investors, and (iii) restricting Neon's operational capacity. These actions have created instability for Neon at a critical time for the Company.

162.    The Individual Defendants' affirmative acts to attempt to liquidate Neon's SHRAP treasury tokens and maintain their unauthorized control over Neon's Board have breached their fiduciary duty of care and are grossly negligent because the Individual Defendants are knowingly attempting to advance their own interests at the expense of Neon and its stockholders while they knowingly maintain purported control of Neon's Board without authority.  Such grossly negligent conduct in ignoring Neon's obligations under the SAFEs includes but is not limited to the Individual Defendants' voting to pass a (void) Board resolution (a)  o distribute the SHRAP tokens held in Neon's treasury and (b) approving a purported settlement offer submitted to the Board by 4D in spite of the Individual Defendants' obvious conflicts of interest and knowledge that they are unauthorized members of the Board.  The Individual Defendants' attempts to pass such self-interested and harmful resolutions on behalf of Neon's Board is inflicting tremendous financial, operational, and reputational harm on Neon, and have been done by the Individual Defendants in order to retain additional value for a separate holding, and entrench themselves on Neon's Board of Directors.

163.    Absent relief from the Court, Plaintiffs and the other stockholders of Neon will be irreparably harmed by Defendants' breaches of fiduciary duty.

164.    Plaintiffs have no adequate remedy at law.

**SEVENTH CLAIM FOR RELIEF**
**BREACH OF FIDUCIARY DUTIES OF CARE AND LOYALTY**
**FOR SUSPENSION OF LONG AS CEO**
**(AGAINST INDIVIDUAL DEFENDANTS)**

165.    Plaintiffs incorporate the foregoing allegations as if fully set forth herein.

166.    Plaintiffs bring this claim for relief derivatively on behalf and for the benefit of Neon to redress the injuries suffered, and to be suffered, by Neon.

167.    As directors, the Individual Defendants owe Neon and its stockholders the fiduciary duties of care and loyalty and the obligation to act in good faith in their conduct of Neon's business.

168.    By suspending Long as CEO as retaliation for having raised the SAFE conversion issue with the Board, and replacing him with Javarone, the Individual Defendants have breached their fiduciary duties to Neon and its stockholders for the sole or primary purpose of preventing the SAFE holders from gaining a controlling interest in Neon in order for the Individual Defendants to entrench themselves in their positions as directors of Neon.

169.    The Individual Defendants' decision to retaliate against Long for raising the SAFE conversion issue with the Board and replace him with defendant Javarone benefits them personally because, among other reasons, they are all stakeholders in 4D, and, if the SAFE holders take additional actions following the SAFE conversion, there is a likelihood that 4D's controlling share in Neon will be diluted from 60% to approximately 19%, which would have the additional effect of allowing the SAFE holders to control the Neon Board.  Thus, the Individual Defendants' decision to remove Long from his position in favor of defendant Javarone is a self-interested, disloyal decision because they are inflicting tremendous financial, operational, and reputational harm in order to retain additional value for a separate company (4D), and entrenching themselves on Neon's Board.

170.     Defendant Javarone further benefits personally from installing himself as CEO of Neon because he will be able to take additional actions to obtain liquidity to satisfy his separate outside debts and harm Neon, including accessing Neon's bank account.

171.     Defendants Honour and Horowitz are stakeholders in 4D and connected with Javarone.  Long's suspension, the installation of Javarone as CEO and the following failure to recognize the SAFEs automatic conversion into preferred shares of Neon, benefits defendants Honour and Horowitz directly, because it allows them to retain their Board seats and prevents the dilution of 4D's shares.

172.     In particular, the Individual Defendants have breached their fiduciary duty of loyalty by acting in bad faith to advance their own interests at the expense of Neon and its stockholders.  The Individual Defendants' decision to replace Long (an industry veteran for more than two decades) with Javarone (who has never been involved with Neon and has only known failure in his business enterprises) has inflicted tremendous operational and reputational harm upon Neon.

173.     Absent relief from the Court, Plaintiffs and the other Neon stockholders will be irreparably harmed by the Individual Defendants' breaches of fiduciary duty.

174.     Plaintiffs have no adequate remedy at law.

### EIGHTH CLAIM FOR RELIEF
**TORTIOUS INTERFERENCE**
**(AGAINST THE 4D FACTORY LLC)**

175.     Plaintiffs incorporate the foregoing allegations as if fully set forth herein.

176.     Plaintiffs bring this claim for relief derivatively on behalf and for the benefit of Neon to redress the injuries suffered, and to be suffered, by Neon.

