**EXHIBIT A**

THIS INSTRUMENT AND ANY SECURITIES ISSUABLE PURSUANT HERETO HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED (THE "**SECURITIES ACT**"), OR UNDER THE SECURITIES LAWS OF CERTAIN STATES. THESE SECURITIES MAY NOT BE OFFERED, SOLD OR OTHERWISE TRANSFERRED, PLEDGED OR HYPOTHECATED EXCEPT AS PERMITTED UNDER THE ACT AND APPLICABLE STATE SECURITIES LAWS PURSUANT TO AN EFFECTIVE REGISTRATION STATEMENT OR AN EXEMPTION THEREFROM.

## NEON MACHINE, INC.
## SAFE

### (Simple Agreement for Future Equity)

THIS CERTIFIES THAT in exchange for the payment by Griffin Gaming Partners II, L.P. (the "**Investor**") of $4,750,000 (the "**Purchase Amount**") on or about September 29, 2021, to Neon Machine, Inc., a Delaware corporation (the "**Company**"), the Company hereby issues to the Investor the right to certain shares of the Company's Capital Stock, subject to the terms set forth below.

The "**Post-Money Valuation Cap**" is $23,000,000.

The "**Discount Rate**" is 80%.

See **Section 2** for certain additional defined terms.

1.    *Events*

(a)    **Qualified Financing**. If there is a Qualified Financing before the earliest to occur of (a) the termination of this instrument and (b) the date that is sixty (60) days after Network Launch, then, on the initial closing of such Qualified Financing, this instrument will automatically convert into the number of shares of Safe Preferred Stock equal to the Purchase Amount divided by the Conversion Price. If, by the date that is sixty (60) days after Network Launch, (i) this instrument has not terminated and (ii) no Qualified Financing has occurred, then, at 8:00 a.m. PT on the date that is sixty-one (61) days after Network Launch, this instrument will automatically convert into that number of shares of a newly created series of the Company's preferred stock, on the terms and conditions set forth on **EXHIBIT A**, equal to the Purchase Amount divided by the Liquidity Price (an "**Automatic Conversion**").

In connection with the automatic conversion of this instrument into shares of Safe Preferred Stock, the Investor will execute and deliver to the Company all of the transaction documents related to the Qualified Financing; *provided,* that such documents are the same documents to be entered into with the purchasers of Standard Preferred Stock, with appropriate variations for the Safe Preferred Stock if applicable, and *provided further,* that such documents have customary exceptions to any drag-along applicable to the Investor, including, without limitation, limited representations and warranties and limited liability and indemnification obligations on the part of the Investor; and

(b)    **Liquidity Event**. If there is a Liquidity Event before the expiration or termination of this instrument, the Investor will, at its option, either (i) receive a cash payment equal to the Purchase Amount (subject to the following paragraph) or (ii) automatically receive from the Company a number of shares of Common Stock equal to the Purchase Amount divided by the Liquidity Price (the "**Conversion Amount**"), if the Investor fails to select the cash option.

In connection with Section (b)(i), the Purchase Amount will be due and payable by the Company to the Investor immediately prior to, or concurrent with, the consummation of the Liquidity Event. If there are not enough funds to pay the Investor and holders of other Safes (collectively, the "**Cash-Out Investors**") in full, then all of the Company's available funds will be distributed with equal priority and pro rata among the Cash-Out Investors in proportion to their Purchase Amounts, and the Cash-Out Investors will automatically receive the

number of shares of Common Stock equal to the remaining unpaid Purchase Amount divided by the Liquidity Price. In connection with a Change of Control intended to qualify as a tax-free reorganization, the Company may reduce, pro rata, the Purchase Amounts payable to the Cash-Out Investors by the amount determined by its board of directors in good faith to be advisable for such Change of Control to qualify as a tax-free reorganization for U.S. federal income tax purposes, and in such case, the Cash-Out Investors will automatically receive the number of shares of Common Stock equal to the remaining unpaid Purchase Amount divided by the Liquidity Price. For the avoidance of doubt, upon a Liquidity Event the Purchase Amount of the Investor shall be deemed to be 100% of the Purchase Amount (i.e. a 1x liquidation preference).

(c)    **Related Entities**. Except as related to Argon Protocol Foundation, a Panamanian Foundation formed for the purpose of, among other things, issuing Tokens and launching the protocol associated with such Tokens, if the Company (or any of its then-current directors, officers, employees or agents) (i) creates or holds capital stock in any entity that is directly or indirectly related to the business purpose of the Company (*i.e.*. owns any relevant intellectual property, receives or issues cryptographic tokens associated with a decentralized network launched by the Company, etc.), whether directly or indirectly owned (other than the Company creating a wholly-owned subsidiary or a subsidiary that is wholly owned but for a de minimis number of shares issued to a third party to satisfy ownership requirements of the applicable jurisdiction of formation), or (ii) exclusively licenses or transfers to any entity (other than a wholly-owned subsidiary) any of the Company's material intellectual property assets outside the ordinary course of business (each, a "**Related Entity**"), the Company agrees that, subject to compliance with applicable laws: (i) if this instrument has converted into Safe Preferred Stock, it will cause such Related Entity to issue to the Investor, without any additional consideration therefor, an equivalent amount of equity interests in any such Related Entity as the Investor owns or is entitled to receive in the Company, and/or (ii) if this instrument has not fully converted into Safe Preferred Stock, it will cause such Related Entity to issue to the Investor, without any additional consideration therefor, a Safe on substantially the same terms as this instrument; *provided that*, notwithstanding the foregoing, the Investor shall not have any economic rights to tokens held by the Company or any Related Entity that are used for working capital or general company purposes.

(d)    **Dissolution Event**. If there is a Dissolution Event before this instrument expires or terminates, the Company will pay an amount equal to the Purchase Amount, due and payable to the Investor immediately prior to, or concurrent with, the consummation of the Dissolution Event. The Purchase Amount will be paid prior and in preference to any Distribution of any of the assets of the Company to holders of outstanding Capital Stock by reason of their ownership thereof. If immediately prior to the consummation of the Dissolution Event, the assets of the Company legally available for distribution to the Investor and all holders of all other Safes (the "*Dissolving Investors*"), as determined in good faith by the Company's board of directors, are insufficient to permit the payment to the Dissolving Investors of their respective Purchase Amounts, then the entire assets of the Company legally available for distribution will be distributed with equal priority and pro rata among the Dissolving Investors in proportion to the Purchase Amounts they would otherwise be entitled to receive pursuant to this Section 1(d). For the avoidance of doubt, upon a Dissolution Event the Purchase Amount of the Investor shall be deemed to be 100% of the Purchase Amount (i.e. a 1x liquidation preference).

(e)    **Termination**. This instrument will expire and terminate (without relieving the Company of any obligations arising from a prior breach of or non-compliance with this instrument) upon either (i) the issuance of stock to the Investor pursuant to Section 1(a) or Section 1(b)(ii); or (ii) the payment, or setting aside for payment, of amounts due the Investor pursuant to Section 1(b)(i) or Section 1(d).

**2.    *Definitions***

"**Capital Stock**" means the capital stock of the Company, including, without limitation, the "**Common Stock**" and the "**Preferred Stock**."

