**EXHIBIT K**

# NEON MACHINE, INC.

## STOCK PURCHASE RIGHT NOTICE AND
## RESTRICTED STOCK PURCHASE AGREEMENT

NEON MACHINE, INC., a Delaware corporation (the "Company"), hereby grants to the Purchaser (as defined below) the right to purchase the number of Shares (as defined below) of the Company's common stock, par value $0.0001 per share (the "Common Stock") set forth below, at the Purchase Price (as defined below), upon the terms and subject to the conditions set forth in the Restricted Stock Purchase Agreement attached hereto as Exhibit A (the "Restricted Stock Purchase Agreement"), which is incorporated herein by reference, and in this Purchase Right Notice (as defined in the Restricted Stock Purchase Agreement). In addition, Purchaser desires to assign the Inventions (as defined in the Proprietary Information and Inventions Assignment Agreement, by and between the Company and Purchaser, entered into on or about the date hereof and attached hereto as Exhibit B (the "PIIA")) to the Company concurrently with the sale and issuance of the Shares. The issuance and sale of the Shares shall be effective upon the payment by the Purchaser to the Company of the Purchase Price as contemplated by Section 4 of the Restricted Stock Purchase Agreement.

| | |
|---|---|
| **Purchaser:** | The 4D Factory LLC (the "Purchaser") |
| **Date of Grant:** | August 20, 2021 |
| **Purchase Price per Share:** | $0.0001 (the "Purchase Price") |
| **Number of Shares:** | 6,000,000 (the "Shares") |
| **Vesting Schedule:** | The Shares shall vest according to the following schedule (the "Vesting Schedule"): |
| | 100% of the Shares shall vest on the date of grant. |
| **Termination Date**: | The right to purchase Shares under this Purchase Right Notice and the Restricted Stock Purchase Agreement shall terminate if not exercised prior to the 31st day following the Date of Grant set forth above. |

By Purchaser's signature below Purchaser agrees to be bound by the terms and conditions of the Restricted Stock Purchase Agreement and this Purchase Right Notice. Purchaser has reviewed the Restricted Stock Purchase Agreement and this Purchase Right Notice in their entirety and has had an opportunity to obtain the advice of counsel prior to executing this Purchase Right Notice and the Restricted Stock Purchase Agreement. To the extent the Shares are issued in uncertificated form, Purchaser also acknowledges and agrees that the Restricted Stock Purchase Agreement constitutes the notice required by Section 151(f) of the DGCL (as defined in the Restricted Stock Purchase Agreement).

1

Purchaser's marital status: ☐ Married ☒ Unmarried.

(*Signature Page Follows*)

| **NEON MACHINE, INC.:** | **PURCHASER: THE 4D FACTORY LLC** |
|---|---|
| By: *Mark Long* (DocuSigned) | By: *Cort Javarone* (DocuSigned) |
| Print Name: Mark Long | Print Name: Cort Javarone |
| Title: Chief Executive Officer | Title: Chief Executive Officer |
| Address: 1700 Westlake Ave N, Suite 200, Seattle, WA 98109 | Address: 1187 Coast Village Road, Ste 443, Montecito, CA 93108 |
| | Email: cort@the4dfactory.com |

**SIGNATURE PAGE TO NEON MACHINE, INC.
STOCK PURCHASE RIGHT NOTICE AND RESTRICTED STOCK PURCHASE AGREEMENT**

EXHIBIT A

TO STOCK PURCHASE RIGHT NOTICE
RESTRICTED STOCK PURCHASE AGREEMENT

Pursuant to the Stock Purchase Right Notice (the "Purchase Right Notice") to which this Restricted Stock Purchase Agreement (this "Agreement") is attached, NEON MACHINE, INC., a Delaware corporation (the "Company"), has granted to Purchaser (as defined in the Purchase Right Notice) the right to purchase the Shares (as defined in the Purchase Right Notice), upon the terms and subject to the conditions of this Agreement and the Purchase Right Notice.

1. Defined Terms. Capitalized terms not specifically defined herein shall have the meanings specified in the Purchase Right Notice.

