**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

-----------------------------------------------------------------x

In re:                                                         :

4D FACTORY, INC., *et al.*,[1]                                 :      Chapter 11
                                                               :      (Subchapter V)
                              Debtors.                         :      Case No. 23-11618 (MEW)
                                                               :      (Jointly Administered)
-----------------------------------------------------------------x

THE 4D FACTORY LLC,                                            :      Adv. Proceeding No. 24-01319
                              Plaintiff,                       :

v.                                                             :      **Related to Adv. Docket Nos. 4 and 7**

MARK LONG, *et al.*,                                           :
                              Defendants,                      :

and                                                            :

NEON MACHINE, INC., *et al.*,                                  :
                              Nominal Defendants.              :
-----------------------------------------------------------------x

GRIFFIN GAMING PARTNERS II, L.P., GRIFFIN              :      **THIRD-PARTY COMPLAINT AND**
GAMING PARTNERS II SIDE FUND, L.P.,                   :      **COUNTERCLAIMS OF GRIFFIN**
POLYCHAIN VENTURES II LP, POLYCHAIN                   :      **GAMING PARTNERS II, L.P., GRIFFIN**
VENTURES II (PARALLEL) LP,                            :      **GAMING PARTNERS II SIDE FUND, L.P.,**
                                                      :      **POLYCHAIN VENTURES II LP,**
                              Counterclaim-Plaintiffs, :      **POLYCHAIN VENTURES II (PARALLEL)**
v.                                                    :      **LP**
                                                      :
THE 4D FACTORY LLC,                                   :
                                                      :
                              Counterclaim-Defendant. :
-----------------------------------------------------------------x

GRIFFIN GAMING PARTNERS II, L.P., GRIFFIN              :
GAMING PARTNERS II SIDE FUND, L.P.,                   :
POLYCHAIN VENTURES II LP, POLYCHAIN                   :
VENTURES II (PARALLEL) LP,                            :

                              Third-Party Plaintiffs,          :

v.                                                             :

CORT JAVARONE, SCOTT HONOUR, and STEVE                :
HOROWITZ,                                             :
                              Third-Party Defendants.          :
-----------------------------------------------------------------x

---

[1]  The Debtors in these Chapter 11 Cases, along with the last four digits of each Debtors' federal tax identification number, are 4D Factory Inc. (6770), and The 4D Factory LLC (8935).

Defendants-Counterclaim Plaintiffs and Third-Party Plaintiffs Polychain Ventures II LP and Polychain Ventures II (Parallel) LP (collectively, "Polychain"), and Griffin Gaming Partners II, L.P. and Griffin Gaming Partners II Side Fund, L.P. (collectively, "Griffin" and, together with Polychain, the "Plaintiffs"),[2] by and through their undersigned counsel, for their counterclaims against The 4D Factory LLC ("4D" or the "Debtor"), and their claims against third-party defendants Cort Javarone, Scott Honour, and Steve Horowitz (collectively, the "Individual Defendants," and together with 4D, "Defendants"), allege as follows for declaratory judgment, tortious interference, fraud, aiding and abetting fraud, conversion, unfair business practices, and unjust enrichment.

## NATURE OF THE ACTION

1.      This action concerns the extortionate and tortious actions of Defendants to shakedown a company and its investors to line their own pockets with undeserved and unsupported personal financial gain.  To wit, 4D, through the Individual Defendants, purposefully interfered with Plaintiffs' investment contracts with Neon Machine, Inc. ("Neon" or the "Company") in order to blockade Neon from fulfilling its unambiguous obligations to Plaintiffs since compliance with the terms of the investment contracts would eviscerate Defendants' perceived control over Neon's Board of Directors ("Board"), and undercut Defendants' attempts to drain Neon of economic value.

2.      The Individual Defendants were appointed to the Board by 4D. As directors, the Individual Defendants owed fiduciary duties to the Company and its shareholders, but rather than comply with their fiduciary obligations they exploited their positions of trust to try

---

[2]    Pursuant to the *Stipulation and Scheduling Order,* [Adv. Dkt. No. 7], the Plaintiffs' *Third-Party Complaint and Counterclaims* is without prejudice to, and a not a waiver of, their right to file an answer, motion to dismiss, or plead in response to the *Amended Complaint* [Adv. Dkt. No. 4] or any other claims filed against them pursuant to the *Stipulation and Scheduling Order.*

to personally enrich themselves and 4D.  Acting in concert with 4D (which as a putative controlling stockholder owed duties as well), the Individual Defendants refused to accept the publicly verifiable truth that, by no later than April 29, 2023, the Company's blockchain-based "Shrapnel Network" had launched, such that network's native cryptocurrency, the "SHRAP Token," was issued.  Upon the occurrence of such "Network Launch," the investment contracts Plaintiffs entered would automatically convert to equity in Neon.  However, rather than accepting Network Launch occurred and ignoring the public and transparent nature of the blockchain which evidences such, Defendants refused to acknowledge this reality because Network Launch would lead to the dilution of 4D's equity interest.  Instead, clearly recognizing they could not avoid the self-evident occurrence of Network Launch for long, the Defendants took actions to try to pillage Neon and cause the Company to distribute SHRAP Tokens to 4D under the false representation that 480,972,488 SHRAP Tokens "belong[ed]" to 4D.  This deliberate false representation sought to defraud Griffin and Polychain (critical seed and Series A investors in Neon), as well as Neon, by extracting hundreds of millions of tokens from Neon (tokens that have real economic value only because of Griffin and Polychain investments coupled with the Neon founders' development efforts) when 4D was owed none.

3.    In June 2021, Griffin and Polychain were introduced to the Neon founders – several respected video game industry veterans – and discussed the founders' vision to create an innovative blockchain-based Web3 video game.  Intrigued by the concept, Griffin and Polychain – sophisticated investment companies with proven track records for identifying, supporting, and capitalizing successful companies in the gaming and cryptocurrency/blockchain space – engaged in discussions over the following months and, on September 29 and 30, 2021, made separate investments of $5 million and $3 million pursuant to negotiated agreements called simple

2

agreements for future equity ("SAFE").  Attached as **Exhibit A** are true and correct copies of those
SAFEs.

4.    Although SAFE investment contracts are industry standard investment
agreements in the crypto space, each investment is separately negotiated and this situation was no
different.  Griffin and Polychain negotiated the SAFEs with counsel for Neon *and also with 4D*.
Indeed, Griffin and Polychain exchanged drafts of the SAFEs and negotiated terms directly with
4D and its counsel.  On information and belief, 4D and Javarone approved the final SAFE contracts
executed on September 29 and 30, 2021.

5.    Through the SAFEs, Plaintiffs obtained the right to receive equity in Neon
*in the future* in exchange for significant up-front capital to fund Neon's operations and
development.  Put differently, Griffin and Polychain did not obtain equity in Neon on the day both
made their initial investments, but instead took on considerable risk that Neon would succeed, and,
based upon the occurrence of Network Launch or the closing of a qualified financing, Griffin and
Polychain would become significant equity holders, diluting the interests of Neon's then-present
shareholders.  Specifically relevant here, each SAFE had a clear feature that would "automatically
convert" into Neon preferred stock upon 61 days following Network Launch.  "Network Launch"
is defined in each SAFE as a "bona fide transaction or series of transactions pursuant to which the
Token Issuer [Neon or a related entity] issues the native Token [SHRAP] associated with access
to and use of the [Shrapnel] Network."

6.    Here, *Network Launch occurred no later than April 29, 2023* because all
of the native cryptocurrency tokens associated with access to and use of the Shrapnel network were
issued on that date.

7.    In addition, the occurrence of Network Launch is publicly verifiable and

proven – the public and transparent nature of the blockchain allows anyone to verify its existence and activity online simply by going to a website: https://avascan.info/blockchain/shrapnel/block/0x492381a997a697b593088b9ac65fb62f0ef1e0a 5e4b6b86a8c1301343c0dfbee (last accessed Mar. 19, 2024).  Thus, no later than June 29, 2023, the 61st day following Network Launch, Griffin and Polychain's SAFEs automatically converted into Neon preferred shares.

8.      In the interim eighteen months between Griffin's and Polychain's initial SAFE investments, Griffin and Polychain appointed members to Neon's Board, which included defendant Javarone (4D's managing and controlling member), to oversee and advise Neon's founders and the management team on development of Neon's flagship Web3 videogame ("Shrapnel").  In early 2023, as the Company's development team grew and the costs associated with operations and development increased, the Company again sought out Griffin and Polychain to lead investment of a Series A capital infusion.  On February 16, 2023 and March 2, 2023, respectively, Griffin and Polychain invested additional capital (collectively $9,347,826) pursuant to substantively identical SAFEs that contained the same terms related to Network Launch and the automatic conversion into preferred shares in Neon.  Attached as **Exhibit B** are true and correct copies of those SAFEs.

