# Exhibit 1

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**
--------------------------------------------------------------------X
In re:

4D FACTORY, INC., et al.,

                                         Debtors. [1]

Chapter 11
(Subchapter V)
Case No.: 23-11618 (MEW)
(Jointly Administered)

--------------------------------------------------------------------X
THE 4D FACTORY LLC and
NEON MEDIA LLC,

                                         Plaintiffs,

        -against-

Adv. Pro. No. 24-01319 (MEW)

MARK LONG, COLIN FORAN,
NAOMI LACKAFF, AARON NONIS,
DON NORBURY, MARK YEEND,
CALVIN ZHOU, GRIFFIN GAMING
PARTNERS II, L.P., GRIFFIN GAMING
PARTNERS II SIDE FUND, L.P., POLYCHAIN
VENTURES II LP, POLYCHAIN VENTURES II
(PARALLEL) LP, PIERRE-EDUOARD
PLANCHE, BENJAMIN PERSZYK,
JOSH ROSENTHAL, ARGON PROTOCOL
FOUNDATION, ARGON ASSET VENTURES
CORP., and NEON MACHINE, INC.,

**THE 4D FACTORY, LLC.'S VERIFIED**
**SECOND-AMENDED COMPLAINT,**
**CORT JAVARONE, SCOTT HONOUR,**
**AND STEVE HOROWITZ'S ORIGINAL**
**COUNTERCLAIMS, AND NEON**
**MEDIA LLC'S ORIGINAL**
**COMPLAINT**

                                         Defendants,

                and

CORT JAVARONE, SCOTT HONOUR,
AND STEVE HOROWITZ

                                         Counterclaimants.

--------------------------------------------------------------------X

_____

[1] The Debtors in these Chapter 11 Cases, along with the last four digits of each Debtors' federal tax identification number, are 4D Factory Inc. (6770), and The 4D Factory LLC (8935).

1

1.      Plaintiff The 4D Factory LLC as co-debtor and debtor-in-possession with 4D

Factory, Inc. (together "4D" or "4D Factory") in the chapter 11 cases[2] brings this second-amended

complaint against:

(1) Mark Long, Colin Foran, Naomi Lackaff, Aaron Nonis, Don Norbury, Mark Yeend,
Calvin Zhou (the "Manager Defendants");

(2) Griffin Gaming Partners II, L.P., and Griffin Gaming Partners II Side Fund, L.P.
(together, "Griffin"), Polychain Ventures II LP and Polychain Ventures II (Parallel) LP
(together, "Polychain"), Pierre-Eduoard Planche, Benjamin Perszyk, and Josh
Rosenthal (together with Griffin and Polychain, the "Fund Defendants"); and

(3) Neon Machine, Inc., Argon Protocol Foundation ("Argon Foundation") and Argon
Asset Ventures Corp. ("Argon Corp.,").

2.      Also included are the original counterclaims of Cort Javarone against Neon

Machine, Inc., and Neon Media LLC's original claims against Neon Machine and the Manager

Defendants.[3]

**Nature of the Complaint**

3.      *Shrapnel* is a revolutionary first-person shooter game with its own cryptocurrency

and user-generated content, a first in the videogame industry. The game's storyline centers around

an asteroid that collides with the moon, perpetually hurling asteroid shrapnel toward Earth in a 500

km-wide band around the planet. For people's safety, this shrapnel-impact zone was originally

quarantined and protected by contracted guards. But when it was discovered that the shrapnel

contained precious elements, the guards transformed into mercenaries—attacking anyone who got

in their way to extract as much wealth for themselves as possible.

---

[2] The chapter 11 cases are captioned In re 4D Factory, Inc., *et al.*, Case No. 23-11618 (MEW) in
the United States Bankruptcy Court for the Southern District of New York.

[3] The term "Defendants" refers to all Defendants collectively and individually.

4.      The facts of this case summon the adage that life imitates art. The *Shrapnel* game originated from Mark Long and his team of Manager Defendants under the umbrella of Neon Media. Long and other Manager Defendants worked for Neon Media—with many, including Long, serving as officers and directors charged with fiduciary duties to guard its business interests. But when Long and his team realized that *Shrapnel* could be worth hundreds of millions of dollars overnight by issuing its own cryptocurrency, these Manager Defendants switched from guarding those interests to attacking them.

5.      Led by Long, the Manager Defendants secretly started a new entity to develop the game, Neon Machine. They then found new financial backers, Griffin and Polychain. And then they lured Neon Media's manager and majority owner, 4D Factory, to transfer over to Neon Machine the *Shrapnel* intellectual property that Neon Media had owned. The lure here required 4D Factory to become a 60% owner of Neon Machine and receive three of its five board seats along with a 60% share in crypto-tokens and the Manager Defendants' share of any dividends (including tokens) until 4D recouped its Neon Media capital investment.[4] While that was the deal, the Defendants never intended to honor it.

6.      As soon as Long believed the *Shrapnel* IP was transferred, before 4D Factory was even added to Neon Machine's board, he gave himself, the other Manager Defendants, and Griffin and Polychain about a billion *Shrapnel* tokens without telling 4D Factory, let alone obtaining its blessing. They also granted Griffin and Polychain future equity that would dilute 4D's ownership in Neon Machine from a majority interest to a minority one. Then, to add insult to injury, they insisted that 4D Factory is entitled to no tokens whatsoever. And when 4D kept asking questions

---

[4] Long sought out 4D to fund his startup, Neon Media, after his team was laid off by HBO. 4D invested over $6 million in Long, his team, and Neon Media's projects—sharing 40% of the Company with Long and his team, even though they'd contributed no assets to their startup.

and seeking transparency into Neon Machine's acts, the Manager Defendants ignored them and *sued* 4D Factory and its directors.

7.    To date, Mark Long and the Manager Defendants along with Griffin and Polychain have extracted over a billion tokens from Neon Machine, a majority ownership interest in the company, control over its board, and the rights to develop *Shrapnel*.[5] Meanwhile, 4D Factory is in bankruptcy. The following explains why the Court should redress that injustice.

**The Parties**

8.    Plaintiff The 4D Factory LLC is, and was at all times, a limited liability company formed under the laws of Wyoming. Plaintiff, along with 4D Factory, Inc., are debtors and debtors-in-possession in chapter 11 cases.

9.    Cort Javarone resides in New York, NY. He is the CEO and Managing Member of Debtors 4D Factory Inc., and The 4D Factory LLC, and the Manager of Neon Media LLC.

10.    Neon Media LLC is a limited liability company organized under the laws of Washington. Its sole member is The 4D Factory LLC.

11.    Defendant Mark Long resides in Seattle, WA. He's currently a director and CEO of Neon Machine and a minority shareholder. Long was a member, director, and officer at Neon Media from 2020 until he abandoned it in 2022 and abandoned his ownership in April 2023.

12.    Defendant Colin Foran resides in Seattle, WA. He's Chief Creative Officer of Neon Machine and a minority shareholder. He was a member and officer at Neon Media from 2020 until he abandoned it in 2022 and abandoned his ownership in April 2023.

---

[5] Earlier in 2024 SHRAP tokens were trading at $0.40 per token.

13.    Defendant Naomi Lackaff resides in Seattle, WA. Lackaff is Neon Machine's Head of Partnerships and a minority shareholder. She was a member and officer at Neon Media from 2020 until she abandoned it in 2022 and abandoned her ownership in April 2023.

14.    Defendant Aaron Nonis resides in Seattle, WA. Nonis is the Chief Operating Officer of Neon Machine and a minority shareholder. He was a member and officer at Neon Media from 2020 until he abandoned it in 2022 and abandoned his ownership in April 2023.

15.    Defendant Don Norbury resides in Seattle, WA. He is the Chief Technical Officer of Neon Machine and a minority shareholder. Norbury was a member, director, and officer at Neon Media from 2020 until he abandoned it in 2022 and abandoned his ownership in April 2023.

16.    Defendant Mark Yeend resides in Seattle, WA. Yeend is the Chief Marketing Officer of Neon Machine and a minority shareholder. He was a member and officer at Neon Media from 2020 until he abandoned it in 2022 and abandoned his ownership in April 2023.

17.    Defendant Calvin Zhou resides in Glendale, CA. Zhou is the Head of Business Development at Neon Machine and a minority shareholder.

18.    Defendant Griffin Gaming Partners II, L.P. is a Delaware limited partnership with its principal place of business in Santa Monica, California.

19.    Defendant Griffin Gaming Partners II Side Fund, L.P. is a Delaware limited partnership with its principal place of business in Santa Monica, California.[6]

20.    Defendant Polychain Ventures II LP is a Delaware limited partnership with its principal place of business in San Francisco, California.

---

[6] Any references to Griffin include Griffin's affiliates and subsidiaries.

21.    Defendant Polychain Ventures II (Parallel) LP is a Delaware limited partnership with its principal place of business in San Francisco, California.[7]

22.    Defendant Pierre-Eduoard Planche is a partner at Griffin and serves as Griffin's director on the Board of Neon Machine.

23.    Defendant Benjamin Perszyk was a partner at Polychain and served as Polychain's director on the Board of Neon Machine from January 26, 2022 until he resigned in September 11, 2023. He's now an employee at Neon Machine.

24.    Defendant Josh Rosenthal is a partner at Polychain and began serving as Polychain's director on the Board of Neon Machine upon Perszyk's resignation.

25.    Neon Machine is a Delaware corporation with its principal place of business in Seattle, WA.

26.    Argon Protocol Foundation is a Panamanian foundation created by and operated at the direction of Neon Machine. Argon Foundation is named because it may hold or control estate property that Plaintiff seeks to recover.

27.    Argon Asset Ventures Corp. is a Panamanian corporation created by and operated at the direction of Neon Machine. Argon Corp. is named because it may hold or control estate property that Plaintiff seeks to recover.

28.    Andrew Grossman, Esq., a non-party mentioned in this complaint, resides in Pacific Palisades, CA. Grossman is a member of 4D. He was Plaintiff's general counsel until 2023, and has concurrently been counsel for Neon Machine since mid-2021.

---

[7] Any references to Polychain include Polychain's affiliates and subsidiaries.

## Jurisdiction and Venue

29.     The Court has jurisdiction under 28 U.S.C. §§ 157 and 1334. This is a core proceeding under § 157(b)(2). Plaintiff consents to the Court's final orders and judgment.

30.     Venue is proper under 28 U.S.C. §§ 1408 and 1409. The statutory predicates for the relief requested here are §§ 541, 542 and 1107(a) of the Bankruptcy Code and Federal Rule of Bankruptcy Procedure 7001.

31.     This adversary proceeding is commenced under Rules 7001(1), 7001(9), and 7003 of the Federal Rules of Bankruptcy Procedure and §§ 541 and 542 of the Bankruptcy Code.

## Procedural History

32.     On October 10, 2023, the Debtors filed voluntary petitions for relief under Subchapter V of chapter 11 of the Bankruptcy Code.  Plaintiff continues in existence as a debtor-in-possession under Bankruptcy Code 11 U.S.C. §1184.

## Background

### A.  4D Factory and the Managers Defendants team up at Neon Media to develop *Shrapnel*.

33.     Around March 2020, Mark Long reached out to 4D Factory to seek funding for his new company, Neon Media. Long knew Cort Javarone and 4D and had briefly worked for 4D before abandoning that job to take a job at HBO. Neon Media was formed by Long around that time after he and his team, including the other Manager Defendants, were laid off from HBO. Each Manager Defendant reported directly to Long. Long represented to 4D Factory that Neon Media could use brands from HBO's parent, Warner Brothers, to develop video games, and that Neon Media already secured both funding and marketing resources to move forward on such a project.

34.     On July 20, 2020, 4D Factory and Neon Media entered into an Amended and Restated Limited Liability Company Operating Agreement, under which 4D Factory would serve as Neon Media's sole Manager and committed to invest $2,300,000 in total capital contributions

7

as needed, in exchange for 60% equity in the company. Each Manager Defendant (except Zhou) and 4D Factory would constitute "Members" of Neon Media, and entered into "Membership Agreements," which provided them ownership units in the company.[8] 4D Factory agreed to the team being granted 40% of the equity units, subject to three-year vesting under agreements committing their full-time employment to Neon Media.

35.    The Membership Agreements specified that any developed intellectual property—*including game designs, game concepts, inventions, and business plans*—were Neon Media's property. The agreements also included a provision barring the employee/members from indirectly or directly competing with Neon Media—especially where the employee/member's disloyalty relied on company confidential information or which competed in any markets in which Neon Media did business or planned to do business.

36.    Six months after closing on the Operating Agreement, Long requested that Neon Media immediately start developing a video game based on *Foundation* (the science-fiction book series by Isaac Asimov) rather than any Warner Bros. brand. Long also informed 4D Factory that Neon Media would need over $10 million in extra funding to develop this game, yet he had secured no funding sources. On February 12, 2021, 4D Factory began funding the budget to produce *Foundation*. It has invested over $4 million to date.

37.    In March 2021, 4D Factory approved the development of another of Long's projects at Neon Media, *Shrapnel*, a first-person-shooter video game with a cryptocurrency component. Long pitched the project to 4D Factory, Neon Media's controlling shareholder, on the basis that it would be funded by issuing crypto tokens, the SHRAP Token, bringing tens of millions in non-

---

[8] Long's agreement, which is largely identical to the other Manager Defendants', is attached as **Exhibit Q**.

dilutive capital into Neon Media. Long represented at this time to 4D Factory, through Javarone, that 4D Factory and Manager Defendants would receive SHRAP Tokens based on and *pro rata* with their respective ownership of Neon Media—meaning 4D Factory would receive the largest share due to its 60% ownership.

38.    In a May 13, 2021 email, Zhou confirmed to 4D Factory that, due to its equity in Neon Media, it would be entitled to at least 342,222,222 SHRAP Tokens based on the then-current tokenomics model, with a potential cash value of up to about $598 million—indicating the tokens would be Plaintiff's with the label "4D Token." Along with showing the amount and projected values at different prices of 4D Factory's total holdings, the table also showed the "Per Month (24 Month Vesting in $m)" value that would become available to 4D Factory every month. This would only be possible with accessible SHRAP tokens delivered to 4D Factory's wallet—*i.e., tokens actually conveyed to 4D Factory*. Nine days later, on May 22, 2021, Zhou emailed 4D Factory again with a capitalization table repeating the 342,222,222 SHRAP Tokens number.[9]

39.    Throughout spring and summer 2021, Zhou advised Javarone that more SHRAP Tokens would be available for purchase by investors. 4D Factory confirmed its interest in getting more. But Zhou questioned why it would want to when it was being granted so many already.

40.    Around June 2021, the Manager Defendants drafted a marketing presentation (the "June 2021 Deck") that proposed a high-level breakdown of the SHRAP "tokenomics." The June 2021 Deck specifically described a "*Shrapnel* Treasury," which comprised tokens allocated to development costs and a rewards program. The Manager Defendants did not represent to 4D Factory then—or at any other time until well after 4D Factory caused Neon Media to turn over its valuable IP—that any of 4D's rights to SHRAP Tokens would fall into this category.

---

[9] Zhou's communications and attachments to same are attached hereto as **Exhibit A**.

41.    In an email on August 4, 2021 (one day after Neon Machine Inc. was secretly formed by Long), Long predicted in a chart tracking comparable tokens in other blockchain games that the SHRAP Token could have a $200 million fully diluted market capitalization at listing, based on a price of $0.06667 per token.

**B.  The Managers Defendants induce 4D Factory to let them start Neon Machine.**

42.    The original intent was for *Shrapnel* to be developed at Neon Media, and indeed the project got its start there. In August 2021, however, Long shifted his plan and pushed to create a separate entity to develop *Shrapnel*. In mid-August 2021, he approached 4D's Factory's then-Chairman, Jonathan Miller, to make this proposal. Long pitched to Miller that the equity and control of this new entity, Neon Machine, would mirror Neon Media's control and economics, in which 4D Factory held 60% equity and Javarone served as sole Manager—making Neon Machine a "controlled subsidiary." Long also represented that the sale of SHRAP Tokens would fund Neon Machine, and if any additional financing were needed, he'd refer any interested parties to 4D Factory to negotiate deal terms.

43.    Miller indicated that he would support 4D Factory approving the structure if Neon Machine was a "controlled subsidiary." After Miller recommended that approach to Javarone, 4D Factory consented to the creation of Neon Machine contingent on this control arrangement.

44.    But, without notifying 4D Factory, Long had already filed a Certificate of Incorporation forming Neon Machine in Delaware on August 3, 2021—essentially usurping what would otherwise be a Neon Media opportunity.  On the same day, Long issued Promissory Notes on Neon Machine's behalf to each Manager Defendant, including himself, for supposed loans they'd made to Neon Machine *while employees and officers of Neon Media*.

45.    On August 20, 2021, Long adopted Neon Machine's bylaws without notice to or consent of 4D Factory or Neon Media (the "Bylaws"). Those Bylaws and their correlating board

resolution—all executed by Long alone while he was still CEO, a director, paid employee, and a shareholder of Neon Media and bound by his Member Agreement—established him as the only director of Neon Machine's board and as the "President, Chief Executive Officer, Chief Financial Officer, Treasurer, Secretary" despite his commitment to set up Neon Machine's control structure to "mirror" Neon Media's.[10]

46.    Around that same time, Long began to engage with 4D Factory's in-house counsel, Grossman, and ultimately retained him as general counsel for Neon Machine. That concurrent representation was undertaken without advising Neon Media or 4D Factory of any potential conflicts. Unbeknownst to 4D Factory, Grossman apparently acted at Long's direction, despite his continuing employment by 4D Factory—duping his client into believing he was overseeing Long's transactions and looking out for 4D's interests when in fact he was conflicted and disloyal.

**C.  With Neon Machine needing the *Shrapnel* IP from Neon Media to develop the game, Long brokers a deal with 4D Factory .**

47.    Despite representing that SHRAP Tokens would fund Neon Machine and that he'd refer any interested parties to 4D Factory (as Neon Media largest shareholder) to negotiate more financing, Long negotiated funding with Griffin and Polychain without telling 4D Factory or Neon Media.  Then on September 2, 2021, he presented to 4D Factory and Neon Media *for the first time* a funding deal with Griffin and Polychain, where both would fund $8 million to Neon Machine, as a "fait accompli." Norbury, Zhou and Grossman were copied on this email. Long presented the deal between Neon Machine, Griffin, and Polychain as substantially finalized, without 4D Factory's involvement.

48.    The deal Long negotiated with Griffin and Polychain required 4D Factory to transfer the *Shrapnel* IP from Neon Media to Neon Machine. In the September 2, 2021 email, Long

---

[10] The Bylaws and the Board resolution are attached as **Exhibits B** and **C**.

represented to 4D Factory that, as 60% shareholder of Neon Machine, it would retain control of three seats (the "4D Directors"): "3 for Neon/4D [both of which Plaintiff controlled], 2 for Griffin/Polychain, plus 1 observer from Griffin." Long also represented in the email that he intended to schedule "day long monthly board meetings" including Griffin and Polychain. He then said: **"So, I believe we have an agreement in principle."**[11]

49.     This "agreement in principle" had not been previously run by or approved by 4D Factory. But after discussions, 4D Factory as majority shareholder of Neon Media, agreed to cause the transfer of the *Shrapnel* IP so long as it received certain rights in exchange: (a) a 60% equity stake in Neon Machine with all rights thereto, including 3 of 5 Board seats; (b) confirmation that it would receive its pro rata share of SHRAP Tokens based on its 60% equity position; and (c) an assignment to it of any dividends that Manager Defendants receive from Neon Machine, including receipt of tokens, until it recovers its capital investment in Neon Media, which at the time exceeded the $2.3 million 4D had originally agreed to. Long also promised to Javarone, in his individual capacity, future interests in 16 million SHRAP Tokens, as compensation for his services as an advisor to and director of Neon Machine.  Since Long assumed he would sit in one of 4D/Neon's Board seats, to assuage 4D Factory's concerns and secure its approval of the structure, Long confirmed on a call with Javarone and Miller that he would commit to vote with the other 4D Directors on Board decisions.

**D.  The Parties enter into an agreement contingent on 4D Factory receiving SHRAP Tokens and dividends to pay back its investment.**

50.     With this agreement in place, the parties entered into a series of integrated transactions to memorialize the deal. Grossman provided the forms of the IP Transfer Agreement

---

[11] Long's September 2, 2021 email is attached as **Exhibit D**.

and the Recoupment Agreements (both as defined below) in the same email dated September 23, 2021. Each was signed or agreed to by consent of the Members of Neon Media (Manager Defendants) simultaneously around October 1, 2021.

51.     First, 4D Factory, Neon Machine, and each Manager Defendant entered into Assignment of Rights to Dividends Agreements (the "Recoupment Agreements"). The form of Recoupment Agreements prepared by Grossman provided that each Manager Defendant would assign and transfer to Plaintiff all their rights and interests to any dividends—"*including any class of cryptocurrency or similar assets*"—paid or to be paid by Neon Machine until Plaintiff's "Capital Account" under the Neon Media Operating Agreement was paid off. Neon Machine would agree to pay those dividends directly to 4D Factory. On October 1, 2021, Long, as Director, CEO, and shareholder, confirmed the Manager Defendants' *unanimous approval* of the Recoupment Agreements to 4D Factory in an email to 4D Factory.[12]

52.     4D Factory and Long then executed a Stock Purchase Right Notice and Restricted Stock Purchase Agreement via DocuSign on October 1, 2021, entitling 4D Factory to 6,000,000 common shares of Neon Machine as of August 20, 2021.

53.     That same day, Neon Media and Neon Machine entered into an Intellectual Property Sale Agreement in which all of Neon Media's intellectual property in *Shrapnel* was "sold" to Neon Machine for nominal consideration of $500 (the "IP Transfer Agreement").

54.     Then, effective October 3, 2021, Neon Machine, through Long's unilateral action, closed with each of Griffin and Polychain on the Simple Agreements for Future Equity, or

---

[12] The October 1, 2021 email is attached as **Exhibit E**.

"SAFEs," in the amount of $5 million and $3 million, respectively.[13] The SAFEs[14] provide that, upon occurrence of "Network Launch," and the passing of 60 days without the termination of the SAFEs or the occurrence of a "Qualified Financing," Griffin and Polychain's SAFEs will automatically convert into a new series of Neon Machine preferred shares belonging to Griffin and Polychain. The partial term sheet for the preferred shares to be issued, which was attached to the SAFEs, provides that holders of preferred stock may at their sole discretion vote as though their preferred equity was common stock, without converting to common stock, or could elect to convert their preferred shares to common stock at any time. But Neon Machine's Bylaws did not permit issuing preferred stock. So any supposed "automatic conversion" of SAFEs without amending the Bylaws was potentially void or voidable as an *ultra vires* act.

55.    The SAFEs define a Network Launch as "a *bona fide* transaction or series of transactions" (emphasis added) where the Token Issuer issues, or "mints," the native token associated with access to and use of the "Network." The SAFEs define "Network" as "any blockchain-based application, platform or service operated or managed by, or based upon, or incorporating material portions of any **intellectual property developed, owned or exclusively licensed by, the Company**…."  In other words, the "Network Launch" required the actual launch of the *Shrapnel* platform developed by Neon Machine, which integrates with the tokens. That's always been the sole reason for SHRAP Tokens to exist—for playing the game itself. This is

---

[13] 4D Factory was aware of the entry into the SAFEs in principle. But Long as the sole director of Neon Machine when the SAFEs were entered into, unilaterally executed them on Neon Machine's behalf, and did not provide the material terms of the SAFEs to 4D Factory until after the first meeting of the full Board in January 2022. In other words, 4D Factory was not provided with the specific terms of the SAFEs until after the IP Transfer Agreement was effectuated.

[14] The SAFEs were previously provided to this Court as Exhibit 2 to the *Neon Shareholders' Motion for an Order Declaring Automatic Stay Inapplicable, or In the Alternative, Granting Relief From Automatic Stay* [ECF 28], and are not reattached here.

reinforced by the fact that $15 million in SAFEs were issued by Neon Machine in summer 2023, *months after* the April 2023 date Defendants now claim "Network Launch" occurred. Those SAFEs all have language referring to Network Launch as a *future event.*

### E. Neon Machine quietly siphons tokens to the Manager Defendants and Griffin and Polychain but not 4D Factory.

56.     Around the same time he was securing 4D's consent to Griffin and Polychain's involvement, the Manager Defendants entered into self-dealing transactions that enriched themselves along with Griffin and Polychain with hundreds of millions of SHRAP Tokens (the "Token Giveaway"). He did so while he was director and officer of the secretly formed Neon Machine and without ensuring it was in Neon Machine's best interests. And he did so without telling 4D Factory, despite his representations that 4D would have majority control at the shareholder and Board levels.

57.     First, on September 29, 2021, without 4D Factory's knowledge or consent, Long entered into token side letter agreements with Griffin and Polychain (the "Side Letters"). The Side Letters provided that Griffin would receive 10.875% of the 3 billion "Total Network Tokens" (over 326 million SHRAP Tokens) and Polychain would receive 6.525% (more than 195 million SHRAP Tokens) for no added consideration. This amount was granted *in addition to* the *pro rata* amount allocated to Griffin and Polychain, as touted in a February 2022 Cap Table and the Internal Cap Table discussed below. Long secretly ratified the Side Letters as the sole member of the Neon Machine board without The 4D Factory's knowledge or consent.

58.     Then on October 1, 2021, without 4D Factory's knowledge or consent, Long delivered Offers of Employment by Neon Machine (the "Offer Letters") to each Manager Defendant. Each promised, "subject to the Company's approval of a Token Incentive Plan," future token interests in amounts of fully-vested SHRAP Tokens that far exceeded what 4D Factory was

told would be granted to each Manager Defendant. Again, these amounts were granted *in addition to* the *pro rata* amount allocated to Manager Defendants, as revealed in the February 2022 Cap Table shown to 4D Factory and the Internal Cap Table not shared with it.

59.    For example, the May 22, 2021 Equity Cap Table, entitled Long to about 35.5 million SHRAP Tokens given his equity in Neon Media.[15] But his Offer Letter promised a special distribution exceeding 90 million *additional* SHRAP Tokens, including tokens to satisfy supposed loans he made to Neon Machine. These tokens were over and above the pro rata share based on the members' equity. Yet there's no record the Promissory Notes (or the SHRAP Tokens granted to satisfy them) correspond to any actual funds paid by the Manager Defendants.[16]

60.    The Token Giveaway was a scheme by Long and the Manager Defendants to enrich themselves with 1/6 of the total SHRAP Tokens,[17] *in addition to* the allocation the Manager Defendants later presented to 4D Factory as tokens corresponding to their respective equity holdings, held in Company Treasury. No SHRAP Tokens were given to 4D Factory, a Founder and majority stockholder, who was supposed to receive the largest portion of SHRAP Tokens. Long, Norbury and Zhou granted themselves 91,328,859 million SHRAP Tokens each; Foran and Nonis took 76,328,859 million SHRAP Tokens each, and Yeend and Lackaff each received over 61 million SHRAP Tokens. Long and these other Manager Defendants formed a cabal, in which each effectuated the receipt of ill-gotten gains. Around November 8, 2021, Argon Foundation

---

[15] *See* Exhibit A.

[16] Long's Offer Letter, executed by Nonis (who also received a massive distribution of tokens), is attached hereto as **Exhibit F**.[16]

[17] Apart from certain amounts paid by Lackaff and Yeend, the Manager Defendants purportedly paid approximately $14,000 in the aggregate per the subscription agreements, but there is no evidence that even this *de minimis* amount was paid.

apparently entered into Token Subscription Agreements with each Manager Defendant, and with

Griffin and Polychain, to guarantee them these SHRAP Tokens.[18]

61.    Long apparently granted the authority to distribute the rights to the SHRAP Tokens,

as the only director of Neon Machine's board and as its "President, Chief Executive Officer, Chief

Financial Officer, Treasurer, Secretary" in a *Unanimous Board Resolution of Neon Machine Inc.*

dated November 5, 2021. Never mind that the *Unanimous Board Resolution* should have been

noticed and determined by the actual agreed-upon board of five directors and all shareholders. Or

that the true board—the board Long promised in exchange for the right to have the Shrapnel project

at Neon Machine—did not authorize 552 million SHRAP Tokens to Manager Defendants. 4D

Factory was the owner of 60% of the issued and outstanding shares of Neon Machine and was

entitled to participate in any dividend of Neon Machine to the stockholders under  Article 2, Sec.

7(c) of the Bylaws. The Token Giveaways and Side Letters are thus potentially void or voidable

as *ultra vires* acts.

62.    In effect, the Offer Letters and the Side Letters—never disclosed to 4D Factory

until August 2023—were a massive dividend to Defendants. But by recharacterizing these

dividends as they did, the Manager Defendants profited from the future sale of SHRAP Tokens

without diluting their rights to SHRAP Tokens and by dodging their recoupment obligations. All

the while, 4D Factory's SHRAP Tokens were secretly relegated to holdings it could not access, as

covered below. And as explained below, the Manager Defendants knew or had reason to know

that the Token Subscription Agreements were disingenuous because Argon Foundation is a shell

entity, and its distribution of the SHRAP Tokens was under Neon Machine's complete control.

---

[18] A copy of Long's Token Subscription Agreements with Argon Protocol Foundation is annexed hereto as **Exhibit G**. This is an example of the Token Subscription Agreements.  Each of the Manager Defendants has 2 such agreements and all are dated "as of" November 8, 2021.

And they knew this was not an arm's-length employment transaction but end-arounds to avoid their pledge to assign their dividends to 4D Factory.

63.     Defendants then developed the fiction that the SHRAP Tokens promised to 4D Factory were not actually intended to be distributed. Rather, these tokens would be owned by Neon Machine to be reserved in the so-called *Shrapnel* Treasury. The Manager Defendants represented that 4D Factory and the other equity holders (which were, exclusively, Manager Defendants who'd already granted themselves hundreds of millions of other, non-Treasury tokens) would not receive SHRAP Tokens but could only *benefit* from their use by the company, theoretically accruing to equity value. Because Defendants executed the Token Giveaway, Defendants, along with Griffin and Polychain, could safely hold a billion SHRAP Tokens while claiming that the tokens promised to 4D Factory were not for actual distribution. In doing so, Defendants have managed to enrich themselves while preventing 4D Factory from obtaining the SHRAP Tokens it was promised.

64.     By this time, Long and the Manager Defendants had entered into Side Letters, Offer Letters and Token Subscription Agreements giving away over 1/3 of the Total Network Tokens without 4D Factory's knowledge or consent, *after* Long represented to 4D that it would control 3 of 5 Board seats, hold 60% equity in Neon Machine, receive hundreds of millions of tokens, and protect those interests through Manager Defendants' unanimous vote to assign their dividends to 4D until it received its capital investment back. But for this promise of majority ownership and board control, 4D Factory would not have sanctioned Neon Machine's creation.

**F.  Long creates Argon Foundation and Argon Corp. to legitimize the Token Giveaway.**

65.     While Defendants were orchestrating their massive token giveaway, Long arranged for the incorporation and establishment of Argon Foundation and Argon Corp. in Panama, which seems to be controlled by the Manager Defendants. He retained García de Paredes Law, a

Panamanian law firm that markets itself as providing "Company and Private Foundation Incorporation" services, to incorporate both entities.[19] The registered offices of both Argon Foundation and Argon Corp. are the offices of García de Paredes Law. All directors and officers of both are apparently employees or agents of García de Paredes Law. And Long was personally invoiced by García de Paredes Law for the incorporation of both Argon Foundation and Argon Corp. on September 23, 2021. Defendants never informed 4D Factory of Argon Foundation and Argon Corp.'s true status—nor do any relevant agreements disclose this.

66.    Yet just one week later, Neon Machine obtained the IP required for the Shrapnel project from Neon Media under the IP Sale Agreement. And soon after Neon Machine entered into a Service Agreement with Argon, where Neon Machine transferred to it core aspects of that Shrapnel IP and granted Argon licenses and rights under other important components of that IP.

**G. Defendants misrepresent 4D Factory's rights as to the SHRAP Tokens and board control.**

67.    The ink not even dry on the IP Transfer Agreement, Long and the other Manager Defendants evaded 4D Factory's oversight as to tokens, broke their agreements to assign their dividends, and  diluted 4D's interests and control in Neon Machine. In November 2021, only a month after 4D Factory agreed to transfer the *Shrapnel* IP from Neon Media, Long called Javarone and told him that Griffin and Polychain would refuse to allow Javarone onto the board. 4D Factory intended for Javarone, Ned Sherman, and Long to sit in 4D's board seats. So 4D Factory contacted the founders of Griffin directly. On the call, the Griffin founders did not voice any objection to Javarone sitting on the board. But they revealed that Long had represented to them that 4D Factory would control only one board seat. As 4D would later find out, the SAFEs with Griffin and

---

[19]    *See* "Services," GDPELAW.COM (last accessed Feb. 17, 2024), *available at* https://www.gdeplaw.com/services/.

Polychain, which were withheld from 4D until after the full board was appointed, stated that Griffin and Polychain would each hold one board seat; two seats would be held by nominees of common stock (4D named Long and Sherman), and a "4D seat" would be "nominated" by the 4D Factory and "acceptable" to both Griffin and Polychain. But it appears Long hadn't informed Griffin that 4D Factory was Neon Machine's controlling shareholder. At this point, the Griffin founders were on notice that Long had misled them and 4D Factory as to the control of Neon Machine—providing conflicting information to both sides. Rather than take caution, however, the Fund Defendants only entrenched themselves in Long's scheme.

68.    Three months behind schedule, the agreed Neon Machine board was officially formed in January of 2022. Javarone and Sherman for 4D, Pierre-Edouard Planche for Griffin, and Benjamin Perszyk for Polychain, were made directors under a board resolution on January 26, 2022. That day, the board also executed a second resolution approving a form version of an Intellectual Property License and Assignment and Services Agreement (the "Argon Services Agreement") with Argon Corp. The form attached to the resolution and reviewed by the board did not name the officer executing on Argon Corp.'s behalf. Neither 4D Factory nor the board were informed that Argon Corp. was a shell created by Long. Nor did they know he'd ordered Argon to make him and Manager Defendants Nonis and Norbury, and Grossman, the Foundation's signatories.

69.    Following the board's approval, on February 2, 2022, Long executed the Argon Services Agreement on Neon Machine's behalf.[20] An employee of García de Paredes Law executed on behalf of Argon Corp. Under the Argon Services Agreement, Argon Corp. retained Neon Machine to provide the "necessary technology, expertise, staffing, infrastructure, and other

---

[20] A true and correct copy of the executed Argon Services Agreement is attached as **Exhibit H**.

resources needed… in order to support the token issuance and the research, development, maintenance, marketing, and support" of the SHRAP Token blockchain.[21] It appears both Argon Foundation and Argon Corp. were created to conceal that Defendants have sole authority to distribute SHRAP Tokens. That means, under the Token Subscription Agreements, the Manager Defendants did not contract with an independent entity to grant themselves SHRAP Tokens. The Manager Defendants instead granted over 1/6 of all SHRAP tokens *from themselves to themselves*.

## H. Defendants provide misleading capitalization tables to 4D Factory while internally maintaining separate books with the actual capitalization.

70.     With 4D Factory's directors officially seated on the board, the Manager Defendants began a series of misrepresentations to 4D Factory to obscure the Token Giveaway and the nature of 4D Factory's SHRAP Token holdings.

71.     During the January 26, 2022 Board meeting, Long was asked by Javarone what the status and then-current capitalization of SHRAP Tokens was. On February 14, 2022, three weeks after the full board was seated, Long delivered to 4D Factory, a copy of Neon Machine's February 2022 capitalization tables (the "February 2022 Cap Tables").[22] Grossman was copied on this email. The February 2022 Cap Tables were created by Zhou on January 29, 2022. In this email, for the first time, Long suggested that 4D Factory did not own its SHRAP Tokens:

> The token treasury controlled by the board is ~41% of total supply, of which 4D's 39% equity interest could theoretically [sic] translate into ~$240M should the board elect to distribute on a pro rata basis.[23]

72.     The February 2022 Cap Tables listed a supposed accounting of the total 3 billion Total Network Tokens. The February 2022 Cap Tables listed SHRAP Tokens sitting in "Neon

---

[21] *See* Argon Services Agreement at 1.

[22] The February 14, 2022 email and February 2022 Cap Tables are attached as **Exhibits I** and **J**.

[23] **Exhibit I.**

Machine Treasury" and SHRAP Tokens sitting with "Insiders" (a category which 4D Factory, as

a founding and majority shareholder of Neon Machine, should not have been excluded from):

| Neon Machine Treasury * | # tokens |
|---|---|
| 4D Factory | 480,927,488 |
| Griffin | 267,181,938 |
| Polychain | 160,309,163 |
| Founders | 320,618,325 |
| Subtotal | 1,229,036,913 |

| Insiders | |
|---|---|
| Seed Round Investors | 612,000,000 |
| Team, Advisors, Future Hires | 793,963,087 |
| Board Directors | 5,000,000 |
| Subtotal | 1,410,963,087 |

73.    These tables were deliberately misleading. The "Neon Machine Treasury" table

represented 4D Factory's understanding that it would *receive* SHRAP Tokens in proportion to its

equity in Neon Machine, as was promised. Long and Grossman did not explain who belonged to

the "Insiders" category or that Griffin, Polychain, and Manager Defendants received over a billion

additional SHRAP Tokens under the discreet labels "Team, Advisors, Future Hires" and "Seed

Round Investors."

74.    Around the same time, a detailed capitalization table dated February 10, 2022 (the

"Internal Cap Table") was maintained by the Manager Defendants and not shared with 4D

Factory.[24] This document was discovered by 4D only after it was forced to remove Long from its

board seat in August 2023 to pry open access to information. Zhou apparently created the Internal

Cap Table on October 28, 2021, after the IP transfer was signed. The Internal Cap Table listed the

exact amounts of SHRAP Token being given to Defendants, including Griffin and Polychain:

---

[24] Excerpts of the Internal Cap Table are attached as **Exhibit K.**

| 1 | Name | Number of Tokens |
|---|---|---|
| 81 | *Launch Partner Equity Investors* | |
| 82 | Griffin Gaming Partners II, L.P. | 309,937,500 |
| 83 | Griffin Gaming Partners II Side Fund, L.P. | 16,312,500 |
| 84 | Polychain Venture Partners II LP | 195,750,000 |
| 85 | **EQUITY INVESTOR SUBTOTAL** | **522,000,000** |

| 1 | Name | Number of Tokens |
|---|---|---|
| 3 | *Founders FTIs* | |
| 4 | Mark Long | 70,001,845 |
| 5 | Don Norbury | 70,001,845 |
| 6 | Colin Foran | 65,665,352 |
| 7 | Aaron Nonis | 65,665,352 |
| 8 | Mark Yeend | 61,415,589 |
| 9 | Naomi Lackaff | 62,196,158 |
| 10 | Calvin Zhou | 70,001,845 |
| 11 | Gianna Sulyma (In Founders Round) | 15,418,945 |
| 12 | **FOUNDERS SUBTOTAL** | **480,366,930** |

| 1 | Name | Number of Tokens |
|---|---|---|
| 93 | **Friends and Family Round** | |
| 94 | Mark Long | 21,327,014 |
| 95 | Don Norbury | 21,327,014 |
| 96 | Colin Foran | 10,663,507 |
| 97 | Aaron Nonis | 10,663,507 |
| 98 | Mark Yeend | 213,270 |
| 99 | Naomi Lackaff | 2,132,701 |
| 100 | Calvin Zhou | 21,327,014 |
| 101 | Gianna Sulyma | 213,270 |
| 102 | David Vicini | 1,066,351 |
| 103 | Andrew Grossman | 1,066,351 |
| 104 | **TOTAL** | **90,000,000** |

75.    The Internal Cap Table does not list anywhere the breakdown of SHRAP Tokens according to equity holdings as listed in the February 2022 Cap Table. In fact, the Internal Cap Table only lists 15 million SHRAP Tokens "Reserved for 4D Factory" under the "Early Advisory" category. But these SHRAP Tokens were shown improperly as 4D's, since they had been promised to Javarone, in his individual capacity, as Long confirmed in his February 14, 2022 email.  So despite being a founding investor, majority stockholder, and "Founders" on the first resolutions (**Exhibit C**) upon Neon Machine's formation, when Long and the other Manager Defendants executed their give-away to "Founders," 4D Factory was excluded.

76.    In short, Long and his team were providing capitalization tables to 4D Factory showing that it, Griffin, Polychain and the Manager Defendants would receive SHRAP Tokens in

proportion to their equity holdings, while omitting the much more detailed tables showing that Griffin, Polychain, and Manager Defendants would have over 1 billion SHRAP Tokens among themselves and that 4D was entitled to *no tokens whatsoever*.

**I.  The Manager Defendants continue to conceal the Token Giveaway from 4D Factory with more lies and omissions.**

77.    Learning that 4D Factory's large SHRAP Token holdings, long promised by Manager Defendants, were relegated to mere "Treasury" holding was surprising to say the least. So 4D Factory, through Javarone, began seeking answers from Long. On May 10, 2022, Javarone, emailed Long a series of questions seeking clarity about his February 14, 2022 email.[25]

78.    Among other questions, Javarone asked for: (1) the identities and investments of the "Pre-Seed" and "Seed Round" investors; (2) how many of the "Team, Advisors, and Future Hires" SHRAP Tokens were already granted or reserved for future hires; (3) how and when the "Seed Round" fundings and the grants of SHRAP Tokens to "Team, Advisors and Future Hires" were approved by the board; (4) clarification about 4D's token allocation in the "Treasury" category; and (5) why 4D Factory, Javarone, Conroy and Miller were not offered SHRAP Tokens to purchase at the near-zero price of the Founder round. 4D Factory also indicated it had never seen its tokens classified in the "Treasury" category before:

> This suggests that 4D is limited to a category that cannot access the token unless approved for distribution, while the rest who have been granted tokens for free or invited to purchase them for fractions of a cent are more liquid and accessible. What was planned for how the Treasury tokens would be available and liquid?  Are there rules or other conditions related to the above white paper description that impact whether they can be distributed, per your footnote?[26]

---

[25] The May 10, 2022 email is attached as **Exhibit L**.

[26] Exhibit L.

79.    Over two months later, by email dated July 29, 2022, Long finally replied.[27]  Long prefaced by saying that Grossman worked with Neon Machine's corporate counsel at Fenwick & West LLP to prepare answers to 4D's questions. Grossman was still 4D Factory's general counsel at this time and had a fiduciary duty and ethical responsibility to provide it full and accurate information from Neon Machine. Yet Long's responses, which according to Long were drafted and signed off by Grossman and outside corporate counsel Fenwick, only further withheld facts and obscured the Manager Defendants' true intentions. Each false or misleading statement in Long's email (A through F below), and 4D's response, is addressed below:

A.    "Argon is a Panamanian foundation (without any members or shareholders) that is developing the smart contract responsible for the SHRAP token and is expected to eventually deploy the smart contract that mints the tokens.  Argon is a contractual counterparty of Neon, but is not owned or controlled by Neon."[28]

80.    This statement "A" is a false and misleading statement intended to lead 4D Factory to believe that the SHRAP Tokens were being developed and distributed by an entity independent of Neon Machine. But both Argon Foundation and Argon Corp. are Panamanian shells of Neon Machine created by Long, and all operations related to creating and distributing SHRAP Tokens were managed by the Manager Defendants at Neon Machine.

B.    "Of the ~799 million SHRAP Tokens that have been allocated for current and future employees, directors, consultants, advisors, etc. of Neon [Machine] in connection with their services, interests in ~714.5 million SHRAP Tokens have already been allocated and/or granted (including to The 4D Factory LLC), and interests in ~84.5 million SHRAP Tokens remain reserved and available (note that the difference between ~794 million and ~799 million token interests is the 5 million token interests allocated for Neon board directors, including yourself)." [29]

---

[27] A true and correct copy of the July 29, 2022 email is attached as **Exhibit M**.

[28] Exhibit M.

[29] *Id.*

81.     This statement "B" is also false and misleading to conceal the Token Giveaway and
otherwise delay and hinder 4D Factory. Long deliberately misrepresented that 4D Factory's
SHRAP Tokens were included in the 714.5 million that "have already been allocated and/or
granted," when those were Javarone's personal tokens for his (otherwise uncompensated) services
as an advisor and Neon Machine director on the board. In addition, although 4D requested a
specific breakdown of how the SHRAP Tokens were distributed to "Team, Advisors and Future
Hires," Long never provided one—concealing that the Manager Defendants had distributed 552
million SHRAP Tokens to themselves.

C.      "Separately, a group of founders and early service providers received an
aggregate of 90 million SHRAP Token interests in exchange for cancellation of
debt in the aggregate amount of ~$422,000."[30]

82.     This statement "C" is also false and misleading. As of July 2023, the roughly
$422,000 in *alleged* debt was still listed as "notes payable" liabilities in Neon Machine's balance
sheets, *with accrued interest*. In reality, 552 million SHRAP Tokens had been distributed or
assigned to the Manager Defendants, not "an aggregate of 90 million SHRAP Token interests" as
the July 29, 2022 response claims.

D.      "4D has a direct allocation of 15 million SHRAP Token interests, and a purchase
agreement covering such token allocation was sent to 4D in December 2021 for
signature."[31]

83.     This statement "D" is likewise a false and misleading statement intended to
mispresent Javarone's token interests and obscure that the Manager Defendants had
disenfranchised 4D Factory of the hundreds of millions of tokens. Javarone, not 4D, had been
granted 15 million tokens. Long himself confirmed this in his February 14, 2022 email. He changed

---

[30] *Id.*

[31] *Id.*

his story from February and misrepresented to 4D Factory in July that those SHRAP Tokens belonged to it to hide that he had actually reserved no SHRAP Tokens for 4D Factory.

      E.      "In May 2021, Calvin Zhou offered you the opportunity invest [sic] in the project, and Calvin recalls that you did not want to participate at that time."[32]

      84.     This statement "E" is also false and misleading and intended to suggest that 4D Factory willingly turned down the opportunity to "invest" in what was in fact a massive SHRAP Token Giveaway. 4D Factory was never offered an opportunity to participate. Instead, around May 2021 when 4D Factory and Zhou discussed the SHRAP Token's capitalization and potential capital raises, Zhou took the opportunity to reinforce the large stake in SHRAP Tokens that 4D Factory was already entitled to in connection with its equity stake in Neon Machine.

      F.      "The specific way in which Neon uses the SHRAP token interests on its balance sheet will be determined over time, as dictated by business needs.  So long as Neon complies with applicable law, there aren't restrictions on how Neon can use the SHRAP token interests. **If approved by the Board, one of those use cases could be distributing some or all of the SHRAP token interests to Neon stockholders.**"[33]

      85.     This statement "F" is deliberately misleading and intended to lead 4D Factory to believe that its SHRAP Tokens, now classified as "treasury" tokens, could still be distributed to them upon board approval.[34] But Defendants intended that 4D Factory would never receive its distribution of SHRAP Tokens, even by board vote. Indeed, with Long sitting in one of 4D's seats, and Griffin and Polychain in 2 out of 5 seats and coordinating with Long, and with Neon Machine actually in control of generating and distributing SHRAP Tokens (rather than shells), Long knew

---

[32] *Id.*

[33] *Id* (emphasis added).

[34] This was at least the second time Long had said this. See, Exhibit M: "The token treasury controlled by the board is ~41% of total supply, of which *4D's 39% equity interest could theorectically [sic] translated into ~$240M should the board elect to distribute on a pro rata basis." (emphasis added).*

it was implausible or even impossible for 4D "treasury" token to ever be distributed by the board. When 4D Factory sought in January 2024 to exercise the board's authority and the board passed the resolution to distribute SHRAP Tokens to stockholders (as that option was prescribed by Long himself in the 7/29/22 email), the Manager Defendants simply ignored the directive, and the Defendants continued to maintain that 4D Factory is entitled to no SHRAP Tokens whatsoever.

86.    The Manager Defendants were aware of the prospect of dilution of their common stock position if and when the SAFEs eventually converted. If and when the conversion occurred, the Manager Defendants would be entitled to fewer tokens based on their pro rata equity due to the dilution of their stock interests. Notwithstanding the lack of authority for the distribution of 552 million SHRAP Tokens in 2021, by distributing the SHRAP Tokens to themselves at the first opportunity, the Manager Defendants avoided all threatened dilution of their shares of the SHRAP Tokens if and when the SAFEs convert, while subjecting 4D Factory to *all* the dilution and now even arguing that 4D Factory receive nothing.

**J.  Defendants improperly control Neon Machine and prevent oversight by its majority shareholder.**

87.    Through the rest of 2022 and until Long's removal from the board in 2023, Defendants ran Neon Machine in direct contravention of Neon Machine's Bylaws and their responsibilities to shareholders and did not provide any more information to Javarone, a Neon Machine director, about 4D's SHRAP Token interests or an accurate picture of securities offerings even though those diluted 4D's interests.

88.    Despite promising "monthly day long board meetings," for almost two years, Long held only two board meetings with the 4D Directors, including the first meeting of the full five-member Board on January 26, 2022. Instead, he apparently held frequent, unnoticed meetings with, Planche and Perszyk and excluded the other two directors appointed by 4D, Javarone and Sherman.

4D Factory did not discover these meetings took place until just before Long was removed from the board on August 22, 2023. And it did not discover the Token Giveaway until even later. But Griffin and Polychain, through Planche and Perszyk respectively, knew that notice of these meetings had not been given to Javarone or Sherman.

89.      These board meetings were conducted in violation of Neon Machine's Bylaws. Article III, Section 10 provides that regular board meetings may be held without notice as determined from time to time by the Board, however, any absent directors must be given notice of such determination when it is made. Article III, Sections 11 and 12 similarly provide that notice of any special meetings of the board must be given to each director.[35] Long, Griffin, Polychain, Planche and Perszyk never noticed the 4D Directors of any meeting they held. Nor did anyone else. Thus, any actions "approved" by them were not approved before the board and are void.

90.      While excluding two of the three 4D Directors—Javarone and Sherman—from vital board meetings, as 4D later discovered, Defendants engaged in significant and damaging actions to Neon Machine's business and 4D's equity value without notice to or approval by Neon Machine's board or its majority stockholder. Defendants collectively ran up high operating costs without sufficient capital, drained Neon Machine's cash, listed SHRAP Tokens on public exchanges without board consideration of securities matters, raised most of Neon Machine's capital by selling agreements for future stock that diluted 4D's equity stake in Neon Machine without authority or approval, and used the cash raised at their whim.

91.      In particular, Long, Griffin, Polychain, Planche and Perszyk without any Board meeting or consent, caused Neon Machine to issue securities exceeding $15 million, the majority raised by Neon Machine as additional SAFEs to third parties in 2023, on terms substantially similar

---

[35] *See* **Exhibit B**.

to the SAFEs entered into with Griffin and Polychain in October 2021, including about $4 million more SAFEs issued to Griffin itself. As with of the original SAFEs issued to Griffin and Polychain, conversion of the SAFEs to stock in Neon Machine has significantly diluted 4D's equity interests.[36] 4D Factory not only lost its control of Neon Machine, but will also suffer reduced potential dividends and be substantially setback from ever recouping its original investment. Defendants engaged in these actions to dilute 4D Factory's influence and ownership of Neon Machine, having already secured their own expected profits through the Token Giveaway.

92.     To date, without 4D Factory's knowledge or consent, Defendants have entered into, Token Subscription Agreements, Offer Letters, and Side Letters giving away over a billion SHRAP Tokens, currently valued at millions of dollars, to Manager Defendants, Griffin and Polychain, plus $15 million of additional, equity-diluting SAFEs.

93.     Unless relief is granted, the Defendants' plan will have worked. The Manager Defendants hold over 1/6 of the 3 billion SHRAP Tokens. At current trading prices[37], they possess *over $50 million* in tokens, in their wallets, which they can access and control to distribute, trade, and benefit from.[38] All while having locked out 4D Factory from receiving a single token.

94.     Defendants' coordinated stripping of value from Neon Media, initiated at a time when Long and others were employees and officers and a director of Neon Media, followed by the calculated pilfering of Neon Machine, combined with the millions of dollars in capital 4D Factory provided for Long's projects, were root causes of 4D Factory's bankruptcy filing in October 2023.

---

[36] In the c*omplaint* filed in the Derivative Action, Manager Defendants allege Plaintiff would only have a 19% equity interest in Neon Machine after SAFE conversion, the difference largely due to additional equity give-aways they desire, not approved by the Board or the Plaintiff.

[37] The value has been has high as $0.42 per token.

[38] Neon Machine unilaterally modified the lockup provisions during the bankruptcy, substantially decreasing the effective current value of the tokens owed to 4D.

**K. Defendants continue to withhold 4D Factory's SHRAP Tokens even after the board ordered they be distributed.**

95.     On August 22, 2023, 4D Factory removed Long from his seat on the Neon Machine Board for withholding information from the 4D directors and refusal to report to the full board. 4D Factory, through its three Board seats (Javarone, Sherman and Honour, who replaced Long), instructed Neon Machine's outside counsel to provide access to the company's data room (which outside counsel, not Neon Machine management, complied with). 4D Factory also called a series of board meetings to establish proper governance, investigate Long's *ultra vires* acts, and consider how to deal with the damaging consequences of Long's actions.  While the 4D directors performed the duties of the board, Griffin and Polychain's Board directors, Planche and Perszyk, objected to or abstained from voting on all proposed measures, even objecting to measures to provide *all* directors with access to Neon Machine's full corporate books and records, appoint special counsel to the board to help navigate matters, including matters related to the question of whether Network Launch had occurred, and to retain investment bankers to support capital raising beyond just the insiders Griffin and Polychain. Indeed, it was only through 4D Factory removing Long from one of its board seats that Plaintiffs learned many of the material facts that prompted this suit.

96.     On September 15, 2023, Long forwarded to the board a letter from Griffin (the "Demand Letter") demanding the conversion of their SAFEs to preferred equity. Long advised that he already asked outside counsel Fenwick to draft an amended corporate charter and financing documents to implement this conversion. The Demand Letter asserted for the first time the occurrence of an alleged "Network Launch" purportedly on April 29, 2023.  It argued 60 days later, on June 29, 2023, conversion of the SAFEs to preferred equity automatically occurred. Before September 15, 2023, neither 4D Factory nor the board ever received any notification, formal or informal, that a Network Launch or SAFE conversion occurred at any time. In fact, no

conversion could have been "automatic," as the Bylaws put in place by Long did not permit issuance of preferred stock and would have had to be amended, all requiring board approval, along with a board investigation into and determination of the purported Network Launch trigger event. SAFEs worth millions of dollars were issued *after* April 29, 2023, all without board approval and with language referring to Network Launch as a future event.

97.    When the board advised Long that it would need to ultimately determine whether Network Launch occurred, and emphasized the past unauthorized actions that required the board's review, Long refused to provide analysis or backup materials. Instead, he merely sent a weblink to the SHRAP blockchain and threatened to tell Griffin and "the other SAFE holders" that the board would not comply with the automatic conversion of the SAFEs.

98.    On October 5, 2023, the next Board meeting, Long, Griffin through Planche, and Polychain through Rosenthal, asserted the board was illegitimate, that the SAFEs must be recognized as converted, and, in a self-motivated act, that the board should not further scrutinize "Network Launch." During the meeting, the 4D directors also confirmed that Long had entered Neon Machine into about $15 million in new SAFEs in 2023 (after the supposed "Network Launch," which also triggers conversion under the new SAFEs), all without board authorization. *Neon Machine's counsel* at *Fenwick stated at the meeting that it had none of the records of the SAFEs that were issued.* Issuance of SAFE agreements *after* the supposed "Network Launch," would mean that Defendants knowingly entered into securities referring to Network Launch as a future event even though they were arguing that Network Launch had already occurred.

99.    On November 13, 2023, a third board meeting was called. Long and the Fund Defendants received notice of this meeting but refused to attend. Long was suspended as CEO (with pay) for abdicating his responsibilities, failing to provide information the board demanded,

and obstructing all board directives since the August Board meeting. Javarone was appointed as interim CEO and Treasurer. The board approved steps to retain counsel to investigate Long's actions at the company and issued directives to certain Manager Defendants. The board issued a directive imposing a two-signature requirement for expenses over $5,000, meant to control costs and give the board visibility on spending—a common-sense corporate control. The board also authorized the retention of investment bankers and game-industry specialist advisors on an expedited basis to support raising new financing for Neon Machine from a broad market. After the meeting, the board, through Javarone as interim CEO, issued these directives to Norbury, Nonis, and Grossman. None responded or complied with the board's directives.

100.    4D Factory's attempts to exercise board authority exposed, among other things, Defendants' desire to evade board review of its actions and prevent the board from opening capital-raising activities to a broader market, since it would lessen their grip on Neon Machine, control which has eviscerated 4D Factory's position despite being majority shareholder. Indeed, in keeping with their plan, Defendants ignored the Board's attempts to secure financing from the broader market. Instead, in early December 2023, Defendants tried to push through a $2 million equity investment from Griffin and Polychain. While this financing was a woefully insufficient amount at barely two-thirds of one month of Neon Machine's expenses, it would constitute a "Qualified Financing" that would cause Griffin and Polychain's SAFEs to automatically convert into preferred shares. If this transaction were carried through, the market would not have spoken. But the scheme to remove 4D from the board and ensure it could never access its tokens would be complete. The board did not approve the transaction.

101.    On January 4, 2024, counsel for 4D Factory delivered a letter to the board requesting the immediate turnover of its negotiated-for SHRAP Tokens. This letter sought turnover

of 480,927,488 SHRAP Tokens based on the representations made in the February 2022 Cap Tables—the most recent token capitalization tables Defendants had provided to date.

102.    These letters precipitated a fourth board meeting on January 12, 2024. Planche and Rosenthal attended and opined, for the first time, that none of the 4D directors were seated any longer on the board because, they claimed, the SAFEs had already converted, and so Griffin and Polychain as "stockholders" could elect different directors. These statements could only be true if Polychain and Griffin "deemed" their SAFEs converted to preferred stock and voted as common shareholders, diluting 4D Factory's common stock and board control. Indeed, Planche suggested at the meeting that they voted for and elected (past tense) different directors after the November 13, 2023 board meeting. Ironically, Planche and Rosenthal in advance made sure to get signatures consenting to record the meeting from *all* Directors—*including 4D's.*

103.    Then on February 1, 2024, certain Manager Defendants filed in 4D Factory's chapter 11 cases the Motion of Neon Shareholders for Entry of an Order for Relief from Prior Order Granting Relief from Stay, or, in the Alternative, Granting Renewed Relief from Automatic Stay (ECF 63). In the motion, the Manager Defendants represented for the first time in indisputable terms their conclusion that 4D Factory was not entitled to any SHRAP Tokens whatsoever. *See* Reconsideration Motion ¶¶ 8–9 (stating the Debtors "do not own, did not disclose on their schedules, and are not entitled to" the SHRAP Tokens promised to Plaintiff); ¶¶ 38–39 ("Rather, the SHRAP Tokens held in Neon's Treasury are similar to treasury stock held by a Delaware corporation. Such Treasury tokens are established for various reasons and have been held on Neon's balance sheet for general corporate purposes… at bottom, Neon's Treasury tokens were never meant or intended to be used as a rainy-day fund for the Debtor…") Indeed, the active trading

of SHRAP Tokens since November 2023 shows that millions of tokens have been distributed to holders around the world. Yet 4D Factory hasn't received a single token.

104.    In defiance of the board, Defendants continued to withhold substantial and vital information about the operations, finances, and token activities of Neon Machine and Argon from the Board, including the 4D directors. They maintained complete control of banking, capital raising, token activities, and operations and, took material actions defying the 4D-controlled board and Javarone as interim CEO. As recently as March 6, 2024, despite Javarone being the acting CEO, on their own Defendants publicly announced a "comprehensive revision" to the SHRAP Token unlock schedule that will reduce planned unlocking of tokens "for the team, advisors, seed token holders, and strategic token holders."[39] In other words, they're preventing 4D Factory from obtaining any benefit from the bargain it struck in exchange for the *Shrapnel* IP, and diminishing the value of 4D's tokens even when they are turned over.

105.    As it relates to potential derivative claims, 4D Factory previously demanded on April 14, 2024, that Neon Machine's board pursue claims against the Defendants, but that demand was denied. Of course given the current composition of the board, with a majority of seats controlled by or occupied by defendants to this litigation, any demand requirement is excused as futile. And given that the only real harm inflicted was to individual shareholder 4D Factory and that the relief sought here is to redress the harm to 4D, all claims brought are direct.

---

[39] Andrew Hayward, "'Shrapnel' Game Tweaks Token Schedule with 75% Less SHRAP Unlocking in April," DECRYPT.CO (Mar. 6, 2024), *available at* https://decrypt.co/220463/shrapnel-game-tweaks-shrap-token-schedule.

**Summary of Defendants' conspiracy to dilute and replace 4D Factory**

106.   Defendants individually and collectively through their executives and co-conspirators engaged in a series of frauds, affirmatively and by omission. Neon Machine, together with its Manager Defendants, Argon Asset Ventures Corp and Argon Protocol Foundation, and Griffin and Polychain, through their directors and agents as described below, created and orchestrated the scheme to issue, operate, and manage a blockchain-based cryptocurrency token-associated video game and cut out the majority shareholder from the control and benefits they'd promised 4D Factory to get the green-light for this entire endeavor. Defendants developed legal and economic ties designed to develop and manage the ecosystem of the game and the token. They acted in concert to ensure that they could control the granting and distribution of tokens.

107.   The aim of their scheme was to line their pockets at 4D's expense. It involved a series of fraudulent communications over a nearly three-year period, continuing to this day—all designed to acquire the *Shrapnel* IP rights and token without providing 4D Factory meaningful value for their cooperation and contribution.

108.   Neon Machine and the Manager Defendants, led by Long, were at the center of the scheme. By the nature of the officers' and directors' positions within Neon Machine, and for the Manager Defendants, acting in violation of their shareholder agreements and duties as Neon Media employees and officers, they orchestrated and carried out the scheme, as described here.

109.   Mark Long knowingly and actively participated in the enterprise's scheme to defraud 4D Factory through his role as CEO of Neon Media and Neon Machine. Because of his position as CEO of Neon Machine, Long granted himself and his team hundreds of millions of SHRAP tokens without disclosing that information to 4D Factory or the 4D directors. He orchestrated and supervised the day-to-day operations of the scheme—withholding key facts from

Neon Media when he was its officer, director, shareholder, and employee, and falsely inducing 4D
Factory to turn over the valuable *Shrapnel* IP to Neon Machine. By granting to himself and the
other Manager Defendants tens of millions of tokens plus equity, Long enriched himself and his
team and ensured they'd stay loyal and conceal their token grab from 4D Factory.

110.    Colin Foran, as Chief Creative Officer at Neon Machine, participated in the
company's day-to-day operations, including aspects of the SHRAP tokens. He received tens of
millions of tokens through the token grab before the board was fully formed. Despite his role as
an officer, he chose not to inform 4D Factory or any 4D director of that token grab and thus
knowingly and intentionally participated in the scheme to defraud 4D Factory.

111.    Naomi Lackaff, as head of Partnerships at Neon Machine, also participated in the
company's day-to-day operations, including aspects of the SHRAP tokens. She received tens of
millions of tokens through the token grab before the board was fully formed. Yet in her role she
chose not to inform 4D Factory or any 4D director of that token grab, and thus knowingly and
intentionally participated in the scheme to defraud 4D Factory.

112.    Don Norbury, as CTO at Neon Machine, participated in the company's day-to-day
operations, including its technical operations. He received tens of millions of tokens through the
token grab before the board was fully formed, yet as an officer he nevertheless chose not to inform
4D Factory or any 4D director of that token grab. He too, then, knowingly and intentionally
participated in the scheme to defraud 4D Factory.

113.    Mark Yeend, as CMO at Neon Machine, also participated in the company's day-
to-day operations. He too received tens of millions of tokens in the token grab before the board
was fully formed. Despite being an officer, he chose not to inform 4D Factory or any 4D director
of the grab. Thus he knowingly and intentionally participated in the scheme to defraud 4D Factory.

114.    Aaron Nonis also knowingly and actively participated in the enterprise's scheme to
defraud 4D Factory through his role as COO of Neon Media and Neon Machine. Because of his
role of COO of Neon Machine, Nonis was complicit in executing Long's employment agreement,
including the secret grant of tokens, without disclosing that information to 4D Factory or the 4D
directors. As COO, he orchestrated and supervised aspects of the day-to-day operations of the
scheme, including authorizing Long's employment agreement that included a token grant.

115.    Calvin Zhou likewise participated in the day-to-day operations of the company.  He
was uniquely knowledgeable about the game's blockchain aspects and the tokenomics. He
prepared cap tables, including cap tables that disguised the ownership of the 522 million tokens
the Manager Defendants granted themselves. Zhou himself received tens of millions of tokens
through this token grab. As such, he not only knew of the enterprise's activities but also
participated in those activities to omit material facts and cover up the wrongful acts.

116.    Long and Grossman had Neon Machine task the Argon entities with creating and
supporting the blockchain network where the tokens reside. Neon Machine, through Long, caused
Argon to enter into a services agreement where Neon Machine would do much of the work that
Argon was supposed to do in launching the blockchain network underlying the SHRAP token, and
Argon would funnel proceeds from the sale of SHRAP tokens back to Neon Machine. It appears
this structure existed mainly to avoid U.S. securities laws and regulations by issuing tokens though
a Panamanian entity. While the Manager Defendants claim Argon was recommended by
cryptocurrency experts, the Argon entities seem to be shells. Nevertheless, Argon received funds
from the sales of tokens in furtherance of the scheme and appears to have reinvested those funds
into the operation of the enterprise via sham payments made under its services agreement.

117.    By the nature of being directors of Neon Machine and representatives of Griffin and Polychain, respectively, Pierre-Eduoard Planche, Benjamin Perszyk, and Josh Rosenthal, were aware of and involved in the enterprise. So the Griffin and Polychain entities not only knew but also benefited financially from the scheme. Indeed, Griffin and Polychain each received a grant of hundreds of millions of tokens. One example of their knowledge of the fraudulent acts of the enterprise was at the August 25, 2023 board meeting, when they voted against information access being enabled for all directors as required by Delaware law. Others include Griffin's written demand for conversion of the SAFEs after 4D's directors started asking about the token giveaway, voting against engaging counsel to investigate the purported Network Launch and advise the board, and voting against Neon Machine honoring the token grant promised to 4D Factory. These defendants were important to the enterprise because converting their SAFEs would dilute 4D's ownership interest below 50%—resulting in the loss of two of the three board seats promised to 4D. Only with Griffin and Polychain's involvement could the other Defendants ensure they'd remain in control and eliminate 4D's ability to investigate and remedy the wrongs described here.

118.    The conspirators knew that obtaining 4D's permission to let *Shrapnel* go forward at Neon Machine was pivotal. Neon Machine needed 4D Factory's permission because it controlled Neon Media as its sole Manager and majority owner. Neon Machine couldn't pursue *Shrapnel* without Neon Media's permission because all the Manager Defendants (except Zhou) were employees and officers of Neon Media and had member/employment agreements that did not let them take business opportunities to a different company.  Moreover, Neon Media owned the *Shrapnel* IP. That IP was key not just to Neon Machine's success but to the entire enterprise's. Without the *Shrapnel* IP, there was no first-person-shooter game that would draw users into the token market.  Without the *Shrapnel* IP, there could be no SHRAP token—that idea was created

at and assigned to Neon Media and thus was its intellectual property. For the conspirators, getting permission to proceed with *Shrapnel* at Neon Machine and acquiring the IP hinged on luring 4D Factory in part with promised control of Neon Machine at the shareholder and board level and granting 4D tokens.

119.    In August and September 2021, Neon Machine, through Andrew Grossman—who was also acting (disloyally) as 4D's counsel—induced 4D to have Neon Media transfer the *Shrapnel* IP to Neon Machine for far less than the IP's actual value. Grossman convinced Javarone (who managed 4D Factory and Neon Media) to assign the valuable *Shrapnel* IP to Neon Machine rather than license it, as Neon Media had been advised to do instead. Neon Machine, through Grossman, promised that 4D Factory would receive a controlling equity stake and board seats along with hundreds of millions of SHRAP tokens. These were material misstatements as 4D Factory did not actually receive a single token, much less an amount reflecting its equity share.

120.    Grossman, through these false and deceptive communications, participated in the scheme to obtain valuable IP with false promises of equity, control, and hundreds of millions of SHRAP tokens. His statements on Neon Machine's behalf were material in successfully inducing 4D to assign Neon Media's IP to Neon Machine for just $500. In his role within the conspiracy, Grossman acted with intent to deceive 4D out of the *Shrapnel* IP's full value, as indicated by the false promises described above, and cheated 4D by depriving it of those Neon Media assets.

121.    The scheme to rob 4D Factory was not apparent and remained essentially unknowable until recently. Neon Machine never allowed 4D Factory's loyal directors access to the data room of corporate books and records until 4D took board action in August 2023. Grossman likewise refused to share full documentation when Javarone requested it. Deceptive and evasive replies were provided in nearly all communications to 4D Factory, making detection especially

difficult. For example, Neon Machine's executives and directors now claim 4D does not actually own any Neon Machine stock because 4D did not timely execute the share-purchase agreement. But Neon Machine, through its CFO, first sent the Share Purchase Agreement to Javarone after the deadline. That agreement was part of the scheme to induce 4D to enter into an overall deal in which it obtained "control" over Neon Machine in return for letting Neon Machine proceed with *Shrapnel*. Neon Machine, through its executives, knew that offering shares, along with the other control elements, would induce the IP transfer for far below its actual value. And indeed, the scheme worked because 4D did have Neon Media transfer the IP to Neon Machine.

122.    Javarone didn't know the stock-purchase agreement was expired already as of the date he received it, as shown by his immediately executing it. By sending the Stock Purchase Agreement at the same time as the IP Sale Agreement, Neon Machine induced 4D Factory and Neon Media to sign the IP Sale Agreement, transferring Neon Media's valuable IP to Neon Machine for nominal consideration—which, as discussed below, Neon Machine never paid.

123.    Neon Machine's email of the share-purchase agreement was an act of fraud furthering the overall scheme. That the agreement could be argued to be void because the acceptance period expired was unknown to Javarone, 4D's Manager, when he received it. The contract's fraudulent nature was further masked by Neon Machine's later actions, like issuing stock certificates to 4D signed by Long and Nonis that say 4D's shares were "fully paid."

124.    On October 1, 2021, 4D Factory, relying on Neon Machine's representation that 4D was acquiring a 60% stake in Neon Machine—entitling it to three of the five seats on Neon Machine's board—caused Neon Media to transfer the valuable *Shrapnel* IP for just $500. To be clear, Neon Media's only consideration for the IP transfer itself was the payment of nominal value, $500 (which Neon Machine did not actually pay). That agreement, which stands on its own, was

intended to be part of a series of transactions by which 4D allowed these Neon Media employees, officers, and directors to pursue an existing Neon Media project in a new but Neon-affiliated vehicle 4D would control through a majority of share ownership and board seats.

125.   Over the next few months, Neon Machine, through its agents, led 4D Factory to believe it was a shareholder and that Neon Machine was upholding its end of the deal. For example, 4D's three directors, including Javarone, were added to the Neon Machine board in January 2022. That board meeting took place by videoconference. Those board seats "belonged" to 4D because of its 60% equity stake and a promise that 4D would always have a board seat. By accepting 4D's three directors, even though 4D allegedly didn't own shares, Neon Machine furthered the scheme to defraud 4D of the IP and line Defendants' pockets with a massive token giveaway.

126.   Soon after, Neon Machine engaged with Carta, an online provider of corporate services such as stock-certificate issuance and management. Neon Machine caused Carta to send 4D's share certificates via electronic communications—and those share certificates were signed by Long and Nonis. Those share certificates, dated August 20, 2021, state that "4D is the stockholder of Six Million (6,000,000) **fully paid** and non-assessable shares of Common Stock, par value $0.0001, of Neon Machine, Inc…."  As indicated by their signatures, Long and Nonis knew about the "fully paid" factual assertions in those shares. But that communication, at least according to Defendants' pleadings in this case, was false. Whether false or not, the communication was made in furtherance of the scheme because the misleading share certificate was intended to, and in fact did, bolster 4D's belief that it was a shareholder of Neon Machine with *de facto* control over the company because of its 60% equity stake.

127.   If Defendants' position were true, then the Carta stock certificates prove Neon Machine misled 4D Factory into believing it was a Neon Machine shareholder as of August 20,

2021. Around October 1, 2021, Long and the other Manager Defendants awarded and accepted for themselves over 522 million tokens. This created, in effect, a cabal of insiders, each of whom knew of the scheme to line their pockets with SHRAP tokens—harming the value of 4D's equity stake in Neon Machine. Despite 4D's director positions, it's been unable to obtain corporate records from the period that Long acted as the sole director and took many of the actions described in this complaint.   But it appears Long and the other Manager Defendants communicated between themselves about their employment agreements, token agreements, and other related documents in furtherance of the fraudulent scheme. Neon Machine, Long, and Nonis knew of this material information and never mentioned it to 4D or Javarone, 4D's Manager, despite the impact it had on the value of 4D's shares. Those omissions were fraudulent because Neon Machine, through its officers Long and Nonis, owed a fiduciary duty to 4D as a shareholder and Javarone as a director. These fraudulent omissions furthered the scheme because they concealed the transactions by which the Manager Defendants secretly gave themselves more than half a billion tokens.

128.   The members of the conspiracy did not merely omit material facts in the early stages of the scheme, they affirmatively obfuscated and misrepresented facts related to the token grant for years. Long and others in the enterprise ceased having formal board meetings to avoid being asked to report further, as Javarone had requested in January 2022. And they continued to withhold information about their massive token grab from the shareholders and the board of directors, including Javarone, because they knew Network Launch, as defined in certain SAFEs, would later occur, diluting 4D's majority ownership and board control and eliminating 4D's ability to investigate or remedy the self-serving token grant. By concealing the token grab until after they claim Network Launch occurred, Long and the other members of the enterprise tried to avoid 4D's directors moving for the Board to declare distribution of tokens to 4D Factory. 4D was directly

harmed by this fraud by omission—as demonstrated by the Defendants' current legal position claiming that the dividend declared by the Neon Machine board in January 2024 was unauthorized.

129.    Further, the January 26, 2022 board meeting was the first meeting of the full board, including 4D's three directors. In the videoconference meeting, Long presented the company's plans to launch the token, including the initial distribution plan. That presentation was materially misleading due to Long's omissions and half-truths. Nowhere did he share that he and his cohorts secretly granted themselves 522 million tokens. Through his omissions, Long sought to cheat 4D out of its valuable property by suppressing the token grab while 4D controlled the board.

130.    As 60% owner in Neon Machine, 4D had an ownership interest in Neon Machine's future release of tokens—none of which had been minted at that point. By giving away the right to those 522 million tokens, Long and his co-conspirators reduced the value of Neon Machine's token holdings, and thus reduced the value of 4D's pro rata share.  Had Long revealed his massive token grab, 4D could have thwarted this scheme early and avoided the token distribution once minted. Had 4D Factory known, it could have simply caused the board, which was under its control, to issue tokens to all founders, including 4D Factory. Or it could have caused the shareholders, of which it held a majority, to vote to change the corporate structure, or secure its share of the Token Giveaway (60%) or take other action to unwind the conspirators' wrongful acts before any tokens were transferred. Long's deceptive communications meant 4D Factory remained unaware of the conspirators' efforts to line their pockets with the company's assets. Long's half-truths and omissions made at the board meeting furthered the scheme to profit at 4D's expense.

131.    Even further, Neon Machine and Argon entered into services agreements where Neon Machine would perform tasks Neon Machine ostensibly hired Argon to perform—developing and operating the token network. In an agreement dated February 2, 2022, Neon

Machine assigned the IP to Argon—the same IP Neon Machine wrested from Neon Media—and agreed to perform essentially all the services associated with support for the token issuance.

132.    This agreement also furthered the scheme in multiple ways. It let Neon Machine maintain control of the actual blockchain network, rather than have an independent entity control that function. That's important because "Network Launch" under the Griffin and Polychain SAFEs cannot be triggered by a blockchain network that is not operated or managed by Neon Machine. Importantly, Long omitted any mention of this key part of the services agreement when he convinced the directors to approve it at the January 26, 2022 board meeting. That was a material omission because it meant Neon Machine had complete control over the conditions required to convert the SAFEs and reduce 4D's control over Neon Machine's governance—a core condition promised to 4D Factory to let the *Shrapnel* project go forward at Neon Machine.

133.    The services agreement also lets Neon Machine profit from Argon's token sales by invoicing Argon for services. Neon Machine seems to be operating a Panama foundation to funnel funds from Argon's token sales back to it for services Argon was supposed to perform. Defendants' allege that Argon "…was recommended to Neon [Machine] by outside experts to assist with the development of the SHRAP token and related [n]etwork." But that's at best a half-truth. Those services are being performed by Neon Machine under the services agreement. And the funds paid to Neon Machine by Argon have been recycled into the enterprise to further the scheme.

134.    Argon Protocol Foundation took actions supporting the conspiracy too. It entered into Token Subscription Agreements with Long and the other Manager Defendants as early as November 2021. Those agreements were actually created and signed later but backdated to November 8, 2021. Argon signed those documents electronically via Docusign. Argon has also sold tokens in furtherance of the conspiracy, and paid money to Neon Machine used in furtherance

of it. For example, Long's email dated July 29, 2022 describes token sales by Argon to investors for $7 million. That letter notes that Argon then paid Neon Machine for services allegedly provided by Neon Machine to Argon.

135.    Another act furthering the scheme to defraud 4D Factory occurred in Long's July 29, 2022 email to Javarone. The email omits any disclosure of the critical fact that Long and his co-conspirators granted themselves 522 million tokens—tokens that, when ultimately minted, would have otherwise been available for Neon Machine to sell or use with the game's development—the same as the tokens Neon Machine now describes as "treasury." By this deceptive communication, Long attempted to cheat 4D Factory out of its property—hiding the token grab until a future Network Launch, when 4D would lose its majority board seats and control.

136.    Griffin, through its directors, took actions in support of the enterprise too. Through its director, it sent a letter around September 14, 2023, demanding conversion of SAFEs due to a supposed Network Launch. Griffin took that step to further the scheme because the request was made to ensure that 4D Factory would lose control of two of its three board seats, and thus lose the ability to investigate the ultra vires acts and remedy the harm caused by the token grab. Griffin's actions demonstrate its awareness of the enterprise's scheme to defraud 4D. Giffin's actions also represent an intentional participation in that scheme to defraud 4D.

137.    All these examples were part of a multi-year, interstate and international effort by the enterprise to acquire 4D's valuable asset and permission, grant themselves tokens worth millions of dollars while engineering a scheme to avoid giving 4D its promised tokens, and then conspire to cover up the enterprise's wrongdoing before 4D could remedy that wrong. This effort is ongoing and will only be stopped with Court intervention.

### THE 4D FACTORY'S CLAIMS

### COUNT I
### (Breach of Contract)
### (Against Neon Machine Inc.)

138.    Plaintiff realleges and incorporates by reference each allegation set forth in this complaint.

139.    Plaintiff was the majority shareholder in Neon Media LLC. And Neon Media LLC owned the Shrapnel intellectual property rights. To convince Plaintiff to allow Neon Media LLC to transfer the Shrapnel intellectual-property rights to new entity Neon Machine, Inc., the Manager Defendants made several agreements on behalf of Neon Machine Inc. In exchange for Plaintiff 4D transferring the Shrapnel intellectual property rights, Neon Machine Inc. agreed:

     a.    Plaintiff 4D Factory LLC would become a 60% owner of Neon Machine, Inc.;

     b.    Plaintiff 4D Factory LLC would occupy three of Neon Machine Inc.'s five board seats;

     c.    Plaintiff 4D Factory LLC would receive tokens proportional to its equity share; and

     d.    Plaintiff 4D Factory LLC would receive the Manager Defendants' share of any dividends (including tokens) until Plaintiff 4D Factory LLC recouped its entire capital investment in Neon Media, at the time more than $2.3M.

140.    Neon Machine, Inc. breached each of these obligations while Plaintiff 4D Factory LLC performed by causing Neon Media LLC to transfer the Shrapnel intellectual property. Specifically, Neon Machine, Inc. issued secret dividends in the form of tokens to the Manager Defendants and Fund Defendants, but none to Plaintiff. In other words, the insiders all paid themselves handsomely, but conspicuously disregarded the majority and founding shareholder 4D Factory. This even though Plaintiff only ever agreed to transfer the Shrapnel intellectual property upon the promises that it would actually receive its promised tokens, backed up by the promise by

Neon Machine's other founders that 4D would recoup its capital investment before any dividends would be paid.

141. Alternatively, if Plaintiff did not contract directly with Neon Machine, Inc., it was the intended third-party beneficiary of the agreement between Neon Media LLC and Neon Machine, Inc. as it was intended to reap the benefit of its shareholder and board control status in Neon Machine, just as it had in Neon Media, together with the right to participate in any token distribution at the same level.

142. In any event, Neon Machine Inc. failed to perform its obligations and breached the agreement with Plaintiff. And to the extent Defendants read other terms into the arrangement to excuse the breach, their behavior violates the implied duty of good faith and fair dealing.

143. As a result, Plaintiff has been damaged in an amount equal to the value of the board control and token distribution that was promised but never provided to it, amounting to approximately 480 million tokens, together with any and all other damages or remedies available to it, including rescission, attorney's fees and costs

## COUNT II
### (Turnover and Accounting of Property)
**(Against Manager Defendants, Neon Machine, Inc., Argon Protocol Foundation, and Argon Asset Ventures Corp.)**

144. Plaintiff realleges and incorporates by reference each allegation set forth in this complaint.

145. Section 541 of the Bankruptcy Code provides that a debtor's estate is comprised of, subject to certain exceptions, "all legal or equitable interests of the debtor as of the commencement of the case." 11 U.S.C. § 541(a)(1).

146. Section 542 of the Bankruptcy Code provides that an entity in possession, custody, or control during the case of property that the trustee may use, sell, or lease under section 363 of

the Bankruptcy Code "shall deliver to the trustee, and account for, such property or the value of such property, unless such property is of inconsequential value or benefit to the estate." 11 U.S.C. § 542(a).

147.    Plaintiff was promised SHRAP Tokens in proportion to Plaintiff's equity interests in Neon Machine. Plaintiff has good cause to believe that SHRAP Tokens to which it is entitled have been and are being improperly held by Manager Defendants, Neon Machine, Inc., Argon Protocol Foundation, and Argon Asset Ventures Corp., who are acting together in furtherance of their wrongful acts, as described in more detail in this complaint, that should be turned over to Plaintiff's bankruptcy estate immediately as promised.

148.    Plaintiff has a legal and equitable interest in the SHRAP Tokens being so held. Although Neon Machine, through its board, authorized the *pro rata* release of SHRAP Tokens including Plaintiff's SHRAP Tokens by delivery to Plaintiff's wallet address, those SHRAP Tokens have not been released.  To the extent SHRAP Tokens constitute "treasury stock" of Neon Machine, the action by the Board was in keeping with Article V, Section 1 of the Bylaws, not to mention in accordance with the process provided by the Manager Defendants and their counsel.

149.    Plaintiff has good cause to believe that the Manager Defendants have continued to sell or give away SHRAP Tokens to reduce the total amount remaining to distribute to stockholders, including to Plaintiff. Manager Defendants continue to withhold information regarding the current pool of SHRAP Tokens remaining to distribute. Plaintiff has only recently been able to discover that Manager Defendants gifted 552,602,013 to themselves and distributed nothing to Plaintiff. Plaintiff remains entitled to the 480,927,488 SHRAP Tokens the Manager Defendants represented it was entitled to as its *pro rata* share based on Plaintiff's initial equity. In

addition, Plaintiff is entitled to receive, at minimum, 60% of the SHRAP Tokens Manager Defendants distributed to themselves, or 331,561,208 tokens.

150.    The SHRAP Tokens can be used, sold, or otherwise transferred for value by Plaintiff as a debtor in the Chapter 11 Cases. SHRAP Tokens are currently in circulation. At a value just $0.05 per token, Plaintiff could potentially yield more than $40 million from the sale, over time, of its SHRAP Token, multiples of what's needed to fund the Debtor's plan.

151.    The Manager Defendants, Neon Machine, Inc., Argon Protocol Foundation, or Argon Asset Ventures Corp., currently have possession, ownership, or dominion over the tokens such that one or all of them are the only individuals or entities with the ability to effectuate a transfer of the tokens, whether by contractual authority or otherwise.

152.    Accordingly, under 11 U.S.C. § 541(a) and 542(a), Plaintiff demands (i) immediate compliance with the Board's directive to release the SHRAP Tokens to Plaintiff, *i.e.* the immediate turnover to Plaintiff of 480,927,488 SHRAP Tokens and (ii) turnover of 331,561,208 SHRAP Tokens, or a rescission of all Token Giveaways and a redistribution on an undiluted, *pro rata* basis with all Defendants' alleged rights equitably subordinated given their improper conduct, and (iii) an accounting of the Total Network Tokens.

153.    Additionally, to the extent the Manager Defendants, Neon Machine, Inc., Argon Protocol Foundation, or Argon Asset Ventures Corp. have sold any SHRAP Tokens that constitute property of the estate, Plaintiff also demands the immediate turnover from Manager Defendants of 60% of the proceeds received for those sales.

**COUNT III**
**(Fraud/Breach of Fiduciary Duty of Disclosure)**
**(Against Manager Defendants)**

154.    Plaintiff realleges and incorporates by reference each allegation set forth in this complaint.

155.    The Manager Defendants, in their respective capacities as directors and officers of Neon Machine, owed fiduciary duties, including the fiduciary duties of loyalty and disclosure, to the company and to 4D Factory, who was a shareholder at Neon Machine.

156.    As detailed in this complaint, the Manager Defendants, working in concert, knowingly made a series of material misrepresentations, including omissions, to Plaintiff to induce Plaintiff, and to cause its controlled company, Neon Media, to agree to the creation of Neon Machine, as well as the transaction with Griffin and Polychain, and then to mislead Plaintiff about the truth of its interest.

157.    In particular, in the time just before the October 1, 2021 IP Sale Agreement, Long represented to Plaintiff that (1) 4D Factory would maintain 60% ownership equity in Neon Machine, (2) 4D would hold three of five seats on the Board and governance would remain unchanged; and (3) 4D would receive SHRAP Tokens as holder of 60% equity in Neon Machine, in proportion to its equity; and (4) 4D would recoup its prior investment from the Manager Defendants' share of dividends. These representations were false, and Long knew it. Long promised 4D Factory three board seats, as evidenced by his September 2, 2021 email to 4D members including Javarone. Yet he told Griffin and Polychain, in his term sheet for the preferred shares, which was finalized by September 29, 2021, that 4D would receive just one board seat, and the other two would be designated as "common." This was material because it meant that 4D would have no board control once the Griffin and Polychain's SAFEs converted.

158.    Long's representation was also materially false because 4D did not actually receive

tokens. The Manager Defendants, through Long and Zhou, referred to "4D's token" and omitted

any characterization of those tokens as "treasury," which was material because those are not owned

by the shareholders but are available only if Neon Machine's board authorizes a distribution. That

omission was repeated and amplified by others, including Zhou. The omission of that material fact

was purposefully designed to keep 4D Factory unaware of the deceptions to deny 4D over 400

million tokens it was entitled to, while it controlled the board and the majority of the company's

shares—when it could have remedied the wrong by allowing a distribution.

159.    On October 1, 2021 at 3:47 PM Eastern, just hours before 4D caused Neon Media

to turn over its Shrapnel IP for consideration of just $500, Long emailed Javarone, 4D's manager,

and communicated the Manager Defendants' agreement to pledge dividends to 4D to allow 4D to

recoup its investment.[40] 4D took that to mean that each of those Manager Defendants understood

the need to provide value to 4D given its multi-million dollar investment at Neon Media. And to

that end, by approving the Recoupment Agreements, each Manager Defendant represented to 4D

Factory that it would be paid back for its significant investments.

160.    One glaring omission from the agreement to recoup 4D's investment was the fact

that the Manager Defendants had hatched a scheme to grab for themselves hundreds of millions of

tokens without allocating 4D its *pro rata* share. That omission by each of them was material

because, with those token grants in their employment agreements, they had no need to receive

tokens through a traditional, board-approved dividend. The omission was intended to cause 4D to

cause Neon Media to grant its IP and support to the Shrapnel project at Neon Machine. 4D did, in

---

[40] This misleading communication did not involve Zhou, who did not own units of Neon Media.

fact, cause Neon Media to transfer that IP less than four hours after receiving confirmation of the misleading recoupment promise.

161.    But for these representations by Neon Machine's then-CEO and manager/shareholders, 4D wouldn't have agreed to the transactions. It reasonably believed the Manager Defendants' representations were true because it had not been informed that Long secretly and unilaterally gave himself all power over Neon Machine through the Bylaws and had no reason to believe the Manager Defendants would intentionally sabotage 4D's investment.

162.    These representations and omissions, individually and as part of an overall scheme, were false when made, and the Manager Defendants knew they were false, or made them recklessly without knowledge of their truth. The Manager Defendants never intended to pay back 4D Factory for its investments. They intended to induce 4D to transfer the *Shrapnel* IP out of Neon Media, and to agree to the SAFEs with Griffin and Polychain, by misleading and defrauding 4D.

163.    Once the Manager Defendants got what they wanted, they each consciously and recklessly undertook efforts to sabotage 4D's investment. This coverup violated the Manager Defendants' duty of disclosure. And Long then set up 4D's equity for significant dilution upon launching *Shrapnel* by closing on more SAFEs without notice to or approval of the board. Long gave over a billion tokens to the Manager Defendants, and Griffin and Polychain without notice.

164.    Each Manager Defendant entered into Offer Letters with Neon Machine and Token Subscription Agreements with Argon Foundation to grant themselves millions of SHRAP Tokens not offered to 4D. Because all services related to generating and distributing SHRAP Tokens were performed by Neon Machine, each Manager Defendant knew or should have known that, through the Token Subscription Agreements, they were essentially contracting with themselves to give

themselves SHRAP Tokens. As Neon Machine officers, each Manager Defendant had a duty to disclose that material information to 4D, who was a Neon Machine shareholder.

165.    From the appointment of the full Board on January 26, 2022, each Manager Defendant worked with Long to conceal the status of the SHRAP Tokens from 4D and withhold all of Neon Machine's vital financial and operational information from the 4D directors.  Other steps, including attempts to conceal conduct and insulate the Manager Defendants, represent more fraudulent conduct and breaches of fiduciary duty, all to cover up their wrongdoing.  In fact, aside from information provided by outside counsel Fenwick West in August, who've since resigned, each Manager Defendant continues to withhold all material information from the 4D directors. Each Manager Defendant was and participates in the scheme to defraud 4D.  This failure to disclose material information violated each Manager Defendants' duty of disclosure.

166.    The Manager Defendants' breaches of fiduciary duty went beyond just fraud and withholding material information from 4D. Nonis, the COO, breached his fiduciary duty by making an employment offer to Long that was not approved by the board. Even if agreement were approved by the board, it happened while Long was the sole director. And to the extent Long approved employment agreements containing token grants and equity grants for the other Manager Defendants, Long likewise breached his fiduciary duty to 4D. Long did not avail himself of any of the safe-harbor provisions of DGCL 144 in that he did not have disinterested directors consider the token and equity grants. He elected to not have the shareholders approve those transactions, and those transactions were not in the company's best interests. Long was not a disinterested director when ratifying the token grants and equity grants to the Manager Defendants; he was beholden to those people because each received a secret token grant that was not disclosed to 4D.

Those massive token grants, on top of the equity grants, were intended to and did line the Manager Defendants' pockets at the expense of Neon Media and 4D.

167. As a direct, proximate, and foreseeable result of the Manager Defendants' continuing fraud against 4D, Plaintiff suffered and sustained and is entitled to recover from the Manager Defendants, jointly and severally, actual, general, compensatory and consequential damages in an amount to be proven at trial but no less than $10 million.

168. As a direct, proximate, and foreseeable result of the Manager Defendants' breaches of their fiduciary duties, 4D Factory suffered substantial losses of equity value at Neon Machine, in an amount to be determined at trial but not less than $10 million. 4D likewise suffered from the diminution of the value of its equity stake at Neon Machine through the self-serving token grab. Alternatively, 4D is entitled to a declaration that these transactions addressed are void or voidable.

169. Plaintiff made a demand on Neon Machine requesting that the company consider bringing this claim. Neon Machine declined the opportunity to pursue this claim.

## COUNT IV
### (Fraudulent Concealment/Breach of Fiduciary Duty of Disclosure)
### (Against Fund Defendants)

170. Plaintiff realleges and incorporates by reference each allegation set forth in this complaint.

171. To the extent the Fund Defendants held seats on the Neon Machine board, they were fiduciaries to Neon Machine and its shareholders, including 4D, and therefore owed a duty to disclose accurate information to it regarding board meetings and significant actions taken by Neon Machine as a result of such board meetings.

172. The Fund Defendants knew the 4D Directors were not given notice of the scheduling or results of these meetings with Long. They deliberately concealed or disclosed no meetings they held with Long to the 4D directors. Through their respective directors, they chose

not to inform 4D's directors about these meetings so it would be unaware of and unable to take a position on any of the actions Long, and the Fund Defendants sought to perform.

173.    4D Factory, as 60% owner of Neon Machine and holder of three seats on its board, was justified in relying on the Fund Defendants' silence. Griffin and Polychain were fiduciaries of Neon Machine and obligated to follow Neon Machine's Bylaws, including as to board meetings. 4D was given no notice or information to suggest that these illicit meetings were occurring. Had it been notified of these meetings, it would've participated, obtained information about the business and 4D's investment, and prevented or at least tempered Defendants' harmful acts.

174.    This concealment allowed Long to execute significant acts on Neon Machine's behalf with the false stamp of board approval, even though each of those actions and meetings violated Neon Machine's bylaws. These actions included issuing additional SAFEs with Griffin in mid-2023.  Further, when the board sought to investigate the alleged Network Launch, the Fund Defendants obstructed the board from launching the investigation—knowing it could result in their SAFEs being deemed unconverted. And when the board sought to retain professionals to raise financing for Neon Machine, the Fund Defendants ignored the board's attempts, and sought with Long to cram down a flawed equity investment to accelerate the SAFEs' conversion.

175.    The Fund Defendants, through their directors, breached their fiduciary duty of care by withholding key financial and operational information about Neon Machine from 4D's board directors. They knew or had reason to know Long was deliberately excluding the other 4D directors from important meetings and decisions about Neon Machine's fate by the lack of notices being sent to the full board and the 4D directors' absence from these meetings. Rather than alert their fellow board members (and indeed the majority shareholder) about the operations and financials of Neon Machine, they facilitated the obstruction of Long and his team.

176.   The Fund Defendants have since refused to engage with the 4D directors in any way, except to obstruct legitimate board oversight in board meetings. And they openly declared at the January 12, 2024 board meeting that they voted for and elected different directors after the November 13, 2023 board meeting. Given the lack of visibility to the full board regarding the financials and management at Neon Machine, it appears the Fund Defendants are continuing to authorize the Manager Defendants' actions and operate the business with Long completely detached from board knowledge or authorization.

177.   Because of this silence, and the Fund Defendants' prior and continued breaches of their fiduciary duties, Long and the Manager Defendants, with the Fund Defendants' endorsement, engaged in their bad acts without 4D's knowledge. 4D Factory was unable (and remains unable) to determine the status of its negotiated-for SHRAP Tokens. The 4D directors have been unable to access (and remain unable to access) Neon Machine's vital financial and operational information on Neon Machine and the project. 4D has been rendered unable to even discover, let alone act to prevent, Long's wrongful actions at Neon Machine. 4D's equity in Neon Machine is now subject to significant dilution because of the agreements for future stock Long entered Neon Machine into with the Fund Defendants' approval but without notice or approval of the full board. And the Fund Defendants had refused even to acknowledge the 4D board members' legitimate positions on the board. 4D has incurred substantial costs, including legal fees, to address the Fund Defendants' breaches.

178.   4D Factory is entitled to recover from the Fund Defendants, jointly and severally, actual, general, compensatory and consequential damages in an amount to be proven at trial but no less than $10 million.

## COUNT V
### (Breach of Fiduciary Duties of Loyalty and Care)
### (Against Manager Defendants)

179. Plaintiff realleges and incorporates by reference each allegation set forth in this complaint.

180. The Manager Defendants, as managers, officers and directors of Neon Machine and those controlling Neon Machine, owed fiduciary duties of care, disclosure, and loyalty to Neon Machine's shareholders, including majority stockholder 4D Factory.

181. The Manager Defendants breached their fiduciary duty of loyalty to Neon Machine and its shareholders by—without notice to or consent of the full board of Neon Machine—significantly diluting 4D's equity by issuing unauthorized SAFEs, snatching up hundreds of millions of SHRAP Tokens for themselves, entering into the Token Subscription Agreements without notice to, or approval by, shareholders (knowing or having reason to know Argon Foundation was a shell), and deliberately misrepresenting the nature of 4D's SHRAP Tokens.

182. Neon Machine is not subject to the same control applicable to Neon Media and the Manager Defendants exploited those differences for their personal benefit or to raise capital on terms that were not permissible under Neon Media's framework, the Manager Defendants breached their fiduciary duty of loyalty by, among other things, usurping a corporate opportunity that belonged to Neon Media.

183. The Manager Defendants who were employed at Neon Media acted in concert because they could not take the *Shrapnel* opportunity to a new entity without Neon Media's permission (or its controlling member's, 4D). Throughout the events described in this complaint, and in particular those events giving rise to this claim, the Manager Defendants acted as a group to breach their duties to Neon Media, Neon Machine, and the majority shareholder of both—4D.

184.    The Manager Defendants breached their fiduciary duty of care and disclosure by misrepresenting the SHRAP Token capitalization to 4D and withholding vital financial and operational information about Neon Machine from 4D's board directors. Long in particular entered into significant additional SAFE financing without notice to or consent of the board and conducted improper "Board meetings" without notice to 4D's two directors. Each other Manager Defendant worked directly with Long to cause these breaches.

185.    As a result of the Manager Defendants' breaches of fiduciary duties, Plaintiff was wrongfully induced into allowing the transfer of its subsidiary's valuable IP to Neon Machine. The Manager Defendants' breaches have caused 4D Factory to receive no proceeds from Neon Machine, despite the millions of dollars and valuable IP it provided to support the Manager Defendants. 4D Factory has incurred substantial costs, including legal fees, to address the Manager Defendants' breaches. And the Manager Defendants' refusal to recognize 4D's rights in the face of the debts 4D took on to fund their projects is a primary precipitator of this bankruptcy.

186.    4D Factory is entitled to recover from the Manager Defendants, jointly and severally, actual, general, compensatory and consequential damages in an amount to be proven at trial but no less than $10 million. Alternatively, it's entitled to a declaration that the transactions addressed here are void or voidable.

### COUNT VI
### (Aiding & Abetting Breaches of Fiduciary Duty)
### (Against Foran, Lackaff, Nonis, Norbury, Yeend, Zhou)

187.    Plaintiff realleges and incorporates by reference each allegation set forth in this complaint.

188.    Long, a  CEO and former board director of Neon Machine, owed fiduciary duties of care and loyalty to Neon Machine's shareholders, including 4D, and breached those duties.

189.    To the extent any of the Manager Defendants Foran, Lackaff, Nonis, Norbury, Yeend, and Zhou are not fiduciaries, they had actual or constructive knowledge that Long was breaching his fiduciary duties. Defendants Foran, Lackaff, Nonis, Norbury, Yeend and Zhou worked with Long daily in developing the Shrapnel game and operating Neon Machine while shutting 4D out from oversight of the company.  Defendants Foran, Lackaff, Nonis, Norbury, Yeend, and Zhou knew or should've known the Argon entities were shells created by Long because Neon Machine was responsible for generating and distributing SHRAP Tokens.

190.    Therefore, Defendants Foran, Lackaff, Nonis, Norbury, Yeend and Zhou knowingly participated in Long's breaches by executing the Offer Letters and the Token Subscription Agreements, generating the contradictory February 2022 Cap Table and the Internal Cap Table, and withholding virtually all information about the financials and operations of Neon Machine while Long was seated on the Board.

191.    Because of Long's breaches of fiduciary duties, as aided and abetted by Defendants Foran, Lackaff, Nonis, Norbury, Yeend, and Zhou, 4D Factory transferred the *Shrapnel* IP to Neon Machine. These defendants aided and abetted Long's breaches to ensure 4D would receive no proceeds from Neon Machine, despite the millions of dollars 4D provided to fund their work. 4D Factory has incurred substantial costs, including legal fees, to address Long's ultra vires actions and breaches of fiduciary duty. His refusal to recognize 4D's rights given the debts it incurred to fund the project is a primary precipitator of this bankruptcy.

192.    4D Factory is entitled to recover from Defendants Foran, Lackaff, Nonis, Norbury, Yeend, and Zhou, jointly and severally, actual, general, compensatory and consequential damages in an amount to be proven at trial but no less than $10 million.

**COUNT VII**
**(Aiding and Abetting Breach of Fiduciary Duties of Loyalty and Care)**
**(Against Fund Defendants)**

193.   Plaintiff realleges and incorporates by reference each allegation set forth in this complaint.

194.   As established, Long as the CEO and former board director of Neon Machine, at all relevant times owed fiduciary duties of care and loyalty to the shareholders of Neon Machine, including Plaintiff, and breached those fiduciary duties.

195.   Each of Fund Defendant had actual or constructive knowledge that Long was breaching his fiduciary duties. They routinely met or communicated with Long without 4D's other board members in 2022 and 2023 and onward. The Fund Defendants knew or should've known Long was excluding the other 4D directors from significant developments at Neon Machine.

196.   Therefore, the Fund Defendants knowingly participated in Long's breaches by holding invalid meetings and making invalid decisions with Long to facilitate his commandeering of Neon Machine. And then, when 4D appropriately and legally removed Long from its board seat, the Fund Defendants rejected his removal and claimed the 4D directors were illegitimate.

197.   As a result of Long's breaches of his fiduciary duties, as aided and abetted by the Fund Defendants, 4D Factory has incurred substantial costs, including legal fees, to address Long's ultra vires actions and breaches of fiduciary duty. 4D is thus entitled to recover from the Fund Defendants, jointly and severally, actual, general, compensatory, and consequential damages in an amount to be proven at trial but no less than $10 million.

## COUNT VIII
### (Promissory Estoppel)
### (Against Neon Machine and the Manager Defendants)

198.    Plaintiff realleges and incorporates by reference each allegation set forth in this complaint.

199.    To the extent any of the elements of any of the following contracts were not met, such that no valid contract exists, 4D hereby pleads this claim in the alternative.

200.    To induce 4D to transfer the *Shrapnel* IP and enter into SAFEs with Griffin and Polychain, Long made clear and unambiguous promises to 4D that (1) it would maintain 60% control of equity in Neon Machine, (2) it would hold three of five seats on the Board that was subject to the same governance terms; (3) it would receive SHRAP Tokens as holder of 60% equity in Neon Machine, in proportion to its equity; and (4) it would recoup its investment through the Manager Defendants' share of dividends. Indeed, under the Recoupment Agreements, the Manager Defendants made clear and unambiguous promises to 4D that they would assign to it their portion of any dividends by Neon Machine until it was repaid for its capital contribution into Neon Media.

201.    4D Factory reasonably and justifiably relied to its detriment on Neon Machine's and the Manager Defendants' promises in approving the IP Transfer Agreement and the SAFEs and incurring substantial legal fees and other costs.

202.    But Neon Machine's and the Manager Defendants' promises were hollow. By simultaneously arranging the Token Giveaway, locking 4D's tokens into treasury tokens, and setting up 4D's equity interests in Neon Machine for future dilution without notice or authorization, Neon Machine and the Manager Defendants worked concertedly to ensure that Plaintiff would never receive a return on its investment. Meanwhile, each Manager Defendant has received massive payouts in SHRAP Token, which they granted themselves.

203. As a proximate and foreseeable result of Neon Machine's and the Manager Defendants' promises, Plaintiff hasn't seen any return on its risk capital investment into Neon Media and Neon Machine, and has incurred damages and lost opportunity costs proximately caused by Plaintiff's reasonable and justifiable reliance on these promises. Justice requires that Neon Machine's and the Manager Defendants' promises to 4D be enforced. 4D is therefore entitled to actual, general, compensatory and consequential damages in an amount to be proven at trial but no less than $10 million.

## COUNT IX
### (Declaratory Relief)
### (Against Defendants)

204. Plaintiff realleges and incorporates by reference each allegation in this complaint.

205. An actual and substantial controversy has arisen and now exists between 4D on one hand and Defendants on the other. 4D contends, as stated, that the parties agreed in exchange for the transfer of the *Shrapnel* IP to Neon Machine that it would be entitled to (1) receipt of SHRAP Tokens in direct correlation to Plaintiff's equity in Neon Machine; (2) assignment of Manager Defendants' rights to dividends in Neon Machine; and (3) oversight and control through three seats on the five-seat Board of Neon Machine; and (4) a 60% ownership interest in Neon Machine. 4D also contends it would be inequitable and unjust if the integrated agreements surrounding the transfer of the *Shrapnel* IP were not enforced in accordance with their terms.

206. Defendants contest and dispute Plaintiff's contentions regarding the agreements and promises that induced 4D to transfer the *Shrapnel* IP.

207. The transactions entered into without Plaintiff's knowledge as described in in this compliant, including those entered into by Long in his alleged capacity as sole director, are void or voidable because they were undertaken without requisite corporate authority or approval. 4D is therefore entitled to a declaration that these transactions lack form or effect.

208.    This controversy is of sufficient immediacy to warrant judicial relief under the Declaratory Judgment Act, 28 U.S.C. §§ 2201–2202.

209.    4D is entitled to a declaration that the agreements and promises set forth in this complaint in connection with the transfer of the *Shrapnel* IP to Neon Machine are enforceable in accordance with their terms, that Plaintiff may receive the SHRAP Tokens in direct proportion to its equity interests, totaling 480,927,488 SHRAP Tokens as well as its *pro rata* share of the Managers' special 2021 distribution to "Founders", i.e., an additional 331,561,208 SHRAP Tokens, that Manager Defendants committed fraud and breached their fiduciary duties in violating the agreements and promises made to 4D, that Fund Defendants committed fraudulent concealment and breached their fiduciary duties in concealing the occurrence of purported board meetings and invalidly authorizing actions on behalf of Neon Machine under those meetings; and that such purported board meetings were invalid and therefore any actions or directives taken by Long and the Fund Defendants then were invalid and unauthorized. 4D is entitled to a determination of the appropriate allocation of SHRAP Tokens between Plaintiff and Defendants.

## COUNT X
### (Conversion)
### (Against Manager Defendants, Neon Machine, Argon Protocol Foundation, and Argon Asset Ventures Corp.)

210.    Plaintiff realleges and incorporates by reference each allegation set forth in this complaint.

211.    4D Factory has a legal right to 60% of the distributed SHRAP Tokens as 60% owner. The SHRAP Tokens were promised to it by Neon Machine, through Long, in proportion to 4D's equity in Neon Machine. The promise of the SHRAP Tokens was a necessary condition to 4D allowing Neon Media to transfer the *Shrapnel* IP to Neon Machine.

212.    The Manager Defendants wrongfully disposed of and converted 4D's promised SHRAP Tokens as if they were their own. Despite 4D's demands for distribution of its SHRAP Tokens, they refuse to distribute them and have misrepresented to 4D the status of the tokens.  The Manager Defendants now take the position that no SHRAP Tokens are allocated to 4D.  If there are in fact no SHRAP Tokens to be distributed to it, then the Manager Defendants distributed to themselves SHRAP Tokens that should've been reserved for distribution to 4D. The Manager Defendants seized and used 4D's interests in the available SHRAP Tokens at their whim.

213.    And Neon Machine or its agents, Argon Protocol Foundation and Argon Asset Ventures Corp., control the SHRAP tokens.

214.    Neon Machine has already distributed hundreds of millions of SHRAP tokens to the Manager Defendants. These distributions represent 100% of SHRAP distributions to Neon Machine shareholders, meaning that 60% of the tokens held by the Manager Defendants belong to 4D (and therefore have been converted).

215.    As a result of Manager Defendants' and Neon Machine, Argon Protocol Foundation, and Argon Asset Ventures Corp.'s unlawful withholding of 4D's SHRAP Tokens, and their unlawful dominion over the SHRAP tokens generally, 4D has received none of the SHRAP Tokens promised to it, or any of the tokens it had a right to as 60% shareholder at the time of the distribution. As a result, 4D has missed an incredible amount of value in its investment. And the unlawful dominion over the SHRAP tokens by the Manager Defendants, Neon Machine, Argon Protocol Foundation, and Argon Asset Ventures Corp. has been solely for the purpose of their own self-enrichment at the cost of 4D as the majority shareholder.

216. Further, to the extent any of the elements of the contract described above between Neon Machine and 4D were not met, such that no valid contract exists, 4D pleads this claim in the alternative as it relates to those claims.

217. 4D Factory is entitled to a judgment against the Defendants directing them to transfer to Plaintiff 480,927,488 SHRAP Tokens, as well as its pro rata share of the Managers' special 2021 distribution to "Founders," *i.e.,* an additional 331,561,208 SHRAP Tokens.

### COUNT XI
### (Fraudulent Transfer)
### (Against Defendant Neon Machine and the Manager Defendants)

218. Plaintiff realleges and incorporates by reference each allegation set forth in this complaint.

219. A transfer made or obligation incurred by a debtor is fraudulent as to a creditor if the debtor made the transfer or incurred the obligation with actual intent to hinder, delay or defraud any creditor of the debtor. 6 Del. C. § 1304(a)(1).

220. Plaintiff is a "creditor" to Neon Machine, as the term is defined under 6 Del. C. § 1301(4). Neon Machine is a "debtor" to Plaintiff, as the term is defined under 6 Del. C. § 1301(6). Each Manager Defendant is an "insider" of Neon Machine, as the terms is defined under 6 Del. C. § 1301(7)(b).

221. Neon Machine was insolvent based on its balance sheet showing negative shareholder equity at the time of the November 2021 transfer of the 552 million SHRAP Tokens to the Manager Defendants.

222. Long approved the transfer of more than 552,602,013 SHRAP Tokens to them with actual intent to hinder, delay, or defraud 4D, a creditor. The Manager Defendants intended to prevent 4D from recovering its share of tokens. The Manager Defendants granted the SHRAP Tokens to themselves, and then represented to 4D that its promised tokens did not belong to it.

66

223.    As far as the Token Giveaway constituted dividends to the Manager Defendants, Long willfully approved the distribution to the Manager Defendants to avoid paying 4D amounts due to it under agreements and as Neon Machine's majority stockholder.

224.    4D Factory is therefore entitled to a judgment against the Manager Defendants directing the return to 4D of those tokens.

### COUNT XII
### (Unjust Enrichment)
### (Against Manager Defendants)

225.    Plaintiff realleges and incorporates by reference each allegation set forth in this complaint.

226.    The Manager Defendants have received over 552,602,013 SHRAP Tokens because of their control of Neon Machine, Argon Foundation, and Argon Corp.

227.    Plaintiff, as 60% stockholder, was entitled to 60% of the Distribution, or 331,561,208 SHRAP Tokens.

228.    By distributing the full amount of 552,602,013 SHRAP Tokens to themselves, each Manager Defendant took for themselves SHRAP Tokens intended for 4D, and therefore were enriched at its expense. 4D has a legal and equitable interest in the SHRAP Tokens they're holding.

229.    Neither the Manager Defendants nor Neon Machine have made any payments to 4D to compensate it for receiving any of the unauthorized SHRAP Tokens belonging to it.

230.    Equity requires the Manager Defendants to return the 331,561,208 SHRAP Tokens.

## COUNT XIII
### (Fraudulent Transfer)
### (Against Neon Machine, Inc)

231.    Plaintiff realleges and incorporates by reference each allegation set forth in this complaint.

232.    Long, Foran, Lackaff, Nonis, Norbury, and Yeend (each a "Neon Media Employee") each executed member/employment agreements with Neon Media around July 24, 2020.[41]

233.    The Neon Media Employees each received ownership units of Neon Media.

234.    While each Neon Media Employee agreed to keep their employment at Neon Media after they started working at Neon Machine, all eventually reneged and stopped working there.

235.    In April 2023, Grossman sent Javarone agreements where the Neon Media Employees would forfeit their shares in Neon Media ("Neon Media Forfeiture Agreements").[42]

236.    When the release agreements were presented to Javarone (4D's manager), Grossman was 4D's general counsel. He was also, and still is, Neon Machine's lawyer. He did not disclose the potential conflict to Javarone as to the Neon Media Forfeiture Agreements.

237.    The Neon Media Forfeiture Agreements each contain a provision that would, on its face, release Neon Media's claims, known and unknown, against the Neon Media Employees and, if read overly broad, Neon Machine.

238.    As discussed below, the release provision in the Neon Media Forfeiture Agreements is unconscionable and unenforceable.

---

[41] Exhibit Q.

[42] A copy of a representative forfeiture agreement is attached as **Exhibit R**.

239.    At no point did Javarone or Neon Media request the forfeiture agreements. They were proposed to him by Grossman as part of an "clean up" at Neon Media.

240.    These agreements binding Neon Media and releasing such claims were secured through the deceptive and disloyal actions of a conflicted attorney, Andrew Grossman.

241.    At the time the Neon Media Forfeiture Agreements were executed, 4D Factory was a creditor of an insolvent Neon Media within the meaning of California's Uniform Voidable Transactions Act and the Bankruptcy Code.[43]

242.    And, within the meaning of these authorities, when Neon Media released the Neon Media Employees and, potentially Neon Machine (each of whom are insiders), it received less than reasonably equivalent value for potentially releasing valuable claims.[44]

243.    Because no claims were released for reasonably equivalent value while Neon Media was insolvent, the releases are constructive fraudulent transfers under § 548 of the Bankruptcy Code and California's Uniform Voidable Transactions Act.[45]

244.    As a Neon Media creditor, then, 4D Factory may avoid the releases and receive any other relief available under these fraudulent-transfer statutes and any applicable other law.[46]

---

[43] *See generally* Cal. Civ. Code § 3439; *see e.g.,* 11 U.S.C. §§ 101(32), 548.

[44] Plaintiffs do not believe that Neon Media released claims against Neon Machine in the Neon Media Forfeiture Agreements. But to the extent the Court disagrees, those claims were not released in exchange for reasonably equivalent value and are thus constructive fraudulent transfers under the Bankruptcy Code and California's fraudulent-transfer statute.

[45] *See generally* Cal. Civ. Code § 3439; *see e.g.,* 11 U.S.C. § 548.

[46] To the extent another state's fraudulent-transfer statute applies instead, 4D Factory reserves the right to assert a fraudulent-transfer claim under that state's statute.

**COUNT XIV**
**(Violation of the Automatic Stay, 11 U.S.C. § 362(k))**
**(Against Neon Machine, Inc.)**

245.    Plaintiff realleges and incorporates by reference each allegation set forth in this complaint.

246.    4D Factory is the Debtor in this bankruptcy, which was filed on October 10, 2023.

247.    Following the petition date, Neon Machine, Inc., through Long and others, including Norbury, made multiple attempts to cause the SAFEs to convert so that 4D's interest in Neon Machine would be diluted and its controlling position eliminated. For example, in December 2023, Neon Machine attempted to enter into a qualified financing round with Griffin and Polychain for only $2 million, less than one month's expenses. Norbury threatened to sign that financing proposal over the board's objections. A qualified financing round, even a small one like that which was proposed, would have caused the Griffin and Polychain SAFEs to convert.

248.    Around that same time, Neon Machine announced it was launching a pre-alpha (i.e., a very early version) of Shrapnel in December that presumably would have allowed players to use SHRAP tokens as part of the game—an activity that, depending on how it was implemented, may have triggered "Network Launch" such that the SAFEs would have eventually converted.

249.    Finally, around March 24, 2024, Neon Machine launched the *Shrapnel* Marketplace, an online market that lets users buy "skins" for game characters using tokens. While Plaintiff has been unable to access this feature to determine whether all aspects required to establish Network Launch are actually present, the technical aspects appear likely to have been met (though it is not clear that such an effort would be "bona fide" as is required by the definition).

250.     Neon Machine, through Long, knew 4D had petitioned for bankruptcy protection. Yet it aggressively worked to reduce 4D's equity in Neon Machine. Its actions violated the automatic stay and injured 4D.

251.     Because of Neon Machine's willful violation of the automatic stay, 4D seeks actual damages, costs, attorney's fees, and punitive damages in the Court's discretion.

## COUNT XV
## (Declaratory Judgment of Unenforceability of Contract Provision)
## (Against Mark Long)

252.     Plaintiff realleges and incorporates by reference each allegation set forth in this complaint.

253.     Before he was CEO of Neon Machine or Neon Media, and before his stint at HBO, Long worked for Javarone as an employee of The 4D Factory, LLC. Under his employment agreement, Long was to receive equity in 4D.

254.     Long's tenure at 4D was short. He took a position at HBO in early 2019. Long informed Javarone that he was abandoning his equity in 4D when he took that position.

255.     Around October 1, 2021, Javarone received a forfeiture agreement from his general counsel, Andrew Grossman ("4D Forfeiture Agreement").[47] This declaratory-judgment action seeks a judicial determination that release in that agreement be rescinded or held unenforceable.

256.     When the release agreements were presented to Javarone, Grossman was 4D's general counsel. Grossman had already begun to provide legal advice to Neon Machine and was eventually named Neon Machine's general counsel. He did not disclose the potential for a conflict to Javarone regarding the 4D Forfeiture Agreement.

---

[47] Exhibit R.

257.    The 4D Forfeiture Agreement contains a release essentially identical to the one in the Neon Media Forfeiture Agreements. That release would, on its face, release 4D's claims, known and unknown, against Long and, if read overly broad, Neon Machine.

258.    The release in the 4D Forfeiture Agreement is unconscionable and unenforceable. It was secured through the deceptive and disloyal actions of a conflicted attorney, Grossman. In agreeing to the 4D Forfeiture Agreement, Javarone relied on Grossman's advice as counsel.

259.    At no point did Javarone or 4D request the forfeiture agreements. Just as he did in April 2023, Grossman described the 4D Forfeiture Agreement to Javarone as merely part of a last-minute clean up during the October 1, 2021 4D/Neon Media/Neon Machine transaction.

260.    Public policy disfavors an attorney like Grossman being involved in a contract negotiation that implicates the interests of two clients. Here, he convinced his client to agree to a release that allegedly releases claims, including claims that implicate many of the disloyal and fraudulent acts by Long that are asserted in this Second Amended Complaint. And, of course, Grossman did so on behalf of Defendants including Neon Machine and the Manager Defendants.

261.    He was almost certainly aware of the facts surrounding Long's disloyalty, breaches of contract, and breaches of fiduciary duties at Neon Machine, yet he failed to disclose any of those events or implication of the release on those claims to 4D.

262.    Javarone, who is not a lawyer, wouldn't have agreed to the release if he'd been informed of the actual facts or the implication of the release. Grossman, who should've been conflicted out of the entire transaction, used his influence over Javarone to secure an unconscionable release to the benefit of Grossman's other client, Neon Machine.

263.    Given the factual circumstances that led to the 4D Forfeiture Agreement, 4D respectfully asks that the Court declare the releases unenforceable.

## CORT JAVARONE COUNTERCLAIMS

### COUNT XVI
### (Breach of Contract)
### (Against Neon Machine, Inc.)

264.    Plaintiff realleges and incorporates by reference each allegation set forth in this complaint.

265.    Neon Machine promised Javarone 16 million tokens under two contracts given his personal contributions as a board director and advisor. Javarone executed a Token Subscription Agreement with Neon Machine Inc. and Argon Protocol Foundation. The Token Subscription Agreement required Neon Machine Inc. and Argon to transfer 16 million SHRAP Tokens to him upon "Token Launch." Those contracts also establish an unlock schedule where the tokens become tradable over time.

266.    If "Network Launch" occurred, as Neon Machine Inc. has declared, then Token Launch must necessarily also have occurred. Javarone notified Neon Machine and Argon of their breach. Yet Neon Machine and the Argon parties refused to transfer the tokens to Javarone.

267.    The Manager Defendants have actual control over the classification, allocation, release, and any other characteristics of the SHRAP Tokens, not Argon Foundation and Argon Corp. And to the extent Defendants read other terms into the contractual arrangement to excuse breach, their behavior violates the implied duty of good faith and fair dealing.

268.    Javarone's tokens were belatedly delivered to him on May 15, 2024. While he eventually recovered the 16 million tokens, he has been injured by the delay in delivering his tokens, especially given the substantial decrease in the token's market value from Token Launch until the present, even taking the unlock schedule into account. Accordingly, Javarone is entitled to all damages resulting from the unlawful withholding of those tokens.

**CORT JAVARONE, SCOTT HONOUR, AND STEVE HOROWITZ'S
COUNTERCLAIMS**

**COUNT XVII**
**(Violation of the Automatic Stay, 11 U.S.C. § 362(k))**
**(Against Neon Machine, Inc.)**

269.    Plaintiffs reallege and incorporate by reference each allegation set forth in this complaint.

270.    Javarone, Honour and Horowitz are each individuals that invested in 4D Factory.

271.    4D Factory is the Debtor in this bankruptcy, which was filed on October 10, 2023.

272.    Following the petition date, Neon Machine, through Long and others, including Norbury, made attempts to cause the SAFEs to convert so that 4D's interest in Neon Machine would be diluted and its controlling position eliminated. For example, in December 2023, Neon Machine tried to enter into a qualified financing round with Griffin and Polychain for only $2 million, less than one month's expenses. Norbury threatened to sign that financing proposal over the board's objections. A qualified financing round, even a small one like that which was proposed, would have caused the Griffin and Polychain SAFEs to convert.

273.    Around that same time, Neon Machine announced it was launching a pre-alpha (i.e., a very early version) of Shrapnel in December that presumably would have allowed players to use SHRAP tokens as part of the game—an activity that, depending on how it was implemented, may have triggered "Network Launch" such that the SAFEs would have eventually converted.

274.    Finally, around March 24, 2024, Neon Machine launched the *Shrapnel* Marketplace, an online market that lets users buy "skins" for their game characters using tokens. While Plaintiffs have been unable to access this feature to determine whether all aspects required to establish Network Launch are met, the technical aspects appear likely to have been met by this

launch (though it's not clear that such an effort would be "bona fide" as is required by the definition).

275.    Neon Machine, through Long, knew 4D had petitioned for bankruptcy protection. Yet it worked to reduce 4D's equity interest in Neon Machine with Network Launch. This violated the automatic stay and not only injured 4D but also Javarone, Honour, and Horowitz.

276.    Because of Neon Machine's willful violation of the automatic stay, Javarone, Honour, and Horowitz seek actual damages, costs, attorney's fees, and punitive damages.

## NEON MEDIA LLC'S ORIGINAL CLAIMS

### COUNT XVIII
### (Breach of Contract)
### (Against Neon Machine, Inc.)

277.    Plaintiff realleges and incorporates by reference each allegation set forth in this complaint.

278.    Neon Media LLC owned the intellectual property rights to *Shrapnel*, including all works related to the *Shrapnel* game and project, including, without limitation, the first-person shooter game, the SHRAP token, and any other crypto assets, as well as various trademarks.

279.    To facilitate the Manager Defendants' fraudulent scheme, Mark Long negotiated for the transfer of all *Shrapnel* intellectual property rights to Neon Machine Inc.

280.    Neon Media LLC and Neon Machine Inc. formalized the transfer of Neon Media's *Shrapnel* IP rights in an Intellectual Property Sale Agreement executed on October 1, 2021.[48]

281.    The IP Transfer Agreement provided that Neon Media would sell, assign, and transfer the IP described in that agreement to Neon Machine. And in exchange, Neon Machine would pay $500 to Neon Media within five business days.

---

[48] The IP Transfer Agreement is attached as **Exhibit P**.

282.    Neon Media upheld its end, transferring the *Shrapnel* IP to Neon Machine.

283.    But Neon Machine never paid the $500 to Neon Media.

284.    Within the four corners of the IP Transfer Agreement, the $500 payment was the only consideration for Neon Media's transfer of the valuable *Shrapnel* IP.

285.    Neon Machine's failure to pay the $500 was a material breach and represented a complete failure of consideration.

286.    Long knew of the breach, as he was at that time CEO of both Neon Machine and Neon Media.

287.    After Neon Machine obtained the *Shrapnel* IP, Neon Machine granted licenses and assigned the ownership of other aspects of that IP, including licenses to Long's Argon Asset Ventures Corp. Argon relied on the licensed and assigned IP to develop the SHRAP tokens.

288.    Because of Neon Machine's material breach of the IP Transfer Agreement, and the failure of consideration, Neon Media seeks all remedies available to it, including rescission of the contract granting that intellectual property to Neon Machine, along with attorney's fees.

289.    Full rescission of the IP granted by Neon Media to Neon Machine, including the white paper and the IP embodied in the SHRAP tokens, will be difficult or impossible because Neon Machine granted that IP to Argon. Moreover, hundreds of millions of SHRAP tokens, which are among the IP listed in the IP Transfer Agreement, are circulating worldwide. Neon Media therefore seeks restitution for the diminished value of any IP that cannot be rescinded to Neon Media.

290.    Neon Media also seeks a permanent injunction to stop Neon Machine (and those under Neon Machine or the Manager Defendants' control) from further distribution, whether by license, assignment, or otherwise, of Neon Media's valuable intellectual property.

**COUNT XIX**
**(Breach of Fiduciary Duty)**
**(Against Mark Long)**

291.    Plaintiff realleges and incorporates by reference each allegation set forth in this complaint.

292.    Neon Media is a Washington LLC. It has a board of directors tasked with reviewing all material actions by the company. In 2021, Mark Long was a director at Neon Machine.

293.    As a director, Long owed Neon Media the fiduciary duties of loyalty and care. Long's fiduciary duty of loyalty required him to account to Neon Media and for it any property, profit, or benefit derived by Long in the conduct of Neon Media's activities or derived from a use by Long of company property, including the appropriation of a Neon Media opportunity.

294.    Long's fiduciary duty of loyalty also required him to refrain from dealing with Neon Media on behalf of a party having an interest adverse to Neon Media and to refrain from competing with Neon Media in the conduct of Neon Media's business activities.

295.    During the time Long was a director of Neon Media, he intentionally devised a scheme to create a separate company into which he would move the *Shrapnel* IP, which was the property of Neon Media, so that he could take that opportunity for himself and his colleagues rather than continue to develop it for the benefit of Neon Media and its members.

296.    While Long was a director of Neon Media, he intentionally formed the Delaware company Neon Machine, appointed himself the sole director, adopted bylaws that were favorable to his personal interests, and intentionally engaged in fundraising activities with outside investors like Griffin and Polychain, using and contingent on him acquiring the rights to, the *Shrapnel* IP, which was then property of Neon Media. Long never disclosed to Neon Media the details of that fundraising until the deals were essentially completely negotiated. Long never disclosed to Neon

Media his appointment as Neon Machine's sole director or the bylaws that contained terms favorable to him, and unfavorable to Neon Media's interests, until well after the fact.

297.    While Long was a director of Neon Media, he induced then-employees of Neon Media—Colin Foran, Naomi Lackaff, Aaron Nonis, Don Norbury, and Mark Yeend—to join Neon Machine. Long, while still a director of Neon Media, facilitated a giveaway of over 522 million SHRAP tokens to himself and those employees. He never disclosed to Neon Media this massive token giveaway when he undertook those disloyal negotiations.

298.    While Long was a Neon Media director, he brokered side agreements with Griffin and Polychain that granted them hundreds of millions of SHRAP tokens. When those deals were negotiated and signed, the tokens were Neon Media's intellectual property. Yet he never disclosed to Neon Media the SHRAP giveaway to Griffin and Polychain while he was negotiating it.

299.    While Long was a Neon Media director, he took actions on Neon Machine's behalf, a company that had interests adverse to Neon Media's—like intentionally holding secret board meetings and taking secret board actions that harmed Neon Media's business but enriched him and his team and entrenched their position of control at Neon Machine.

300.    Around September 2021, while Long was a director of Neon Media, Long took actions, alone and through Neon Machine, to form Argon Protocol Foundation and Argon Asset Ventures, Panama entities tasked with creating and issuing SHRAP token, which at that time was Neon Media's property. Long later had Neon Machine enter into a services agreement where parts of the *Shrapnel* IP were licensed or assigned to Argon Asset Ventures. Long never disclosed to Neon Media that he'd had the Argon entities formed or his ownership or control over those entities.

301.    Neon Media was of course damaged by these breaches of fiduciary duty by Long.

302.   Long should not be entitled to retain any financial benefit obtained as a result of his disloyalty. Neon Media is therefore entitled to damages in an amount to be determined at trial, as well as attorney's fees and equitable remedies including disgorgement of his ill-gotten gains.

## COUNT XX
### (Breach Of Contract)
### (Against Mark Long, Colin Foran, Naomi Lackaff, Aaron Nonis, Don Norbury, and Mark Yeend)

303.   Plaintiff realleges and incorporates by reference each allegation set forth in this complaint.

304.    Long, Foran, Lackaff, Nonis, Norbury, and Yeend (each a "Neon Media Employee") each executed member/employment agreements with Neon Media around July 24, 2020.[49]

305.   Each Neon Media Employee was paid an annual salary ranging from $120,000 to $200,000.

306.   Each Neon Media Employee was also granted equity in Neon Media on a vesting schedule described in the Neon Media Member Agreements.

307.   Each Neon Media Employee's agreement barred the employee from (1) using or disclosing Neon Media's confidential information for any non-company purpose without the written consent of a senior executive officer of Neon Media; and (2) competing with Neon Media.

308.   But each Neon Media Employee used and disclosed confidential information belonging to Neon Media for noncompany business, like forming Neon Machine and soliciting outside financing for Neon Machine from Griffin and Polychain, among others.

---

[49] Exhibit R.

309. In particular, the Neon Media Employees disclosed one or more White Paper regarding the *Shrapnel* game to individuals and entities not authorized to receive those documents, including Neon Machine. Neon Media's Shrapnel white papers bore the following confidentiality designation: "This document is strictly confidential and intended to be viewed exclusively by those recipients ('Recipients') specifically authorized by the Company."

310. Neon Media was harmed by these breaches of contract. The Neon Media Employees used its confidential information to start a new company and obtain financing from Griffin and Polychain in exchange for hundreds of millions of SHRAP tokens. Once those pieces were in place, Long essentially forced Neon Media and 4D to capitulate to the transfer of IP to a separate company, Neon Machine.

311. That was not the only breach by the Neon Media Employees. Each Neon Media Employee also remained employed by Neon Media, even while they competed with Neon Media through what became Neon Machine.

312. Each of the Neon Media Member Agreements states:

Member therefore agrees that he or she will not at any time during his or her employment with the Company, engage in any activity that competes with or is directly related to the business of the Company, and will not directly or indirectly own an interest in, join, operate, or participate in or be connected with, in any manner whatsoever, any person or entity engaged in developing, producing, designing, selling, distributing or marketing products or services that compete with the Company's products, services or other business, in any markets in which the Company does business or contemplates doing business.

313. Each Neon Media Employee breached that provision by working on behalf of, taking an interest in, participating in, and being connected with, Neon Machine while employed by Neon Media.

314. For example, Long incorporated Neon Machine in early August 2021. He appointed himself the company's sole director. By then he was operating and participating in Neon Machine,

a company that competed with Neon Media in developing a blockchain-based video game. Long had not yet disclosed to Neon Media that he'd formed a new corporation or that he and his fellow Neon Media Employees had engaged in a massive token giveaway to themselves.

315.    The other Neon Media Employees have alleged that they invested hundreds of thousands of dollars in their own money to form Neon Machine. They did so in the form of alleged loans to the company, some of which are still on the books. They also received token grants as a partial repayment of the loans. When those loans were made to Neon Machine (or what became Neon Machine), each had an interest in a company that competed with Neon Media.

316.    Neon Media was harmed by these breaches. But for the Neon Media Employees' violating their employment agreements, Neon Machine would have never had access to the *Shrapnel* IP or the team tasked with developing *Shrapnel* at Neon Media.

317.    Through each of these actions, the Neon Media Employees each breached their employment agreements with Neon Media.

318.    As a result, Neon Media has been damaged in an amount equal to the value of the confidential information wrongfully disclosed by the Neon Media Employees. Neon Media has been damaged by the Neon Media Employee's breach of their noncompete agreements in an amount to be determined at trial. In addition, Neon Media seeks to disgorge all profits obtained by the Neon Media Employees from their breaches, together with all other damages or remedies available to it, including rescission, attorney's fees, and costs.

**(Intentional Interference with Contract)**
**(Against Colin Foran, Naomi Lackaff, Aaron Nonis, Don Norbury, and Mark Yeend)**

319.    Plaintiff realleges and incorporates by reference each allegation set forth in this complaint.

320.    Foran, Lackaff, Nonis, Norbury, and Yeend each knew that Long had an membership/employment agreement with Neon Media that contained non-compete provisions.

321.    Foran, Lackaff, Nonis, Norbury, and Yeend assisted Long in forming and operating Neon Machine, knowing this was a breach of Long's noncompete clause with Neon Media.

322.    Neon Media was harmed by Foran, Lackaff, Nonis, Norbury, and Yeend's efforts to interfere with Neon Media's contract with Long.

323.    Neon Media is therefore entitled to damages in an amount to be determined at trial, as well as attorney's fees and any available equitable remedies.

**COUNT XXI**
**(Breach Of Duty Of Loyalty)**
**(Against Colin Foran, Naomi Lackaff, Aaron Nonis, Don Norbury, and Mark Yeend,)**

324.    Plaintiff realleges and incorporates by reference each allegation set forth in this complaint.

325.    Long, Foran, Lackaff, Nonis, Norbury, and Yeend were each employees of Neon Media in 2021, including during the months leading to Neon Machine's formation in August 2021.

326.    As employees, they each owed Neon Media a fiduciary duty of loyalty.

327.    Each violated that duty of loyalty by assisting each other, and each individually working, on behalf their own self-interests and self-enrichment on *Shrapnel* at Neon Machine, and in a manner contrary to the best interests of their employer, Neon Media.

328.    Neon Media was harmed by these defendants' disloyal conduct.

329.    Each of these employees received a financial benefit from their disloyalty, including shares in Neon Machine, a salary at Neon Machine, and hundreds of millions of SHRAP tokens. Neon Media is entitled to damages in an amount to be determined at trial, as well as attorney's fees and equitable remedies including disgorgement of the disloyal employees' ill-gotten gains.

## COUNT XXII
### (Intentional Interference With Contract)
### (Against Neon Machine, Inc.)

330.    Plaintiff realleges and incorporates by reference each allegation set forth in this complaint.

331.    Each Neon Media Employee executed membership/employment agreements with Neon Media, LLC on or around July 24, 2020.

332.    Each Neon Media Employee remained employed by Neon Media in 2021, including in the months leading to Neon Machine's formation in August 2021.

333.    Their Neon Media Member Agreements forbade them from competing with Neon Media and disclosing Neon Media confidential information to unauthorized recipients.

334.    Neon Machine was formed on August 3, 2021 by Long. Long thereafter appointed himself CEO and the sole director of Neon Machine.

335.    Long was certainly aware of the restrictions in the Neon Media Member Agreements, because he himself was subject to those restrictions. Despite his personal knowledge of those restrictions, Neon Machine induced each Neon Media Employee to violate the non-disclosure and non-compete provisions of their respective Neon Media Employment Agreements.

336.    Neon Media was harmed by Neon Machine's interference with its contractual relationships with the Neon Media Employees. Each of those employees competed with Neon Media, to Neon Media's detriment. Moreover, Neon Machine caused those employees to share

confidential Neon Media information, including information about the *Shrapnel* project then being developed at Neon Media, with recipients who were not authorized to receive that information.

337.    Neon Media is therefore entitled to damages in an amount to be determined at trial, as well as attorney's fees and any available equitable remedies.

## COUNT XXIII
### (Declaratory Judgment Of Unenforceability Of Contract Provision)
### (Against Mark Long, Colin Foran, Naomi Lackaff, Aaron Nonis, Don Norbury, and Mark Yeend)

338.    Plaintiff realleges and incorporates by reference each allegation set forth in this complaint.

339.    The Neon Media Employees each received ownership units of Neon Media as part of their employee-compensation packages.

340.    While each Neon Media Employee agreed to keep their employment at Neon Media after they started working at Neon Machine, all eventually reneged and stopped working there.

341.    In April 2023, Grossman sent Javarone agreements where the Neon Media Employees would forfeit their shares in Neon Media ("Neon Media Forfeiture Agreements").  This declaratory-judgment action seeks a judicial determination that the release provision of those agreements be rescinded or otherwise held unenforceable.

342.    When the release agreements were presented to Javarone (4D and Neon Media's manager), Grossman was 4D's general counsel. He was also, and still is, Neon Machine's lawyer. Grossman did not disclose his conflict of interest to Javarone as it related to the Neon Media Forfeiture Agreements.

343.    The Neon Media Forfeiture Agreements each contain a provision that would, on its face, release Neon Media's claims, known and unknown, against the Neon Media Employees and, if read overly broad, Neon Machine.

344.    The release provision in the Neon Media Forfeiture Agreements is unconscionable and unenforceable. It was secured through the deceptive and disloyal actions of a conflicted attorney, Andrew Grossman. In agreeing to the Neon Media Forfeiture Agreements, Javarone relied on the advice of his counsel, Grossman.

345.    At no point did Javarone or Neon Media request the forfeiture agreements. They were proposed to him by Grossman as part of a purported "clean up" at Neon Media.

346.    Public policy disfavors an attorney like Grossman from being involved in a contract negotiation that implicates the interests of two clients. Here, Grossman convinced one client, Javarone, to agree to a release that allegedly releases claims that would otherwise negatively impact his other client or clients, including many of the Neon Media claims asserted in this Second Amended Complaint, before Javarone started to discover the depths of disloyalty by Long and the other Neon Media Employees.

347.    Grossman, who as general counsel to Neon Machine was aware of the facts surrounding the Neon Media Employees' disloyalty and breaches of contract, failed to disclose to Javarone the impact the release would have on potential claims against Neon Machine and the Neon Media Employees.

348.    Javarone, who is not a lawyer, would not have agreed to the release if he had been informed of the actual facts or the impact of the release to that situation. Grossman, who should have been conflicted out of the entire transaction, used his influence as 4D's lawyer to secure an unconscionable release to the benefit of Grossman's other client, Neon Machine, and its officers and employees.

349.    Given the factual circumstances that led to the Neon Media Forfeiture Agreement, Neon Media respectfully asks that the Court declare the releases unenforceable.

**CONCLUSION**

To say 4D was taken advantage of goes without saying. Mark Long and the Manager Defendants started Neon Media after they were laid off by HBO. And when that fledgling business needed funding, Long urged 4D Factory to invest in its life support. Yet just as 4D's investment started showing signs it would bear fruit with *Shrapnel*, Long and his team cut 4D out. 4D Factory invested over $6 million toward Neon Media—all while generously sharing 40% of the company with Long and his team, who'd contributed no assets to their startup. The Manager Defendants have faced no consequence for their betrayal. They continue to develop *Shrapnel* at Neon Machine, while 4D pleads for debt relief in bankruptcy. And the ones that continue to suffer the harm are its creditors.

For these reasons**,** 4D Factory, Neon Media, Javarone, Honour, and Horowitz respectfully seek a judgment against Defendants as follows:

(1)     On Count 1: a judgment for Plaintiff and against Neon Machine Inc. for breach of contract with an order rescinding the contract, and any and all actual and circumstantial damages, attorney's fees, and costs that may be awarded.

(2)     On Count 2: a judgment for Plaintiff and against Manager Defendants, Neon Machine, Inc., Argon Protocol Foundation, and Argon Asset Ventures Corp., under 11 U.S.C. § 541(a) and 542(a), compelling (i) immediate turnover of (a) 480,927,488 SHRAP Tokens to Plaintiff and (b) Plaintiff demands turnover of 331,561,208 SHRAP Tokens, and (ii) an accounting of the Total Network Tokens; (ii) an accounting of the Total Network Tokens; and (iii) to the extent Manager Defendants have sold any SHRAP Tokens that constitute property of the estate, a judgment in the amount of 60% of the proceeds received for those sales;

(3)     On Count 3: a judgment for Plaintiff and against Manager Defendants, jointly and severally, in an amount to be proven at trial but no less than $10,000,000, together with an equitable accounting; or alternatively a declaration in favor of Plaintiff and against Manager Defendants that the transactions addressed in Count 4 are void or voidable;

(4)     On Count 4: a judgment for Plaintiff and against Fund Defendants, jointly and severally, in an amount to be proven at trial but no less than $10,000,000, together with an equitable accounting;

(5)     On Count 5: a judgment for Plaintiff and against Manager Defendants, jointly and severally, in an amount to be proven at trial but no less than $10,000,00, together with equitable accounting, or alternatively a declaration in favor of Plaintiff and against Manager Defendants that the transactions addressed in Count 5 are void or voidable;

(6)     On Count 6: a judgment for Plaintiff and against Defendants Foran, Lackaff, Nonis, Norbury, Yeend and Zhou, jointly and severally, in an amount to be proven at trial but no less than $10,000,000, together with an equitable accounting;

(7)     On Count 7: a judgment for Plaintiff and against Fund Defendants, jointly and severally, in an amount to be proven at trial but no less than $10,000,000, together with an equitable accounting;

(8)     On Count 8: a judgment for Plaintiff and against Manager Defendants, jointly and severally, in an amount to be proven at trial but no less than $10,000,000;

(9)     On Count 9: a judgment for Plaintiff and against Defendants declaring that:

  a.   the agreements and promises made to Plaintiff set forth in this Complaint in connection with the transfer of the *Shrapnel* IP to Neon Machine are enforceable in accordance with their terms;

  b.   Plaintiff is entitled to receipt of the SHRAP Tokens in direct proportion to Plaintiff's equity interests, totaling 480,927,488 SHRAP Tokens;

  c.   Plaintiff is entitled as a Founder to receipt of 331,561,208 SHRAP Tokens, its pro rata share of the special 2021 Token Giveaway to Founders;

  d.   Plaintiff is entitled to a determination of the appropriate division of SHRAP Tokens between Plaintiff and Defendants;

  e.   Manager Defendants committed fraud and breached their fiduciary duties in violating the agreements and promises made to Plaintiff;

  f.   Fund Defendants committed fraudulent concealment and breached their fiduciary duties in concealing the occurrence of purported Board meetings and invalidly authorizing actions on behalf of Neon Machine under those meetings; and

  g.   Such purported Board meetings were invalid and therefore any actions or directives taken by Long and Fund Defendants at such meetings were invalid and unauthorized.

(10)    On Count 10: a judgment for Plaintiff and against Manager Defendants directing the return to Plaintiff of 480,927,488 SHRAP Tokens, as well as its pro rata share

of the Managers' special 2021 distribution to "Founders," i.e., an additional 331,561,208 SHRAP Tokens;

(11)    On Count 11: a judgment in favor of Plaintiff and against Defendant Neon Machine and the Manager Defendants directing the return to Plaintiff of 552,602,013 SHRAP Tokens.

(12)    On Count 12: a judgment for Plaintiff and against Manager Defendants directing the return to Plaintiff of 331,561,208 SHRAP Tokens, representing 60% of SHRAP Tokens distributed to Founders, collectively from Manager Defendants;

(13)    On Count 13: a judgment in favor of Plaintiff and against Defendant Neon Machine avoiding the releases, together with any other relief the Court finds just and reasonable;

(14)    On Count 14: a judgment in favor of Plaintiff and against Neon Machine, Inc., for damages in an amount to be proven at trial, together with costs and attorney's fees, and punitive damages in the Court's discretion;

(15)    On Count 15: a judgment in favor of 4D Factory, LLC against Mark Long declaring that the releases are unenforceable;

(16)    On Count 16: a judgment for Javarone and against Neon Machine, Inc., for damages in an amount to be proven at trial, together with costs and attorney's fees;

(17)    On Count 17: a judgment for Javarone, Honour, and Horowitz against Neon Machine, Inc., for damages in an amount to be proven at trial, together with costs and attorney's fees, and punitive damages in the Court's discretion.

(18)    On Count 18: a judgment for Neon Media LLC against Neon Machine, Inc., for rescission of the IP transfer agreement and immediate transfer and return of the Shrapnel IP to Neon Media LLC, as well of restitution for the value of any IP that cannot be returned to Neon Media;

(19)    On Count 19: a judgment in favor of Neon Media against Mark Long for damages in an amount to be proven at trial, together with costs and attorney's fees, and equitable remedies including disgorgement of his ill-gotten gains;

(20)    On Count 20: a judgment in favor of Neon Media against Mark Long, Colin Foran, Naomi Lackaff, Aaron Nonis, Don Norbury, and Mark Yeend, for damages in an amount to be proven at trial, together with costs and attorney's fees, and equitable remedies including disgorgement of their ill-gotten gains, and recission;

(21)    On Count 21: a judgment in favor of Neon Media against Colin Foran, Naomi Lackaff, Aaron Nonis, Don Norbury, and Mark Yeend for damages in an amount

to be proven at trial, together with costs and attorney's fees, and any equitable remedies that may be available;

(22)    On Count 22: a judgment in favor of Neon Media against Mark Long, Colin Foran, Naomi Lackaff, Aaron Nonis, Don Norbury, and Mark Yeend for damages in an amount to be proven at trial, together with costs and attorney's fees, and equitable remedies including disgorgement of their ill-gotten gains.

(23)    On Count 23: a judgment in favor of Plaintiff against Neon Machine Inc., for damages in an amount to be proven at trial, together with costs and attorney's fees, and any equitable remedies that may be available;

(24)    On Count 24: a judgment in favor of Neon Media and against Mark Long, Colin Foran, Naomi Lackaff, Aaron Nonis, Don Norbury, and Mark Yeend, declaring that the releases are unenforceable.

(25)    For reasonable litigation expenses and attorneys' fees; and

(26)    Any other relief that this Court deems just and proper.


Dated: August 9, 2024

**LAWSON & MOSHENBERG PLLC**
Attorneys for Plaintiff, Cort Javarone, Scott Honour, Steve Horowitz, and Neon Media LLC

By:        */s/ Avi Moshenberg*
Avi Moshenberg
avi.moshenberg@lmbusinesslaw.com
Nicholas R Lawson
nick.lawson@lmbusinesslaw.com
Telephone: (832) 280-5670

801 Travis Street, Suite 2101 #838
Houston, Texas 77002

## Verification

I, Cort Javarone, declare as follows:

I am the representative for the Debtor, and a Claimant, in this Adversary case, a citizen of the United States of America, and a resident of the State of Florida.

I have personal knowledge of myself, my activities, and my intentions, including those set out in the foregoing Second-Amended Complaint, Original Counterclaims, and Original Complaint, and if called on to testify I would competently testify as to the matters stated in them.

I have personal knowledge of my own efforts to ignite board action, including the activities described in this Second Amended Complaint, Original Counterclaims, and Original Complaint, and if called to testify I would competently testify as to those matters.

I verify under penalty of perjury under the laws of the United States of America that the factual statements in this Complaint concerning myself, my activities, and my intentions are true and correct, as are the factual statements concerning board action as described herein. 28 U.S. § 1746.

Executed on August 9, 2024

_____

Cort Javarone

# EXHIBIT A

**Neon - Shrapnel Sum of Parts Valuation**



CZ ○ **Calvin Zhou** <calvinz@the4dfactory.com>
To: ⊙ Cort Javarone;  **Cc:**  ○ David Vicini  ∨

Thursday, May 13, 2021 at 8:06 PM



Neon - Sum of Parts...
18 KB

Download  ·  Preview

Cort, see the Neon valuation range and 4D's share of the SHRAP token valuation. Neon valuation of $90-400m. The attached spreadsheet has the comps and details.

| | Valuation range ($m) | | |
|---|---|---|---|
| | **Bear** | **Base** | **Bull** |
| Shrapnel Entity | 30 | 50 | 150 |
| SHRAP Token | 30 | 50 | 150 |
| Rest of Neon | 30 | 50 | 100 |
| **Neon Total** | **90** | **150** | **400** |

| | Total Tokens | | |
|---|---|---|---|
| **4D Tokens** | 342,222,222 | | |
| | | | |
| | Price/Token | Valuation ($m) | |
| F&F Round (Pre-Seed) | $0.0033 | 10 | |
| VC Round (Seed) | $0.0100 | 30 | |
| Strategic Round | $0.0167 | 50 | |
| ICO Round | $0.0500 | 150 | |
| | | | |
| Cash on cash return from Strategic Round | Price per token | Market Cap ($m) | 4D Token Valuation ($m) | Per Month (24 Month Vesting in $m) |
| | $0.003 | $10,000,000 | $1,140,741 | $47,531 |

**Neon - Shrapnel Sum of Parts Valuation**



CZ  ○ **Calvin Zhou** <calvinz@the4dfactory.com>
Thursday, May 13, 2021 at 8:06 PM

To: ⊙ Cort Javarone;  Cc: ○ David Vicini  ⌄

📄 Neon - Sum of Parts...
18 KB

Download  ·  Preview

| Cash on cash return from Strategic Round | Price per token | Market Cap ($m) | 4D Token Valuation ($m) | Per Month (24 Month Vesting in $m) |
|---|---|---|---|---|
| | $0.003 | $10,000,000 | $1,140,741 | $47,531 |
| | $0.010 | $30,000,000 | $3,422,222 | $142,593 |
| | $0.017 | $50,000,000 | $5,703,704 | $237,654 |
| 3x | $0.050 | $150,000,000 | $17,111,111 | $712,963 |
| 9x | $0.150 | $450,000,000 | $51,333,333 | $2,138,889 |
| 15x | $0.250 | $750,000,000 | $85,555,556 | $3,564,815 |
| 21x | $0.350 | $1,050,000,000 | $119,777,778 | $4,990,741 |
| 27x | $0.450 | $1,350,000,000 | $154,000,000 | $6,416,667 |
| 33x | $0.550 | $1,650,000,000 | $188,222,222 | $7,842,593 |
| 39x | $0.650 | $1,950,000,000 | $222,444,444 | $9,268,519 |
| 45x | $0.750 | $2,250,000,000 | $256,666,667 | $10,694,444 |
| 51x | $0.850 | $2,550,000,000 | $290,888,889 | $12,120,370 |
| 57x | $0.950 | $2,850,000,000 | $325,111,111 | $13,546,296 |
| 63x | $1.050 | $3,150,000,000 | $359,333,333 | $14,972,222 |
| 69x | $1.150 | $3,450,000,000 | $393,555,555 | $16,398,148 |
| 75x | $1.250 | $3,750,000,000 | $427,777,778 | $17,824,074 |
| 81x | $1.350 | $4,050,000,000 | $462,000,000 | $19,250,000 |
| 87x | $1.450 | $4,350,000,000 | $496,222,222 | $20,675,926 |
| 93x | $1.550 | $4,650,000,000 | $530,444,444 | $22,101,852 |
| 99x | $1.650 | $4,950,000,000 | $564,666,666 | $23,527,778 |
| 105x | $1.750 | $5,250,000,000 | $598,888,889 | $24,953,704 |

| | Valuation range ($m) | | |
|---|---|---|---|
| | **Bear** | **Base** | **Bull** |
| Shrapnel Entity | 30 | 50 | 150 |
| SHRAP Token | 30 | 50 | 150 |
| Rest of Neon | 30 | 50 | 100 |
| **Neon Total** | **90** | **150** | **400** |

| SHRAP Token Comparables | Valuation ($m) | | | |
|---|---|---|---|---|
| | **Seed Round** | **ICO** | **Current** | **Premium to ICO** |
| Illuvium Seed Round Valuation | 33 | 380 | 750 | 2.0x |
| Axie Infinity | 30 | 27 | 2,000 | 74.1x |
| Decentraland | | 62 | 2,700 | 43.5x |
| My Neighbor Alice | | 13 | 1,200 | 92.3x |
| The Sandbox | | 25 | 1,900 | 76.0x |
| Revv | | 20 | 1,000 | 50.0x |
| | | | | **56.3x** |

| SHRAP Entity Comparables | EST. 2020 Revenues | EBITDA Margin | EST. EBITDA | Revenue Multiple | Valuation |
|---|---|---|---|---|---|
| CS:GO | 500 | 40% | 200 | | |
| Escape From Tarkov | 500 | 40% | 200 | | |
| Valorant | 1,000 | 40% | 400 | | |
| PUBG | 2,700 | 40% | 1,080 | | |
| Fortnite | 1,800 | 40% | 720 | 16.1x | 29,000 |
| Call of Duty | 1,950 | 40% | 780 | | |
| Roblox | 920 | NA | NA | 45.5x | 41,900 |

| | Peak Revenue | 3 Year Revenue | Peak EBITDA | 3 year EBITDA |
|---|---|---|---|---|
| **Shrapnel Entity** | 851 | 1,438 | 422 | 650 |
| **Rest of Neon** | 144 | 316 | 43 | 96 |

| Neon Valuation Analysis | | | | |
|---|---|---|---|---|
| Revenue Multiple | | | | |
| | **1x** | **2x** | **3x** | **4x** |
| Shrapnel Entity Valuation Range | 851 | 1,702 | 2,553 | 3,404 |
| **95% Discount to full valuation** | **43** | **85** | **128** | **170** |
| | | | | |
| Rest of Neon Valuation Range | 144 | 288 | 432 | 576 |
| **75% Discount to full valuation** | **36** | **72** | **108** | **144** |

| | Seed | ICO | Bear Market | Bull Market |
|---|---|---|---|---|
| **SHRAP Token Valuation Range** | **30** | **150** | **300** | **3,000** |

|  | Total Tokens |  |
|---|---|---|
| **4D Tokens** | 342,222,222 | |

|  | Price/Token | Valuation ($m) |
|---|---|---|
| F&F Round (Pre-Seed) | $0.0033 | 10 |
| VC Round (Seed) | $0.0100 | 30 |
| Strategic Round | $0.0167 | 50 |
| ICO Round | $0.0500 | 150 |

| **Cash on cash return from Strategic Round** | Price per token | Market Cap ($m) | 4D Token Valuation ($m) | Per Month (24 Month Vesting in $m) |
|---|---|---|---|---|
|  | $0.003 | $10,000,000 | $1,140,741 | $47,531 |
|  | $0.010 | $30,000,000 | $3,422,222 | $142,593 |
|  | $0.017 | $50,000,000 | $5,703,704 | $237,654 |
| 3x | $0.050 | $150,000,000 | $17,111,111 | $712,963 |
| 9x | $0.150 | $450,000,000 | $51,333,333 | $2,138,889 |
| 15x | $0.250 | $750,000,000 | $85,555,556 | $3,564,815 |
| 21x | $0.350 | $1,050,000,000 | $119,777,778 | $4,990,741 |
| 27x | $0.450 | $1,350,000,000 | $154,000,000 | $6,416,667 |
| 33x | $0.550 | $1,650,000,000 | $188,222,222 | $7,842,593 |
| 39x | $0.650 | $1,950,000,000 | $222,444,444 | $9,268,519 |
| 45x | $0.750 | $2,250,000,000 | $256,666,667 | $10,694,444 |
| 51x | $0.850 | $2,550,000,000 | $290,888,889 | $12,120,370 |
| 57x | $0.950 | $2,850,000,000 | $325,111,111 | $13,546,296 |
| 63x | $1.050 | $3,150,000,000 | $359,333,333 | $14,972,222 |
| 69x | $1.150 | $3,450,000,000 | $393,555,555 | $16,398,148 |
| 75x | $1.250 | $3,750,000,000 | $427,777,778 | $17,824,074 |
| 81x | $1.350 | $4,050,000,000 | $462,000,000 | $19,250,000 |
| 87x | $1.450 | $4,350,000,000 | $496,222,222 | $20,675,926 |
| 93x | $1.550 | $4,650,000,000 | $530,444,444 | $22,101,852 |
| 99x | $1.650 | $4,950,000,000 | $564,666,666 | $23,527,778 |
| 105x | $1.750 | $5,250,000,000 | $598,888,889 | $24,953,704 |
| 111x | $1.850 | $5,550,000,000 | $633,111,111 | $26,379,630 |
| 117x | $1.950 | $5,850,000,000 | $667,333,333 | $27,805,556 |
| 123x | $2.050 | $6,150,000,000 | $701,555,555 | $29,231,481 |
| 129x | $2.150 | $6,450,000,000 | $735,777,777 | $30,657,407 |
| 135x | $2.250 | $6,750,000,000 | $770,000,000 | $32,083,333 |
| 141x | $2.350 | $7,050,000,000 | $804,222,222 | $33,509,259 |
| 147x | $2.450 | $7,350,000,000 | $838,444,444 | $34,935,185 |
| 153x | $2.550 | $7,650,000,000 | $872,666,666 | $36,361,111 |
| 159x | $2.650 | $7,950,000,000 | $906,888,888 | $37,787,037 |
| 165x | $2.750 | $8,250,000,000 | $941,111,111 | $39,212,963 |
| 171x | $2.850 | $8,550,000,000 | $975,333,333 | $40,638,889 |
| 177x | $2.950 | $8,850,000,000 | $1,009,555,555 | $42,064,815 |

| | | | | |
|---|---|---|---|---|
| 183x | $3.050 | $9,150,000,000 | $1,043,777,777 | $43,490,741 |

**Subject:** Shrapnel Cap Table
**Date:** Saturday, May 22, 2021 at 4:10:44 PM Eastern Daylight Time
**From:** Calvin Zhou
**To:** Cort Javarone, David Vicini
**Attachments:** Shrapnel Cap Table.xlsx


----------------------------------------------
Calvin Zhou
Director
4D Factory LLC
e.   calvinz@the4dfactory.com
m.  +1.949.933.5713

| $SHRAP Tokens | | |
|---|---|---|
| **Team** | | **Tokens** |
| Mark L | 1.19% | 35,555,556 |
| Don | 1.19% | 35,555,556 |
| Colin | 1.19% | 35,555,556 |
| Aaron Nonis | 1.19% | 35,555,556 |
| Mark Y | 1.19% | 35,555,556 |
| Naomi | 1.19% | 35,555,556 |
| Gianna | 0.30% | 8,888,889 |
| Calvin Zhou | 1.19% | 35,555,556 |
| 4D | 11.41% | 342,222,222 |
| **Shareholders of Shrapnel Inc.** | **20.00%** | **600,000,000** |
| | | |
| **Advisors** | | **Tokens** |
| Shroud | 0.03% | 1,000,000 |
| Derek Kolstad | 0.03% | 1,000,000 |
| Dmitri Johnson | 0.03% | 1,000,000 |
| Joanna Alexander | 0.03% | 1,000,000 |
| Adam Barlam | 0.25% | 7,500,000 |
| Helpers/Volunteers | 0.17% | 5,000,000 |
| Finders/Brokers (James Z, etc) | 1.75% | 52,500,000 |
| Advisor 1 | 0.25% | 7,500,000 |
| Advisor 2 | 0.25% | 7,500,000 |
| Advisor 3 | 0.25% | 7,500,000 |
| Advisor 4 | 0.25% | 7,500,000 |
| Advisor 5 | 0.25% | 7,500,000 |
| All Others | 1.45% | 43,500,000 |
| **Total** | **5.00%** | **150,000,000** |

| Shrapnel Inc. | Equity |
|---|---|
| Calvin Zhou | 5.4% |
| 4D LLC | 50.8% |
| Neon C Corp | 33.8% |
| VCs | 10.0% |
| **Total** | **100.0%** |
| | |
| Mark L | 5.4% |
| Don | 5.4% |
| Aaron | 5.4% |
| Colin | 5.4% |
| Mark Y | 5.4% |
| Naomi | 5.4% |
| Gianna | 1.4% |
| **Neon C Corp Subtotal** | **33.8%** |

| FUNDING SOURCES | AMOUNT RAISED | TOKENS ISSUED | PRICE/TOKEN | % TOTAL SUPPLY | FULLY DILUTED VALUATION | Discount To Public sale |
|---|---|---|---|---|---|---|
| Pre-Seed (Friends and Family) | $ 1,061,000 | 318,300,000 | $ 0.0033 | 10.6% | $ 10,000,000 | 93% |
| Seed | $ 1,000,000 | 100,000,000 | $ 0.0100 | 3.3% | $ 30,000,000 | 80% |
| Strategic 1 | $ 110,000 | 6,600,000 | $ 0.0167 | 0.2% | $ 50,000,000 | 67% |
| Strategic 2 | $ 500,000 | 25,000,000 | $ 0.0200 | 0.8% | $ 60,000,000 | 60% |
| Public Sale | $ 37,329,000 | 746,580,000 | $ 0.0500 | 24.9% | $ 150,000,000 | 0% |
| TOTAL RAISED | $ 40,000,000 | 1,196,480,000 | $ 0.0500 | 39.9% | $ 100,294,196 | |

| | | |
|---|---|---|
| Max Amt Raised If No Private Round | $ | 22,495,000 |
| Private Round Raise | $ | 2,671,000 |
| Dollar Amt of Discount to Public Round | $ | 19,824,000 |

### Pre-Seed (Friends and Family)

| Name | Accredited? | Affiliation | Contribution | Tokens Issued | Price/Token | % Total Supply | Fully Diluted Valuation |
|---|---|---|---|---|---|---|---|
| Mark L | Y | Team | $ 100,000 | 30,000,000 | $0.0033 | 1.00% | $ 10,000,000 |
| Don | Y | Team | $ 100,000 | 30,000,000 | $0.0033 | 1.00% | $ 10,000,000 |
| Calvin | Y | Team | $ 100,000 | 30,000,000 | $0.0033 | 1.00% | $ 10,000,000 |
| Colin | Y | Team | $ 50,000 | 15,000,000 | $0.0033 | 0.50% | $ 10,000,000 |
| Aaron Nonis | Y | Team | $ 50,000 | 15,000,000 | $0.0033 | 0.50% | $ 10,000,000 |
| Cort * | Y | Team | $ 10,000 | 3,000,000 | $0.0033 | 0.10% | $ 10,000,000 |
| Kevin Conroy * | Y | Team | $ 10,000 | 3,000,000 | $0.0033 | 0.10% | $ 10,000,000 |
| Jon Miller * | Y | Team | $ 25,000 | 7,500,000 | $0.0033 | 0.25% | $ 10,000,000 |
| David Vicini | Y | Team | $ 5,000 | 1,500,000 | $0.0033 | 0.05% | $ 10,000,000 |
| Andrew Grossman * | Y | Team | $ 5,000 | 1,500,000 | $0.0033 | 0.05% | $ 10,000,000 |
| Gianna | N | Team | $ 1,000 | 300,000 | $0.0033 | 0.01% | $ 10,000,000 |
| Cort's Investor * | Y | Cort's Investor | $ 50,000 | 15,000,000 | $0.0033 | 0.50% | $ 10,000,000 |
| John Gaudiosi | Y | Mark Long's Friend | $ 50,000 | 15,000,000 | $0.0033 | 0.50% | $ 10,000,000 |
| John Benyamine | Y | Mark Long's Friend | $ 50,000 | 15,000,000 | $0.0033 | 0.50% | $ 10,000,000 |
| Edmund Shern | Y | Mark Long's Friend | $ 50,000 | 15,000,000 | $0.0033 | 0.50% | $ 10,000,000 |
| Nick Simpson | Y | Mark Long's Friend | $ 5,000 | 1,500,000 | $0.0033 | 0.05% | $ 10,000,000 |
| Bill Anker | Y | Mark Long's Friend | $ 25,000 | 7,500,000 | $0.0033 | 0.25% | $ 10,000,000 |
| Joe Minton | Y | Mark Long's Friend | $ 50,000 | 15,000,000 | $0.0033 | 0.50% | $ 10,000,000 |
| Brad Bond | Y | Mark Long's Friend | $ 25,000 | 7,500,000 | $0.0033 | 0.25% | $ 10,000,000 |
| Matthew Paik | Y | 4D investment banker at Pinnacle Capital | $ 5,000 | 1,500,000 | $0.0033 | 0.05% | $ 10,000,000 |
| Leath Bing | Y | Calvin's Friend, who is bringing Rob Leshner to the table | $ 10,000 | 3,000,000 | $0.0033 | 0.10% | $ 10,000,000 |
| Irvin Hu | Y | Calvin's Friend, who is bringing Andy Do to the table | $ 10,000 | 3,000,000 | $0.0033 | 0.10% | $ 10,000,000 |
| Andy Do | Y | Calvin's Friend | $ 10,000 | 3,000,000 | $0.0033 | 0.10% | $ 10,000,000 |
| Think VC | Y | Calvin's crypto group inner circle | $ 50,000 | 15,000,000 | $0.0033 | 0.50% | $ 10,000,000 |
| Tom Mcgowan | Y | Calvin's Crypto Friend | $ 30,000 | 9,000,000 | $0.0033 | 0.30% | $ 10,000,000 |
| Mikhail | Y | Calvin's trader friend- ex-Soros. | $ 20,000 | 6,000,000 | $0.0033 | 0.20% | $ 10,000,000 |
| Matthias Reist | Y | Calvin's friend in Switzerland | $ 20,000 | 6,000,000 | $0.0033 | 0.20% | $ 10,000,000 |
| Justin Chow | Y | Calvin's Friend who is at DRW Cumberland | $ 10,000 | 3,000,000 | $0.0033 | 0.10% | $ 10,000,000 |
| Brad Bond | Y | Mark Long's Friend | $ 25,000 | 7,500,000 | $0.0033 | 0.25% | $ 10,000,000 |
| Joe Miton | Y | DDM President | $ 60,000 | 18,000,000 | $0.0033 | 0.60% | $ 10,000,000 |
| Joshua Davis | Y | Don's Friend | $ 50,000 | 15,000,000 | $0.0033 | 0.50% | $ 10,000,000 |
| | | Total Friends and Family | $ 1,061,000 | 318,300,000 | $0.0033 | 10.61% | $ 10,000,000 |

### Seed (VCs)

| Name | Accredited? | Affiliation | Contribution | Tokens Issued | Price/Token | % Total Supply | Fully Diluted Valuation |
|---|---|---|---|---|---|---|---|
| | Y | a16z | $ 250,000 | 25,000,000 | $ 0.0100 | 0.8% | $ 30,000,000 |
| | Y | Pantera | $ 250,000 | 25,000,000 | $ 0.0100 | 0.8% | $ 30,000,000 |
| | Y | Blockchain Capital | $ 250,000 | 25,000,000 | $ 0.0100 | 0.8% | $ 30,000,000 |
| | Y | Galaxy | $ 250,000 | 25,000,000 | $ 0.0100 | 0.8% | $ 30,000,000 |
| | Y | Tim Draper | $ 250,000 | 25,000,000 | $ 0.0100 | 0.8% | $ 30,000,000 |
| | | Total Seed | $ 1,250,000 | 125,000,000 | $0.0100 | 4.17% | $ 30,000,000 |

### Strategic

| Name | Accredited? | Affiliation | Contribution | Tokens Issued | Price/Token | % Total Supply | Fully Diluted Valuation |
|---|---|---|---|---|---|---|---|
| James Zhang | Y | Advisor | $ 25,000 | 1,500,000 | $ 0.0167 | 0.1% | $ 50,000,000 |
| Matthew C. Le Merle | Y | Advisor | $ 10,000 | 600,000 | $ 0.0167 | 0.0% | $ 50,000,000 |
| Klark | Y | Advisor | $ 25,000 | 1,500,000 | $ 0.0167 | 0.1% | $ 50,000,000 |
| DDM | Y | Company | $ 50,000 | 3,000,000 | $ 0.0167 | 0.1% | $ 50,000,000 |
| | | Total Strategic | $ 110,000 | 6,600,000 | $0.0167 | 0.2% | $ 50,000,000 |

* Estimated. Not verified

# EXHIBIT B

**BYLAWS**

**OF**

**NEON MACHINE, INC.**
**(a Delaware corporation)**

**Adopted as of August 20, 2021**

# TABLE OF CONTENTS

**Page**

ARTICLE I. IDENTIFICATION; OFFICES ................................................................ 1

    SECTION 1.    NAME .................................................................................. 1
    SECTION 2.    PRINCIPAL AND BUSINESS OFFICES ..................................... 1
    SECTION 3.    REGISTERED AGENT AND OFFICE ......................................... 1
    SECTION 4.    CORPORATE RECORDS ......................................................... 1

ARTICLE II. STOCKHOLDERS ............................................................................ 1

    SECTION 1.    ANNUAL MEETING ............................................................. 1
    SECTION 2.    SPECIAL MEETING ............................................................. 1
    SECTION 3.    PLACE OF STOCKHOLDER MEETINGS ................................... 1
    SECTION 4.    NOTICE OF MEETINGS ........................................................ 2
    SECTION 5.    QUORUM ........................................................................... 2
    SECTION 6.    ADJOURNED MEETINGS ...................................................... 2
    SECTION 7.    FIXING OF RECORD DATE ................................................... 3
    SECTION 8.    VOTING LIST ..................................................................... 3
    SECTION 9.    VOTING ............................................................................. 4
    SECTION 10.   PROXIES ........................................................................... 4
    SECTION 11.   RATIFICATION OF ACTS OF DIRECTORS AND OFFICERS ......... 4
    SECTION 12.   CONDUCT OF MEETINGS ..................................................... 5
    SECTION 13.   ACTION WITHOUT MEETING ............................................... 5

ARTICLE III. DIRECTORS ................................................................................. 6

    SECTION 1.    GENERAL POWERS ............................................................. 6
    SECTION 2.    NUMBER AND TENURE OF DIRECTORS ................................. 6
    SECTION 3.    ELECTION OF DIRECTORS ................................................... 6
    SECTION 4.    CHAIRMAN OF THE BOARD; VICE CHAIRMAN OF THE BOARD ..... 6
    SECTION 5.    QUORUM ........................................................................... 7
    SECTION 6.    VOTING ............................................................................. 7
    SECTION 7.    VACANCIES ....................................................................... 7
    SECTION 8.    REMOVAL OF DIRECTORS ................................................... 7
    SECTION 9.    RESIGNATION .................................................................... 7
    SECTION 10.   REGULAR MEETINGS .......................................................... 7
    SECTION 11.   SPECIAL MEETINGS ........................................................... 8
    SECTION 12.   NOTICE OF SPECIAL MEETINGS OF THE BOARD OF DIRECTORS ... 8
    SECTION 13.   WRITTEN ACTION BY DIRECTORS ....................................... 8
    SECTION 14.   PARTICIPATION BY CONFERENCE TELEPHONE ..................... 8
    SECTION 15.   COMMITTEES ..................................................................... 8
    SECTION 16.   COMPENSATION OF DIRECTORS .......................................... 9

ARTICLE IV. OFFICERS .................................................................................... 9

    SECTION 1.    GENERAL PROVISIONS ....................................................... 9
    SECTION 2.    ELECTION AND TERM OF OFFICE ........................................ 9
    SECTION 3.    RESIGNATION AND REMOVAL OF OFFICERS ....................... 10

i

SECTION 4. VACANCIES ............................................................... 10
SECTION 5. THE CHIEF EXECUTIVE OFFICER ........................... 10
SECTION 6. THE PRESIDENT ....................................................... 10
SECTION 7. THE VICE PRESIDENT .............................................. 11
SECTION 8. THE SECRETARY ...................................................... 11
SECTION 9. THE ASSISTANT SECRETARY .................................. 11
SECTION 10. THE TREASURER ....................................................... 11
SECTION 11. THE ASSISTANT TREASURER .................................. 12
SECTION 12. OTHER OFFICERS, ASSISTANT OFFICERS AND AGENTS ................ 12
SECTION 13. ABSENCE OF OFFICERS ........................................... 12
SECTION 14. COMPENSATION ....................................................... 12

ARTICLE V. CAPITAL STOCK ................................................................ 12

SECTION 1. ISSUANCE OF STOCK .............................................. 12
SECTION 2. CERTIFICATES OF SHARES; UNCERTIFICATED SHARES ................ 13
SECTION 3. SIGNATURES OF FORMER OFFICER, TRANSFER AGENT OR
REGISTRAR ............................................................... 13
SECTION 4. TRANSFER OF SHARES ............................................ 13
SECTION 5. LOST, DESTROYED OR STOLEN CERTIFICATES ................ 14
SECTION 6. REGULATIONS ......................................................... 14

ARTICLE VI. RESTRICTIONS ON TRANSFER AND RIGHT OF FIRST REFUSAL. ......... 14

SECTION 1. TRANSFERS .............................................................. 14
SECTION 2. CONSENT TO TRANSFER ......................................... 15
SECTION 3. RIGHT OF FIRST REFUSAL ...................................... 15
SECTION 4. EXCEPTIONS ............................................................ 16
SECTION 5. TERMINATION .......................................................... 17
SECTION 6. VOID TRANSFERS .................................................... 17
SECTION 7. LEGENDS ................................................................. 17

ARTICLE VII. INDEMNIFICATION ......................................................... 18

SECTION 1. RIGHT TO INDEMNIFICATION OF DIRECTORS AND OFFICERS ..... 18
SECTION 2. PREPAYMENT OF EXPENSES OF DIRECTORS AND OFFICERS ....... 18
SECTION 3. CLAIMS BY DIRECTORS AND OFFICERS ................. 18
SECTION 4. INDEMNIFICATION OF EMPLOYEES AND AGENTS ........ 18
SECTION 5. ADVANCEMENT OF EXPENSES OF EMPLOYEES AND AGENTS .... 19
SECTION 6. NON-EXCLUSIVITY OF RIGHTS ............................... 19
SECTION 7. OTHER INDEMNIFICATION ...................................... 19
SECTION 8. INSURANCE .............................................................. 19
SECTION 9. AMENDMENT OR REPEAL ....................................... 19

ARTICLE VIII. DIVIDENDS .................................................................... 19

SECTION 1. DECLARATIONS OF DIVIDENDS .............................. 19
SECTION 2. SPECIAL PURPOSES RESERVES .............................. 20

ARTICLE IX. NOTICE BY ELECTRONIC TRANSMISSION ................... 20

SECTION 1. NOTICE BY ELECTRONIC TRANSMISSION ............. 20

ii

SECTION 2.    DEFINITION OF ELECTRONIC TRANSMISSION ................................... 21
SECTION 3.    INAPPLICABILITY ......................................................................... 21

ARTICLE X. GENERAL PROVISIONS ...................................................................... 21

SECTION 1.    FISCAL YEAR .............................................................................. 21
SECTION 2.    SEAL ......................................................................................... 21
SECTION 3.    WRITTEN WAIVER OF NOTICE ................................................... 21
SECTION 4.    ATTENDANCE AS WAIVER OF NOTICE ........................................ 21
SECTION 5.    WAIVER OF SECTION 1501. ......................................................... 22
SECTION 6.    CONTRACTS ................................................................................ 22
SECTION 7.    LOANS ........................................................................................ 22
SECTION 8.    CHECKS, DRAFTS, ETC. ............................................................. 22
SECTION 9.    DEPOSITS ................................................................................... 22
SECTION 10.   ANNUAL STATEMENT ................................................................ 22
SECTION 11.   VOTING OF SECURITIES ............................................................. 22
SECTION 12.   EVIDENCE OF AUTHORITY .......................................................... 22
SECTION 13.   CERTIFICATE OF INCORPORATION ............................................. 22
SECTION 14.   SEVERABILITY ........................................................................... 22
SECTION 15.   PRONOUNS ................................................................................ 23

ARTICLE XI. AMENDMENTS ................................................................................. 23

SECTION 1.    BY THE BOARD OF DIRECTORS ................................................... 23
SECTION 2.    BY THE STOCKHOLDERS ............................................................. 23

iii

# ARTICLE I.
## IDENTIFICATION; OFFICES

SECTION 1.  NAME.  The name of the corporation is NEON MACHINE, INC. (the "Corporation").

SECTION 2.  PRINCIPAL AND BUSINESS OFFICES.  The Corporation may have such principal and other business offices, either within or outside of the state of Delaware, as the Board of Directors may designate or as the Corporation's business may require from time to time.

SECTION 3.  REGISTERED AGENT AND OFFICE.  The Corporation's registered agent may be changed from time to time by or under the authority of the Board of Directors. The address of the Corporation's registered agent may change from time to time by or under the authority of the Board of Directors, or the registered agent. The business office of the Corporation's registered agent shall be identical to the registered office. The Corporation's registered office may be but need not be identical with the Corporation's principal office in the state of Delaware. The Corporation's initial registered office shall be in the City of Wilmington, County of New Castle, State of Delaware.

SECTION 4.  CORPORATE RECORDS.  Any records and documents required by law to be kept by the Corporation permanently or administered by the Corporation in the regular course of business may be kept on, or by means of, or be in the form of, any information storage device, method, or one more electronic networks or databases, provided that the records so kept can be converted into clearly legible paper form within a reasonable time and, with respect to the stock ledger, the records so kept comply with Section 224 of the Delaware General Corporation Law. The Corporation shall so convert any records so kept upon the request of any person entitled to inspect such records pursuant to applicable law.

# ARTICLE II.
## STOCKHOLDERS

SECTION 1.  ANNUAL MEETING.  An annual meeting of the stockholders shall be held on such date as may be designated by the Board of Directors, the Chairman of the Board, the Chief Executive Officer or the President. At each annual meeting, the stockholders shall elect directors to hold office for the term provided in Section 2 of Article III of these Bylaws and transact such other business as may properly be brought before the meeting.

SECTION 2.  SPECIAL MEETING.  A special meeting of the stockholders for any purpose or purposes may be called at any time only by the President, the Board of Directors, the Chairman of the Board, the Chief Executive Officer or any other person designated by the Board of Directors. The Board of Directors may postpone or reschedule any previously scheduled special meeting of stockholders. Business transacted at any special meeting of stockholders shall be limited to matters relating to the purpose or purposes stated in the notice of meeting.

SECTION 3.  PLACE OF STOCKHOLDER MEETINGS.  The Board of Directors, the Chairman of the Board, the Chief Executive Officer or the President may designate any place, either within or without the State of Delaware, as the place of meeting for any annual meeting or

for any special meeting. If no such place is designated by the Board of Directors, the place of meeting will be the principal business office of the Corporation or the Board of Directors may, in its sole discretion, determine that the meeting shall not be held at any place, but will instead be held solely by means of remote communication as provided under Section 211 of the Delaware General Corporation Law.

SECTION 4.   NOTICE OF MEETINGS. Except as otherwise provided by law or waived as herein provided, whenever stockholders are required or permitted to take any action at a meeting, whether annual or special, notice of the meeting shall be given stating the place, if any, date and hour of the meeting, the means of remote communications, if any, by which stockholders may be deemed to be present in person and vote at such meeting and, in the case of a special meeting, the purpose or purposes for which the meeting is called. Such notice shall be given unless otherwise required by law not less than 10 days nor more than 60 days before the date of the meeting to each stockholder entitled to vote at the meeting.

When a meeting is adjourned to reconvene at the same or another place, if any, or by means of remote communications, if any, in accordance with <u>Section 6</u> of Article II of these Bylaws, notice need not be given of the adjourned meeting if the time and place thereof are announced at the meeting at which the adjournment is taken.

SECTION 5. QUORUM. Unless otherwise provided by law, the Corporation's Certificate of Incorporation or these Bylaws, the holders of a majority in voting power of the shares of the capital stock of the Corporation issued and outstanding and entitled to vote at the meeting, present in person, present by means of remote communication in a manner, if any, authorized by the Board of Directors in its sole discretion, or represented by proxy, shall constitute a quorum for the transaction of business; <u>provided</u>, <u>however</u>, that where a separate vote by a class or classes or series of capital stock is required by law or the Certificate of Incorporation, the holders of a majority in voting power of the shares of such class or classes or series of the capital stock of the Corporation issued and outstanding and entitled to vote on such matter, present in person, present by means of remote communication in a manner, if any, authorized by the Board of Directors in its sole discretion, or represented by proxy, shall constitute a quorum entitled to take action with respect to the vote on such matter. If a quorum is present in person or represented by proxy at such meeting, such stockholders may continue to transact business until adjournment, notwithstanding the withdrawal of such number of stockholders as may leave less than a quorum.

SECTION 6. ADJOURNED MEETINGS. Any meeting of stockholders may be adjourned from time to time to any other time and to any other place (or by means of remote communications, if any) at which a meeting of stockholders may be held under these Bylaws by the chairman of the meeting or by a majority of the stockholders present or represented at the meeting and entitled to vote, although less than a quorum. It shall not be necessary to notify any stockholder of any adjournment of less than 30 days if the time and place, if any, of the adjourned meeting, and the means of remote communication, if any, by which stockholders and proxyholders may be deemed to be present in person and vote at such adjourned meeting, are announced at the meeting at which adjournment is taken, unless after the adjournment a new record date is fixed for the adjourned meeting. At the adjourned meeting, the Corporation may transact any business which might have been transacted at the original meeting.

2

SECTION 7.   FIXING OF RECORD DATE.

(a)      The Board of Directors may fix in advance a date as a record date for the determination of the stockholders entitled to notice of or to vote at any meeting of stockholders or any adjournment thereof. Such record date shall not precede the date upon which the resolution fixing the record date is adopted by the Board of Directors, and which record date shall not be more than 60 days nor less than 10 days before the date of such meeting. If no record date is fixed by the Board of Directors, the record date for determining stockholders entitled to notice of or to vote at a meeting of stockholders shall be at the close of business on the day next preceding the day on which notice is given, or, if notice is waived, at the close of business on the day next preceding the day on which the meeting is held. A determination of stockholders of record entitled to notice of or to vote at a meeting of stockholders shall apply to any adjournment of the meeting; provided, however, that the Board of Directors may fix a new record date for the adjourned meeting.

(b)      For the purpose of determining stockholders entitled to consent to corporate action in writing without a meeting, the Board of Directors may fix a record date, which record date shall not precede the date upon which the resolution fixing the record date is established by the Board of Directors, and which date shall not be more than 10 days after the date on which the resolution fixing the record date is adopted by the Board of Directors. If no record date has been fixed by the Board of Directors, the record date for determining stockholders entitled to consent to corporate action in writing without a meeting, when no prior action by the Board of Directors is required by law, shall be the first date on which a signed written consent setting forth the action taken or proposed to be taken is delivered to the Corporation by delivery to its registered office in the State of Delaware, its principal office, or an officer or agent of the Corporation having custody of the book in which the proceedings of meetings of stockholders are recorded. Delivery to the Corporation's registered office shall be by hand or by certified or registered mail, return receipt requested. If no record date has been fixed by the Board of Directors and prior action by the Board of Directors is required by law, the record date for determining stockholders' consent to corporate action in writing without a meeting shall be the close of business on the day on which the Board of Directors adopts the resolution taking such prior action.

(c)      For the purpose of determining the stockholders entitled to receive payment of any dividend or other distribution or allotment of any rights or the stockholders entitled to exercise any rights in respect to any change, conversion or exchange of stock, or for the purpose of any other lawful action, the Board of Directors may fix the record date, which record date shall not precede the date upon which the resolution fixing the record date is adopted, and which record date shall be not more than 60 days prior to such action. If no record date is fixed, the record date for determining the stockholders for any such purpose shall be the close of business on the day on which the Board of Directors adopts the resolution relating thereto.

SECTION 8.   VOTING LIST. The officer who has charge of the stock ledger of the Corporation shall prepare and make, at least 10 days before every meeting of stockholders, a complete list of stockholders entitled to vote at the meeting, arranged in alphabetical order, and showing the address of each stockholder and the number of shares registered in the name of each stockholder. Such list shall be open to the examination of any stockholder, for any purpose

US-DOCS\126055529.1

germane to the meeting, for a period of at least 10 days prior to the meeting, (i) by a reasonably accessible electronic network, provided that the information required to gain access to such list is provided with the notice of the meeting, or (ii) during ordinary business hours, at the principal place of business of the Corporation. In the event that the Corporation determines to make the list available on an electronic network, the Corporation may take reasonable steps to ensure that such information is available only to the stockholders of the Corporation. If the meeting is to be held at a place, then the list shall be produced and kept at the time and place of the meeting during the whole time thereof and may be inspected by any stockholder who is present. If the meeting is to be held solely by means of remote communication, then the list shall also be open to the examination of any stockholder during the whole time of the meeting on a reasonably accessible electronic network, and the information required to access such list shall be provided with the notice of the meeting. Except as otherwise provided by law, such list shall be the only evidence as to the identity of stockholders entitled to examine the list of stockholders required by this Section 8 or to vote in person or by proxy at any meeting of the stockholders. The Corporation shall not be required to include electronic mail addresses or other electronic contact information on such list.

SECTION 9.    VOTING. Unless otherwise provided by the Certificate of Incorporation, each stockholder shall be entitled to one vote for each share of capital stock held by each stockholder. When a quorum is present at any meeting, in all matters other than the election of directors, the affirmative vote of the majority of shares present in person or represented by proxy at the meeting and entitled to vote on the subject matter shall be the act of the stockholders, except when a different vote is required by law, the Certificate of Incorporation or these Bylaws. When a quorum is present at any meeting, directors shall be elected by plurality of the votes of the shares present in person or represented by a proxy at the meeting entitled to vote on the election of directors.

SECTION 10. PROXIES. Each stockholder entitled to vote at a meeting of stockholders or to express consent or dissent to corporate action in writing without a meeting (including by means of remote communications, if any, by which stockholders may be deemed to be present in person and vote at such meeting) may authorize another person or persons to act for him or her by proxy (executed or transmitted in a manner permitted by the Delaware General Corporation Law), but no such proxy shall be voted or acted upon after three years from its date, unless the proxy provides for a longer period. A duly executed proxy shall be irrevocable if it states that it is irrevocable and if, and only as long as, it is coupled with an interest sufficient in law to support an irrevocable power. A proxy may remain irrevocable regardless of whether the interest with which it is coupled is an interest in the stock itself or an interest in the Corporation generally.

SECTION 11. RATIFICATION OF ACTS OF DIRECTORS AND OFFICERS. Except as otherwise provided by law or by the Certificate of Incorporation of the Corporation, any transaction or contract or act of the Corporation or of the directors or the officers of the Corporation may be ratified by the affirmative vote of the holders of the number of shares which would have been necessary to approve such transaction, contract or act at a meeting of stockholders, or by the written consent of stockholders in lieu of a meeting.

US-DOCS\126055529.1

SECTION 12. CONDUCT OF MEETINGS.

(a)    <u>Chairman of Meeting</u>. Meetings of stockholders shall be presided over by the Chairman of the Board, if any, or in the Chairman's absence by the Vice Chairman of the Board, if any, or in the Vice Chairman's absence by the Chief Executive Officer, or in the Chief Executive Officer's absence, by the President, or in the President's absence by a Vice President, or in the absence of all of the foregoing persons by a chairman designated by the Board of Directors, or in the absence of such designation by a chairman chosen by vote of the stockholders at the meeting. The Secretary shall act as secretary of the meeting, but in the Secretary's absence the chairman of the meeting may appoint any person to act as secretary of the meeting.

(b)    <u>Rules, Regulations and Procedures</u>. The Board of Directors may adopt by resolution such rules, regulations and procedures for the conduct of any meeting of stockholders of the Corporation as it shall deem appropriate including, without limitation, such guidelines and procedures as it may deem appropriate regarding the participation by means of remote communication of stockholders and proxyholders not physically present at a meeting. Except to the extent inconsistent with such rules, regulations and procedures as adopted by the Board of Directors, the chairman of any meeting of stockholders shall have the right and authority to prescribe such rules, regulations and procedures and to do all such acts as, in the judgment of such chairman, are appropriate for the proper conduct of the meeting. Such rules, regulations or procedures, whether adopted by the Board of Directors or prescribed by the chairman of the meeting, may include, without limitation, the following: (i) the establishment of an agenda or order of business for the meeting; (ii) rules and procedures for maintaining order at the meeting and the safety of those present; (iii) limitations on attendance at or participation in the meeting to stockholders of record of the Corporation, their duly authorized and constituted proxies or such other persons as shall be determined; (iv) restrictions on entry to the meeting after the time fixed for the commencement thereof; and (v) limitations on the time allotted to questions or comments by participants. Unless and to the extent determined by the Board of Directors or the chairman of the meeting, meetings of stockholders shall not be required to be held in accordance with the rules of parliamentary procedure.

SECTION 13. ACTION WITHOUT MEETING.

(a)    Any action required or permitted to be taken at any annual or special meeting of stockholders of the Corporation, may be taken without a meeting, without prior notice and without a vote, if a consent or consents in writing, setting forth the action so taken, shall be delivered to the Corporation signed by the holders of outstanding stock having not less than the minimum number of votes that would be necessary to authorize or take such action at a meeting at which all shares entitled to vote thereon were present and voted.

(b)    Prompt notice of the taking of the corporate action without a meeting by less than unanimous consent shall be given to those stockholders who have not consented in writing and who, if the action had been taken at a meeting, would have been entitled to notice of the meeting if the record date for such meeting had been the date that written consents signed by a sufficient number of holders to take the action were delivered to the Corporation.

(c)     An electronic transmission consenting to an action to be taken and transmitted by a stockholder or proxy holder, or by a person or persons authorized to act for a stockholder or proxy holder, shall be deemed to be written, signed and dated for the purposes of this section, provided that any such electronic transmission sets forth or is delivered with information from which the Corporation can determine (i) that the electronic transmission was transmitted by the stockholder or proxy holder or by a person or persons authorized to act for the stockholder or proxy holder and (ii) the date on which such stockholder or proxy holder or authorized person or persons transmitted such electronic transmission. A consent given by electronic transmission is delivered to the Corporation upon the earliest of: (i) when the consent enters an information processing system, if any, designated by the Corporation for receiving consents, so long as the electronic transmission is in a form capable of being processed by that system and the Corporation is able to retrieve that electronic transmission; (ii) when a paper reproduction of the consent is delivered to the Corporation's principal place of business or an officer or agent of the Corporation having custody of the book in which proceedings of meetings of stockholders or members are recorded; (iii) when a paper reproduction of the consent is delivered to the Corporation's registered office in this State by hand or by certified or registered mail, return receipt requested; or (iv) when delivered in such other manner, if any, provided by resolution of the Board of Directors or governing body of the Corporation. Any copy, facsimile or other reliable reproduction of a consent in writing may be substituted or used in lieu of the original writing for any and all purposes for which the original writing could be used, provided that such copy, facsimile or other reproduction shall be a complete reproduction of the entire original writing.

## ARTICLE III.
## DIRECTORS

SECTION 1.   GENERAL POWERS. The business and affairs of the Corporation shall be managed by or under the direction of a Board of Directors, who may exercise all of the powers of the Corporation except as otherwise provided by law or the Certificate of Incorporation.

SECTION 2.   NUMBER AND TENURE OF DIRECTORS. Subject to the rights of holders of any class or series of capital stock of the Corporation to elect directors, the number of directors of the Corporation shall be determined from time to time by the stockholders or the Board of Directors in a resolution adopted by the Board of Directors. Each director shall hold office until the next annual meeting of stockholders and until such director's successor is elected and qualified or until such director's earlier death, resignation or removal.

SECTION 3.   ELECTION OF DIRECTORS. Except as otherwise provided in these Bylaws, directors shall be elected at the annual meeting of stockholders by such stockholders as have the right to vote on such election. Directors need not be residents of the State of Delaware. Directors need not be stockholders of the Corporation. Elections of directors need not be by written ballot.

SECTION 4.   CHAIRMAN OF THE BOARD; VICE CHAIRMAN OF THE BOARD. The Board of Directors may appoint from its members a Chairman of the Board and a Vice Chairman of the Board, neither of whom need be an employee or officer of the Corporation. If

6

the Board of Directors appoints a Chairman of the Board, such Chairman shall perform such duties and possess such powers as are assigned by the Board of Directors. If the Board of Directors appoints a Vice Chairman of the Board, such Vice Chairman shall perform such duties and possess such powers as are assigned by the Board of Directors. Unless otherwise provided by the Board of Directors, the Chairman of the Board or, in the Chairman's absence, the Vice Chairman of the Board, if any, shall preside at all meetings of the Board of Directors.

SECTION 5.   QUORUM. The greater of (a) a majority of the directors at any time in office and (b) one-third of the number of directors fixed pursuant to Section 2 of Article III of these Bylaws shall constitute a quorum of the Board of Directors. If less than a quorum are present at a meeting of the Board of Directors, a majority of the directors present may adjourn the meeting from time to time without further notice other than announcement at the meeting, until such quorum shall be present.

SECTION 6.   VOTING. The vote of the majority of the directors present at a meeting at which a quorum is present shall be the act of the Board of Directors, unless the Delaware General Corporation Law or the Certificate of Incorporation requires a vote of a greater number.

SECTION 7.   VACANCIES. Subject to the rights of holders of any series of Preferred Stock to elect directors, unless and until filled by the stockholders, any vacancy or newly-created directorship on the Board of Directors, however occurring, may be filled by vote of a majority of the directors then in office, although less than a quorum, or by a sole remaining director. A director elected to fill a vacancy shall be elected for the unexpired term of such director's predecessor in office, and a director chosen to fill a position resulting from a newly-created directorship shall hold office until the next annual meeting of stockholders and until a successor is elected and qualified, or until such director's earlier death, resignation or removal.

SECTION 8.   REMOVAL OF DIRECTORS. Except as otherwise provided by the General Corporation Law of the State of Delaware, a director, or the entire Board of Directors, may be removed, with or without cause, by the holders of a majority of the shares then entitled to vote at an election of directors, except that the directors elected by the holders of a particular class or series of stock may be removed without cause only by vote of the holders of a majority of the outstanding shares of such class or series.

SECTION 9.   RESIGNATION. Any director may resign by delivering a resignation in writing or by electronic transmission to the Corporation at its principal office or to the Chairman of the Board, the Chief Executive Officer, the President or the Secretary. Such resignation shall be effective upon delivery unless it is specified to be effective at some later time or upon the happening of some later event.

SECTION 10. REGULAR MEETINGS. Regular meetings of the Board of Directors may be held without notice at such time, place and manner as shall be determined from time to time by the Board of Directors; provided that any director who is absent when such a determination is made shall be given notice of the determination. A regular meeting of the Board of Directors may be held without notice immediately after and at the same place as the annual meeting of stockholders.

SECTION 11. SPECIAL MEETINGS. Special meetings of the Board of Directors may be called by or at the request of the Chairman of the Board, the Chief Executive Officer, the President, two or more directors or by one director in the event that there is only a single director in office. The person or persons authorized to call special meetings of the Board of Directors may fix any time, date or place, either within or without the State of Delaware, for holding any special meeting of the Board of Directors called by them.

SECTION 12. NOTICE OF SPECIAL MEETINGS OF THE BOARD OF DIRECTORS. Notice of the date, place, if any, and time of any special meeting of the Board of Directors shall be given to each director by the Secretary or by the officer or one of the directors calling the meeting. Notice shall be duly given to each director (a) in person, by telephone, fax or by electronic transmission at least 24 hours in advance of the meeting, (b) by sending written notice by reputable overnight courier or delivering written notice by hand, to such director's last known business, home or facsimile address at least 48 hours in advance of the meeting, or (c) by sending written notice by first-class mail to such director's last known business or home address at least 72 hours in advance of the meeting. A notice or waiver of notice of a meeting of the Board of Directors need not specify the purposes of the meeting.

SECTION 13. WRITTEN ACTION BY DIRECTORS. Unless otherwise restricted by the Certificate of Incorporation or these Bylaws, any action required or permitted to be taken at any meeting of the Board of Directors, or of any committee thereof, may be taken without a meeting if all members of the Board of Directors or committee, as the case may be, consent thereto in writing, or by electronic transmission. Without limiting the manner by which consent may be given, members of the Board of Directors may consent by delivery of an electronic transmission when such transmission is directed to a facsimile number or electronic mail address at which the Corporation has consented to receive such electronic transmissions, and copies of the electronic transmissions are filed with the minutes of proceedings of the Board of Directors or committee. After an action is taken, the consent or consents relating thereto shall be filed with the minutes of the proceedings of the Board of Directors, or the committee thereof, in the same paper or electronic form as the minutes are maintained.

SECTION 14. PARTICIPATION BY CONFERENCE TELEPHONE. Members of the Board of Directors, or any committee designated by such board, may participate in a meeting of the Board of Directors, or committee thereof, by means of conference telephone or similar communications equipment as long as all persons participating in the meeting can speak with and hear each other, and participation by a director pursuant to this section shall constitute presence in person at such meeting.

SECTION 15. COMMITTEES. The Board of Directors may designate one or more committees, each committee to consist of one or more of the directors of the Corporation with such lawfully delegable powers and duties as the Board of Directors thereby confers, to serve at the pleasure of the Board of Directors. The Board may designate one or more directors as alternate members of any committee, who may replace any absent or disqualified member at any meeting of the committee. In the absence or disqualification of a member at any meeting of a committee, the member or members thereof present at any meeting and not disqualified from voting, whether or not such member or members constitute a quorum, may unanimously appoint another member of the Board of Directors to act at the meeting in the place of any such absent or

US-DOCS\126055529.1

disqualified member. Any such committee, to the extent provided in the resolution of the Board of Directors, shall have and may exercise all the powers and authority of the Board of Directors in the management of the business and affairs of the Corporation, and may authorize the seal of the Corporation to be affixed to all papers which may require it, but no such committee shall have the power or authority in reference to the following matters: (i) approving or adopting, or recommending to the stockholders, any action or matter (other than the election or removal of directors) expressly required by law to be submitted to stockholders for approval or (ii) adopting, amending or repealing any bylaw of the Corporation. Each such committee shall keep minutes and make such reports as the Board of Directors may from time to time request. Except as the Board of Directors may otherwise determine, any committee may make rules for the conduct of its business, but unless otherwise provided by the directors or in such rules, its business shall be conducted as nearly as possible in the same manner as is provided in these Bylaws for the Board of Directors. Except as otherwise provided in the Certificate of Incorporation, these Bylaws, or the resolution of the Board of Directors designating the committee, a committee may create one or more subcommittees, each subcommittee to consist of one or more members of the committee, and delegate to a subcommittee any or all of the powers and authority of the committee.

SECTION 16. COMPENSATION OF DIRECTORS. Unless otherwise restricted by the Certificate of Incorporation or these Bylaws, the Board of Directors shall have the authority to fix the compensation of directors. The directors may be paid their expenses, if any, of attendance at each meeting of the Board of Directors and may be paid a fixed sum for attendance at each meeting of the Board of Directors or a stated salary as director. No such payment shall preclude any director from serving the Corporation in any other capacity and receiving compensation therefore. Members of special or standing committees may be allowed like compensation for attending committee meetings.

## ARTICLE IV.
## OFFICERS

SECTION 1.   GENERAL PROVISIONS. The officers of the Corporation shall consist of a Chief Executive Officer, a President, a Secretary, a Treasurer and such other officers with such other titles as the Board of Directors shall determine, including one or more Vice Presidents, Assistant Treasurers and Assistant Secretaries. The Board of Directors may appoint such other officers as it may deem appropriate. No officer need be a stockholder. Any two or more offices may be held by the same person. The officers elected by the Board of Directors shall have such duties as are hereafter described and such additional duties as the Board of Directors may from time to time prescribe.

SECTION 2.   ELECTION AND TERM OF OFFICE. The Chief Executive Officer, President, Treasurer and Secretary shall be elected annually by the Board of Directors at the regular meeting of the Board of Directors held after each annual meeting of the stockholders. If the election of officers is not held at such meeting, such election shall be held as soon thereafter as may be convenient. Other officers may be appointed at any time, at a meeting or by the written consent of the Board of Directors. Except as otherwise provided by law, by the Certificate of Incorporation or by these Bylaws, each officer shall hold office until his or her successor has been duly elected and qualified, unless a different term is specified in the

9

resolution electing or appointing such officer, or until his or her earlier death, resignation or removal. Election or appointment of an officer or agent shall not of itself create contract rights.

SECTION 3.   RESIGNATION AND REMOVAL OF OFFICERS. Any officer may resign by delivering a written resignation to the Corporation at its principal office or to the Chief Executive Officer, the President or the Secretary. Such resignation shall be effective upon receipt unless it is specified to be effective at some later time or upon the happening of some later event. Any officer may be removed at any time, with or without cause, by vote of a majority of the directors then in office. Except as the Board of Directors may otherwise determine, no officer who resigns or is removed shall have any right to any compensation as an officer for any period following such officer's resignation or removal, or any right to damages on account of such removal, whether such officer's compensation be by the month or by the year or otherwise, unless such compensation is expressly provided for in a duly authorized written agreement with the Corporation.

SECTION 4.   VACANCIES. The Board of Directors may fill any vacancy occurring in any office for any reason and may, in its discretion, leave unfilled for such period as it may determine any offices other than those of Chief Executive Officer, President, Treasurer and Secretary. Each such successor shall hold office for the unexpired term of such officer's predecessor and until a successor is elected and qualified, or until such officer's earlier death, resignation or removal.

SECTION 5.   THE CHIEF EXECUTIVE OFFICER. Unless the Board of Directors has designated another person as the Corporation's Chief Executive Officer, the President shall be the Chief Executive Officer of the Corporation. The Chief Executive Officer shall have general charge and supervision of the business and affairs of the Corporation subject to the direction of the Board of Directors, and shall perform all duties and have all powers that are commonly incident to the office of chief executive or that are delegated to such officer by the Board of Directors. The Chief Executive Officer shall preside at all meetings of the Board of Directors and shall see that orders and resolutions of the Board of Directors are carried into effect. The Chief Executive Officer may sign bonds, mortgages, certificates for shares and all other contracts and documents whether or not under the seal of the Corporation except in cases where the signing and execution thereof shall be expressly delegated by law, by the Board of Directors or by these Bylaws to some other officer or agent of the Corporation. The Chief Executive Officer shall have general powers of supervision and shall be the final arbiter of all differences between officers of the Corporation and his or her decision as to any matter affecting the Corporation shall be final and binding as between the officers of the Corporation subject only to the Board of Directors.

SECTION 6.   THE PRESIDENT. In the absence of the Chief Executive Officer or in the event of his or her inability or refusal to act, the President shall perform the duties of the Chief Executive Officer, and when so acting, shall have all the powers of and be subject to all the restrictions upon the Chief Executive Officer. At all other times the President shall have the active management of the business of the Corporation under the general supervision of the Chief Executive Officer or the Board of Directors. The President shall have concurrent power with the Chief Executive Officer to sign bonds, mortgages, certificates for shares and other contracts and documents, whether or not under the seal of the Corporation except in cases where the signing and execution thereof shall be expressly delegated by law, by the Board of Directors, or by these

10

Bylaws to some other officer or agent of the Corporation. In general, the President shall perform all duties incident to the office of president and such other duties as the Chief Executive Officer (if the President is not the Chief Executive Officer) or the Board of Directors may from time to time prescribe.

SECTION 7.   THE VICE PRESIDENT. In the absence of the President or in the event of his or her inability or refusal to act, the Vice President (or in the event there be more than one Vice President, the Executive Vice President and then the other Vice President or Vice Presidents in the order designated, or in the absence of any designation, then in the order of their election) shall perform the duties of the President, and when so acting, shall have all the powers of and be subject to all the restrictions upon the President. The Vice Presidents shall perform such other duties and have such other powers as the Chief Executive Officer or the Board of Directors may from time to time prescribe.

SECTION 8.   THE SECRETARY. The Secretary shall perform such duties and shall have such powers as the Board of Directors or the Chief Executive Officer may from time to time prescribe. The Secretary shall perform such duties and have such powers as are incident to the office of the secretary, including without limitation the duty and power to attend all meetings of the Board of Directors and all meetings of the stockholders and record all the proceedings in a book to be kept for that purpose and shall perform like duties for the standing committees when required and to maintain a stock ledger and prepare lists of stockholders and their addresses as required. The Secretary shall give, or cause to be given, notice of all meetings of the stockholders and special meetings of the Board of Directors, and shall perform such other duties as may be prescribed by the Board of Directors or the Chief Executive Officer, under whose supervision he or she shall be. The Secretary shall have custody of the corporate records and the corporate seal of the Corporation and the Secretary, or an Assistant Secretary, shall have authority to affix the same to any instrument requiring it and when so affixed, it may be attested by his or her signature or by the signature of such Assistant Secretary. The Board of Directors may give general authority to any other officer to affix the seal of the Corporation and to attest the affixing by his or her signature.

SECTION 9.   THE ASSISTANT SECRETARY. The Assistant Secretary, or if there be more than one, the Assistant Secretaries in the order determined by the Board of Directors (or if there be no such determination, then in the order of their election), shall, in the absence of the Secretary or in the event of his or her inability or refusal to act, perform the duties and exercise the powers of the Secretary and shall perform such other duties and have such other powers as the Chief Executive Officer, the Board of Directors or the Secretary may from time to time prescribe. In the absence of the Secretary or any Assistant Secretary at any meeting of stockholders or directors, the chairman of the meeting shall designate a temporary secretary to keep a record of the meeting.

SECTION 10. THE TREASURER. The Treasurer shall perform such duties and shall have such powers as may from time to time be assigned by the Board of Directors or the Chief Executive Officer. In addition, the Treasurer shall perform such duties and have such powers as are incident to the office of treasurer, including without limitation, the duty and power to have the custody of the corporate funds and securities and to keep full and accurate accounts of receipts and disbursements in books belonging to the Corporation and deposit all moneys and

11

other valuable effects in the name and to the credit of the Corporation in such depositories as may be designated by the Board of Directors. The Treasurer shall disburse the funds of the Corporation as may be ordered by the Board of Directors, taking proper vouchers for such disbursements, and shall render to the President and the Board of Directors, as required by the Board of Directors, an account of all his or her transactions as Treasurer and of the financial condition of the Corporation. If required by the Board of Directors, the Treasurer shall give the Corporation a bond (which shall be renewed every six years) in such sum and with such surety or sureties as shall be satisfactory to the Board of Directors for the faithful performance of the duties of his or her office and for the restoration to the Corporation, in case of his or her death, resignation, retirement or removal from office, of all books, papers, vouchers, money and other property of whatever kind in his or her possession or under his or her control belonging to the Corporation.

SECTION 11. THE ASSISTANT TREASURER. The Assistant Treasurer, or if there shall be more than one, the Assistant Treasurers in the order determined by the Board of Directors (or if there be no such determination, then in the order of their election), shall, in the absence of the Treasurer or in the event of his or her inability or refusal to act, perform the duties and exercise the powers of the Treasurer and shall perform such other duties and have such other powers as the Chief Executive Officer, the Board of Directors or the Treasurer may from time to time prescribe.

SECTION 12. OTHER OFFICERS, ASSISTANT OFFICERS AND AGENTS. Officers, Assistant Officers and Agents, if any, other than those whose duties are provided for in these Bylaws, shall have such authority and perform such duties as may from time to time be prescribed by resolution of the Board of Directors.

SECTION 13. ABSENCE OF OFFICERS, DELEGATION OF AUTHORITY. In the absence of any officer of the Corporation, or for any other reason the Board of Directors may deem sufficient, the Board of Directors may from time to time delegate the powers or duties, or any of such powers or duties, of any officers or officer to any other officer or to any director.

SECTION 14. COMPENSATION. The Board of Directors shall have the authority to establish reasonable salaries, compensation or reimbursement of all officers for services to the Corporation.

## ARTICLE V.
## CAPITAL STOCK

SECTION 1.  ISSUANCE OF STOCK. Subject to the provisions of the Certificate of Incorporation, the whole or any part of any unissued balance of the authorized capital stock of the Corporation or the whole or any part of any shares of the authorized capital stock of the Corporation held in the Corporation's treasury may be issued, sold, transferred or otherwise disposed of by vote of the Board of Directors in such manner, for such lawful consideration and on such terms as the Board of Directors may determine.

12

SECTION 2.   CERTIFICATES OF SHARES; UNCERTIFICATED SHARES.

(a)    The shares of the Corporation shall be represented by certificates, provided that the Board of Directors of the Corporation may provide by resolution or resolutions that some or all of any or all classes or series of its stock shall be uncertificated shares. Any such resolution shall not apply to shares represented by a certificate until such certificate is surrendered to the Corporation. Every holder of stock represented by certificates shall be entitled to have a certificate, in such form as may be prescribed by law and by the Board of Directors, signed in a manner that complies with Section 158 of the Delaware General Corporation Law, representing the number of shares held by such holder registered in certificate form. Any or all the signatures on the certificate may be a facsimile or pdf.

(b)    Each certificate for shares of stock which are subject to any restriction on transfer pursuant to the Certificate of Incorporation, these Bylaws, applicable securities laws or any agreement among any number of stockholders or among such holders and the Corporation shall have conspicuously noted on the face or back of the certificate either the full text of the restriction or a statement of the existence of such restriction.

(c)    If the Corporation shall be authorized to issue more than one class of stock or more than one series of any class, the powers, designations, preferences and relative, participating, optional or other special rights of each class of stock or series thereof and the qualifications, limitations or restrictions of such preferences and/or rights shall be set forth in full or summarized on the face or back of each certificate representing shares of such class or series of stock, provided that in lieu of the foregoing requirements there may be set forth on the face or back of each certificate representing shares of such class or series of stock a statement that the Corporation will furnish without charge to each stockholder who so requests a copy of the full text of the powers, designations, preferences and relative, participating, optional or other special rights of each class of stock or series thereof and the qualifications, limitations or restrictions of such preferences and/or rights.

(d)    Within a reasonable time after the issuance or transfer of uncertificated shares, the Corporation shall send to the registered owner thereof a written notice containing the information required to be set forth or stated on certificates pursuant to Sections 151, 156, 202(a) or 218(a) of the General Corporation Law of the State of Delaware or, with respect to Section 151 of the General Corporation Law of the State of Delaware, a statement that the Corporation will furnish without charge to each stockholder who so requests the powers, designations, preferences and relative participating, optional or other special rights of each class of stock or series thereof and the qualifications, limitations or restrictions of such preferences and/or rights.

SECTION 3.   SIGNATURES OF FORMER OFFICER, TRANSFER AGENT OR REGISTRAR. In case any officer, transfer agent, or registrar who has signed or whose facsimile signature has been placed upon a certificate shall have ceased to be such officer, transfer agent or registrar before such certificate is issued, it may be issued by the Corporation with the same effect as if such person or entity were such officer, transfer agent or registrar at the date of issue.

SECTION 4.   TRANSFER OF SHARES. Transfers of shares of the Corporation shall be made only on the books of the Corporation, or by transfer agents designated to transfer shares of

13

the Corporation. Subject to applicable law, shares of stock represented by certificates shall be transferred only on the books of the Corporation by the surrender to the Corporation or its transfer agent of the certificate representing such shares properly endorsed or accompanied by a written assignment or power of attorney properly executed, and with such proof of authority or the authenticity of signature as the Corporation or its transfer agent may reasonably require. Except as may be otherwise required by law, by the Certificate of Incorporation or by these Bylaws, the Corporation shall be entitled to treat the record holder of stock as shown on its books as the owner of such stock for all purposes, including the payment of dividends and the right to vote with respect to such stock, regardless of any transfer, pledge or other disposition of such stock until the shares have been transferred on the books of the Corporation in accordance with the requirements of these Bylaws.

SECTION 5. LOST, DESTROYED OR STOLEN CERTIFICATES. Whenever a certificate representing shares of the Corporation has been lost, destroyed or stolen, the holder thereof may file in the office of the Corporation an affidavit setting forth, to the best of his or her knowledge and belief, the time, place, and circumstance of such loss, destruction or theft together with a statement of indemnity and posting of such bond sufficient in the opinion of the Board of Directors to indemnify the Corporation against any claim that may be made against it on account of the alleged loss of any such certificate. Thereupon the Board may cause to be issued to such person or such person's legal representative a new certificate or a duplicate of the certificate alleged to have been lost, destroyed or stolen. In the exercise of its discretion, the Board of Directors may waive the indemnification and bond requirements provided herein.

SECTION 6. REGULATIONS. The issue, transfer, conversion and registration of shares of stock of the Corporation shall be governed by such other regulations as the Board of Directors may establish.

## ARTICLE VI.
## RESTRICTIONS ON TRANSFER AND RIGHT OF FIRST REFUSAL.

SECTION 1. TRANSFERS. If a holder of any shares of stock of the Corporation (a "Holder") proposes to, directly or indirectly, sell, assign, transfer, pledge, hypothecate or otherwise dispose of, by operation of law or otherwise (collectively "Transfer") any such shares, or any right or interest therein (including, without limitation, the entering into of any swap or other arrangement that Transfers to another, in whole or in part, any of the economic consequences of ownership of the common stock of the Corporation, whether any such transaction described above is to be settled by delivery of common stock of the Corporation or other securities, in cash or otherwise), pursuant to a bona fide offer acceptable to such Holder, then Holder shall first give written notice of the proposed Transfer (the "Transfer Notice") to the Corporation. The Transfer Notice shall state the name of the proposed transferee, the number of shares Holder proposes to Transfer (the "Offered Shares"), whether the Offered Shares are vested or unvested shares, the price per share and all other material terms and conditions of the Transfer, including any available exemption set forth in Section 4 below from the restrictions set forth in Sections 2 and 3 below and shall include a confirmation from the Holder that the proposed transferee is an accredited investor as defined in Rule 501(a) of Regulation D promulgated under the Securities Act of 1933, as amended (the "Securities Act").

14

SECTION 2.   CONSENT TO TRANSFER. Following receipt of the Transfer Notice, the prior written consent of the Corporation (upon duly authorized action of its Board of Directors) shall be required (and such consent may be withheld) if such Transfer (a) would be to an individual, company or any other form of entity identified by the Corporation as a competitor or potential competitor; (b) increases the risk of the Corporation having a class of equity security (other than an exempted security) held of record by either (i) 2,000 or more persons, provided, however, that such restriction shall only apply after the Corporation has a class of equity security (other than an exempted security) held of record by more than 1,000 persons or (ii) 500 or more persons who are not accredited investors, as described in Section 12(g) of the Securities and Exchange Act of 1934 (the "1934 Act"), and Rule 12g5-1 promulgated thereunder, or otherwise requiring the Corporation to register any class of securities under the 1934 Act; (c) would result in the loss of any federal or state securities law exemption relied upon by the Corporation in connection with the initial issuance of such shares or the issuance of any other securities; (d) is facilitated in any manner by any public posting, message board, trading portal, internet site or similar method of communication, including without limitation any trading portal or internet site intended to facilitate secondary Transfers of securities; (e) is to be effected in a brokered transaction; (f) represents a Transfer of less than all of the shares then held by the stockholder and its affiliates or is to be made to more than a single transferee or (g) is determined by the Corporation's Board of Directors to require such consent for any legitimate corporate purpose. The provisions of subsections (f) and (g) of this Section 2 shall not apply to any Transfer of Preferred Stock of the Corporation or the shares of Common Stock issued upon conversion thereof. The Corporation shall notify Holder within 30 days of receipt of the Transfer Notice indicating whether the proposed Transfer requires such consent and if so, whether such consent has been provided (a "Transfer Approval") or withheld (a "Transfer Denial" and together with "Transfer Approval", the "Transfer Determination"). For purposes of clarity, (i) if the Corporation determines no consent is required for the proposed Transfer, then this determination shall constitute a Transfer Approval and (ii) a Holder shall not be entitled to Transfer any shares if such proposed Transfer results in a Transfer Denial. Any Transfer made following a Transfer Determination that results in a Transfer Approval shall be effected pursuant to a transfer agreement in a form reasonably acceptable to the Corporation (which form shall include, without limitation, a release in favor of the Corporation and representations from the Holder and transferee that the Corporation is not a party to the transaction and has made no representations to the transferee).

SECTION 3.   RIGHT OF FIRST REFUSAL.

(a)      Subject to the exceptions set forth in Section 3(e) below, for 30 days following a Transfer Determination that results in a Transfer Approval, the Corporation or its assigns shall have the option to purchase all or part of the Offered Shares at the price and upon the terms set forth in the Transfer Notice (the "Right of First Refusal"). In the event the Corporation or its assigns, as applicable, elects to purchase all or part of the Offered Shares, it shall give written notice of such election to the Holder within such 30 day period. Within 10 days after Holder's receipt of such notice, Holder shall tender to the Corporation at its principal offices the certificate or certificates representing the Offered Shares to be purchased by the Corporation, duly endorsed in blank by Holder or with duly endorsed stock powers attached thereto, all in a form suitable for Transfer of the Offered Shares to the Corporation. Promptly following receipt of such certificate or certificates, the Corporation or its assigns, as applicable,

shall deliver or mail to Holder a check in payment of the purchase price for such Offered Shares; provided that if the terms of payment set forth in the Transfer Notice were other than cash against delivery, the Corporation or its assigns, as applicable, may pay for the Offered Shares on the same terms and conditions as were set forth in the Transfer Notice.

(b)     If the Corporation or its assigns, as applicable, does not elect to acquire any of the Offered Shares, Holder may, within the 30-day period following the expiration of the option granted to the Corporation under Section 3(a) above, Transfer the Offered Shares that the Corporation has not elected to acquire to the proposed transferee, provided that such Transfer shall not be on terms and conditions more favorable to the transferee than those contained in the Transfer Notice, such Transfer shall be only to a prospective transferee that is an accredited investor as defined in Rule 501(a) of Regulation D promulgated under the Securities Act and such Transfer shall comply with the Securities Act. Notwithstanding any of the above, all Offered Shares transferred pursuant to this Section 3 shall remain subject to these Bylaws and any equity grant agreement such Offered Shares were subject to and such transferee shall, as a condition to such Transfer, deliver to the Corporation a written instrument confirming that such transferee shall be bound by all of the terms and conditions of these Bylaws and any applicable equity grant agreement.

(c)     After the time at which the Offered Shares are required to be delivered to the Corporation for Transfer to the Corporation pursuant to subsection 3(a) above, the Corporation shall not pay any dividend to Holder on account of such Offered Shares or permit Holder to exercise any of the privileges or rights of a stockholder with respect to such Offered Shares, but shall, insofar as permitted by law, treat the Corporation as the owner of such Offered Shares.

(d)     The Corporation may assign its Right of First Refusal in any particular transaction under this Section 3 to one or more persons or entities.

(e)     The provisions of this Section 3 shall not apply to any Transfer of Preferred Stock of the Corporation or the shares of Common Stock issued upon conversion thereof.

(f)     To the extent the Corporation has entered into any written agreement with the stockholder attempting to Transfer shares that grants the Corporation a right of first refusal with respect thereto ("Separate ROFR Terms"), then such Separate ROFR Terms shall supersede this Section 3 of Article VI and shall control such stockholder's proposed Transfer of shares following a Transfer Determination that results in a Transfer Approval.

SECTION 4.   EXCEPTIONS.

(a)     The provisions of this Article VI may be waived with respect to any Transfer upon duly authorized action of its Board of Directors.

(b)     The following transactions shall be exempt from the restrictions set forth in Article VI, Section 3:

16

(A)    any Transfer to or for the benefit of (i) any spouse, children, parents, uncles, aunts, siblings or grandchildren of the Holder or any other relatives of the Holder that have been approved by the Board of Directors (collectively, "Approved Relatives"), (ii) a trust established solely for the benefit of the Holder and/or Approved Relatives or (iii) where the Holder is a trust, (x) a trust established solely for the benefit of one or more beneficiaries of the Holder trust and/or Approved Relatives of any such beneficiaries or (y) one or more beneficiaries of the Holder trust and/or Approved Relatives of any such beneficiaries;

(B)    any Transfer made as part of the sale of all or substantially all of the shares of capital stock of the Corporation (including pursuant to a merger or consolidation);

(C)    any Transfer pursuant to an effective registration statement filed by the Corporation under the Securities Act;

(D)    a stockholder's bona fide pledge or mortgage of any Common Stock with a commercial lending institution;

(E)    a corporate stockholder's Transfer of any or all of its shares pursuant to and in accordance with the terms of any merger, consolidation, reclassification of common stock or capital reorganization of the corporate stockholder, or pursuant to a sale of all or substantially all of the stock or assets of a corporate stockholder;

(F)    a corporate stockholder's Transfer of any or all of its shares to any or all of its stockholders; and

(G)    a Transfer of any or all of the shares held by a stockholder which is a limited or general partnership to any or all of its partners.

(c)    In the case of a Transfer pursuant to Sections 4(b)(A) and (D)-(G) above, such shares shall remain subject to these Bylaws and any existing equity grant agreement and such transferee shall, as a condition to such Transfer, deliver to the Corporation a written instrument confirming that such transferee shall be bound by all of the terms and conditions of these Bylaws and any applicable equity grant agreement and there shall be no further Transfer of such shares except in accordance with these Bylaws.

SECTION 5.    TERMINATION. The provisions of Article VI shall terminate upon the closing of the sale of shares of common stock in an underwritten public offering pursuant to an effective registration statement filed by the Corporation under the Securities Act.

SECTION 6.    VOID TRANSFERS. The Corporation shall not be required (a) to Transfer on its books any shares which shall have been sold or otherwise transferred in violation of any of the provisions of this Article VI or (b) to treat as owner of such shares or to accord the right to vote or pay dividends to any purchaser or other transferee to whom any such shares shall have been so sold or transferred.

SECTION 7.    LEGENDS. The books and records of the Corporation and any certificates representing shares of stock of the Corporation shall contain or bear the following legend so long as the foregoing Transfer restrictions are in effect:

17

THE SHARES REPRESENTED BY THIS CERTIFICATE ARE SUBJECT TO (i) TRANSFER RESTRICTIONS AND (ii) A RIGHT OF FIRST REFUSAL OPTION IN FAVOR OF THE CORPORATION AND/OR ITS ASSIGNEE(S), EACH AS PROVIDED IN THE BYLAWS OF THE CORPORATION.

## ARTICLE VII.
## INDEMNIFICATION

SECTION 1.  RIGHT TO INDEMNIFICATION OF DIRECTORS AND OFFICERS. The Corporation shall indemnify and hold harmless, to the fullest extent permitted by applicable law as it presently exists or may hereafter be amended, any person (an "Indemnified Person") who was or is made or is threatened to be made a party or is otherwise involved in any action, suit or proceeding, whether civil, criminal, administrative or investigative (a "Proceeding"), by reason of the fact that such person, or a person for whom such person is the legal representative, is or was a director or officer of the Corporation or, while a director or officer of the Corporation, is or was serving at the request of the Corporation as a director, officer, employee or agent of another corporation or of a partnership, joint venture, limited liability company, trust, enterprise or nonprofit entity, including service with respect to employee benefit plans, against all liability and loss suffered and expenses (including attorneys' fees) reasonably incurred by such Indemnified Person in such Proceeding. Notwithstanding the preceding sentence, except as otherwise provided in Section 3 of this Article VII, the Corporation shall be required to indemnify an Indemnified Person in connection with a Proceeding (or part thereof) commenced by such Indemnified Person only if the commencement of such Proceeding (or part thereof) by the Indemnified Person was authorized in advance by the Board of Directors.

SECTION 2.  PREPAYMENT OF EXPENSES OF DIRECTORS AND OFFICERS. The Corporation shall pay the expenses (including attorneys' fees) incurred by an Indemnified Person in defending any Proceeding in advance of its final disposition, provided, however, that, to the extent required by law, such payment of expenses in advance of the final disposition of the Proceeding shall be made only upon receipt of an undertaking by the Indemnified Person to repay all amounts advanced if it should be ultimately determined that the Indemnified Person is not entitled to be indemnified under this Article VII or otherwise.

SECTION 3.  CLAIMS BY DIRECTORS AND OFFICERS. If a claim for indemnification or advancement of expenses under this Article VII is not paid in full within 30 days after a written claim therefor by the Indemnified Person has been received by the Corporation, the Indemnified Person may file suit to recover the unpaid amount of such claim and, if successful in whole or in part, shall be entitled to be paid the expense of prosecuting such claim. In any such action the Corporation shall have the burden of proving that the Indemnified Person is not entitled to the requested indemnification or advancement of expenses under applicable law.

SECTION 4.  INDEMNIFICATION OF EMPLOYEES AND AGENTS. The Corporation may indemnify and advance expenses to any person who was or is made or is threatened to be made or is otherwise involved in any Proceeding by reason of the fact that such person, or a person for whom such person is the legal representative, is or was an employee or agent of the Corporation or, while an employee or agent of the Corporation, is or was serving at

18

the request of the Corporation as a director, officer, employee or agent of another corporation or of a partnership, joint venture, limited liability company, trust, enterprise or nonprofit entity, including service with respect to employee benefit plans, against all liability and loss suffered and expenses (including attorneys' fees) reasonably incurred by such person in connection with such Proceeding. The ultimate determination of entitlement to indemnification of persons who are non-director or officer employees or agents shall be made in such manner as is determined by the Board of Directors in its sole discretion. Notwithstanding the foregoing sentence, the Corporation shall not be required to indemnify a person in connection with a Proceeding initiated by such person if the Proceeding was not authorized in advance by the Board of Directors.

SECTION 5.   ADVANCEMENT OF EXPENSES OF EMPLOYEES AND AGENTS. The Corporation may pay the expenses (including attorneys' fees) incurred by an employee or agent in defending any Proceeding in advance of its final disposition on such terms and conditions as may be determined by the Board of Directors.

SECTION 6.   NON-EXCLUSIVITY OF RIGHTS. The rights conferred on any person by this Article VII shall not be exclusive of any other rights which such person may have or hereafter acquire under any statute, provision of the Certificate of Incorporation, these bylaws, agreement, vote of stockholders or disinterested directors or otherwise.

SECTION 7.   OTHER INDEMNIFICATION. The Corporation's obligation, if any, to indemnify any person who was or is serving at its request as a director, officer or employee of another corporation, partnership, limited liability company, joint venture, trust, organization or other enterprise shall be reduced by any amount such person may collect as indemnification from such other corporation, partnership, limited liability company, joint venture, trust, organization or other enterprise.

SECTION 8.   INSURANCE. The Board of Directors may, to the full extent permitted by applicable law as it presently exists, or may hereafter be amended from time to time, authorize an appropriate officer or officers to purchase and maintain at the Corporation's expense insurance: (a) to indemnify the Corporation for any obligation which it incurs as a result of the indemnification of directors, officers and employees under the provisions of this Article VII; and (b) to indemnify or insure directors, officers and employees against liability in instances in which they may not otherwise be indemnified by the Corporation under the provisions of this Article VII.

SECTION 9.   AMENDMENT OR REPEAL. Any repeal or modification of the foregoing provisions of this Article VII shall not adversely affect any right or protection hereunder of any person in respect of any act or omission occurring prior to the time of such repeal or modification. The rights provided hereunder shall inure to the benefit of any Indemnified Person and such person's heirs, executors and administrators.

## ARTICLE VIII.
## DIVIDENDS

SECTION 1.   DECLARATIONS OF DIVIDENDS. Dividends upon the capital stock of the Corporation, subject to the provisions of the Certificate of Incorporation, if any, may be

US-DOCS\126055529.1

declared by the Board of Directors at any regular or special meeting, pursuant to law. Dividends may be paid in cash, in property, or in shares of the capital stock, subject to the provisions of the Certificate of Incorporation.

SECTION 2.   SPECIAL PURPOSES RESERVES. The Board of Directors may set apart out of any of the funds of the Corporation available for dividends a reserve or reserves for any proper purpose and may abolish any such reserve.

## ARTICLE IX.
## NOTICE BY ELECTRONIC TRANSMISSION

SECTION 1.   NOTICE BY ELECTRONIC TRANSMISSION. Without limiting the manner by which notice otherwise may be given effectively to stockholders, any notice to stockholders given by the Corporation under the Delaware General Corporation Law, the Certificate of Incorporation, or these Bylaws may be given in writing directed to the stockholder's mailing address (or by electronic transmission directed to the stockholder's electronic mail address, as applicable) as it appears on the records of the Corporation and shall be given (1) if mailed, when the notice is deposited in the U.S. mail, postage prepaid, (2) if delivered by courier service, the earlier of when the notice is received or left at such stockholder's address or (3) if given by electronic mail, when directed to such stockholder's electronic mail address unless the stockholder has notified the Corporation in writing or by electronic transmission of an objection to receiving notice by electronic mail or such notice is prohibited by Section 3 of this Article. A notice by electronic mail must include a prominent legend that the communication is an important notice regarding the Corporation.

Without limiting the manner by which notice otherwise may be given effectively to stockholders, but subject to Section 3 of this Article, any notice to stockholders given by the Corporation under any provision of the Delaware General Corporation Law, the Certificate of Incorporation or these Bylaws shall be effective if given by a form of electronic transmission consented to by the stockholder to whom the notice is given. Any such consent shall be revocable by the stockholder by written notice or electronic transmission to the Corporation.

Any notice given pursuant to the preceding paragraph shall be deemed given:

(a)    if by facsimile telecommunication, when directed to a number at which the stockholder has consented to receive notice;

(b)    if by a posting on an electronic network together with separate notice to the stockholder of such specific posting, upon the later of (A) such posting and (B) the giving of such separate notice; and

(c)    if by any other form of electronic transmission, when directed to the stockholder.

Notwithstanding the foregoing, a notice may not be given by an electronic transmission from and after the time that (1) the Corporation is unable to deliver by such electronic transmission 2 consecutive notices given by the Corporation and (2) such inability becomes known to the secretary or an assistant secretary of the Corporation or to the transfer agent, or other person

20

responsible for the giving of notice, provided, however, the inadvertent failure to discover such inability shall not invalidate any meeting or other action.

An affidavit of the secretary or an assistant secretary or of the transfer agent or other agent of the Corporation that the notice has been given shall, in the absence of fraud, be *prima facie* evidence of the facts stated therein.

SECTION 2.  DEFINITION OF ELECTRONIC TRANSMISSION; ELECTRONIC MAIL; ELECTRONIC MAIL ADDRESS. An "electronic transmission" means any form of communication, not directly involving the physical transmission of paper, that creates a record that may be retained, retrieved, and reviewed by a recipient thereof, and that may be directly reproduced in paper form by such a recipient through an automated process. An "electronic mail" means an electronic transmission directed to a unique electronic mail address (which electronic mail shall be deemed to include any files attached thereto and any information hyperlinked to a website if such electronic mail includes the contact information of an officer or agent of the Corporation who is available to assist with accessing such files and information). An "electronic mail address" means a destination, commonly expressed as a string of characters, consisting of a unique user name or mailbox (commonly referred to as the "local part" of the address) and a reference to an internet domain (commonly referred to as the "domain part" of the address), whether or not displayed, to which electronic mail can be sent or delivered.

SECTION 3.  INAPPLICABILITY. Notice by a form of electronic transmission shall not apply to Sections 164, 296, 311, 312 or 324 of the Delaware General Corporation Law.

## ARTICLE X.
## GENERAL PROVISIONS

SECTION 1.  FISCAL YEAR. The fiscal year of the Corporation shall be fixed by resolution of the Board of Directors.

SECTION 2.  SEAL. The corporate seal shall have inscribed thereon the name of the Corporation, the year of its organization and the words "Corporate Seal, Delaware" or such other form as shall be approved by the Board of Directors. Said seal may be used by causing it or a facsimile thereof to be impressed or affixed or reproduced or otherwise.

SECTION 3.  WRITTEN WAIVER OF NOTICE. A written waiver of any notice required to be given by law, the Certificate of Incorporation or by these Bylaws, signed by or electronically transmitted by the person entitled to notice, whether before, at or after the time of the event for which notice is to be given, shall be deemed equivalent to notice required to be given to such person. Neither the business to be transacted at, nor the purpose of, any regular or special meeting of stockholders, directors or members of a committee of directors need be specified in any written waiver of notice.

SECTION 4.  ATTENDANCE AS WAIVER OF NOTICE. Attendance of a person at a meeting shall constitute a waiver of notice of such meeting, except when the person attends a meeting for the express purpose of objecting at the beginning of the meeting, and objects, to the transaction of any business because the meeting is not lawfully called or convened.

US-DOCS\126055529.1

SECTION 5.   WAIVER OF SECTION 1501.

To the fullest extent provided by the law, the Corporation shall not be required to cause annual reports to be delivered to its stockholders under Section 1501 of the California General Corporation Law.

SECTION 6.   CONTRACTS. The Board of Directors may authorize any officer or officers, agent or agents, to enter into any contract or execute and deliver any instrument in the name of and on behalf of the Corporation, and such authority may be general or confined to specific instances.

SECTION 7.   LOANS. No loans shall be contracted on behalf of the Corporation and no evidences of indebtedness shall be issued in its name unless authorized by a resolution of the Board of Directors. Such authority may be general or confined to specific instances.

SECTION 8.   CHECKS, DRAFTS, ETC. All checks, drafts or other orders for the payment of money, notes or other evidences of indebtedness issued in the name of the Corporation shall be signed by one or more officers or agents of the Corporation and in such manner as shall from time to time be determined by resolution of the Board of Directors.

SECTION 9.   DEPOSITS. The funds of the Corporation may be deposited or invested in such bank account, in such investments or with such other depositaries as determined by the Board of Directors.

SECTION 10. ANNUAL STATEMENT. The Board of Directors shall present at each annual meeting, and at any special meeting of the stockholders when called for by vote of the stockholders, a full and clear statement of the business and condition of the Corporation.

SECTION 11. VOTING OF SECURITIES. Except as the Board of Directors may otherwise designate, the Chief Executive Officer, the President or the Treasurer may waive notice of, vote, or appoint any person or persons to vote, on behalf of the Corporation at, and act as, or appoint any person or persons to act as, proxy or attorney-in-fact for this Corporation (with or without power of substitution) at, any meeting of stockholders or securityholders of any other entity, the securities of which may be held by this Corporation.

SECTION 12. EVIDENCE OF AUTHORITY. A certificate by the Secretary, or an Assistant Secretary, or a temporary Secretary, as to any action taken by the stockholders, directors, a committee or any officer or representative of the Corporation shall as to all persons who rely on the certificate in good faith be conclusive evidence of such action.

SECTION 13. CERTIFICATE OF INCORPORATION. All references in these Bylaws to the Certificate of Incorporation shall be deemed to refer to the Certificate of Incorporation of the Corporation, as amended and in effect from time to time.

SECTION 14. SEVERABILITY. Any determination that any provision of these Bylaws is for any reason inapplicable, illegal or ineffective shall not affect or invalidate any other provision of these Bylaws.

22

SECTION 15. PRONOUNS. All pronouns used in these Bylaws shall be deemed to refer to the masculine, feminine or neuter, singular or plural, as the identity of the person or persons may require.

## ARTICLE XI.
## AMENDMENTS

SECTION 1.  BY THE BOARD OF DIRECTORS. These Bylaws may be altered, amended or repealed, in whole or in part, or new Bylaws may be adopted by the Board of Directors, when such power is conferred upon the Board of Directors by the Certificate of Incorporation.

SECTION 2.  BY THE STOCKHOLDERS. These Bylaws may be altered, amended or repealed, in whole or in part, or new Bylaws may be adopted, by the affirmative vote of the holders of a majority of the shares of the capital stock of the Corporation issued and outstanding and entitled to vote at any annual meeting of stockholders, or at any special meeting of stockholders, provided notice of such alteration, amendment, repeal or adoption of new Bylaws shall have been stated in the notice of such special meeting. If the power to adopt, amend or repeal Bylaws is conferred upon the Board of Directors by the Certificate of Incorporation it shall not divest or limit the power of the stockholders to adopt, amend or repeal Bylaws.

23

# EXHIBIT C

**ACTION BY WRITTEN CONSENT IN LIEU OF THE ORGANIZATIONAL MEETING
BY THE SOLE DIRECTOR OF**

**NEON MACHINE, INC.**

August 20, 2021

The undersigned, being the sole member of the Board of Directors (the "Board") of NEON MACHINE, INC., a Delaware corporation (the "Corporation"), and acting in accordance with Section 141(f) of the General Corporation Law of the State of Delaware, consent to the adoption of the following resolutions:

Action by Sole Incorporator

> **RESOLVED**, that the original Certificate of Incorporation of the Corporation, filed in the office of the Delaware Secretary of State on August 3, 2021, is hereby ratified and shall be inserted in the minute book of the Corporation (the "Minute Book").

> **RESOLVED FURTHER**, that all actions taken by the sole incorporator of the Corporation as set forth in the Action by Sole Incorporator, attached hereto as Exhibit A, be, and they hereby are, approved, ratified and confirmed.

> **RESOLVED FURTHER**, that the bylaws of the Corporation (the "Bylaws"), in the form attached to the Action by Sole Incorporator, be, and they hereby are, ratified and approved, and shall be inserted in the Minute Book.

Election of Officers

> **RESOLVED,** that the following person be, and such person hereby is, elected to serve in the office of the Corporation set forth opposite such person's name, to hold such office until his or her successor is elected and qualified or until his or her earlier resignation or removal:

| | |
|---|---|
| Mark Long | President, Chief Executive Officer, Chief Financial Officer, Treasurer, Secretary |

Selection of Annual Accounting Period

> **RESOLVED**, that fiscal year of the Corporation shall end on December 31 of each calendar year.

Designation of Depository

> **RESOLVED**, that the President, Chief Executive Officer, Chief Financial Officer and Treasurer of the Corporation be, and each hereby is, authorized:

(a)    to designate such bank or banks as depositories (the "Depository" or "Depositories") for the funds of the Corporation as he may deem necessary or advisable;

(b)    to open, maintain and close general and special bank accounts and safe deposit boxes with any Depository;

(c)    to cause to be deposited in accounts with any Depository from time to time such funds of the Corporation as he may deem necessary or advisable;

(d)    to designate, change or revoke the designation, from time to time, of the officers or agents of the Corporation authorized to sign or countersign checks, drafts or other orders for the payment of money issued in the name of the Corporation against any such account;

(e)    to authorize the use of facsimile signatures for the signing or countersigning of checks, drafts or other orders for the payment of money, and to enter into such agreements as the Depositories customarily require as a condition for permitting the use of facsimile signatures; and

(f)    to make such general and special rules and regulations with respect to such accounts as he may deem necessary or advisable and to complete, execute and certify any customary printed blank signature card forms in order to exercise conveniently the authority granted by this resolution (and any resolutions printed on such cards are deemed adopted as a part of this resolution).

> **RESOLVED FURTHER**, that, if any Depository requires a prescribed form of preamble, preambles, resolution or resolutions relating to such accounts or to any application, statement, instrument or other documents connected therewith, each such preamble or resolution shall be deemed to be adopted by the Board, and the Secretary of the Corporation is authorized to certify the adoption of any such preamble or resolution as though it were presented to the Board at the time of adopting this resolution, and to insert all such preambles and resolutions in the Minute Book immediately following this resolution.

Employer Tax Identification Number

> **RESOLVED**, that the officers of the Corporation be, and each of them acting singly hereby is, authorized and empowered to apply to the Internal Revenue Service for a federal employer identification number on Form SS-4.

Payment of Organizational Expenses

**RESOLVED**, that any officer of the Corporation is hereby authorized to pay all fees and expenses incident and necessary to the organization of the Corporation and to reimburse the persons who have made any disbursements therefor.

Adoption of Stock Certificate

**RESOLVED**, that the form of electronic stock certificate generated by the Corporation's electronic capitalization management system or any other form of stock certificate approved by the President, Chief Executive Officer, Treasurer, Chief Financial Officer or Secretary of the Corporation (each an "Authorized Officer" and collectively, the "Authorized Officers") be, and it hereby is, adopted and prescribed as the form of stock certificate for the common stock, $0.0001 par value, of the Corporation ("Common Stock").

Sale and Issuance of Common Stock

**WHEREAS**, the Board has determined that it is in the best interest of the Corporation to sell and issue shares of Common Stock to the following individual (the "Founder") in the aggregate amount and for the cash purchase price, as set forth below:

| Name of Founder | State of Residency | Number of Shares | Vesting Schedule | Cash Amount |
|---|---|---|---|---|
| Mark Long | Washington | 543,405 | Four-year vesting with a one-year "cliff" | $54.34 |
| Don Norbury | Washington | 543,405 | Four-year vesting with a one-year "cliff" | $54.34 |
| Colin Foran | Washington | 543,405 | Four-year vesting with a one-year "cliff" | $54.34 |
| Aaron Nonis | Washington | 543,405 | Four-year vesting with a one-year "cliff" | $54.34 |
| Mark Yeend | Washington | 543,405 | Four-year vesting with a one-year "cliff" | $54.34 |
| Naomi Lackaff | Washington | 543,405 | Four-year vesting with a one-year "cliff" | $54.34 |
| Calvin Zhou | Tennessee | 543,405 | Four-year vesting with a one-year "cliff" | $54.34 |
| Andy Chung-An Chang | Washington | 110,484 | 100% vested up front | $11.05 |

| Name of Founder | State of Residency | Number of Shares | Vesting Schedule | Cash Amount |
|---|---|---|---|---|
| James Zhang | California | 85,681 | 100% vested up front | $8.57 |
| The 4D Factory LLC | California | 6,000,000 | 100% vested up front | $600.00 |

**NOW, THEREFORE, BE IT RESOLVED**, that the Authorized Officers be, and each hereby is, authorized, empowered and directed to sell and issue to the Founder the number of shares of Common Stock set forth opposite the Founder's name above for the aggregate consideration set forth opposite the Founder's name above.

**RESOLVED FURTHER**, that the Authorized Officers be, and each of them hereby is, authorized and directed, for and on behalf of the Corporation, to execute and deliver a Restricted Stock Purchase Agreement, the form of which is attached hereto as Exhibit B (the "Restricted Stock Purchase Agreement"), with the Founder and to sell an aggregate of 10,000,000 shares of Common Stock at the purchase prices set forth above.

**RESOLVED FURTHER**, that the shares of Common Stock authorized to be sold and issued by the Corporation shall be offered and sold in accordance with the exemption from qualification provided for in Section 4(a)(2) of the Securities Act of 1933, as amended.

**RESOLVED FURTHER**, that upon the issuance and sale in accordance with the foregoing resolutions, such shares of Common Stock shall be duly and validly issued, fully-paid and nonassessable shares of the Corporation.

**RESOLVED FURTHER**, that the offer and sale of said shares will not be accompanied by the publication of any advertisement, that no selling expenses will be given, paid or incurred in connection therewith, and that no promotional consideration will be given, paid or incurred in connection therewith.

**RESOLVED FURTHER**, that upon receipt of consideration from the Founder for the Founder's shares, the Authorized Officers of the Corporation are authorized, empowered and directed to issue a stock certificate (by electronic means or otherwise) to the Founder representing the Founder's shares.

Form of Employee Proprietary Information and Inventions Assignment Agreement

**RESOLVED**, that the form of Employee Proprietary Information and Inventions Assignment Agreement, substantially in the form attached hereto as Exhibit C (the "PIIAA"), be, and hereby is, adopted, ratified and approved for use by the Corporation and, unless otherwise approved by the Board, all of the Corporation's employees shall execute the PIIAA.

Qualifications

**RESOLVED**, that the Authorized Officers are each authorized to execute and deliver such documents, and to take such actions, as the Authorized Officer so acting deems necessary or appropriate to qualify the Corporation to do business as a foreign corporation in any jurisdiction deemed necessary or advisable; to appoint all necessary agents or attorneys for service of process and to substitute new agents or attorneys for such purpose; to designate the location of all necessary statutory offices and to change the location thereof; to make and file all necessary certificates, reports, powers of attorney and other instruments, under the corporate seal, as may be required to qualify the Corporation to do business as a foreign corporation therein; and, whenever it is expedient for the Corporation to cease doing business therein and withdraw therefrom, to revoke any appointment of agent or attorney for service of process, and to file such certificates, reports, revocation of appointment or surrender of authority of the Corporation to do business as a foreign corporation therein.

Additional Filings

**RESOLVED**, that the Authorized Officers of the Corporation be, and each of them hereby is, authorized and directed, for and on behalf of the Corporation, to make such filings and applications, to execute and deliver such documents and instruments, and to do such acts and things as such officer deems necessary or advisable in order to obtain such licenses, authorizations and permits as are necessary or desirable for the Corporation's business, and to fulfill such legal requirements as are applicable to the Corporation and its business and to complete the organization of the Corporation.

Management Powers

**RESOLVED**, that the Authorized Officers be, and each of them hereby is, authorized to sign and deliver any agreement in the name of the Corporation relating to matters arising in the ordinary course of business of the Corporation and otherwise to obligate the Corporation in any regard relating to matters arising in the ordinary course of business of the Corporation, within any general guidelines and budget approved by the Board from time to time, provided, however, that the Board may from time to time adopt specific limitations on such authority of such officers as granted herein.

General Authority and Ratification

**RESOLVED**, that the Authorized Officers of the Corporation be, and each of them hereby is, authorized, empowered and directed, in the name of and on behalf of the Corporation, to prepare or cause to be prepared and to execute, deliver, verify, acknowledge, file or record any documents, instruments, certificates, statements, papers, or any amendments thereto, as may be deemed necessary or advisable in order to effectuate the transactions contemplated by the agreements and actions

approved herein, and to take such further steps and do all such further acts or things as shall be necessary or desirable to carry out the transactions contemplated by the foregoing resolutions.

**RESOLVED FURTHER**, that the authority and power given hereunder be deemed retroactive and any and all acts authorized hereunder performed prior to the passage of these resolutions, are hereby ratified, approved and confirmed.

*(Signature Page Follows)*

**IN WITNESS WHEREOF**, the undersigned, being the sole director of the Corporation, does hereby consent to the foregoing action on the date set forth below. This action shall be filed with the minutes of the proceedings of this Board. Any copy, facsimile or other reliable reproduction of this action (including, without limitation, transmission by .pdf) may be substituted or used in lieu of the original writing for any and all purposes for which the original writing could be used, provided that such copy, facsimile or other reproduction be a complete reproduction of the entire original writing.

_____

Mark Long
Date: August 20, 2021

**SIGNATURE PAGE TO NEON MACHINE, INC.**
**ORGANIZATIONAL BOARD CONSENT**

<u>EXHIBIT A</u>

**ACTION OF SOLE INCORPORATOR**

<u>EXHIBIT B</u>

**FORM OF RESTRICTED STOCK PURCHASE AGREEMENT (FOUNDER)**

## EXHIBIT C

**FORM OF PROPRIETARY INFORMATION AND INVENTION ASSIGNMENT
AGREEMENT**

# EXHIBIT D

**Subject:** Griffin/Polychain Agreement in Principle
**Date:** Thursday, September 2, 2021 at 6:42:07 PM Eastern Daylight Time
**From:** Mark Long
**To:** Jon Miller, Cort Javarone, Kevin Conroy, Don Norbury
**CC:** Andrew Grossman, David Vicini, Calvin Zhou

I walked Griffin through our redlines yesterday and got confirmation today that the Managing Director, Phil Sanderson, approved what we tentatively agreed to.

Griffin rejected a pre-money valuation increase to $20M. I let them know we had a competing offer for $30M and a large number of VCs vying to syndicate. They were unmoved and said $15M was their final offer.

I did get control of the board, however. We agreed to 5 seats - 3 for Neon/4D, 2 for Griffin/Polychain - plus 1 observer from Griffin. I asked for observer. The 2 young partners at Griffin I've been working with are super knowledgeable about the intersection of blockchain and gaming. I'd like both of them in the day long monthly board meetings I intend to schedule.

**So, I believe we have an agreement in principle.**

Because Griffin went straight to definitive docs like the SAFE rather than a term sheet, we've been advised by our legal team to include them in the negotiation of the remaining redlines. They've been adamant that we don't sign until they have worked with Griffin/Polychain to avoid making any mistakes in the SAFE that could have unintended tax or regulatory consequences. Andrew is leading that effort for us and we expect it to take another two weeks to finalize.

I'm going to continue to work with Dragonfly on their syndicate as a back up until we actually execute the SAFE. We had a Zoom meeting last night to keep them warm.

Thanks for your support in getting this funding secured. Big up to Andrew who worked super late Tuesday night to collate the redlines!

**mark long I ceo**
neon media
www.neonmedia.io
+01 206 669 5940
mark.long@neonmedia.io

**zoom link**
https://us02web.zoom.us/j/4321511612

**calendy link**
https://calendly.com/markvlong/mark-neon

# EXHIBIT E

**Subject:** Neon Founders Pledge of Dividends

**Date:**   Friday, October 1, 2021 at 3:47:25 PM Eastern Daylight Time

**From:**   Mark Long

**To:**     Cort Javarone

**CC:**     Jon Miller, Kevin Conroy, Andrew Grossman

Cort,

I was able to call a meeting of the Neon members and get a unanimous vote to approve the pledge of any dividends to 4D to be able to recoup up to the $2.3M investment to date. Details TBD by Andrew in an agreement to be drafted next week.

**mark long I ceo**
neon media
www.neonmedia.io
+01 206 669 5940
mark.long@neonmedia.io

**zoom link**
https://us02web.zoom.us/j/4321511612

**calendy link**
https://calendly.com/markvlong/mark-neon

# EXHIBIT F

DocuSign Envelope ID: 8944B59B-37D8-456A-8048-E440B0F86788

NEON MACHINE INC.


October 1, 2021


Neon Machine, Inc.
1700 Westlake Avenue North
Suite #200
Seattle, WA 98109


Re:    Offer of Employment by Neon Machine, Inc.

Dear Mark:

I am very pleased to confirm our offer to you of employment with Neon Machine, Inc. (the "**Company**").  The terms of our offer and the benefits currently provided by the Company are as follows:

1.    **Position and Start Date**.  You are being offered the position of Chief Executive Officer.  This is an exempt position based in our Seattle office.  Your anticipated start date will be October 4, 2021.

2.    **Starting Salary and Paydays**.  Your starting salary will be $200,000 per year and will be subject to periodic review.  You will be paid in accordance with the Company's regular payroll schedule, which is subject to change.

3.    **Benefits**.  In addition, you will be eligible to participate in regular health insurance and other employee benefit plans established by the Company for its employees from time to time.

The Company reserves the right to change or otherwise modify, in its sole discretion, the preceding terms of employment.

4.    **Future Token Interests**.  Additionally, subject to the Company's approval of a Token Incentive Plan (the "***Token Plan***"), the Company will recommend that the Board grant you a future token interest representing the conditional right to receive:

4.1    First Grant: 70,001,845 SHRAP Tokens from the Company (the "***First Grant***"), subject to the terms of the Token Plan and the applicable token agreement.  The First Grant you will be given the opportunity to receive will be fully vested. Any other terms of the First Grant (including lock-up) will be determined by the Board at the time of such grant.  The First Grant (and the vesting and settlement thereof) will be subject to the Company's applicable withholding obligations and you authorize the Company to withhold in any manner the Company deems appropriate.]

DocuSign Envelope ID: 8944B59B-37D8-456A-8048-E440B0E86780

Employment Offer
Page 2

      **4.2**    Second Grant: No later than January 1, 2022, 21,327,014 SHRAP Tokens from the Company (the "***Second Grant***"), subject to the terms of the Token Plan and the applicable token agreement. The Second Grant you will be given the opportunity to receive will be fully vested upon grant and shall fully satisfy and terminate the promissory note dated August 3, 2021 and assigned to and assumed by the Company. Any other terms of the Second Grant (including lock-up) will be determined by the Board at the time of such grant. The Second Grant (and the vesting and settlement thereof) will be subject to the Company's applicable withholding obligations and you authorize the Company to withhold in any manner the Company deems appropriate.

      **5.**    <u>**Protection of Confidential and Proprietary Information**</u>.  As an employee of the Company, you will have access to certain confidential information of the Company and you may, during the course of your employment, develop certain information or inventions that will be the property of the Company.  To protect the Company's interests, as a condition of employment, you must sign and abide by the Company's standard "Employee Invention Assignment and Confidentiality Agreement."

      **6.**    <u>**No Breach of Obligations to Prior Employers**</u>.  We wish to impress upon you that we do not want you to, and we hereby direct you not to, bring with you any confidential or proprietary material of any former employer or violate any other obligations you may have to any former employer.  You represent that your signing of this offer letter, agreement(s) concerning stock options granted to you, if any, under the Plan and/or tokens granted to you, if any, under the Token Plan and the Company's Employee Invention Assignment and Confidentiality Agreement and your commencement of employment with the Company will not violate any agreement currently in place between yourself and current or past employers.

      **7.**    <u>**No Competition During Employment**</u>.  During the period that you render services to the Company, you agree to not engage in any employment, business or activity that is in any way competitive with the business or proposed business of the Company.  You will disclose to the Company in writing any other gainful employment, business or activity that you are currently associated with or participate in that competes with the Company.  You will not assist any other person or organization in competing with the Company or in preparing to engage in competition with the business or proposed business of the Company. Notwithstanding the foregoing, the Company acknowledges, agrees and consents to your (i) association as a member of and activity with Neon Media LLC; and (ii) acting as an advisor to third parties from time to time, subject to the Employee Invention Assignment and Confidentiality Agreement signed by you and provided that you promptly inform the CEO of the Company (or his designee) of such advisor work. The CEO of the Company (or his designee) may, in his sole discretion, decline to allow you to act as an advisor to a third party.

      **8.**    <u>**At Will Employment**</u>.  Employment with the Company is for no specific period of time.  Should you accept our offer, you will be an at-will employee of the Company, which means the employment relationship can be terminated by either of us for any reason, at any time, with or without prior notice and with or without cause.  Any statements or representations to the contrary (and, indeed, any statements contradicting any provision in this letter) are superseded by this agreement.  Further, your participation in any stock option or benefit program is not to be

Employment Offer
Page 3

regarded as assuring you of continuing employment for any particular period of time. Although your job duties, title, compensation and benefits, as well as the Company's personnel policies and practices, may change from time to time, the "at-will" nature of your employment may be changed only in an express, written employment agreement signed by you and a duly authorized officer of the Company (other than you).

      **9.**     **Tax Matters**. All forms of compensation referred to in this agreement are subject to reduction to reflect applicable withholding and payroll taxes and other deductions required by law.

      **10.**     **Authorization to Work**. Please note that because of employer regulations adopted in the Immigration Reform and Control Act of 1986, within three (3) business days of starting your new position you will need to present documentation demonstrating that you have authorization to work in the United States. If you have questions about this requirement, which applies to U.S. citizens and non-U.S. citizens alike, you may contact our personnel office.

      **11.**     **Arbitration and Class Action Waiver**. You and the Company agree to submit to mandatory binding arbitration, governed by the Federal Arbitration Act ("***FAA***"), any and all claims arising out of or related to your employment with the Company and the termination thereof, including, but not limited to, claims for unpaid wages, wrongful termination, torts, stock or stock options or other ownership interest in the Company, and/or discrimination (including harassment) based upon any federal, state or local ordinance, statute, regulation or constitutional provision except that each party may, at its, his or her option, seek injunctive relief in court related to the improper use, disclosure or misappropriation of a party's private, proprietary, confidential or trade secret information (collectively, "***Arbitrable Claims***"). Further, to the fullest extent permitted by law, you and the Company agree that no class or collective actions can be asserted in arbitration or otherwise. All claims, whether in arbitration or otherwise, must be brought solely in your or the Company's individual capacity, and not as a plaintiff or class member in any purported class or collective proceeding. **Nothing in this Arbitration and Class Action Waiver section, however, restricts your right to pursue claims in court: (a) on a representative action basis under applicable law, or (b) arising under the Washington State Law Against Discrimination (RCW 49.60,** *et seq.***) or any federal anti-discrimination law.**

      SUBJECT TO THE ABOVE PROVISO, THE PARTIES HEREBY WAIVE ANY RIGHTS THEY MAY HAVE TO TRIAL BY JURY IN REGARD TO ARBITRABLE CLAIMS. THE PARTIES FURTHER WAIVE ANY RIGHTS THEY MAY HAVE TO PURSUE OR PARTICIPATE IN A CLASS OR COLLECTIVE ACTION PERTAINING TO ANY CLAIMS BETWEEN YOU AND THE COMPANY.

      This agreement to arbitrate does not restrict your right to file administrative claims you may bring before any government agency where, as a matter of law, the parties may not restrict the employee's ability to file such claims (including, but not limited to, the National Labor Relations Board, the Equal Employment Opportunity Commission and the Department of Labor). However, the parties agree that, to the fullest extent permitted by law, arbitration shall be the exclusive remedy for the subject matter of such administrative claims, except for the resolution of claims of discrimination. The arbitration shall be conducted in Seattle, Washington through

Employment Offer
Page 4

JAMS before a single neutral arbitrator, in accordance with the JAMS employment arbitration rules then in effect, provided however, that the FAA, including its procedural provisions for compelling arbitration, shall govern and apply to this arbitration agreement. The JAMS rules may be found and reviewed at http://www.jamsadr.com/rules-employment-arbitration. If you are unable to access these rules, please let me know and I will provide you with a hardcopy. The arbitrator shall issue a written decision that contains the essential findings and conclusions on which the decision is based. If, for any reason, any term of this Arbitration and Class Action Waiver provision is held to be invalid or unenforceable, all other valid terms and conditions herein shall be severable in nature and remain fully enforceable.

12. **Background Check**. This offer is contingent upon a satisfactory verification of criminal, education, driving and/or employment background. This offer can be rescinded based upon data received in the verification.

13. **Entire Agreement**. This offer, once accepted, constitutes the entire agreement between you and the Company with respect to the subject matter hereof and supersedes all prior offers, negotiations and agreements, if any, whether written or oral, relating to such subject matter. You acknowledge that neither the Company nor its agents have made any promise, representation or warranty whatsoever, either express or implied, written or oral, which is not contained in this agreement for the purpose of inducing you to execute the agreement, and you acknowledge that you have executed this agreement in reliance only upon such promises, representations and warranties as are contained herein.

14. **Severability**. The provisions of this offer letter are severable, and if any part of it is found to be invalid or unenforceable, including, but not limited to, the arbitration provision above, the other parts shall remain fully valid and enforceable.

15. **Acceptance**. This offer will remain open until November 1, 2021. If you decide to accept our offer, and I hope you will, please sign the enclosed copy of this letter in the space indicated and return it to me. Your signature will acknowledge that you have read and understood and agreed to the terms and conditions of this offer letter and the attached documents, if any. Should you have anything else that you wish to discuss, please do not hesitate to call me.

We look forward to the opportunity to welcome you to the Company.

Very truly yours,

*Aaron Nonis*

Aaron Nonis, Chief Operating Officer

Employment Offer
Page 5

I have read and understood this offer letter and hereby acknowledge, accept and agree to the
terms as set forth above and further acknowledge that no other commitments were made to me as
part of my employment offer except as specifically set forth herein. **I further acknowledge that
I have received and read, or have had the opportunity to read, the arbitration agreement
herein. I understand that this arbitration agreement requires that disputes that involve the
matters subject to the agreement be submitted to arbitration pursuant to the arbitration
agreement rather than to a judge and jury in court.**

DocuSigned by:

*Mark Long*

4B1C0B3D000B48A...

Mark Long

Date signed: 10/14/2021

# EXHIBIT G

*THE TOKEN INTERESTS PURCHASED HEREUNDER HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED, AND HAVE BEEN ACQUIRED TO HOLD FOR THE LONG TERM AND NOT WITH A VIEW TO, OR IN CONNECTION WITH, THE SALE OR DISTRIBUTION THEREOF, EXCEPT AS EXPRESSLY PERMITTED HEREIN. NO TRANSFER MAY BE EFFECTED WITHOUT AN EFFECTIVE REGISTRATION STATEMENT RELATED THERETO UNLESS SUCH REGISTRATION IS NOT REQUIRED UNDER THE SECURITIES ACT OF 1933, AS AMENDED.*

## ARGON PROTOCOL FOUNDATION

### TOKEN SUBSCRIPTION AGREEMENT

This Token Subscription Agreement (this "***Agreement***") is made and entered into as of November 8, 2021 (the "***Effective Date***") by and between Argon Protocol Foundation, a Republic of Panama foundation (the "***Foundation***"), and the undersigned purchaser (the "***Purchaser***").

**WHEREAS**, it is the mission of the Foundation to support the growth and development of the Shrapnel Protocol (the "***Protocol***") with units of value on the Protocol denominated as "***SHRAP Tokens***";

**WHEREAS**, the Purchaser desires to contribute to the initial startup and operating costs of the Foundation by purchasing, and the Foundation desires accept such contribution by selling, the right to receive SHRAP Tokens (the "***Token Rights***" and, collectively with any securities received in substitution or fulfilment of the Token Rights, or in replacement of the Token Rights, as may be applicable, the "***Token Interests***") (for the avoidance of doubt, the term "Token Interests" only include SHRAP Tokens to the extent such SHRAP Tokens are securities under applicable law) from the Foundation all on the terms and conditions set forth in this Agreement; and

**WHEREAS**, Purchaser understands and agrees that the Token Interests purchased hereunder are nonrefundable, and agrees to assume all risks and liabilities in connection therewith.

**NOW THEREFORE, BE IT RESOLVED**, that in consideration of the mutual representations, warranties and agreements contained herein, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Foundation and the Purchaser agree as follows:

1.    **PURCHASE.** Subject to the terms and conditions of this Agreement, the Purchaser hereby purchases from the Foundation, and the Foundation hereby sells to Purchaser, the right to receive, automatically and without requiring any future payment, that number of SHRAP Tokens set forth on the signature page hereto (the "***Tokens***") for that aggregate purchase price set forth on the signature page hereto (the "***Aggregate Purchase Price***").

2.    **PAYMENT OF AGGREGATE PURCHASE PRICE; CLOSING.**

2.1    **Deliveries by Purchaser.** Purchaser hereby delivers, or has delivered, to the Foundation (a) a duly executed copy of this Agreement, and (b) payment of the Aggregate Purchase Price. The Aggregate Purchase Price may be paid in USDC, USDT or any other U.S.

1

Dollar-denominated stablecoin, ETH or BTC on an as converted to U.S. Dollar basis, or U.S. Dollars.

        2.2      **Deliveries by the Foundation.** Upon the Foundation's receipt of all the documents and payment to be executed and delivered by Purchaser under Section 2.1, the Foundation (a) shall deliver, or will have delivered to the Purchaser a duly executed copy of this Agreement and (b) agrees to distribute the Tokens to the Purchaser as soon as practicable after the date of bona fide public release of the Protocol by the Foundation (as determined by the Foundation in its reasonable discretion), provided that such Tokens are subject to the transfer restrictions and the Lockup Provisions set forth herein. The Purchaser shall provide to the Foundation a network/wallet address compatible with receiving Tokens (the "***Wallet***"), in writing to which the Tokens will be sent.

        3.      **REPRESENTATIONS AND WARRANTIES OF PURCHASER.** Purchaser hereby represents and warrants to the Foundation as follows:

        3.1      **Entirely for Own Account.** Purchaser is purchasing the Token Interests entirely for Purchaser's own account to hold for the long term, not as a nominee or agent, and not with a view to, or for sale in connection with, a distribution of the Token Interests within the meaning of the Securities Act of 1933, as amended (the "***1933 Act***"). Purchaser has no present intention of selling or otherwise disposing of all or any portion of the Token Interests and no one other than Purchaser has any beneficial ownership of any of the Token Interests. By executing this Agreement, the Purchaser further represents that the Purchaser does not presently have any contract, undertaking, agreement or arrangement with any individual, corporation, partnership, trust, limited liability company, association or other entity ("***Person***") to sell, transfer or grant participations to such Person or to any third Person, with respect to any of the Token Interests.

        3.2      **Access to Information.** Purchaser has had access to all information that Purchaser reasonably considers important in making the decision to purchase the Token Interests, and Purchaser has had ample opportunity to ask questions concerning such matters and this purchase.

        3.3      **Understanding of Risks.** Purchaser is fully aware of: (a) the highly speculative nature of the Token Interests; (b) the financial hazards involved; (c) the lack of liquidity of the Token Interests and the restrictions on transferability of the Token Interests (e.g., that Purchaser may not be able to sell or dispose of the Token Interests or use them as collateral for loans); and (d) the tax consequences of purchasing the Token Interests, including the tax consequences of receiving the Tokens in accordance with the terms of this Agreement. Further, the Purchaser understands that the Token Interests involve risks, all of which the Purchaser fully and completely assumes, including, but not limited to, the risk that (i) the technology associated with the Protocol, the Tokens and associated ecosystem (collectively, the "***Network***") will not function as intended; (ii) the Network will not be completed and the Tokens will not be distributed; (iii) the Protocol will fail to attract sufficient interest from key stakeholders; (iv) the Network will not gain adoption and acceptance; and (v) the Foundation, Purchaser, the Network and/or third party entities participating in the development of the Network (the "***Third Parties***") may be subject to investigation and punitive actions from governmental authorities. The Purchaser understands and expressly accepts that the Tokens will be delivered to the Purchaser at the sole risk of the

Purchaser on an "AS IS" and "UNDER DEVELOPMENT" basis. The Purchaser understands and expressly accepts that the Purchaser has not relied on any oral or written statements, representations or warranties made by the Foundation, any Third Parties, or any of their officers, directors, employees, consultants, advisors, equity holders or other agents outside of this instrument, including, but not limited to, conversations of any kind, whether through oral or electronic communication, or any white paper. WITHOUT LIMITING THE GENERALITY OF THE FOREGOING, THE PURCHASER ASSUMES ALL RISK AND LIABILITY FOR THE RESULTS OBTAINED BY THE USE OF ANY TOKENS AND REGARDLESS OF ANY ORAL OR WRITTEN STATEMENTS MADE BY THE FOUNDATION, BY WAY OF TECHNICAL ADVICE OR OTHERWISE, RELATED TO THE USE OF THE TOKENS.

   **3.4**  **Understanding and Experience.** Purchaser has sufficient understanding of the functionality, usage, storage, transmission mechanisms and other material characteristics of cryptographic tokens, token wallets and other token storage mechanisms, public and private key management, blockchain technology, and blockchain-based software systems to understand the terms of this instrument. Purchaser understands, acknowledges and agrees that such knowledge allows the Purchaser to appreciate the implications and risks of acquiring the Tokens Interests herein.

   **3.5**  **Accredited Investor and Sophistication.** Purchaser is either an accredited investor (as defined in Rule 501(a) of Regulation D promulgated under the 1933 Act); or Purchaser is a sophisticated purchaser and has appointed a purchaser representative (as defined in Rule 501(i) of Regulation D promulgated under the 1933 Act).

   **3.6**  **Qualifications.** Purchaser has a preexisting personal or business relationship with the Foundation and/or certain of its officers and/or directors of a nature and duration sufficient to make Purchaser aware of the character, business acumen and general business and financial circumstances of the Foundation. If Purchaser is not an accredited investor, the Purchaser, alone or with its purchaser representative, is a sophisticated purchaser and has made its own independent investigation, review and analysis regarding the Foundation and the transactions contemplated hereby, which investigation, review and analysis were conducted by the Purchaser, alone or with its purchaser representative, and together with other expert advisors that it has engaged for such purpose. By reason of its business or financial experience, Purchaser and its purchaser representative, as applicable, is capable of evaluating the merits and risks of this purchase, has the ability to protect Purchaser's own interests in this transaction and is financially capable of bearing a total loss of the Aggregate Purchase Price.

   **3.7**  **Information Statement.** If Purchaser is not an accredited investor (as defined in Rule 501(a) of Regulation D promulgated under the 1933 Act), Purchaser has received a confidential information statement from the Foundation setting forth such information required to be provided under Rule 502(b) of Regulation D promulgated under the 1933 Act and has had ample opportunity to review such documents with Purchaser's purchaser representative and ask questions concerning such matters and this purchase.

   **3.8**  **No General Solicitation.** At no time was Purchaser presented with or solicited by any publicly issued or circulated newspaper, mail, radio, television or other form of

general advertising or solicitation in connection with the offer, sale and purchase of the Token Interests.

      **3.9**      <u>**Compliance with Securities Laws**</u>. Purchaser understands and acknowledges that, to the extent the Token Interests are considered securities, in reliance upon the representations and warranties made by Purchaser herein, the Token Interests have not been, and will not be, registered with the Securities and Exchange Commission ("***SEC***") under the 1933 Act or any applicable state securities law, but instead are being issued under an exemption or exemptions from the registration and qualification requirements of the 1933 Act and other applicable state securities laws which impose certain restrictions on Purchaser's ability to transfer the Token Interests.

      **3.10**      <u>**No Public Market**</u>. The Purchaser understands that no public market now exists for the Token Interests, and that the Foundation has made no assurances that a public market will ever exist for the Token Interests.

      **3.11**      <u>**Restrictions on Transfer**</u>. The Token Interests may constitute securities in various jurisdictions, although the Foundation does not concede this point in any jurisdiction. Accordingly, Purchaser understands and agrees as follows:

> **Purchaser may not transfer any Token Interests unless (1) such Token Interests are registered under the 1933 Act and qualified under other applicable state securities laws, (2) exemptions from such registration and qualification requirements are available, or (3) such Token Interests do not constitute securities under applicable law or SEC rules.**

Purchaser understands that only the Foundation may file a registration statement with the SEC or other applicable state securities commissioners and that the Foundation is under no obligation to do so with respect to the Token Interests. Purchaser has also been advised that exemptions from registration and qualification may not be available or may not permit Purchaser to transfer all or any of the Token Interests in the amounts or at the times proposed by Purchaser. The Purchaser further acknowledges that if an exemption from registration or qualification is available, it may be conditioned on various requirements including, but not limited to, the time and manner of sale, the holding period for the Token Interests, and on requirements relating to the Foundation which are outside of the Purchaser's control, and which the Foundation is under no obligation and may not be able to satisfy.

      **3.12**      <u>**Legends**</u>. The Purchaser understands that the Token Interests may bear any legend required by the securities laws of any state to the extent such laws are applicable to the Token Interests, to the extent such interests may contain a legend, and the following legend (and even without such legend the following restrictions apply):

> *"THE TOKEN INTERESTS PURCHASED HEREUNDER HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED, AND HAVE BEEN ACQUIRED TO HOLD FOR THE LONG TERM AND NOT WITH A VIEW TO, OR IN CONNECTION WITH, THE SALE OR DISTRIBUTION*

*THEREOF, EXCEPT AS EXPRESSLY PERMITTED UNDER A TOKEN SUBSCRIPTION AGREEMENT BETWEEN THE ISSUER AND THE ORIGINAL PURCHASER OF THE TOKEN INTERESTS. NO TRANSFER MAY BE EFFECTED WITHOUT AN EFFECTIVE REGISTRATION STATEMENT RELATED THERETO UNLESS SUCH REGISTRATION IS NOT REQUIRED UNDER THE SECURITIES ACT OF 1933, AS AMENDED."*

**4.** **LOCKUP.** The Token Interests acquired herein and the Tokens deliverable in fulfillment thereto (as applicable as of the applicable date of determination, the "***Restricted Tokens***") shall be subject to the following restrictions (collectively, the "***Lockup Provisions***"):

**4.1** **Lockup Period.** Prior to the twelve-month anniversary of the Effective Date, Purchaser agrees that it will not, without the prior written consent of the Foundation, offer, sell, contract to sell, pledge, grant any option to purchase, make any short sale of, or place any liens or security interests in, hypothecate, encumber or otherwise transfer or dispose of ("***Transfer***") any Restricted Tokens or any interest therein, any options to purchase any Restricted Tokens, or any instruments convertible into, exchangeable for, or that represent the right to receive Restricted Tokens, including the Token Interests acquired herein, whether now or hereinafter acquired by the Purchaser; ***provided that,*** subject to Section 3.9, on the twelve-month anniversary of the Effective Date, 1/2 of the Restricted Tokens shall be released from these Lockup Provisions, and 1/12th of the Restricted Tokens shall be released on each monthly anniversary thereafter, such that all Restricted Tokens will be released from these Lockup Provisions on the two-year anniversary of the Effective Date.

**4.2** **Restrictions.** To ensure compliance with these Lockup Provisions, the Foundation may impose technological lockups or restrictions on the Restricted Tokens, or withhold delivery of the Restricted Tokens until such restrictions expire or termination.

**5.** **RIGHTS AS OWNER OF TOKEN INTERESTS.** The Purchaser is not entitled, as a holder of the Token Interests, to vote or receive dividends or be deemed the holder of equity of the Foundation for any purpose, nor will anything contained herein be construed to confer on the Purchaser, as such, any of the rights of an equity holder of the Foundation or any right to vote for the election of board members or upon any matter submitted to council members of the Foundation at any meeting thereof, or to give or withhold consent to any corporate or foundation action or to receive notice of meetings, or to receive subscription rights or otherwise.

**6.** **DISCLAIMER AND LIMITATION OF LIABILITY.** The Foundation shall not be liable or responsible to the Purchaser, nor be deemed to have defaulted under or breached this Agreement, for any failure or delay in fulfilling or performing any term of this Agreement, including without limitation, launching, developing and maintaining the Protocol and/or the Network, launching the SHRAP Tokens, selling the Token Interests, sending the Tokens to the Wallet, or distributing the Tokens, when and to the extent such failure or delay is caused by or results from acts beyond the affected party's commercially reasonable control, including, without limitation: (a) acts of God; (b) flood, fire, earthquake, pandemic or explosion; (c) war, invasion, hostilities (whether war is declared or not), terrorist threats or acts, or other civil unrest; (d) applicable law or regulations; or (e) action by any governmental authority. THE FOUNDATION MAKES NO WARRANTY WHATSOEVER WITH RESPECT TO THE TOKENS,

INCLUDING ANY (A) WARRANTY OF MERCHANTABILITY; (B) WARRANTY OF FITNESS FOR A PARTICULAR PURPOSE; (C) WARRANTY OF TITLE; OR (D) WARRANTY AGAINST INFRINGEMENT OF INTELLECTUAL PROPERTY RIGHTS OF A THIRD PARTY; WHETHER ARISING BY LAW, COURSE OF DEALING, COURSE OF PERFORMANCE, USAGE OF TRADE, OR OTHERWISE. EXCEPT AS EXPRESSLY SET FORTH HEREIN, PURCHASER ACKNOWLEDGES THAT IT HAS NOT RELIED UPON ANY REPRESENTATION OR WARRANTY MADE BY THE FOUNDATION, OR ANY OTHER PERSON ON THE FOUNDATION'S BEHALF.

The Purchaser understands that Purchaser has no right against the Foundation or any other individual or legal entity except in the event of the Foundation's material breach of this instrument or intentional fraud. THE FOUNDATION'S (OR ANY OTHER INDIVIDUAL'S OR LEGAL ENTITY'S) AGGREGATE LIABILITY ARISING OUT OF OR RELATED TO THIS AGREEMENT, WHETHER ARISING OUT OF OR RELATED TO BREACH OF CONTRACT, TORT OR OTHERWISE, SHALL NOT EXCEED THE AGGREGATE PURCHASE PRICE (IN U.S. DOLLARS). NEITHER THE FOUNDATION NOR ITS REPRESENTATIVES SHALL BE LIABLE FOR CONSEQUENTIAL, INDIRECT, INCIDENTAL, SPECIAL, EXEMPLARY, PUNITIVE OR ENHANCED DAMAGES, LOST PROFITS OR REVENUES OR DIMINUTION IN VALUE, ARISING OUT OF OR RELATING TO ANY BREACH OF THIS INSTRUMENT.

**7.    TAX CONSEQUENCES.** PURCHASER UNDERSTANDS THAT PURCHASER MAY SUFFER ADVERSE TAX CONSEQUENCES AS A RESULT OF THE PURCHASER'S PURCHASE OR DISPOSITION OF THE TOKEN INTERESTS AND THE TOKENS HEREUNDER. PURCHASER REPRESENTS (a) THAT IT HAS CONSULTED WITH A TAX ADVISER THAT IT DEEMS ADVISABLE IN CONNECTION WITH THE PURCHASE, RECEIPT, VESTING, AND DISPOSITION OF THE TOKEN INTERESTS AND THE TOKENS HEREUNDER, AND (b) THAT PURCHASER IS NOT RELYING ON THE FOUNDATION, OR ANY AGENTS, REPRESENTATIVES, OR ADVISORS OF THE FOUNDATION FOR ANY TAX ADVICE.

THE FAIR MARKET VALUE OF THE TOKEN INTERESTS HEREUNDER HAS BEEN DETERMINED IN GOOD FAITH IN ACCORDANCE WITH A VALUATION REPORT RECEIVED BY THE FOUNDATION, A COPY OF WHICH IS AVAILABLE TO PURCHASER UPON REQUEST. THERE IS NO GUARANTEE THAT SUCH DETERMINATION OF FAIR MARKET VALUE WILL NECESSARILY REFLECT OR EQUAL ANY DETERMINATION OF FAIR MARKET VALUE BY A TAXING AUTHORITY (SUCH AS THE IRS). PURCHASER AGREES TO BE FULLY RESPONSIBLE FOR ANY TAXES RESULTING FROM THE RECEIPT AND DISPOSITION OF THE TOKEN INTERESTS AND TOKENS HEREUNDER, INCLUDING ANY ADDITIONAL TAXES RESULTING FROM A DIFFERENT DETERMINATION OF FAIR MARKET VALUE.

**8.    COMPLIANCE WITH LAWS AND REGULATIONS.** The issuance and transfer of the Token Interests will be subject to and conditioned upon compliance by the Foundation and Purchaser with all applicable state and federal laws and regulations and with all applicable requirements of any exchange on which Tokens may be listed or quoted at the time of such issuance or transfer. Notwithstanding the foregoing, there is no guarantee that there will be any exchange or market available for the Token Interests or the Tokens.

9.    **GENERAL PROVISIONS.**

9.1    **Notices.** All notices and other communications given or made pursuant to this Agreement shall be in writing and shall be deemed effectively given upon the earlier of actual receipt, or (a) personal delivery to the party to be notified, or (b) when sent, if sent by electronic mail or facsimile during normal business hours of the Purchaser, and if not sent during normal business hours, then on the Purchaser's next Business Day, or (c) three (3) Business Days after deposit in the United States mail by certified mail (return receipt requested) for United States deliveries. All notices for delivery outside the United States will be sent by express courier. All notices for delivery will be sent by express courier. All notices not delivered personally will be sent with postage and/or other charges prepaid and properly addressed to the party to be notified at the address set forth below the signature lines of this Agreement or at such other address as such other party may designate by one of the indicated means of notice herein to the other party hereto. A "***Business Day***" shall be a day, other than Saturday or Sunday, when the banks in the Republic of Panama are open for business.

9.2    **Further Assurances.** The parties agree to execute such further documents and instruments and to take such further actions as may be reasonably necessary to carry out the purposes and intent of this Agreement.

9.3    **Titles and Headings.** The titles, captions and headings of this Agreement are included for ease of reference only and will be disregarded in interpreting or construing this Agreement. Unless otherwise specifically stated, all references herein to "sections" and "exhibits" will mean "sections" and "exhibits" to this Agreement.

9.4    **Governing Law; Dispute Resolution.** Any unresolved controversy or claim arising out of or relating to this Agreement, except any such controversies or claims arising out of either party's intellectual property rights for which a provisional remedy or equitable relief is sought, shall be determined by arbitration administered by the Center of Arbitration and Conciliation of Panama in accordance with its rules. All disputes shall be heard by a single arbitrator. The law of the arbitration shall be the law of the Republic of Panama. The language of the arbitration shall be English. The arbitration shall take place in San Francisco, California, unless such venue is not mutually agreeable to the parties, in which case the arbitration shall be administered by the Panama Conciliation and Arbitration Centre in accordance with its procedural rules. The arbitration shall be commenced following the aggrieved party's notification to the other of the particulars of the controversy or claim along with the aggrieved party's proposed arbitrator obtained from a list of potential arbitrators maintained by the American Arbitration Association (the "***AAA***"). Where the notified party does not agree with the choice of arbitrator or if no agreement on the choice of arbitrator can be reached within thirty (30) days, then an arbitrator will be one chosen by the AAA having reasonable experience in transactions of the type provided for in this Agreement. The arbitrator shall render the award within three (3) months of the commencement of the arbitration, unless such time limit is extended by the arbitrator. Prior to the issue or delivery of arbitral award, each party will bear its own costs in respect the arbitration, following which the prevailing party shall be entitled to reasonable attorney's fees, costs, and necessary disbursements in addition to any other relief to which such party may be entitled. An award by the arbitrator shall be final and conclusive and binding upon the parties and shall not be subject to further a ppeal. Each party may enforce any award granted in accordance with this

Section 9.4 in any court of competent jurisdiction. The arbitrator shall be required to provide in writing to the parties the basis for the award or order of such arbitrator, and all hearings shall be recorded, with such record constituting the official transcript of such proceedings.

       **9.5**      **Assignments; Successors and Assigns.** The Foundation may assign any of its rights and obligations under this Agreement. Any assignment of rights and obligations by any other party to this Agreement requires the Foundation's prior written consent. This Agreement, and the rights and obligations of the parties hereunder, will be binding upon and inure to the benefit of their respective successors, permitted assigns, heirs, executors, administrators and legal representatives.

       **9.6**      **Entire Agreement.** This Agreement and the documents referred to herein constitute the entire agreement and understanding of the parties with respect to the subject matter of this Agreement, and supersede all prior understandings and agreements, whether oral or written, between or among the parties hereto with respect to the specific subject matter hereof.

       **9.7**      **Amendment and Waivers.** This Agreement may be amended only by a written agreement executed by each of the parties hereto. No amendment of or waiver of, or modification of any obligation under this Agreement will be enforceable unless set forth in a writing signed by the party against which enforcement is sought. Any amendment effected in accordance with this Section 9.7 will be binding upon all parties hereto and each of their respective successors and assigns. No delay or failure to require performance of any provision of this Agreement shall constitute a waiver of that provision as to that or any other instance or of any other provision of this Agreement. No waiver granted under this Agreement as to any one provision herein shall constitute a subsequent waiver of such provision or of any other provision herein, nor shall it constitute the waiver of any performance other than the actual performance specifically waived.

       **9.8**      **Severability.** If any provision of this Agreement is determined by any court or arbitrator of competent jurisdiction to be invalid, illegal or unenforceable in any respect, such provision will be enforced to the maximum extent possible given the intent of the parties hereto. If such clause or provision cannot be so enforced, such provision shall be stricken from this Agreement and the remainder of this Agreement shall be enforced as if such invalid, illegal or unenforceable clause or provision had (to the extent not enforceable) never been contained in this Agreement. Notwithstanding the foregoing, if the value of this Agreement based upon the substantial benefit of the bargain for any party is materially impaired, which determination as made by the presiding court or arbitrator of competent jurisdiction shall be binding, then both parties agree to substitute such provision(s) through good faith negotiations.

       **9.9**      **Counterparts; Facsimile Signatures.** This Agreement may be executed in any number of counterparts, each of which when so executed and delivered will be deemed an original, and all of which together shall constitute one and the same agreement. This Agreement may be executed and delivered by facsimile or electronic mail (including .pdf or any electronic signature, e.g., www.docusign.com) and upon such delivery the signature will be deemed to have the same effect as if the original signature had been delivered to the other party.

*[Signature page follows]*

8

**IN WITNESS WHEREOF**, the Foundation has caused this Token Subscription Agreement to be executed by its duly authorized representative and Purchaser has executed this Agreement, each as of the date first set forth above.


**FOUNDATION:**

**ARGON PROTOCOL FOUNDATION**


By: _____

Name:    Diana Aidee Muñoz Maclao de Camargo

Title:    Director

Address:    Oceania Business Plaza, 21st floor, Tower 1000, Issac Hanono Missri Street, Punta Pacifica, Panama City, Republic of Panama.

**IN WITNESS WHEREOF**, the Foundation has caused this Token Subscription Agreement to be executed by its duly authorized representative and Purchaser has executed this Agreement, each as of the date first set forth above.

**PURCHASER:**

**[INVESTOR]**

By:        _____

Name:    Mark Long

Title:        _____

Address:    _____

| Number of SHRAP Tokens | Aggregate Purchase Price | Price per Token |
|---|---|---|
| 70,001,845 | $1,831.25 | $0.00002616 |

*THE TOKEN INTERESTS PURCHASED HEREUNDER HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED, AND HAVE BEEN ACQUIRED TO HOLD FOR THE LONG TERM AND NOT WITH A VIEW TO, OR IN CONNECTION WITH, THE SALE OR DISTRIBUTION THEREOF, EXCEPT AS EXPRESSLY PERMITTED HEREIN. NO TRANSFER MAY BE EFFECTED WITHOUT AN EFFECTIVE REGISTRATION STATEMENT RELATED THERETO UNLESS SUCH REGISTRATION IS NOT REQUIRED UNDER THE SECURITIES ACT OF 1933, AS AMENDED.*

## ARGON PROTOCOL FOUNDATION

### TOKEN SUBSCRIPTION AGREEMENT

This Token Subscription Agreement (this "***Agreement***") is made and entered into as of November 8, 2021 (the "***Effective Date***") by and between Argon Protocol Foundation, a Republic of Panama foundation (the "***Foundation***"), and the undersigned purchaser (the "***Purchaser***").

**WHEREAS**, it is the mission of the Foundation to support the growth and development of the Shrapnel Protocol (the "***Protocol***") with units of value on the Protocol denominated as "***SHRAP Tokens***";

**WHEREAS**, the Purchaser desires to contribute to the initial startup and operating costs of the Foundation by purchasing, and the Foundation desires accept such contribution by selling, the right to receive SHRAP Tokens (the "***Token Rights***" and, collectively with any securities received in substitution or fulfilment of the Token Rights, or in replacement of the Token Rights, as may be applicable, the "***Token Interests***") (for the avoidance of doubt, the term "Token Interests" only include SHRAP Tokens to the extent such SHRAP Tokens are securities under applicable law) from the Foundation all on the terms and conditions set forth in this Agreement; and

**WHEREAS**, Purchaser understands and agrees that the Token Interests purchased hereunder are nonrefundable, and agrees to assume all risks and liabilities in connection therewith.

**NOW THEREFORE, BE IT RESOLVED**, that in consideration of the mutual representations, warranties and agreements contained herein, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Foundation and the Purchaser agree as follows:

1.  **PURCHASE.** Subject to the terms and conditions of this Agreement, the Purchaser hereby purchases from the Foundation, and the Foundation hereby sells to Purchaser, the right to receive, automatically and without requiring any future payment, that number of SHRAP Tokens set forth on the signature page hereto (the "***Tokens***") for that aggregate purchase price set forth on the signature page hereto (the "***Aggregate Purchase Price***").

2.  **PAYMENT OF AGGREGATE PURCHASE PRICE; CLOSING.**

    2.1    **Deliveries by Purchaser.** Purchaser hereby delivers, or has delivered, to the Foundation (a) a duly executed copy of this Agreement, and (b) payment of the Aggregate Purchase Price. The Aggregate Purchase Price may be paid in USDC, USDT or any other U.S.

Dollar-denominated stablecoin, ETH or BTC on an as converted to U.S. Dollar basis, or U.S. Dollars.

2.2 **Deliveries by the Foundation.** Upon the Foundation's receipt of all the documents and payment to be executed and delivered by Purchaser under Section 2.1, the Foundation (a) shall deliver, or will have delivered to the Purchaser a duly executed copy of this Agreement and (b) agrees to distribute the Tokens to the Purchaser as soon as practicable after the date of bona fide public release of the Protocol by the Foundation (as determined by the Foundation in its reasonable discretion), provided that such Tokens are subject to the transfer restrictions and the Lockup Provisions set forth herein. The Purchaser shall provide to the Foundation a network/wallet address compatible with receiving Tokens (the "***Wallet***"), in writing to which the Tokens will be sent.

3. **REPRESENTATIONS AND WARRANTIES OF PURCHASER.** Purchaser hereby represents and warrants to the Foundation as follows:

3.1 **Entirely for Own Account.** Purchaser is purchasing the Token Interests entirely for Purchaser's own account to hold for the long term, not as a nominee or agent, and not with a view to, or for sale in connection with, a distribution of the Token Interests within the meaning of the Securities Act of 1933, as amended (the "***1933 Act***"). Purchaser has no present intention of selling or otherwise disposing of all or any portion of the Token Interests and no one other than Purchaser has any beneficial ownership of any of the Token Interests. By executing this Agreement, the Purchaser further represents that the Purchaser does not presently have any contract, undertaking, agreement or arrangement with any individual, corporation, partnership, trust, limited liability company, association or other entity ("***Person***") to sell, transfer or grant participations to such Person or to any third Person, with respect to any of the Token Interests.

3.2 **Access to Information.** Purchaser has had access to all information that Purchaser reasonably considers important in making the decision to purchase the Token Interests, and Purchaser has had ample opportunity to ask questions concerning such matters and this purchase.

3.3 **Understanding of Risks.** Purchaser is fully aware of: (a) the highly speculative nature of the Token Interests; (b) the financial hazards involved; (c) the lack of liquidity of the Token Interests and the restrictions on transferability of the Token Interests (e.g., that Purchaser may not be able to sell or dispose of the Token Interests or use them as collateral for loans); and (d) the tax consequences of purchasing the Token Interests, including the tax consequences of receiving the Tokens in accordance with the terms of this Agreement. Further, the Purchaser understands that the Token Interests involve risks, all of which the Purchaser fully and completely assumes, including, but not limited to, the risk that (i) the technology associated with the Protocol, the Tokens and associated ecosystem (collectively, the "***Network***") will not function as intended; (ii) the Network will not be completed and the Tokens will not be distributed; (iii) the Protocol will fail to attract sufficient interest from key stakeholders; (iv) the Network will not gain adoption and acceptance; and (v) the Foundation, Purchaser, the Network and/or third party entities participating in the development of the Network (the "***Third Parties***") may be subject to investigation and punitive actions from governmental authorities. The Purchaser understands and expressly accepts that the Tokens will be delivered to the Purchaser at the sole risk of the

2

Purchaser on an "AS IS" and "UNDER DEVELOPMENT" basis. The Purchaser understands and expressly accepts that the Purchaser has not relied on any oral or written statements, representations or warranties made by the Foundation, any Third Parties, or any of their officers, directors, employees, consultants, advisors, equity holders or other agents outside of this instrument, including, but not limited to, conversations of any kind, whether through oral or electronic communication, or any white paper. WITHOUT LIMITING THE GENERALITY OF THE FOREGOING, THE PURCHASER ASSUMES ALL RISK AND LIABILITY FOR THE RESULTS OBTAINED BY THE USE OF ANY TOKENS AND REGARDLESS OF ANY ORAL OR WRITTEN STATEMENTS MADE BY THE FOUNDATION, BY WAY OF TECHNICAL ADVICE OR OTHERWISE, RELATED TO THE USE OF THE TOKENS.

3.4    **Understanding and Experience.** Purchaser has sufficient understanding of the functionality, usage, storage, transmission mechanisms and other material characteristics of cryptographic tokens, token wallets and other token storage mechanisms, public and private key management, blockchain technology, and blockchain-based software systems to understand the terms of this instrument. Purchaser understands, acknowledges and agrees that such knowledge allows the Purchaser to appreciate the implications and risks of acquiring the Tokens Interests herein.

3.5    **Accredited Investor and Sophistication.** Purchaser is either an accredited investor (as defined in Rule 501(a) of Regulation D promulgated under the 1933 Act); or Purchaser is a sophisticated purchaser and has appointed a purchaser representative (as defined in Rule 501(i) of Regulation D promulgated under the 1933 Act).

3.6    **Qualifications.** Purchaser has a preexisting personal or business relationship with the Foundation and/or certain of its officers and/or directors of a nature and duration sufficient to make Purchaser aware of the character, business acumen and general business and financial circumstances of the Foundation. If Purchaser is not an accredited investor, the Purchaser, alone or with its purchaser representative, is a sophisticated purchaser and has made its own independent investigation, review and analysis regarding the Foundation and the transactions contemplated hereby, which investigation, review and analysis were conducted by the Purchaser, alone or with its purchaser representative, and together with other expert advisors that it has engaged for such purpose. By reason of its business or financial experience, Purchaser and its purchaser representative, as applicable, is capable of evaluating the merits and risks of this purchase, has the ability to protect Purchaser's own interests in this transaction and is financially capable of bearing a total loss of the Aggregate Purchase Price.

3.7    **Information Statement.** If Purchaser is not an accredited investor (as defined in Rule 501(a) of Regulation D promulgated under the 1933 Act), Purchaser has received a confidential information statement from the Foundation setting forth such information required to be provided under Rule 502(b) of Regulation D promulgated under the 1933 Act and has had ample opportunity to review such documents with Purchaser's purchaser representative and ask questions concerning such matters and this purchase.

3.8    **No General Solicitation.** At no time was Purchaser presented with or solicited by any publicly issued or circulated newspaper, mail, radio, television or other form of

general advertising or solicitation in connection with the offer, sale and purchase of the Token Interests.

      **3.9**    <u>**Compliance with Securities Laws**</u>. Purchaser understands and acknowledges that, to the extent the Token Interests are considered securities, in reliance upon the representations and warranties made by Purchaser herein, the Token Interests have not been, and will not be, registered with the Securities and Exchange Commission ("***SEC***") under the 1933 Act or any applicable state securities law, but instead are being issued under an exemption or exemptions from the registration and qualification requirements of the 1933 Act and other applicable state securities laws which impose certain restrictions on Purchaser's ability to transfer the Token Interests.

      **3.10**    <u>**No Public Market**</u>. The Purchaser understands that no public market now exists for the Token Interests, and that the Foundation has made no assurances that a public market will ever exist for the Token Interests.

      **3.11**    <u>**Restrictions on Transfer**</u>. The Token Interests may constitute securities in various jurisdictions, although the Foundation does not concede this point in any jurisdiction. Accordingly, Purchaser understands and agrees as follows:

> **Purchaser may not transfer any Token Interests unless (1) such Token Interests are registered under the 1933 Act and qualified under other applicable state securities laws, (2) exemptions from such registration and qualification requirements are available, or (3) such Token Interests do not constitute securities under applicable law or SEC rules.**

Purchaser understands that only the Foundation may file a registration statement with the SEC or other applicable state securities commissioners and that the Foundation is under no obligation to do so with respect to the Token Interests. Purchaser has also been advised that exemptions from registration and qualification may not be available or may not permit Purchaser to transfer all or any of the Token Interests in the amounts or at the times proposed by Purchaser. The Purchaser further acknowledges that if an exemption from registration or qualification is available, it may be conditioned on various requirements including, but not limited to, the time and manner of sale, the holding period for the Token Interests, and on requirements relating to the Foundation which are outside of the Purchaser's control, and which the Foundation is under no obligation and may not be able to satisfy.

      **3.12**    <u>**Legends**</u>. The Purchaser understands that the Token Interests may bear any legend required by the securities laws of any state to the extent such laws are applicable to the Token Interests, to the extent such interests may contain a legend, and the following legend (and even without such legend the following restrictions apply):

*"THE TOKEN INTERESTS PURCHASED HEREUNDER HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED, AND HAVE BEEN ACQUIRED TO HOLD FOR THE LONG TERM AND NOT WITH A VIEW TO, OR IN CONNECTION WITH, THE SALE OR DISTRIBUTION*

4

*THEREOF, EXCEPT AS EXPRESSLY PERMITTED UNDER A TOKEN
SUBSCRIPTION AGREEMENT BETWEEN THE ISSUER AND THE ORIGINAL
PURCHASER OF THE TOKEN INTERESTS. NO TRANSFER MAY BE EF-
FECTED WITHOUT AN EFFECTIVE REGISTRATION STATEMENT RELATED
THERETO UNLESS SUCH REGISTRATION IS NOT REQUIRED UNDER THE
SECURITIES ACT OF 1933, AS AMENDED."*

**4.** **LOCKUP.** The Token Interests acquired herein and the Tokens deliverable in fulfillment thereto (as applicable as of the applicable date of determination, the "***Restricted Tokens***") shall be subject to the following restrictions (collectively, the "***Lockup Provisions***"):

**4.1** **Lockup Period.** Prior to the twelve-month anniversary of the Effective Date, Purchaser agrees that it will not, without the prior written consent of the Foundation, offer, sell, contract to sell, pledge, grant any option to purchase, make any short sale of, or place any liens or security interests in, hypothecate, encumber or otherwise transfer or dispose of ("***Transfer***") any Restricted Tokens or any interest therein, any options to purchase any Restricted Tokens, or any instruments convertible into, exchangeable for, or that represent the right to receive Restricted Tokens, including the Token Interests acquired herein, whether now or hereinafter acquired by the Purchaser; ***provided that,*** subject to Section 3.9 on this Agreement, $1/12^{th}$ of the Restricted Tokens shall be released on each monthly anniversary of the Effective Date, such that on the twelve-month anniversary of the Effective Date all of the Restricted Tokens shall be released from these Lockup Provisions.

**4.2** **Restrictions.** To ensure compliance with these Lockup Provisions, the Foundation may impose technological lockups or restrictions on the Restricted Tokens, or withhold delivery of the Restricted Tokens until such restrictions expire or termination.

**5.** **RIGHTS AS OWNER OF TOKEN INTERESTS.** The Purchaser is not entitled, as a holder of the Token Interests, to vote or receive dividends or be deemed the holder of equity of the Foundation for any purpose, nor will anything contained herein be construed to confer on the Purchaser, as such, any of the rights of an equity holder of the Foundation or any right to vote for the election of board members or upon any matter submitted to council members of the Foundation at any meeting thereof, or to give or withhold consent to any corporate or foundation action or to receive notice of meetings, or to receive subscription rights or otherwise.

**6.** **DISCLAIMER AND LIMITATION OF LIABILITY.** The Foundation shall not be liable or responsible to the Purchaser, nor be deemed to have defaulted under or breached this Agreement, for any failure or delay in fulfilling or performing any term of this Agreement, including without limitation, launching, developing and maintaining the Protocol and/or the Network, launching the SHRAP Tokens, selling the Token Interests, sending the Tokens to the Wallet, or distributing the Tokens, when and to the extent such failure or delay is caused by or results from acts beyond the affected party's commercially reasonable control, including, without limitation: (a) acts of God; (b) flood, fire, earthquake, pandemic or explosion; (c) war, invasion, hostilities (whether war is declared or not), terrorist threats or acts, or other civil unrest; (d) applicable law or regulations; or (e) action by any governmental authority. THE FOUNDATION MAKES NO WARRANTY WHATSOEVER WITH RESPECT TO THE TOKENS, INCLUDING ANY (A) WARRANTY OF MERCHANTABILITY; (B) WARRANTY OF

FITNESS FOR A PARTICULAR PURPOSE; (C) WARRANTY OF TITLE; OR (D) WARRANTY AGAINST INFRINGEMENT OF INTELLECTUAL PROPERTY RIGHTS OF A THIRD PARTY; WHETHER ARISING BY LAW, COURSE OF DEALING, COURSE OF PERFORMANCE, USAGE OF TRADE, OR OTHERWISE. EXCEPT AS EXPRESSLY SET FORTH HEREIN, PURCHASER ACKNOWLEDGES THAT IT HAS NOT RELIED UPON ANY REPRESENTATION OR WARRANTY MADE BY THE FOUNDATION, OR ANY OTHER PERSON ON THE FOUNDATION'S BEHALF.

The Purchaser understands that Purchaser has no right against the Foundation or any other individual or legal entity except in the event of the Foundation's material breach of this instrument or intentional fraud. THE FOUNDATION'S (OR ANY OTHER INDIVIDUAL'S OR LEGAL ENTITY'S) AGGREGATE LIABILITY ARISING OUT OF OR RELATED TO THIS AGREEMENT, WHETHER ARISING OUT OF OR RELATED TO BREACH OF CONTRACT, TORT OR OTHERWISE, SHALL NOT EXCEED THE AGGREGATE PURCHASE PRICE (IN U.S. DOLLARS). NEITHER THE FOUNDATION NOR ITS REPRESENTATIVES SHALL BE LIABLE FOR CONSEQUENTIAL, INDIRECT, INCIDENTAL, SPECIAL, EXEMPLARY, PUNITIVE OR ENHANCED DAMAGES, LOST PROFITS OR REVENUES OR DIMINUTION IN VALUE, ARISING OUT OF OR RELATING TO ANY BREACH OF THIS INSTRUMENT.

7.    **TAX CONSEQUENCES.**    PURCHASER    UNDERSTANDS    THAT PURCHASER MAY SUFFER ADVERSE TAX CONSEQUENCES AS A RESULT OF THE PURCHASER'S PURCHASE OR DISPOSITION OF THE TOKEN INTERESTS AND THE TOKENS HEREUNDER. PURCHASER REPRESENTS (a) THAT IT HAS CONSULTED WITH A TAX ADVISER THAT IT DEEMS ADVISABLE IN CONNECTION WITH THE PURCHASE, RECEIPT, VESTING, AND DISPOSITION OF THE TOKEN INTERESTS AND THE TOKENS HEREUNDER, AND (b) THAT PURCHASER IS NOT RELYING ON THE FOUNDATION, OR ANY AGENTS, REPRESENTATIVES, OR ADVISORS OF THE FOUNDATION FOR ANY TAX ADVICE.

THE FAIR MARKET VALUE OF THE TOKEN INTERESTS HEREUNDER HAS BEEN DETERMINED IN GOOD FAITH IN ACCORDANCE WITH A VALUATION REPORT RECEIVED BY THE FOUNDATION, A COPY OF WHICH IS AVAILABLE TO PURCHASER UPON REQUEST. THERE IS NO GUARANTEE THAT SUCH DETERMINATION OF FAIR MARKET VALUE WILL NECESSARILY REFLECT OR EQUAL ANY DETERMINATION OF FAIR MARKET VALUE BY A TAXING AUTHORITY (SUCH AS THE IRS). PURCHASER AGREES TO BE FULLY RESPONSIBLE FOR ANY TAXES RESULTING FROM THE RECEIPT AND DISPOSITION OF THE TOKEN INTERESTS AND TOKENS HEREUNDER, INCLUDING ANY ADDITIONAL TAXES RESULTING FROM A DIFFERENT DETERMINATION OF FAIR MARKET VALUE.

8.    **COMPLIANCE WITH LAWS AND REGULATIONS.** The issuance and transfer of the Token Interests will be subject to and conditioned upon compliance by the Foundation and Purchaser with all applicable state and federal laws and regulations and with all applicable requirements of any exchange on which Tokens may be listed or quoted at the time of such issuance or transfer. Notwithstanding the foregoing, there is no guarantee that there will be any exchange or market available for the Token Interests or the Tokens.

9.        **GENERAL PROVISIONS.**

9.1        **Notices.** All notices and other communications given or made pursuant to this Agreement shall be in writing and shall be deemed effectively given upon the earlier of actual receipt, or (a) personal delivery to the party to be notified, or (b) when sent, if sent by electronic mail or facsimile during normal business hours of the Purchaser, and if not sent during normal business hours, then on the Purchaser's next Business Day, or (c) three (3) Business Days after deposit in the United States mail by certified mail (return receipt requested) for United States deliveries. All notices for delivery outside the United States will be sent by express courier. All notices for delivery will be sent by express courier. All notices not delivered personally will be sent with postage and/or other charges prepaid and properly addressed to the party to be notified at the address set forth below the signature lines of this Agreement or at such other address as such other party may designate by one of the indicated means of notice herein to the other party hereto. A "***Business Day***" shall be a day, other than Saturday or Sunday, when the banks in the Republic of Panama are open for business.

9.2        **Further Assurances.** The parties agree to execute such further documents and instruments and to take such further actions as may be reasonably necessary to carry out the purposes and intent of this Agreement.

9.3        **Titles and Headings.** The titles, captions and headings of this Agreement are included for ease of reference only and will be disregarded in interpreting or construing this Agreement. Unless otherwise specifically stated, all references herein to "sections" and "exhibits" will mean "sections" and "exhibits" to this Agreement.

9.4        **Governing Law; Dispute Resolution.** Any unresolved controversy or claim arising out of or relating to this Agreement, except any such controversies or claims arising out of either party's intellectual property rights for which a provisional remedy or equitable relief is sought, shall be determined by arbitration administered by the Center of Arbitration and Conciliation of Panama in accordance with its rules. All disputes shall be heard by a single arbitrator. The law of the arbitration shall be the law of the Republic of Panama. The language of the arbitration shall be English. The arbitration shall take place in San Francisco, California, unless such venue is not mutually agreeable to the parties, in which case the arbitration shall be administered by the Panama Conciliation and Arbitration Centre in accordance with its procedural rules. The arbitration shall be commenced following the aggrieved party's notification to the other of the particulars of the controversy or claim along with the aggrieved party's proposed arbitrator obtained from a list of potential arbitrators maintained by the American Arbitration Association (the "***AAA***"). Where the notified party does not agree with the choice of arbitrator or if no agreement on the choice of arbitrator can be reached within thirty (30) days, then an arbitrator will be one chosen by the AAA having reasonable experience in transactions of the type provided for in this Agreement. The arbitrator shall render the award within three (3) months of the commencement of the arbitration, unless such time limit is extended by the arbitrator. Prior to the issue or delivery of arbitral award, each party will bear its own costs in respect the arbitration, following which the prevailing party shall be entitled to reasonable attorney's fees, costs, and necessary disbursements in addition to any other relief to which such party may be entitled. An award by the arbitrator shall be final and conclusive and binding upon the parties and shall not be subject to further a ppeal. Each party may enforce any award granted in accordance with this

7

Section 9.4 in any court of competent jurisdiction. The arbitrator shall be required to provide in writing to the parties the basis for the award or order of such arbitrator, and all hearings shall be recorded, with such record constituting the official transcript of such proceedings.

      **9.5**      **Assignments; Successors and Assigns.** The Foundation may assign any of its rights and obligations under this Agreement. Any assignment of rights and obligations by any other party to this Agreement requires the Foundation's prior written consent. This Agreement, and the rights and obligations of the parties hereunder, will be binding upon and inure to the benefit of their respective successors, permitted assigns, heirs, executors, administrators and legal representatives.

      **9.6**      **Entire Agreement.** This Agreement and the documents referred to herein constitute the entire agreement and understanding of the parties with respect to the subject matter of this Agreement, and supersede all prior understandings and agreements, whether oral or written, between or among the parties hereto with respect to the specific subject matter hereof.

      **9.7**      **Amendment and Waivers.** This Agreement may be amended only by a written agreement executed by each of the parties hereto. No amendment of or waiver of, or modification of any obligation under this Agreement will be enforceable unless set forth in a writing signed by the party against which enforcement is sought. Any amendment effected in accordance with this Section 9.7 will be binding upon all parties hereto and each of their respective successors and assigns. No delay or failure to require performance of any provision of this Agreement shall constitute a waiver of that provision as to that or any other instance or of any other provision of this Agreement. No waiver granted under this Agreement as to any one provision herein shall constitute a subsequent waiver of such provision or of any other provision herein, nor shall it constitute the waiver of any performance other than the actual performance specifically waived.

      **9.8**      **Severability.** If any provision of this Agreement is determined by any court or arbitrator of competent jurisdiction to be invalid, illegal or unenforceable in any respect, such provision will be enforced to the maximum extent possible given the intent of the parties hereto. If such clause or provision cannot be so enforced, such provision shall be stricken from this Agreement and the remainder of this Agreement shall be enforced as if such invalid, illegal or unenforceable clause or provision had (to the extent not enforceable) never been contained in this Agreement. Notwithstanding the foregoing, if the value of this Agreement based upon the substantial benefit of the bargain for any party is materially impaired, which determination as made by the presiding court or arbitrator of competent jurisdiction shall be binding, then both parties agree to substitute such provision(s) through good faith negotiations.

      **9.9**      **Counterparts; Facsimile Signatures.** This Agreement may be executed in any number of counterparts, each of which when so executed and delivered will be deemed an original, and all of which together shall constitute one and the same agreement. This Agreement may be executed and delivered by facsimile or electronic mail (including .pdf or any electronic signature, e.g., www.docusign.com) and upon such delivery the signature will be deemed to have the same effect as if the original signature had been delivered to the other party.

*[Signature page follows]*

8

      **IN WITNESS WHEREOF**, the Foundation has caused this Token Subscription Agreement to be executed by its duly authorized representative and Purchaser has executed this Agreement, each as of the date first set forth above.

**FOUNDATION:**

**ARGON PROTOCOL FOUNDATION**

By: _____

Name:    Diana Aidee Muñoz Maclao de Camargo

Title:     Director

Address:  Oceania Business Plaza, 21st floor, Tower 1000, Isaac Hanono Missri Street, Punta Pacifica, Panama City, Republic of Panama.

**IN WITNESS WHEREOF**, the Foundation has caused this Token Subscription Agreement to be executed by its duly authorized representative and Purchaser has executed this Agreement, each as of the date first set forth above.

**PURCHASER:**

**[INVESTOR]**

By: _____

Name: Mark Long _____

Title: _____

Address: _____

| Number of SHRAP Tokens | Aggregate Purchase Price | Price per Token |
|---|---|---|
| 21,327,014 | $557.91 | $0.00002616 |

EXHIBIT H

### INTELLECTUAL PROPERTY LICENSE AND ASSIGNMENT AND SERVICES AGREEMENT

This Intellectual Property License and Assignment and Services Agreement (the "**Agreement**") by and between the Argon Asset Ventures Corp., a corporation under the laws of Panama (the "**Service Recipient**") and Neon Machine, Inc., a Delaware corporation (the "**Service Provider**") is made and entered into as of February 2, 2022 (the "**Effective Date**").

WHEREAS, the Service Recipient wishes to facilitate the issuance of a token ("**Token**") for use in the SHRAPNEL Protocol that will be built on blockchain technology (the "**Service Recipient Network**");

WHEREAS, Service Provider has necessary technology, expertise, staffing, infrastructure, and other resources needed by the Service Recipient in order to support the token issuance and the research, development, maintenance, marketing, and support of the Service Recipient Network; and

WHEREAS, the Service Recipient wishes to obtain, and Service Provider wishes to provide, the intellectual property licenses and services as such licenses and services are described herein and as may be subsequently agreed upon in statements of work (each a "**Statement of Work**") executed by the parties during the Term in accordance with this Agreement.

NOW THEREFORE, in consideration of the terms and conditions and mutual agreements contained herein, the receipt and sufficiency of which are hereby acknowledged, it is agreed as follows:

**1.    DEFINITIONS**.

1.1    "**Affiliate**" means, with respect to any party, any entity that directly or indirectly controls, is controlled by, or is under common control with a party, now or anytime in the future.  For purposes of this definition, "control" means having ownership of the majority of the voting securities of such party.

1.2    "**Change of Control**" means, with respect to a party: (a) the direct or indirect acquisition of either (i) the majority of voting securities of such party or (ii) all or substantially all of the assets of such party, by another entity in a single transaction or a series of transactions; or (b) the merger of such party with another entity

1.3    "**Deliverables**" means the deliverables specifically designated as "Deliverables" in Exhibit A, or in any Statement of Work, to be delivered by Service Provider to the Service Recipient under this Agreement, including without limitation the Service Recipient Network. For the avoidance of doubt, the Service Recipient Network refers solely to the decentralized blockchain technology and does not include any applications, products or services that utilize such protocol.

1.4    "**Intellectual Property Rights**" means all worldwide patent rights (including patent applications and disclosures), copyrights, industrial designs, mask work rights, know-how, trade secrets rights, and any and all other intellectual property or proprietary rights therein.

1.5    "**Service Recipient Data**" means all electronic data or information submitted by or on behalf of the Service Recipient to Service Provider for use, storage or processing for the Token issuance or in the Service Recipient Network.

1.6    "**Moral Rights**" mean any rights to claim authorship of a work, to object to or prevent the modification or destruction of a work, to withdraw from circulation or control the publication or distribution

of a work, and any similar right, existing under judicial or statutory law of any country in the world, or under any treaty, regardless of whether or not such right is called or generally referred to as a "moral right."

1.7    "**Service Provider Domain Names**" means the following Internet domain names: www.shrapnel.com.

1.8    "**Service Provider IP**" means all (i) Intellectual Property Rights owned or controlled by Service Provider prior to the Effective Date; (ii) all Intellectual Property Rights developed, acquired or licensed by the Service Provider independent of this Agreement; and (iii) all enhancements, improvements, adaptations or modifications by Service Provider or its Affiliates to the Service Provider IP other than pursuant to this Agreement.

1.9    "**Services**" means the engineering, administrative, financial, technology and related operational services necessary to develop, launch, support and maintain the Service Recipient Network, including related documentation, and any other specified services or deliverables required, provided or to be provided by Service Provider under this Agreement as described in the <u>Exhibit A</u> hereto, as amended from time to time, or in any applicable Statement of Work.

## 2.    SERVICES.

2.1    **Services**. Subject to the terms and conditions of this Agreement, the Service Recipient hereby engages the Service Provider, and the Service Provider hereby agrees, to perform the Services as described in the attached <u>Exhibit A</u> or otherwise in an applicable Statement of Work. The Service Recipient and the Service Provider will periodically and in good faith (i) consult on the specific scope of the Services; and (ii) amend the specifications and descriptions of, and timelines for, the Services (and associated Deliverables and Fees) set forth in this Agreement to the extent reasonably necessary.

2.2    **Change in Services**. To the extent the Service Recipient requests any material modifications or adjustments to the Services, or any Services outside of the scope of the Services identified in <u>Exhibit A</u> or otherwise in an applicable Statement of Work, the parties will discuss such changes in good faith and increase any fees or other compensation due to the Service Provider.

2.3    **Performance**. Service Provider will provide the Services in a timely and professional manner. The Service Recipient acknowledges and agrees that delays or failure of the Service Recipient or its representatives to deliver required content, information, instructions or other materials in a timely manner will excuse Service Provider from related performance requirements under this Agreement to the extent such delay caused or contributed to delays or disruption in the performance of Services. Service Provider may subcontract the Services or any portion thereof, at the Service Provider's reasonable discretion.

2.4    **Limitation and Disclaimer**. For the avoidance of doubt, in no event will Service Provider perform any Services not agreed to in <u>Exhibit A</u> or in any Statement of Work unless agreed to in writing by Service Provider. Without limiting the foregoing, the Service Recipient specifically acknowledges and agrees that in no event will the Services to be performed by Service Provider under this Agreement involve or be construed to involve Service Provider, directly or indirectly, in the Service Recipient's Token issuance and distribution of tokens, or any subsequent sales, issuance, trading, or any other transactions by the Service Recipient relating to the Token or any other tokens, or any issuance of debt instruments, equity interests, or securities (registered or unregistered) of any sort by the Service Recipient. Neither Service Provider nor any person or entity associated with it, including but not limited to its Affiliates, officers, directors, managers, shareholders, members, employees, subcontractors, agents, representatives and successors and assigns, will be liable, whether in contract, tort (including negligence), or otherwise, for any damage, expense, or other loss that the

DocuSign Envelope ID: 9B4168BB-C137-4C86-A5C5-FA1376278B9F

Service Recipient or any third party may suffer or claim arising out of or related to the Token issuance or distribution, or the legal status of the Service Recipient, and the Service Recipient agrees to defend, indemnify, and hold Service Provider and the Service Provider Indemnitees harmless as provided in <u>Section 9.2</u> for any breach of the provisions of this <u>Section 2.4</u>.

**3.     INTELLECTUAL PROPERTY ASSIGNMENTS AND LICENSES**

3.1     **Ownership of White Paper**. Subject to <u>Section 3.4</u>, Service Provider hereby irrevocably conveys, transfers and assigns to the Service Recipient all right, title and interest in and to the White Paper, including all Intellectual Property Rights therein. At the Service Recipient's request and expense, Service Provider will assist and cooperate with the Service Recipient in all reasonable respects, and will execute documents and will take such other acts reasonably requested by the Service Recipient in writing to enable the Service Recipient to acquire, transfer, maintain, perfect and enforce its Intellectual Property Rights and other legal protections for the White Paper. To the fullest extent permitted by applicable law, Service Provider also hereby irrevocably transfers and assigns to the Service Recipient, and agrees to irrevocably transfer and assign to the Service Recipient, and waives and agrees never to assert, and shall ensure that its employees and any other third parties who created the White Paper will waive and agree never to assert, any and all Moral Rights that Service Provider, its employees or any other third party may have in or with respect to the White Paper.

3.2     **Ownership of Deliverables**.  Service Provider agrees that, subject to <u>Section 3.4</u>, to the fullest extent legally possible, each Deliverable will be a work made for hire owned exclusively by the Service Recipient. Service Provider acknowledges that regardless of whether a Deliverable is a work made for hire, all Deliverables will be the sole and exclusive property of the Service Recipient. Service Provider hereby conveys, transfers and assigns and agrees to convey, transfer and assign to the Service Recipient all rights, title and interest in and to any and all Deliverables including all Intellectual Property Rights therein. To the extent any of the rights, title and interest in the Deliverables cannot be assigned by Service Provider to the Service Recipient, Service Provider hereby grants to the Service Recipient an exclusive, royalty-free, transferable, perpetual, irrevocable, unrestricted worldwide license (with rights to sublicense through one or more tiers of sublicensees) to such non-assignable rights. To the fullest extent permitted by applicable law, Service Provider also hereby irrevocably transfers and assigns to the Service Recipient, and agrees to irrevocably transfer and assign to the Service Recipient, and waives and agrees never to assert, and will ensure that its employees and any other third parties who created any Deliverables will waive and agree never to assert, any and all Moral Rights that Service Provider, its employees or any other third party may have in or with respect to any Deliverables.

3.3     **Perfection of Assignment for the Deliverables**. Service Provider will promptly disclose and deliver to the Service Recipient any Deliverables upon payment to the corresponding Fees to Service Provider. At the Service Recipient's request and expense, Service Provider will assist and cooperate with the Service Recipient in all reasonable respects, and will execute at Service Recipient's sole expense, documents and will take such other acts reasonably requested by the Service Recipient in writing to enable the Service Recipient to acquire, transfer, maintain, perfect and enforce its Intellectual Property Rights and other legal protections for the Deliverables.

3.4     **Service Provider IP**. As between the parties, all Service Provider IP will remain the sole and exclusive property of Service Provider. To the extent any Service Provider IP is included in or required to use any Deliverable provided hereunder, Service Provider hereby grants to the Service Recipient a worldwide, royalty-free, non-exclusive, perpetual license to the Service Recipient, to use, modify, and create derivate works of such Service Provider IP solely in connection with the Deliverables and solely for use of the Network. Except as expressly set forth in this Agreement, the Service Recipient acknowledges and agrees that nothing in this

DocuSign Envelope ID: 0B4168BB-C137-4C86-A5C0-FA1376278895

Agreement will be construed as granting any rights to the Service Recipient, by license, implication, estoppel or otherwise, in or to any Service Provider IP.

3.5     **License to Service Provider**. The Service Recipient hereby grants Service Provider a non-exclusive, royalty-free, transferable, perpetual, irrevocable, worldwide license (with rights to sublicense through one or more tiers of sublicensees) to the Deliverables to make, have made, use, offer to sell, sell, import, copy, modify, create derivative works based upon, distribute, sublicense, display, perform and transmit any products, software, hardware, methods or materials of any kind that are covered by such Deliverables, as part of Service Provider's business operations, including, without limitation, the provision of the Services, and the use, development, sale and exploitation of software applications, products and services.

3.6     **Feedback**. In connection with this Agreement, the Service Recipient may provide Service Provider with comments, suggestions, descriptions, and other information, either orally or in writing, including but not limited to, information that helps Service Provider to identify and resolve any errors or problems in the provision of the Services (collectively, "**Feedback**"). The Service Recipient acknowledges and agrees that all Feedback will be the sole and exclusive property of Service Provider. The Service Recipient hereby assigns to Service Provider  and agrees to assign to Service Provider all of the Service Recipient's right, title, and interest in and to all Feedback, including all Intellectual Property Rights therein.

3.7     **Trademark License**.  Each party expressly reserves all right, title, and interest in and to its own trademarks, service marks, branding and logos (the "**Marks**").  The Service Recipient hereby grants to Service Provider a limited, non-exclusive, worldwide, royalty-free, non-transferable (except as provided in <u>Section 11.6</u>), irrevocable license, with the right to grant sublicenses, to use the Service Recipient's Marks during the Term as necessary to perform the Services and for any promotional or marketing purposes. Service Provider hereby grants to Service Recipient a limited, non-exclusive, revocable right and license to use Service Provider's Marks solely in the manner approved by Service Provider in each instance. All uses of the Marks shall solely inure to the benefit of the licensor in each instance and neither party shall impair the other party's ownership or rights in and to its Marks or challenge or contest the validity or seek to register or file applications for the other party's Marks or any confusingly similar Marks.

3.8     **Domain Names**.  Service Provider hereby irrevocably conveys, transfers and assigns to the Service Recipient all right, title and interest in and to the Domain Names, including all Intellectual Property Rights therein. At the Service Recipient's expense, Service Provider will assist and cooperate with the Service Recipient in all reasonable respects, and will execute documents and will take such other acts reasonably requested by the Service Recipient in writing to enable the Service Recipient to acquire, transfer, maintain, perfect and enforce its Intellectual Property Rights and other legal protections for the Domain Names.

**4.      SECURITY AND ACCESS POLICIES**.

4.1     **Network Security**. Service Provider shall use commercially reasonable efforts consistent with industry standards to protect the physical security and electronic security of the Service Recipient Network and other systems utilized to provide the Services, including but not limited to using up-to-date anti-virus, security and firewall technology commonly used in the industry. The Service Recipient agrees that it and its Affiliates will not take actions that negatively affect the security, integrity, and as appropriate the availability of Service Provider's systems and information assets.

4.2     **Harmful Code**. If either party becomes aware that an unauthorized party has accessed Service Recipient Data, or Confidential Information, or that Harmful Code (as defined below) has infected a relevant network or system of such party, then it will notify the other party as soon as reasonably practical, so the

parties can work together to mitigate any potential adverse effect and undertake any further steps that may be applicable or required by law. For purposes of this Agreement, "**Harmful Code**" means computer instructions whose primary purpose or effect is to disrupt, damage or interfere with use of any computer or telecommunications facilities, including, without limitation, any automatic restraint, time-bomb, trap- door, virus, worm, Trojan horse, or other harmful code or instrumentality that will cause a system to cease to operate or to fail to conform to its specifications. Each party will take commercially reasonable precautions to avoid, prevent, stop, find and eliminate the spread of all Harmful Code on its hardware systems and networks.

4.3     **Export Restrictions**. The Service Recipient will not remove or export from the United States or re-export from anywhere any part of the Services or any direct product thereof to any prohibited country or party as specified by the export laws of the United States. Further, each party warrants to the other that it is not on the United States' prohibited party list and is not located in or a national resident of any country on the United States' prohibited country list. The Service Recipient acknowledges that the Services contain encryption technology, export of which is subject to regulation by the U.S. and certain foreign jurisdictions.

## 5.     FEES; PAYMENT TERMS AND TAXES.

5.1     **Fees**. The fees charged by Service Provider for the provision of the Services, and any other fees, expenses, and charges due to Service Provider under this Agreement (collectively, "**Fees**") are set forth on Exhibit B hereto. The parties may amend and update Exhibit B from time to time to reflect any increased costs in providing the Services.

5.2     **Payment Terms**. In accordance with Exhibit B, the Service Recipient will remit sufficient proceeds to be held as an advance against all Fees and other amounts due to Service Provider under this Agreement ("**Fee Advance**"). Unless otherwise agreed by the parties in writing, Service Provider will hold the Fee Advance in a separate interest-bearing account in U.S. dollars. Each month during the Term, Service Provider will deliver to the Service Recipient an invoice for all Fees due in U.S. dollars, and unless disputed in writing by the Service Recipient within ten (10) days from receipt of the invoice, Service Provider may withdraw undisputed amounts from the Fee Advance account as payment on the invoice. Invoices will be delivered as set forth in Exhibit B. In the event of any dispute relating to invoiced amounts or payments due, the parties shall work in good faith to resolve any disagreements as quickly and as reasonably possible, and in no event later than thirty (30) days after the invoice date. The Service Recipient will reimburse Service Provider for any expenses associated with the recovery of any payments that result from any such disputes, including reasonable attorneys' fees.

5.3.     **Taxes**. The Service Recipient will be responsible for the payment of any and all taxes applicable to the license and use of the Services under this Agreement (other than those based upon Service Provider's net income) including, without limitation, Service Recipient's income, payroll, sales, VAT, use, gross receipts, real estate, personal property, withholding or other taxes imposed upon transactions under this Agreement ("**Taxes**"), and will indemnify and hold harmless Service Provider and its Affiliates for any loss or damage (including without limitation any penalties and interest) sustained because of Service Recipient's failure to pay such Taxes. If Service Provider has the legal obligation to collect Taxes for which the Service Recipient is responsible under this Section 5.3, the appropriate amount shall be invoiced to and paid by the Service Recipient from the Fee Advance, unless the Service Recipient provides Service Provider with a valid tax exemption certificate authorized by the appropriate taxing authority. If any withholding taxes must be paid based on the payments to Service Provider specified in this Agreement, then the Service Recipient will pay all such taxes and the amounts payable to Service Provider under this Agreement will be increased such that the amounts actually paid to Service Provider will be no less than the amounts that Service Provider would have

received notwithstanding such tax.

## 6.    CONFIDENTIALITY.

6.1    **Definition**. For purposes of this Agreement, "**Confidential Information**" means any information, materials or knowledge regarding either party and its business, financial condition, products, programming techniques, customers, suppliers, technology or research and development, whether or not reduced to writing, that is disclosed to the other party or to which the other party has access in connection with this Agreement, which is designated in writing as confidential or which should be otherwise reasonably deemed to be confidential under the circumstances.

6.2    **Confidentiality Obligations**. Each party agrees that it and its Affiliates will hold in strict confidence and not disclose the Confidential Information of the other party to any third party and to use the Confidential Information of the other party for no purpose other than the purposes expressly permitted by this Agreement. Each party will only permit access to the other party's Confidential Information to those of its or its Affiliates' employees, contractors and advisors having a need to know and who have signed or are bound by confidentiality obligations or agreements containing terms at least as restrictive as those contained in this Agreement. Each party will maintain the confidentiality and prevent accidental or other loss or disclosure of any Confidential Information of the other party with at least the same degree of care as it uses to protect its own Confidential Information, but in no event with less than reasonable care.

6.3    **Exclusions**. A party's obligations of confidentiality under this Agreement will not apply to information which (a) is in or comes into the public domain without breach of this Agreement by the receiving party; (b) was in the possession of the receiving party prior to receipt from the disclosing party and was not acquired by the receiving party from the disclosing party under an obligation of confidentiality or non-use; (c) is acquired by the receiving party from a third party not under an obligation of confidentiality or non-use to the disclosing party; or (d) is independently developed by the receiving party without use of any Confidential Information of the disclosing party.

6.4    **Legally Required Disclosure**. In the event either party is required to disclose, pursuant to a judicial order, a requirement of a governmental agency or by operation of law, any Confidential Information provided to it by the other party then such party will provide the other party written notice of any such requirement immediately after learning of any such requirement, and take commercially reasonable measures at the other party's expense to avoid or limit disclosure under such requirements and to obtain confidential treatment or a protective order and allow the other party to participate in the proceeding.

6.5    **Injunctive Relief**. Each party recognizes and acknowledges that any use or disclosure of the Confidential Information of the other party in a manner inconsistent with the provisions of this Agreement will cause the other party irreparable damage for which remedies at law may be inadequate. Accordingly, the non-breaching party will have the right to seek an immediate injunction in respect of any breach of these confidentiality obligations to obtain such relief. Notwithstanding the foregoing, this <u>Section 6.5</u> will not in any way limit the remedies in law or equity otherwise available to the non-breaching party.

6.6    **Obligations Upon Termination**. Upon expiration or termination of this Agreement, each party will promptly cease all use of the other party's Confidential Information and destroy or return (in accordance with the disclosing party's instructions) all Confidential Information to the disclosing party except for any archived electronic communications, which shall continue to be stored on a confidential basis by the receiving party in accordance with its then-current document retention policies. As between the parties, each party will remain the sole and exclusive owner of any Confidential Information provided to the other party under this

DocuSign Envelope ID: 9B4168BB-C137-4C86-A5C0-FA1376278895

Agreement.

**7.    TERM AND TERMINATION.**

7.1     **Term.** This Agreement will commence on the Effective Date and will continue for the period of one (1) year as of such date (the "**Initial Term**"), unless terminated earlier as provided in this Agreement.  This Agreement will automatically renew for subsequent one-year periods, unless either party notifies the other in writing of its intent not to renew at least thirty (30) days prior to the end of the then-current term. The Initial Term and renewal periods are collectively the "**Term**".

7.2     **Termination for Cause**.  If either party breaches any material terms or conditions of this Agreement, then the other party may give written notice to the breaching party that if the breach is not cured within thirty (30) days of the date of such written notice, the Agreement will be terminated.

7.3     **Termination for Insolvency.** Either party may terminate this Agreement immediately upon written notice to the other party if the other party (a) becomes insolvent, unable to pay debts when due, or the subject of bankruptcy proceedings not terminated within thirty (30) days of any filing; or (b) makes a general assignment for the benefit of creditors; or if a receiver is appointed  for  substantially  all  of  its  property.

7.4     **Effect of Termination**. All licenses and rights of the Service Recipient to use the Services hereunder will terminate as of the date of any termination or expiration of this Agreement. No refunds of any amounts paid, including the balance of the Fee Advance, will be made as a result of any termination or expiration of this Agreement; provided, however, that if this Agreement is terminated for a material breach of Service Provider and Service Provider further stipulates that termination for such breach was proper under this Agreement, then unearned amounts, if any, remaining from the Fee Advance, after payment of all amounts due to Service Provider, will be refunded to the Service Recipient within thirty (30) days of such termination for cause by the Service Recipient.

7.5     **Effect of Bankruptcy**. The parties intend that all licenses that are granted under this Agreement are, for purposes of section 365(n) of the Bankruptcy Code, licenses of rights to "intellectual property," as that term is defined in section 101 of the Bankruptcy Code. Nothing in this agreement limits either party's rights under section 365(n).

7.6     **Survival**. The provisions of Sections 3.4, 3.5, 3.7, 7.6, 9, 10 and 11 will survive the termination or expiration of this Agreement for any reason.

**8.    REPRESENTATIONS AND WARRANTIES**.

8.1.    **Mutual Representations and Warranties.** Each party represents and warrants to the other party that (a) it is duly organized and validly existing under the laws of its jurisdiction of organization; (b) it has the legal power and authority to execute and deliver this Agreement; (c) the execution, delivery and performance of this Agreement by it have been duly authorized by all necessary actions and do not violate its organizational documents or any other material agreements to which it is a party; and (d) this Agreement constitutes a legally valid and binding obligation of it enforceable against it in accordance with its terms, except as such enforcement may be limited by applicable law.

8.2     **Disclaimer**. EACH PARTY HEREBY ACKNOWLEDGES AND AGREES THAT THE SERVICES AND ALL DELIVERABLES ARE PROVIDED "AS IS," AND WITHOUT WARRANTY OF ANY KIND.  Service Provider MAKES NO REPRESENTATIONS OR WARRANTIES, EXPRESS OR IMPLIED, WITH RESPECT TO THE SERVICES OR

DELIVERABLES, AND DISCLAIMS ALL IMPLIED WARRANTIES, INCLUDING WITHOUT LIMITATION ANY
WARRANTY OF MERCHANTABILITY, FITNESS FOR A PARTICULAR PURPOSE OR NONINFRINGEMENT.

**9.    INDEMNIFICATION.**

9.1    **Indemnification by Service Provider.** Service Provider will defend, indemnify and hold the Service
Recipient, and its officers, directors, managers, shareholders, members, and employees, and successors and
assigns ("**Service Recipient Indemnitees**") harmless from and against any out-of-pocket loss, liability, damage
or expense (including, without limitation, reasonable attorney's fees (collectively, "**Losses**") incurred in
connection with the defense of third-party claims, demands, suits, proceedings, investigations or inquiries
(collectively, "**Claims**") made, brought or commenced by a third party (including without limitation, regulators)
against such Service Recipient Indemnitees which arise, results from or relate to: (i) the assertion of any Claims
that the Services, when used as delivered and as authorized under this Agreement (but excluding
modifications made by third parties and excluding combination of the Services with any equipment,
hardware, technology or services not provided by Service Provider) infringes any U.S. patent, copyright, or
trademark, or misappropriates other Intellectual Property Rights of a third party in the United States;  or (ii)
gross negligence or willful misconduct by Service Provider  or its Affiliates.

9.2    **Indemnification by the Service Recipient.** The Service Recipient will defend, indemnify, and hold
Service Provider and its Affiliates, and its and their officers, directors, managers, shareholders,  members,
employees, agents, representatives and successors and assigns ("**Service Provider  Indemnitees**") harmless
against any Losses incurred in connection with Claims made, brought or commenced by a third party
(including without limitation regulators) which arise, result from, or relate to (i) any failure or alleged failure
of the Service Recipient to comply with any applicable law, rule or regulation in connection with Service
Recipient's use or offering of the Services  hereunder; (ii) the negligent or willful acts or omissions of Service
Recipient; (iii) Claims that any Service Recipient Data or other materials provided by Service Recipient to
Service Provider infringe the Intellectual Property Rights of any third party; (iv) Claims relating to the legal
status of Token or of the Service Recipient distribution, including without limitation Claims for which the
Service Recipient is required to indemnify Service Provider  pursuant to <u>Section 2.4</u>; (v) the Service Recipient's
breach of its obligations (including its representations and warranties) under this Agreement; and (vi) Claims
relating to the Service Recipient which are not the result of the negligence or intentional misconduct of the
Service Provider.

9.3    **Procedure for Service Provider Claims**. As an express condition to Service Provider's obligation under
this <u>Section 9</u>, the Service Recipient, as a condition to seeking indemnification must: (a) promptly notify
Service Provider in writing of the applicable Claim for which indemnification is sought; (b) tender control of
the defense to the Service Provider; and (c) provide Service Provider with non-financial assistance,
information, and authority reasonably required for the defense and settlement of such Claim. The Service
Recipient may select its own counsel and participate in the defense of a Claim if it chooses to do so, but at its
own expense. Service Provider may settle any such Claim, to the extent it seeks a money payment, with or
without the consent of the Service Recipient. The Service Recipient must obtain Service Provider's prior
written consent to any settlement to the extent it consents to injunctive relief or requires any admission of
fault or any public statement or contains contract terms governing future activities that would materially
affect the indemnified party's business or interests, said consent not to be unreasonably withheld,
conditioned, or delayed.

9.4    **Procedure for Service Recipient Claims**. In the event the Service Provider reasonably seeks
indemnification from the Service Recipient under this <u>Section 9</u>, Service Provider will provide notice to the
Service Recipient, and may apply any Fee Advance to the costs of such Claim. Service Provider will select its

own counsel and control its own defense, all at the costs of the Service Recipient.

**10.    LIMITATION OF LIABILITY.**

10.1    EXCEPT FOR ANY BREACH OF <u>SECTION 6</u>, AND EITHER PARTY'S INDEMNIFICATION OBLIGATIONS UNDER <u>SECTION 9</u>, IN NO EVENT WILL EITHER PARTY BE LIABLE TO THE OTHER OR TO ANY THIRD PARTY FOR ANY, SPECIAL, INCIDENTAL, PUNITIVE OR CONSEQUENTIAL DAMAGES (INCLUDING LOSS OF USE, BUSINESS OR PROFITS) ARISING OUT OF OR IN CONNECTION WITH THIS AGREEMENT OR FOR ANY ERROR OR DEFECT IN THE SERVICES OR ANY DELIVERABLES WHETHER SUCH LIABILITY ARISES FROM ANY CLAIM BASED UPON CONTRACT, WARRANTY, TORT (INCLUDING NEGLIGENCE), STRICT LIABILITY OR OTHERWISE, AND WHETHER OR NOT SUCH PARTY HAS BEEN ADVISED OF THE POSSIBILITY OF SUCH LOSS OR DAMAGE. THE PARTIES HAVE AGREED THAT THESE LIMITATIONS WILL SURVIVE AND APPLY EVEN IF ANY LIMITED REMEDY SPECIFIED IN THIS AGREEMENT IS FOUND TO HAVE FAILED OF ITS ESSENTIAL PURPOSE.

10.2    EXCEPT FOR ANY BREACH OF <u>SECTION 6</u>, THE SERVICE RECIPIENT'S PAYMENT OBLIGATIONS UNDER THIS AGREEMENT, AND EITHER PARTY'S INDEMNIFICATION OBLIGATIONS UNDER <u>SECTION 9</u>, EACH PARTY'S AGGREGATE LIABILITY TO THE OTHER PARTY ARISING OUT OF, OR RELATING TO, THIS AGREEMENT (WHETHER IN CONTRACT, TORT OR OTHER LEGAL THEORY) WILL NOT EXCEED THE LESSER OF FIVE HUNDRED THOUSAND DOLLARS (US$500,000.00) OR THE TOTAL AMOUNTS PAID BY THE SERVICE RECIPIENT TO SERVICE PROVIDER UNDER THIS AGREEMENT DURING THE PREVIOUS TWELVE (12) MONTHS.

10.3    <u>Allocation of Risk and Material Term</u>. THE PROVISIONS OF THIS SECTION 10 ALLOCATE THE RISKS UNDER THIS AGREEMENT BETWEEN THE PARTIES AND ARE AN INTRINSIC PART OF THE BARGAIN BETWEEN THE PARTIES. THE FEES PROVIDED FOR IN THIS AGREEMENT REFLECT THIS ALLOCATION OF RISKS AND THE LIMITATION OF LIABILITY AND SUCH LIMITATION WILL APPLY NOTWITHSTANDING A FAILURE OF ESSENTIAL PURPOSE OF ANY LIMITED REMEDY AND TO THE FULLEST EXTENT PERMITTED BY LAW.

**11.    GENERAL PROVISIONS.**

11.1    **Relationship of Parties**.  The parties to this Agreement will at all times and for all purposes be deemed to be independent contractors and no party or its employees, representatives, subcontractors or agents will have the right or power to bind the other.  This Agreement will not itself create or be deemed to create any relationship of joint venture, partnership, employment, franchise, agency, or similar association or relationship among the parties or their employees, subcontractors or agents. Each party specifically disclaims and waives the formation of any fiduciary relationship between them under or in relation to this Agreement and the Services.

11.2    **Governing Law and Jurisdiction**.  This Agreement will be construed and governed by the laws of Delaware, without reference to conflict of laws principles. Any proceeding relating to or arising from this Agreement may be brought only in the state and federal courts in Delaware, and the parties hereby waive any objections to jurisdiction or venue of any such court. Each party hereby waives any right to jury trial in connection with any action or litigation in any way arising out of or related to this Agreement.

11.3    **Notices**.  Any and all notices made under this Agreement will be in writing and will be (a) sent by email or (b) delivered personally or sent by registered or certified mail to the party at the address specified in this <u>Section 11.3</u> (or to such other address or individual as a party may designate by notice to the other party). In the case of any notice, election, offer, acceptance, or demand made pursuant to this Agreement, original signed documents will be available upon request.

DocuSign Envelope ID: 9B4168BB-C137-4C06-A5C0-FA1376278895

**Argon Asset Ventures Corp.**
Name: Mario Ernesto Garcia de Paredes E.
Title: Attorney at law
Address:
Oceanea Business Plaza
Torre 1000, 21st Floor
Isaac Hanono Missri Street
Punta Pacifica, Panama City, Republic of
Panama

Phone: + (507) 395-2021
E-mail:  team@gdeplaw.com

**Neon Machine, Inc.**
Name: Mark Long
Title: Chief Executive Officer
Address:
1700 Westlake Ave N.
Suite 200
Seattle, Washington 98109
USA

Phone: (206) 669-5940
E-mail:  mark.long@shrapnel.com

11.4    **Force Majeure**.  Nonperformance of either party will be excused to the extent that performance is rendered impossible by strike, fire, flood, governmental acts, orders or restrictions, or any other reason where failure to perform is beyond the reasonable control and not caused by the negligence of the non-performing party, provided that the non-performing party uses its best efforts to promptly resume performance once it is possible to do so.

11.5    **Third Party Beneficiaries**.  No provision of this Agreement or the performance thereof is intended to confer any rights, benefits, remedies, obligations or liabilities hereunder upon any person or entity other than the parties and their respective successors and permitted assigns.

11.6    **Assignment**. Neither party will, without the prior written consent of the other party, assign this Agreement in whole or in part or delegate any right or duty hereunder to any third party, except that Service Provider may assign this Agreement without the Service Recipient's consent (i) to an Affiliate of Service Provider, or (ii) connection with a Change of Control of Service Provider. Any attempted assignment in violation of this Section 11.6 will be void and without effect. Subject to the foregoing restrictions, this Agreement will inure to the benefit of the successors and permitted assigns of the parties.

11.7    **Headings; Counterparts**.  Headings to Sections of this Agreement are to facilitate reference only, do not form a part of this Agreement, and will not in any way affect the interpretation hereof.  This Agreement may be executed in two (2) or more English language counterparts or duplicate originals, all of which will be regarded as one of the same instrument, and which will be the official and governing version in the interpretation of this Agreement.

11.8    **Severability**.  If any term of this Agreement is held invalid or unenforceable for any reason, the remainder of the provisions will continue in full force and effect, and the parties will substitute a valid provision with the same intent and economic effect.

11.9    **Entire Agreement**.  This Agreement sets forth the entire agreement and understanding of the parties relating to the subject matter herein and merges all prior discussions between them.  No modification of or amendment to this Agreement, nor any waiver of any rights under this Agreement, will be effective unless in writing and signed by the party to be charged.

11.10    **Force Majeure**. Neither party will be liable hereunder by reason of any failure or delay in the performance of its obligations hereunder (except for payment obligations) on account of events beyond the reasonable control of such party, which may include without limitation denial-of-service attacks, strikes, shortages, riots, insurrection, fires, flood, storm, explosions, acts of God, war, terrorism, governmental action,

labor conditions, earthquakes and material shortages (each a "**Force Majeure Event**").  Upon the occurrence of a Force Majeure Event, the non-performing party will be excused from any further performance of its obligations effected by the Force Majeure Event for so long as the event continues and such party continues to use commercially reasonable efforts to resume performance.

IN WITNESS WHEREOF the parties hereto have executed this Agreement as of the day and year first above written.

**Argon Asset Ventures Corp.**

By: _____

Name: _____
        Diana Muñoz

Title: _____
        Director

**Neon Machine, Inc.**

By: _____
        Mark Long

Name: _____
        Mark Long

Title: _____
        CEO

DocuSign Envelope ID: 0841688BB-C137-4C86-A5C0-FA1376278895

**EXHIBIT A**
**Services**

### I.    Generally

In general terms, it is the parties' intent that Service Provider will provide to the Service Recipient research, development, and provision of technology and services necessary to successfully launch, support, market, and maintain the Service Recipient Network as generally described in the Whitepaper. Without limiting the foregoing, and subject to the parties' mutual agreement and specifications as they may change from time-to-time, the Services are anticipated to include the below.

### II.    Administrative Services ("Administrative Services")

Service Provider will provide sales, marketing and administrative services for the Service Recipient and the Service Recipient Network. All deliverables provided in connection with the provision of the Administrative Services will be deemed "Deliverables" for the purposes of the Agreement.

### III.    Development / Engineering Services ("Engineering Services")

Service Provider will provide engineering services to create, issue, maintain, and update the Network, including with respect to research and development for protocol improvements as set forth in the White Paper. All deliverables provided in connection with the provision of the Engineering Services will be deemed "Deliverables" for the purposes of the Agreement.

### IV.    Operational Services ("Operational Services")

Service Provider will provide operational services to the Service Recipient, which will include (but is not limited to) management of the Service Recipient's social media accounts. All deliverables provided in connection with the provision of the Operational Services will be deemed "Deliverables" for the purposes of the Agreement.

**Exhibit B**
**Fees**

## I.    Services

The Service Recipient will pay Service Provider the following Fees for the Services:

| Services (see Exhibit A) | Fee (in USD/other currency) ** | Due Date | Form of Payment |
|---|---|---|---|
| Administrative Services | US $2,300,000.00 | Feb. 2, 2022 | USDC |
| Engineering Services | US $2,300,000.00 | Feb. 2, 2022 | USDC |
| Operational Services | US $2,300,000.00 | Feb. 2, 2022 | USDC |

**II.**    Invoices for payment of any of the above may be sent and delivered to the Service Recipient electronically.


** Subject to adjustment or amendment as agreed upon by the Parties.

**<u>Schedule 3.7</u>**
**Marks**

[Service Provider Marks to be added]

# EXHIBIT I

**Subject:** Neon Cap Tables
**Date:** Monday, February 14, 2022 at 12:44:49 PM Eastern Standard Time
**From:** Mark Long
**To:** Cort Javarone
**CC:** Andrew Grossman
**Attachments:** Neon Machine Cap Table Feb 2022.xlsx

Sorry this was delayed. Cap tables enclosed.

As we related in the board meeting, our designated market maker (DMM) Amber Group has priced their options at a fully diluted token market cap of ~$1.5B. The token treasury controlled by the board is ~41% of total supply, of which 4D's 39% equity interest could theorectically translate into ~$240M should the board elect to distribute on a pro rata basis.

The company has also granted you 15M tokens as an advisor and 1M as a board director. Again, at a theoretical DMM valuation, your personal stake could be worth ~$8M.

Of course it's impossible to predict how public sale will perform or what the price of the token will be a year later when lockup ends, but my personal opinion is that Amber's strike price of $.50 is the lower boundary of probability.

If we look at our closest comparable - Star Atlas - a AAA sci-fi shooter; they're at ~$3B. And that's in the current crypto down draft. They were worth twice that in November. I think ~$1.00 is a more likely probability in a year and that the upper boundary could be ~$3.00.


**mark long I ceo neon**
www.shrapnel.com
+01 206 669 5940
mark.long@shrapnel.com

**zoom link**
https://zoom.us/j/4787766268

**calendy link**
https://calendly.com/markvlong

# EXHIBIT J

**EQUITY**

| Neon Machine | # shares |
|---|---|
| 4D Factory | 6,000,000 |
| * Griffin | 3,333,333 |
| * Polychain | 2,000,000 |
| Founders | 4,000,000 |
| **Total** | **15,333,333** |

\* When SAFE converts to preferred

**TOKENS**

| Neon Machine Treasury * | # tokens |
|---|---|
| 4D Factory | 480,927,488 |
| Griffin | 267,181,938 |
| Polychain | 160,309,163 |
| Founders | 320,618,325 |
| **Subtotal** | **1,229,036,913** |

| Private Sale | |
|---|---|
| Dragonfly | 60,000,000 |
| 3 Arrows Capital (3AC) | 22,500,000 |
| Defiance Capital | 22,500,000 |
| Sfermion | 15,000,000 |
| Mechanism Capital | 15,000,000 |
| Merit Circle | 7,500,000 |
| CMT Group | 7,500,000 |
| Finality Capital Partners | 3,000,000 |
| Spartan | 3,000,000 |
| Woodstock | 3,000,000 |
| Overwolf | 1,500,000 |
| Okex | 1,500,000 |
| Digital Development Management (DDM) | 1,500,000 |
| Angels, influencers, guilds | 46,500,000 |
| **Subtotal** | **210,000,000** |

| Insiders | |
|---|---|
| Seed Round Investors | 612,000,000 |
| Team, Advisors, Future Hires | 793,963,087 |
| Board Directors | 5,000,000 |
| **Subtotal** | **1,410,963,087** |

| **Public Sale** | **150,000,000** |
|---|---|

| **Total Supply** | **3,000,000,000** |
|---|---|

\* Upon dividend or other distribution event

# EXHIBIT K

| | Number of Token | % Allocation |
|---|---|---|
| *Total Number of Tokens in Universe* | *3,000,000,000* | *100.0%* |
| Foundation Reserve | | |
|    Partner/Collaborator Incentives (if any) **[1]** | 90,000,000 | 3.0% |
| For Sale | | |
|    Pre-Sale **[2]** | 300,000,000 | 10.0% |
|    Public Sale (if any) **[3]** | 150,000,000 | 5.0% |
| Launch Partner | | |
|    Partner/Collaborator Incentives (if any) | 0 | 0.0% |
|    Employee/Advisor/Board Token Pool (if any) | 126,150,000 | 4.2% |
|    Equity Investors | 522,000,000 | 17.4% |
|    Tokens Reserved for Launch Partner Treasury **[4]** | 150,000,000 | 5.0% |
|    AirDrop | 0 | 0.0% |
| Founders and Early Advisors **[5]** | 673,313,087 | 22.4% |
| Future Mining | 988,536,913 | 33.0% |

**[1] Reserved for liquidity & market making**
**[2] 7% of total supply sold to VCs in strategic token round. 3% of total supply sold to Friends & Family Round**
**[3] Total allocation to public sale still TBD by board of directors. 5% is an estimation**
**[4] Reserved for Secondaries, Corp Dev, M&A, marketing and growth.**
**[5] Does NOT include 3% of total supply sold to founders in a F&F round, which was the first fundraising round internally funded**

| Token Cap Table (For internal purposes only) | | |
|---|---|---|
| **Team, Advisors, Future Hires** | 799,463,087 | 27% |
| **Investors** | 822,000,000 | 27% |
| **Tokens for Insiders** | **1,621,463,087** | **54%** |
| | | |
| **Public Sale** | 150,000,000 | 5% |
| **Market Making/Liquidity/Exchanges** | 90,000,000 | 3% |
| **Corporate Treasury** | 150,000,000 | 5% |
| **Future Mining** | 988,536,913 | 33% |
| **Tokens for Community Distribution** | **1,378,536,913** | **46%** |
| | | |
| **TOTAL** | 3,000,000,000 | 100% |

| | | |
|---|---|---|
| Team | 27% | 799,463,087 |
| Investors | 27% | 822,000,000 |
| Public | 8% | 240,000,000 |
| Corporate Activities | 5% | 150,000,000 |
| Future Mining | 33% | 988,536,913 |
| **TOTAL** | **100%** | **3,000,000,000** |

| **Name** | **Number of Tokens** |
|---|---|
| ***Founders FTIs*** | |
| Mark Long | 70,001,845 |
| Don Norbury | 70,001,845 |
| Colin Foran | 65,665,352 |
| Aaron Nonis | 65,665,352 |
| Mark Yeend | 61,415,589 |
| Naomi Lackaff | 62,196,158 |
| Calvin Zhou | 70,001,845 |
| Gianna Sulyma (In Founders Round) | 15,418,945 |
| **FOUNDERS SUBTOTAL** | **480,366,930** |
| | |
| ***Early Advisors*** | |
| David Vicini | 15,433,649 |
| Andrew Grossman | 15,433,649 |
| James Zhang | 1,000,000 |
| Andy Chang | 250,000 |
| Terrance Spier | 12,265,772 |
| Mike Wilson | 1,000,000 |
| Derek Kolstad | 1,000,000 |
| Dmitri Johnson | 1,000,000 |
| Stephan Bugaj | 1,000,000 |
| Jason Hollingshead | 1,000,000 |
| Brian Marchetti | 3,000,000 |
| Joshua Davis | 3,000,000 |
| Geoffrey Hayes | 1,000,000 |
| Joanna Alexander | 1,000,000 |
| Jesper Kyd (Jesper Jacobsen) | 1,000,000 |
| Stephen Bachmann | 27,000,000 |
| Steve Wade | 18,000,000 |
| Tammy McDonald | 15,000,000 |
| John Gaudiosi | 3,750,000 |
| John Benyamine | 3,750,000 |
| Leath Bing | 1,000,000 |
| Irvin Hu | 1,000,000 |
| Thinkspace (Peter Chee) | 1,000,000 |
| Ayman Moumina (Invest Group Ventures N.A., Inc.) | 50,000 |
| Vicki Anderson | 50,000 |
| Alex Beck | 48,963,087 |
| Reserved for 4D Factory | 15,000,000 |
| **EARLY ADVISORS SUBTOTAL** | **192,946,157** |

| *Employees FTIs* | |
|---|---:|
| Shelly Stewart | 125,000 |
| Joshua Davis | 3,000,000 |
| Marcus Jones | 2,275,000 |
| Tanner Ellison | 1,000,000 |
| Arun Rao | 3,000,000 |
| Alexander Veneruso | 275,000 |
| Francis Brankin | 250,000 |
| Ira Shokeen | 300,000 |
| Jonathan Schwartz | 1,500,000 |
| Karen Nicol | 1,000,000 |
| Muhammad Noman | 275,000 |
| Viren Khandelwal | 3,000,000 |
| Clint Bundrick | 2,000,000 |
| Reserved for Future Hires | 87,650,000 |
| **EMPLOYEES SUBTOTAL** | **105,650,000** |

| **Future and Late Stage Advisor FTIs** | |
|---|---:|
| Ken Cron | 1,000,000 |
| Justin Chow | 1,000,000 |
| Jay Chang | 1,000,000 |
| Andy Do | 250,000 |
| Reserved for Shroud | 3,000,000 |
| Reserved for Ron Bloom | 250,000 |
| Reserved for Razer | 1,000,000 |
| Reserved for Future Advisors | 8,000,000 |
| **FUTURE AND LATE STAGE ADVISOR SUBTOTAL** | **15,500,000** |

| **Board Members/Observers** | |
|---|---:|
| Cort Javarone | 1,000,000 |
| Ned Sherman | 1,000,000 |
| Ben Perszyk (Polychain) | 1,000,000 |
| Pierre-Edouard Planche (Griffin) | 1,000,000 |
| Anthony Palma (Griffin) | 1,000,000 |
| Mark Long (Common shareholder seat) | |
| **BOARD MEMBERS SUBTOTAL** | **5,000,000** |

| *Launch Partner Equity Investors* | |
|---|---:|
| Griffin Gaming Partners II, L.P. | 309,937,500 |
| Griffin Gaming Partners II Side Fund, L.P. | 16,312,500 |
| Polychain Venture Partners II LP | 195,750,000 |

| EQUITY INVESTOR SUBTOTAL | 522,000,000 |
|---|---|

| **Launch Partner Treasury** | |
|---|---|
| Reserved for Secondaries, Corp Dev, M&A, Marketing/Growth | **150,000,000** |

*Launch Partner*

Total

| **Friends and Family Round** | |
|---|---|
| Mark Long | 21,327,014 |
| Don Norbury | 21,327,014 |
| Colin Foran | 10,663,507 |
| Aaron Nonis | 10,663,507 |
| Mark Yeend | 213,270 |
| Naomi Lackaff | 2,132,701 |
| Calvin Zhou | 21,327,014 |
| Gianna Sulyma | 213,270 |
| David Vicini | 1,066,351 |
| Andrew Grossman | 1,066,351 |
| **TOTAL** | **90,000,000** |

| **Data for Argon Protocol Foundation (Founders Token PPM)** | |
|---|---|
| | **Total Tokens** |
| Total FTIs purchased by Neon or by Individuals/Entities direct from the Foundation | 1,561,463,087 |
| Total FTIs Neon Machine is purchasing from Foundation | 276,150,000 |
| FTIs reserved by Foundation for future sales (Token Round Investors + Public Sale) | 360,000,000 |
| Tokens are reserved by the Foundation to support the development of the Protocol | 1,438,536,913 |
| Tokens purchased directly by Individuals/Entities from the Foundation | 1,285,313,087 |
| FTIs allocated to current or future officers, employees or contractors of the Company | 121,150,000 |
| Team | 27% |
| Investors | 27% |
| Public | 8% |
| Corporate Activities | 5% |
| Future Mining | 33% |
| **TOTAL** | **100%** |

| **Data from Board Consent (Seed Token Subscriptions, Token Plan Ad** | |
|---|---|
| FTIs at Neon Machine allocated to current and future service providers of Neon Machine | 126,150,000 |
| FTIs at Neon Machine reserved for future service providers | 101,900,000 |

| Data for Argon Protocol Foundation (Founders Token PPM) - prev | |
|---|---|
| | **Total Tokens** |
| Total FTIs purchased by Neon or by Individuals/Entities direct from the Foundation | 1,560,963,087 |
| Total FTIs Neon Machine is purchasing from Foundation | 277,650,000 |
| FTIs reserved by Foundation for future sales (Token Round Investors + Public Sale) | 353,400,000 |
| Tokens are reserved by the Foundation to support the development of the Protocol | 1,439,036,913 |
| Tokens purchased directly by Individuals/Entities from the Foundation | 1,283,313,087 |
| FTIs allocated to current or future officers, employees or contractors of the Company | 122,650,000 |
| Team | 27% |
| Investors | 27% |
| Public | 8% |
| Corporate Activities | 5% |
| Future Mining | 33% |
| **TOTAL** | **100%** |

| Data from Board Consent (Seed Token Subscriptions, Token Plan Ad | |
|---|---|
| FTIs at Neon Machine allocated to current and future service providers of Neon Machine | 127,650,000 |
| FTIs at Neon Machine reserved for future service providers | 120,250,000 |

| Common Equity Cap Table | Shares | Vesting |
|---|---|---|
| 4D | 6,000,000 | No vesting |
| Mark Long | 543,405 | 4 years, monthly linear unlock, 1 year cliff |
| Don Norbury | 543,405 | 4 years, monthly linear unlock, 1 year cliff |
| Colin Foran | 543,405 | 4 years, monthly linear unlock, 1 year cliff |
| Aaron Nonis | 543,405 | 4 years, monthly linear unlock, 1 year cliff |
| Mark Yeend | 543,405 | 4 years, monthly linear unlock, 1 year cliff |
| Naomi Lackaff | 543,405 | 4 years, monthly linear unlock, 1 year cliff |
| Calvin Zhou | 543,405 | 4 years, monthly linear unlock, 1 year cliff |
| Andy Chang | 110,484 | No vesting |
| James Zhang | 85,681 | No vesting |
| **TOTAL** | **10,000,000** | |

| SAFE Notes (if converted to preferred shares) | | Vesting |
|---|---|---|
| Griffin II | 3,166,667 | No vesting |
| Griffin Side Fund | 158,333 | No vesting |
| Polychain | 2,000,000 | No vesting |
| **TOTAL** | **5,325,000** | |

| ESOP Plan (15% of common) | Shares | Vesting |
|---|---|---|
| Shelly Stewart | 2,000 | 4 years, monthly linear unlock, 1 year cliff |
| Marcus Jones | 5,000 | 4 years, monthly linear unlock, 1 year cliff |
| Tanner Ellison | 15,000 | 4 years, monthly linear unlock, 1 year cliff |
| Joshua Davis | 50,000 | 4 years, monthly linear unlock, 1 year cliff |
| Arun Rao | 50,000 | 4 years, monthly linear unlock, 1 year cliff |
| Alexander Veneruso | 5,000 | 4 years, monthly linear unlock, 1 year cliff |
| Ira Shokeen | 5,000 | 4 years, monthly linear unlock, 1 year cliff |
| Jonathan Schwartz | 30,000 | 4 years, monthly linear unlock, 1 year cliff |
| Karen Nicol | 30,000 | 4 years, monthly linear unlock, 1 year cliff |
| Muhammad Noman | 5,000 | 4 years, monthly linear unlock, 1 year cliff |
| Viren Khandelwal | 50,000 | 4 years, monthly linear unlock, 1 year cliff |
| Clint Bundrick | 50,000 | 4 years, monthly linear unlock, 1 year cliff |

| | | |
|---|---|---|
| **RUNNING SUBTOTAL** | **297,000** | |
| **MAX ESOP AUTHORIZED @15% of COMMON** | **1,764,706** | 15.00% |

# EXHIBIT L

| | |
|---|---|
| **Subject:** | Shrapnel Cap Table Questions |
| **Date:** | Tuesday, May 10, 2022 at 5:07:58 PM Eastern Daylight Time |
| **From:** | Cort Javarone |
| **To:** | mark.long@neonmedia.io |
| **CC:** | Jfmiller10@gmail.com |
| **Attachments:** | Neon Machine Cap Table Feb 2022(1).xlsx, 4D Factory - Token Assignment Agreement.docx |

Mark,

Counsel had a medical emergency that delayed him two days. He's fine now and responses will go out by tomorrow, which I hope you recognize as timely after I also got back to you on Saturday. Now we should return to business and follow up on *Foundation* project next steps per our correspondence this weekend. I haven't seen your reply on that thread and will check in with you separately on it, as I have been gathering information and heard back from Skydance as well.

In the meantime, we've rarely discussed business at Neon Machine, and need to report on its status to our stakeholders as we proceed with our transactions and in advance of the Shrap public offering. I've been catching up on outstanding paper that needs to be signed, and had the attached package Andrew sent me, that would grant Advisory tokens to 4D, not to me as your below email suggests (was this a typo?) In any case, in researching I pulled up your below email with the cap table attached, and have several questions. Please explain/clarify:

-> Who were the Pre-Seed and Seed Round investors and how much was invested by each? I see "Seed" in one bucket on the attached, while in your recent White Paper you list two rounds at prices of $0.0033 and $0.0050 respectively.

-> We'd like to see the breakdown of the ~794 million tokens granted by individual. How much is already granted vs. reserved for future hires and on what basis would they be granted? Are there any vesting or other restrictions?

-> What was the price paid in the Private Sale, and how much has been closed? Why is that round not listed in the table on p. 27 of the White Paper?

-> How and when were the two Seed round plans and pricing, and the Grants to Team, Advisors and Future Hires approved? We were not made privy to a Board meeting or other process that signed off on either.

-> Please confirm lockup restrictions on the Seed round and Private Sale tokens issued. Will there be any restrictions on public sale tokens?

-> 4D's only token allocation is in the "Treasury" category. However in your decks you state *"The Shrapnel treasury consists of funds allocated to development costs, growth, marketing, & communications as well as a rewards program for staking and players who create good content or showcase good gameplay."* This suggests our token is not actually ours but could be spent for other purposes. Please clarify.

-> You footnoted the Treasury token as conditioned "Upon dividend or other distribution event", which we've never seen before in any of the decks. This suggests that 4D is limited to a category that cannot access the token unless approved for distribution, while the rest who have been granted tokens for free or invited to purchase them for fractions of a cent are more liquid and accessible. What was planned for how the Treasury tokens would be available and liquid? Are there rules or other conditions related to the above white paper

description that impact whether they can be distributed, per your footnote?

-> When 4D and Neon approved this project, you stated that all of us would have the opportunity to buy into the pre-public rounds as Insiders. From what I understand, Andrew and David received invitations to buy in at the private sale price. Neither Jon nor Kevin nor I, nor 4D as an entity, can find any invitation to invest in any of the rounds. Was this an oversight?

Look forward your reply.

Thanks,

Cort




———————————————
Cort Javarone
Founder & CEO
4D Factory LLC
m. 646.676.0070
e.  cort@the4dfactory.com


**From:** Mark Long <mark.long@shrapnel.com>
**Sent:** Monday, February 14, 2022 12:44 PM
**To:** Cort Javarone <cort@the4dfactory.com>
**Cc:** Andrew Grossman <andrew@the4dfactory.com>
**Subject:** Neon Cap Tables

Sorry this was delayed. Cap tables enclosed.

As we related in the board meeting, our designated market maker (DMM) Amber Group has priced their options at a fully diluted token market cap of ~$1.5B. The token treasury controlled by the board is ~41% of total supply, of which 4D's 39% equity interest could theorectically translate into ~$240M should the board elect to distribute on a pro rata basis.

The company has also granted you 15M tokens as an advisor and 1M as a board director. Again, at a theoretical DMM valuation, your personal stake could be worth ~$8M.

Of course it's impossible to predict how public sale will perform or what the price of the token will be a year later when lockup ends, but my personal opinion is that Amber's strike price of $.50 is the lower boundary of probability.

If we look at our closest comparable - Star Atlas - a AAA sci-fi shooter; they're at ~$3B. And that's in the current crypto down draft. They were worth twice that in November. I think ~$1.00 is a more likely probability in a year and that the upper boundary could be ~$3.00.


**mark long I ceo neon**
www.shrapnel.com
+01 206 669 5940

mark.long@shrapnel.com

**zoom link**
https://zoom.us/j/4787766268

**calendy link**
https://calendly.com/markvlong

EXHIBIT M

**Subject:** Answers to Your Neon Machine Fundraising and Token Questions

**Date:** Friday, July 29, 2022 at 6:13:31 PM Eastern Daylight Time

**From:** Mark Long

**To:** Cort Javarone

**CC:** Andrew Grossman

Cort,

Andrew worked with our corporate council Fennwick to prepare these answers to your questions re Neon's fundraising history as well as token interest sales that have occurred at Argon Protocol Foundation, with whom Neon has a services relationship. I'll make any subsequent discussion of this subject you may want to have an agenda item at our next board meeting which I hope to hold in August in Seattle.

Mark


*Who were the Pre-Seed and Seed Round investors and how much was invested by each?  I see "Seed" in one bucket on the attached, while in your recent White Paper you list two rounds at prices of $0.0033 and $0.0050 respectively.*

- In the Fall of 2021, Neon Machine, Inc. ("Neon") sold Simple Agreements for Future Equity ("SAFEs") to Griffin Gaming Partners and Polychain for a total raise of $8 million. In connection with the SAFE purchases, Griffin and Polychain each entered into a Side Letter with Neon, pursuant to which Griffin is directly entitled to 10.875% of the total network for each type of token and Polychain is directly entitled to 6.525% of the total network for each type of token.

  Additionally, Argon Protocol Foundation ("Argon") was formed and sold 1,591,463,087 SHRAP token interests, out of a total 3 billion possible tokens, to Neon and to its service providers, investors (including Griffin and Polychain) and stockholders in a "Founder Round" at a nominal purchase price based on a valuation report prepared by an independent third-party valuation firm, Redwood Valuation Partners. These direct allocations to Griffin and Polychain were to satisfy the obligations under each Side Letter. Argon is a Panamanian foundation (without any members or shareholders) that is developing the smart contract responsible for the SHRAP token and is expected to eventually deploy the smart contract that mints the tokens. Argon is a contractual counterparty of Neon, but is not owned or controlled by Neon.

  Separately, a group of founders and early service providers received an aggregate of 90 million SHRAP token interests in exchange for cancellation of debt in the aggregate amount of ~$422,000.

  Subsequently, Argon sold SHRAP token interests to a broad group of investors including Dragonfly Capital, Defiance Capital, Mechanism Capital and several other funds and angel investors at a price of ~$0.0333, for a total raise of $7 million. Such price was determined through negotiation with participating investors. Currently, Argon's sole development partner at this stage is Neon, and some of the proceeds of such token interest sales have been used by Argon to compensate Neon for the services Neon has provided via a Services Agreement between Argon and Neon.

*We'd like to see the breakdown of the ~794 million tokens granted by individual.  How much is already granted vs. reserved for future hires and on what basis would they be granted?  Are there any vesting or other restrictions?*

- Of the ~799 million SHRAP tokens that have been allocated for current and future employees, directors, consultants, advisors, etc. of Neon in connection with their services, interests in ~714.5 million SHRAP tokens have already been allocated and/or granted (including to The 4D Factory LLC), and interests in ~84.5 million SHRAP tokens remain reserved and available (note that the difference between ~794 million and ~799 million token interests is the 5 million token interests allocated for Neon board directors, including yourself).

Such token interests that were granted to the founders and early advisors are not subject to vesting, but they are subject to lock-up restrictions for 30 months after token generation event (i.e., a 6-month cliff after token generation, followed by equal monthly unlocks for the subsequent 24 months). The token interests granted to employees, later advisors and directors are subject to both vesting and lock-up provisions, which provisions vary between 2, 3 and 4 years.

*What was the price paid in the Private Sale, and how much has been closed?  Why is that round not listed in the table on p. 27 of the White Paper?*

- The "Private Sale" is the previously mentioned SHRAP token interest sale among Argon, Dragonfly, Defiance Capital, Mechanism Capital and others, in which token interests were sold by Argon at a price of ~$0.0333, for a total raise of $7 million. The purchasers in the "Private Sale" are referred to as the "Strategic Token Holders" in the White Paper.

*How and when were the two Seed round plans and pricing, and the Grants to Team, Advisors and Future Hires approved?  We were not made privy to a Board meeting or other process that signed off on either.*

- As discussed above, Neon raised $8 million through the sale of SAFEs to Griffin and Polychain. Concurrently with the SAFE investment, Griffin and Polychain entered into Side Letters entitling them directly to 10.875% and 6.525%, respectively, of the total token network. The Neon Board of Directors ratified this transaction in October 2021. In November 2021, the Neon Board of Directors also approved the assignment of ~127.7 million SHRAP token interests to then-current service providers, and the establishment of a Token Plan with ~120.25 million SHRAP token interests for future service provider use. (In January 2022, the Neon Board of Directors was expanded from 1 director to 5 directors and Pierre-Edouard, Benjamin, Ned and you were added to the Board.)

  Also, as discussed above, Argon raised $7 million through the sale of SHRAP token interests to Dragonfly, Defiance Capital, Mechanism Capital and others at a price of ~$0.0333. Prior to such SHRAP token interest sales, Argon sold SHRAP token interests directly to Neon service providers (who qualified as Accredited Inventors), investors (i.e., Griffin and Polychain) and stockholders at the price determined by Redwood.  Such transactions were between Argon and the recipient of the token interests.

*Please confirm lockup restrictions on the Seed round and Private Sale tokens issued.  Will there be any restrictions on public sale tokens?*

- The SHRAP token interests received by Neon SAFE investors and individuals who agreed to cancel the debt owed to them by Neon are subject to a 12-month lock-up from token generation (i.e., a 6-month cliff after token generation, followed by equal monthly unlocks for the subsequent 6 months).

  The SHRAP token interests purchased by investors from Argon are subject to an 18-month lock-up from token generation (i.e., a 6-month cliff after token generation, followed by equal monthly unlocks for the subsequent 12 months).

  It is not anticipated that SHRAP token interests purchased in a public sale will be subject to a lock-up.

*4D's only token allocation is in the "Treasury" category.  However in your decks you state "The Shrapnel treasury consists of funds allocated to development costs, growth, marketing, & communications as well as a rewards program for staking and players who create good content or showcase good gameplay."  This suggests our token is not actually ours but could be spent for other purposes.  Please clarify.*

- In the first instance, 4D has a direct allocation of 15 million SHRAP token interests and its allocation is not limited to the Treasury category.

Separately, Neon currently holds ~264.5 million SHRAP token interests on its balance sheet. So, each Neon stockholder has an indirect interest in such SHRAP token assets, and each stockholder's stake in Neon is worth more as a result of Neon holding such asset. Neon could keep these SHRAP token interests as an asset on its balance sheet, use them as payment in development/growth transactions, or distribute such token interests to stockholders. Please note that this number is subject to adjustment for new hires.

*You footnoted the Treasury token as conditioned "Upon dividend or other distribution event", which we've never seen before in any of the decks.  This suggests that 4D is limited to a category that cannot access the token unless approved for distribution, while the rest who have been granted tokens for free or invited to purchase them for fractions of a cent are more liquid and accessible.  What was planned for how the Treasury tokens would be available and liquid?  Are there rules or other conditions related to the above white paper description that impact whether they can be distributed, per your footnote?*

- As discussed above, 4D has a direct allocation of 15 million SHRAP token interests, and a purchase agreement covering such token allocation was sent to 4D in December 2021 for signature.

  The specific way in which Neon uses the SHRAP token interests on its balance sheet will be determined over time, as dictated by business needs. So long as Neon complies with applicable law, there aren't restrictions on how Neon can use the SHRAP token interests. If approved by the Board, one of those use cases could be distributing some or all of the SHRAP token interests to Neon stockholders.

*When 4D and Neon approved this project, you stated that all of us would have the opportunity to buy into the pre-public rounds as Insiders.  From what I understand, Andrew and David received invitations to buy in at the private sale price.  Neither Jon nor Kevin nor I, nor 4D as an entity, can find any invitation to invest in any of the rounds.  Was this an oversight?*

- In May 2021, Calvin Zhou offered you the opportunity invest in the project, and Calvin recalls that you did not want to participate at that time. However, if you, Jon Miller, or Kevin Conroy would like to purchase token interests in the private sale, you are welcome to do so before the public sale.

**mark long I ceo**
neon

[mark.long@neonmedia.io](mailto:mark.long@neonmedia.io)
+01 206 669 590

**zoom**
https://us02web.zoom.us/j/4321511612

**calendly**
https://calendly.com/markvlong

# EXHIBIT N

## ASSIGNMENT AND ASSUMPTION OF TOKEN SUBSCRIPTION AGREEMENT

THIS ASSIGNMENT AND ASSUMPTION OF TOKEN SUBSCRIPTION AGREEMENT (this "***Agreement***"), is made this 8th day of November, 2021 (the "***Effective Date***"), by and among Argon Protocol Foundation, a Republic of Panama foundation (the "***Foundation***"), Neon Machine, Inc., a Delaware corporation ("***Assignor***"), and the undersigned (the "***Assignee***"). Unless otherwise defined herein, all capitalized terms shall have the meanings assigned to such terms in that certain Token Subscription Agreement (the "***TSA***") dated on or about the date hereof between the Assignor and the Foundation.

WHEREAS, the Assignor and the Foundation previously entered into the TSA whereby Assignor purchased the right to receive 15,000,000 SHRAP Tokens (the "***Tokens***") from the Foundation.

WHEREAS, the Assignee is providing certain services to the Assignor in connection with the Foundation's mission to support the growth and development of the Protocol, the Tokens and the Network.

WHEREAS, in consideration of Assignee's services and payment of the aggregate purchase price set forth on the signature page hereto (the "***Aggregate Purchase Price***"), Assignor desires to transfer and assign to Assignee, and Assignee desires to purchase and assume, all of Assignor's rights, title and interests in and to the TSA, all as further set forth in this Agreement.

NOW, THEREFORE, incorporating the foregoing recitals as a material part hereof, and in consideration of the covenants contained in this Agreement and in the TSA, Assignor and Assignee, each intending to be legally bound hereby, agree as follows:

## 1.    ASSIGNMENT.

1.1    On the Effective Date and subject to the terms and conditions of this Agreement, Assignor does hereby unconditionally and irrevocably assign, transfer, convey and deliver unto Assignee, and Assignee hereby purchases and accepts, all of Assignor's rights, title and interest in and to the TSA, including the right to receive, automatically and without any future payment, that number of SHRAP Tokens (the "***Tokens***") set forth on the signature page hereto from the Foundation. Assignee by this Agreement becomes entitled to all rights, title and interest of Assignor in and to the TSA as if Assignee were an original party to the TSA.

1.2    In consideration for Assignor's assignment of Assignor's rights, title and interest in and to the TSA under the terms of this Agreement, Assignee hereby delivers, or has delivered, a duly executed copy of this Agreement to the Assignor and the Foundation, and payment of the Aggregate Purchase Price in USDC, USDT or any other U.S. Dollar-denominated stablecoin, ETH or BTC on as-converted to U.S. Dollar basis, or U.S. Dollars. In consideration for receipt of the Aggregate Purchase Price, the Assignor hereby delivers, or has delivered, to the Assignee and the Company a duly executed copy of this Agreement, and agrees to distribute, or cause to be distributed, the Tokens to the Assignee as soon as practicable after the date of the Token Launch.

2.    **REPRESENTATIONS AND WARRANTIES OF ASSIGNEE.** Assignee hereby represents and warrants to Assignor and the Foundation as follows:

2.1    **Entirely for Own Account.** Assignee is acquiring the right to receive the Token Interests entirely for Assignee's own account to hold for the long term, not as a nominee or agent, and not with a view to, or for sale in connection with, a distribution of the Token Interests within the meaning of the Securities Act of 1933, as amended (the "***1933 Act***"). Assignee has no present intention of selling or otherwise disposing of all or any portion of the Token Interests and no one other than Assignee has any beneficial ownership of any of the Token Interests. By executing this Agreement, Assignee further represents that Assignee does not presently have any contract, undertaking, agreement or arrangement with any individual, corporation, partnership, trust, limited liability company, association or other entity ("***Person***") to sell, transfer or grant participations to such Person or to any third Person, with respect to any of the Token Interests.

2.2    **Access to Information.** Assignee has had access to all information that Assignee reasonably considers important in making the decision to obtain the Token Interests, and Assignee has had ample opportunity to ask questions of the Foundation's representative concerning such matters and this transaction.

2.3    **Understanding of Risks.** Assignee is a founder, officer, director, employee, consultant, advisor, independent contractor, or other service provider of Assignor and fully aware of:  (a) the highly speculative nature of the Token Interests; (b) the financial hazards involved; (c) the lack of liquidity of the Token Interests and the restrictions on transferability of the Token Interests (e.g., that Assignee may not be able to sell or dispose of the Token Interests or use them as collateral for loans); and (d) the tax consequences of purchasing the Token Interests, including the tax consequences of receiving the Tokens in accordance with the terms of this Agreement and the TSA. Further, the Assignee understands that the Token Interests involve risks, all of which the Assignee fully and completely assumes, including, but not limited to, the risk that (i) the technology associated with the Protocol, the SHRAP Tokens and the Network will not function as intended; (ii) the Protocol and/or the Network will not be completed and the SHRAP Tokens will not be distributed; (iii) the Network will fail to attract sufficient interest from key stakeholders; (iv) the Network will not gain adoption and acceptance; and (v) the Foundation, Assignor and/or the Network may be subject to investigation and punitive actions from governmental authorities. The Assignee understands and expressly accepts that the Tokens will be delivered to the Assignee at the sole risk of the Assignee on an "AS IS" and "UNDER DEVELOPMENT" basis. The Assignee understands and expressly accepts that the Assignee has not relied on any oral or written statements, representations or warranties made by the Foundation, Assignor or any of their officers, directors, employees, consultants, advisors, equity holders, or other agents outside of this instrument, including, but not limited to, conversations of any kind, whether through oral or electronic communication, or any white paper. WITHOUT LIMITING THE GENERALITY OF THE FOREGOING, THE ASSIGNEE ASSUMES ALL RISK AND LIABILITY FOR THE RESULTS OBTAINED BY THE USE OF ANY SHRAP TOKENS AND REGARDLESS OF ANY ORAL OR WRITTEN STATEMENTS MADE BY ASSIGNOR OR THE FOUNDATION, BY WAY OF TECHNICAL ADVICE OR OTHERWISE, RELATED TO THE USE OF THE SHRAP TOKENS.

DocuSign Envelope ID: 515C4930-815A-4965-AA15-43907E944BA9

**2.4**    **Understanding and Experience**. Assignee has sufficient understanding of the functionality, usage, storage, transmission mechanisms and other material characteristics of cryptographic tokens, token wallets and other token storage mechanisms, public and private key management, blockchain technology, and blockchain-based software systems to understand the terms of this instrument. Assignee understands, acknowledges and agrees that such knowledge allows the Assignee to appreciate the implications and risks of acquiring the Tokens Interests herein.

**2.5**    **Accredited Investor**. Assignee is either an accredited investor (as defined in Rule 501(a) of Regulation D promulgated under the 1933 Act); or Assignee is a sophisticated purchaser and has appointed a purchaser representative (as defined in Rule 501(i) of Regulation D promulgated under the 1933 Act).

**2.6**    **Assignee's Qualifications.** Assignee has a preexisting personal or business relationship with Assignor and the Foundation and/or certain of their officers and/or directors of a nature and duration sufficient to make Assignee aware of the character, business acumen and general business and financial circumstances of Assignor and the Foundation and/or certain of their officers and/or directors. If Assignee is not an accredited investor, then the Assignee, alone or with its purchaser representative, has made its own independent investigation, review and analysis regarding the Assignor and the Foundation and the transactions contemplated hereby, which investigation, review and analysis were conducted by the Assignee, alone or with its purchaser representative, and together with other expert advisors that it has engaged for such purpose. By reason of their business or financial experience, Assignee and its purchaser representative, if applicable, is capable of evaluating the merits and risks of this transaction, has the ability to protect Assignee's own interests in this transaction and is financially capable of bearing a total loss of the value of this transaction.

**2.7**    **Information Statement**.  Assignee has received a confidential information statement from Assignor or the Foundation setting forth such information required to be provided under Rule 502(b) of Regulation D promulgated under the 1933 Act, and has had ample opportunity to review such documents with Assignee's purchaser representative (as defined in Rule 501(i) of Regulation D promulgated under the 1933 Act) and ask questions concerning such matters and this transaction.

**2.8**    **No General Solicitation.** At no time was Assignee presented with or solicited by any publicly issued or circulated newspaper, mail, radio, television or other form of general advertising or solicitation in connection with the offer, sale, purchase and assignment of the Token Interests.

**2.9**    **Compliance with Securities Laws.** Assignee understands and acknowledges that, to the extent the Token Interests are considered securities, the Token Interests have not been, and are not expected to be, registered with the Securities and Exchange Commission ("*SEC*") under the 1933 Act or any applicable state securities law, but instead are being issued under an exemption or exemptions from the registration and qualification requirements of the 1933 Act and other applicable state securities laws which impose certain restrictions on Assignee's ability to transfer the Token Interests.

      **2.10**   **No Public Market**. The Assignee understands that no public market now exists for the Token Interests, and that neither Assignor nor the Foundation has made any assurances that a public market will ever exist for the Token Interests.

      **2.11**   **Restrictions on Transfer.** The Token Interests may constitute securities in various jurisdictions, although Assignor and the Foundation do not concede this point in any jurisdiction. Accordingly, Assignee understands and agrees as follows:

> **Assignee may not transfer any Token Interests unless (1) such Token Interests are registered under the 1933 Act and qualified under other applicable state securities laws, (2) exemptions from such registration and qualification requirements are available, or (3) such Token Interests do not constitute securities under applicable law or SEC rules.**

Assignee understands that only the Foundation may file a registration statement with the SEC or other applicable state securities commissioners and that the Foundation is under no obligation to do so with respect to the Token Interests. Assignee has also been advised that exemptions from registration and qualification may not be available or may not permit Assignee to transfer all or any of the Token Interests in the amounts or at the times proposed by Assignee. Assignee further acknowledges that if an exemption from registration or qualification is available, it may be conditioned on various requirements including, but not limited to, the time and manner of sale, the holding period for the Token Interests, and on requirements relating to the Foundation which are outside of the Assignee's control, and which the Foundation is under no obligation and may not be able to satisfy.

      **2.12**   **Legends.** The Assignee understands that the Token Interests may bear any legend required by the securities laws of any state to the extent such laws are applicable to the Token Interests, to the extent they may contain a legend, and the following legend (and even without such legend the following restrictions apply):

> *"THE TOKEN INTERESTS GRANTED HEREUNDER HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED, AND HAVE BEEN ACQUIRED TO HOLD FOR THE LONG TERM AND NOT WITH A VIEW TO, OR IN CONNECTION WITH, THE SALE OR DISTRIBUTION THEREOF. NO TRANSFER MAY BE EFFECTED WITHOUT AN EFFECTIVE REGISTRATION STATEMENT RELATED THERETO UNLESS SUCH REGISTRATION IS NOT REQUIRED UNDER THE SECURITIES ACT OF 1933, AS AMENDED."*

      **3.**   **LOCKUP.** The Token Interests and the Tokens issued to the Assignee in fulfillment of the Token Interests (as applicable as of the applicable date of determination, the "***Restricted Tokens***") shall be subject to the following restrictions (collectively, the "***Lockup Provisions***"):

      **3.1**   **Lockup Period**. Prior to the twelve-month anniversary of the Effective Date, Purchaser agrees that it will not, without the prior written consent of the Assignor, offer, sell, contract to sell, pledge, grant any option to purchase, make any short sale of, or place any liens or

security interests in, hypothecate, encumber or otherwise transfer or dispose of ("***Transfer***") any Restricted Tokens or any interest therein, any options to purchase any Restricted Tokens, or any instruments convertible into, exchangeable for, or that represent the right to receive Restricted Tokens, including the Token Interests acquired herein, whether now or hereinafter acquired by the Purchaser.

3.2    **Unlock Schedule.** Subject to Section 3.1, on the six-month anniversary of the Network Launch (as defined below), 1/24 of the Restricted Tokens shall be released from these Lockup Provisions, and 1/24th of the Restricted Tokens shall be released on each monthly anniversary thereafter, such that all Restricted Tokens will be released from these Lockup Provisions on the thirty (30) month anniversary of the Network Launch.

3.3    **Network Launch.** "Network Launch" means the bona fide public release and transaction or series of transactions pursuant to which the SHRAP token is issued and provided with access to and use of the associated blockchain-based network, platform, or service operated or managed by (or by a service provider on behalf of), or based upon, intellectual property developed, owned, or exclusively licensed by, the Foundation or an Affiliate of the Foundation.

3.4    **Unvested Tokens**. Notwithstanding anything to the contrary herein, Assignee agrees that it will not, at any time, Transfer any Unvested Tokens (as defined below), any options to purchase any Unvested Tokens, or any instruments convertible into, exchangeable for, or that represent the right to receive Unvested Tokens.

3.5    **Restrictions**. To ensure compliance with these Lockup Provisions, the Company and/or the Foundation may impose technological lockups or restrictions on the Restricted Tokens or withhold delivery of the applicable Restricted Tokens until such restrictions expire or termination.

4.    **FOUNDATION'S REPURCHASE OPTION.** The Foundation and/or its assignees shall have the option to repurchase all or a portion of the Unvested Tokens on the terms and conditions set forth in this Section (the "***Repurchase Option***") if Assignee ceases to be employed by Assignor for any reason, or no reason, including without limitation Assignee's death, disability, voluntary resignation or termination by Assignor with or without cause.

4.1    **Definition of "Employed by Assignor"; "Termination Date".** For purposes of this Agreement, Assignee will be considered to be "***employed by Assignor***" if the Board of Directors of the Assignor (the "***Board***") determines that Assignee is rendering substantial services as a director, officer, employee, consultant, advisor or independent contractor to the Assignor or to any Affiliate thereof. In case of any dispute as to whether Assignee is employed by Assignor, the Board shall have sole discretion to determine whether Assignee has ceased to be employed by Assignor or its Affiliate and the effective date on which Assignee's employment or service relationship terminated (the "***Termination Date***"). An "***Affiliate***" means any entity that owns, directly or indirectly, stock representing more than 50% of the total combined voting power of all classes of stock of Assignor or any entity in which Assignor owns, directly or indirectly, equity interests representing more than 50% of the voting power of such entity.

4.2    **Unvested and Vested Restricted Tokens**.

**(a)**    Vesting Schedule. Restricted Tokens that are vested pursuant to the schedule set forth herein are "**Vested Tokens**". Restricted Tokens that are not vested pursuant to the schedule set forth herein are "**Unvested Tokens**". The "**Vesting Commencement Date**" is the date set forth on the signature page hereto. All tokens granted here under are hereby fully vested as of the Effective Date and shall be considered Vested Tokens.

**(b)**    Acceleration of Vesting Following Termination without Cause. Notwithstanding anything to the contrary set forth in Section 3, if Assignee's employment by the Assignor is terminated by the Assignor (or successor thereof) following the twelve (12) month anniversary of the Vesting Commencement Date but prior to the First Vesting Date, other than for Cause, and provided that the Assignee delivers to the Assignor and the Company a general release and non-disparagement agreement of claims in favor of the Assignor, the Company and certain related parties in a form satisfactory to the Assignor and the Company (the "**Release**") within sixty (60) days following such separation from service, and satisfy all conditions to make the Release effective, then, effective as of immediately prior to such termination, a number of Restricted Tokens equal to the product of (a) the number of Restricted Tokens, and (b) a fraction, the numerator of which is the number of whole calendar months that has elapsed between the Vesting Commencement Date and the Termination Date, and the denominator of which is thirty-six (36), will become Vested Tokens at the time of such termination.

As used in this Section 4.2(b): "**Cause**" means any of the following: (a) the Assignee's unauthorized misuse of the Company's trade secrets or proprietary information, (b) the Assignee's conviction of or plea of nolo contendere to a felony or a crime involving moral turpitude, (c) the Assignee's commission of an act of fraud against the Assignor, the Company or any Affiliate, (d) the Assignee's willful engagement in conduct that is in bad faith and materially injurious to the Assignor, the Company or any Affiliate, including but not limited to, misappropriation of trade secrets, fraud or embezzlement, (e) Assignee commits a material breach of any written agreement between Assignee and the Assignor that causes harm to the Assignor, which breach is not cured within thirty (30) days after receipt of written notice describing in detail such breach to Assignee from the Assignor, or (f) Assignee engages in material misfeasance or malfeasance demonstrated by a continued pattern of material failure to perform the essential job duties associated with Assignee's position, which breach is not cured within thirty (30) days after receipt of written notice describing in detail such breach to Assignee from the Assignor.

**(c)**    Acceleration of Vesting Following Insolvency of Assignor. In addition to any Restricted Tokens that have become Vested Tokens pursuant to Section 4.2(a) hereof, in the event of a voluntary or involuntary dissolution, liquidation or winding-up of the Assignor, the filing of a petition by or against the Assignor under Title 11 of the United States Code (as now and hereafter in effect, or any successor statute), the appointment of a receiver, trustee, custodian or liquidator of or for all or substantially all of the assets or property of the Assignor, or the execution by the Assignor of a general assignment for the benefit of creditors (in each case, an "**Insolvency Event**"), then, if Assignee has been continuously employed by the Assignor from the Effective Date until the date of such Insolvency Event, effective as of such Insolvency Event, 100% of the Restricted Tokens will become Vested Tokens at the time of such event.

**4.3**    **Exercise of Repurchase Option at Original Price.** At any time within ninety (90) days after the Termination Date, the Foundation and/or its assignee(s) may elect to repurchase any or all of the Unvested Tokens by giving Assignee written notice of exercise of the Repurchase Option; provided, however, that without requirement of further action on the part of either party hereto, the Repurchase Option shall be deemed to have been automatically exercised as to all Unvested Tokens as of 11:59 PM PT on the date that is ninety (90) days after the Termination Date, unless the Foundation declines in writing to exercise its Repurchase Option. Foundation and/or its assignee(s) will then repurchase (or be deemed to have repurchased) from Assignee (or from Assignee's personal representative as the case may be) any or all of the Unvested Tokens at a price of per Token equal to that set forth on the signature page hereto (the "***Repurchase Price***").

**4.4**    **Payment of Repurchase Price.** The Repurchase Price may be payable in Bitcoin, Ether or other forms of digital assets on an as-converted to U.S. dollars basis or in U.S. dollars, at the option of the Foundation and/or its assignee(s), as the case may be, by cash, wire transfer or check, or by cancellation of all or a portion of any outstanding indebtedness owed by Assignee to the Foundation (or to such assignee) or by any combination thereof, or any other forms of payment on an as-converted to U.S. dollars basis as determined by the Foundation in its sole discretion. The Repurchase Price will be paid without interest.

**4.5**    **Right of Termination Unaffected.** Nothing in this Agreement will be construed to limit or otherwise affect in any manner whatsoever the right or power of Assignor (or any Affiliate) to terminate Assignee's employment or service relationship with Assignor (or any Affiliate) at any time for any reason or no reason, with or without cause.

**5.**    **RIGHTS AS OWNER OF TOKEN INTERESTS AND TOKENS.** The Token Interests do not, and the Tokens will not following the Token Launch, entitle Assignee to vote or receive dividends or be deemed the holder of equity of Assignor or the Foundation for any purpose, nor will anything contained herein be construed to confer on the Assignee, as such, any of the rights of a stockholder of Assignor or the Foundation or any right to vote for the election of Assignor's Board or the Foundation's Board or upon any matter submitted to the stockholders of Assignor, Assignor's Board, Foundation's Board, or the council members of the Foundation, or at any meeting thereof, or to give or withhold consent to any corporate or foundation action or to receive notice of meetings, or to receive subscription rights or otherwise.

**6.**    **DISCLAIMER AND LIMITATION OF LIABILITY**. Neither the Assignor nor the Foundation shall be liable or responsible to the Assignee, nor be deemed to have defaulted under or breached this Agreement, for any failure or delay in fulfilling or performing any term of this Agreement, including without limitation, launching, developing and maintaining the Protocol and/or the Network, launching the Tokens, selling the Token Interests, sending the Tokens to the smart contract address compatible with receiving Tokens, or distributing the Tokens, when and to the extent such failure or delay is caused by or results from acts beyond the affected party's commercially reasonable control, including, without limitation: (a) acts of God; (b) flood, fire, earthquake, pandemic or explosion; (c) war, invasion, hostilities (whether war is declared or not), terrorist threats or acts, or other civil unrest; (d) applicable law or regulations; or (e) action by any governmental authority. NEITHER THE ASSIGNOR NOR THE FOUNDATION MAKE ANY WARRANTY WHATSOEVER WITH RESPECT TO THE TOKENS, INCLUDING ANY (A)

WARRANTY OF MERCHANTABILITY; (B) WARRANTY OF FITNESS FOR A PARTICULAR PURPOSE; (C) WARRANTY OF TITLE; OR (D) WARRANTY AGAINST INFRINGEMENT OF INTELLECTUAL PROPERTY RIGHTS OF A THIRD PARTY; WHETHER ARISING BY LAW, COURSE OF DEALING, COURSE OF PERFORMANCE, USAGE OF TRADE, OR OTHERWISE. EXCEPT AS EXPRESSLY SET FORTH HEREIN, ASSIGNEE ACKNOWLEDGES THAT IT HAS NOT RELIED UPON ANY REPRESENTATION OR WARRANTY MADE BY THE ASSIGNOR OR THE FOUNDATION, OR ANY OTHER PERSON ON THE ASSIGNOR OR THE FOUNDATION'S BEHALF.

The Assignee understands that Assignee has no right against the Assignor or the Foundation or any other individual or legal entity except in the event of the Assignor's or the Foundation's material breach of this instrument or intentional fraud. THE ASSIGNOR'S AND THE FOUNDATION'S (OR ANY OTHER INDIVIDUAL'S OR LEGAL ENTITY'S) AGGREGATE LIABILITY ARISING OUT OF OR RELATED TO THIS AGREEMENT, WHETHER ARISING OUT OF OR RELATED TO BREACH OF CONTRACT, TORT OR OTHERWISE, SHALL NOT EXCEED US$1,000.00. NEITHER THE ASSIGNOR, THE FOUNDATION NOR THEIR REPRESENTATIVES SHALL BE LIABLE FOR CONSEQUENTIAL, INDIRECT, INCIDENTAL, SPECIAL, EXEMPLARY, PUNITIVE OR ENHANCED DAMAGES, LOST PROFITS OR REVENUES OR DIMINUTION IN VALUE, ARISING OUT OF OR RELATING TO ANY BREACH OF THIS INSTRUMENT.

7.    **TAX CONSEQUENCES**. ASSIGNEE UNDERSTANDS THAT ASSIGNEE MAY SUFFER ADVERSE TAX CONSEQUENCES AS A RESULT OF ASSIGNEE'S RECEIPT, VESTING OR DISPOSITION OF ASSIGNOR'S RIGHTS UNDER THE TSA. ASSIGNEE REPRESENTS (a) THAT ASSIGNEE HAS CONSULTED WITH A TAX ADVISER THAT ASSIGNEE DEEMS ADVISABLE IN CONNECTION WITH THE RECEIPT, VESTING, AND DISPOSITION OF ASSIGNOR'S RIGHTS UNDER THE TSA, AND (b) THAT ASSIGNEE IS NOT RELYING ON ASSIGNOR, THE FOUNDATION, OR ANY AGENTS, REPRESENTATIVES, OR ADVISORS OF EITHER ASSIGNOR OR FOUNDATION FOR ANY TAX ADVICE. Assignee has been informed that unless Assignee files with the Internal Revenue Service (and, if necessary, the proper state taxing authorities) within 30 days after the Effective Date, electing pursuant to Section 83(b) of the Internal Revenue Code (and similar state tax provisions, if applicable) to be taxed currently on any difference between the fair market value of the Token Interests on the date of grant and the amount paid by the Assignee, there may be a recognition of taxable income to Assignee at each time the Repurchase Option lapses with respect to a portion of the Restricted Tokens, measured by the excess, if any, of the fair market value of such portion of the Restricted Tokens over the amount paid by the Assignor allocable to such portion of the Restricted Tokens. Assignee represents that Assignee has consulted any tax advisors Assignee deems advisable in connection with Assignee's receipt of Assignor's rights under the TSA and the filing of the election under Section 83(b) and similar tax provisions. A form of Election under Section 83(b) is attached hereto as Exhibit A for reference. ASSIGNEE HEREBY ASSUMES ALL RESPONSIBILITY FOR FILING SUCH ELECTION AND PAYING ANY TAXES RESULTING FROM SUCH ELECTION OR FROM FAILURE TO FILE THE ELECTION AND PAYING TAXES RESULTING FROM THE LAPSE OF THE REPURCHASE RESTRICTIONS ON THE UNVESTED TOKENS.

DocuSign Envelope ID: 5F5G4930-8454-4965-AA14-43907E944BA9

THE FAIR MARKET VALUE OF ASSIGNOR'S RIGHTS UNDER THE TSA HAS BEEN DETERMINED IN GOOD FAITH IN ACCORDANCE WITH A VALUATION REPORT RECEIVED BY THE FOUNDATION AND SHARED WITH ASSIGNOR, A COPY OF WHICH IS AVAILABLE TO ASSIGNEE UPON REQUEST. THERE IS NO GUARANTEE THAT SUCH DETERMINATION OF FAIR MARKET VALUE WILL NECESSARILY REFLECT OR EQUAL ANY DETERMINATION OF FAIR MARKET VALUE BY A TAXING AUTHORITY (SUCH AS THE INTERNAL REVENUE SERVICE). ASSIGNEE AGREES TO BE FULLY RESPONSIBLE FOR ANY TAXES RESULTING FROM THE RECEIPT, VESTING AND DISPOSITION OF ASSIGNOR'S RIGHTS UNDER THE TSA, INCLUDING ANY ADDITIONAL TAXES RESULTING FROM A DIFFERENT DETERMINATION OF FAIR MARKET VALUE.

8. **MISCELLANEOUS**.

8.1 **Notices**. All notices and other communications given or made pursuant to this Agreement shall be in writing and shall be deemed effectively given upon the earlier of actual receipt, or (a) personal delivery to the party to be notified, or (b) when sent, if sent by electronic mail or facsimile during normal business hours of the Assignor, and if not sent during normal business hours, then on the Assignor's next Business day, or (c) three (3) Business Days after deposit in the United States mail by certified mail (return receipt requested) for United States deliveries. All notices for delivery outside the United States will be sent by express courier. All notices for delivery will be sent by express courier. All notices not delivered personally will be sent with postage and/or other charges prepaid and properly addressed to the party to be notified at the address set forth below the signature lines of this Agreement or at such other address as such other party may designate by one of the indicated means of notice herein to the other party hereto. A "*Business day*" shall be a day, other than Saturday or Sunday, when the banks in the Republic of Panama are open for business.

8.2 **Governing Law.** This Agreement will be governed by and construed in accordance with the laws of the jurisdiction set forth in the TSA, without giving effect to that body of laws pertaining to conflict of laws.

8.3 **Binding Effect**. This Agreement shall be binding upon, inure to the benefit of, and be enforceable by the parties hereto and their respective successors and assigns.

8.4 **Entire Agreement**. This Agreement and the TSA constitute the entire agreement and understanding of the parties with respect to the subject matter hereof and supersede all prior understandings and agreements, whether oral or written, between or among the parties hereto with respect to the specific subject matter hereof.

8.5 **Further Assurances**. Assignee agrees to execute and deliver such additional documents, instruments, conveyances and assurances and take such further actions as may be reasonably requested to give effect to the transactions contemplated hereby, including without limitation to enable the Foundation and the Assignor to comply with applicable laws and any other documents that (1) other unaffiliated purchasers of Tokens shall be required to execute and deliver, or (2) are requested by any digital asset exchanges or markets (including any specific or additional lock-up agreements or terms in connection with a listing or sale of Tokens).

**8.6     Counterparts; Facsimile Signatures.** This Agreement may be executed in any number of counterparts, each of which will be deemed an original, and all of which together shall constitute one and the same agreement. This Agreement may be executed and delivered by facsimile or other means of electronic delivery and upon such delivery the facsimile signature will be deemed to have the same effect as if the original signature had been delivered to the other party.

[SIGNATURE PAGE FOLLOWS]

DocuSign Envelope ID: 515G4930-815A-4965-AA15-43907E944BA0

**IN WITNESS WHEREOF**, the parties hereto, being authorized to do so and intending to be legally bound hereby, have duly executed and entered into this Agreement on the date first set forth above.

**ASSIGNOR:**

NEON MACHINE, INC.

By: _____

Name: Mark Long

Title: CEO

DocuSign Envelope ID: 515C4930-815A-4965-AA15-43907E944BA0

    **IN WITNESS WHEREOF**, the parties hereto, being authorized to do so and intending to be legally bound hereby, have duly executed and entered into this Agreement on the date first set forth above.

                                    **ASSIGNEE:**

                                    _____

                                    Name: Cort Javarone

| Number of SHRAP Tokens | Price per Token | Vesting Commencement Date |
|---|---|---|
| 15,000,000 | $0.00002616 | 11/08/2021 – Fully Vested Tokens |

**IN WITNESS WHEREOF**, the parties hereto, being authorized to do so and intending to be legally bound hereby, have duly executed and entered into this Agreement on the date first set forth above.

FOUNDATION:

ARGON PROTOCOL FOUNDATION

By: _Diana Muñoz_____
    DocuSigned by:
    1F2ADEB64CF54GD...

Name: Diana Muñoz_____

Title: _Director_____

## EXHIBIT A

## ELECTION UNDER SECTION 83(b) OF THE
## INTERNAL REVENUE CODE

The undersigned Taxpayer hereby elects, pursuant to Section 83(b) of the Internal Revenue Code, as amended, to include in gross income for the Taxpayer's current taxable year the excess, if any, of the fair market value of the property described below at the time of transfer over the amount paid for such property, as compensation for services.

1.    TAXPAYER'S NAME:    _____

       TAXPAYER'S ADDRESS:    _____

       SOCIAL SECURITY NUMBER:    _____

2.    The property with respect to which the election is made is described as follows:  the right to receive from Argon Protocol Foundation, a Republic of Panama foundation (the "***Foundation***") [_____] SHRAP Tokens of the Foundation (the "***Tokens***").

3.    The date on which the right to receive the Tokens was transferred was [_____], 2021 and this election is made for calendar year 2021.

4.    The Tokens are subject to the following restrictions:  The Foundation may repurchase all or a portion of the Tokens at $[_____] per Token under certain conditions at the time of Taxpayer's termination of employment or services.

5.    The fair market value of the right to receive the Tokens (without regard to restrictions other than restrictions which by their terms will never lapse) was $[_____] per Token at the time of transfer.

6.    The amount paid for the right to receive the Tokens was $[_____] per Token.

7.    The Taxpayer has submitted a copy of this statement to the Foundation.

*THIS ELECTION MUST BE FILED WITH THE INTERNAL REVENUE SERVICE ("**IRS**"), AT THE OFFICE WHERE THE TAXPAYER FILES ANNUAL INCOME TAX RETURNS, <u>WITHIN 30 DAYS</u> AFTER THE DATE OF TRANSFER OF THE PROPERTY. THE ELECTION CANNOT BE REVOKED WITHOUT THE CONSENT OF THE IRS.*

Dated:    _____    _____
                                                                    Taxpayer's Signature

# EXHIBIT O

**ASSIGNMENT AND ASSUMPTION OF TOKEN SUBSCRIPTION AGREEMENT**

THIS ASSIGNMENT AND ASSUMPTION OF TOKEN SUBSCRIPTION AGREEMENT (this "***Agreement***"), is made this 8th day of November, 2021 (the "***Effective Date***"), by and among Argon Protocol Foundation, a Republic of Panama foundation (the "***Foundation***"), Neon Machine, Inc., a Delaware corporation ("***Assignor***"), and the undersigned (the "***Assignee***"). Unless otherwise defined herein, all capitalized terms shall have the meanings assigned to such terms in that certain Token Subscription Agreement (the "***TSA***") dated on or about the date hereof between the Assignor and the Foundation.

**WHEREAS**, the Assignor and the Foundation previously entered into the TSA whereby Assignor purchased the right to receive 1,000,000 SHRAP Tokens (the "***Tokens***") from the Foundation.

**WHEREAS**, the Assignee is providing certain services to the Assignor in connection with the Foundation's mission to support the growth and development of the Protocol, the Tokens and the Network.

**WHEREAS**, in consideration of Assignee's services and payment of the aggregate purchase price set forth on the signature page hereto (the "***Aggregate Purchase Price***"), Assignor desires to transfer and assign to Assignee, and Assignee desires to purchase and assume, Assignor's rights, title and interests in and to the TSA in respect to the Tokens, all as further set forth in this Agreement.

**NOW, THEREFORE**, incorporating the foregoing recitals as a material part hereof, and in consideration of the covenants contained in this Agreement and in the TSA, Assignor and Assignee, each intending to be legally bound hereby, agree as follows:

1. **ASSIGNMENT**.

    1.1    On the Effective Date and subject to the terms and conditions of this Agreement, Assignor does hereby unconditionally and irrevocably assign, transfer, convey and deliver unto Assignee, and Assignee hereby purchases and accepts, all of Assignor's rights, title and interest in and to the TSA, including the right to receive, automatically and without any future payment, that number of SHRAP Tokens (the "***Tokens***") set forth on the signature page hereto from the Foundation. Assignee by this Agreement becomes entitled to the rights, title and interest of Assignor in and to the TSA in respect to the Tokens as if Assignee were an original party to the TSA.

    1.2    In consideration for Assignor's assignment of Assignor's rights, title and interest in and to the TSA in respect to the Tokens under the terms of this Agreement, Assignee hereby delivers, or has delivered, a duly executed copy of this Agreement to the Assignor and the Foundation, and payment of the Aggregate Purchase Price in USDC, USDT or any other U.S. Dollar-denominated stablecoin, ETH or BTC on as-converted to U.S. Dollar basis, or U.S. Dollars. In consideration for receipt of the Aggregate Purchase Price, the Assignor hereby delivers, or has delivered, to the Assignee and the Company a duly executed copy of this Agreement, and agrees to distribute, or cause to be distributed, the Tokens to the Assignee as soon as practicable after the date of the Token Launch.

**2.    REPRESENTATIONS AND WARRANTIES OF ASSIGNEE.** Assignee
hereby represents and warrants to Assignor and the Foundation as follows:

**2.1    Entirely for Own Account.** Assignee is acquiring the right to receive the
Token Interests entirely for Assignee's own account to hold for the long term, not as a nominee or
agent, and not with a view to, or for sale in connection with, a distribution of the Token Interests
within the meaning of the Securities Act of 1933, as amended (the "***1933 Act***"). Assignee has no
present intention of selling or otherwise disposing of all or any portion of the Token Interests and
no one other than Assignee has any beneficial ownership of any of the Token Interests. By
executing this Agreement, Assignee further represents that Assignee does not presently have any
contract, undertaking, agreement or arrangement with any individual, corporation, partnership,
trust, limited liability company, association or other entity ("***Person***") to sell, transfer or grant
participations to such Person or to any third Person, with respect to any of the Token Interests.

**2.2    Access to Information.** Assignee has had access to all information that
Assignee reasonably considers important in making the decision to obtain the Token Interests, and
Assignee has had ample opportunity to ask questions of the Foundation's representative
concerning such matters and this transaction.

**2.3    Understanding of Risks.** Assignee is a founder, officer, director,
employee, consultant, advisor, independent contractor, or other service provider of Assignor and
fully aware of:  (a) the highly speculative nature of the Token Interests; (b) the financial hazards
involved; (c) the lack of liquidity of the Token Interests and the restrictions on transferability of
the Token Interests (e.g., that Assignee may not be able to sell or dispose of the Token Interests or
use them as collateral for loans); and (d) the tax consequences of purchasing the Token Interests,
including the tax consequences of receiving the Tokens in accordance with the terms of this
Agreement and the TSA. Further, the Assignee understands that the Token Interests involve risks,
all of which the Assignee fully and completely assumes, including, but not limited to, the risk that
(i) the technology associated with the Protocol, the SHRAP Tokens and the Network will not
function as intended; (ii) the Protocol and/or the Network will not be completed and the SHRAP
Tokens will not be distributed; (iii) the Network will fail to attract sufficient interest from key
stakeholders; (iv) the Network will not gain adoption and acceptance; and (v) the Foundation,
Assignor and/or the Network may be subject to investigation and punitive actions from
governmental authorities. The Assignee understands and expressly accepts that the Tokens will be
delivered to the Assignee at the sole risk of the Assignee on an "AS IS" and "UNDER
DEVELOPMENT" basis. The Assignee understands and expressly accepts that the Assignee has
not relied on any oral or written statements, representations or warranties made by the Foundation,
Assignor or any of their officers, directors, employees, consultants, advisors, equity holders, or
other agents outside of this instrument, including, but not limited to, conversations of any kind,
whether through oral or electronic communication, or any white paper. WITHOUT LIMITING
THE GENERALITY OF THE FOREGOING, THE ASSIGNEE ASSUMES ALL RISK AND
LIABILITY FOR THE RESULTS OBTAINED BY THE USE OF ANY SHRAP TOKENS AND
REGARDLESS OF ANY ORAL OR WRITTEN STATEMENTS MADE BY ASSIGNOR OR
THE FOUNDATION, BY WAY OF TECHNICAL ADVICE OR OTHERWISE, RELATED TO
THE USE OF THE SHRAP TOKENS.

**2.4    Understanding and Experience**. Assignee has sufficient understanding of the functionality, usage, storage, transmission mechanisms and other material characteristics of cryptographic tokens, token wallets and other token storage mechanisms, public and private key management, blockchain technology, and blockchain-based software systems to understand the terms of this instrument. Assignee understands, acknowledges and agrees that such knowledge allows the Assignee to appreciate the implications and risks of acquiring the Tokens Interests herein.

**2.5    Accredited Investor**. Assignee is either an accredited investor (as defined in Rule 501(a) of Regulation D promulgated under the 1933 Act); or Assignee is a sophisticated purchaser and has appointed a purchaser representative (as defined in Rule 501(i) of Regulation D promulgated under the 1933 Act).

**2.6    Assignee's Qualifications.** Assignee has a preexisting personal or business relationship with Assignor and the Foundation and/or certain of their officers and/or directors of a nature and duration sufficient to make Assignee aware of the character, business acumen and general business and financial circumstances of Assignor and the Foundation and/or certain of their officers and/or directors. If Assignee is not an accredited investor, then the Assignee, alone or with its purchaser representative, has made its own independent investigation, review and analysis regarding the Assignor and the Foundation and the transactions contemplated hereby, which investigation, review and analysis were conducted by the Assignee, alone or with its purchaser representative, and together with other expert advisors that it has engaged for such purpose. By reason of their business or financial experience, Assignee and its purchaser representative, if applicable, is capable of evaluating the merits and risks of this transaction, has the ability to protect Assignee's own interests in this transaction and is financially capable of bearing a total loss of the value of this transaction.

**2.7    Information Statement**. [1]   Assignee has received a confidential information statement from Assignor or the Foundation setting forth such information required to be provided under Rule 502(b) of Regulation D promulgated under the 1933 Act, and has had ample opportunity to review such documents with Assignee's purchaser representative (as defined in Rule 501(i) of Regulation D promulgated under the 1933 Act) and ask questions concerning such matters and this transaction.

**2.8    No General Solicitation.** At no time was Assignee presented with or solicited by any publicly issued or circulated newspaper, mail, radio, television or other form of general advertising or solicitation in connection with the offer, sale, purchase and assignment of the Token Interests.

**2.9    Compliance with Securities Laws.** Assignee understands and acknowledges that, to the extent the Token Interests are considered securities, the Token Interests have not been, and are not expected to be, registered with the Securities and Exchange Commission ("*SEC*") under the 1933 Act or any applicable state securities law, but instead are being issued under an exemption or exemptions from the registration and qualification requirements of the 1933

---

[1] Note to draft: this paragraph is not required for 506(c) compliant offerings.

DocuSign Envelope ID: 3F333C50-5CA0-46B4-895F-511E6G3RA1D0

Act and other applicable state securities laws which impose certain restrictions on Assignee's ability to transfer the Token Interests.

       **2.10**   **No Public Market**. The Assignee understands that no public market now exists for the Token Interests, and that neither Assignor nor the Foundation has made any assurances that a public market will ever exist for the Token Interests.

       **2.11**   <u>**Restrictions on Transfer.**</u> The Token Interests may constitute securities in various jurisdictions, although Assignor and the Foundation do not concede this point in any jurisdiction. Accordingly, Assignee understands and agrees as follows:

> **Assignee may not transfer any Token Interests unless (1) such Token Interests are registered under the 1933 Act and qualified under other applicable state securities laws, (2) exemptions from such registration and qualification requirements are available, or (3) such Token Interests do not constitute securities under applicable law or SEC rules.**

Assignee understands that only the Foundation may file a registration statement with the SEC or other applicable state securities commissioners and that the Foundation is under no obligation to do so with respect to the Token Interests. Assignee has also been advised that exemptions from registration and qualification may not be available or may not permit Assignee to transfer all or any of the Token Interests in the amounts or at the times proposed by Assignee. Assignee further acknowledges that if an exemption from registration or qualification is available, it may be conditioned on various requirements including, but not limited to, the time and manner of sale, the holding period for the Token Interests, and on requirements relating to the Foundation which are outside of the Assignee's control, and which the Foundation is under no obligation and may not be able to satisfy.

       **2.12**   <u>**Legends.**</u> The Assignee understands that the Token Interests may bear any legend required by the securities laws of any state to the extent such laws are applicable to the Token Interests, to the extent they may contain a legend, and the following legend (and even without such legend the following restrictions apply):

> *"THE TOKEN INTERESTS GRANTED HEREUNDER HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED, AND HAVE BEEN ACQUIRED TO HOLD FOR THE LONG TERM AND NOT WITH A VIEW TO, OR IN CONNECTION WITH, THE SALE OR DISTRIBUTION THEREOF. NO TRANSFER MAY BE EFFECTED WITHOUT AN EFFECTIVE REGISTRATION STATEMENT RELATED THERETO UNLESS SUCH REGISTRATION IS NOT REQUIRED UNDER THE SECURITIES ACT OF 1933, AS AMENDED."*

       **3.**   **LOCKUP.** The Token Interests and the Tokens issued to the Assignee in fulfillment of the Token Interests (as applicable as of the applicable date of determination, the "***Restricted Tokens***") shall be subject to the following restrictions (collectively, the "***Lockup Provisions***"):

**3.1**    **Lockup Period**. Prior to the twelve-month anniversary of the Effective Date, Assignee agrees that it will not, without the prior written consent of the Assignor, offer, sell, contract to sell, pledge, grant any option to purchase, make any short sale of, or place any liens or security interests in, hypothecate, encumber or otherwise transfer or dispose of ("*Transfer*") any Restricted Tokens or any interest therein, any options to purchase any Restricted Tokens, or any instruments convertible into, exchangeable for, or that represent the right to receive Restricted Tokens, including the Token Interests assigned to the Assignee herein, whether now or hereinafter acquired by the Assignee; ***provided that***, subject to Section 2.9, on the twelve-month anniversary of the Effective Date, 1/3 of the Restricted Tokens shall be released from these Lockup Provisions, and 1/36th of the Restricted Tokens shall be released on each monthly anniversary thereafter, such that all Restricted Tokens will be released from these Lockup Provisions on the three-year anniversary of the Effective Date.

**3.2**    **Unvested Tokens**. Notwithstanding anything to the contrary herein, Assignee agrees that it will not, at any time, Transfer any Unvested Tokens (as defined below), any options to purchase any Unvested Tokens, or any instruments convertible into, exchangeable for, or that represent the right to receive Unvested Tokens.

**3.3**    **Restrictions**. To ensure compliance with these Lockup Provisions, the Company and/or the Foundation may impose technological lockups or restrictions on the Restricted Tokens or withhold delivery of the Restricted Tokens until such restrictions expire or termination.

**4.**    **FOUNDATION'S REPURCHASE OPTION.** The Foundation and/or its assignees shall have the option to repurchase all or a portion of the Unvested Tokens on the terms and conditions set forth in this Section (the "*Repurchase Option*") if Assignee ceases to be employed by Assignor for any reason, or no reason, including without limitation Assignee's death, disability, voluntary resignation or termination by Assignor with or without cause.

**4.1**    **Definition of "Employed by Assignor"; "Termination Date".** For purposes of this Agreement, Assignee will be considered to be "*employed by Assignor*" if the Board of Directors of the Assignor (the "*Board*") determines that Assignee is rendering substantial services as a director, officer, employee, consultant, advisor or independent contractor to the Assignor or to any Affiliate thereof. In case of any dispute as to whether Assignee is employed by Assignor, the Board shall have sole discretion to determine whether Assignee has ceased to be employed by Assignor or its Affiliate and the effective date on which Assignee's employment or service relationship terminated (the "*Termination Date*"). An "*Affiliate*" means any entity that owns, directly or indirectly, stock representing more than 50% of the total combined voting power of all classes of stock of Assignor or any entity in which Assignor owns, directly or indirectly, equity interests representing more than 50% of the voting power of such entity.

**4.2**    **Unvested and Vested Restricted Tokens**.

**(a)**    Vesting Schedule. Restricted Tokens that are vested pursuant to the schedule set forth herein are "*Vested Tokens*". Restricted Tokens that are not vested pursuant to the schedule set forth herein are "*Unvested Tokens*". The "*Vesting Commencement Date*" is the date set forth on the signature page hereto. If Assignee has continuously been employed by

DocuSign Envelope ID: 3F333GB0-5CA0-46B4-895F-511E6G3RA1D0

Assignor, at all times from the Vesting Commencement Date, and thereafter, for so long (and only for so long) as Assignee remains continuously employed by Assignor at all times from the Vesting Commencement Date, on the last business day of each month after the Vesting Commencement Date 1/36th of the Restricted Tokens will become Vested Tokens, such that if Assignee has been continuously employed by the Assignor during such period, all Restricted Tokens will be fully vested on the three-year anniversary of the Vesting Commencement Date. No Unvested Tokens will become Vested Tokens after the Termination Date.

(b)    Acceleration of Vesting Following Termination without Cause. Notwithstanding anything to the contrary set forth in Section 3, if Assignee's employment by the Assignor is terminated by the Assignor (or successor thereof) following the twelve (12) month anniversary of the Vesting Commencement Date but prior to the First Vesting Date, other than for Cause, and provided that the Assignee delivers to the Assignor and the Company a general release and non-disparagement agreement of claims in favor of the Assignor, the Company and certain related parties in a form satisfactory to the Assignor and the Company (the "*Release*") within sixty (60) days following such separation from service, and satisfy all conditions to make the Release effective, then, effective as of immediately prior to such termination, a number of Restricted Tokens equal to the product of (a) the number of Restricted Tokens, and (b) a fraction, the numerator of which is the number of whole calendar months that has elapsed between the Vesting Commencement Date and the Termination Date, and the denominator of which is thirty-six (36), will become Vested Tokens at the time of such termination.

As used in this Section 4.2(b): "*Cause*" means any of the following: (a) the Assignee's unauthorized misuse of the Company's trade secrets or proprietary information, (b) the Assignee's conviction of or plea of nolo contendere to a felony or a crime involving moral turpitude, (c) the Assignee's commission of an act of fraud against the Assignor, the Company or any Affiliate, (d) the Assignee's willful engagement in conduct that is in bad faith and materially injurious to the Assignor, the Company or any Affiliate, including but not limited to, misappropriation of trade secrets, fraud or embezzlement, (e) Assignee commits a material breach of any written agreement between Assignee and the Assignor that causes harm to the Assignor, which breach is not cured within thirty (30) days after receipt of written notice describing in detail such breach to Assignee from the Assignor, or (f) Assignee engages in material misfeasance or malfeasance demonstrated by a continued pattern of material failure to perform the essential job duties associated with Assignee's position, which breach is not cured within thirty (30) days after receipt of written notice describing in detail such breach to Assignee from the Assignor.

(c)    Acceleration of Vesting Following Insolvency of Assignor. In addition to any Restricted Tokens that have become Vested Tokens pursuant to Section 4.2(a) hereof, in the event of a voluntary or involuntary dissolution, liquidation or winding-up of the Assignor, the filing of a petition by or against the Assignor under Title 11 of the United States Code (as now and hereafter in effect, or any successor statute), the appointment of a receiver, trustee, custodian or liquidator of or for all or substantially all of the assets or property of the Assignor, or the execution by the Assignor of a general assignment for the benefit of creditors (in each case, an "*Insolvency Event*"), then, if Assignee has been continuously employed by the Assignor from the Effective Date until the date of such Insolvency Event, effective as of such Insolvency Event, 100% of the Restricted Tokens will become Vested Tokens at the time of such event.

**4.3    Exercise of Repurchase Option at Original Price.** At any time within ninety (90) days after the Termination Date, the Foundation and/or its assignee(s) may elect to repurchase any or all of the Unvested Tokens by giving Assignee written notice of exercise of the Repurchase Option; provided, however, that without requirement of further action on the part of either party hereto, the Repurchase Option shall be deemed to have been automatically exercised as to all Unvested Tokens as of 11:59 PM PT on the date that is ninety (90) days after the Termination Date, unless the Foundation declines in writing to exercise its Repurchase Option. Foundation and/or its assignee(s) will then repurchase (or be deemed to have repurchased) from Assignee (or from Assignee's personal representative as the case may be) any or all of the Unvested Tokens at a price of per Token equal to that set forth on the signature page hereto (the "***Repurchase Price***").

**4.4    Payment of Repurchase Price.** The Repurchase Price may be payable in Bitcoin, Ether or other forms of digital assets on an as-converted to U.S. dollars basis or in U.S. dollars, at the option of the Foundation and/or its assignee(s), as the case may be, by cash, wire transfer or check, or by cancellation of all or a portion of any outstanding indebtedness owed by Assignee to the Foundation (or to such assignee) or by any combination thereof, or any other forms of payment on an as-converted to U.S. dollars basis as determined by the Foundation in its sole discretion. The Repurchase Price will be paid without interest.

**4.5    Right of Termination Unaffected.** Nothing in this Agreement will be construed to limit or otherwise affect in any manner whatsoever the right or power of Assignor (or any Affiliate) to terminate Assignee's employment or service relationship with Assignor (or any Affiliate) at any time for any reason or no reason, with or without cause.

**5.    RIGHTS AS OWNER OF TOKEN INTERESTS AND TOKENS.** The Token Interests do not, and the Tokens will not following the Token Launch, entitle Assignee to vote or receive dividends or be deemed the holder of equity of Assignor or the Foundation for any purpose, nor will anything contained herein be construed to confer on the Assignee, as such, any of the rights of a stockholder of Assignor or the Foundation or any right to vote for the election of Assignor's Board or the Foundation's Board or upon any matter submitted to the stockholders of Assignor, Assignor's Board, Foundation's Board, or the council members of the Foundation, or at any meeting thereof, or to give or withhold consent to any corporate or foundation action or to receive notice of meetings, or to receive subscription rights or otherwise.

**6.    DISCLAIMER AND LIMITATION OF LIABILITY.** Neither the Assignor nor the Foundation shall be liable or responsible to the Assignee, nor be deemed to have defaulted under or breached this Agreement, for any failure or delay in fulfilling or performing any term of this Agreement, including without limitation, launching, developing and maintaining the Protocol and/or the Network, launching the Tokens, selling the Token Interests, sending the Tokens to the smart contract address compatible with receiving Tokens, or distributing the Tokens, when and to the extent such failure or delay is caused by or results from acts beyond the affected party's commercially reasonable control, including, without limitation: (a) acts of God; (b) flood, fire, earthquake, pandemic or explosion; (c) war, invasion, hostilities (whether war is declared or not), terrorist threats or acts, or other civil unrest; (d) applicable law or regulations; or (e) action by any governmental authority. NEITHER THE ASSIGNOR NOR THE FOUNDATION MAKE ANY

WARRANTY WHATSOEVER WITH RESPECT TO THE TOKENS, INCLUDING ANY (A) WARRANTY OF MERCHANTABILITY; (B) WARRANTY OF FITNESS FOR A PARTICULAR PURPOSE; (C) WARRANTY OF TITLE; OR (D) WARRANTY AGAINST INFRINGEMENT OF INTELLECTUAL PROPERTY RIGHTS OF A THIRD PARTY; WHETHER ARISING BY LAW, COURSE OF DEALING, COURSE OF PERFORMANCE, USAGE OF TRADE, OR OTHERWISE. EXCEPT AS EXPRESSLY SET FORTH HEREIN, ASSIGNEE ACKNOWLEDGES THAT IT HAS NOT RELIED UPON ANY REPRESENTATION OR WARRANTY MADE BY THE ASSIGNOR OR THE FOUNDATION, OR ANY OTHER PERSON ON THE ASSIGNOR OR THE FOUNDATION'S BEHALF.

The Assignee understands that Assignee has no right against the Assignor or the Foundation or any other individual or legal entity except in the event of the Assignor's or the Foundation's material breach of this instrument or intentional fraud. THE ASSIGNOR'S AND THE FOUNDATION'S (OR ANY OTHER INDIVIDUAL'S OR LEGAL ENTITY'S) AGGREGATE LIABILITY ARISING OUT OF OR RELATED TO THIS AGREEMENT, WHETHER ARISING OUT OF OR RELATED TO BREACH OF CONTRACT, TORT OR OTHERWISE, SHALL NOT EXCEED US$1,000.00. NEITHER THE ASSIGNOR, THE FOUNDATION NOR THEIR REPRESENTATIVES SHALL BE LIABLE FOR CONSEQUENTIAL, INDIRECT, INCIDENTAL, SPECIAL, EXEMPLARY, PUNITIVE OR ENHANCED DAMAGES, LOST PROFITS OR REVENUES OR DIMINUTION IN VALUE, ARISING OUT OF OR RELATING TO ANY BREACH OF THIS INSTRUMENT.

7. **TAX CONSEQUENCES**. ASSIGNEE UNDERSTANDS THAT ASSIGNEE MAY SUFFER ADVERSE TAX CONSEQUENCES AS A RESULT OF ASSIGNEE'S RECEIPT, VESTING OR DISPOSITION OF ASSIGNOR'S RIGHTS UNDER THE TSA. ASSIGNEE REPRESENTS (a) THAT ASSIGNEE HAS CONSULTED WITH A TAX ADVISER THAT ASSIGNEE DEEMS ADVISABLE IN CONNECTION WITH THE RECEIPT, VESTING, AND DISPOSITION OF ASSIGNOR'S RIGHTS UNDER THE TSA, AND (b) THAT ASSIGNEE IS NOT RELYING ON ASSIGNOR, THE FOUNDATION, OR ANY AGENTS, REPRESENTATIVES, OR ADVISORS OF EITHER ASSIGNOR OR FOUNDATION FOR ANY TAX ADVICE. Assignee has been informed that unless Assignee files with the Internal Revenue Service (and, if necessary, the proper state taxing authorities) within 30 days after the Effective Date, electing pursuant to Section 83(b) of the Internal Revenue Code (and similar state tax provisions, if applicable) to be taxed currently on any difference between the fair market value of the Token Interests on the date of grant and the amount paid by the Assignee, there may be a recognition of taxable income to Assignee at each time the Repurchase Option lapses with respect to a portion of the Restricted Tokens, measured by the excess, if any, of the fair market value of such portion of the Restricted Tokens over the amount paid by the Assignor allocable to such portion of the Restricted Tokens. Assignee represents that Assignee has consulted any tax advisors Assignee deems advisable in connection with Assignee's receipt of Assignor's rights under the TSA and the filing of the election under Section 83(b) and similar tax provisions. A form of Election under Section 83(b) is attached hereto as Exhibit A for reference. ASSIGNEE HEREBY ASSUMES ALL RESPONSIBILITY FOR FILING SUCH ELECTION AND PAYING ANY TAXES RESULTING FROM SUCH ELECTION OR FROM FAILURE TO FILE THE ELECTION AND PAYING TAXES RESULTING FROM THE LAPSE OF THE REPURCHASE RESTRICTIONS ON THE UNVESTED TOKENS.

DocuSign Envelope ID: 3F733C5B0-5CA0-46B4-895F-511E6G3RA1D0

THE FAIR MARKET VALUE OF ASSIGNOR'S RIGHTS UNDER THE TSA HAS BEEN DETERMINED IN GOOD FAITH IN ACCORDANCE WITH A VALUATION REPORT RECEIVED BY THE FOUNDATION AND SHARED WITH ASSIGNOR, A COPY OF WHICH IS AVAILABLE TO ASSIGNEE UPON REQUEST. THERE IS NO GUARANTEE THAT SUCH DETERMINATION OF FAIR MARKET VALUE WILL NECESSARILY REFLECT OR EQUAL ANY DETERMINATION OF FAIR MARKET VALUE BY A TAXING AUTHORITY (SUCH AS THE INTERNAL REVENUE SERVICE). ASSIGNEE AGREES TO BE FULLY RESPONSIBLE FOR ANY TAXES RESULTING FROM THE RECEIPT, VESTING AND DISPOSITION OF ASSIGNOR'S RIGHTS UNDER THE TSA, INCLUDING ANY ADDITIONAL TAXES RESULTING FROM A DIFFERENT DETERMINATION OF FAIR MARKET VALUE.

8.    **MISCELLANEOUS**.

8.1    **Notices**. All notices and other communications given or made pursuant to this Agreement shall be in writing and shall be deemed effectively given upon the earlier of actual receipt, or (a) personal delivery to the party to be notified, or (b) when sent, if sent by electronic mail or facsimile during normal business hours of the Assignor, and if not sent during normal business hours, then on the Assignor's next Business day, or (c) three (3) Business Days after deposit in the United States mail by certified mail (return receipt requested) for United States deliveries. All notices for delivery outside the United States will be sent by express courier. All notices for delivery will be sent by express courier. All notices not delivered personally will be sent with postage and/or other charges prepaid and properly addressed to the party to be notified at the address set forth below the signature lines of this Agreement or at such other address as such other party may designate by one of the indicated means of notice herein to the other party hereto. A "**_Business day_**" shall be a day, other than Saturday or Sunday, when the banks in the Republic of Panama are open for business.

8.2    **Governing Law.** This Agreement will be governed by and construed in accordance with the laws of the jurisdiction set forth in the TSA, without giving effect to that body of laws pertaining to conflict of laws.

8.3    **Binding Effect**. This Agreement shall be binding upon, inure to the benefit of, and be enforceable by the parties hereto and their respective successors and assigns.

8.4    **Entire Agreement**. This Agreement and the TSA constitute the entire agreement and understanding of the parties with respect to the subject matter hereof and supersede all prior understandings and agreements, whether oral or written, between or among the parties hereto with respect to the specific subject matter hereof.

8.5    **Further Assurances**. Assignee agrees to execute and deliver such additional documents, instruments, conveyances and assurances and take such further actions as may be reasonably requested to give effect to the transactions contemplated hereby, including without limitation to enable the Foundation and the Assignor to comply with applicable laws and any other documents that (1) other unaffiliated purchasers of Tokens shall be required to execute and deliver, or (2) are requested by any digital asset exchanges or markets (including any specific or additional lock-up agreements or terms in connection with a listing or sale of Tokens).

**8.6**    **Counterparts; Facsimile Signatures.** This Agreement may be executed in any number of counterparts, each of which will be deemed an original, and all of which together shall constitute one and the same agreement. This Agreement may be executed and delivered by facsimile or other means of electronic delivery and upon such delivery the facsimile signature will be deemed to have the same effect as if the original signature had been delivered to the other party.

[SIGNATURE PAGE FOLLOWS]

**IN WITNESS WHEREOF**, the parties hereto, being authorized to do so and intending to be legally bound hereby, have duly executed and entered into this Agreement on the date first set forth above.

**ASSIGNOR:**

NEON MACHINE, INC.

By: _____

Name: ___Mark Long_____

Title: ___CEO_____

**IN WITNESS WHEREOF**, the parties hereto, being authorized to do so and intending to be legally bound hereby, have duly executed and entered into this Agreement on the date first set forth above.

**ASSIGNEE:**

DocuSigned by:

*Cort Javarone*

066C102172D3417

Name: Cort Javarone

| Number of SHRAP Tokens | Price per Token | Vesting Commencement Date |
|---|---|---|
| 1,000,000 | $0.00002616 | November 08, 2021 |

**IN WITNESS WHEREOF**, the parties hereto, being authorized to do so and intending to be legally bound hereby, have duly executed and entered into this Agreement on the date first set forth above.

**FOUNDATION:**

ARGON PROTOCOL FOUNDATION

DocuSigned by:

*Diana Muñoz*

By: _____
1F2ADEB61CF54CD...

Name: Diana Muñoz

Title: Director

DocuSign Envelope ID: 3F333C5B0-5CA0-46B4-895F-511E6G3RA1D0

## EXHIBIT A

## ELECTION UNDER SECTION 83(b) OF THE
## INTERNAL REVENUE CODE

The undersigned Taxpayer hereby elects, pursuant to Section 83(b) of the Internal Revenue Code, as amended, to include in gross income for the Taxpayer's current taxable year the excess, if any, of the fair market value of the property described below at the time of transfer over the amount paid for such property, as compensation for services.

1.    TAXPAYER'S NAME:    _____

       TAXPAYER'S ADDRESS:    _____

       SOCIAL SECURITY NUMBER:    _____

2.    The property with respect to which the election is made is described as follows:  the right to receive from Argon Protocol Foundation, a Republic of Panama foundation (the "**Foundation**") [_____] SHRAP Tokens of the Foundation (the "***Tokens***").

3.    The date on which the right to receive the Tokens was transferred was [_____], 2021 and this election is made for calendar year 2021.

4.    The Tokens are subject to the following restrictions:  The Foundation may repurchase all or a portion of the Tokens at $[_____] per Token under certain conditions at the time of Taxpayer's termination of employment or services.

5.    The fair market value of the right to receive the Tokens (without regard to restrictions other than restrictions which by their terms will never lapse) was $[_____] per Token at the time of transfer.

6.    The amount paid for the right to receive the Tokens was $[_____] per Token.

7.    The Taxpayer has submitted a copy of this statement to the Foundation.

*THIS ELECTION MUST BE FILED WITH THE INTERNAL REVENUE SERVICE ("**IRS**"), AT THE OFFICE WHERE THE TAXPAYER FILES ANNUAL INCOME TAX RETURNS, <u>WITHIN 30 DAYS</u> AFTER THE DATE OF TRANSFER OF THE PROPERTY. THE ELECTION CANNOT BE REVOKED WITHOUT THE CONSENT OF THE IRS.*

Dated:    _____    _____
                                                                          Taxpayer's Signature

# EXHIBIT P

INTELLECTUAL PROPERTY SALE AGREEMENT

THIS INTELLECTUAL PROPERTY SALE AGREEMENT (this "Agreement") is entered into as of 01 October 2021 (the "Effective Date") between NEON Media LLC, a Washington limited liability company ("Seller"), and NEON Machine, Inc., a Delaware corporation ("Buyer").

RECITALS

WHEREAS, Seller has determined that it would be appropriate and desirable to separate the Shrapnel Business from Seller;

WHEREAS, in connection with the separation of the Shrapnel Business from Seller, Seller desires to sell, assign and otherwise transfer all assets relevant to the Shrapnel Business to Buyer (the "Sale");

WHEREAS, as part of such Sale, Seller desires to sell or otherwise transfer and assign certain Intellectual Property of the Seller associated with the Shrapnel Business prior to the Effective Date;

NOW, THEREFORE, in consideration of the foregoing and the mutual covenants and agreements set forth below, and other good and valuable consideration, the receipt and adequacy of which is hereby acknowledged, the parties hereby agree as follows:

AGREEMENT

1. DEFINITIONS

1.1 "Affiliate" of any specified Person means any other Person directly or indirectly "controlling," "controlled by," or "under common control with" (within the meaning of the Securities Act), such specified Person.

1.2 "Assigned Copyrights" means: (a) all Copyrights in and to the Assigned Technology and other copyrightable works identified in Exhibit A; (b) all renewals and extensions thereof; and (c) all rights with respect to such Copyrights.

1.3 "Assigned Intellectual Property" has the meaning set forth in Section 2.1 (Assigned Intellectual Property).

1.4 "Assigned Patents" means: (a) all Patents set forth on Exhibit A; (b) all inventions claimed or described in such Patents; (c) all divisions, renewals, reissues, continuations, extensions, and continuations-in-part of the foregoing Patents, (d) any Patents in the United States and anywhere else in the world and Patent applications that have been or may be granted or filed, respectively, with respect to those inventions, including without limitation all foreign Patents that may claim priority based on and correspond to the Patents listed in Exhibit A; and (e) all rights with respect to such Patents.

1.5   "Assigned Technology" means any and all portions of Corporation Technology: (a) used or held for use in the Shrapnel Business; (b) the Technology set forth on Exhibit A; and (c) all rights with respect to such Technology.

1.6   "Assigned Trademarks" means: (a) the Trademarks identified on Exhibit A; (b) all goodwill associated with the business related to such Trademarks; and (c) all rights with respect to such Trademarks.

1.7   "Copyrights" means: (a) any rights in original works of authorship fixed in any tangible medium of expression as set forth in 17 U.S.C. § 101 *et. seq.*; (b) all registrations and applications to register the foregoing anywhere in the world; (c) all foreign counterparts and analogous rights anywhere in the world; and (d) all rights in and to any of the foregoing.

1.8   "Corporation Technology" means any and all Technology that exists as of the Effective Date and that, immediately prior to the Effective Date, is owned by Seller.

1.9 "Intellectual Property" means all rights in Copyrights, Patents, Trademarks, Technology and any other proprietary rights relating to intangible property anywhere in the world, and all registrations and applications related to any of the foregoing and analogous rights thereto anywhere in the world.

1.10 "Patents" means: (a) patents and patent applications, worldwide, including all divisions, continuations, continuing prosecution applications, continuations in part, reissues, renewals, reexaminations, and extensions thereof and any counterparts worldwide claiming priority therefrom; utility models, design patents, patents of importation/confirmation, and certificates of invention and like statutory rights; and (b) all right in and to any of the foregoing.

1.11 "Person" means an individual, a partnership, a corporation, a limited liability company, an association, a joint stock company, a trust, a joint venture, an unincorporated organization and a governmental entity or any department, agency, or political subdivision thereof.

1.12 "Registered Intellectual Property" means Intellectual Property that is the subject of an application, certificate, filing, registration or other document issued by, filed with, or recorded by any governmental or quasi-governmental agency or non-governmental registrar (whether provisional, supplemental, or otherwise), anywhere in the world.

1.13 "Software" means computer programs and systems, whether embodied in software, firmware or otherwise, including, software compilations, software implementations of algorithms, software tool sets, compilers, and software models and methodologies (regardless of the stage of development or completion) including any and all: (a) media on which any of the foregoing is recorded; (b) forms in which any of the foregoing is embodied (whether in source code, object code, executable code or human readable form); and (c) translation, ported versions and modifications of any of the foregoing.



DocuSign Envelope ID: 744D4808-E144-45BA-BE82-43A132B48E97

1.14 "Shrapnel Business" means any assets that, immediately prior to the Effective Date, is identified as a product of the Seller's Shrapnel game or project.

1.15 "Technology" means any and all technical information, Software, specifications, drawings, records, documentation, works of authorship or other creative works, ideas, knowledge, know-how, trade secrets invention disclosures or other data including works subject to Copyrights.

1.16 "Trademarks" means: (a) trademarks, service marks, logos, trade dress and trade names, and domain names indicating the source of goods or services, and other indicia of commercial source or origin (whether registered, common law, statutory or otherwise); (b) all registrations and applications to register the foregoing anywhere in the world; (c) all goodwill associated therewith; and (e) all rights in and to any of the foregoing.

## 2.  SALE, ASSIGNMENT, AND TRANSFER OF INTELLECTUAL PROPERTY

2.1 Assigned Intellectual Property. In accordance with this Agreement, Seller hereby sells, assigns, conveys, transfers and agrees to deliver to Buyer, and Buyer hereby acquires from Seller, all right, title and interest in the United States and throughout the world of Seller in and to the following (collectively, the "Assigned Intellectual Property"):

(a) all Assigned Patents, Assigned Copyrights, Assigned Trademarks, and Assigned Technology including, without limitation, the Intellectual Property listed and described in Exhibit A, and all tangible embodiments of any of the foregoing, in any form and in any media, in the possession of Seller, or other Persons engaged or retained by Seller, subject to all licenses and covenants not to assert with respect to any of the foregoing entered into prior to the Effective Date;

(b) the exclusive right to grant licenses and rights under and with respect to any of the Intellectual Property referenced in Section 2.1(a), and to sue for any infringement occurring before or after the Effective Date as well as all statutory, contractual and other claims, demands, and causes of action for royalties, fees, or other income from, or infringement, misappropriation or violation of, any of the foregoing, and all of the proceeds from the foregoing that are accrued and unpaid as of, and/or accruing after, the Effective Date; and

(c) the exclusive right to apply for and obtain statutory rights and registrations with respect to any Intellectual Property referenced in Section 2.1(a), including without limitation any Intellectual Property: (i) conceived, developed or reduced to practice prior to the Effective Date solely by individuals who were Seller members or employees and become Buyer employees after the Effective Date, even if the applicable Buyer employment agreement is not signed by such individuals ("Transferred Employees"), and (ii) unless otherwise agreed by the parties, conceived, developed or reduced to practice solely by Transferred Employees after the Effective Date, in the United States and anywhere else in the world.

2.2 <u>Mandatory Laws</u>. If and to the extent that, as a matter of law in any jurisdiction, ownership, title, or any rights or interest in or to any of the Assigned Intellectual Property cannot be assigned as provided in Section 2.1 (Assigned Intellectual Property) (i) Seller irrevocably agrees to assign and transfer, and hereby assigns and transfers to Buyer all rights (including, without limitation, all economic and commercialization rights) that can be assigned pursuant to Section 2.1 (Assigned Intellectual Property) to the fullest extent permissible; and (ii) Seller irrevocably agrees to grant, and hereby grants, Buyer an unlimited, exclusive, irrevocable, worldwide, perpetual, royalty-free license to use, exploit and commercialize in any manner now known or in the future discovered and for whatever purpose, any rights to Assigned Intellectual Property that cannot be assigned as contemplated by Section 2.1 (Assigned Intellectual Property).

## 3. CONSIDERATION

In consideration for the sale, assignment, and transfer set forth in Article 2, Buyer shall pay Seller the sum of five hundred dollars ($500.00), payable no later than five (5) business days after this Agreement becomes effective.

## 4. NO REPRESENTATIONS OR WARRANTIES

BUYER ACKNOWLEDGES AND AGREES THAT: (A) NEITHER SELLER NOR ANY MEMBER OF SELLER IS MAKING IN THIS AGREEMENT (OR ANY OTHER AGREEMENT CONTEMPLATED BY THIS AGREEMENT OR OTHERWISE) ANY REPRESENTATIONS OR WARRANTIES, EXPRESS OR IMPLIED, AS TO THE CONDITION, QUALITY, MERCHANTABILITY OR FITNESS OF ANY ASSIGNED INTELLECTUAL PROPERTY; (B) ALL SUCH ASSIGNED INTELLECTUAL PROPERTY SHALL BE TRANSFERRED ON AN "AS IS," "WHERE IS" BASIS; AND (C) BUYER SHALL BEAR THE ECONOMIC AND LEGAL RISKS THAT ANY CONVEYANCE SHALL PROVE TO BE INSUFFICIENT TO VEST IN IT OR THEM GOOD AND MARKETABLE TITLE, FREE AND CLEAR OF ANY SECURITY INTEREST, PLEDGE, LIEN, CHARGE, CLAIM OR OTHER ENCUMBRANCE OF ANY NATURE WHATSOEVER.

## 5. MISCELLANEOUS

5.1 <u>Governing Law</u>. The internal laws of the State of Delaware (without reference to its principles of conflicts of law) govern the construction, interpretation and other matters arising out of or in connection with this Agreement and its exhibits and schedules (whether arising in contract, tort, equity or otherwise).

5.2 <u>Jurisdiction</u>. If any Dispute arises out of or in connection with this Agreement, except as expressly contemplated by another provision of this Agreement, the parties irrevocably: (a) consent and submit to the exclusive jurisdiction of federal and state courts located in Delaware; (b) waive any objection to that choice of forum based on venue or to the effect that the forum is not convenient; and (c) WAIVE TO THE FULLEST EXTENT PERMITTED BY LAW ANY RIGHT TO TRIAL OR ADJUDICATION BY JURY.



5.3 <u>Dispute Resolution</u>.

(a) *Amicable Resolution* –

(i) Seller and Buyer mutually desire that friendly collaboration will continue between them. Accordingly, they will try, and will cause their respective members to try, to resolve in an amicable manner all disagreements and misunderstandings connected with their respective rights and obligations under this Agreement, including any amendments hereto or thereto. In furtherance thereof, in the event of any dispute or disagreement (a "<u>Dispute</u>") between Seller and Buyer as to the interpretation of any provision of this Agreement (or the performance of obligations hereunder), the matter, upon written request of either party, will be referred for resolution to a steering committee established pursuant to this <u>Section 5.3(a)</u> (Amicable Resolution) (the "<u>Steering Committee</u>"). The Steering Committee will have eight (8) members, four (4) of whom will be appointed by Seller and four (4) of whom will be appointed by Buyer. Each of Seller and Buyer will use its good faith efforts to avoid replacing the initial members of the Steering Committee for the first year after the Effective Date. Thereafter, Seller and Buyer will, to the extent practicable, honor the other party's reasonable objections to any replacements of Steering Committee members. While any person is serving as a member of the Steering Committee, such person may not designate any substitute or proxy for purposes of attending or voting at a Steering Committee meeting. The Steering Committee will make a good faith effort to promptly resolve all Disputes referred to it. Steering Committee decisions made with the consent of at least three (3) Buyer members and at least three (3) Seller members will be binding on Seller and Buyer. If the Steering Committee does not agree to a resolution of a Dispute within thirty (30) days after the reference of the matter to it, each of Seller and Buyer will be free to exercise the remedies available to it under applicable law, subject to <u>Section 5.3(b)</u> (Mediation and Alternate Dispute Resolution). Notwithstanding anything to the contrary in this <u>Section 5</u>(Miscellaneous), any amendment to the terms of this Agreement may only be effected in accordance with <u>Section 5.10</u> (Amendment).

(ii) Between the Effective Date and the first anniversary of the Effective Date, the Steering Committee will hold meetings every six (6) weeks on dates established at the organizational meeting of the Steering promptly as practicable after the Effective Date. Such meeting dates may be rescheduled by the Steering Committee if it becomes reasonably impracticable to hold such a meeting. After the first anniversary of the Effective Date, the Steering Committee will hold regularly scheduled meetings as determined by the Steering Committee.

(b) *Mediation and Alternate Dispute Resolution* – In the event any Dispute cannot be resolved in a friendly manner as set forth in <u>Section 5.3(a)</u> (Amicable Resolution), the parties intend that such Dispute be resolved by an alternative dispute resolution process ("<u>ADR</u>"). If the Steering Committee is unable to resolve the Dispute as contemplated by <u>Section 5.3(a)</u> (Amicable Resolution), either Seller or Buyer may demand mediation of the Dispute by written notice to the other, in which case the two parties will select a mediator within ten (10) days after the demand. Neither party may unreasonably withhold consent to the selection of the mediator. The parties may agree to replace mediation with some other form of non-binding ADR such as neutral fact finding or mini-trial. The use of any ADR procedures will not be construed

under the doctrines of laches, waiver or estoppel to affect adversely the rights of either party. Each of Seller and Buyer will bear its own costs of mediation or other form of ADR, but both parties will share the costs of the mediator or other arbiter equally.

(c) *Non-Exclusive Remedy* – Nothing in this Section 5.3 (Dispute Resolution) will prevent either Seller or Buyer from commencing formal litigation proceedings or seeking injunctive or similar relief if: (i) the Dispute has not been resolved within forty-five (45) days after commencement of the applicable ADR process; or (ii) any delay resulting from efforts to mediate such Dispute could result in serious and irreparable injury to either Seller or Buyer.

(d) *Commencement of Dispute Resolution Procedure* – Notwithstanding anything to the contrary in this Agreement, Seller and Buyer are the only parties entitled to commence a dispute resolution procedure under this Agreement, whether pursuant to this Section 5.3 (Dispute Resolution) or otherwise, and each party will cause its respective members not to commence any dispute resolution procedure other than through such party as provided in this Section 5.3(d).

5.4 Notices. Each party giving any notice required or permitted under this Agreement will give the notice in writing and use one of the following methods of delivery to the party to be notified, at the address set forth below or another address of which the sending party has been notified in accordance with this Section 5.1 (Notices): (a) personal delivery; (b) facsimile, email, or telecopy transmission with a reasonable method of confirming transmission; (c) commercial overnight courier with a reasonable method of confirming delivery; or (d) pre-paid, United States of America certified or registered mail, return receipt requested. Notice to a party is effective for purposes of this Agreement only if given as provided in this Section 5.4 (Notices) and shall be deemed given on the date that the intended addressee actually receives the notice.

If to Seller:

NEON Media LLC
1700 Westlake Ave N #200
Seattle, WA 98109
Attention: Chief Financial Officer

If to Buyer:

NEON Machine Inc.
1700 Westlake Ave N #200
Seattle, WA 98109
Attention: Chief Financial Officer

5.5 Binding Effect and Assignment. This Agreement binds and benefits the parties and their respective successors and assigns, neither party may assign any of its rights or delegate any of its obligations under this Agreement without the written consent of the other party which consent may be withheld in its sole and absolute discretion and any assignment or attempted assignment

in violation of the foregoing will be null and void. Notwithstanding the preceding sentence, Seller may assign this Agreement in connection with a merger transaction in which Seller is not the surviving entity or the sale of all or substantially all of its assets.

5.6 <u>Severability</u>. If any provision of this Agreement is determined to be invalid, illegal or unenforceable, the remaining provisions of this Agreement will remain in full force, if the essential terms and conditions of this Agreement for each party remain valid, binding and enforceable.

5.7 <u>Entire Agreement</u>. This Agreement constitutes the final agreement between the parties, and is the complete and exclusive statement of the parties' agreement on the matters contained herein and therein. All prior and contemporaneous negotiations and agreements between the parties with respect to the matters contained in this Agreement are superseded by this Agreement.

5.8 <u>Counterparts</u>. The parties may execute this Agreement in multiple counterparts, each of which constitutes an original as against the party that signed it, and all of which together constitute one agreement. The signatures of both parties need not appear on the same counterpart. The delivery of signed counterparts by facsimile or email transmission that includes a copy of the sending party's signature is as effective as signing and delivering the counterpart in person.

5.9  <u>Expenses</u>. Except as otherwise provided in this Agreement, any of the other Ancillary Agreements or any other agreement between the parties contemplated hereby, all costs, fees and expenses of either party in connection with the transactions contemplated by this Agreement will be paid by the party that incurs such costs and expenses.

5.10 <u>Amendment</u>. The parties may amend this Agreement only by a written agreement signed by each party to be bound by the amendment and that identifies itself as an amendment to this Agreement.

5.11 <u>Waiver</u>. The parties may waive a provision of this Agreement only by a writing signed by the party intended to be bound by the waiver. A party is not prevented from enforcing any right, remedy or condition in the party's favor because of any failure or delay in exercising any right or remedy or in requiring satisfaction of any condition, except to the extent that the party specifically waives the same in writing. A written waiver given for one matter or occasion is effective only in that instance and only for the purpose stated. A waiver once given is not to be construed as a waiver for any other matter or occasion. Any enumeration of a party's rights and remedies in this Agreement is not intended to be exclusive, and a party's rights and remedies are intended to be cumulative to the extent permitted by law and include any rights and remedies authorized in law or in equity.

5.12 <u>Authority</u>. Each of the parties hereto represents to the other that: (a) it has the corporate or other requisite power and authority to execute, deliver and perform this Agreement, (b) the execution, delivery and performance of this Agreement has been duly authorized by all necessary corporate or other action, (c) it has duly and validly executed and delivered this

Agreement, and (d) this Agreement is a legal, valid and binding obligation, enforceable against it and its Affiliates in accordance with its terms, subject to applicable bankruptcy, insolvency, reorganization, moratorium or other similar laws affecting creditors' rights generally and general equity principles.

5.13  <u>Construction of Agreement</u>.

(a) Where this Agreement states that a party "will" or "shall" perform in some manner or otherwise act or omit to act, it means that the party is legally obligated to do so in accordance with this Agreement.

(b) The captions, titles and headings, and table of contents, included in this Agreement are for convenience only, and do not affect this Agreement's construction or interpretation. When a reference is made in this Agreement to an Article or a Section, exhibit or schedule, such reference will be to an Article or Section of, or an exhibit or schedule to, this Agreement unless otherwise indicated.

(c) This Agreement is for the sole benefit of the parties hereto and does not, and is not intended to, confer any rights or remedies in favor of any Person (including any employee or stockholder of Seller or Buyer) other than the parties signing this Agreement.

(d) The words "<u>including</u>," "<u>includes</u>," or "<u>include</u>" are to be read as listing non-exclusive examples of the matters referred to, whether or not words such as "<u>without limitation</u>" or "<u>but not limited to</u>" are used in each instance.

(e) Any reference in this Agreement to the singular includes the plural where appropriate. Any reference in this Agreement to the masculine, feminine or neuter gender includes the other genders where appropriate. For purposes of this Agreement, after the Effective Date, the Shrapnel Business will be deemed to be the business of Buyer.

(f) Unless otherwise expressly specified, all references in this Agreement or any Ancillary Agreement to "<u>dollars</u>" or "<u>$</u>" means United States Dollars. If any payment required to be made hereunder is denominated in a currency other than United States Dollars, such payment will be made in United States Dollars and the amount thereof will be computed using Seller's P&L rate for the current month.

5.14 <u>Performance</u>. Seller shall cause to be performed, and hereby guarantees the performance of, all actions, agreements and obligations set forth in this Agreement to be performed by any member of the Seller. Buyer shall cause to be performed, and hereby guarantees the performance of, all actions, agreements and obligations set forth in this Agreement. Each party further agrees that it will cause its other members not to take any action or fail to take any action inconsistent with such party's obligations under this Agreement or the transactions contemplated hereby. Without limiting the foregoing or anything else in this Agreement, the parties shall cause each member to make such assignments or transfers (or take

such other action) as may be necessary to make effective the assignments and transfers under this
Agreement.

**[Signature Page Follows]**



IN WITNESS WHEREOF, each of the parties has caused this Agreement to be executed on its behalf by a duly authorized officer on the day and year first above written.

NEON Media LLC                              NEON Machine Inc.

By: _Cort Javarone_____          By: _Mark Long_____
    96394AC10B4C4B1...                          1D5E638F6782431...

Name:  Cort Javarone                        Name: Mark Long
Title:    Manager                           Title:   Chief Executive Officer
Date:   01 October 2021                     Date:   01 October 2021

DocuSign Envelope ID: 744D4308-E144-45BA-BF82-43A132B48E97

# EXHIBIT A

1.2: Assigned Copyrights

All works related to the Shrapnel game and project, including without limitation the first-person shooter game, the SHRAP token, and any other crypto assets.

1.4: Assigned Patents

None

1.5: Assigned Technology

All technical information and documentation related to the Shrapnel game and project, including without limitation the first-person shooter game and the SHRAP token.

1.6: Assigned Trademarks

SHRAPNEL (Serial No. 90730320)

Domain at: www.shrapnel.com




Exhibit Q

**NEON MEDIA, LLC**
**MEMBERSHIP AGREEMENT**
<span style="color:red">**MARK LONG**</span>

This MEMBERSHIP AGREEMENT dated July 23, 2020 is made by and between NEON MEDIA LLC, a Washington limited liability company ("the Company"), and Mark Long, an individual (the "Member").

The Member and Company make reference to that certain Amended and Restated Operating Agreement of concurrent date of the Company ("Operating Agreement"). The Company has granted to Member the number of Units in Company set forth on Attachment A ("Member Units"). Company continues to employ Member in the capacity shown on Attachment B as an employee for hire. The Member Units were granted to Member as contingent incentive compensation subject to the terms of this Agreement.

THEREFORE, as a condition of and in consideration of the Company's employment or continuation of employment of the Terms, and the compensation now and hereafter paid to Member including the Units, Member and Company agree as follows:

1. Certain Definitions.  For purposes of this Agreement, the terms defined below have the meanings indicated.

1.1 "Affiliate".  "Affiliate" means and includes  any series limited liability company, corporation, partnership, joint venture, association or other entity in which the Company owns or comes to own more than twenty percent of the voting stock or other ownership interest or which owns at any relevant time twenty percent or more of the Company's outstanding Units.

1.2 "Confidential Information and Materials".  "Confidential Information and Materials" means and includes the following:

All past, present or future trade secrets, confidential data or knowledge or other proprietary information and materials of the Company relating to:  financial and operating data, marketing data, products, processes, know how, computer programming and code, programming tools, methods and techniques, game concepts, layouts, story boards, game designs, documents, files, electronically recordable data or concepts, data bases, inventions, improvements, developmental or experimental work, business plans, compilations of information, records and specifications, existing and potential customer lists, information regarding the Company's existing and potential joint venture partners, licensees, licensors, vendors, suppliers and distributors and the terms of any agreements with such persons, costs of materials, prices the Company obtains or has obtained its supplies and services or at which it sells, has sold or intends to sell its products or services, information regarding the Company's financial condition, compensation paid to the Company's consultants and employees and

DocuSign Envelope ID: 12B9765A-2B33-4941-82A8-61B3F3F3A063

other terms of employment, and any of the foregoing that may have been or may be conceived, originated, discovered or developed by the Company or the Employee or any other employees or consultants of the Company while employed or engaged by the Company or on the basis of or using any Confidential Information and Materials.

All Confidential Information and Materials are the property of the Company and held in strict confidence by the Company.  Nevertheless, "Confidential Information and Materials" excludes any of the foregoing that the Member can demonstrate has entered the public domain through no fault of the Member or that an authorized senior executive officer of the Company has authorized for public dissemination.

2. Vesting Of Units/Restrictions On Transfer.

2.1 Vesting Of Units. The Units were granted to Member based on his or her expected continued employment by Company for a minimum of three years.  Should Member's employment by Company terminate on or before the following dates, then the following number of Member Units will be terminated and returned to the Company: (a) [all] Units if employment terminated on or before July 20, 2021; (b) [2/3] Units if employment terminated on or before July 20, 2022; and (c) [1/3] Units if employment terminated on or before July 20. 2023.

2.2.    Restrictions On Transfer. Member acknowledges that he has read Paragraph 9 of the Operating Agreement and the restrictions on Transfer of his Units as therein set forth. As a result, Member acknowledges and agrees that he cannot Transfer any of his Units without the consent of the Company and must Transfer his Units in connection with a Sale of Control at the request of the Manager. In consideration of this Agreement, all Units of Member still employed by the Company shall vest in the event of a Sale of Control irrespective of Member's expected continued employment by Company following the Sale of Control.

3.    Nondisclosure, Competition, Solicitation, Property.

1.1    3.1 Nondisclosure.  Member will at all times, whether during or after his or her employment, hold in strict confidence all Confidential Information and Materials.  Member represents, warrants and agrees that, except as permitted with the written authorization of a senior executive officer of the Company, he or she will not at any time, whether during or after his or her employment by the Company, directly or indirectly, use, permit or assist others to use, or disclose or communicate to any person or entity, any of the Confidential Information and Materials.  Notwithstanding the foregoing, Member may use Confidential Information and Materials solely for the benefit of the Company as required in the course of performing his or her duties for the Company and as directed by the Company.

3.2 Non-Competition During Employment.  Member acknowledges and agrees that, as

DocuSign Envelope ID: 12B9735A-2B33-4941-82A8-61B3F3F34053

an employee of the Company he or she has or will participate in important aspects of the Company's research, development, creative work, planning, operations and other activities, and that the conduct by the Member of any business or activity directly or indirectly competing with the Company's business necessarily would constitute trading on the Company's good will and reputation developed through the Company's expenditure of very substantial efforts and funds, would involve the use by the Member of Confidential Information and Materials and would unreasonably and unfairly impair or interfere with the Company's ability to conduct its business profitably and maintain its existing and prospective relationships.  Member therefore agrees that he or she will not at any time during his or her employment with the Company, engage in any activity that competes with or is directly related to the business of the Company, and will not directly or indirectly own an interest in, join, operate, or participate in or be connected with, in any manner whatsoever, any person or entity engaged in developing, producing, designing, selling, distributing or marketing products or services that compete with the Company's products, services or other business, in any markets in which the Company does business or contemplates doing business.

3.3  <u>No Solicitation.</u>  As further protection for the Confidential Information and Materials, Member agrees that he or she will not at any time during his or her employment with the Company, (i) directly or indirectly, and whether or not for compensation, solicit, take away, or divert or attempt to solicit, take away, or divert from the Company any customer or client or any business in which the Company is engaged or contemplates engaging, or assist any person or entity to do so, or (ii) solicit or induce or attempt to solicit or induce any employee or consultant of the Company to leave the Company's employ, or assist any person or entity to do so.

3.4  <u>Property</u>.  Member agrees that he or she will not make or retain any originals, copies or reproductions of or excerpts from any of the Confidential Information and Materials for his or her use or the use of others and, on request by the Company or on termination of the Member's employment with the Company, Member will deliver to the Company all tangible property that is or embodies any of the Confidential Information and Materials, whether prepared or developed by or with the assistance of the Member or otherwise coming into his or her possession, control or knowledge.

3.5  <u>Legal Duties</u>.  Member acknowledges and agrees that his or her agreements herein are intended to implement the Member's duties under Federal and state laws and that this Agreement shall not be interpreted or construed as limiting Member's obligations or the Company's rights under any of such laws.

3.5  <u>Nondisclosure to the Company</u>.  Member further represents and warrants that Member has not disclosed and will not disclose to the Company or any Affiliate any trade secrets or other proprietary or confidential information of any previous employer or any other person or entity that may not lawfully be so disclosed by Member.

4.  <u>Inventions, Designs and Patents</u>.

4.1 <u>Disclosure and Assignment of Inventions</u>.  Member agrees that he or she will promptly and fully disclose to the Company, and the Company agrees to keep confidential, all inventions, designs, creations, processes, technical or other developments, improvements, ideas and discoveries and other works of original authorship (collectively, "Inventions"), whether patentable or not, of which Member obtains knowledge or information during his or her employment with the Company and for a period of one year thereafter and which relate to the existing or contemplated products, services or business of or to any research or experimental, developmental or creative work carried on or contemplated by the Company, whether or not conceived, originated, made, developed or reduced to practice by Member alone or with others during regular working hours or at other times. All Inventions are and shall remain the exclusive property of the Company.  Member agrees that (i) all Inventions are "works made for hire" (as such term is defined in the United States Copyright Act); and (ii) he or she will assign, and hereby does assign, to the Company or its designee, all of Member's right, title and interest in and to all Inventions, whether patentable or not, conceived, originated, made, developed or reduced to practice by Member, alone or with others, during the term of his or her employment with the Company.

4.2 <u>Cooperation</u>.  Member agrees to assist the Company to obtain any and all United States or foreign patents, copyrights, trademarks and service marks relating to Inventions and to execute all documents and do all things necessary to obtain letters patent and copyright, trademark and service mark registrations therefor, to vest the Company or its designee with full and exclusive title thereto and to protect the same against infringement by others, all as and to the extent the Company may request and at the Company's expense, for no consideration to the Member other than the Employee's salary or wages.

4.3 <u>Exceptions</u>.  Member has listed on the Attachment to this Agreement, which the Company agrees to keep confidential, all unpatented Inventions owned, conceived, originated, made, developed or reduced to practice by the Employee prior to the Employee's employment with the Company.

5. <u>Injunctive Relief</u>.  Member acknowledges and agrees that his or her failure to perform any of his or her covenants in this Agreement would cause irreparable injury to the Company and cause damages to the Company, which would be difficult or impossible to ascertain or quantify.  Accordingly, without limiting any remedies that may be available with respect to any breach of this Agreement, Member consents to the entry of an injunction to restrain any breach of this Agreement by Member.

6. <u>Trade Secrets of Third Parties</u>.  Member acknowledges and understands that, in dealing with existing and potential Affiliates, suppliers, contracting parties and other third parties with which the Company has business relations or potential business relations, the Company frequently receives confidential and proprietary information and materials from such third parties subject to the Company's understanding that the Company will maintain the

confidentiality thereof and will require its employees and consultants to do so. Member agrees to treat all such information and materials as Confidential Information and Materials subject to this Agreement.

7. <u>Severability</u>. The invalidity or unenforceable of any provision, word, phrase, clause, sentence, paragraph or section hereof shall in no way affect the validity or enforceability of any other provision, word, phrase, clause, sentence, paragraph or section hereof, and any such invalid or unenforceable provision that is overbroad in scope, duration or coverage, shall be deemed narrowed to the broadest term permitted by applicable law and shall be enforced as narrowed.

8. <u>Attorneys' Fees</u>. If suit is brought to enforce or interpret this Agreement, the prevailing party shall be entitled to recover as an element of costs of suit, and not as damages, reasonable attorneys' fees and expenses and all expert witness fees and expenses incurred by the prevailing party. In such event, the "prevailing party" shall be the party that is entitled to recover costs of suit, whether or not the suit proceeds to final judgment, the party not entitled to recover costs shall not recover attorneys' or expert witness fees or expenses and no sum for attorneys' and expert witness fees and expenses shall be counted in calculating the amount of a judgment for purposes of determining whether a party is entitled to recover costs or attorneys' or expert witness fees or expenses.

9. <u>Successors</u>. This Agreement shall inure to the benefit of and bind the Company and the Employee, and their respective successors, assigns, heirs, legatees, devisees and personal representatives.

10. <u>Entire Agreement</u>. This Agreement contains the entire agreement of the Company and the Employee and supersedes all prior negotiations, oral or written representations or covenants, correspondence, understandings and agreements between them, with respect to the subject matter hereof. This Agreement may amended or modified only by a contract in writing executed by Company and Member.

11. <u>Survival</u>. All agreements, representations, warranties and acknowledgments herein shall survive any termination of the Member's employment with the Company for any reason.

12. <u>The Company's Right to Terminate</u>. Nothing contained herein shall be interpreted to impair or otherwise affect the right and power of the Company to terminate its employment of Member.

13. <u>Member's Right to Terminate.</u>  Member may terminate this agreement with two (2) weeks advance notice to a Company officer. If Member terminates this Agreement prior to completion of the project for which he or she was hired, Member will reimburse Company for any costs associated with hiring Member, for example, moving costs or employment costs (headhunter or lawyer for visas etc).

 MEMBER HEREBY WARRANTS AND ACKNOWLEDGES THAT HE OR SHE HAS CAREFULLY READ AND UNDERSTANDS ALL OF THE PROVISIONS OF THIS AGREEMENT.

NEON MEDIA LLC

By _____
      332DD528E94F40A...

Its _Manager_____

MEMBER

(Print Name): **Mark Long**

Address: _2701 Franklin Ave E_
_Seattle WA 98102_____
_____
_____

Date: _7/23/2020_____

ATTACHMENT A
TO
MEMBERSHIP AGREEMENT

The undersigned MEMBER has been granted and is the owner of **254** Units of the Company.

Member certifies that he or she owns only the interest indicated below in the inventions, designs,

processes, technical or other developments, improvements, ideas and discoveries, as

contemplated by Section 3.3 of this Agreement:

MEMBER: 

(Print Name): **Mark Long**

Date: 7/23/2020

**Property**:
*Blacklight Retribution* a game by Zombie Studios, comic by Mark Long, screenplay by
Jason Dean Hall, produced by Mark Long.
**Acquired rights:**
Digital Feature by Legendary Television

**Property**:
*Imperial Messenger* a screenplay by Mark Long, story by Mark Long & Allison Shrapker,
produced by Mark Long.
**Acquired rights:**
Feature Film by Legendary Pictures

**Property**:
*Rubicon* an original graphic novel by Mark Long, story by Christopher McQuarrie.
**Acquired rights:**
Graphic Novel by Archaia Comics

**Property**:
*The Silence of Our Friends* an original graphic novel by Mark Long, Nate Powell, & Jim
Demonakos.
**Acquired rights:**
Graphic Novel by First Second, a division of Holtzbrinck

DocuSign Envelope ID: 12B9755A-2B33-4941-92A8-61B3F3F34053

**Property**:
*Aperture* a screenplay by Mark Long, produced by Mark Long.

**Property**:
*The Killionaires* a novel by Mark Long, produced by Mark Long.

ATTACHMENT B
TO
MEMBERSHIP AGREEMENT


**Member's Duties:**  Member will fulfill duties as **CEO**.


**Compensation:**  Member will be compensated at an annual salary of **$200,000 (two hundred thousand dollars)**.  Employment to commence on 27 July 2020.  Member's compensation package will include Company's health insurance plan if any (subject to your acceptance by the Insurance Company) which includes medical, dental, vision, prescription, and life insurance coverages. Three weeks of paid vacation in a year pro-rated for a partial calendar year worked. Company policies regarding vacation are detailed in the Company's employee handbook.)




                                                        :

NEON MEDIA LLC

By _____        _____
         332BB528E94F40A...                    1D5E638F6782431...

Its _____        MEMBER
         Manager                      (Print Name): **NAME**

                                      Address:  2701 Franklin Ave E
                                                Seattle WA 98102
                                      _____
                                      _____

                                      Date:  7/23/2020
                                             _____

Exhibit R

## UNIT FORFEITURE AGREEMENT

This Unit Forfeiture Agreement (this "*Agreement*") is made by and between The 4D Factory LLC, a Wyoming limited liability company (the "*Company*"), and the individual (the "*Unit Holder*") whose name is set forth on the signature page attached here to (the "*Signature Page*"), effective as of the date set forth on the Signature Page as the "Date of Forfeiture." As used herein, "Party" refers individually to Unit Holder or Company and "Parties" refers to Unit Holder and Company collectively.

## RECITALS

**WHEREAS**, the Company has previously granted to the Unit Holder membership units in the Company (the "*Units*");

**WHEREAS**, the Unit Holder believes it to be in the Unit Holder's best interest and in the best interest of the Company and its members for the Unit Holder to voluntarily surrender and cancel certain outstanding Units that the Unit Holder presently holds, as identified on the Signature Page (the "*Forfeited Units*"), so that additional units become available which the Company may use for future equity awards;

**WHEREAS**, the Unit Holder desires to surrender the Forfeited Units for cancellation without receiving any cash, equity awards or other consideration and without any expectation to receive, and without imposing any obligation on the Company to pay or grant, any cash, equity awards or other consideration presently or in the future in connection with the cancellation of such Forfeited Units; and

**WHEREAS**, the Company is relying on the Unit Holder's surrender and cancellation of the Forfeited Units in making administrative determinations regarding the Company.

**NOW, THEREFORE**, the parties hereby agree as follows:

1. <u>Surrender and Cancellation of Units</u>. The Unit Holder hereby surrenders the Forfeited Units for cancellation, and the Company hereby accepts such surrender and cancellation, effective as of the Date of Forfeiture. By execution of this Agreement, the parties have taken all steps necessary to cancel the Forfeited Units.

2. <u>No Expectation or Obligation</u>. The Unit Holder and the Company acknowledge and agree that the surrender and cancellation of the Forfeited Units described herein shall be without any expectation of the Unit Holder to receive, and without imposing any obligation on the Company to pay or grant, any cash, equity awards or other consideration presently or in the future in connection with the surrender and cancellation of such Forfeited Units.

3. <u>No Prior Transfers</u>. The Forfeited Units have not, in whole or in part, been assigned, transferred, hypothecated, pledged, or otherwise disposed of since the date of acquisition of the Units by the Unit Holder.

4. <u>Attorneys' Fees</u>. In the event that any party institutes any action or suit to enforce this Agreement or to secure relief from any default hereunder or breach hereof, the breaching party

or parties shall reimburse the non-breaching party or parties for all costs, including reasonable attorneys' fees, incurred in connection therewith and in enforcing or collecting any judgment rendered therein.

5.    <u>Release</u>. Each Party on behalf of itself, its directors and officers, and for its affiliates, and its and their respective successors and assigns, hereby irrevocably releases, acquits and forever discharges the other Party, and their respective officers, directors, employees, agents, successors, assigns, representatives, attorneys, customers, employers, investors, suppliers, vendors, partners and contractors from any and all claims or liabilities of any kind and nature, at law, in equity, or otherwise, known and unknown, suspected and unsuspected, disclosed and undisclosed, relating in any way in to this Agreement, the Forfeited Units, the Company, Unit Holder, or any companies of which each Party is a  member of, shareholder in, or otherwise related to or involved with.

6.    <u>Waiver</u>. The Parties to this Agreement and any permitted assigns, successors or predecessors in interest thereto expressly waive any statute, legal doctrine, or other similar limitation upon the effect of general releases. By way of example, and without limitation, the foregoing parties waive the benefit of California Civil Code Section 1542, which states as follows:

A GENERAL RELEASE DOES NOT EXTEND TO CLAIMS WHICH THE CREDITOR DOES NOT KNOW OR SUSPECT TO EXIST IN HIS OR HER FAVOR AT THE TIME OF EXECUTING THE RELEASE, WHICH IF KNOWN BY HIM OR HER MUST HAVE MATERIALLY AFFECTED HIS OR HER SETTLEMENT WITH THE DEBTOR.

Each Party, with the advice of their counsel, waive any rights or benefits that they, or any of them, might otherwise have under Civil Code Section 1542 and any other statute, legal doctrine, or principle of similar effect in California, or any other state, federal or other jurisdiction, to the full extent that such rights and benefits may be waived.

7.    <u>Miscellaneous</u>.

(a)    <u>Reliance</u>. The Unit Holder acknowledges and agrees that the Company is relying on the provisions of this Agreement in connection with the administration of the Company including, without limitation, determinations regarding the nature of future equity grants in the Company.

(b)    <u>Successor and Assigns</u>. This Agreement shall be binding upon, and inure to the benefit of, both parties and their respective successors and assigns.

(c)    <u>Governing Law</u>. This Agreement shall be construed, interpreted, and enforced in accordance with the laws of the State of California, without regard to any choice of law principle that would dictate the application of the law of another jurisdiction.

(d)    <u>Counterparts</u>. This Agreement may be executed in several counterparts and all documents so executed shall constitute one agreement, binding on each of the parties hereto, notwithstanding that both of the parties did not sign the original or the same counterparts.

(e)    <u>Headings</u>. The headings of the sections of this Agreement are for convenience of reference only and in no way define, limit or affect the scope or substance of any section of this Agreement.

(f)    <u>Severability</u>. In the event that any provision of this Agreement shall be invalid, illegal or otherwise unenforceable, the validity, legality and enforceability of the remaining provisions shall in no way be affected or impaired thereby.

(g)    <u>Entire Agreement</u>. This Agreement constitutes the entire agreement between the parties and supersedes all prior agreements and understandings, whether written or oral, relating to the subject matter of this Agreement. The Company and the Unit Holder have made no promises, agreements, conditions, or understandings relating to this subject matter, either orally or in writing, that are not included in this Agreement.

*[Signature page follows.]*

IN WITNESS WHEREOF, the Company and the Unit Holder have executed this Unit Forfeiture Agreement as of the dates set forth below.

**Unit Holder**                                    **The 4D Factory LLC**

By: _____              By: _____
Name: Mark Long                                  Name: Cort Javarone
Number of Forfeited Units: 112                   Title: CEO
Date: 10/1/2021                                   Date: 10/1/2021