177.     Neon entered into a SAFE contract with Griffin on or about September 29, 2021.

178.    Neon entered into a SAFE contract with Polychain on or about September 30, 2021 (together with the Griffin September 29, 2021 SAFE, the "2021 Seed SAFEs").

179.    Neon entered into a further SAFE contract with Griffin on or about March 2, 2023.

180.    Neon entered into a further SAFE contract with Polychain on or about March 2, 2023 (together with the Griffin March 2, 2023 SAFE, the "2023 Series A SAFEs")

181.    4D was involved in the negotiations for the 2021 Seed SAFEs.  In fact, 4D not only knew about the agreements, the amount of the SAFE investments, and their terms, 4D participated in the drafting of the 2021 Seed SAFEs and approved their execution.

182.    The 2023 Series A SAFEs were ratified and approved by Neon's Board, which at the time consisted of defendant Javarone, the managing member of 4D.  4D appointed three of five of the directors of Neon's Board at the time of approval of the 2023 Series A SAFEs.

183.    A central feature of the SAFEs is their "Automatic Conversion" to an agreed-upon amount of preferred equity upon the occurrence of certain events; namely, "[i]f, by the date that is sixty (60) days after Network Launch, (i) this instrument has not terminated and (ii) no Qualified Financing has occurred, then, at 8:00 a.m. PT on the date that is sixty-one (61) days after Network Launch, this instrument will ***automatically convert*** into that number of shares of a newly created series of the Company's preferred stock" (emphasis added).

184.    "Network Launch" is defined in each of the SAFEs as "a bona fide transaction or series of transactions pursuant to which the Token Issuer issues the native Token associated with access to and use of the Network."

185.    "Network Launch" occurred on April 29, 2023.  As such, the SAFEs interests automatically converted to preferred stock in Neon.

46

186.    4D, knowing Network Launch occurred, intentionally and improperly directed and caused its appointed directors to Neon's Board – the Individual Defendants – both before the Petition Date and post-petition, to refuse to recognize the occurrence of Network Launch, causing Neon to breach the SAFEs with Griffin and Polychain.

187.    4D, knowing Network Launch occurred, intentionally and improperly directed and caused the post-petition appointment of Defendant Horowitz to the purported Board of Neon.

188.    There is no justification for 4D's tortious conduct.  Network Launch is objectively verifiable.  There is no question it occurred.

189.    Also, 4D understood that if the SAFEs automatically convert, 4D necessarily does not have control over the Company's Board.

190.    Thus, 4D acted in its own self-interest to retain illegitimate control over Neon's Board in order to advance its own interests – to extract a financial windfall in the delivery of more than 480 million SHRAP tokens from Neon's treasury to 4D.

191.    4D is not a party to the SAFEs but was aware of their validity and ratification by Neon's Board.  4D knowingly disrupted the contractual relationship between Neon and Polychain and Griffin, respectively, and caused Neon to breach the SAFEs by failing to cause it to recognize Network Launch, improperly appointing directors to Neon's Board post-petition, and causing 4D's appointees to make sham resolutions and other void acts of Neon's Board post-petition in an attempt to raid Neon's coffers and prevent Neon from performing under the SAFEs.

192.    Neon was, and continues to be, severely damaged by 4D's tortious actions in an amount to be proven at trial.

## NINTH CLAIM FOR RELIEF
### CIVIL CONSPIRACY
### (AGAINST ALL DEFENDANTS)

193.     Plaintiffs incorporate the foregoing allegations as if fully set forth herein.

194.     Plaintiffs bring this claim for relief derivatively on behalf and for the benefit of Neon to redress the injuries suffered, and to be suffered, by Neon.

195.     On information and belief Defendants entered into an agreement to conspire to cause Neon to breach its agreements with Griffin and Polychain and to further fraudulently attempt to cause the distribution of more than 480 million SHRAP Tokens held in Neon's treasury to 4D.

196.     On information and belief, defendants Honour and Horowitz have an arrangement with defendants Javarone and 4D whereby Honour and Horowitz will reap financial benefits if they agree to fulfill 4D's agenda and wrongfully obtain the distribution of the more than 480 million SHRAP tokens to 4D.

197.     Neon entered into a SAFE contract with Griffin on or about September 29, 2021.

198.     Neon entered into a SAFE contract with Polychain on or about September 30, 2021 (together with the Griffin September 29, 2021 SAFE, the "2021 Seed SAFEs").

199.     Neon entered into a further SAFE contract with Griffin on or about March 2, 2023.

200.     4D and Javarone know that they are not parties to the SAFEs and that the SAFEs were ratified by Neon's Board, including by Javarone himself.