DocuSign Envelope ID: A5CC0A29-4280-4D84-B6B0-02BCFE369F94

"**Change of Control**" means (i) a transaction or series of related transactions in which any "person" or "group" (within the meaning of Section 13(d) and 14(d) of the Securities Exchange Act of 1934, as amended), becomes the "beneficial owner" (as defined in Rule 13d-3 under the Securities Exchange Act of 1934, as amended), directly or indirectly, of more than 50% of the outstanding voting securities of the Company having the right to vote for the election of members of the Company's board of directors, (ii) any reorganization, merger or consolidation of the Company, other than a transaction or series of related transactions in which the holders of the voting securities of the Company outstanding immediately prior to such transaction or series of related transactions retain, immediately after such transaction or series of related transactions, at least a majority of the total voting power represented by the outstanding voting securities of the Company or such other surviving or resulting entity or (iii) a sale, lease or other disposition of all or substantially all of the assets of the Company.

"**Company Capitalization**" is calculated as of immediately prior to the Qualified Financing and (without double-counting):

- Includes all shares of Capital Stock issued and outstanding;

- Includes all Converting Securities;

- Includes all (i) issued and outstanding Options and (ii) Promised Options;

- Includes the Unissued Option Pool; and

- Excludes, notwithstanding the foregoing, any increases to the Unissued Option Pool (except to the extent necessary to cover Promised Options that exceed the Unissued Option Pool) in connection with the Qualified Financing.

"**Conversion Price**" means the either: (1) the Safe Price or (2) the Discount Price, whichever calculation results in a greater number of shares of Safe Preferred Stock.

"**Converting Securities**" includes this instrument and other convertible securities issued by the Company, including but not limited to: (i) other Safes; (ii) convertible promissory notes and other convertible debt instruments; and (iii) convertible securities that have the right to convert into shares of Capital Stock.

"**Discount Price**" means the price per share of the Standard Preferred Stock sold in the Qualified Financing multiplied by the Discount Rate.

"**Distribution**" means the transfer to holders of Capital Stock by reason of their ownership thereof of cash or other property without consideration whether by way of dividend or otherwise, other than dividends on Common Stock payable in Common Stock, or the purchase or redemption of Capital Stock by the Company or its subsidiaries for cash or property other than: (i) repurchases of Common Stock held by employees, officers, directors or consultants of the Company or its subsidiaries pursuant to an agreement providing, as applicable, a right of first refusal or a right to repurchase shares upon termination of such service provider's employment or services; or (ii) repurchases of Capital Stock in connection with the settlement of disputes with any stockholder.

"**Dissolution Event**" means (i) a voluntary termination of operations, (ii) a general assignment for the benefit of the Company's creditors or (iii) any other liquidation, dissolution or winding up of the Company (excluding a Liquidity Event), whether voluntary or involuntary.

"**Initial Public Offering**" means the closing of the Company's first firm commitment underwritten initial public offering of Common Stock pursuant to a registration statement filed under the Securities Act.

"Key Employee" means each of Mark Long, Don Norbury, Colin Foran, Aaron Nonis, Mark Yeend, Naomi Lackaff, and Calvin Zhou.

"**Liquidity Capitalization**" is calculated as of immediately prior to the Liquidity Event or Automatic Conversion, as applicable, and (without double-counting):

- Includes all shares of Capital Stock issued and outstanding;

- Includes all (i) issued and outstanding Options and (ii) to the extent receiving Proceeds, Promised Options;

- Includes all Converting Securities, other than any Safes and other convertible securities (including without limitation shares of Preferred Stock) where the holders of such securities are receiving Purchase Amount or similar liquidation preference payments in lieu of Conversion Amounts or similar "as-converted" payments; and

- Excludes the Unissued Option Pool.

"**Liquidity Event**" means a Change of Control or an Initial Public Offering.

"**Liquidity Price**" means the price per share equal to the Post-Money Valuation Cap divided by the Liquidity Capitalization.

"**Network**" means any blockchain-based application, platform or service operated or managed by, or based upon, or incorporating material portions of any intellectual property developed, owned or exclusively licensed by, the Company (or any parent, subsidiary or Affiliate thereof)..

"**Network Launch**" means a bona fide transaction or series of transactions pursuant to which the Token Issuer issues the native Token associated with access to and use of the Network.

"**Proceeds**" means cash and other assets (including without limitation stock consideration) that are proceeds from the Liquidity Event or the Dissolution Event, as applicable, and legally available for distribution.

"**Promised Options**" means promised but ungranted Options that are the greater of those (i) promised pursuant to agreements or understandings made prior to the execution of, or in connection with, the term sheet for the Qualified Financing (or the initial closing of the Qualified Financing, if there is no term sheet), or (ii) treated as outstanding Options in the calculation of the Standard Preferred Stock's price per share.

"**Qualified Financing**" means a bona fide transaction or series of transactions with the principal purpose of raising capital, pursuant to which the Company or a Related Entity issues and sells (i) shares of Capital Stock at a fixed pre-money valuation with an aggregate sales price of not less than $1,000,000, or (ii) tokens in a primary or secondary transaction with an aggregate sales price of not less than $1,000,000.

"**Safe**" means an instrument containing a future right to shares of Capital Stock, similar in form and content to this instrument, purchased by investors for the purpose of funding the Company's business operations. References to "this instrument" mean this specific instrument.

"**Safe Preferred Stock**" means the shares of the series of Preferred Stock issued to the Investor (a) in a Qualified Financing, having the identical rights, privileges, preferences and restrictions as the shares of Standard Preferred Stock, other than with respect to: (i) the per share liquidation preference, which the Investor shall receive at a rate of 1x, and the conversion price for purposes of price-based anti-dilution protection, which will equal the

Conversion Price; and (ii) the basis for any dividend rights, which will be based on the Conversion Price, or (b) pursuant to an Automatic Conversion.

"**Safe Price**" means the price per share equal to the Post-Money Valuation Cap divided by the Company Capitalization.

"**Standard Preferred Stock**" means the shares of the series of Preferred Stock issued to the investors investing new money in the Company in connection with the initial closing of the Qualified Financing.

"**Subsequent Convertible Securities**" means convertible securities that the Company may issue after the issuance of this instrument with the principal purpose of raising capital, including but not limited to, other Safes, convertible debt instruments and other convertible securities. Subsequent Convertible Securities excludes: (i) options issued pursuant to any equity incentive or similar plan of the Company; (ii) convertible securities issued or issuable to (A) banks, equipment lessors, financial institutions or other persons engaged in the business of making loans pursuant to a debt financing or commercial leasing or (B) suppliers or third party service providers in connection with the provision of goods or services pursuant to transactions; and (iii) convertible securities issued or issuable in connection with sponsored research, collaboration, technology license, development, OEM, marketing or other similar agreements or strategic partnerships.

"**Tokens**" means any class of any cryptocurrency, decentralized application tokens, protocol tokens, blockchain-based assets or other cryptofinance coins, tokens or similar digital assets built on blockchain or cryptographic technology or other like instrument, created using intellectual property created, in whole or in part, by the Company and operating on the Network, including the "SHRAP" tokens, provided however that Tokens shall not include non-fungible tokens (NFT), land sales, and related assets under any circumstances..