2. Grant of Restricted Stock. In consideration of Purchaser's agreement to remain in the employ of the Company or its subsidiaries, if Purchaser is an employee, or to continue to provide services to the Company or its subsidiaries, if Purchaser is a consultant, or to serve as a director, if Purchaser is a director, and for other good and valuable consideration, effective as of the Date of Grant set forth in the Purchase Right Notice, the Company irrevocably grants to Purchaser the right to purchase the Shares at any time prior to the Termination Date set forth in the Purchase Right Notice, upon the terms and conditions set forth in the Purchase Right Notice and this Agreement.

3. Issuance and Sale of Stock. The issuance and sale of the Shares shall be effective upon the payment by the Purchaser to the Company of the Purchase Price as contemplated by Section 4 below.

4. Payment of Purchase Price. The cash amount of the Purchase Price shall be solely paid in cash, check or other immediately available funds at the direction of the Company. As additional consideration for the Company's agreement to issue and sell the Shares, Purchaser (i) shall execute and deliver the PIIA concurrent with the payment of the Purchase Price

5. Delivery of Certificates; Book Entry Form. Upon receipt by the Company of payment for the Shares, the Company shall issue to the Purchaser one or more certificates (which may be issued by electronic or other means) in the name of the Purchaser for that number of Shares purchased by the Purchaser. The Purchaser agrees that the Shares shall be subject to the restrictions set forth in this Agreement (collectively, the "Restrictions"). To the extent the Shares will be issued in uncertificated form, the Shares shall be recorded in the name of Purchaser in the books and records of the Company's transfer agent with appropriate notations regarding the Restrictions.

6. Stockholder Rights. Subject to Sections 7 and 10, Purchaser (or any successor in interest) shall have all the rights of a holder of Common Stock (including voting and dividend rights, as applicable) with respect to the Shares.

7. Limitations on Transfer. In addition to any other limitation on transfer pursuant to applicable securities laws, Purchaser shall not sell, assign, transfer, pledge, hypothecate or otherwise dispose of, directly or indirectly, by operation of law or otherwise (any of the foregoing,

a "Transfer") any Shares except in compliance with the provisions herein, in the Company's Bylaws and applicable securities laws. Furthermore, the Shares shall be subject to a right of first refusal in favor of the Company or its assignees as set forth in the Company's Bylaws. Notwithstanding the foregoing, the Purchaser may, subject to compliance with the transfer restrictions set forth in the Company's Bylaws, transfer Shares (i) to or for the benefit of any spouse, children, parents, uncles, aunts, siblings, grandchildren and any other relatives approved by the Board of Directors (collectively, "Approved Relatives") or to a trust established solely for the benefit of the Purchaser and/or Approved Relatives, provided that such Shares shall remain subject to this Agreement and such permitted transferee shall, as a condition to such transfer, deliver to the Company a written instrument confirming that such transferee shall be bound by all of the terms and conditions of this Agreement or (ii) subject to Section 11.2 below, as part of the sale of all or substantially all of the shares of capital stock of the Company (including pursuant to a merger or consolidation). The Company shall not be required (a) to transfer on its books any of the Shares that have been sold or otherwise transferred in violation of any of the provisions of this Agreement or the provisions of the Company's Bylaws or (b) to treat as owner of such Shares or to accord the right to vote or pay dividends to any purchaser or other transferee to whom any such Shares shall have been so sold or transferred.

8.  Investment Representations. Purchaser represents, warrants and covenants to the Company as follows:

8.1  Purchase for Own Account. Purchaser is purchasing the Shares for Purchaser's own account for investment only, and not with a view to, or for sale in connection with, any distribution of the Shares in violation of the Securities Act of 1933, as amended (the "Securities Act"), or any rule or regulation under the Securities Act.

8.2  Disclosure of Information. Purchaser is aware of the Company's business affairs and financial condition and has acquired sufficient information about the Company to permit Purchaser to evaluate the merits and risks of Purchaser's investment in the Company and to reach an informed and knowledgeable decision to acquire the Shares.

8.3  No Public Market. Purchaser understands that the Shares have not been registered under the Securities Act by reason of a specific exemption therefrom, which exemption depends upon, among other things, the bona fide nature of Purchaser's investment intent as expressed herein.