9.      During this time, defendant Javarone was a Board member of Neon.  On information and belief, he was or should have been intimately aware of Neon's milestones, development, and successes, as both Javarone and 4D were provided with updates on the progress of the Company.  In fact, not only did Javarone serve as a Board member, but 4D's counsel and other employees (including 4D's Chief Financial Officer) worked with and periodically advised Neon.

4

10.     On information and belief, in mid-2023, Defendants recognized that 4D was in financial trouble so they engineered a scheme to steal from Griffin and Polychain, as well as Neon and its other stockholders, to line their own pockets.

11.     First, in August 2023, defendant Javarone, on behalf of 4D, approached Griffin and asked Griffin to purchase 4D's interest in Neon.  4D falsely represented that it had a "majority" interest in the Company.  This was false because 4D never paid consideration for its common shares and thus had zero interest in the Company.  Nevertheless, Griffin refused the overture, stating that it was not interested at that time in acquiring whatever interests 4D had in the Company.

12.     As 4D and Javarone were unsuccessful in finding other buyers to acquire 4D's interests in Neon, Defendants then began to improperly try to seize control of the Company. That same month, defendant Javarone caused Mark Long to be removed from Neon's Board and interfered with the operations of the Company.  Concerned by these antics, Griffin sent a letter to Neon dated September 14, 2023, demanding compliance with the SAFEs' automatic conversion and to take all necessary corporate actions to honor its contractual obligations.  Attached as **Exhibit C** is a true and correct copy of this letter.  Griffin's demand was presented to Neon's Board in September 2023; the Individual Defendants, who wrongly claim control of a majority of the Board, refused to comply, citing spurious claims that Network Launch may have not occurred and/or that the SAFEs were not approved by the Board.  Shortly thereafter, defendant Javarone then caused the Board to suspend Mr. Long as the Company's Chief Executive Officer.

13.     Second, in October 2023, 4D filed the instant chapter 11 case and has since improperly attempted to insulate itself and the Individual Defendants by claiming the automatic stay prevents Neon, Griffin, and Polychain (all non-debtors) from taking any actions in relation to

5

one another that could result in 4D no longer having a controlling stake in Neon.  In doing so, not only has 4D attempted to use the automatic stay to enhance its own equity, but it prevents Neon from complying with its contractual obligations, causing significant harm to Griffin and Polychain.

14.     Third, while 4D alleged the automatic stay prevented Plaintiffs from taking any appropriate action to the contrary, Defendants leveraged 4D's appointed directors on Neon's Board to direct illegitimate (and void) corporate actions.   On January 4, 2024, 4D falsely represented to the Board that it was entitled to 480,927,488 SHRAP Tokens held by Neon in its treasury.  Attached as **Exhibit D** is a true and correct copy of this letter.  By that same letter, 4D demanded that these tokens be released to 4D.  It subsequently represented to the Bankruptcy Court that it was entitled to these tokens.  This too, was false, as 4D is not entitled to any SHRAP tokens.

15.     On January 9, 2024, 4D's appointed directors noticed an illegitimate Board meeting for January 12, 2024, including in the notice an authorization to release Neon's treasury tokens.  At the illegitimate meeting on January 12, the Individual Defendants directed the release of 480,927,488 tokens to 4D.  Attached as **Exhibit E** is a true and correct copy of the purported Board resolution.   Then, on January 31, 2024, defendant Honour instructed the Company to comply and to distribute the 480,927,488 SHRAP Tokens to 4D.

16.     On information and belief, to date, no SHRAP Tokens have been issued to Defendants, as doing so would provide Defendants with Griffin's, Polychain's, and the Company's stolen property.  Griffin and Polychain invested millions of dollars and hundreds of hours, across years, into Neon to fund and accelerate its development.  Defendants invested nothing; did nothing; and then leveraged the perception of control over Neon's Board to effectuate a fraud, causing severe damage to Griffin and Polychain, as well as the Company itself, that must be redressed.

## PARTIES

17.     Neon Machine, Inc. is a Delaware corporation with its principal place of business in Seattle, Washington.  It was incorporated under Delaware law on August 3, 2021.

18.     Polychain Ventures II LP is a limited partnership based in San Francisco, California.  Its investments focus on cryptocurrency and blockchain technology.  On or about September 30, 2021, Polychain Ventures II LP invested $3,000,000 pursuant to an executed SAFE.[3]  On or about March 2, 2023, Polychain Ventures II LP invested $3,490,420 pursuant to an executed SAFE.

19.     Polychain Ventures II (Parallel) LP, is a limited partnership based in San Francisco, California.  Its investments focus on cryptocurrency and blockchain technology.  On or about March 2, 2023, Polychain Ventures II (Parallel) LP invested $1,509,580 pursuant to an executed SAFE.  Together with Polychain Ventures II LP, the Polychain parties are referred to collectively as "Polychain."

20.     Griffin Gaming Partners II, L.P., is a limited partnership based in Santa Monica, California.  Griffin is one of the world's largest investment funds focused exclusively on gaming.  On or about September 29, 2021, Griffin Gaming Partners II, L.P. invested $4,750,000 pursuant to an executed SAFE.  On or about February 16, 2023, Griffin Gaming Partners II, L.P. invested $4,214,166 pursuant to an executed SAFE.

21.     Griffin Gaming Partners II Side Fund, L.P. is a limited partnership based in Santa Monica, California.  On or about September 29, 2021, Griffin Gaming Partners II Side Fund L.P. invested $250,000 pursuant to an executed SAFE.  On or about February 16, 2023, Griffin

---

[3] Polychain Ventures II LP subsequently assigned its rights to $905,748 of the $3,000,000 to Polychain Ventures II (Parallel) LP.

Gaming Partners II Side Fund L.P. invested $133,166 pursuant to an executed SAFE.  Together with Griffin Gaming Partners II, L.P., the Griffin parties are collectively referred to as "Griffin."

22.     Defendant The 4D Factory LLC is a Wyoming Limited Liability Company, which purports to own 60% of Neon's common shares.

23.     Defendant Cort Javarone is the managing member of 4D.  On information and belief, Javarone resides in New York, New York.

24.     On information and belief, defendant Scott Honour resides in Minnesota and is the Managing Member of Northern Pacific Group, a Minnesota-based private equity firm. Northern Pacific Group holds 453,869 Membership Units in 4D, and its website indicates that it has been an investor in the Debtor since in or around January 2021.[4]

25.     On information and belief, defendant Steve Horowitz resides in New York, New York.  Defendant Horowitz owns significant equity in 4D.

## BACKGROUND

## I.    THE PLAINTIFFS' EXPERIENCE WORKING WITH EARLY-STAGE ENTERPRISES

26.     The Plaintiffs were contacted by Mark Long in late summer 2021 regarding an idea for a AAA sci-fi first-person-shooter video game that would include a blockchain enabled in-game economy, including a token, that would allow players to develop unique in-game content, share that content, and profit from their contributions to game improvement and development.

27.     Griffin and Polychain, among many other investors and advisors informally contacted regarding the idea for the "Shrapnel" game, were uniquely suited to contribute not only capital to such a project, but their considerable experience and expertise working with early-stage

---

[4] *See* https://northernpacificgroup.com/portfolio/4dfactory/ (last visited March 25, 2024).

companies in the gaming and digital asset spaces.

28.     Griffin, based in Santa Monica, California, is the world's leading venture fund focused exclusively on early-stage investment opportunities in the gaming industry.  With over $1 billion under management and decades of experience building commercial relationships in the gaming space, Griffin has funded or acquired over thirty early-stage companies and guided them through the challenges of staffing and executive leadership, product development, and game launch.  With its industry-best experience and know-how, Griffin partners with founders in more than fifteen countries across the world to support a shared vision around gaming and blockchain as transformational and growing industries.

29.     Polychain, the world's premier digital asset investment fund, is a San Francisco-based venture capital firm that manages investments and partnerships in the blockchain and digital asset space.  Polychain manages more than $6 billion in assets, investing in protocols and companies that advance the global adoption of blockchain technology.  Founded in 2016, Polychain partners with the best and brightest in the investment world to identify transformational companies in the growing blockchain and cryptocurrency economies.