201.     "Network Launch" is defined in each of the SAFEs as "a bona fide transaction or series of transactions pursuant to which the Token Issuer issues the native Token associated with access to and use of the Network."

48

202.    "Network Launch" occurred on April 29, 2023.    As such, the SAFEs interests automatically converted to preferred stock in Neon.

203.    4D, knowing Network Launch occurred, intentionally and improperly directed its appointed directors to Neon's Board – the Individual Defendants – to refuse to recognize the occurrence of Network Launch causing Neon to breach the SAFEs with Griffin and Polychain.

204.    Network Launch is objectively and independently verifiable based on all public information available on the blockchain.

205.    Also, 4D understood that if the SAFEs automatically convert, 4D necessarily does not have control over the Company's Board.

206.    Thus, 4D acted in its own self-interest to retain illegitimate control over Neon's Board in order to effectuate its own desires – to extract a financial windfall in the delivery of more than 480 million SHRAP tokens from Neon's treasury to 4D.

207.    After entrenching 4D's appointed directors on Neon's Board, and in furtherance of its scheme, on January 4, 2024, 4D sent a letter to Neon's Board, specifically to the attention of its purported chairman defendant Honour, demanding distribution of 480,927,488 SHRAP Tokens to 4D.

208.    On information and belief, 4D knew that it had no legal right to the SHRAP Tokens it demanded.    4D never purchase any SHRAP Tokens, was never awarded SHRAP Tokens, never participated in any SHRAP token warrant offerings, and further knew that it was not even a shareholder of Neon because it had failed to pay the consideration for common shares in Neon.

209.    In furtherance of its scheme, on January 9, 2023, the Individual Defendants noticed a "special meeting" of the Neon Board.    One of the agenda items listed on the notice was

"SHRAP Token Release Authorization."   Then, on January 12, 2024, the Individual Defendants

held the illegitimate "special meeting."  Neon Board members Josh Rosenthal and Pierre Planche

attended and objected to the holding of the meeting and the actions of the Board as illegitimate.

Nevertheless, the Individual Defendants approved the distribution of the 480,927,488 SHRAP

tokens to defendant 4D.

210.    Then, on January 31, 2024, defendant Honour emailed Plaintiff Aaron

Nonis (Neon's COO), Don Norbury (Neon's CTO), and others stating that he and defendant

Javarone – acting as "Neon's Board" directed management to "work together to promptly execute

the authorized distribution of SHRAP tokens" to 4D.  Honour stated that he "expect[ed]

completion of the process within 72 hours[,]" and that there "are no restrictions in place on the

tokens."

211.    The Defendants' conspiracy to obtain a financial windfall was complete,

and they have continued to cause Neon to breach the SAFEs, disrupting the contractual relationship

between Neon, on the one hand, and Polychain and Griffin, respectively, on the other.

212.    Neon was, and continues to be, damaged as a result of the conspiracy in an

amount to proven at trial.

### TENTH CLAIM FOR RELIEF
**FRAUD**
**(AGAINST THE 4D FACTORY LLC)**

213.    Plaintiffs incorporate the foregoing allegations as if fully set forth herein.

214.    Plaintiffs bring this claim for relief derivatively on behalf and for the benefit

of Neon to redress the injuries suffered, and to be suffered, by Neon.

215.    On January 4, 2024, 4D sent a letter to Neon's Board, specifically to the

attention of its purported chairman defendant Honour, demanding distribution of 480,927,488

SHRAP Tokens to 4D.  In the letter, 4D represents that the 480,927,488 SHRAP Tokens "belong[]

to 4D." This representation was knowingly false when made.

216.    By the same letter on January 4, 2024, 4D threatened that it would pursue legal action against the Board and Neon for damages if Neon failed to comply with 4D's demand.

217.    4D knew that it had no legal right to the SHRAP Tokens it demanded. 4D never paid any consideration to acquire SHRAP Tokens, and never participated (despite being offered the opportunity to participate) in any opportunity to acquire SHRAP Tokens. In fact, 4D never paid any consideration to have any interest in Neon whatsoever. 4D was offered the opportunity to acquire 6,000,000 shares of common stock in Neon (not SHRAP Tokens), but failed to pay the consideration for the shares and the agreement to do so terminated on its own terms in September of 2021. Despite plainly knowing that it never paid consideration for any shares of Neon, 4D continues to make false representations that it is a "controlling" shareholder of Neon, when it is not.

218.    To complete its fraud, and as more fully described above, 4D caused the Individual Defendants (its membership holders), to direct Neon to distribute the SHRAP Tokens to 4D via illegitimate Board resolution and directives.