"**Token Issuer**" means the Company, any parent, subsidiary, affiliate, or their respective successors or assigns of the Company, or a third-party entity that is a contractual counterparty, that is issuing, or has issued, any Tokens that operate on a Network. Any Key Employee shall also be deemed a Token Issuer for purposes of this Agreement while such Key Employee is providing services to the Company (including any parent, subsidiary or Affiliate) and for the twelve month period immediately following the date that the Key Employee is no longer providing services to the Company (including any parent, subsidiary or Affiliate) as an employee or consultant, provided that any Key Employee shall be deemed a Token Issuer only to the extent such Key Employee creates, generates, or authors a Token that is a derivative of, is based on, or otherwise relates to or incorporates the Company's (including any parent's, subsidiary's or Affiliate's) business, intellectual property, Network, or related assets.  For the avoidance of doubt, if the issuance of Tokens is completed by an anonymous or unidentified person or the genesis block of the Tokens is agreed upon by a decentralized group of validators, the Token Issuer shall be deemed to be the person described in the immediately preceding sentence that has either (a) nominated the genesis block of the blockchain protocol, or (b) been the primary developer of the differentiated intellectual property that is utilized by or in connection with the Network.

"**Unissued Option Pool**" means all shares of Capital Stock that are reserved, available for future grant and not subject to any outstanding Options or Promised Options (but in the case of a Liquidity Event, only to the extent Proceeds are payable on such Promised Options) under any equity incentive or similar Company plan.

**3.**    *"MFN" Provision*. If the Company issues any Subsequent Convertible Securities prior to termination of this instrument, the Company will promptly provide the Investor with written notice thereof, together with a copy of all documentation relating to such Subsequent Convertible Securities and, upon written request of the Investor, any additional information related to such Subsequent Convertible Securities as may be reasonably requested by the Investor. In the event the Investor determines that any terms of the Subsequent Convertible Securities are preferable to the terms of this instrument, the Investor will notify the Company in writing. Promptly after receipt

of such written notice from the Investor, the Company agrees to amend and/or restate this instrument to include such preferable terms from the Subsequent Convertible Securities.

## 4.    *Company Representations*

(a)    The Company is a corporation duly organized, validly existing and in good standing under the laws of its state of incorporation, and has the corporate power and authority to own, lease and operate its properties and carry on its business as now conducted.

(b)    The execution, delivery and performance by the Company of this instrument is within the power of the Company and, other than with respect to the actions to be taken when equity is to be issued to the Investor, has been duly authorized by all necessary actions on the part of the Company. This instrument constitutes a legal, valid and binding obligation of the Company, enforceable against the Company in accordance with its terms, except as limited by bankruptcy, insolvency or other laws of general application relating to or affecting the enforcement of creditors' rights generally and general principles of equity. To the knowledge of the Company, it is not in violation of (i) its current certificate of incorporation or bylaws, (ii) any material statute, rule or regulation applicable to the Company or (iii) any material indenture or contract to which the Company is a party or by which it is bound, where, in each case, such violation or default, individually, or together with all such violations or defaults, could reasonably be expected to have a material adverse effect on the Company.

(c)    The performance and consummation of the transactions contemplated by this instrument do not and will not: (i) violate any material judgment, statute, rule or regulation applicable to the Company; (ii) result in the acceleration of any material indenture or contract to which the Company is a party or by which it is bound; or (iii) result in the creation or imposition of any lien upon any property, asset or revenue of the Company or the suspension, forfeiture, or nonrenewal of any material permit, license or authorization applicable to the Company, its business or operations.

(d)    No consents or approvals are required in connection with the performance of this instrument, other than: (i) the Company's corporate approvals; (ii) any qualifications or filings under applicable securities laws; and (iii) necessary corporate approvals for the authorization of Capital Stock issuable pursuant to Section 1.

(e)    To its knowledge, the Company owns or possesses (or can obtain on commercially reasonable terms) sufficient legal rights to all patents, trademarks, service marks, trade names, copyrights, trade secrets, licenses, information, processes and other intellectual property rights necessary for its business as now conducted and as currently proposed to be conducted, without any conflict with, or infringement of the rights of, others.

## 5.    *Investor Representations*

(a)    The Investor has full legal capacity, power and authority to execute and deliver this instrument and to perform its obligations hereunder. This instrument constitutes valid and binding obligation of the Investor, enforceable in accordance with its terms, except as limited by bankruptcy, insolvency or other laws of general application relating to or affecting the enforcement of creditors' rights generally and general principles of equity.

(b)    The Investor is an accredited investor as such term is defined in Rule 501 of Regulation D under the Securities Act. The Investor has been advised that this instrument and the underlying securities have not been registered under the Securities Act, or any state securities laws and, therefore, cannot be resold unless they are registered under the Securities Act and applicable state securities laws or unless an exemption from such registration requirements is available. The Investor is purchasing this instrument and the securities to be acquired by the Investor hereunder for its own account for investment, not as a nominee or agent, and not with a view to, or for resale in connection with, the distribution thereof, and the Investor has no present intention of selling, granting any participation in, or otherwise distributing the same. The Investor has such knowledge and experience

-6-

in financial and business matters that the Investor is capable of evaluating the merits and risks of such investment, is able to incur a complete loss of such investment without impairing the Investor's financial condition and is able to bear the economic risk of such investment for an indefinite period of time.

**6.** *Miscellaneous*

(a)    Any provision of this instrument may be amended, waived or modified by written consent of the Company and either (i) the Investor or (ii) the Majority-in-Interest of all then-outstanding Safes with the same "Post-Money Valuation Cap" and "Discount Rate" as this instrument (and Safes lacking one or both of such terms will be considered to be the same with respect to such term(s)), *provided that* with respect to clause (ii): (A) the Purchase Amount may not be amended, waived or modified in this manner, (B) the consent of the Investor and each holder of such Safes must be solicited (even if not obtained), and (C) such amendment, waiver or modification treats all such holders in the same manner. "**Majority-in-Interest**" refers to the holders of the applicable group of Safes whose Safes have a total Purchase Amount greater than 50% of the total Purchase Amount of all of such applicable group of Safes.

(b)    Any notice required or permitted by this instrument will be deemed sufficient when delivered personally or by overnight courier or sent by email to the relevant address listed on the signature page, or 48 hours after being deposited in the U.S. mail as certified or registered mail with postage prepaid, addressed to the party to be notified at such party's address listed on the signature page, as subsequently modified by written notice.

(c)    The Investor is not entitled, as a holder of this instrument, to vote or receive dividends or be deemed the holder of Capital Stock for any purpose, nor will anything contained herein be construed to confer on the Investor, as such, any of the rights of a stockholder of the Company or any right to vote for the election of directors or upon any matter submitted to stockholders at any meeting thereof, or to give or withhold consent to any corporate action or to receive notice of meetings, or to receive subscription rights or otherwise until shares have been issued upon the terms described herein.