8.4  Restricted Securities. Purchaser understands that the Shares are "restricted securities" under applicable U.S. federal and state securities laws and that, pursuant to these laws, the Shares must be held indefinitely unless they are subsequently registered under the Securities Act or an exemption from such registration is available. Purchaser further acknowledges and understands that the Company is under no obligation to register or qualify the Shares for resale. Purchaser further acknowledges that if an exemption from registration or qualification is available, it may be conditioned on various requirements including, but not limited to, the time and manner of sale, the holding period for the Shares, and requirements relating to the Company which are outside of Purchaser's control, and which the Company is under no obligation and may not be able to satisfy.

2

8.5     Economic Risk. Purchaser can afford a complete loss of the value of the Shares and is able to bear the economic risk of holding such Shares for an indefinite period.

8.6     Accredited Investor. To the extent Purchaser is not a director or executive officer of the Company, by Purchaser's execution of this Agreement such Purchaser hereby represents that (1) Purchaser is an "accredited investor" as that term is defined in Rule 501 of Regulation D promulgated by the Commission under the Securities Act and (2) Purchaser has either (i) preexisting personal or business relationships with the Company or any of its officers, directors or controlling persons, or (ii) the capacity to protect his or her own interests in connection with the purchase of the Shares by virtue of the business or financial expertise of himself or of professional advisors to Purchaser who are unaffiliated with and who are not compensated by the Company or any of its affiliates, directly or indirectly.

8.7     Foreign Investor Purchasing for Own Account. To the extent that Purchaser is not a United States person, as such term is defined in Rule 902 promulgated under the Securities Act (a "Regulation S Purchaser"), the Shares will be acquired for investment for such Regulation S Purchaser's own account, not as a nominee or agent, and not with a view to the resale or distribution of any part thereof in the United States or to a United States resident, and that such Regulation S Purchaser has no present intention of selling, granting any participation in, or otherwise distributing the same. Such Regulation S Purchaser does not have any contract, undertaking, agreement or arrangement with any person to sell, transfer or grant participations to such person or to any third person in the United States or to a United States resident, with respect to any of the Shares.

8.8     Regulation S Purchaser Not a United States Person. Each Regulation S Purchaser represents that it is not a United States person as such term is defined in Rule 902 promulgated under the Securities Act.

8.9     Purchaser Address. If Purchaser is an individual, then Purchaser resides in the state or province identified in the address of Purchaser set forth on the signature page hereto; if Purchaser is a partnership, corporation, limited liability company or other entity, then the office or offices of Purchaser in which its investment decision was made is located at the address or addresses of Purchaser set forth on the signature page hereto.

8.10    Observance of Laws. If Purchaser is not a United States person (as defined by Section 7701(a)(30) of the Internal Revenue Code of 1986, as amended), Purchaser has satisfied itself as to the full observance of the laws of its jurisdiction in connection with any invitation to subscribe for the Shares or any use of this Agreement, including (i) the legal requirements within its jurisdiction for the purchase of the Shares, (ii) any foreign exchange restrictions applicable to such purchase, (iii) any government or other consents that may need to be obtained, and (iv) the income tax and other tax consequences, if any, that may be relevant to the purchase, holding, redemption, sale or transfer of the Shares. Purchaser's subscription and payment for and continued beneficial ownership of the Shares will not violate any applicable securities or other laws of Purchaser's jurisdiction.

8.11    Bad Actor Disqualifying Event. No "bad actor" disqualifying event described in Rule 506(d)(1)(i)-(viii) of the Securities Act (a "Disqualification Event") is applicable

3

to Purchaser or any of its Rule 506(d) Related Parties, except, if applicable, for a Disqualification Event as to which Rule 506(d)(2)(ii) or (iii) or (d)(3) is applicable. For purposes of this Agreement, "Rule 506(d) Related Party" shall mean any individual, corporation, partnership, trust, limited liability company, association or other entity that is a beneficial owner of Purchaser's securities for purposes of Rule 506(d) of the Securities Act.