## II.    THE FORMATION AND LAUNCH OF NEON MACHINE, INC.

### A.    Neon's Development of Shrapnel

30.     Neon was founded to develop the sci-fi first-person-shooter game, Shrapnel.  A key innovation and selling point for the game is that whereas most modern games require players to buy items, levels, and other assets key to playing the game by purchasing in-game "credits" or "points" with U.S. dollars or other fiat currencies, Shrapnel's blockchain technology powers a cryptocurrency token-based ecosystem, in which tokens are made available to players, both inside and outside of the game, and players can use those tokens in the game and,

9

unlike other games, own and transfer that token outside of the game on a public blockchain.

31.     Yet another innovation in the Shrapnel world is that players can create their own content within the game, and then use the blockchain technology to "mint" that content – such as a new weapon, or a game map they created – as a non-fungible token ("NFT").  In other words, once "minted," that content is represented on the blockchain as an NFT that belongs to that player, and which can be transferred or "sold" to other players, as the creators receive more tokens based on how well their creations perform.

### B.     Griffin and Polychain Invest in Exchange for Future Equity

32.     In September 2021, following several meetings with Neon's management team, including in-person meetings with Mark Long and Don Norbury, Griffin and Polychain agreed to invest $5,000,000 and $3,000,000, respectively.  The Plaintiffs' investments were based on the opportunity to collaborate and partner with the experienced management team at Neon and the considerable upside that an industry-leading AAA sci-fi game might have if tethered to a robust blockchain economy.  More than investors simply lending gravitas to the project, the Plaintiffs shared a vision (and reality) with Neon of working together – an ideal combination of game industry and blockchain expertise and relationships – to multiply Shrapnel's potential success by providing, as needed, support in recruiting and hiring, engineering, and product marketing.  While the SAFEs provide the parameters of the parties' investment agreement, for more than two years the Plaintiffs have collaborated across thousands of hours with Neon's management to realize the potential that Shrapnel holds.

33.     Critically, the SAFE agreements, including the key terms, ***were negotiated with both Neon and 4D***.  Indeed, 4D, through its counsel, offered comments and edits to drafts of the SAFEs and offered its input to the structure of the SAFE investments.  Mark Long provided

Javarone and other non-party advisors to 4D with a comparative presentation regarding the proposed Griffin/Polychain investments and other funding opportunities. Long recommended moving forward with the Griffin and Polychain proposal because of their reputation and expertise, but he also elicited the Debtor's views regarding the funding proposals, including because the different investment opportunities varied in their valuations of Neon—and eventual dilution of 4D—given the significant capital being offered. Put simply, not only did 4D know about the SAFEs with Griffin and Polychain, 4D *participated in negotiating the agreements and applauded the infusion of critical capital into the Company* to fund development of Shrapnel.

34.    Eventually, the SAFEs were finalized and executed, and, under the terms of the SAFEs, Plaintiffs each received future equity in Neon in exchange for their substantial investments. The SAFEs were structured so that the equity would vest in the form of preferred shares of Neon upon the occurrence of certain events.

35.    A central feature of the SAFEs is their "Automatic Conversion" to an agreed-upon amount of preferred equity upon the occurrence of certain events; namely, "[i]f, by the date that is sixty (60) days after Network Launch, (i) this instrument has not terminated and (ii) no Qualified Financing has occurred, then, *at 8:00 a.m. PT on the date that is sixty-one (61) days after Network Launch, this instrument will automatically convert into that number of shares of a newly created series of the Company's preferred stock*" (emphasis added). *See* Exhs. A and B.

36.    Prior to the parties' executing the SAFEs, to entice Griffin and Polychain to enter into the agreements, 4D represented that it approved Neon, Griffin, and Polychain entering into the SAFEs, and would approve corporate actions to effectuate the automatic conversions of the SAFEs to preferred shares when required. Griffin and Polychain relied on these representations

11

in entering into the SAFEs.

37.    The SAFEs have not and were never terminated, and no "Qualified Financing," as defined in the SAFEs, ever occurred.

38.    Pursuant to Section 141(f) of the General Corporation Law of Delaware, on at least two occasions, the Neon Board, including defendant Javarone, adopted and approved resolutions related to the SAFEs that were issued to Griffin and Polychain, respectively.  Attached as **Exhibit F** is a true and correct copy of the Board resolution dated January 26, 2022, and **Exhibit G** is a true and correct copy of the Board resolution dated January 13, 2023.

39.    The January 13, 2023 Board resolution plainly approves the form and terms of the SAFEs and contemplates the Company entering into further SAFE financings.  In fact, the $5 million in SAFE financings referenced in the Board resolution were for a future SAFE – executed by Polychain in that exact amount on March 2, 2023 – that postdates Griffin's SAFEs of February 16, 2023.  *See* Exhibit G.  Through these Board resolutions, SAFEs totaling $17,347,826 to Griffin and Polychain were approved.

40.    Specifically:

    a)  The Board resolved that the "SAFE Financing is hereby ratified, confirmed, adopted and approved in all respects." The Board further resolved "that the form, terms and conditions of each SAFE are hereby ratified, confirmed, adopted and approved." The Board still further resolved that it "ratifies, confirms, approves and adopts all actions previously taken by officers or directors of the Corporation in connection with the foregoing resolutions, including the execution of the SAFEs."

    b)  The Board ratified certain letter agreements with Polychain in connection with the SAFEs, resolving that "each of the Letter Agreements is hereby ratified, confirmed and approved," and that the Board "hereby ratifies, confirms, approves and adopts all actions previously taken by officers or directors of the Corporation in connection with the foregoing resolutions, including the execution of the Side Letter Agreements."

    c)   The Board further "ratifies, confirms, approves and adopts all actions previously taken by officers or directors of the Corporation that are approved by the foregoing resolutions."

    d)   Finally, the Board resolved that "each of the officers of the Corporation is authorized to do or cause to be done any and all such further acts and to execute and deliver any and all such additional documents as such officer may deem necessary or appropriate in order to carry into effect the purposes and intent of the foregoing resolutions."[5]

41.    All five Directors at the time, including defendant Javarone, Ned Sherman, Pierre-Edouard Planche, Mark Long, and Ben Perszyk, approved and executed the foregoing resolutions. *Id.*

### C.    Griffin and Polychain Advise Neon as Board Members While Neon Builds and Develops Shrapnel

42.    As they worked to build the Company, Messrs. Long, Nonis, and Norbury, all managers at Neon, routinely consulted with representatives from Griffin and Polychain, discussing topics such as the game's blockchain technology, additional fundraising, and the overall development of the Shrapnel game. Defendants were aware of these efforts but, despite being invited, either did not attend or did not participate in any calls or meetings, and otherwise contributed nothing to Neon and Shrapnel.

43.    For example, in a January 2022 Neon Board meeting, Neon officers such as Messrs. Long and Norbury updated the Board regarding Neon's fundraising efforts, its partnerships, hiring, Shrapnel's development, and other operational segments. Griffin and Polychain representatives attended in person and made professional inquiry into important matters. Defendant Javarone attended remotely, and had little to no involvement.

44.    Neon also engaged in early public marketing as it developed Shrapnel, to

---

[5] *Id.*

begin the process of building public and industry-specific interest. This included appearing at video game conventions, holding marketing events, and releasing other forms of media related to Shrapnel, including comic books, and movie clips.

45.     On April 27, 2022, Neon published a White Paper describing the gameplay and the token ecosystem embedded in the game. The White Paper marketed Shrapnel's gameplay innovations, identified the development team (including the Neon founders), and publicly marketed Shrapnel's investors, including most prominently, Griffin and Polychain, as well as a wide variety of other investors who made the game's development possible. The Shrapnel White Paper was shared with 4D and defendant Javarone but, in contrast to Griffin and Polychain, neither 4D nor defendant Javarone had invested any resources into Neon or Shrapnel (*i.e.* neither time, nor money in any capital raising or token-subscription funding rounds), nor had any expertise or experience in blockchain-enabled gaming.

## III.     NEON'S FIRST SHRAP TOKEN WAS CREATED ON MARCH 17, 2023 AND "NETWORK LAUNCH" OCCURRED NO LATER THAN APRIL 29, 2023

46.     The "Network Launch" – the key trigger within the SAFEs – is defined by the SAFEs as a "bona fide transaction or series of transactions pursuant to which the Token Issuer [Neon or a related party] issues the native Token [SHRAP] associated with access to and use of the Network." This definition relates to a straightforward and important facet within Neon's business operations which is easily demonstrated and provable by review of public information. Network Launch was universally acknowledged to have happened no later than April 29, 2023 by Neon and its investors at the time and thereafter, with the sole exception of the Defendants and only after 4D sought bankruptcy protection as it desperately sought to cling to control of the Neon Board for its own gain.