219.    On January 31, 2024, 4D again represented that it was entitled to the 480,927,488 SHRAP Tokens, and instructed that the tokens be distributed to 4D's cryptocurrency wallet.

220.    Neon was, and continues to be, damaged in an amount to proven at trial as a result of the fraud including but not limited to the decrease in value of the Company, as well as the amount of expense and time necessary to redress the wrongful conduct.

## ELEVENTH CLAIM FOR RELIEF
### UNJUST ENRICHMENT
### (AGAINST THE 4D FACTORY LLC)

221.    Plaintiffs incorporate the foregoing allegations as if fully set forth herein.

222.    In the alternative to the failure of consideration declaratory judgment, 4D was unjustly enriched on or about August 20, 2021, when 4D received a benefit of the rights afforded to a 60% shareholder of Neon, including but not limited to the ability to select members of the Company's Board.  4D failed to pay any consideration for the 6,000,000 common shares.

223.    4D's benefit came at the expense of Plaintiffs, all of whom consist of the remaining common shareholders who each paid consideration for their shares.

224.    It is unjust for 4D to retain the benefits conferred to common shareholders of Neon while failing to pay any consideration.

225.    Plaintiffs have no adequate remedy at law.

## TWELFTH CLAIM FOR RELIEF
### UNJUST ENRICHMENT
### (AGAINST ALL DEFENDANTS)

226.    Plaintiffs incorporate the foregoing allegations as if fully set forth herein.

227.    Plaintiffs bring this claim for relief derivatively on behalf and for the benefit of Neon to redress the injuries suffered, and to be suffered, by Neon.

228.    On information and belief, the Defendants have acted in concert to obtain Neon's insurance policies and made a false claim to Neon's insurance carrier, causing the insurance carrier to pay out a claim to Defendants in connection with their tortious pre-petition and post-petition conduct, including for the payment of legal fees in connection with litigation interpreting the Stock Purchase Agreement, the Debtor's purported equity interests in Neon, the Debtor's ability to appoint directors to Neon's Board seats that are subject to appointment by Neon's common stockholders, among other known and unknown fees and expenses that the Defendants have wrongfully received reimbursement of.

229.    Further, the action caused Neon's insurance carrier to refuse to accept future coverage.

52

230.     The Defendants' benefit came at the expense of Plaintiffs, all of whom consist of the remaining common shareholders who each paid consideration for their shares, are officers of the Company and insureds under such policy, and have suffered damages in an amount to be proven at trial.

231.     It is unjust for the Individual Defendants to retain the benefits conferred to legitimate Directors and Officers under Neon's insurance policy, and it is unjust for the Debtor to have caused the appointment of the Individual Defendants as directors of Neon and directed the Individual Defendants to seek coverage under Neon's insurance policy.

**THIRTEENTH CLAIM FOR RELIEF**
**UNJUST ENRICHMENT**
**(AGAINST THE 4D FACTORY, LLC)**

232.     Plaintiffs incorporate the foregoing allegations as if fully set forth herein.

233.     Pursuant to token subscription agreements each Plaintiff executed with Neon, Plaintiffs purchased SHRAP tokens.

234.     On information and belief, the Defendants have acted in concert for 4D to obtain 60% of Plaintiffs' SHRAP tokens.

235.     4D paid no consideration for Plaintiffs' SHRAP tokens.  4D is not a stockholder of Neon and never made any contribution to Neon at all.

236.     4D's benefit came at the expense of Plaintiffs, all of whom consist of the remaining common shareholders who each paid consideration for their rights to tokens pursuant to validly entered token subscription agreements.

237.     It is unjust for 4D to retain the benefits conferred to Plaintiffs of Neon while failing to pay any consideration.

238.     Plaintiffs have no adequate remedy at law.

**FOURTEENTH CLAIM FOR RELIEF**
**BREACH OF FIDUCIARY DUTY OF LOYALTY**
**(AGAINST THE 4D FACTORY LLC)**

239.    Plaintiffs incorporate the foregoing allegations as if fully set forth herein.

240.    Plaintiffs bring this claim for relief in the alternative to the failure of consideration declaratory judgment.

241.    Plaintiffs are each stockholders of Neon.

242.    Because of 4D's status as a 60% shareholder of Neon, 4D has control over Neon.

243.    As a controlling stockholder, 4D owes fiduciary duties to Plaintiffs as the minority stockholders of Neon, including the duty of loyalty.

244.    4D breached its fiduciary duty to Plaintiffs by taking actions that harm the Plaintiffs in order to benefit only 4D.