(d)    Neither this instrument nor the rights contained herein may be assigned, by operation of law or otherwise, by either party without the prior written consent of the other; *provided, however*, that this instrument and/or the rights contained herein may be assigned without the Company's consent by the Investor to any other entity who directly or indirectly, controls, is controlled by or is under common control with the Investor, including, without limitation, any general partner, managing member, officer or director of the Investor, or any venture capital fund now or hereafter existing which is controlled by one or more general partners or managing members of, or shares the same management company with, the Investor, and, *provided further*, that the Company may assign this instrument in whole, without the consent of the Investor, in connection with a reincorporation to change the Company's domicile.

(e)    In the event any one or more of the provisions of this instrument is for any reason held to be invalid, illegal or unenforceable, in whole or in part or in any respect, or in the event that any one or more of the provisions of this instrument operate or would prospectively operate to invalidate this instrument, then and in any such event, such provision(s) only will be deemed null and void and will not affect any other provision of this instrument and the remaining provisions of this instrument will remain operative and in full force and effect and will not be affected, prejudiced, or disturbed thereby.

(f)    All rights and obligations hereunder will be governed by the laws of the State of California, without regard to the conflicts of law provisions of such jurisdiction.

(g)    The parties acknowledge and agree that for United States federal and state income tax purposes this instrument is, and at all times has been, intended to be characterized as stock, and more particularly as common stock for purposes of Sections 304, 305, 306, 354, 368, 1036 and 1202 of the Internal Revenue Code of

1986, as amended. Accordingly, the parties agree to treat this instrument consistent with the foregoing intent for all United States federal and state income tax purposes (including, without limitation, on their respective tax returns or other informational statements).

*(Signature page follows)*

IN WITNESS WHEREOF, the undersigned have caused this instrument to be duly executed and delivered on this September 29, 2021.

**GRIFFIN GAMING PARTNERS II, L.P.**

By: GGP GP II, LLC, Its General Partner
By: _____
Phil Sanderson, Managing Director

Address:
1501 Colorado, Ste B
Santa Monica, CA  90404
Attn:  Philip Sanderson
Email: phil@griffingp.com

**NEON MACHINE, INC.**

By: _____
Name: _____
Its: _____

Address: _____

Email: _____

-9-

IN WITNESS WHEREOF, the undersigned have caused this instrument to be duly executed and delivered on this September 29, 2021.

**GRIFFIN GAMING PARTNERS II, L.P.**

By: GGP GP II, LLC, Its General Partner

By: _____

Phil Sanderson, Managing Director

Address:
1501 Colorado, Ste B
Santa Monica, CA  90404
Attn:  Philip Sanderson
Email: phil@griffingp.com

**NEON MACHINE, INC.**

By: _____
    Mark Long
Name: _____
    Mark Long
Its: _____
    CEO

Address: _____
    1700 Westlake Ave N Seattle WA 98109

Email: _____
    mark.long@neonmedia.io

-9-

**Exhibit A**

## TERMS OF SERIES PREFERRED STOCK

| | |
|---|---|
| *Securities:* | A newly created series of Preferred Stock (the "**Series Preferred**") |
| *Liquidation preference:* | In the event of a liquidation, dissolution or winding up of the Company, the Series Preferred will have the right to receive the original purchase price prior to any distribution to the Common Stock. The remaining assets will be distributed *pro rata* to the holders of Common Stock. A sale of all or substantially all of the Company's assets or a merger or consolidation of the Company with any other company will be treated as a liquidation of the Company. |
| *Conversion:* | The Series Preferred may be converted at any time, at the option of the holder, into shares of Common Stock. The conversion rate will initially be 1:1, subject to customary adjustments. |
| *Automatic conversion:* | Each share of Series Preferred will automatically convert into Common Stock, at the then applicable conversion rate, upon (i) the closing of a firm commitment underwritten public offering of Common Stock, or (ii) the consent of the holders of at least a majority of the then outstanding shares of Series Preferred. |
| *General voting rights:* | Each share of Series Preferred will have the right to a number of votes equal to the number of shares of Common Stock issuable upon conversion of each such share of Series Preferred. The Series Preferred will vote with the Common Stock on all matters except as specifically provided herein or as otherwise required by law. |
| *Protective provisions*: | So long as any of the Series Preferred is outstanding, consent of the holders of at least a majority of the Series Preferred will be required for (i) any amendment or change of the rights, preferences, privileges or powers of the Series Preferred; (ii) increase or decrease in the authorized number of shares of Series Preferred; (iii) any action that authorizes, creates or issues shares of any class of stock having preferences superior to or on parity with the Series Preferred; (iv) any amendment of the Company's Certificate of Incorporation or Bylaws; (v) any change of control event; (vi) the liquidation or dissolution of the Company; (vii) repurchases of Common Stock, except in connection with the acquisition of unvested shares at no more than cost; (viii) the declaration or payment of a dividend on Common Stock |

-10-

(other than a dividend payable solely in Common Stock); or
(ix) any increase to the size of the Company's Board of
Directors.

## INVESTOR RIGHTS

*Right to maintain proportionate ownership:*   Each holder of Series Preferred (or one or more of its affiliates) will have a right to purchase its *pro rata* share of any offering of new securities by the Company, subject to customary exceptions. The *pro rata* share will be based on the ratio of (x) the number of shares of Common Stock held by such holder (on an as-converted basis) to (y) the Company's fully-diluted capitalization (on an as-converted and as-exercised basis). This right will terminate upon the Company's initial public offering.

*Information rights:*   As soon as practicable, the Company will deliver to each holder of Series Preferred, (i) unaudited annual financial statements and (ii) unaudited quarterly financial statements. The Company will also deliver to each holder of Series Preferred the Company's operating plan not later than 30 days prior to year-end. The information rights will terminate upon an initial public offering.

*Board of Directors:*   The parties agree that the size of the Board of the Company shall be set at five (5).  Griffin shall have the right to, at any time, appoint one (1) director (initially Pierre-Edouard Planche) and shall have one Board observer (initially Anthony Palma). Polychain Ventures II LP shall have the right to, at any time, appoint one (1) director.   Two (2) directors shall be nominees of the holders of Common Stock (initially Mark Long and Jonathan Miller).   One director shall be nominated by 4D Factory and acceptable to Griffin.

*Registration Rights:*   The holders of Series Preferred will have customary demand, S-3 and piggyback registration rights.

*Voting Agreement:*   The holders of Series Seed Preferred and the Company's founders will enter into a customary voting agreement that will include a customary drag-along provision triggered by the holders of a majority of the common stock and a majority of the Series Preferred.

*ROFR/Co-sale:*   The Company's founders and the holders of Series Preferred will execute a customary Right of First Refusal and Co-Sale Agreement pursuant to which sales of stock by the founders will be restricted by a right of first refusal held by the

DocuSign Envelope ID: A5CC0A29-4280-4D84-B6B0-02BCFE36CF94

|  | Company and the Investors, and by rights of co-sale held by the Investors. |
|---|---|
| ***IPO Lockup**:* | Holders of Series Preferred will agree not to effect any transactions with respect to any of the Company's securities within 180 days following the Company's initial public offering, provided that all officers, directors and 1% stockholders of the Company are similarly bound. |
| ***Other Matters:*** | The parties will execute a Stock Purchase Agreement with customary terms and conditions, including representations and warranties, conditions to closing and legal fee reimbursement. |

-12-

THIS INSTRUMENT AND ANY SECURITIES ISSUABLE PURSUANT HERETO HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED (THE "**SECURITIES ACT**"), OR UNDER THE SECURITIES LAWS OF CERTAIN STATES. THESE SECURITIES MAY NOT BE OFFERED, SOLD OR OTHERWISE TRANSFERRED, PLEDGED OR HYPOTHECATED EXCEPT AS PERMITTED UNDER THE ACT AND APPLICABLE STATE SECURITIES LAWS PURSUANT TO AN EFFECTIVE REGISTRATION STATEMENT OR AN EXEMPTION THEREFROM.