9. Stock Certificate Legends. The stock certificate (whether in electronic or other form) evidencing the Shares issued hereunder shall be endorsed with the following legends:

9.1 THE SHARES REPRESENTED BY THIS CERTIFICATE HAVE BEEN ACQUIRED FOR INVESTMENT AND NOT WITH A VIEW TO, OR IN CONNECTION WITH, THE SALE OR DISTRIBUTION THEREOF. NO SUCH SALE OR DISPOSITION MAY BE EFFECTED WITHOUT AN EFFECTIVE REGISTRATION STATEMENT RELATED THERETO OR AN OPINION OF COUNSEL SATISFACTORY TO THE COMPANY THAT SUCH REGISTRATION IS NOT REQUIRED UNDER THE SECURITIES ACT OF 1933, AS AMENDED.

9.2 THE SHARES REPRESENTED BY THIS CERTIFICATE ARE SUBJECT TO A RIGHT OF FIRST REFUSAL IN FAVOR OF THE COMPANY AND/OR ITS ASSIGNEE(S) AND TRANSFER RESTRICTIONS AS PROVIDED IN THE BYLAWS OF THE COMPANY THAT PROVIDE FOR TRANSFER RESTRICTIONS AT THE DISCRETION OF THE COMPANY. SUCH RIGHT OF FIRST REFUSAL AND TRANSFER RESTRICTIONS ARE BINDING UPON TRANSFEREES OF THESE SECURITIES. COPIES OF THE BYLAWS OF THE COMPANY MAY BE OBTAINED UPON WRITTEN REQUEST TO THE SECRETARY OF THE COMPANY.

9.3 Other Legends. Any other notations required by any applicable federal or state securities laws.

The Company may be authorized from time to time pursuant to its certificate of incorporation to issue more than one class or series of stock. In such case and at any time or from time to time thereafter the Company will furnish without charge to the Purchaser upon request the powers, designations, preferences and relative participating, optional or other special rights of each class of stock or series thereof and the qualifications, limitations or restrictions of such preferences and/or rights.

To the extent the Shares are issued in uncertificated form, (i) this Section 9 provides the Purchaser with notice that the Shares are subject to the aforementioned restrictions in satisfaction of the notice requirement set forth in Section 151(f) of the General Corporation Law of the State of Delaware (the "DGCL") and (ii) the recording of the Shares in the books and records of the Company shall be accompanied by the legends included in this Section 9.

10. Lock-Up Period. Purchaser shall not offer, pledge, sell, contract to sell, sell any option or contract to purchase, purchase any option or contract to sell, grant any option, right or warrant to purchase, lend, or otherwise transfer or dispose of, directly or indirectly, any Shares (or other securities) of the Company or enter into any swap, hedging or other arrangement that transfers to another, in whole or in part, any of the economic consequences of ownership of any

4

Shares (or other securities) of the Company held by Purchaser (other than those included in the registration) for a period specified by the representative of the underwriters of Common Stock (or other securities) of the Company not to exceed 180 days following the effective date of any registration statement of the Company filed under the Securities Act (or such other period as may be requested by the Company or the underwriters to accommodate regulatory restrictions on (i) the publication or other distribution of research reports and (ii) analyst recommendations and opinions, including, but not limited to, the restrictions contained in FINRA Rule 2241, or any successor provisions or amendments thereto).

Purchaser agrees to execute and deliver such other agreements as may be reasonably requested by the Company or the underwriter that are consistent with the foregoing or that are necessary to give further effect thereto. In addition, if requested by the Company or the representative of the underwriters of Common Stock (or other securities) of the Company, Purchaser shall provide, within ten days of such request, such information as may be required by the Company or such representative in connection with the completion of any public offering of the Company's securities pursuant to a registration statement filed under the Securities Act. The obligations described in this Section shall not apply to a registration relating solely to employee benefit plans on Form S-1 or Form S-8 or similar forms that may be promulgated in the future, or a registration relating solely to a Securities and Exchange Commission Rule 145 transaction on Form S-4 or similar forms that may be promulgated in the future. The Company may impose stop-transfer instructions with respect to the shares of Common Stock (or other securities) subject to the foregoing restriction until the end of said 180 day (or other) period.

11.     Adjustment for Stock Split, Stock Dividend, etc.

11.1    Stock Split; Stock Dividends. All references to the number of Shares and the purchase price of the Shares in this Agreement shall be appropriately adjusted to reflect any stock split, reverse stock split or stock dividend or other similar change in the Shares that may be made by the Company after the date of this Agreement.