47.     Because one of the central innovations of the Shrapnel video game is its use

14

of blockchain technology, the Neon founders, with assistance from the Plaintiffs and others, had to work long before the game's eventual launch to support development and launch of a cryptocurrency "token" that would be used within the game. For example, as Defendants are well aware, upon the advice of experts in the crypto field, Neon worked with a third-party partner, and separately with Avalanche, a prominent blockchain platform, to support the creation of a unique token related to Shrapnel – the SHRAP Token.

48.    The SHRAP Token is a central part of the Shrapnel network and has substantial utility and use within the Shrapnel game. For the prospective players of Shrapnel, they can use SHRAP as currency for acquiring items during the game, such as weapons, special game maps, and other items. Players can also use SHRAP to customize their experience, such as creating their own "skins" (clothes or suits) that they would then own within the game's marketplace, or creating their own unique "callsign," a form of "tag" or identification for when they play the game.

49.    For Neon, the launch of the SHRAP token was a key element of Shrapnel's promotional efforts that could drive gamers to the Shrapnel game and support the Shrapnel ecosystem. After the SHRAP Tokens were "minted," some were "airdropped" (*i.e.*, given away for free) to potentially interested players in order to build additional excitement about the game.

50.    For Neon's outside investors, including Griffin and Polychain, Network Launch and the airdrop of the SHRAP Token to the growing Shrapnel community signaled key development milestones for Neon and the Shrapnel network, especially in the context of the SAFEs. Indeed, as described above and approved by the Board, absent a qualifying financing event, the Plaintiffs' rights to Neon's preferred shares vested on the 61st day following the Network Launch.

51.    Critically, whether Network Launch has indeed occurred (it did nearly one

year ago), is verifiable on immutable public blockchain ledgers. For example, because the Avalanche blockchain is a decentralized, peer-to-peer network, each transaction that occurs on the blockchain is recorded and available publicly. Accordingly, and as described below, each step leading to Network Launch and the subsequent transactions involving the SHRAP Token on the Shrapnel Network are fully available and verifiable with reference to publicly available online tools.

52.    First, on February 17, 2023, the Shrapnel "subnet" was created: a network of blockchain validators on which the SHRAP Token, identified by a specific code to 18 decimal places, would be made available. As shown below, evidence of that "subnet" creation is available online on "Avascan," a tool used to view blockchain transactions.[6]



---

[6] *See* "Shrapnel on Avalanche," Avascan, *available at* https://avascan.info/blockchain/shrapnel/info (last accessed Mar. 19, 2024).

53.    Next, on March 17, 2023, the first native token (referred to as the SHRAP

"gas" token) was generated on the Shrapnel subnet.  This transaction can also be publicly viewed[7]:



54.    Additional token transactions built up over the following month, and, by

April 29, 2023, the three billion SHRAP Tokens had been generated and numerous transactions

were being performed on the Shrapnel Network daily.  ***These are all of the SHRAP tokens that

will ever be created or released***.  Soon after that, SHRAP Tokens were airdropped to potential

players of Shrapnel and players were able to create their own callsigns using SHRAP tokens – an

act that inarguably requires that the Network has launched such that the SHRAP Token can be

used to create and purchase one's Callsign.

55.    Accordingly, by April 29, 2023 at the latest—if not earlier—the Network

Launch as defined in the SAFEs had occurred:  there had been a series of transactions pursuant to

which the native token associated with access to and use of the Shrapnel network had been issued.

---

7    *See*    "Shrapnel    on    Avalanche,"    Avascan,    *available    at*
https://avascan.info/blockchain/shrapnel/block/0x492381a997a697b593088b9ac65fb62f0ef1e0a5e4b6b86a8c13013
43c0dfbee (last accessed Mar. 19, 2024).

56.    In fact, following Network Launch in April 2023, interested players began using SHRAP Tokens to purchase their "callsigns" (player names) in earnest, as early as May 16, 2023.  Since then, more than 100,000 players have registered to play Shrapnel and over 42,000 have competed with each other across its various maps and futuristic landscapes.  Players access these competitions, or play the Shrapnel game at will, by simply downloading the game from the Epic Game Store.[8]

57.    Shrapnel was formally made available in the Epic Games Store in or around January 22, 2024, however players had been creating and purchasing "callsigns", "operators" (player profile avatars), and "emblems" (decals), and accessing and playing the game through shrapnel.com for eleven months.  Notwithstanding that the launch of the Shrapnel game is entirely detached from the definition of Network Launch, the Network having launched—a condition precedent to the SHRAP Token being available for game-play, purchases, and the in-game creation of callsigns and modification of weapons, "skins" (*i.e.* clothes and wearables), or maps—is a *sine qua non* of playing Shrapnel and using the SHRAP Token to enhance the players' experience

58.    There is no good faith basis for Network Launch to be disputed.  Even if the native token were insufficient (and it is sufficient, according to the plain language of the SAFEs), the clear and substantial evidence of the SHRAP Token being minted and used on the Shrapnel network has never been disputed.

59.    Accordingly, by June 29, 2023, Griffin and Polychain's SAFEs had automatically converted to preferred shares in Neon.

## IV.    DEFENDANTS' SCHEME TO DEFRAUD GRIFFIN AND POLYCHAIN

60.    On information and belief, by the summer of 2023, 4D's significant debt –

---

[8] *See* (https://store.epicgames.com/en-US/p/shrapnel-e59542) (last visited March 25, 2024).

including an approximate $4 million loan from non-party lender MEP Capital Holdings III LP to another company made in December of 2021 (after Neon was founded) and guaranteed by 4D – was causing 4D significant financial distress.

61.    As security for its guarantee to MEP Capital Holdings III LP, 4D pledged whatever common share interest 4D held in Neon.  On information and belief, 4D did so without providing any notice to Neon, in violation of Neon's Right of First Refusal as set forth in Article VI of Neon's bylaws.

62.    Around this time, in or about August 2023, defendant Javarone, seeking liquidity to satisfy 4D's debts, approached Griffin to acquire 4D's purported "majority" interest in Neon.

63.    On information and belief, defendant Javarone's representation that 4D had any economic interest at all, let alone a majority interest in Neon through ownership of common stock, was materially false and misleading when made because, while 4D was offered an opportunity to acquire 6,000,000 common shares of Neon and defendant Javarone executed a Stock Purchase Agreement on August 20, 2021 on behalf of 4D to do so, 4D never paid consideration for the shares.  On information and belief, the Stock Purchase Agreement terminated on or about September 21, 2021, so 4D is not a stockholder of Neon and should have no rights attendant with being a stockholder.

64.    Griffin refused to engage with 4D, stating that it was not interested in acquiring 4D's interests in Neon.  At the time, Griffin understood that it – together with Polychain – were preferred shareholders in Neon based on the automatic conversion of the SAFE interests that occurred no later than June 29, 2023.  As such, Griffin recognized that 4D's purported interest, whatever it was, was not a "majority" of Neon.

19

65.     Recognizing 4D was unable to legally turn its involvement in Neon into cash, Defendants then executed a scheme to exert undue and improper control over Neon to reap an ill-gotten financial windfall.

66.     In August 2023, defendant Javarone, purportedly acting as a director of Neon, but acting directly adverse to its interests, took action to replace Mr. Long (then one of five directors) with defendant Honour, a personal friend and substantial (indirect) investor in 4D.

67.     On September 14, 2023, alarmed by defendant Javarone's actions purportedly on behalf of Neon's Board, Griffin sent a letter to Neon demanding that it honor the SAFE conversion and take all necessary corporate actions to do so. *See* Exh. C.

68.     At that time, the Neon Board consisted of five directors: Javarone; Honour; Ned Sherman, a former director of the Board who had been appointed by 4D; Pierre-Edouard Planche, a representative appointed by Griffin who routinely worked with Plaintiffs and Neon; and Josh Rosenthal, a representative appointed by Polychain who was also closely involved with Neon's operations.

69.     On October 5, 2023, 4D's appointed directors tried to end-run their contractual failings by causing Neon's Board to cause stock certificates to be printed and delivered to 4D.

70.     At the same meeting, the Individual Defendants, who purportedly controlled the majority of the Board, rejected Griffin's demand letter (although the Board never formally responded).  Defendants Javarone and Honour questioned whether Network Launch ever actually occurred and whether the SAFEs were approved.  Of course, the Individual Defendants blatantly ignored that 4D negotiated the SAFEs in 2021, the Neon Board (including defendant Javarone) previously ratified the SAFEs executed by the Company in January 2022, and further

ratified the issuance of similar SAFEs with Polychain (and others) in January 2023.