245.    Specifically, 4D caused Neon to breach its SAFEs with Griffin and Polychain to entrench 4D's control over the Company and extract a financial windfall.

246.    Neon entered into a SAFE contract with Griffin on or about September 29, 2021.  Neon entered into a SAFE contract with Polychain on or about September 30, 2021 (together with the Griffin September 29, 2021 SAFE, the "2021 Seed SAFEs").

247.    Neon entered into a further SAFE contract with Griffin on or about March 2, 2023.

248.    "Network Launch" occurred on April 29, 2023.  As such, the SAFEs interests automatically converted to preferred stock in Neon.

249.    4D, knowing Network Launch occurred, intentionally and improperly leveraged its controlling interest in Neon to refuse to recognize the occurrence of Network Launch causing Neon to breach the SAFEs with Griffin and Polychain.

54

250.    Network Launch is objectively and independently verifiable based on all public information available on the blockchain.

251.    Thus, 4D acted in its own self-interest to retain illegitimate control over Neon's Board in order to effectuate its own desires.

252.    First, after entrenching 4D's appointed directors on Neon's Board, on January 4, 2024, 4D sent a letter to Neon's Board, specifically to the attention of its purported chairman defendant Honour, demanding distribution of 480,927,488 SHRAP Tokens to 4D.

253.    On information and belief, 4D knew that it had no legal right to the SHRAP Tokens it demanded.

254.    Second, 4D caused the Individual Defendants (4D's controlled directors of Neon), to direct Neon to distribute the SHRAP Tokens to 4D via illegitimate Board resolution and directives.

255.    On January 31, 2024, 4D again represented that it was entitled to the 480,927,488 SHRAP Tokens, and instructed that the tokens be distributed to 4D's cryptocurrency wallet.

256.    4D's actions harmed Plaintiffs directly.  Plaintiffs, as stockholders of Neon, were damaged by 4D's actions to cause the Company to distribute the Company's assets to 4D when 4D was not the rightful owner of the assets.

257.    4D's actions were plainly in its own self-interest and not in the best interest of the Company or its minority stockholders.

258.    Plaintiffs have no adequate remedy at law.

259.    4D's actions caused Plaintiffs harm in an amount to be determined at trial.

**PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiffs respectfully request that the Court:

260.    Enter an order declaring that under the SAFEs, Network Launch occurred not later than April 29, 2023.

261.    Enter an order declaring that, given the occurrence of Network Launch, the SAFEs have automatically converted to preferred shares in Neon, and Neon may take all corporate actions required to recognize that conversion.

262.    Enter an order declaring that the Individual Defendants shall comply with the terms of the SAFEs and, as necessary, effectuate all corporate actions required to create the preferred shares of Neon.

263.    Enter an order declaring that the automatic stay is inapplicable to the foregoing relief and such other relief related to Neon's corporate governance, including that holders of Neon's preferred shares may convert such shares to common stock and exercise their rights as common stockholders in Neon to appoint and/or replace directors and officers of Neon, as applicable.

264.    Award actual and compensatory damages against Defendants and in favor of Plaintiffs, for the substantial harms that Defendants have caused to Plaintiffs, including as a result of post-petition conduct of the Debtor.

265.    Award Plaintiffs their reasonable litigation expenses and attorneys' fees, including as against the Debtor under the Stock Purchase Agreement, and section 13.10 thereof; and

266.    Award such other and further relief as equity and justice may require.

Dated:  March 26, 2024          PAUL HASTINGS LLP
       New York, New York

*/s/ Avram E. Luft*

      Avram E. Luft
      **PAUL HASTINGS LLP**
      200 Park Avenue
      New York, New York 10166
      Telephone:   (212) 318-6000
      Facsimile:   (212) 319-4090
      Email:  aviluft@paulhastings.com

      Justin Rawlins
      Edward Han
      Timothy D. Reynolds
      **PAUL HASTINGS LLP**
      1999 Avenue of the Stars, 27th Floor
      Century City, California 90067
      Telephone:   (310) 620-5700
      Facsimile:   (310) 620-5899
      Email:  justinrawlins@paulhastings.com
         edwardhan@paulhastings.com
         timothyreynolds@paulhastings.com

      *Counsel to Mark Long, Colin Foran, Naomi Lackaff, Aaron Nonis, Don Norbury, Mark Yeend, Calvin Zhou, Polychain Ventures II LP, Polychain Ventures II (Parallel) LP, Griffin Gaming Partners II, L.P., Griffin Gaming Partners II Side Fund, L.P., Pierre-Edouard Planche, Ben Perszyk, and Josh Rosenthal*