### NEON MACHINE, INC.
### SAFE

### (Simple Agreement for Future Equity)

THIS CERTIFIES THAT in exchange for the payment by Griffin Gaming Partners II Side Fund, L.P. (the "**Investor**") of $250,000 (the "**Purchase Amount**") on or about September 29, 2021, to Neon Machine, Inc., a Delaware corporation (the "**Company**"), the Company hereby issues to the Investor the right to certain shares of the Company's Capital Stock, subject to the terms set forth below.

The "**Post-Money Valuation Cap**" is $23,000,000.

The "**Discount Rate**" is 80%.

See **Section 2** for certain additional defined terms.

1.    *Events*

(a)    **Qualified Financing**. If there is a Qualified Financing before the earliest to occur of (a) the termination of this instrument and (b) the date that is sixty (60) days after Network Launch, then, on the initial closing of such Qualified Financing, this instrument will automatically convert into the number of shares of Safe Preferred Stock equal to the Purchase Amount divided by the Conversion Price. If, by the date that is sixty (60) days after Network Launch, (i) this instrument has not terminated and (ii) no Qualified Financing has occurred, then, at 8:00 a.m. PT on the date that is sixty-one (61) days after Network Launch, this instrument will automatically convert into that number of shares of a newly created series of the Company's preferred stock, on the terms and conditions set forth on **EXHIBIT A**, equal to the Purchase Amount divided by the Liquidity Price (an "**Automatic Conversion**").

In connection with the automatic conversion of this instrument into shares of Safe Preferred Stock, the Investor will execute and deliver to the Company all of the transaction documents related to the Qualified Financing; *provided,* that such documents are the same documents to be entered into with the purchasers of Standard Preferred Stock, with appropriate variations for the Safe Preferred Stock if applicable, and *provided further,* that such documents have customary exceptions to any drag-along applicable to the Investor, including, without limitation, limited representations and warranties and limited liability and indemnification obligations on the part of the Investor; and

(b)    **Liquidity Event**. If there is a Liquidity Event before the expiration or termination of this instrument, the Investor will, at its option, either (i) receive a cash payment equal to the Purchase Amount (subject to the following paragraph) or (ii) automatically receive from the Company a number of shares of Common Stock equal to the Purchase Amount divided by the Liquidity Price (the "**Conversion Amount**"), if the Investor fails to select the cash option.

In connection with Section (b)(i), the Purchase Amount will be due and payable by the Company to the Investor immediately prior to, or concurrent with, the consummation of the Liquidity Event. If there are not enough funds to pay the Investor and holders of other Safes (collectively, the "**Cash-Out Investors**") in full, then all of the Company's available funds will be distributed with equal priority and pro rata among the Cash-Out Investors in proportion to their Purchase Amounts, and the Cash-Out Investors will automatically receive the

number of shares of Common Stock equal to the remaining unpaid Purchase Amount divided by the Liquidity Price. In connection with a Change of Control intended to qualify as a tax-free reorganization, the Company may reduce, pro rata, the Purchase Amounts payable to the Cash-Out Investors by the amount determined by its board of directors in good faith to be advisable for such Change of Control to qualify as a tax-free reorganization for U.S. federal income tax purposes, and in such case, the Cash-Out Investors will automatically receive the number of shares of Common Stock equal to the remaining unpaid Purchase Amount divided by the Liquidity Price. For the avoidance of doubt, upon a Liquidity Event the Purchase Amount of the Investor shall be deemed to be 100% of the Purchase Amount (i.e. a 1x liquidation preference).

(c)    **Related Entities**. Except as related to Argon Protocol Foundation, a Panamanian Foundation formed for the purpose of, among other things, issuing Tokens and launching the protocol associated with such Tokens, if the Company (or any of its then-current directors, officers, employees or agents) (i) creates or holds capital stock in any entity that is directly or indirectly related to the business purpose of the Company (*i.e.*. owns any relevant intellectual property, receives or issues cryptographic tokens associated with a decentralized network launched by the Company, etc.), whether directly or indirectly owned (other than the Company creating a wholly-owned subsidiary or a subsidiary that is wholly owned but for a de minimis number of shares issued to a third party to satisfy ownership requirements of the applicable jurisdiction of formation), or (ii) exclusively licenses or transfers to any entity (other than a wholly-owned subsidiary) any of the Company's material intellectual property assets outside the ordinary course of business (each, a "**Related Entity**"), the Company agrees that, subject to compliance with applicable laws: (i) if this instrument has converted into Safe Preferred Stock, it will cause such Related Entity to issue to the Investor, without any additional consideration therefor, an equivalent amount of equity interests in any such Related Entity as the Investor owns or is entitled to receive in the Company, and/or (ii) if this instrument has not fully converted into Safe Preferred Stock, it will cause such Related Entity to issue to the Investor, without any additional consideration therefor, a Safe on substantially the same terms as this instrument; *provided that*, notwithstanding the foregoing, the Investor shall not have any economic rights to tokens held by the Company or any Related Entity that are used for working capital or general company purposes.

(d)    **Dissolution Event**. If there is a Dissolution Event before this instrument expires or terminates, the Company will pay an amount equal to the Purchase Amount, due and payable to the Investor immediately prior to, or concurrent with, the consummation of the Dissolution Event. The Purchase Amount will be paid prior and in preference to any Distribution of any of the assets of the Company to holders of outstanding Capital Stock by reason of their ownership thereof. If immediately prior to the consummation of the Dissolution Event, the assets of the Company legally available for distribution to the Investor and all holders of all other Safes (the "*Dissolving Investors*"), as determined in good faith by the Company's board of directors, are insufficient to permit the payment to the Dissolving Investors of their respective Purchase Amounts, then the entire assets of the Company legally available for distribution will be distributed with equal priority and pro rata among the Dissolving Investors in proportion to the Purchase Amounts they would otherwise be entitled to receive pursuant to this Section 1(d). For the avoidance of doubt, upon a Dissolution Event the Purchase Amount of the Investor shall be deemed to be 100% of the Purchase Amount (i.e. a 1x liquidation preference).

(e)    **Termination**. This instrument will expire and terminate (without relieving the Company of any obligations arising from a prior breach of or non-compliance with this instrument) upon either (i) the issuance of stock to the Investor pursuant to Section 1(a) or Section 1(b)(ii); or (ii) the payment, or setting aside for payment, of amounts due the Investor pursuant to Section 1(b)(i) or Section 1(d).

**2.    *Definitions***

"**Capital Stock**" means the capital stock of the Company, including, without limitation, the "**Common Stock**" and the "**Preferred Stock**."