11.2    Merger or Consolidation. Upon the occurrence of any merger or consolidation of the Company with or into another entity as a result of which all of the Common Stock of the Company is converted into or exchanged for the right to receive cash, securities or other property or any exchange of all of the Common Stock of the Company for cash, securities or other property pursuant to a share exchange transaction, the rights of the Company hereunder shall inure to the benefit of the Company's successor and shall apply to the cash, securities or other property which the Shares were converted into or exchanged for pursuant to such transaction in the same manner and to the same extent as they applied to the Shares under this Agreement. If, in connection with such a transaction, a portion of the cash, securities and/or other property received upon the conversion or exchange of the Shares is to be placed into escrow to secure indemnification or similar obligations, the mix between the vested and unvested portion of such cash, securities and/or other property that is placed into escrow shall be the same as the mix between the vested and unvested portion of such cash, securities and/or other property that is not subject to escrow.

DocuSign Envelope ID: 3AGD4D69-5C9D-46CF-980E-866D7F6C3558

12. <u>Withholding Taxes</u>.

12.1 <u>Deductions</u>. Purchaser acknowledges and agrees that the Company has the right to deduct from payments of any kind otherwise due to Purchaser any federal, state or local taxes of any kind required by law to be withheld with respect to the purchase of the Shares by Purchaser.

13. <u>General Provisions</u>.

13.1 <u>Governing Law</u>. This Agreement and any controversy arising out of or relating to this Agreement shall be governed by and construed in accordance with the DGCL as to matters within the scope thereof, and as to all other matters shall be governed by and construed in accordance with the internal laws of the State of Washington, without regard to conflict of law principles that would result in the application of any law other than the law of the State of Washington.

13.2 <u>Entire Agreement</u>. This Agreement and the Purchase Right Notice set forth the entire agreement between the parties with respect to the purchase of the Shares by Purchaser and supersede all prior agreements and understandings relating to the subject matter of this agreement.

13.3 <u>Notice</u>. Any notice, demand or request required or permitted to be given by either the Company or Purchaser pursuant to the terms of this Agreement shall be in writing and shall be deemed given when delivered personally or deposited in the U.S. mail, as certified or registered mail, with postage prepaid, and addressed to the parties at the addresses of the parties set forth in the Purchase Right Notice or such other address as a party may request by notifying the other in writing or when delivered by facsimile telecommunication or electronic mail to the facsimile number or electronic mail address set forth in the Purchase Right Notice or such other facsimile number or electronic mail address as a party may request by notifying the other in writing. Subject to the limitations set forth in Section 232 of the DGCL, Purchaser acknowledges that the Company may deliver any notice to Purchaser under the DGCL or the Company's certificate of incorporation or bylaws by electronic transmission (as defined in the DGCL) pursuant to Section 232 of the DGCL (or any successor thereto) at the electronic mail address or the facsimile number for the Purchaser set forth in the Purchase Right Notice, as updated from time to time by notice to the Company, or as on the books of the Company, unless Purchaser notifies the Company in writing or by electronic transmission of an objection to receiving notice by electronic mail. Purchaser agrees to promptly notify the Company of any change in its electronic mail address, and the failure to do so shall not affect the foregoing.

13.4 <u>Successors and Assigns</u>. The rights and benefits of the Company under this Agreement shall be transferable to any one or more persons or entities, and all covenants and agreements hereunder shall inure to the benefit of, and be enforceable by the Company's successors and assigns. The rights and obligations of Purchaser under this Agreement may only be assigned with the prior written consent of the Company and any purported transfer otherwise shall be null and void.

6

13.5 <u>Amendment; Enforcement of Rights</u>. No modification of or amendment to this Agreement, nor any waiver of any rights under this Agreement, shall be effective unless in writing signed by the parties to this Agreement. Either party's failure to enforce any provision or provisions of this Agreement shall not in any way be construed as a waiver of any such provision or provisions, nor prevent that party thereafter from enforcing each and every other provision of this Agreement. The rights granted both parties herein are cumulative and shall not constitute a waiver of either party's right to assert all other legal remedies available to it under the circumstances.

13.6 <u>Cooperation</u>. Purchaser agrees upon request to execute any further documents or instruments necessary or desirable to carry out the purposes or intent of this Agreement.