71.    The Individual Defendants were plainly motivated by their own self-interest to effectuate a fraud and try to reap a financial windfall, rather than any consideration for or interest in Neon, a company with which they had no pecuniary or operational involvement.  Each of the three Individual Defendants all held and hold, either directly or indirectly, substantial equity in 4D, and they were and are concerned that if the SAFEs were converted and the preferred shares were issued, as the agreements require, Griffin and Polychain would take subsequent actions that would lead to the dilution of 4D's common shares in Neon, and the loss of control of the Board.

72.    At the purported October 5, 2023 "special meeting," the Board majority members then appointed by 4D (Javarone, Honour, and Sherman) first voted to appoint defendant Honour as Chairman of the Board and then voted to make "Chairman" an official officer position and approved Honour as Neon's "Executive Chairman."  At the same meeting, the demand was made again on the Board to recognize the conversion of the SAFEs.  Defendant Honour stated that they needed additional time to "carefully consider" whether the Network Launch had occurred, and whether the SAFEs had converted.  He provided no reason to believe that either event had not, in fact, occurred.

73.    Shortly after that meeting, on October 10, 2023, 4D filed a voluntary petition for relief under Chapter 11 of the Bankruptcy Code in the Southern District of New York.

74.    On October 16, 2023, former director Sherman abruptly resigned from the Board, without stating a reason for doing so.  Shortly thereafter, the Debtor, through its purported majority common stock position in Neon, caused defendant Horowitz, another equity holder in 4D, to be appointed as a replacement 4D-director for Mr. Sherman.

75.    On information and belief, on November 7, 2023, with Neon facing

21

significant potential liability from its outside investors, including the possibility of having to return capital to SAFE agreement counter-parties, and a recalcitrant Board acting contrary to Neon's best interests, Mr. Long as CEO of Neon engaged counsel to provide advice to Neon and guide it through the issues.  Soon after, Neon, through counsel, sent a letter to Javarone explaining the potential harm to the Company based on the purported Board's refusal to recognize the conversion of the SAFEs, and sought a meeting to discuss and attempt to resolve the Company's pressing issues.

76.    On information and belief, and in retaliation for this action and Mr. Long's repeated demands to the Board that Neon abide by its contractual obligations to its key investors, the current Board majority (the Individual Defendants) voted on November 13, 2023, to suspend Mr. Long as CEO and appointed Javarone as his putative interim replacement.

77.    As "interim CEO," Javarone immediately began taking actions that are and will continue to harm Neon and Plaintiffs' investment in same, including imposing a restriction on any expenditure over $5,000 without his and Honour's approval, threatening to discipline key Neon officers, and attempting to seize control of Neon's bank accounts at a time when defendant Javarone has been desperate for cash to satisfy 4D's obligations and otherwise.

78.    In fact, with Defendants' scheme to entrench themselves as illegitimate controlling stakeholders of Neon complete, Defendants moved quickly to try to drain Neon of any economic value.

79.    On December 27, 2023, defendant Javarone's counsel sent a letter to the Argon Protocol Foundation demanding the transfer of 16 million SHRAP Tokens under the terms of two Assignment and Assumption Agreements executed by Javarone in December 2021. Attached as **Exhibit H** is a true and correct copy of this letter.  On information and belief, the

Argon Protocol Foundation is the third party that was recommended to Neon by outside experts to assist with the development of the SHRAP Token and related Network. Not only did this letter completely ignore the notice requirements of the relevant Assignment and Assumption Agreements, defendant Javarone and his counsel overlooked that the agreement for 15 million of those SHRAP Tokens explicitly provides an unlock schedule ***based on the occurrence of Network Launch***. So, out of one side of his mouth, defendant Javarone claims Network Launch has not occurred, thus directly impacting Plaintiffs' investment and holdings in Neon, but out of the other side, claims entitlement to 15 million SHRAP Tokens that could only be transferred to a cryptocurrency wallet if Network Launch had occurred.

80.    Not satisfied with only demanding 16 million SHRAP Tokens, on January 4, 2024, 4D's counsel then sent a letter to defendant Honour, purportedly in his capacity as the "Executive Chairman of the Board of Neon Machine, Inc.," demanding that Neon's Board (again now illegitimately controlled by the Individual Defendants, despite Griffin and Polychain being the only parties represented on the Board who had ever invested a single dime into Neon) distribute 480,927,488 treasury tokens to 4D via a cryptocurrency wallet that 4D would provide. A true and correct of this demand letter is attached hereto as **Exhibit D**.

81.    4D's post-petition demand for this amount of SHRAP Tokens, under the guise of a threatened turnover action under section 542 of the Bankruptcy Code, was not supported by any agreement with Neon. Instead, it was solely based on an email that provided a proposed capitalization table for Neon ***as of February 2022*** and reflected that ***post-SAFE conversion*** 4D's equity interest "***could theoretically translate***" into a certain amount of SHRAP Tokens if the Board ever elected to distribute all SHRAP Tokens held in Neon's treasury on a pro rata basis to shareholders. Such a pro rata distribution, however, could only really occur if Neon were to sell

23

or liquidate, since a pro rata distribution of all SHRAP tokens would mean that there could be no other tokens to issue for use in the Shrapnel game, to new investors, or otherwise.

82.     On January 9, 2024, the Individual Defendants noticed a "special meeting of the board" of Neon for January 12, 2024.  One of the agenda items listed on the notice was "SHRAP Token Release Authorization."  A true and correct copy of this correspondence is attached hereto as **Exhibit I**.

83.     On January 12, 2024, the Individual Defendants then held yet another illegitimate "special meeting."  Neon Board members appointed by Plaintiffs, Josh Rosenthal and Pierre Planche, attended and objected to the holding of the meeting and the actions of the Board as illegitimate.  Nevertheless, the Individual Defendants, in spite of their inherent conflicts and looking only to line their own pockets, approved the distribution of the 480,927,488 SHRAP Tokens to 4D (again, which each Individual Defendant owns units in).  *See* Exh. E.

84.     Then, on January 31, 2024, defendant Honour emailed Plaintiff Aaron Nonis (Neon's COO), Don Norbury (Neon's CTO), and others stating that he and defendant Javarone—acting as "Neon's Board" directed management to "work together to promptly execute the authorized distribution of SHRAP tokens" to 4D.  Defendant Honour stated that he "expect[ed] completion of the process within 72 hours[,]" and that there "are no restrictions in place on the tokens."  A true and correct copy of this correspondence is attached hereto as **Exhibit J**.

85.     Defendants' scheme thwarted the Company's plain contractual obligations under the SAFEs that necessarily removed 4D's controlling interest (and thus control of the Board); caused 4D to send a demand to an illegitimate and highly conflicted Board that had both fiduciary duties to Neon and its investors and personal self-interest in 4D; caused the approval of the distribution of more than 480 million SHRAP Tokens to 4D; and then directed Neon's

management to implement the transfer within 72 hours to a cryptocurrency wallet controlled by 4D that is by its very nature not a reversible nor easily traceable transfer.

## V.    GRIFFIN AND POLYCHAIN CONTINUE TO BE DAMAGED BY DEFENDANTS' NEFARIOUS CONDUCT

86.    Griffin and Polychain are entitled to the benefits of their contractual agreements with Neon.  The record is clear that Neon's management team intends to recognize the obligations, but Defendants have purposefully intervened to deny Griffin and Polychain their contractual rights, specifically the right that their SAFEs *automatically converted to preferred shares in Neon* no later than June 29, 2023.  The Defendants' interference has caused Griffin and Polychain to not be able to enjoy their controlling stake in Neon nor their ability to direct its management team.  The Defendants' intentional misconduct has also caused the value of Griffin's and Polychain's more than $17 million investment to plummet.