DocuSign Envelope ID: 2AF82B0F-8BB3-4454-888C-413E3CEB0962

"**Change of Control**" means (i) a transaction or series of related transactions in which any "person" or "group" (within the meaning of Section 13(d) and 14(d) of the Securities Exchange Act of 1934, as amended), becomes the "beneficial owner" (as defined in Rule 13d-3 under the Securities Exchange Act of 1934, as amended), directly or indirectly, of more than 50% of the outstanding voting securities of the Company having the right to vote for the election of members of the Company's board of directors, (ii) any reorganization, merger or consolidation of the Company, other than a transaction or series of related transactions in which the holders of the voting securities of the Company outstanding immediately prior to such transaction or series of related transactions retain, immediately after such transaction or series of related transactions, at least a majority of the total voting power represented by the outstanding voting securities of the Company or such other surviving or resulting entity or (iii) a sale, lease or other disposition of all or substantially all of the assets of the Company.

"**Company Capitalization**" is calculated as of immediately prior to the Qualified Financing and (without double-counting):

- Includes all shares of Capital Stock issued and outstanding;

- Includes all Converting Securities;

- Includes all (i) issued and outstanding Options and (ii) Promised Options;

- Includes the Unissued Option Pool; and

- Excludes, notwithstanding the foregoing, any increases to the Unissued Option Pool (except to the extent necessary to cover Promised Options that exceed the Unissued Option Pool) in connection with the Qualified Financing.

"**Conversion Price**" means the either: (1) the Safe Price or (2) the Discount Price, whichever calculation results in a greater number of shares of Safe Preferred Stock.

"**Converting Securities**" includes this instrument and other convertible securities issued by the Company, including but not limited to: (i) other Safes; (ii) convertible promissory notes and other convertible debt instruments; and (iii) convertible securities that have the right to convert into shares of Capital Stock.

"**Discount Price**" means the price per share of the Standard Preferred Stock sold in the Qualified Financing multiplied by the Discount Rate.

"**Distribution**" means the transfer to holders of Capital Stock by reason of their ownership thereof of cash or other property without consideration whether by way of dividend or otherwise, other than dividends on Common Stock payable in Common Stock, or the purchase or redemption of Capital Stock by the Company or its subsidiaries for cash or property other than: (i) repurchases of Common Stock held by employees, officers, directors or consultants of the Company or its subsidiaries pursuant to an agreement providing, as applicable, a right of first refusal or a right to repurchase shares upon termination of such service provider's employment or services; or (ii) repurchases of Capital Stock in connection with the settlement of disputes with any stockholder.

"**Dissolution Event**" means (i) a voluntary termination of operations, (ii) a general assignment for the benefit of the Company's creditors or (iii) any other liquidation, dissolution or winding up of the Company (excluding a Liquidity Event), whether voluntary or involuntary.

"**Initial Public Offering**" means the closing of the Company's first firm commitment underwritten initial public offering of Common Stock pursuant to a registration statement filed under the Securities Act.

"Key Employee" means each of Mark Long, Don Norbury, Colin Foran, Aaron Nonis, Mark Yeend, Naomi Lackaff, and Calvin Zhou.

"**Liquidity Capitalization**" is calculated as of immediately prior to the Liquidity Event or Automatic Conversion, as applicable, and (without double-counting):

- Includes all shares of Capital Stock issued and outstanding;

- Includes all (i) issued and outstanding Options and (ii) to the extent receiving Proceeds, Promised Options;

- Includes all Converting Securities, other than any Safes and other convertible securities (including without limitation shares of Preferred Stock) where the holders of such securities are receiving Purchase Amount or similar liquidation preference payments in lieu of Conversion Amounts or similar "as-converted" payments; and

- Excludes the Unissued Option Pool.

"**Liquidity Event**" means a Change of Control or an Initial Public Offering.

"**Liquidity Price**" means the price per share equal to the Post-Money Valuation Cap divided by the Liquidity Capitalization.

"**Network**" means any blockchain-based application, platform or service operated or managed by, or based upon, or incorporating material portions of any intellectual property developed, owned or exclusively licensed by, the Company (or any parent, subsidiary or Affiliate thereof)..

"**Network Launch**" means a bona fide transaction or series of transactions pursuant to which the Token Issuer issues the native Token associated with access to and use of the Network.

"**Proceeds**" means cash and other assets (including without limitation stock consideration) that are proceeds from the Liquidity Event or the Dissolution Event, as applicable, and legally available for distribution.

"**Promised Options**" means promised but ungranted Options that are the greater of those (i) promised pursuant to agreements or understandings made prior to the execution of, or in connection with, the term sheet for the Qualified Financing (or the initial closing of the Qualified Financing, if there is no term sheet), or (ii) treated as outstanding Options in the calculation of the Standard Preferred Stock's price per share.

"**Qualified Financing**" means a bona fide transaction or series of transactions with the principal purpose of raising capital, pursuant to which the Company or a Related Entity issues and sells (i) shares of Capital Stock at a fixed pre-money valuation with an aggregate sales price of not less than $1,000,000, or (ii) tokens in a primary or secondary transaction with an aggregate sales price of not less than $1,000,000.

"**Safe**" means an instrument containing a future right to shares of Capital Stock, similar in form and content to this instrument, purchased by investors for the purpose of funding the Company's business operations. References to "this instrument" mean this specific instrument.

"**Safe Preferred Stock**" means the shares of the series of Preferred Stock issued to the Investor (a) in a Qualified Financing, having the identical rights, privileges, preferences and restrictions as the shares of Standard Preferred Stock, other than with respect to: (i) the per share liquidation preference, which the Investor shall receive at a rate of 1x, and the conversion price for purposes of price-based anti-dilution protection, which will equal the

-4-

Conversion Price; and (ii) the basis for any dividend rights, which will be based on the Conversion Price, or (b) pursuant to an Automatic Conversion.

"**Safe Price**" means the price per share equal to the Post-Money Valuation Cap divided by the Company Capitalization.

"**Standard Preferred Stock**" means the shares of the series of Preferred Stock issued to the investors investing new money in the Company in connection with the initial closing of the Qualified Financing.

"**Subsequent Convertible Securities**" means convertible securities that the Company may issue after the issuance of this instrument with the principal purpose of raising capital, including but not limited to, other Safes, convertible debt instruments and other convertible securities. Subsequent Convertible Securities excludes: (i) options issued pursuant to any equity incentive or similar plan of the Company; (ii) convertible securities issued or issuable to (A) banks, equipment lessors, financial institutions or other persons engaged in the business of making loans pursuant to a debt financing or commercial leasing or (B) suppliers or third party service providers in connection with the provision of goods or services pursuant to transactions; and (iii) convertible securities issued or issuable in connection with sponsored research, collaboration, technology license, development, OEM, marketing or other similar agreements or strategic partnerships.

"**Tokens**" means any class of any cryptocurrency, decentralized application tokens, protocol tokens, blockchain-based assets or other cryptofinance coins, tokens or similar digital assets built on blockchain or cryptographic technology or other like instrument, created using intellectual property created, in whole or in part, by the Company and operating on the Network, including the "SHRAP" tokens, provided however that Tokens shall not include non-fungible tokens (NFT), land sales, and related assets under any circumstances..