13.7 <u>Counterparts</u>. This Agreement may be executed in two or more counterparts, each of which shall be deemed an original and all of which together shall constitute one instrument.

13.8 <u>Electronic and Facsimile Signatures</u>. Any signature page delivered electronically or by facsimile (including without limitation transmission by .pdf or any electronic signature complying with the U.S. federal ESIGN Act of 2000, e.g., [www.docusign.com](www.docusign.com)) shall be binding to the same extent as an original signature page, with regard to any agreement subject to the terms hereof or any amendment thereto.

13.9 <u>Severability</u>. If one or more provisions of this Agreement are held to be unenforceable under applicable law, the parties agree to renegotiate such provision in good faith. In the event that the parties cannot reach a mutually agreeable and enforceable replacement for such provision, then (i) such provision shall be excluded from this Agreement, (ii) the balance of the Agreement shall be interpreted as if such provision were so excluded and (iii) the balance of the Agreement shall be enforceable in accordance with its terms.

13.10 <u>Attorney's Fees</u>. If any action at law or in equity is necessary to enforce or interpret the terms of this Agreement, the prevailing party shall be entitled to reasonable attorneys' fees, costs, and disbursements in addition to any other relief to which such party may be entitled. The Company and Purchaser shall bear their own expenses and legal fees incurred on their behalf with respect to this Agreement and the transactions contemplated hereby.

13.11 <u>Employment at Will</u> PURCHASER ACKNOWLEDGES AND AGREES THAT THIS AGREEMENTAND THE TRANSACTIONS CONTEMPLATED HEREUNDER DO NOT CONSTITUTE AN EXPRESS OR IMPLIED PROMISE OF CONTINUED EMPLOYMENT AS AN EMPLOYEE FOR ANY PERIOD AT ALL, AND SHALL NOT INTERFERE WITH PURCHASER'S RIGHT OR THE COMPANY'S RIGHT TO TERMINATE PURCHASER'S RELATIONSHIP WITH THE COMPANY AT ANY TIME, WITH OR WITHOUT CAUSE OR NOTICE IN ACCORDANCE WITH LAW.

13.12 <u>Waiver of Information Rights</u>. Purchaser hereby acknowledges and agrees that, except for such information as required to be delivered to Purchaser by the Company pursuant to any other agreement by and between the Company and Purchaser, Purchaser shall have no right

7

to receive any information from the Company by virtue of such Purchaser's purchase of the Shares, ownership of the Shares, or as a result of Purchaser being a holder of record of stock of the Company. Without limiting the foregoing, to the fullest extent permitted by law, Purchaser hereby waives Purchaser's inspection rights under Section 220 of the DGCL and all such similar information and/or inspection rights that may be provided under the law of any jurisdiction, or any federal, state or foreign regulation, that are, or may become, applicable to the Company, the Company's capital stock or the Shares (the "Inspection Rights"). Purchaser hereby covenants and agrees never to directly or indirectly commence, voluntarily aid in any way, prosecute, assign, transfer, or cause to be commenced any claim, action, cause of action, or other proceeding to pursue or exercise the Inspection Rights. The foregoing (i) shall not affect any rights of a director, in his or her capacity as such, under Section 220 of the DGCL and (ii) shall terminate upon the first sale of Common Stock of the Company to the general public pursuant to a registration statement filed with and declared effective under the Securities Act.

13.13   Purchaser's Acknowledgments. Purchaser acknowledges that he: (i) has read this Agreement; (ii) has been represented in the preparation, negotiation, and execution of this Agreement by legal counsel of Purchaser's own choice or has voluntarily declined to seek such counsel; (iii) understands the terms and consequences of this Agreement; (iv) is fully aware of the legal and binding effect of this Agreement; and (v) understands that the law firm of Latham & Watkins LLP is acting as counsel to the Company in connection with the transactions contemplated by the Agreement, and is not acting as counsel for Purchaser.

13.14   Titles and Subtitles. The titles and subtitles used in this Agreement are used for convenience only and are not to be considered in construing or interpreting this Agreement.



8

DocuSign Envelope ID: 3AGD4D69-5C9D-46CF-980E-866D7F6C3558

## EXHIBIT B

**PROPRIETARY INFORMATION AND INVENTIONS ASSIGNMENT AGREEMENT**