87.    Further, the Individual Defendants' efforts to divert 480,927,488 SHRAP Tokens held in Neon's treasury to 4D defrauds Griffin and Polychain of the value of its investment. Those tokens are the rightful property of Neon, and thus as the rightful majority equity holders in Neon, the value of those tokens are reflected in the value of Griffin's and Polychain's investment in the Company.  Disbursement of those tokens into the market will necessarily tank the SHRAP Token price, severely damaging, if not destroying the Company, and further depleting Griffin's and Polychain's investment.[9]

88.    The knowing and intentional conduct of the Debtor and the Individual Defendants in refusing to acknowledge Network Launch, appointing directors to Neon's Board and maintaining directors in Board seats that should be controlled by the Plaintiffs, demanding the

---

[9]    Griffin and Polychain expressly reserve their right to seek administrative expense priority claims, as applicable.

post-petition distribution of SHRAP Tokens from Neon's treasury, and causing the Plaintiffs to incur significant costs and legal expenses to protect and enforce their contractual, equitable, and common law rights, has caused Plaintiffs substantial damage to be proved at trial.  The Debtor and the Individual Defendants have severely disrupted the contractual relationship between Neon and the Plaintiffs by knowingly and intentionally withholding the Plaintiffs' bargained for rights under the SAFEs, notwithstanding the tens of millions of dollars, and thousands of hours, invested by Plaintiffs in Neon.

89.     Moreover, the Defendants, none of whom have ever contributed a dollar or a meaningful thought to Shrapnel's development, improvement, and potential, have damaged the Plaintiffs through their knowing and intentional interference with the SAFEs and the investments made thereunder, and the Plaintiffs intend to recover the maximum damages at law, including those caused by the Debtor's post-petition tortious conduct, and including for any damages that may arise from third-party claims against the Plaintiffs brought by their counterparties, limited partners, or investors.

90.     If the Debtor and its appointees, the Individual Defendants, had not caused Neon to fail to perform under the SAFEs, the Plaintiffs would control a legitimate Board of Neon, in stark contrast to the present unauthorized Board.  The Plaintiffs, in turn, would not be forced to fight the Defendants' efforts to create a meritless windfall for 4D, a debtor that has never provided any financial or managerial support to Neon.  The Plaintiffs have invested millions of dollars and thousands of hours into Shrapnel, its Network, and the human capital at Neon.  The Defendants, as they continue to interfere with Neon's obligations and cause it to breach its promises to the Plaintiffs (and others), should be held to account for the substantial damages to the Plaintiffs as a result of their intentional dereliction of their duties as directors of the Company.

## FIRST CLAIM FOR RELIEF
### DECLARATORY JUDGMENT THAT NETWORK LAUNCH OCCURRED BY NO LATER THAN APRIL 29, 2023 (AGAINST ALL DEFENDANTS)

91.     Plaintiffs incorporate the foregoing allegations as if fully set forth herein.

92.     An actual, existing, and bona fide case and controversy exists regarding whether Network Launch has occurred.

93.     Plaintiffs contend that Network Launch, as defined in the SAFEs, occurred by no later than April 29, 2023.

94.     The Defendants contend that Network Launch has not occurred.

95.     Plaintiffs desire a judicial declaration and determination of the parties' respective interests and rights.

96.     A declaratory judgment is necessary and appropriate at this time so that the parties may know their interests and rights with respect to the composition of the Board.  A judicial declaration will eliminate uncertainties and controversies that might otherwise result in additional litigation.

## SECOND CLAIM FOR RELIEF
### DECLARATORY JUDGMENT THAT SAFES HAVE CONVERTED TO PREFERRED SHARES IN NEON MACHINE, INC. (AGAINST ALL DEFENDANTS)

97.     Plaintiffs incorporate the foregoing allegations as if fully set forth herein.

98.     An actual, existing, and bona fide case and controversy exists regarding whether preferred shares should issue to Griffin and Polychain.

99.     Plaintiffs contend that the preferred shares automatically issued 61 days after Network Launch—*i.e.*, by no later than July 29, 2023.

100.    The Debtor and the Individual Defendants contend that Network Launch

27

has not occurred, and thus that no shares should issue.

101.    Based on the occurrence of Network Launch, Neon must comply with its obligations under the SAFEs, including recognizing the automatic conversion of the SAFEs into preferred shares, and Neon must take all relevant corporate actions necessary to effectuate the conversion of the SAFEs and issuance of preferred shares.  Defendants, however, are using their purported control over Neon and not allowing those actions.

102.    Plaintiffs desire a judicial declaration and determination of the parties' respective interests and rights, including Neon's obligations under the SAFEs with respect to the automatic conversion of the SAFEs into preferred shares in Neon.

103.    A declaratory judgment is necessary and appropriate at this time so that the parties may know their interests and rights with respect to the composition of the Board.  A judicial declaration will eliminate uncertainties and controversies that might otherwise result in additional litigation.

### THIRD CLAIM FOR RELIEF
**DECLARATORY JUDGMENT THAT AUTOMATIC STAY IS INAPPLICABLE, OR, IN THE ALTERNATIVE, CAUSE EXISTS TO LIFT THE STAY, SUCH THAT NOMINAL DEFENDANT NEON MACHINE, INC. MAY COMPLY WITH ITS CONTRACTUAL OBLIGATIONS, ISSUE PREFERRED SHARES, AND RESOLVE ITS CORPORATE GOVERNANCE
(AGAINST ALL DEFENDANTS)**

104.    Plaintiffs incorporate the foregoing allegations as if fully set forth herein.

105.    An actual, existing, and bona fide case and controversy exists regarding whether the automatic stay prevents (a) non-debtor Neon from issuing preferred shares in compliance with its obligations under the SAFEs it entered into, and its Board approved, with Griffin and Polychain, among other counterparties to such agreements, and (b) non-debtors Griffin and Polychain then voting any shares in non-debtor Neon to replace or appoint non-debtor

directors and officers of Neon.

106.    Plaintiffs contend that the automatic stay under section 362 of the Bankruptcy Code is inapplicable to the relief requested herein, or, in the alternative, that cause exists to lift the stay such that, to the extent Network Launch occurred not later than April 29, 2023, and the SAFEs automatically converted into Neon preferred shares 61 days later, non-debtor Neon may take all corporate actions necessary to issue such preferred shares, and Griffin and Polychain, among other preferred shareholders, may exercise their rights as stockholders of Neon.

107.    Defendants contend that Network Launch has not occurred, and thus that no shares should issue.

108.    The Debtor has twice opposed Plaintiffs' motions before the Court for an order determining that the stay is inapplicable to the foregoing relief or, in the alternative, that cause exists to lift the stay.

109.    Plaintiffs desire a judicial declaration and determination of the parties' respective interests and rights.

110.    A declaratory judgment is necessary and appropriate at this time so that the parties may know their interests and rights with respect to the composition of the Board.  A judicial declaration will eliminate uncertainties and controversies that might otherwise result in additional litigation.

**FOURTH CLAIM FOR RELIEF**
**INTENTIONAL INTERFERENCE WITH CONTRACTUAL RELATIONS**
**(AGAINST ALL DEFENDANTS)**

111.    Plaintiffs incorporate the foregoing allegations as if fully set forth herein.

112.    Plaintiff Griffin and Neon are parties to SAFEs by which Griffin, in return for its investments in Neon, is entitled to preferred shares of Neon that automatically vest 61 days

after Network Launch.  The SAFEs are valid contracts between Griffin and Neon, and neither 4D

nor the Individual Defendants are a party to the SAFEs.

113.    Plaintiff Polychain and Neon are parties to SAFEs by which Polychain, in

return for its investments in Neon, is entitled to preferred shares of Neon that automatically vest

61 days after Network Launch.  The SAFEs are valid contracts between Polychain and Neon, and

neither 4D nor the Individual Defendants are a party to the SAFEs.

114.    The Individual Defendants were aware of the SAFEs between Neon and

Plaintiffs, and Defendant Javarone even voted in favor of a Board resolution ratifying these

SAFEs.  4D was aware of the SAFEs at all relevant times, having participated in the negotiation

of the SAFEs and appointed directors of Neon who approved of the SAFEs in Board resolutions.

115.    The SAFEs provide that "[i]f, by the date that is sixty (60) days after

Network Launch, (i) this instrument has not terminated and (ii) no Qualified Financing has

occurred, then, at 8:00 a.m. PT on the date that is sixty-one (61) days after Network Launch, this

instrument will ***automatically convert*** into that number of shares of a newly created series of the

Company's preferred stock" (emphasis added).

116.    Network Launch occurred by no later than April 29, 2023.

117.    Despite repeated requests, the Defendants have refused to take the required

and necessary actions for Neon to issue shares of preferred stock to Plaintiffs Griffin or Polychain.

118.    4D and the Individual Defendants have repeatedly refused to cause Neon to

honor its obligation to perform under the SAFEs. 4D and the Individual Defendants have

intentionally ignored Plaintiffs' demands that Network Launch be recognized, instead withholding

the Plaintiffs' preferred equity in Neon; withholding Plaintiffs' additional seats on Neon's board

of directors without authority; appointing post-petition a director to a board seat without authority;

demanding that Neon, through its illegitimate board, liquidate the SHRAP tokens in its treasury

instead of performing under the SAFEs ratified by Neon's board years ago; and ignoring the

Plaintiffs' position that Neon's present board is unlawfully constituted and illegitimate.