"**Token Issuer**" means the Company, any parent, subsidiary, affiliate, or their respective successors or assigns of the Company, or a third-party entity that is a contractual counterpart, that is issuing, or has issued, any Tokens that operate on a Network. Any Key Employee shall also be deemed a Token Issuer for purposes of this Agreement while such Key Employee is providing services to the Company (including any parent, subsidiary or Affiliate) and for the twelve month period immediately following the date that the Key Employee is no longer providing services to the Company (including any parent, subsidiary or Affiliate) as an employee or consultant, provided that any Key Employee shall be deemed a Token Issuer only to the extent such Key Employee creates, generates, or authors a Token that is a derivative of, is based on, or otherwise relates to or incorporates the Company's (including any parent's, subsidiary's or Affiliate's) business, intellectual property, Network, or related assets. For the avoidance of doubt, if the issuance of Tokens is completed by an anonymous or unidentified person or the genesis block of the Tokens is agreed upon by a decentralized group of validators, the Token Issuer shall be deemed to be the person described in the immediately preceding sentence that has either (a) nominated the genesis block of the blockchain protocol, or (b) been the primary developer of the differentiated intellectual property that is utilized by or in connection with the Network.

"**Unissued Option Pool**" means all shares of Capital Stock that are reserved, available for future grant and not subject to any outstanding Options or Promised Options (but in the case of a Liquidity Event, only to the extent Proceeds are payable on such Promised Options) under any equity incentive or similar Company plan.

**3.**    *"MFN" Provision*. If the Company issues any Subsequent Convertible Securities prior to termination of this instrument, the Company will promptly provide the Investor with written notice thereof, together with a copy of all documentation relating to such Subsequent Convertible Securities and, upon written request of the Investor, any additional information related to such Subsequent Convertible Securities as may be reasonably requested by the Investor. In the event the Investor determines that any terms of the Subsequent Convertible Securities are preferable to the terms of this instrument, the Investor will notify the Company in writing. Promptly after receipt

of such written notice from the Investor, the Company agrees to amend and/or restate this instrument to include such preferable terms from the Subsequent Convertible Securities.

## 4.    *Company Representations*

(a)    The Company is a corporation duly organized, validly existing and in good standing under the laws of its state of incorporation, and has the corporate power and authority to own, lease and operate its properties and carry on its business as now conducted.

(b)    The execution, delivery and performance by the Company of this instrument is within the power of the Company and, other than with respect to the actions to be taken when equity is to be issued to the Investor, has been duly authorized by all necessary actions on the part of the Company. This instrument constitutes a legal, valid and binding obligation of the Company, enforceable against the Company in accordance with its terms, except as limited by bankruptcy, insolvency or other laws of general application relating to or affecting the enforcement of creditors' rights generally and general principles of equity. To the knowledge of the Company, it is not in violation of (i) its current certificate of incorporation or bylaws, (ii) any material statute, rule or regulation applicable to the Company or (iii) any material indenture or contract to which the Company is a party or by which it is bound, where, in each case, such violation or default, individually, or together with all such violations or defaults, could reasonably be expected to have a material adverse effect on the Company.

(c)    The performance and consummation of the transactions contemplated by this instrument do not and will not: (i) violate any material judgment, statute, rule or regulation applicable to the Company; (ii) result in the acceleration of any material indenture or contract to which the Company is a party or by which it is bound; or (iii) result in the creation or imposition of any lien upon any property, asset or revenue of the Company or the suspension, forfeiture, or nonrenewal of any material permit, license or authorization applicable to the Company, its business or operations.

(d)    No consents or approvals are required in connection with the performance of this instrument, other than: (i) the Company's corporate approvals; (ii) any qualifications or filings under applicable securities laws; and (iii) necessary corporate approvals for the authorization of Capital Stock issuable pursuant to Section 1.

(e)    To its knowledge, the Company owns or possesses (or can obtain on commercially reasonable terms) sufficient legal rights to all patents, trademarks, service marks, trade names, copyrights, trade secrets, licenses, information, processes and other intellectual property rights necessary for its business as now conducted and as currently proposed to be conducted, without any conflict with, or infringement of the rights of, others.

## 5.    *Investor Representations*

(a)    The Investor has full legal capacity, power and authority to execute and deliver this instrument and to perform its obligations hereunder. This instrument constitutes valid and binding obligation of the Investor, enforceable in accordance with its terms, except as limited by bankruptcy, insolvency or other laws of general application relating to or affecting the enforcement of creditors' rights generally and general principles of equity.

(b)    The Investor is an accredited investor as such term is defined in Rule 501 of Regulation D under the Securities Act. The Investor has been advised that this instrument and the underlying securities have not been registered under the Securities Act, or any state securities laws and, therefore, cannot be resold unless they are registered under the Securities Act and applicable state securities laws or unless an exemption from such registration requirements is available. The Investor is purchasing this instrument and the securities to be acquired by the Investor hereunder for its own account for investment, not as a nominee or agent, and not with a view to, or for resale in connection with, the distribution thereof, and the Investor has no present intention of selling, granting any participation in, or otherwise distributing the same. The Investor has such knowledge and experience

-6-

in financial and business matters that the Investor is capable of evaluating the merits and risks of such investment, is able to incur a complete loss of such investment without impairing the Investor's financial condition and is able to bear the economic risk of such investment for an indefinite period of time.

**6.**    *Miscellaneous*

(a)    Any provision of this instrument may be amended, waived or modified by written consent of the Company and either (i) the Investor or (ii) the Majority-in-Interest of all then-outstanding Safes with the same "Post-Money Valuation Cap" and "Discount Rate" as this instrument (and Safes lacking one or both of such terms will be considered to be the same with respect to such term(s)), *provided that* with respect to clause (ii): (A) the Purchase Amount may not be amended, waived or modified in this manner, (B) the consent of the Investor and each holder of such Safes must be solicited (even if not obtained), and (C) such amendment, waiver or modification treats all such holders in the same manner. "**Majority-in-Interest**" refers to the holders of the applicable group of Safes whose Safes have a total Purchase Amount greater than 50% of the total Purchase Amount of all of such applicable group of Safes.

(b)    Any notice required or permitted by this instrument will be deemed sufficient when delivered personally or by overnight courier or sent by email to the relevant address listed on the signature page, or 48 hours after being deposited in the U.S. mail as certified or registered mail with postage prepaid, addressed to the party to be notified at such party's address listed on the signature page, as subsequently modified by written notice.

(c)    The Investor is not entitled, as a holder of this instrument, to vote or receive dividends or be deemed the holder of Capital Stock for any purpose, nor will anything contained herein be construed to confer on the Investor, as such, any of the rights of a stockholder of the Company or any right to vote for the election of directors or upon any matter submitted to stockholders at any meeting thereof, or to give or withhold consent to any corporate action or to receive notice of meetings, or to receive subscription rights or otherwise until shares have been issued upon the terms described herein.

(d)    Neither this instrument nor the rights contained herein may be assigned, by operation of law or otherwise, by either party without the prior written consent of the other; *provided, however*, that this instrument and/or the rights contained herein may be assigned without the Company's consent by the Investor to any other entity who directly or indirectly, controls, is controlled by or is under common control with the Investor, including, without limitation, any general partner, managing member, officer or director of the Investor, or any venture capital fund now or hereafter existing which is controlled by one or more general partners or managing members of, or shares the same management company with, the Investor, and, *provided further*, that the Company may assign this instrument in whole, without the consent of the Investor, in connection with a reincorporation to change the Company's domicile.