119.    4D and the Individual Defendants caused Neon to breach the SAFEs by not

recognizing Network Launch and conversion of the SAFEs to preferred shares, and the contractual

relationship between Neon and the Plaintiffs has been significantly disrupted by the Defendants'

intentional pre-petition and post-petition misconduct.

120.    Plaintiffs have been, and are, damaged, in an amount to be proven at trial, as

a result of the Defendants' interference with the automatic contractual rights provided by the

SAFEs, including the post-petition conduct of 4D.

**FIFTH CLAIM FOR RELIEF**
**FRAUD IN THE INDUCEMENT**
**(AGAINST THE 4D FACTORY LLC AND CORT JAVARONE)**

121.    Plaintiffs incorporate the foregoing allegations as if fully set forth herein.

122.    On or about September 29 and 30, 2021, Griffin and Polychain, respectively,

entered into SAFEs with Neon whereby Griffin and Polychain invested a total of $8,000,000 into

Neon Machine in exchange for the contractual promises contained in the SAFEs.

123.    On February 16, 2023 Griffin entered into SAFEs with Neon, whereby

Griffin invested an additional $4,347,826.  On March 2, 2023, Polychain entered into SAFEs with

Neon, investing an additional $5 million dollars.  These SAFEs were approved by Neon's Board.

124.    Prior to executing the SAFEs, Griffin and Polychain negotiated the material

terms of the SAFEs with Neon as well as representatives of 4D.

125.    Specifically, Griffin and Polychain negotiated with 4D, through its counsel,

the automatic conversion of their SAFEs into preferred shares of Neon 61 days following the

31

occurrence of Network Launch.

126.    Griffin and Polychain also negotiated with 4D, through its counsel, prior to the execution of the SAFEs, the definition of Network Launch included in the SAFEs.

127.    4D, having negotiated the provisions of the SAFEs, through it counsel, understood the SAFEs to be valid, enforceable agreements, and that their express terms would be performed by the Plaintiffs and Neon, respectively, such that after 61 days following Network Launch, 4D's purported equity interest in Neon would be substantially diluted based upon the millions of dollars and countless hours invested into Neon by the Plaintiffs.

128.    4D, having negotiated the provisions of the SAFEs, through it counsel, understood that it could not in good faith cause Neon to breach the very contracts it assisted in negotiating for the benefit of Neon and the Plaintiffs by maintaining illegitimate control of Neon's Board and refusing to cause Neon to comply with the SAFEs.

129.    4D was enthusiastic that Griffin and Polychain would invest capital in Neon and represented that 4D approved the execution of the SAFEs and the obligations therein including that upon automatic conversion, 4D's interest in Neon (if any) along with all other then-present equity holders, would necessarily be diluted.

130.    The 4D approval and representation to Griffin and Polychain were material because 4D represented that it was a shareholder of Neon and, upon automatic conversion, its equity interests (if any) would necessarily be reduced.

131.    Griffin and Polychain necessarily relied on 4D's representation in making their decision to execute the SAFEs and invest millions of dollars into Neon.  The representations induced Griffin and Polychain to execute the SAFEs.

132.    4D and Javarone, however, never intended to abide by their representations.

32

Instead, 4D and Javarone wanted Griffin and Polychain to invest their capital and devised a scheme whereby 4D would reap the financial benefits of the investment for their own gain and, notwithstanding any future occurrence of Network Launch, would refuse to recognize Network Launch and would attempt to leverage illegitimate control of Neon for the benefit of 4D and its stakeholders only.

133.    Network Launch occurred on April 29, 2023.

134.    By the terms of the SAFEs, Griffin's and Polychain's SAFEs automatically converted to preferred shares of Neon.

135.    However, on October 5, 2023, more than three months after the automatic conversion occurred, 4D and defendant Javarone, as well as defendant Honour, rejected the automatic conversion, refused to accept that Network Launch occurred, and refused to effectuate the corporate actions necessary to formalize Griffin's and Polychain's preferred shares.

136.    Griffin and Polychain were damaged as a result of this conduct in an amount to be proven at trial.

**SIXTH CLAIM FOR RELIEF**
**FRAUD**
**(AGAINST THE 4D FACTORY LLC AND CORT JAVARONE)**

137.    Plaintiffs incorporate the foregoing allegations as if fully set forth herein.

138.    In August 2023, defendant Javarone, on behalf of 4D, approached Griffin and represented to Griffin that it was a 60% holder of Neon's equity, which 4D was attempting to sell.

139.    At this meeting, 4D represented that this was a "majority" of the common shares of Neon.

140.    These representations, which were also conveyed to Polychain, were

33

materially false when made because 4D never paid consideration for the 6,000,000 shares of common stock it was offered in August of 2021. As such, 4D was not a shareholder at all, let alone a majority shareholder, and 4D knew it had never paid for its purported shares.

141. Nevertheless, 4D and defendant Javarone persisted in their fraud to exert undue and illegitimate control over Neon in a concerted effort to obtain a financial windfall. Based on its representations that it was a shareholder with 60% of the common shares in Neon, 4D replaced Mark Long as a director and replaced him with defendant Honour.

142. After the filing of its bankruptcy petition, 4D persisted in intentionally refusing to acknowledge Network Launch, and it replaced Ned Sherman with defendant Horowitz on Neon's board of directors, notwithstanding its knowledge that it no longer controlled the two "common stock" director seats on Neon's board.

143. Defendants Honour and Horowitz are members of 4D, as is defendant Javarone, and, on information and belief, all of the Individual Defendants will financially benefit if 4D obtains a financial windfall through fraudulent manipulation of its purported interests in Neon. Despite knowing that 4D never purchased any shares in Neon and that 4D assisted in negotiating the SAFEs, which bound Neon to issue preferred shares to the Plaintiffs upon the occurrence of Network Launch, thereby diluting 4D's interest in Neon, 4D and defendant Javarone continue to do intentional acts to maintain illegitimate control of Neon's board of directors.

144. On January 4, 2024, 4D demanded distribution of 480,927,488 treasury tokens to 4D via a cryptocurrency wallet that 4D would provide under the guise of a turnover claim under section 542 of the Bankruptcy Code. This amount of SHRAP tokens claimed by 4D was not supported by any agreement with Neon. 4D knowingly made its demand after having admitted that its equity interest in Neon was subject to dilution, but it knowingly refused to recognize

34

Network Launch.  On January 9, 2024, the Individual Defendants then noticed a "special meeting of the board" of Neon for January 12, 2024, and at that meeting, and in spite of the inherent conflicts and looking only to line their own pockets, approved the distribution of the 480,927,488 SHRAP tokens to 4D (again, which each Individual Defendant owns units in).

145.    Griffin and Polychain have been, and continue to be harmed by 4D's and defendant Javarone's fraud.  Griffin and Polychain were denied their rights under the SAFEs, and refused their controlling positions of Neon's Board because 4D was never a majority shareholder of Neon.

146.    The fraud has wreaked havoc on Neon's operations and reduced the value of Griffin's and Polychain's financial investment in Neon in an amount to be proven at trial.

### SEVENTH CLAIM FOR RELIEF
### AIDING AND ABETTING FRAUD
### (AGAINST SCOTT HONOUR AND STEVE HOROWITZ)

147.    Plaintiffs incorporate the foregoing allegations as if fully set forth herein.

148.    Defendant Scott Honour was appointed by 4D to serve as a member of Neon's Board on or about August 22, 2023 after 4D improperly caused Mark Long to be removed as a Board member.

149.    Defendant Steve Horowitz was appointed by 4D to Neon's Board in or around November 2023, to serve as a director following the resignation of Ned Sherman.

150.    Defendants Honour and Horowitz are significant indirect, and direct, respectively, equity holders in 4D.

151.    On information and belief, defendants Honour and Horowitz knew that 4D never complied with its obligations under the Stock Purchase Agreement, [10] never paid

---

[10] The Stock Purchase Agreement is attached hereto as **Exhibit K**.

consideration for any common shares in Neon, let alone consideration for 6,000,000 common shares, never invested any money in Neon at all, never executed any contract for SHRAP Tokens, or paid any money to obtain SHRAP Tokens. Nevertheless, defendants Honour and Horowitz actively participated in a scheme, as more fully alleged above, to defraud Griffin and Polychain of their rights under validly executed and binding SAFEs, including by holding illegitimate Board meetings and trying to force the distribution of millions of SHRAP treasury tokens to 4D that it has no right to, based on material misrepresentations.