(e)    In the event any one or more of the provisions of this instrument is for any reason held to be invalid, illegal or unenforceable, in whole or in part or in any respect, or in the event that any one or more of the provisions of this instrument operate or would prospectively operate to invalidate this instrument, then and in any such event, such provision(s) only will be deemed null and void and will not affect any other provision of this instrument and the remaining provisions of this instrument will remain operative and in full force and effect and will not be affected, prejudiced, or disturbed thereby.

(f)    All rights and obligations hereunder will be governed by the laws of the State of California, without regard to the conflicts of law provisions of such jurisdiction.

(g)    The parties acknowledge and agree that for United States federal and state income tax purposes this instrument is, and at all times has been, intended to be characterized as stock, and more particularly as common stock for purposes of Sections 304, 305, 306, 354, 368, 1036 and 1202 of the Internal Revenue Code of

1986, as amended. Accordingly, the parties agree to treat this instrument consistent with the foregoing intent for all United States federal and state income tax purposes (including, without limitation, on their respective tax returns or other informational statements).

*(Signature page follows)*

4137-3123-9729.1

IN WITNESS WHEREOF, the undersigned have caused this instrument to be duly executed and delivered on this September 29, 2021.

**GRIFFIN GAMING PARTNERS II SIDE FUND, L.P.**

By: GGP GP II, LLC, Its General Partner
By: _____
Phil Sanderson, Managing Director

Address:
1501 Colorado, Ste B
Santa Monica, CA  90404
Attn:  Philip Sanderson
Email: phil@griffingp.com

**NEON MACHINE, INC.**

By: _____
Name: _____
Its: _____

Address: _____

Email: _____

-9-

IN WITNESS WHEREOF, the undersigned have caused this instrument to be duly executed and delivered on this September 29, 2021.

**GRIFFIN GAMING PARTNERS II SIDE FUND, L.P.**

By: GGP GP II, LLC, Its General Partner
By: _____
Phil Sanderson, Managing Director

Address:
1501 Colorado, Ste B
Santa Monica, CA  90404
Attn:  Philip Sanderson
Email: phil@griffingp.com

**NEON MACHINE, INC.**

By: _____
Name: _____
     Mark Long
Its: _____
     CEO

Address: _____
     1700 Westlake Ave N Seattle WA 98109

Email: _____
     mark.long@neonmedia.io

DocuSign Envelope ID: 2AF82B0E-88B3-4454-888G-41363CEB0069

**Exhibit A**

## TERMS OF SERIES PREFERRED STOCK

| | |
|---|---|
| *Securities:* | A newly created series of Preferred Stock (the "**Series Preferred**") |
| *Liquidation preference:* | In the event of a liquidation, dissolution or winding up of the Company, the Series Preferred will have the right to receive the original purchase price prior to any distribution to the Common Stock. The remaining assets will be distributed *pro rata* to the holders of Common Stock. A sale of all or substantially all of the Company's assets or a merger or consolidation of the Company with any other company will be treated as a liquidation of the Company. |
| *Conversion:* | The Series Preferred may be converted at any time, at the option of the holder, into shares of Common Stock. The conversion rate will initially be 1:1, subject to customary adjustments. |
| *Automatic conversion:* | Each share of Series Preferred will automatically convert into Common Stock, at the then applicable conversion rate, upon (i) the closing of a firm commitment underwritten public offering of Common Stock, or (ii) the consent of the holders of at least a majority of the then outstanding shares of Series Preferred. |
| *General voting rights:* | Each share of Series Preferred will have the right to a number of votes equal to the number of shares of Common Stock issuable upon conversion of each such share of Series Preferred. The Series Preferred will vote with the Common Stock on all matters except as specifically provided herein or as otherwise required by law. |
| *Protective provisions:* | So long as any of the Series Preferred is outstanding, consent of the holders of at least a majority of the Series Preferred will be required for (i) any amendment or change of the rights, preferences, privileges or powers of the Series Preferred; (ii) increase or decrease in the authorized number of shares of Series Preferred; (iii) any action that authorizes, creates or issues shares of any class of stock having preferences superior to or on parity with the Series Preferred; (iv) any amendment of the Company's Certificate of Incorporation or Bylaws; (v) any change of control event; (vi) the liquidation or dissolution of the Company; (vii) repurchases of Common Stock, except in connection with the acquisition of unvested shares at no more than cost; (viii) the declaration or payment of a dividend on Common Stock |

4137-3123-9729.1

(other than a dividend payable solely in Common Stock); or (ix) any increase to the size of the Company's Board of Directors.

## INVESTOR RIGHTS

| | |
|---|---|
| *Right to maintain proportionate ownership*: | Each holder of Series Preferred (or one or more of its affiliates) will have a right to purchase its *pro rata* share of any offering of new securities by the Company, subject to customary exceptions. The *pro rata* share will be based on the ratio of (x) the number of shares of Common Stock held by such holder (on an as-converted basis) to (y) the Company's fully-diluted capitalization (on an as-converted and as-exercised basis). This right will terminate upon the Company's initial public offering. |
| *Information rights*: | As soon as practicable, the Company will deliver to each holder of Series Preferred, (i) unaudited annual financial statements and (ii) unaudited quarterly financial statements. The Company will also deliver to each holder of Series Preferred the Company's operating plan not later than 30 days prior to year-end. The information rights will terminate upon an initial public offering. |
| *Board of Directors*: | The parties agree that the size of the Board of the Company shall be set at five (5).  Griffin shall have the right to, at any time, appoint one (1) director (initially Pierre-Edouard Planche) and shall have one Board observer (initially Anthony Palma). Polychain Ventures II LP shall have the right to, at any time, appoint one (1) director.   Two (2) directors shall be nominees of the holders of Common Stock (initially Mark Long and Jonathan Miller).   One director shall be nominated by 4D Factory and acceptable to Griffin. |
| *Registration Rights*: | The holders of Series Preferred will have customary demand, S-3 and piggyback registration rights. |
| *Voting Agreement*: | The holders of Series Seed Preferred and the Company's founders will enter into a customary voting agreement that will include a customary drag-along provision triggered by the holders of a majority of the common stock and a majority of the Series Preferred. |
| *ROFR/Co-sale*: | The Company's founders and the holders of Series Preferred will execute a customary Right of First Refusal and Co-Sale Agreement pursuant to which sales of stock by the founders will be restricted by a right of first refusal held by the |

4137-3123-9729.1

Company and the Investors, and by rights of co-sale held by
the Investors.

*IPO Lockup*:                     Holders of Series Preferred will agree not to effect any
                                  transactions with respect to any of the Company's securities
                                  within 180 days following the Company's initial public
                                  offering, provided that all officers, directors and 1%
                                  stockholders of the Company are similarly bound.

*Other Matters:*                  The parties will execute a Stock Purchase Agreement with
                                  customary terms and conditions, including representations
                                  and warranties, conditions to closing and legal fee
                                  reimbursement.

-12-