152.    To be clear, 4D and defendant Javarone could never have executed their fraud but for the efforts of defendants Honour and Horowitz. Defendants Honour and Horowitz voted in favor of gutting Neon of treasury tokens to reap a financial windfall for 4D—an entity in which both defendants Honour and Horowitz hold significant equity investments.

153.    Griffin and Polychain were damaged by their fraudulent conduct in an amount to be proven at trial.

## EIGHTH CLAIM FOR RELIEF
### CONVERSION
### (AGAINST THE 4D FACTORY LLC)

154.    Plaintiffs incorporate the foregoing allegations as if fully set forth herein.

155.    Griffin and Polychain are the rightful majority shareholders of Neon.

156.    Network Launch occurred on April 29, 2023 and the automatic conversion of the SAFEs to preferred shares occurred on June 29, 2023.

157.    4D participated in negotiations of the material terms of the SAFEs and was aware of Griffin's and Polychain's possessory right and interest in Neon.

158.    4D asserted, improperly, dominion over Griffin's and Polychain's property interest and interfered with it by causing the Individual Defendants to refuse to acknowledge or

36

accept the occurrence of Network Launch, the automatic conversion to preferred shares on June 29, 2023, and their obligation to cause Neon to undertake the corporate formalities to formalize Griffin's and Polychain's interest.

159.    Griffin and Polychain have been damaged by the conversion of their respective interests in an amount that exceeds more than $17 million, to be proven at trial.

**NINTH CLAIM FOR RELIEF**
**VIOLATION OF CAL. BUS. & PROF. CODE § 17200, *et seq*.**
**(AGAINST THE 4D FACTORY LLC)**

160.    Plaintiffs incorporate the foregoing allegations as if fully set forth herein.

161.    California's Unfair Competition Law ("UCL"), Cal. Bus. & Prof. Code § 17200 *et seq*. defines "unfair business competition" to include any "unlawful, unfair, or fraudulent" act or practice as well as any "unfair, deceptive, untrue or misleading" advertising. Cal. Bus. Prof. Code § 17200.

162.    The UCL imposes strict liability.  Plaintiffs need not prove intentional or negligent conduct, but only that such practices occurred.

163.    4D engaged in a business act or practice that is unfair.  A business act or practice is "unfair" under the UCL if it offends an established public policy or is immoral, unethical, oppressive, unscrupulous or substantially injurious to consumers, and that unfairness is determined by weighing the reasons, justifications, and motives of the practice against the gravity of the harm.

164.    4D's actions constitute unfair business acts and/or practices because, as alleged herein, 4D engaged in misleading and deceptive tactics in connection with its involvement in Neon.  4D made false and misleading representations that it approved and accepted the SAFEs only to later reveal it never intended to comply, and in fact, took actions to cause Neon to breach the obligations thereunder.  4D further acted immorally and unscrupulously in causing its

37

representatives to effectuate illegitimate control over Neon despite never paying consideration for any shares in Neon. 4D further acted immorally and unscrupulously in directing its representatives to refuse to accept the unassailable truth that Network Launch occurred.

165.    The harm to Griffin and Polychain outweighs the utility to 4D's acts and business practices.

166.    4D's actions constitute a fraudulent business act or practice because under the UCL it is likely to deceive members of the public. Griffin and Polychain relied on 4Ds false and misleading promises and representations regarding the SAFEs, 4D's (nonexistent) equity interest in Neon, and its intentions to act in the best interest of Neon through its appointed directors. None of this was true.

167.    4D's actions constitute an unlawful business act and/or practice as they have violated state and federal law. The Federal Trade Commission's ACT ("FCTA") prohibits "unfair or deceptive acts or practices in or affecting commerce" and similarly prohibits the dissemination of any false advertisements. *See* 15 U.S.C. § 45; § 52(a). Similarly, California False Advertising Law, Prof. Code § 17500 prohibits false and deceptive advertising. 4D falsely advertised that it had acquired rights in various games and studios and that it was developing videogames pursuant to those licensing rights. These claims were false. But further, 4D advertised that it was a majority equity holder in Neon. It was not. Despite executing a Stock Purchase Agreement, it never paid any consideration.

168.    4D's conduct and actions have misled Griffin and Polychain and the public and will continue to mislead in the future. Consequently, 4D's acts and business practices constitute an unfair, fraudulent, and unlawful act or business practices under the meaning of the UCL.

169.    4D's violation of the UCL, through its unfair, fraudulent, and unlawful

38

business acts and practices are ongoing and present a continuing threat to the public who will be deceived by 4D's conduct.

170.    Pursuant to the UCL, Griffin and Polychain are entitled to injunctive relief to cause 4D to cease its unfair competition, as well as disgorgement and restitution to Griffin and Polychain.

### TENTH CLAIM FOR RELIEF
### UNJUST ENRICHMENT
### (AGAINST ALL DEFENDANTS)

171.    Plaintiffs incorporate the foregoing allegations as if fully set forth herein.

172.    Defendants took improper actions to cause Neon's Board to confer possessory and ownership rights in 480,927,488 SHRAP tokens to 4D that 4D never owned, never had any right to acquire, and never did acquire.  4D never paid a single cent to Neon, let alone any consideration for any common shares in the Company or any SHRAP tokens that Neon holds in its treasury.

173.    This constitutes an unjust enrichment to Defendants that is plainly at the expense of Griffin and Polychain.  To wit, Griffin and Polychain invested more than $17 million in Neon, and are the rightful holders of the right to appoint the majority of Neon's Board.

174.    Equity and good conscious do not permit 4D to retain the 480,927,488 SHRAP tokens, which is an unconscionable and unjust financial windfall.[11]

### PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs respectfully request that the Court:

175.    Enter an order declaring that under the SAFEs, Network Launch occurred

---

[11]  The Plaintiffs' expressly reserve their right to seek administrative expense priority for any amounts alleged in this action.

not later than April 29, 2023.

176.    Enter an order declaring that, given the occurrence of Network Launch, the SAFEs have automatically converted to preferred shares in Neon, and Neon shall take all corporate actions required to recognize that conversion.

177.    Enter an order declaring that the Individual Defendants shall comply with the terms of the SAFEs and, as necessary, effectuate all corporate actions required to create the preferred shares of Neon.

178.    Enter an order declaring that the automatic stay is inapplicable to the foregoing relief and such other relief related to Neon's corporate governance, including that holders of Neon's preferred shares may convert such shares to common stock and exercise their rights as common stockholders in Neon to appoint and/or replace directors and officers of Neon, as applicable.

179.    Enter an order for a permanent injunction against Defendant 4D to cease its unfair competition pursuant to Cal. Bus. & Prof. § 17200 *et seq*.

180.    Enter judgment in favor of Plaintiffs and against Defendants in an amount to be proven at trial.

181.    Award compensatory damages against Defendants and in favor of Plaintiffs, for the substantial harms that Defendants have caused since the SAFE conversions should have been recognized, including as a result of post-petition conduct of the Debtor.

182.    Award Plaintiffs their reasonable litigation expenses and attorneys' fees; and

183.    Award such other and further relief as equity and justice may require.

Dated:  March 26, 2024                    PAUL HASTINGS LLP
        New York, New York


                                          */s/ Avram E. Luft*

                                          Avram E. Luft
                                          **PAUL HASTINGS LLP**
                                          200 Park Avenue
                                          New York, New York 10166
                                          Telephone:    (212) 318-6000
                                          Facsimile:    (212) 319-4090
                                          Email:  aviluft@paulhastings.com

                                          Justin Rawlins
                                          Edward Han
                                          Timothy D. Reynolds
                                          **PAUL HASTINGS LLP**
                                          1999 Avenue of the Stars, 27th Floor
                                          Century City, California 90067
                                          Telephone:    (310) 620-5700
                                          Facsimile:    (310) 620-5899
                                          Email:  justinrawlins@paulhastings.com
                                                  edwardhan@paulhastings.com
                                                  timothyreynolds@paulhastings.com

                                          *Counsel to Mark Long, Colin Foran, Naomi Lackaff, Aaron
                                          Nonis, Don Norbury, Mark Yeend, Calvin Zhou, Polychain
                                          Ventures II LP, Polychain Ventures II (Parallel) LP, Griffin
                                          Gaming Partners II, L.P., Griffin Gaming Partners II Side
                                          Fund, L.P., Pierre-Edouard Planche, Ben Perszyk, and Josh
                                          Rosenthal*

41