**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

------------------------------------------------------------------X

In re:

4D FACTORY, INC., et al.,

                                Debtors. [1]

------------------------------------------------------------------X

THE 4D FACTORY LLC and
NEON MEDIA LLC,

                         Plaintiffs,

     -against-

MARK LONG, COLIN FORAN,
NAOMI LACKAFF, AARON NONIS,
DON NORBURY, MARK YEEND,
CALVIN ZHOU, GRIFFIN GAMING
PARTNERS II, L.P., GRIFFIN GAMING
PARTNERS II SIDE FUND, L.P., POLYCHAIN
VENTURES II LP, POLYCHAIN VENTURES II
(PARALLEL) LP, PIERRE-EDUOARD
PLANCHE, BENJAMIN PERSZYK,
JOSH ROSENTHAL, ARGON PROTOCOL
FOUNDATION, ARGON ASSET VENTURES
CORP., and NEON MACHINE, INC.,

                           Defendants,

          and

CORT JAVARONE, SCOTT HONOUR,
AND STEVE HOROWITZ

                        Counterclaimants.

------------------------------------------------------------------X

Chapter 11
(Subchapter V)
Case No.: 23-11618 (MEW)
(Jointly Administered)

Adv. Pro. No. 24-01319 (MEW)

**THE 4D FACTORY, LLC.'S VERIFIED SECOND-AMENDED COMPLAINT, CORT JAVARONE, SCOTT HONOUR, AND STEVE HOROWITZ'S ORIGINAL COUNTERCLAIMS, AND NEON MEDIA LLC'S ORIGINAL COMPLAINT**

---

[1] The Debtors in these Chapter 11 Cases, along with the last four digits of each Debtors' federal tax identification number, are 4D Factory Inc. (6770), and The 4D Factory LLC (8935).

1

1.      Plaintiff The 4D Factory LLC as co-debtor and debtor-in-possession with 4D

Factory, Inc. (together "4D" or "4D Factory") in the chapter 11 cases[2] brings this second-amended

complaint against:

> (1) Mark Long, Colin Foran, Naomi Lackaff, Aaron Nonis, Don Norbury, Mark Yeend, Calvin Zhou (the "Manager Defendants");
>
> (2) Griffin Gaming Partners II, L.P., and Griffin Gaming Partners II Side Fund, L.P. (together, "Griffin"), Polychain Ventures II LP and Polychain Ventures II (Parallel) LP (together, "Polychain"), Pierre-Eduoard Planche, Benjamin Perszyk, and Josh Rosenthal (together with Griffin and Polychain, the "Fund Defendants"); and
>
> (3) Neon Machine, Inc., Argon Protocol Foundation ("Argon Foundation") and Argon Asset Ventures Corp. ("Argon Corp.,").

2.      Also included are the original counterclaims of Cort Javarone against Neon

Machine, Inc., and Neon Media LLC's original claims against Neon Machine and the Manager

Defendants.[3]

## Nature of the Complaint

3.      *Shrapnel* is a revolutionary first-person shooter game with its own cryptocurrency

and user-generated content, a first in the videogame industry. The game's storyline centers around

an asteroid that collides with the moon, perpetually hurling asteroid shrapnel toward Earth in a 500

km-wide band around the planet. For people's safety, this shrapnel-impact zone was originally

quarantined and protected by contracted guards. But when it was discovered that the shrapnel

contained precious elements, the guards transformed into mercenaries—attacking anyone who got

in their way to extract as much wealth for themselves as possible.

---

[2] The chapter 11 cases are captioned In re 4D Factory, Inc., *et al.*, Case No. 23-11618 (MEW) in the United States Bankruptcy Court for the Southern District of New York.

[3] The term "Defendants" refers to all Defendants collectively and individually.

4.      The facts of this case summon the adage that life imitates art. The *Shrapnel* game originated from Mark Long and his team of Manager Defendants under the umbrella of Neon Media. Long and other Manager Defendants worked for Neon Media—with many, including Long, serving as officers and directors charged with fiduciary duties to guard its business interests. But when Long and his team realized that *Shrapnel* could be worth hundreds of millions of dollars overnight by issuing its own cryptocurrency, these Manager Defendants switched from guarding those interests to attacking them.

5.      Led by Long, the Manager Defendants secretly started a new entity to develop the game, Neon Machine. They then found new financial backers, Griffin and Polychain. And then they lured Neon Media's manager and majority owner, 4D Factory, to transfer over to Neon Machine the *Shrapnel* intellectual property that Neon Media had owned. The lure here required 4D Factory to become a 60% owner of Neon Machine and receive three of its five board seats along with a 60% share in crypto-tokens and the Manager Defendants' share of any dividends (including tokens) until 4D recouped its Neon Media capital investment.[4] While that was the deal, the Defendants never intended to honor it.

6.      As soon as Long believed the *Shrapnel* IP was transferred, before 4D Factory was even added to Neon Machine's board, he gave himself, the other Manager Defendants, and Griffin and Polychain about a billion *Shrapnel* tokens without telling 4D Factory, let alone obtaining its blessing. They also granted Griffin and Polychain future equity that would dilute 4D's ownership in Neon Machine from a majority interest to a minority one. Then, to add insult to injury, they insisted that 4D Factory is entitled to no tokens whatsoever. And when 4D kept asking questions

---

[4] Long sought out 4D to fund his startup, Neon Media, after his team was laid off by HBO. 4D invested over $6 million in Long, his team, and Neon Media's projects—sharing 40% of the Company with Long and his team, even though they'd contributed no assets to their startup.

3

and seeking transparency into Neon Machine's acts, the Manager Defendants ignored them and *sued* 4D Factory and its directors.

7.      To date, Mark Long and the Manager Defendants along with Griffin and Polychain have extracted over a billion tokens from Neon Machine, a majority ownership interest in the company, control over its board, and the rights to develop *Shrapnel*.[5] Meanwhile, 4D Factory is in bankruptcy. The following explains why the Court should redress that injustice.

**The Parties**

8.      Plaintiff The 4D Factory LLC is, and was at all times, a limited liability company formed under the laws of Wyoming. Plaintiff, along with 4D Factory, Inc., are debtors and debtors-in-possession in chapter 11 cases.

9.      Cort Javarone resides in New York, NY. He is the CEO and Managing Member of Debtors 4D Factory Inc., and The 4D Factory LLC, and the Manager of Neon Media LLC.

10.     Neon Media LLC is a limited liability company organized under the laws of Washington. Its sole member is The 4D Factory LLC.

11.     Defendant Mark Long resides in Seattle, WA. He's currently a director and CEO of Neon Machine and a minority shareholder. Long was a member, director, and officer at Neon Media from 2020 until he abandoned it in 2022 and abandoned his ownership in April 2023.

12.     Defendant Colin Foran resides in Seattle, WA. He's Chief Creative Officer of Neon Machine and a minority shareholder. He was a member and officer at Neon Media from 2020 until he abandoned it in 2022 and abandoned his ownership in April 2023.

---

[5] Earlier in 2024 SHRAP tokens were trading at $0.40 per token.

13.     Defendant Naomi Lackaff resides in Seattle, WA. Lackaff is Neon Machine's Head of Partnerships and a minority shareholder. She was a member and officer at Neon Media from 2020 until she abandoned it in 2022 and abandoned her ownership in April 2023.

14.     Defendant Aaron Nonis resides in Seattle, WA. Nonis is the Chief Operating Officer of Neon Machine and a minority shareholder. He was a member and officer at Neon Media from 2020 until he abandoned it in 2022 and abandoned his ownership in April 2023.

15.     Defendant Don Norbury resides in Seattle, WA. He is the Chief Technical Officer of Neon Machine and a minority shareholder. Norbury was a member, director, and officer at Neon Media from 2020 until he abandoned it in 2022 and abandoned his ownership in April 2023.

16.     Defendant Mark Yeend resides in Seattle, WA. Yeend is the Chief Marketing Officer of Neon Machine and a minority shareholder. He was a member and officer at Neon Media from 2020 until he abandoned it in 2022 and abandoned his ownership in April 2023.

17.     Defendant Calvin Zhou resides in Glendale, CA. Zhou is the Head of Business Development at Neon Machine and a minority shareholder.

18.     Defendant Griffin Gaming Partners II, L.P. is a Delaware limited partnership with its principal place of business in Santa Monica, California.

19.     Defendant Griffin Gaming Partners II Side Fund, L.P. is a Delaware limited partnership with its principal place of business in Santa Monica, California.[6]

20.     Defendant Polychain Ventures II LP is a Delaware limited partnership with its principal place of business in San Francisco, California.

---

[6] Any references to Griffin include Griffin's affiliates and subsidiaries.

5

21.     Defendant Polychain Ventures II (Parallel) LP is a Delaware limited partnership with its principal place of business in San Francisco, California.[7]

22.     Defendant Pierre-Eduoard Planche is a partner at Griffin and serves as Griffin's director on the Board of Neon Machine.

23.     Defendant Benjamin Perszyk was a partner at Polychain and served as Polychain's director on the Board of Neon Machine from January 26, 2022 until he resigned in September 11, 2023. He's now an employee at Neon Machine.

24.     Defendant Josh Rosenthal is a partner at Polychain and began serving as Polychain's director on the Board of Neon Machine upon Perszyk's resignation.

25.     Neon Machine is a Delaware corporation with its principal place of business in Seattle, WA.

26.     Argon Protocol Foundation is a Panamanian foundation created by and operated at the direction of Neon Machine. Argon Foundation is named because it may hold or control estate property that Plaintiff seeks to recover.

27.     Argon Asset Ventures Corp. is a Panamanian corporation created by and operated at the direction of Neon Machine. Argon Corp. is named because it may hold or control estate property that Plaintiff seeks to recover.

28.     Andrew Grossman, Esq., a non-party mentioned in this complaint, resides in Pacific Palisades, CA. Grossman is a member of 4D. He was Plaintiff's general counsel until 2023, and has concurrently been counsel for Neon Machine since mid-2021.

---

[7] Any references to Polychain include Polychain's affiliates and subsidiaries.

**Jurisdiction and Venue**

29.    The Court has jurisdiction under 28 U.S.C. §§ 157 and 1334. This is a core proceeding under § 157(b)(2). Plaintiff consents to the Court's final orders and judgment.

30.    Venue is proper under 28 U.S.C. §§ 1408 and 1409. The statutory predicates for the relief requested here are §§ 541, 542 and 1107(a) of the Bankruptcy Code and Federal Rule of Bankruptcy Procedure 7001.

31.    This adversary proceeding is commenced under Rules 7001(1), 7001(9), and 7003 of the Federal Rules of Bankruptcy Procedure and §§ 541 and 542 of the Bankruptcy Code.

**Procedural History**

32.    On October 10, 2023, the Debtors filed voluntary petitions for relief under Subchapter V of chapter 11 of the Bankruptcy Code.  Plaintiff continues in existence as a debtor-in-possession under Bankruptcy Code 11 U.S.C. §1184.

**Background**

**A.  4D Factory and the Managers Defendants team up at Neon Media to develop *Shrapnel*.**

33.    Around March 2020, Mark Long reached out to 4D Factory to seek funding for his new company, Neon Media. Long knew Cort Javarone and 4D and had briefly worked for 4D before abandoning that job to take a job at HBO. Neon Media was formed by Long around that time after he and his team, including the other Manager Defendants, were laid off from HBO. Each Manager Defendant reported directly to Long. Long represented to 4D Factory that Neon Media could use brands from HBO's parent, Warner Brothers, to develop video games, and that Neon Media already secured both funding and marketing resources to move forward on such a project.

34.    On July 20, 2020, 4D Factory and Neon Media entered into an Amended and Restated Limited Liability Company Operating Agreement, under which 4D Factory would serve as Neon Media's sole Manager and committed to invest $2,300,000 in total capital contributions

as needed, in exchange for 60% equity in the company. Each Manager Defendant (except Zhou) and 4D Factory would constitute "Members" of Neon Media, and entered into "Membership Agreements," which provided them ownership units in the company.[8] 4D Factory agreed to the team being granted 40% of the equity units, subject to three-year vesting under agreements committing their full-time employment to Neon Media.

35.    The Membership Agreements specified that any developed intellectual property— *including game designs, game concepts, inventions, and business plans*—were Neon Media's property. The agreements also included a provision barring the employee/members from indirectly or directly competing with Neon Media—especially where the employee/member's disloyalty relied on company confidential information or which competed in any markets in which Neon Media did business or planned to do business.

36.    Six months after closing on the Operating Agreement, Long requested that Neon Media immediately start developing a video game based on *Foundation* (the science-fiction book series by Isaac Asimov) rather than any Warner Bros. brand. Long also informed 4D Factory that Neon Media would need over $10 million in extra funding to develop this game, yet he had secured no funding sources. On February 12, 2021, 4D Factory began funding the budget to produce *Foundation*. It has invested over $4 million to date.

37.    In March 2021, 4D Factory approved the development of another of Long's projects at Neon Media, *Shrapnel*, a first-person-shooter video game with a cryptocurrency component. Long pitched the project to 4D Factory, Neon Media's controlling shareholder, on the basis that it would be funded by issuing crypto tokens, the SHRAP Token, bringing tens of millions in non-

---

[8] Long's agreement, which is largely identical to the other Manager Defendants', is attached as **Exhibit Q**.

8

dilutive capital into Neon Media. Long represented at this time to 4D Factory, through Javarone, that 4D Factory and Manager Defendants would receive SHRAP Tokens based on and *pro rata* with their respective ownership of Neon Media—meaning 4D Factory would receive the largest share due to its 60% ownership.

38.     In a May 13, 2021 email, Zhou confirmed to 4D Factory that, due to its equity in Neon Media, it would be entitled to at least 342,222,222 SHRAP Tokens based on the then-current tokenomics model, with a potential cash value of up to about $598 million—indicating the tokens would be Plaintiff's with the label "4D Token." Along with showing the amount and projected values at different prices of 4D Factory's total holdings, the table also showed the "Per Month (24 Month Vesting in $m)" value that would become available to 4D Factory every month. This would only be possible with accessible SHRAP tokens delivered to 4D Factory's wallet—*i.e., tokens actually conveyed to 4D Factory*. Nine days later, on May 22, 2021, Zhou emailed 4D Factory again with a capitalization table repeating the 342,222,222 SHRAP Tokens number.[9]

39.     Throughout spring and summer 2021, Zhou advised Javarone that more SHRAP Tokens would be available for purchase by investors. 4D Factory confirmed its interest in getting more. But Zhou questioned why it would want to when it was being granted so many already.

40.     Around June 2021, the Manager Defendants drafted a marketing presentation (the "June 2021 Deck") that proposed a high-level breakdown of the SHRAP "tokenomics."  The June 2021 Deck specifically described a "*Shrapnel* Treasury," which comprised tokens allocated to development costs and a rewards program. The Manager Defendants did not represent to 4D Factory then—or at any other time until well after 4D Factory caused Neon Media to turn over its valuable IP—that any of 4D's rights to SHRAP Tokens would fall into this category.

---

[9] Zhou's communications and attachments to same are attached hereto as **Exhibit A**.

41.    In an email on August 4, 2021 (one day after Neon Machine Inc. was secretly formed by Long), Long predicted in a chart tracking comparable tokens in other blockchain games that the SHRAP Token could have a $200 million fully diluted market capitalization at listing, based on a price of $0.06667 per token.

**B.  The Managers Defendants induce 4D Factory to let them start Neon Machine.**

42.    The original intent was for *Shrapnel* to be developed at Neon Media, and indeed the project got its start there. In August 2021, however, Long shifted his plan and pushed to create a separate entity to develop *Shrapnel*. In mid-August 2021, he approached 4D's Factory's then-Chairman, Jonathan Miller, to make this proposal. Long pitched to Miller that the equity and control of this new entity, Neon Machine, would mirror Neon Media's control and economics, in which 4D Factory held 60% equity and Javarone served as sole Manager—making Neon Machine a "controlled subsidiary." Long also represented that the sale of SHRAP Tokens would fund Neon Machine, and if any additional financing were needed, he'd refer any interested parties to 4D Factory to negotiate deal terms.

43.    Miller indicated that he would support 4D Factory approving the structure if Neon Machine was a "controlled subsidiary." After Miller recommended that approach to Javarone, 4D Factory consented to the creation of Neon Machine contingent on this control arrangement.

44.    But, without notifying 4D Factory, Long had already filed a Certificate of Incorporation forming Neon Machine in Delaware on August 3, 2021—essentially usurping what would otherwise be a Neon Media opportunity.  On the same day, Long issued Promissory Notes on Neon Machine's behalf to each Manager Defendant, including himself, for supposed loans they'd made to Neon Machine *while employees and officers of Neon Media*.

45.    On August 20, 2021, Long adopted Neon Machine's bylaws without notice to or consent of 4D Factory or Neon Media (the "Bylaws"). Those Bylaws and their correlating board

resolution—all executed by Long alone while he was still CEO, a director, paid employee, and a shareholder of Neon Media and bound by his Member Agreement—established him as the only director of Neon Machine's board and as the "President, Chief Executive Officer, Chief Financial Officer, Treasurer, Secretary" despite his commitment to set up Neon Machine's control structure to "mirror" Neon Media's.[10]

46.    Around that same time, Long began to engage with 4D Factory's in-house counsel, Grossman, and ultimately retained him as general counsel for Neon Machine. That concurrent representation was undertaken without advising Neon Media or 4D Factory of any potential conflicts. Unbeknownst to 4D Factory, Grossman apparently acted at Long's direction, despite his continuing employment by 4D Factory—duping his client into believing he was overseeing Long's transactions and looking out for 4D's interests when in fact he was conflicted and disloyal.

**C.  With Neon Machine needing the *Shrapnel* IP from Neon Media to develop the game, Long brokers a deal with 4D Factory .**

47.    Despite representing that SHRAP Tokens would fund Neon Machine and that he'd refer any interested parties to 4D Factory (as Neon Media largest shareholder) to negotiate more financing, Long negotiated funding with Griffin and Polychain without telling 4D Factory or Neon Media.  Then on September 2, 2021, he presented to 4D Factory and Neon Media *for the first time* a funding deal with Griffin and Polychain, where both would fund $8 million to Neon Machine, as a "fait accompli." Norbury, Zhou and Grossman were copied on this email. Long presented the deal between Neon Machine, Griffin, and Polychain as substantially finalized, without 4D Factory's involvement.

48.    The deal Long negotiated with Griffin and Polychain required 4D Factory to transfer the *Shrapnel* IP from Neon Media to Neon Machine. In the September 2, 2021 email, Long

---

[10] The Bylaws and the Board resolution are attached as **Exhibits B** and **C**.

represented to 4D Factory that, as 60% shareholder of Neon Machine, it would retain control of three seats (the "4D Directors"): "3 for Neon/4D [both of which Plaintiff controlled], 2 for Griffin/Polychain, plus 1 observer from Griffin." Long also represented in the email that he intended to schedule "day long monthly board meetings" including Griffin and Polychain. He then said: "**So, I believe we have an agreement in principle.**"[11]

49.     This "agreement in principle" had not been previously run by or approved by 4D Factory. But after discussions, 4D Factory as majority shareholder of Neon Media, agreed to cause the transfer of the *Shrapnel* IP so long as it received certain rights in exchange: (a) a 60% equity stake in Neon Machine with all rights thereto, including 3 of 5 Board seats; (b) confirmation that it would receive its pro rata share of SHRAP Tokens based on its 60% equity position; and (c) an assignment to it of any dividends that Manager Defendants receive from Neon Machine, including receipt of tokens, until it recovers its capital investment in Neon Media, which at the time exceeded the $2.3 million 4D had originally agreed to. Long also promised to Javarone, in his individual capacity, future interests in 16 million SHRAP Tokens, as compensation for his services as an advisor to and director of Neon Machine.  Since Long assumed he would sit in one of 4D/Neon's Board seats, to assuage 4D Factory's concerns and secure its approval of the structure, Long confirmed on a call with Javarone and Miller that he would commit to vote with the other 4D Directors on Board decisions.

**D.  The Parties enter into an agreement contingent on 4D Factory receiving SHRAP Tokens and dividends to pay back its investment.**

50.     With this agreement in place, the parties entered into a series of integrated transactions to memorialize the deal. Grossman provided the forms of the IP Transfer Agreement

---

[11] Long's September 2, 2021 email is attached as **Exhibit D**.

and the Recoupment Agreements (both as defined below) in the same email dated September 23, 2021. Each was signed or agreed to by consent of the Members of Neon Media (Manager Defendants) simultaneously around October 1, 2021.

51.     First, 4D Factory, Neon Machine, and each Manager Defendant entered into Assignment of Rights to Dividends Agreements (the "Recoupment Agreements"). The form of Recoupment Agreements prepared by Grossman provided that each Manager Defendant would assign and transfer to Plaintiff all their rights and interests to any dividends—"*including any class of cryptocurrency or similar assets*"—paid or to be paid by Neon Machine until Plaintiff's "Capital Account" under the Neon Media Operating Agreement was paid off. Neon Machine would agree to pay those dividends directly to 4D Factory. On October 1, 2021, Long, as Director, CEO, and shareholder, confirmed the Manager Defendants' *unanimous approval* of the Recoupment Agreements to 4D Factory in an email to 4D Factory.[12]

52.     4D Factory and Long then executed a Stock Purchase Right Notice and Restricted Stock Purchase Agreement via DocuSign on October 1, 2021, entitling 4D Factory to 6,000,000 common shares of Neon Machine as of August 20, 2021.

53.     That same day, Neon Media and Neon Machine entered into an Intellectual Property Sale Agreement in which all of Neon Media's intellectual property in *Shrapnel* was "sold" to Neon Machine for nominal consideration of $500 (the "IP Transfer Agreement").

54.     Then, effective October 3, 2021, Neon Machine, through Long's unilateral action, closed with each of Griffin and Polychain on the Simple Agreements for Future Equity, or

---

[12] The October 1, 2021 email is attached as **Exhibit E**.

"SAFEs," in the amount of $5 million and $3 million, respectively.[13] The SAFEs[14] provide that, upon occurrence of "Network Launch," and the passing of 60 days without the termination of the SAFEs or the occurrence of a "Qualified Financing," Griffin and Polychain's SAFEs will automatically convert into a new series of Neon Machine preferred shares belonging to Griffin and Polychain. The partial term sheet for the preferred shares to be issued, which was attached to the SAFEs, provides that holders of preferred stock may at their sole discretion vote as though their preferred equity was common stock, without converting to common stock, or could elect to convert their preferred shares to common stock at any time. But Neon Machine's Bylaws did not permit issuing preferred stock. So any supposed "automatic conversion" of SAFEs without amending the Bylaws was potentially void or voidable as an *ultra vires* act.

55.    The SAFEs define a Network Launch as "a *bona fide* transaction or series of transactions" (emphasis added) where the Token Issuer issues, or "mints," the native token associated with access to and use of the "Network." The SAFEs define "Network" as "any blockchain-based application, platform or service operated or managed by, or based upon, or incorporating material portions of any **intellectual property developed, owned or exclusively licensed by, the Company**…."  In other words, the "Network Launch" required the actual launch of the *Shrapnel* platform developed by Neon Machine, which integrates with the tokens. That's always been the sole reason for SHRAP Tokens to exist—for playing the game itself. This is

---

[13] 4D Factory was aware of the entry into the SAFEs in principle. But Long as the sole director of Neon Machine when the SAFEs were entered into, unilaterally executed them on Neon Machine's behalf, and did not provide the material terms of the SAFEs to 4D Factory until after the first meeting of the full Board in January 2022. In other words, 4D Factory was not provided with the specific terms of the SAFEs until after the IP Transfer Agreement was effectuated.

[14] The SAFEs were previously provided to this Court as Exhibit 2 to the *Neon Shareholders' Motion for an Order Declaring Automatic Stay Inapplicable, or In the Alternative, Granting Relief From Automatic Stay* [ECF 28], and are not reattached here.

reinforced by the fact that $15 million in SAFEs were issued by Neon Machine in summer 2023, *months after* the April 2023 date Defendants now claim "Network Launch" occurred. Those SAFEs all have language referring to Network Launch as a *future event.*

**E.  Neon Machine quietly siphons tokens to the Manager Defendants and Griffin and Polychain but not 4D Factory.**

56.     Around the same time he was securing 4D's consent to Griffin and Polychain's involvement, the Manager Defendants entered into self-dealing transactions that enriched themselves along with Griffin and Polychain with hundreds of millions of SHRAP Tokens (the "Token Giveaway"). He did so while he was director and officer of the secretly formed Neon Machine and without ensuring it was in Neon Machine's best interests. And he did so without telling 4D Factory, despite his representations that 4D would have majority control at the shareholder and Board levels.

57.     First, on September 29, 2021, without 4D Factory's knowledge or consent, Long entered into token side letter agreements with Griffin and Polychain (the "Side Letters"). The Side Letters provided that Griffin would receive 10.875% of the 3 billion "Total Network Tokens" (over 326 million SHRAP Tokens) and Polychain would receive 6.525% (more than 195 million SHRAP Tokens) for no added consideration. This amount was granted *in addition to* the *pro rata* amount allocated to Griffin and Polychain, as touted in a February 2022 Cap Table and the Internal Cap Table discussed below. Long secretly ratified the Side Letters as the sole member of the Neon Machine board without The 4D Factory's knowledge or consent.

58.     Then on October 1, 2021, without 4D Factory's knowledge or consent, Long delivered Offers of Employment by Neon Machine (the "Offer Letters") to each Manager Defendant.  Each promised, "subject to the Company's approval of a Token Incentive Plan," future token interests in amounts of fully-vested SHRAP Tokens that far exceeded what 4D Factory was

told would be granted to each Manager Defendant. Again, these amounts were granted *in addition to* the *pro rata* amount allocated to Manager Defendants, as revealed in the February 2022 Cap Table shown to 4D Factory and the Internal Cap Table not shared with it.

59.     For example, the May 22, 2021 Equity Cap Table, entitled Long to about 35.5 million SHRAP Tokens given his equity in Neon Media.[15] But his Offer Letter promised a special distribution exceeding 90 million *additional* SHRAP Tokens, including tokens to satisfy supposed loans he made to Neon Machine. These tokens were over and above the pro rata share based on the members' equity. Yet there's no record the Promissory Notes (or the SHRAP Tokens granted to satisfy them) correspond to any actual funds paid by the Manager Defendants.[16]

60.     The Token Giveaway was a scheme by Long and the Manager Defendants to enrich themselves with 1/6 of the total SHRAP Tokens,[17] *in addition to* the allocation the Manager Defendants later presented to 4D Factory as tokens corresponding to their respective equity holdings, held in Company Treasury. No SHRAP Tokens were given to 4D Factory, a Founder and majority stockholder, who was supposed to receive the largest portion of SHRAP Tokens. Long, Norbury and Zhou granted themselves 91,328,859 million SHRAP Tokens each; Foran and Nonis took 76,328,859 million SHRAP Tokens each, and Yeend and Lackaff each received over 61 million SHRAP Tokens. Long and these other Manager Defendants formed a cabal, in which each effectuated the receipt of ill-gotten gains. Around November 8, 2021, Argon Foundation

---

[15] *See* Exhibit A.

[16] Long's Offer Letter, executed by Nonis (who also received a massive distribution of tokens), is attached hereto as **Exhibit F**.[16]

[17] Apart from certain amounts paid by Lackaff and Yeend, the Manager Defendants purportedly paid approximately $14,000 in the aggregate per the subscription agreements, but there is no evidence that even this *de minimis* amount was paid.

apparently entered into Token Subscription Agreements with each Manager Defendant, and with

Griffin and Polychain, to guarantee them these SHRAP Tokens.[18]

61.    Long apparently granted the authority to distribute the rights to the SHRAP Tokens,

as the only director of Neon Machine's board and as its "President, Chief Executive Officer, Chief

Financial Officer, Treasurer, Secretary" in a *Unanimous Board Resolution of Neon Machine Inc.*

dated November 5, 2021. Never mind that the *Unanimous Board Resolution* should have been

noticed and determined by the actual agreed-upon board of five directors and all shareholders. Or

that the true board—the board Long promised in exchange for the right to have the Shrapnel project

at Neon Machine—did not authorize 552 million SHRAP Tokens to Manager Defendants. 4D

Factory was the owner of 60% of the issued and outstanding shares of Neon Machine and was

entitled to participate in any dividend of Neon Machine to the stockholders under  Article 2, Sec.

7(c) of the Bylaws. The Token Giveaways and Side Letters are thus potentially void or voidable

as *ultra vires* acts.

62.    In effect, the Offer Letters and the Side Letters—never disclosed to 4D Factory

until August 2023—were a massive dividend to Defendants. But by recharacterizing these

dividends as they did, the Manager Defendants profited from the future sale of SHRAP Tokens

without diluting their rights to SHRAP Tokens and by dodging their recoupment obligations. All

the while, 4D Factory's SHRAP Tokens were secretly relegated to holdings it could not access, as

covered below. And as explained below, the Manager Defendants knew or had reason to know

that the Token Subscription Agreements were disingenuous because Argon Foundation is a shell

entity, and its distribution of the SHRAP Tokens was under Neon Machine's complete control.

---

[18] A copy of Long's Token Subscription Agreements with Argon Protocol Foundation is annexed
hereto as **Exhibit G**. This is an example of the Token Subscription Agreements.  Each of the
Manager Defendants has 2 such agreements and all are dated "as of" November 8, 2021.

And they knew this was not an arm's-length employment transaction but end-arounds to avoid their pledge to assign their dividends to 4D Factory.

63.     Defendants then developed the fiction that the SHRAP Tokens promised to 4D Factory were not actually intended to be distributed. Rather, these tokens would be owned by Neon Machine to be reserved in the so-called *Shrapnel* Treasury. The Manager Defendants represented that 4D Factory and the other equity holders (which were, exclusively, Manager Defendants who'd already granted themselves hundreds of millions of other, non-Treasury tokens) would not receive SHRAP Tokens but could only *benefit* from their use by the company, theoretically accruing to equity value. Because Defendants executed the Token Giveaway, Defendants, along with Griffin and Polychain, could safely hold a billion SHRAP Tokens while claiming that the tokens promised to 4D Factory were not for actual distribution. In doing so, Defendants have managed to enrich themselves while preventing 4D Factory from obtaining the SHRAP Tokens it was promised.

64.     By this time, Long and the Manager Defendants had entered into Side Letters, Offer Letters and Token Subscription Agreements giving away over 1/3 of the Total Network Tokens without 4D Factory's knowledge or consent, *after* Long represented to 4D that it would control 3 of 5 Board seats, hold 60% equity in Neon Machine, receive hundreds of millions of tokens, and protect those interests through Manager Defendants' unanimous vote to assign their dividends to 4D until it received its capital investment back. But for this promise of majority ownership and board control, 4D Factory would not have sanctioned Neon Machine's creation.

**F.  Long creates Argon Foundation and Argon Corp. to legitimize the Token Giveaway.**

65.     While Defendants were orchestrating their massive token giveaway, Long arranged for the incorporation and establishment of Argon Foundation and Argon Corp. in Panama, which seems to be controlled by the Manager Defendants. He retained García de Paredes Law, a

Panamanian law firm that markets itself as providing "Company and Private Foundation Incorporation" services, to incorporate both entities.[19] The registered offices of both Argon Foundation and Argon Corp. are the offices of García de Paredes Law. All directors and officers of both are apparently employees or agents of García de Paredes Law. And Long was personally invoiced by García de Paredes Law for the incorporation of both Argon Foundation and Argon Corp. on September 23, 2021. Defendants never informed 4D Factory of Argon Foundation and Argon Corp.'s true status—nor do any relevant agreements disclose this.

66.     Yet just one week later, Neon Machine obtained the IP required for the Shrapnel project from Neon Media under the IP Sale Agreement. And soon after Neon Machine entered into a Service Agreement with Argon, where Neon Machine transferred to it core aspects of that Shrapnel IP and granted Argon licenses and rights under other important components of that IP.

**G.  Defendants misrepresent 4D Factory's rights as to the SHRAP Tokens and board control.**

67.     The ink not even dry on the IP Transfer Agreement, Long and the other Manager Defendants evaded 4D Factory's oversight as to tokens, broke their agreements to assign their dividends, and  diluted 4D's interests and control in Neon Machine. In November 2021, only a month after 4D Factory agreed to transfer the *Shrapnel* IP from Neon Media, Long called Javarone and told him that Griffin and Polychain would refuse to allow Javarone onto the board. 4D Factory intended for Javarone, Ned Sherman, and Long to sit in 4D's board seats. So 4D Factory contacted the founders of Griffin directly. On the call, the Griffin founders did not voice any objection to Javarone sitting on the board. But they revealed that Long had represented to them that 4D Factory would control only one board seat. As 4D would later find out, the SAFEs with Griffin and

---

[19]   *See*  "Services,"  GDPELAW.COM  (last  accessed  Feb.  17,  2024),  *available  at* https://www.gdeplaw.com/services/.

Polychain, which were withheld from 4D until after the full board was appointed, stated that Griffin and Polychain would each hold one board seat; two seats would be held by nominees of common stock (4D named Long and Sherman), and a "4D seat" would be "nominated" by the 4D Factory and "acceptable" to both Griffin and Polychain. But it appears Long hadn't informed Griffin that 4D Factory was Neon Machine's controlling shareholder. At this point, the Griffin founders were on notice that Long had misled them and 4D Factory as to the control of Neon Machine—providing conflicting information to both sides. Rather than take caution, however, the Fund Defendants only entrenched themselves in Long's scheme.

68.    Three months behind schedule, the agreed Neon Machine board was officially formed in January of 2022. Javarone and Sherman for 4D, Pierre-Edouard Planche for Griffin, and Benjamin Perszyk for Polychain, were made directors under a board resolution on January 26, 2022. That day, the board also executed a second resolution approving a form version of an Intellectual Property License and Assignment and Services Agreement (the "Argon Services Agreement") with Argon Corp. The form attached to the resolution and reviewed by the board did not name the officer executing on Argon Corp.'s behalf. Neither 4D Factory nor the board were informed that Argon Corp. was a shell created by Long. Nor did they know he'd ordered Argon to make him and Manager Defendants Nonis and Norbury, and Grossman, the Foundation's signatories.

69.    Following the board's approval, on February 2, 2022, Long executed the Argon Services Agreement on Neon Machine's behalf.[20] An employee of García de Paredes Law executed on behalf of Argon Corp. Under the Argon Services Agreement, Argon Corp. retained Neon Machine to provide the "necessary technology, expertise, staffing, infrastructure, and other

---

[20] A true and correct copy of the executed Argon Services Agreement is attached as **Exhibit H**.

resources needed… in order to support the token issuance and the research, development, maintenance, marketing, and support" of the SHRAP Token blockchain.[21] It appears both Argon Foundation and Argon Corp. were created to conceal that Defendants have sole authority to distribute SHRAP Tokens.  That means, under the Token Subscription Agreements, the Manager Defendants did not contract with an independent entity to grant themselves SHRAP Tokens. The Manager Defendants instead granted over 1/6 of all SHRAP tokens *from themselves to themselves*.

## H. Defendants provide misleading capitalization tables to 4D Factory while internally maintaining separate books with the actual capitalization.

70.    With 4D Factory's directors officially seated on the board, the Manager Defendants began a series of misrepresentations to 4D Factory to obscure the Token Giveaway and the nature of 4D Factory's SHRAP Token holdings.

71.    During the January 26, 2022 Board meeting, Long was asked by Javarone what the status and then-current capitalization of SHRAP Tokens was. On February 14, 2022, three weeks after the full board was seated, Long delivered to 4D Factory, a copy of Neon Machine's February 2022 capitalization tables (the "February 2022 Cap Tables").[22] Grossman was copied on this email. The February 2022 Cap Tables were created by Zhou on January 29, 2022. In this email, for the first time, Long suggested that 4D Factory did not own its SHRAP Tokens:

> The token treasury controlled by the board is ~41% of total supply, of which 4D's 39% equity interest could theoretically [sic] translate into ~$240M should the board elect to distribute on a pro rata basis.[23]

72.    The February 2022 Cap Tables listed a supposed accounting of the total 3 billion Total Network Tokens. The February 2022 Cap Tables listed SHRAP Tokens sitting in "Neon

---

[21] *See* Argon Services Agreement at 1.

[22] The February 14, 2022 email and February 2022 Cap Tables are attached as **Exhibits I** and **J**.

[23] **Exhibit I.**

Machine Treasury" and SHRAP Tokens sitting with "Insiders" (a category which 4D Factory, as

a founding and majority shareholder of Neon Machine, should not have been excluded from):

| Neon Machine Treasury * | # tokens |
|---|---|
| 4D Factory | 480,927,488 |
| Griffin | 267,181,938 |
| Polychain | 160,309,163 |
| Founders | 320,618,325 |
| **Subtotal** | **1,229,036,913** |

| Insiders | |
|---|---|
| Seed Round Investors | 612,000,000 |
| Team, Advisors, Future Hires | 793,963,087 |
| Board Directors | 5,000,000 |
| **Subtotal** | **1,410,963,087** |

73.    These tables were deliberately misleading. The "Neon Machine Treasury" table

represented 4D Factory's understanding that it would *receive* SHRAP Tokens in proportion to its

equity in Neon Machine, as was promised. Long and Grossman did not explain who belonged to

the "Insiders" category or that Griffin, Polychain, and Manager Defendants received over a billion

additional SHRAP Tokens under the discreet labels "Team, Advisors, Future Hires" and "Seed

Round Investors."

74.    Around the same time, a detailed capitalization table dated February 10, 2022 (the

"Internal Cap Table") was maintained by the Manager Defendants and not shared with 4D

Factory.[24] This document was discovered by 4D only after it was forced to remove Long from its

board seat in August 2023 to pry open access to information. Zhou apparently created the Internal

Cap Table on October 28, 2021, after the IP transfer was signed. The Internal Cap Table listed the

exact amounts of SHRAP Token being given to Defendants, including Griffin and Polychain:

---

[24] Excerpts of the Internal Cap Table are attached as **Exhibit K.**

| | Name | Number of Tokens |
|---|---|---|
| 81 | *Launch Partner Equity Investors* | |
| 82 | Griffin Gaming Partners II, L.P. | 309,937,500 |
| 83 | Griffin Gaming Partners II Side Fund, L.P. | 16,312,500 |
| 84 | Polychain Venture Partners II LP | 195,750,000 |
| 85 | **EQUITY INVESTOR SUBTOTAL** | **522,000,000** |

| | Name | Number of Tokens |
|---|---|---|
| 3 | *Founders FTIs* | |
| 4 | Mark Long | 70,001,845 |
| 5 | Don Norbury | 70,001,845 |
| 6 | Colin Foran | 65,665,352 |
| 7 | Aaron Nonis | 65,665,352 |
| 8 | Mark Yeend | 61,415,589 |
| 9 | Naomi Lackaff | 62,196,158 |
| 10 | Calvin Zhou | 70,001,845 |
| 11 | Gianna Sulyma (In Founders Round) | 15,418,945 |
| 12 | **FOUNDERS SUBTOTAL** | **480,366,930** |

| | Name | Number of Tokens |
|---|---|---|
| 93 | **Friends and Family Round** | |
| 94 | Mark Long | 21,327,014 |
| 95 | Don Norbury | 21,327,014 |
| 96 | Colin Foran | 10,663,507 |
| 97 | Aaron Nonis | 10,663,507 |
| 98 | Mark Yeend | 213,270 |
| 99 | Naomi Lackaff | 2,132,701 |
| 100 | Calvin Zhou | 21,327,014 |
| 101 | Gianna Sulyma | 213,270 |
| 102 | David Vicini | 1,066,351 |
| 103 | Andrew Grossman | 1,066,351 |
| 104 | **TOTAL** | **90,000,000** |

75.     The Internal Cap Table does not list anywhere the breakdown of SHRAP Tokens according to equity holdings as listed in the February 2022 Cap Table. In fact, the Internal Cap Table only lists 15 million SHRAP Tokens "Reserved for 4D Factory" under the "Early Advisory" category. But these SHRAP Tokens were shown improperly as 4D's, since they had been promised to Javarone, in his individual capacity, as Long confirmed in his February 14, 2022 email.  So despite being a founding investor, majority stockholder, and "Founders" on the first resolutions (**Exhibit C**) upon Neon Machine's formation, when Long and the other Manager Defendants executed their give-away to "Founders," 4D Factory was excluded.

76.     In short, Long and his team were providing capitalization tables to 4D Factory showing that it, Griffin, Polychain and the Manager Defendants would receive SHRAP Tokens in

proportion to their equity holdings, while omitting the much more detailed tables showing that Griffin, Polychain, and Manager Defendants would have over 1 billion SHRAP Tokens among themselves and that 4D was entitled to *no tokens whatsoever*.

## I.   The Manager Defendants continue to conceal the Token Giveaway from 4D Factory with more lies and omissions.

77.    Learning that 4D Factory's large SHRAP Token holdings, long promised by Manager Defendants, were relegated to mere "Treasury" holding was surprising to say the least. So 4D Factory, through Javarone, began seeking answers from Long. On May 10, 2022, Javarone, emailed Long a series of questions seeking clarity about his February 14, 2022 email.[25]

78.    Among other questions, Javarone asked for: (1) the identities and investments of the "Pre-Seed" and "Seed Round" investors; (2) how many of the "Team, Advisors, and Future Hires" SHRAP Tokens were already granted or reserved for future hires; (3) how and when the "Seed Round" fundings and the grants of SHRAP Tokens to "Team, Advisors and Future Hires" were approved by the board; (4) clarification about 4D's token allocation in the "Treasury" category; and (5) why 4D Factory, Javarone, Conroy and Miller were not offered SHRAP Tokens to purchase at the near-zero price of the Founder round. 4D Factory also indicated it had never seen its tokens classified in the "Treasury" category before:

> This suggests that 4D is limited to a category that cannot access the token unless approved for distribution, while the rest who have been granted tokens for free or invited to purchase them for fractions of a cent are more liquid and accessible. What was planned for how the Treasury tokens would be available and liquid? Are there rules or other conditions related to the above white paper description that impact whether they can be distributed, per your footnote?[26]

---

[25] The May 10, 2022 email is attached as **Exhibit L**.

[26] Exhibit L.

79.     Over two months later, by email dated July 29, 2022, Long finally replied.[27]  Long

prefaced by saying that Grossman worked with Neon Machine's corporate counsel at Fenwick &

West LLP to prepare answers to 4D's questions. Grossman was still 4D Factory's general counsel

at this time and had a fiduciary duty and ethical responsibility to provide it full and accurate

information from Neon Machine. Yet Long's responses, which according to Long were drafted

and signed off by Grossman and outside corporate counsel Fenwick, only further withheld facts

and obscured the Manager Defendants' true intentions. Each false or misleading statement

in Long's email (A through F below), and 4D's response, is addressed below:

> A.     "Argon is a Panamanian foundation (without any members or shareholders)
> that is developing the smart contract responsible for the SHRAP token and is
> expected to eventually deploy the smart contract that mints the tokens.  Argon is a
> contractual counterparty of Neon, but is not owned or controlled by Neon."[28]

80.     This statement "A" is a false and misleading statement intended to lead 4D Factory

to believe that the SHRAP Tokens were being developed and distributed by an entity independent

of Neon Machine. But both Argon Foundation and Argon Corp. are Panamanian shells of Neon

Machine created by Long, and all operations related to creating and distributing SHRAP Tokens

were managed by the Manager Defendants at Neon Machine.

> B.     "Of the ~799 million SHRAP Tokens that have been allocated for current
> and future employees, directors, consultants, advisors, etc. of Neon [Machine] in
> connection with their services, interests in ~714.5 million SHRAP Tokens have
> already been allocated and/or granted (including to The 4D Factory LLC), and
> interests in ~84.5 million SHRAP Tokens remain reserved and available (note that
> the difference between ~794 million and ~799 million token interests is the 5
> million token interests allocated for Neon board directors, including yourself)." [29]

---

[27] A true and correct copy of the July 29, 2022 email is attached as **Exhibit M**.

[28] Exhibit M.

[29] *Id.*

81.     This statement "B" is also false and misleading to conceal the Token Giveaway and otherwise delay and hinder 4D Factory. Long deliberately misrepresented that 4D Factory's SHRAP Tokens were included in the 714.5 million that "have already been allocated and/or granted," when those were Javarone's personal tokens for his (otherwise uncompensated) services as an advisor and Neon Machine director on the board. In addition, although 4D requested a specific breakdown of how the SHRAP Tokens were distributed to "Team, Advisors and Future Hires," Long never provided one—concealing that the Manager Defendants had distributed 552 million SHRAP Tokens to themselves.

C.      "Separately, a group of founders and early service providers received an aggregate of 90 million SHRAP Token interests in exchange for cancellation of debt in the aggregate amount of ~$422,000."[30]

82.     This statement "C" is also false and misleading. As of July 2023, the roughly $422,000 in *alleged* debt was still listed as "notes payable" liabilities in Neon Machine's balance sheets, *with accrued interest*. In reality, 552 million SHRAP Tokens had been distributed or assigned to the Manager Defendants, not "an aggregate of 90 million SHRAP Token interests" as the July 29, 2022 response claims.

D.      "4D has a direct allocation of 15 million SHRAP Token interests, and a purchase agreement covering such token allocation was sent to 4D in December 2021 for signature."[31]

83.     This statement "D" is likewise a false and misleading statement intended to mispresent Javarone's token interests and obscure that the Manager Defendants had disenfranchised 4D Factory of the hundreds of millions of tokens. Javarone, not 4D, had been granted 15 million tokens. Long himself confirmed this in his February 14, 2022 email. He changed

---

[30] *Id.*

[31] *Id.*

his story from February and misrepresented to 4D Factory in July that those SHRAP Tokens belonged to it to hide that he had actually reserved no SHRAP Tokens for 4D Factory.

      E.     "In May 2021, Calvin Zhou offered you the opportunity invest [sic] in the project, and Calvin recalls that you did not want to participate at that time."[32]

      84.    This statement "E" is also false and misleading and intended to suggest that 4D Factory willingly turned down the opportunity to "invest" in what was in fact a massive SHRAP Token Giveaway. 4D Factory was never offered an opportunity to participate. Instead, around May 2021 when 4D Factory and Zhou discussed the SHRAP Token's capitalization and potential capital raises, Zhou took the opportunity to reinforce the large stake in SHRAP Tokens that 4D Factory was already entitled to in connection with its equity stake in Neon Machine.

      F.     "The specific way in which Neon uses the SHRAP token interests on its balance sheet will be determined over time, as dictated by business needs.  So long as Neon complies with applicable law, there aren't restrictions on how Neon can use the SHRAP token interests.  **If approved by the Board, one of those use cases could be distributing some or all of the SHRAP token interests to Neon stockholders.**"[33]

      85.    This statement "F" is deliberately misleading and intended to lead 4D Factory to believe that its SHRAP Tokens, now classified as "treasury" tokens, could still be distributed to them upon board approval.[34] But Defendants intended that 4D Factory would never receive its distribution of SHRAP Tokens, even by board vote. Indeed, with Long sitting in one of 4D's seats, and Griffin and Polychain in 2 out of 5 seats and coordinating with Long, and with Neon Machine actually in control of generating and distributing SHRAP Tokens (rather than shells), Long knew

---

[32] *Id*.

[33] *Id* (emphasis added).

[34] This was at least the second time Long had said this. See, Exhibit M: "The token treasury controlled by the board is ~41% of total supply, of which ***4D's 39% equity interest could theorectically [sic] translated into ~$240M should the board elect to distribute on a pro rata basis.*** (emphasis added).

it was implausible or even impossible for 4D "treasury" token to ever be distributed by the board. When 4D Factory sought in January 2024 to exercise the board's authority and the board passed the resolution to distribute SHRAP Tokens to stockholders (as that option was prescribed by Long himself in the 7/29/22 email), the Manager Defendants simply ignored the directive, and the Defendants continued to maintain that 4D Factory is entitled to no SHRAP Tokens whatsoever.

86.    The Manager Defendants were aware of the prospect of dilution of their common stock position if and when the SAFEs eventually converted. If and when the conversion occurred, the Manager Defendants would be entitled to fewer tokens based on their pro rata equity due to the dilution of their stock interests. Notwithstanding the lack of authority for the distribution of 552 million SHRAP Tokens in 2021, by distributing the SHRAP Tokens to themselves at the first opportunity, the Manager Defendants avoided all threatened dilution of their shares of the SHRAP Tokens if and when the SAFEs convert, while subjecting 4D Factory to *all* the dilution and now even arguing that 4D Factory receive nothing.

**J.  Defendants improperly control Neon Machine and prevent oversight by its majority shareholder.**

87.    Through the rest of 2022 and until Long's removal from the board in 2023, Defendants ran Neon Machine in direct contravention of Neon Machine's Bylaws and their responsibilities to shareholders and did not provide any more information to Javarone, a Neon Machine director, about 4D's SHRAP Token interests or an accurate picture of securities offerings even though those diluted 4D's interests.

88.    Despite promising "monthly day long board meetings," for almost two years, Long held only two board meetings with the 4D Directors, including the first meeting of the full five-member Board on January 26, 2022. Instead, he apparently held frequent, unnoticed meetings with, Planche and Perszyk and excluded the other two directors appointed by 4D, Javarone and Sherman.

4D Factory did not discover these meetings took place until just before Long was removed from the board on August 22, 2023. And it did not discover the Token Giveaway until even later. But Griffin and Polychain, through Planche and Perszyk respectively, knew that notice of these meetings had not been given to Javarone or Sherman.

89.     These board meetings were conducted in violation of Neon Machine's Bylaws. Article III, Section 10 provides that regular board meetings may be held without notice as determined from time to time by the Board, however, any absent directors must be given notice of such determination when it is made. Article III, Sections 11 and 12 similarly provide that notice of any special meetings of the board must be given to each director.[35] Long, Griffin, Polychain, Planche and Perszyk never noticed the 4D Directors of any meeting they held. Nor did anyone else. Thus, any actions "approved" by them were not approved before the board and are void.

90.     While excluding two of the three 4D Directors—Javarone and Sherman—from vital board meetings, as 4D later discovered, Defendants engaged in significant and damaging actions to Neon Machine's business and 4D's equity value without notice to or approval by Neon Machine's board or its majority stockholder. Defendants collectively ran up high operating costs without sufficient capital, drained Neon Machine's cash, listed SHRAP Tokens on public exchanges without board consideration of securities matters, raised most of Neon Machine's capital by selling agreements for future stock that diluted 4D's equity stake in Neon Machine without authority or approval, and used the cash raised at their whim.

91.     In particular, Long, Griffin, Polychain, Planche and Perszyk without any Board meeting or consent, caused Neon Machine to issue securities exceeding $15 million, the majority raised by Neon Machine as additional SAFEs to third parties in 2023, on terms substantially similar

---

[35] *See* **Exhibit B**.

to the SAFEs entered into with Griffin and Polychain in October 2021, including about $4 million more SAFEs issued to Griffin itself.  As with of the original SAFEs issued to Griffin and Polychain, conversion of the SAFEs to stock in Neon Machine has significantly diluted 4D's equity interests.[36] 4D Factory not only lost its control of Neon Machine, but will also suffer reduced potential dividends and be substantially setback from ever recouping its original investment. Defendants engaged in these actions to dilute 4D Factory's influence and ownership of Neon Machine, having already secured their own expected profits through the Token Giveaway.

92.    To date, without 4D Factory's knowledge or consent, Defendants have entered into, Token Subscription Agreements, Offer Letters, and Side Letters giving away over a billion SHRAP Tokens, currently valued at millions of dollars, to Manager Defendants, Griffin and Polychain, plus $15 million of additional, equity-diluting SAFEs.

93.    Unless relief is granted, the Defendants' plan will have worked. The Manager Defendants hold over 1/6 of the 3 billion SHRAP Tokens. At current trading prices[37], they possess *over $50 million* in tokens, in their wallets, which they can access and control to distribute, trade, and benefit from.[38] All while having locked out 4D Factory from receiving a single token.

94.    Defendants' coordinated stripping of value from Neon Media, initiated at a time when Long and others were employees and officers and a director of Neon Media, followed by the calculated pilfering of Neon Machine, combined with the millions of dollars in capital 4D Factory provided for Long's projects, were root causes of 4D Factory's bankruptcy filing in October 2023.

---

[36] In the c*omplaint* filed in the Derivative Action, Manager Defendants allege Plaintiff would only have a 19% equity interest in Neon Machine after SAFE conversion, the difference largely due to additional equity give-aways they desire, not approved by the Board or the Plaintiff.

[37] The value has been has high as $0.42 per token.

[38] Neon Machine unilaterally modified the lockup provisions during the bankruptcy, substantially decreasing the effective current value of the tokens owed to 4D.

**K. Defendants continue to withhold 4D Factory's SHRAP Tokens even after the board ordered they be distributed.**

95.    On August 22, 2023, 4D Factory removed Long from his seat on the Neon Machine Board for withholding information from the 4D directors and refusal to report to the full board. 4D Factory, through its three Board seats (Javarone, Sherman and Honour, who replaced Long), instructed Neon Machine's outside counsel to provide access to the company's data room (which outside counsel, not Neon Machine management, complied with). 4D Factory also called a series of board meetings to establish proper governance, investigate Long's *ultra vires* acts, and consider how to deal with the damaging consequences of Long's actions.  While the 4D directors performed the duties of the board, Griffin and Polychain's Board directors, Planche and Perszyk, objected to or abstained from voting on all proposed measures, even objecting to measures to provide *all* directors with access to Neon Machine's full corporate books and records, appoint special counsel to the board to help navigate matters, including matters related to the question of whether Network Launch had occurred, and to retain investment bankers to support capital raising beyond just the insiders Griffin and Polychain. Indeed, it was only through 4D Factory removing Long from one of its board seats that Plaintiffs learned many of the material facts that prompted this suit.

96.    On September 15, 2023, Long forwarded to the board a letter from Griffin (the "Demand Letter") demanding the conversion of their SAFEs to preferred equity. Long advised that he already asked outside counsel Fenwick to draft an amended corporate charter and financing documents to implement this conversion. The Demand Letter asserted for the first time the occurrence of an alleged "Network Launch" purportedly on April 29, 2023.  It argued 60 days later, on June 29, 2023, conversion of the SAFEs to preferred equity automatically occurred. Before September 15, 2023, neither 4D Factory nor the board ever received any notification, formal or informal, that a Network Launch or SAFE conversion occurred at any time. In fact, no

conversion could have been "automatic," as the Bylaws put in place by Long did not permit issuance of preferred stock and would have had to be amended, all requiring board approval, along with a board investigation into and determination of the purported Network Launch trigger event. SAFEs worth millions of dollars were issued *after* April 29, 2023, all without board approval and with language referring to Network Launch as a future event.

97.     When the board advised Long that it would need to ultimately determine whether Network Launch occurred, and emphasized the past unauthorized actions that required the board's review, Long refused to provide analysis or backup materials. Instead, he merely sent a weblink to the SHRAP blockchain and threatened to tell Griffin and "the other SAFE holders" that the board would not comply with the automatic conversion of the SAFEs.

98.     On October 5, 2023, the next Board meeting, Long, Griffin through Planche, and Polychain through Rosenthal, asserted the board was illegitimate, that the SAFEs must be recognized as converted, and, in a self-motivated act, that the board should not further scrutinize "Network Launch." During the meeting, the 4D directors also confirmed that Long had entered Neon Machine into about $15 million in new SAFEs in 2023 (after the supposed "Network Launch," which also triggers conversion under the new SAFEs), all without board authorization. *Neon Machine's counsel* at *Fenwick stated at the meeting that it had none of the records of the SAFEs that were issued.* Issuance of SAFE agreements *after* the supposed "Network Launch," would mean that Defendants knowingly entered into securities referring to Network Launch as a future event even though they were arguing that Network Launch had already occurred.

99.     On November 13, 2023, a third board meeting was called. Long and the Fund Defendants received notice of this meeting but refused to attend. Long was suspended as CEO (with pay) for abdicating his responsibilities, failing to provide information the board demanded,

and obstructing all board directives since the August Board meeting. Javarone was appointed as interim CEO and Treasurer. The board approved steps to retain counsel to investigate Long's actions at the company and issued directives to certain Manager Defendants. The board issued a directive imposing a two-signature requirement for expenses over $5,000, meant to control costs and give the board visibility on spending—a common-sense corporate control. The board also authorized the retention of investment bankers and game-industry specialist advisors on an expedited basis to support raising new financing for Neon Machine from a broad market. After the meeting, the board, through Javarone as interim CEO, issued these directives to Norbury, Nonis, and Grossman. None responded or complied with the board's directives.

100.    4D Factory's attempts to exercise board authority exposed, among other things, Defendants' desire to evade board review of its actions and prevent the board from opening capital-raising activities to a broader market, since it would lessen their grip on Neon Machine, control which has eviscerated 4D Factory's position despite being majority shareholder. Indeed, in keeping with their plan, Defendants ignored the Board's attempts to secure financing from the broader market. Instead, in early December 2023, Defendants tried to push through a $2 million equity investment from Griffin and Polychain. While this financing was a woefully insufficient amount at barely two-thirds of one month of Neon Machine's expenses, it would constitute a "Qualified Financing" that would cause Griffin and Polychain's SAFEs to automatically convert into preferred shares. If this transaction were carried through, the market would not have spoken. But the scheme to remove 4D from the board and ensure it could never access its tokens would be complete. The board did not approve the transaction.

101.    On January 4, 2024, counsel for 4D Factory delivered a letter to the board requesting the immediate turnover of its negotiated-for SHRAP Tokens. This letter sought turnover

of 480,927,488 SHRAP Tokens based on the representations made in the February 2022 Cap Tables—the most recent token capitalization tables Defendants had provided to date.

102.    These letters precipitated a fourth board meeting on January 12, 2024.  Planche and Rosenthal attended and opined, for the first time, that none of the 4D directors were seated any longer on the board because, they claimed, the SAFEs had already converted, and so Griffin and Polychain as "stockholders" could elect different directors. These statements could only be true if Polychain and Griffin "deemed" their SAFEs converted to preferred stock and voted as common shareholders, diluting 4D Factory's common stock and board control. Indeed, Planche suggested at the meeting that they voted for and elected (past tense) different directors after the November 13, 2023 board meeting. Ironically, Planche and Rosenthal in advance made sure to get signatures consenting to record the meeting from *all* Directors—*including 4D's.*

103.    Then on February 1, 2024, certain Manager Defendants filed in 4D Factory's chapter 11 cases the Motion of Neon Shareholders for Entry of an Order for Relief from Prior Order Granting Relief from Stay, or, in the Alternative, Granting Renewed Relief from Automatic Stay (ECF 63). In the motion, the Manager Defendants represented for the first time in indisputable terms their conclusion that 4D Factory was not entitled to any SHRAP Tokens whatsoever. *See* Reconsideration Motion ¶¶ 8–9 (stating the Debtors "do not own, did not disclose on their schedules, and are not entitled to" the SHRAP Tokens promised to Plaintiff); ¶¶ 38–39 ("Rather, the SHRAP Tokens held in Neon's Treasury are similar to treasury stock held by a Delaware corporation.  Such Treasury tokens are established for various reasons and have been held on Neon's balance sheet for general corporate purposes… at bottom, Neon's Treasury tokens were never meant or intended to be used as a rainy-day fund for the Debtor…") Indeed, the active trading

of SHRAP Tokens since November 2023 shows that millions of tokens have been distributed to holders around the world. Yet 4D Factory hasn't received a single token.

104.    In defiance of the board, Defendants continued to withhold substantial and vital information about the operations, finances, and token activities of Neon Machine and Argon from the Board, including the 4D directors. They maintained complete control of banking, capital raising, token activities, and operations and, took material actions defying the 4D-controlled board and Javarone as interim CEO. As recently as March 6, 2024, despite Javarone being the acting CEO, on their own Defendants publicly announced a "comprehensive revision" to the SHRAP Token unlock schedule that will reduce planned unlocking of tokens "for the team, advisors, seed token holders, and strategic token holders."[39] In other words, they're preventing 4D Factory from obtaining any benefit from the bargain it struck in exchange for the *Shrapnel* IP, and diminishing the value of 4D's tokens even when they are turned over.

105.    As it relates to potential derivative claims, 4D Factory previously demanded on April 14, 2024, that Neon Machine's board pursue claims against the Defendants, but that demand was denied. Of course given the current composition of the board, with a majority of seats controlled by or occupied by defendants to this litigation, any demand requirement is excused as futile. And given that the only real harm inflicted was to individual shareholder 4D Factory and that the relief sought here is to redress the harm to 4D, all claims brought are direct.

---

[39] Andrew Hayward, "'Shrapnel' Game Tweaks Token Schedule with 75% Less SHRAP Unlocking in April," DECRYPT.CO (Mar. 6, 2024), *available at* https://decrypt.co/220463/shrapnel-game-tweaks-shrap-token-schedule.

**Summary of Defendants' conspiracy to dilute and replace 4D Factory**

106.    Defendants individually and collectively through their executives and co-conspirators engaged in a series of frauds, affirmatively and by omission. Neon Machine, together with its Manager Defendants, Argon Asset Ventures Corp and Argon Protocol Foundation, and Griffin and Polychain, through their directors and agents as described below, created and orchestrated the scheme to issue, operate, and manage a blockchain-based cryptocurrency token-associated video game and cut out the majority shareholder from the control and benefits they'd promised 4D Factory to get the green-light for this entire endeavor. Defendants developed legal and economic ties designed to develop and manage the ecosystem of the game and the token. They acted in concert to ensure that they could control the granting and distribution of tokens.

107.    The aim of their scheme was to line their pockets at 4D's expense. It involved a series of fraudulent communications over a nearly three-year period, continuing to this day—all designed to acquire the *Shrapnel* IP rights and token without providing 4D Factory meaningful value for their cooperation and contribution.

108.    Neon Machine and the Manager Defendants, led by Long, were at the center of the scheme. By the nature of the officers' and directors' positions within Neon Machine, and for the Manager Defendants, acting in violation of their shareholder agreements and duties as Neon Media employees and officers, they orchestrated and carried out the scheme, as described here.

109.    Mark Long knowingly and actively participated in the enterprise's scheme to defraud 4D Factory through his role as CEO of Neon Media and Neon Machine. Because of his position as CEO of Neon Machine, Long granted himself and his team hundreds of millions of SHRAP tokens without disclosing that information to 4D Factory or the 4D directors. He orchestrated and supervised the day-to-day operations of the scheme—withholding key facts from

Neon Media when he was its officer, director, shareholder, and employee, and falsely inducing 4D Factory to turn over the valuable *Shrapnel* IP to Neon Machine. By granting to himself and the other Manager Defendants tens of millions of tokens plus equity, Long enriched himself and his team and ensured they'd stay loyal and conceal their token grab from 4D Factory.

110.    Colin Foran, as Chief Creative Officer at Neon Machine, participated in the company's day-to-day operations, including aspects of the SHRAP tokens. He received tens of millions of tokens through the token grab before the board was fully formed. Despite his role as an officer, he chose not to inform 4D Factory or any 4D director of that token grab and thus knowingly and intentionally participated in the scheme to defraud 4D Factory.

111.    Naomi Lackaff, as head of Partnerships at Neon Machine, also participated in the company's day-to-day operations, including aspects of the SHRAP tokens. She received tens of millions of tokens through the token grab before the board was fully formed. Yet in her role she chose not to inform 4D Factory or any 4D director of that token grab, and thus knowingly and intentionally participated in the scheme to defraud 4D Factory.

112.    Don Norbury, as CTO at Neon Machine, participated in the company's day-to-day operations, including its technical operations. He received tens of millions of tokens through the token grab before the board was fully formed, yet as an officer he nevertheless chose not to inform 4D Factory or any 4D director of that token grab. He too, then, knowingly and intentionally participated in the scheme to defraud 4D Factory.

113.    Mark Yeend, as CMO at Neon Machine, also participated in the company's day-to-day operations. He too received tens of millions of tokens in the token grab before the board was fully formed. Despite being an officer, he chose not to inform 4D Factory or any 4D director of the grab. Thus he knowingly and intentionally participated in the scheme to defraud 4D Factory.

114.    Aaron Nonis also knowingly and actively participated in the enterprise's scheme to defraud 4D Factory through his role as COO of Neon Media and Neon Machine. Because of his role of COO of Neon Machine, Nonis was complicit in executing Long's employment agreement, including the secret grant of tokens, without disclosing that information to 4D Factory or the 4D directors. As COO, he orchestrated and supervised aspects of the day-to-day operations of the scheme, including authorizing Long's employment agreement that included a token grant.

115.    Calvin Zhou likewise participated in the day-to-day operations of the company. He was uniquely knowledgeable about the game's blockchain aspects and the tokenomics. He prepared cap tables, including cap tables that disguised the ownership of the 522 million tokens the Manager Defendants granted themselves. Zhou himself received tens of millions of tokens through this token grab. As such, he not only knew of the enterprise's activities but also participated in those activities to omit material facts and cover up the wrongful acts.

116.    Long and Grossman had Neon Machine task the Argon entities with creating and supporting the blockchain network where the tokens reside. Neon Machine, through Long, caused Argon to enter into a services agreement where Neon Machine would do much of the work that Argon was supposed to do in launching the blockchain network underlying the SHRAP token, and Argon would funnel proceeds from the sale of SHRAP tokens back to Neon Machine. It appears this structure existed mainly to avoid U.S. securities laws and regulations by issuing tokens though a Panamanian entity. While the Manager Defendants claim Argon was recommended by cryptocurrency experts, the Argon entities seem to be shells. Nevertheless, Argon received funds from the sales of tokens in furtherance of the scheme and appears to have reinvested those funds into the operation of the enterprise via sham payments made under its services agreement.

117.    By the nature of being directors of Neon Machine and representatives of Griffin and Polychain, respectively, Pierre-Eduoard Planche, Benjamin Perszyk, and Josh Rosenthal, were aware of and involved in the enterprise. So the Griffin and Polychain entities not only knew but also benefited financially from the scheme. Indeed, Griffin and Polychain each received a grant of hundreds of millions of tokens. One example of their knowledge of the fraudulent acts of the enterprise was at the August 25, 2023 board meeting, when they voted against information access being enabled for all directors as required by Delaware law. Others include Griffin's written demand for conversion of the SAFEs after 4D's directors started asking about the token giveaway, voting against engaging counsel to investigate the purported Network Launch and advise the board, and voting against Neon Machine honoring the token grant promised to 4D Factory. These defendants were important to the enterprise because converting their SAFEs would dilute 4D's ownership interest below 50%—resulting in the loss of two of the three board seats promised to 4D. Only with Griffin and Polychain's involvement could the other Defendants ensure they'd remain in control and eliminate 4D's ability to investigate and remedy the wrongs described here.

118.    The conspirators knew that obtaining 4D's permission to let *Shrapnel* go forward at Neon Machine was pivotal. Neon Machine needed 4D Factory's permission because it controlled Neon Media as its sole Manager and majority owner. Neon Machine couldn't pursue *Shrapnel* without Neon Media's permission because all the Manager Defendants (except Zhou) were employees and officers of Neon Media and had member/employment agreements that did not let them take business opportunities to a different company.  Moreover, Neon Media owned the *Shrapnel* IP. That IP was key not just to Neon Machine's success but to the entire enterprise's. Without the *Shrapnel* IP, there was no first-person-shooter game that would draw users into the token market.  Without the *Shrapnel* IP, there could be no SHRAP token—that idea was created

at and assigned to Neon Media and thus was its intellectual property. For the conspirators, getting permission to proceed with *Shrapnel* at Neon Machine and acquiring the IP hinged on luring 4D Factory in part with promised control of Neon Machine at the shareholder and board level and granting 4D tokens.

119.    In August and September 2021, Neon Machine, through Andrew Grossman—who was also acting (disloyally) as 4D's counsel—induced 4D to have Neon Media transfer the *Shrapnel* IP to Neon Machine for far less than the IP's actual value. Grossman convinced Javarone (who managed 4D Factory and Neon Media) to assign the valuable *Shrapnel* IP to Neon Machine rather than license it, as Neon Media had been advised to do instead. Neon Machine, through Grossman, promised that 4D Factory would receive a controlling equity stake and board seats along with hundreds of millions of SHRAP tokens. These were material misstatements as 4D Factory did not actually receive a single token, much less an amount reflecting its equity share.

120.    Grossman, through these false and deceptive communications, participated in the scheme to obtain valuable IP with false promises of equity, control, and hundreds of millions of SHRAP tokens. His statements on Neon Machine's behalf were material in successfully inducing 4D to assign Neon Media's IP to Neon Machine for just $500. In his role within the conspiracy, Grossman acted with intent to deceive 4D out of the *Shrapnel* IP's full value, as indicated by the false promises described above, and cheated 4D by depriving it of those Neon Media assets.

121.    The scheme to rob 4D Factory was not apparent and remained essentially unknowable until recently. Neon Machine never allowed 4D Factory's loyal directors access to the data room of corporate books and records until 4D took board action in August 2023. Grossman likewise refused to share full documentation when Javarone requested it. Deceptive and evasive replies were provided in nearly all communications to 4D Factory, making detection especially

difficult. For example, Neon Machine's executives and directors now claim 4D does not actually own any Neon Machine stock because 4D did not timely execute the share-purchase agreement. But Neon Machine, through its CFO, first sent the Share Purchase Agreement to Javarone after the deadline. That agreement was part of the scheme to induce 4D to enter into an overall deal in which it obtained "control" over Neon Machine in return for letting Neon Machine proceed with *Shrapnel*. Neon Machine, through its executives, knew that offering shares, along with the other control elements, would induce the IP transfer for far below its actual value. And indeed, the scheme worked because 4D did have Neon Media transfer the IP to Neon Machine.

122.    Javarone didn't know the stock-purchase agreement was expired already as of the date he received it, as shown by his immediately executing it. By sending the Stock Purchase Agreement at the same time as the IP Sale Agreement, Neon Machine induced 4D Factory and Neon Media to sign the IP Sale Agreement, transferring Neon Media's valuable IP to Neon Machine for nominal consideration—which, as discussed below, Neon Machine never paid.

123.    Neon Machine's email of the share-purchase agreement was an act of fraud furthering the overall scheme. That the agreement could be argued to be void because the acceptance period expired was unknown to Javarone, 4D's Manager, when he received it. The contract's fraudulent nature was further masked by Neon Machine's later actions, like issuing stock certificates to 4D signed by Long and Nonis that say 4D's shares were "fully paid."

124.    On October 1, 2021, 4D Factory, relying on Neon Machine's representation that 4D was acquiring a 60% stake in Neon Machine—entitling it to three of the five seats on Neon Machine's board—caused Neon Media to transfer the valuable *Shrapnel* IP for just $500. To be clear, Neon Media's only consideration for the IP transfer itself was the payment of nominal value, $500 (which Neon Machine did not actually pay). That agreement, which stands on its own, was

intended to be part of a series of transactions by which 4D allowed these Neon Media employees, officers, and directors to pursue an existing Neon Media project in a new but Neon-affiliated vehicle 4D would control through a majority of share ownership and board seats.

125.    Over the next few months, Neon Machine, through its agents, led 4D Factory to believe it was a shareholder and that Neon Machine was upholding its end of the deal. For example, 4D's three directors, including Javarone, were added to the Neon Machine board in January 2022. That board meeting took place by videoconference. Those board seats "belonged" to 4D because of its 60% equity stake and a promise that 4D would always have a board seat. By accepting 4D's three directors, even though 4D allegedly didn't own shares, Neon Machine furthered the scheme to defraud 4D of the IP and line Defendants' pockets with a massive token giveaway.

126.    Soon after, Neon Machine engaged with Carta, an online provider of corporate services such as stock-certificate issuance and management. Neon Machine caused Carta to send 4D's share certificates via electronic communications—and those share certificates were signed by Long and Nonis. Those share certificates, dated August 20, 2021, state that "4D is the stockholder of Six Million (6,000,000) **fully paid** and non-assessable shares of Common Stock, par value $0.0001, of Neon Machine, Inc.…."  As indicated by their signatures, Long and Nonis knew about the "fully paid" factual assertions in those shares. But that communication, at least according to Defendants' pleadings in this case, was false. Whether false or not, the communication was made in furtherance of the scheme because the misleading share certificate was intended to, and in fact did, bolster 4D's belief that it was a shareholder of Neon Machine with *de facto* control over the company because of its 60% equity stake.

127.    If Defendants' position were true, then the Carta stock certificates prove Neon Machine misled 4D Factory into believing it was a Neon Machine shareholder as of August 20,

2021. Around October 1, 2021, Long and the other Manager Defendants awarded and accepted for themselves over 522 million tokens. This created, in effect, a cabal of insiders, each of whom knew of the scheme to line their pockets with SHRAP tokens—harming the value of 4D's equity stake in Neon Machine. Despite 4D's director positions, it's been unable to obtain corporate records from the period that Long acted as the sole director and took many of the actions described in this complaint.   But it appears Long and the other Manager Defendants communicated between themselves about their employment agreements, token agreements, and other related documents in furtherance of the fraudulent scheme. Neon Machine, Long, and Nonis knew of this material information and never mentioned it to 4D or Javarone, 4D's Manager, despite the impact it had on the value of 4D's shares. Those omissions were fraudulent because Neon Machine, through its officers Long and Nonis, owed a fiduciary duty to 4D as a shareholder and Javarone as a director. These fraudulent omissions furthered the scheme because they concealed the transactions by which the Manager Defendants secretly gave themselves more than half a billion tokens.

128.    The members of the conspiracy did not merely omit material facts in the early stages of the scheme, they affirmatively obfuscated and misrepresented facts related to the token grant for years. Long and others in the enterprise ceased having formal board meetings to avoid being asked to report further, as Javarone had requested in January 2022. And they continued to withhold information about their massive token grab from the shareholders and the board of directors, including Javarone, because they knew Network Launch, as defined in certain SAFEs, would later occur, diluting 4D's majority ownership and board control and eliminating 4D's ability to investigate or remedy the self-serving token grant. By concealing the token grab until after they claim Network Launch occurred, Long and the other members of the enterprise tried to avoid 4D's directors moving for the Board to declare distribution of tokens to 4D Factory. 4D was directly

harmed by this fraud by omission—as demonstrated by the Defendants' current legal position claiming that the dividend declared by the Neon Machine board in January 2024 was unauthorized.

129.    Further, the January 26, 2022 board meeting was the first meeting of the full board, including 4D's three directors. In the videoconference meeting, Long presented the company's plans to launch the token, including the initial distribution plan. That presentation was materially misleading due to Long's omissions and half-truths. Nowhere did he share that he and his cohorts secretly granted themselves 522 million tokens. Through his omissions, Long sought to cheat 4D out of its valuable property by suppressing the token grab while 4D controlled the board.

130.    As 60% owner in Neon Machine, 4D had an ownership interest in Neon Machine's future release of tokens—none of which had been minted at that point. By giving away the right to those 522 million tokens, Long and his co-conspirators reduced the value of Neon Machine's token holdings, and thus reduced the value of 4D's pro rata share.  Had Long revealed his massive token grab, 4D could have thwarted this scheme early and avoided the token distribution once minted. Had 4D Factory known, it could have simply caused the board, which was under its control, to issue tokens to all founders, including 4D Factory. Or it could have caused the shareholders, of which it held a majority, to vote to change the corporate structure, or secure its share of the Token Giveaway (60%) or take other action to unwind the conspirators' wrongful acts before any tokens were transferred. Long's deceptive communications meant 4D Factory remained unaware of the conspirators' efforts to line their pockets with the company's assets. Long's half-truths and omissions made at the board meeting furthered the scheme to profit at 4D's expense.

131.    Even further, Neon Machine and Argon entered into services agreements where Neon Machine would perform tasks Neon Machine ostensibly hired Argon to perform—developing and operating the token network. In an agreement dated February 2, 2022, Neon

Machine assigned the IP to Argon—the same IP Neon Machine wrested from Neon Media—and agreed to perform essentially all the services associated with support for the token issuance.

132.    This agreement also furthered the scheme in multiple ways. It let Neon Machine maintain control of the actual blockchain network, rather than have an independent entity control that function. That's important because "Network Launch" under the Griffin and Polychain SAFEs cannot be triggered by a blockchain network that is not operated or managed by Neon Machine. Importantly, Long omitted any mention of this key part of the services agreement when he convinced the directors to approve it at the January 26, 2022 board meeting. That was a material omission because it meant Neon Machine had complete control over the conditions required to convert the SAFEs and reduce 4D's control over Neon Machine's governance—a core condition promised to 4D Factory to let the *Shrapnel* project go forward at Neon Machine.

133.    The services agreement also lets Neon Machine profit from Argon's token sales by invoicing Argon for services. Neon Machine seems to be operating a Panama foundation to funnel funds from Argon's token sales back to it for services Argon was supposed to perform. Defendants' allege that Argon "…was recommended to Neon [Machine] by outside experts to assist with the development of the SHRAP token and related [n]etwork." But that's at best a half-truth. Those services are being performed by Neon Machine under the services agreement. And the funds paid to Neon Machine by Argon have been recycled into the enterprise to further the scheme.

134.    Argon Protocol Foundation took actions supporting the conspiracy too. It entered into Token Subscription Agreements with Long and the other Manager Defendants as early as November 2021. Those agreements were actually created and signed later but backdated to November 8, 2021. Argon signed those documents electronically via Docusign. Argon has also sold tokens in furtherance of the conspiracy, and paid money to Neon Machine used in furtherance

of it. For example, Long's email dated July 29, 2022 describes token sales by Argon to investors for $7 million. That letter notes that Argon then paid Neon Machine for services allegedly provided by Neon Machine to Argon.

135.    Another act furthering the scheme to defraud 4D Factory occurred in Long's July 29, 2022 email to Javarone. The email omits any disclosure of the critical fact that Long and his co-conspirators granted themselves 522 million tokens—tokens that, when ultimately minted, would have otherwise been available for Neon Machine to sell or use with the game's development—the same as the tokens Neon Machine now describes as "treasury." By this deceptive communication, Long attempted to cheat 4D Factory out of its property—hiding the token grab until a future Network Launch, when 4D would lose its majority board seats and control.

136.    Griffin, through its directors, took actions in support of the enterprise too. Through its director, it sent a letter around September 14, 2023, demanding conversion of SAFEs due to a supposed Network Launch. Griffin took that step to further the scheme because the request was made to ensure that 4D Factory would lose control of two of its three board seats, and thus lose the ability to investigate the ultra vires acts and remedy the harm caused by the token grab. Griffin's actions demonstrate its awareness of the enterprise's scheme to defraud 4D. Giffin's actions also represent an intentional participation in that scheme to defraud 4D.

137.    All these examples were part of a multi-year, interstate and international effort by the enterprise to acquire 4D's valuable asset and permission, grant themselves tokens worth millions of dollars while engineering a scheme to avoid giving 4D its promised tokens, and then conspire to cover up the enterprise's wrongdoing before 4D could remedy that wrong. This effort is ongoing and will only be stopped with Court intervention.

## THE 4D FACTORY'S CLAIMS

### COUNT I
### (Breach of Contract)
### (Against Neon Machine Inc.)

138.    Plaintiff realleges and incorporates by reference each allegation set forth in this complaint.

139.    Plaintiff was the majority shareholder in Neon Media LLC. And Neon Media LLC owned the Shrapnel intellectual property rights. To convince Plaintiff to allow Neon Media LLC to transfer the Shrapnel intellectual-property rights to new entity Neon Machine, Inc., the Manager Defendants made several agreements on behalf of Neon Machine Inc. In exchange for Plaintiff 4D transferring the Shrapnel intellectual property rights, Neon Machine Inc. agreed:

    a.  Plaintiff 4D Factory LLC would become a 60% owner of Neon Machine, Inc.;

    b.  Plaintiff 4D Factory LLC would occupy three of Neon Machine Inc.'s five board seats;

    c.  Plaintiff 4D Factory LLC would receive tokens proportional to its equity share; and

    d.  Plaintiff 4D Factory LLC would receive the Manager Defendants' share of any dividends (including tokens) until Plaintiff 4D Factory LLC recouped its entire capital investment in Neon Media, at the time more than $2.3M.

140.    Neon Machine, Inc. breached each of these obligations while Plaintiff 4D Factory LLC performed by causing Neon Media LLC to transfer the Shrapnel intellectual property. Specifically, Neon Machine, Inc. issued secret dividends in the form of tokens to the Manager Defendants and Fund Defendants, but none to Plaintiff. In other words, the insiders all paid themselves handsomely, but conspicuously disregarded the majority and founding shareholder 4D Factory. This even though Plaintiff only ever agreed to transfer the Shrapnel intellectual property upon the promises that it would actually receive its promised tokens, backed up by the promise by

Neon Machine's other founders that 4D would recoup its capital investment before any dividends would be paid.

141.    Alternatively, if Plaintiff did not contract directly with Neon Machine, Inc., it was the intended third-party beneficiary of the agreement between Neon Media LLC and Neon Machine, Inc. as it was intended to reap the benefit of its shareholder and board control status in Neon Machine, just as it had in Neon Media, together with the right to participate in any token distribution at the same level.

142.    In any event, Neon Machine Inc. failed to perform its obligations and breached the agreement with Plaintiff. And to the extent Defendants read other terms into the arrangement to excuse the breach, their behavior violates the implied duty of good faith and fair dealing.

143.    As a result, Plaintiff has been damaged in an amount equal to the value of the board control and token distribution that was promised but never provided to it, amounting to approximately 480 million tokens, together with any and all other damages or remedies available to it, including rescission, attorney's fees and costs

### COUNT II
### (Turnover and Accounting of Property)
### (Against Manager Defendants, Neon Machine, Inc., Argon Protocol Foundation, and Argon Asset Ventures Corp.)

144.    Plaintiff realleges and incorporates by reference each allegation set forth in this complaint.

145.    Section 541 of the Bankruptcy Code provides that a debtor's estate is comprised of, subject to certain exceptions, "all legal or equitable interests of the debtor as of the commencement of the case."  11 U.S.C. § 541(a)(1).

146.    Section 542 of the Bankruptcy Code provides that an entity in possession, custody, or control during the case of property that the trustee may use, sell, or lease under section 363 of

the Bankruptcy Code "shall deliver to the trustee, and account for, such property or the value of such property, unless such property is of inconsequential value or benefit to the estate." 11 U.S.C. § 542(a).

147.    Plaintiff was promised SHRAP Tokens in proportion to Plaintiff's equity interests in Neon Machine. Plaintiff has good cause to believe that SHRAP Tokens to which it is entitled have been and are being improperly held by Manager Defendants, Neon Machine, Inc., Argon Protocol Foundation, and Argon Asset Ventures Corp., who are acting together in furtherance of their wrongful acts, as described in more detail in this complaint, that should be turned over to Plaintiff's bankruptcy estate immediately as promised.

148.    Plaintiff has a legal and equitable interest in the SHRAP Tokens being so held. Although Neon Machine, through its board, authorized the *pro rata* release of SHRAP Tokens including Plaintiff's SHRAP Tokens by delivery to Plaintiff's wallet address, those SHRAP Tokens have not been released.  To the extent SHRAP Tokens constitute "treasury stock" of Neon Machine, the action by the Board was in keeping with Article V, Section 1 of the Bylaws, not to mention in accordance with the process provided by the Manager Defendants and their counsel.

149.    Plaintiff has good cause to believe that the Manager Defendants have continued to sell or give away SHRAP Tokens to reduce the total amount remaining to distribute to stockholders, including to Plaintiff. Manager Defendants continue to withhold information regarding the current pool of SHRAP Tokens remaining to distribute. Plaintiff has only recently been able to discover that Manager Defendants gifted 552,602,013 to themselves and distributed nothing to Plaintiff. Plaintiff remains entitled to the 480,927,488 SHRAP Tokens the Manager Defendants represented it was entitled to as its *pro rata* share based on Plaintiff's initial equity. In

addition, Plaintiff is entitled to receive, at minimum, 60% of the SHRAP Tokens Manager Defendants distributed to themselves, or 331,561,208 tokens.

150.    The SHRAP Tokens can be used, sold, or otherwise transferred for value by Plaintiff as a debtor in the Chapter 11 Cases. SHRAP Tokens are currently in circulation. At a value just $0.05 per token, Plaintiff could potentially yield more than $40 million from the sale, over time, of its SHRAP Token, multiples of what's needed to fund the Debtor's plan.

151.    The Manager Defendants, Neon Machine, Inc., Argon Protocol Foundation, or Argon Asset Ventures Corp., currently have possession, ownership, or dominion over the tokens such that one or all of them are the only individuals or entities with the ability to effectuate a transfer of the tokens, whether by contractual authority or otherwise.

152.    Accordingly, under 11 U.S.C. § 541(a) and 542(a), Plaintiff demands (i) immediate compliance with the Board's directive to release the SHRAP Tokens to Plaintiff, *i.e.* the immediate turnover to Plaintiff of 480,927,488 SHRAP Tokens and (ii) turnover of 331,561,208 SHRAP Tokens, or a rescission of all Token Giveaways and a redistribution on an undiluted, *pro rata* basis with all Defendants' alleged rights equitably subordinated given their improper conduct, and (iii) an accounting of the Total Network Tokens.

153.    Additionally, to the extent the Manager Defendants, Neon Machine, Inc., Argon Protocol Foundation, or Argon Asset Ventures Corp. have sold any SHRAP Tokens that constitute property of the estate, Plaintiff also demands the immediate turnover from Manager Defendants of 60% of the proceeds received for those sales.

**COUNT III**
**(Fraud/Breach of Fiduciary Duty of Disclosure)**
**(Against Manager Defendants)**

154.    Plaintiff realleges and incorporates by reference each allegation set forth in this complaint.

155.    The Manager Defendants, in their respective capacities as directors and officers of Neon Machine, owed fiduciary duties, including the fiduciary duties of loyalty and disclosure, to the company and to 4D Factory, who was a shareholder at Neon Machine.

156.    As detailed in this complaint, the Manager Defendants, working in concert, knowingly made a series of material misrepresentations, including omissions, to Plaintiff to induce Plaintiff, and to cause its controlled company, Neon Media, to agree to the creation of Neon Machine, as well as the transaction with Griffin and Polychain, and then to mislead Plaintiff about the truth of its interest.

157.    In particular, in the time just before the October 1, 2021 IP Sale Agreement, Long represented to Plaintiff that (1) 4D Factory would maintain 60% ownership equity in Neon Machine, (2) 4D would hold three of five seats on the Board and governance would remain unchanged; and (3) 4D would receive SHRAP Tokens as holder of 60% equity in Neon Machine, in proportion to its equity; and (4) 4D would recoup its prior investment from the Manager Defendants' share of dividends. These representations were false, and Long knew it. Long promised 4D Factory three board seats, as evidenced by his September 2, 2021 email to 4D members including Javarone. Yet he told Griffin and Polychain, in his term sheet for the preferred shares, which was finalized by September 29, 2021, that 4D would receive just one board seat, and the other two would be designated as "common." This was material because it meant that 4D would have no board control once the Griffin and Polychain's SAFEs converted.

158.    Long's representation was also materially false because 4D did not actually receive tokens. The Manager Defendants, through Long and Zhou, referred to "4D's token" and omitted any characterization of those tokens as "treasury," which was material because those are not owned by the shareholders but are available only if Neon Machine's board authorizes a distribution. That omission was repeated and amplified by others, including Zhou. The omission of that material fact was purposefully designed to keep 4D Factory unaware of the deceptions to deny 4D over 400 million tokens it was entitled to, while it controlled the board and the majority of the company's shares—when it could have remedied the wrong by allowing a distribution.

159.    On October 1, 2021 at 3:47 PM Eastern, just hours before 4D caused Neon Media to turn over its Shrapnel IP for consideration of just $500, Long emailed Javarone, 4D's manager, and communicated the Manager Defendants' agreement to pledge dividends to 4D to allow 4D to recoup its investment.[40] 4D took that to mean that each of those Manager Defendants understood the need to provide value to 4D given its multi-million dollar investment at Neon Media. And to that end, by approving the Recoupment Agreements, each Manager Defendant represented to 4D Factory that it would be paid back for its significant investments.

160.    One glaring omission from the agreement to recoup 4D's investment was the fact that the Manager Defendants had hatched a scheme to grab for themselves hundreds of millions of tokens without allocating 4D its *pro rata* share. That omission by each of them was material because, with those token grants in their employment agreements, they had no need to receive tokens through a traditional, board-approved dividend. The omission was intended to cause 4D to cause Neon Media to grant its IP and support to the Shrapnel project at Neon Machine. 4D did, in

---

[40] This misleading communication did not involve Zhou, who did not own units of Neon Media.

fact, cause Neon Media to transfer that IP less than four hours after receiving confirmation of the misleading recoupment promise.

161.    But for these representations by Neon Machine's then-CEO and manager/shareholders, 4D wouldn't have agreed to the transactions. It reasonably believed the Manager Defendants' representations were true because it had not been informed that Long secretly and unilaterally gave himself all power over Neon Machine through the Bylaws and had no reason to believe the Manager Defendants would intentionally sabotage 4D's investment.

162.    These representations and omissions, individually and as part of an overall scheme, were false when made, and the Manager Defendants knew they were false, or made them recklessly without knowledge of their truth. The Manager Defendants never intended to pay back 4D Factory for its investments. They intended to induce 4D to transfer the *Shrapnel* IP out of Neon Media, and to agree to the SAFEs with Griffin and Polychain, by misleading and defrauding 4D.

163.    Once the Manager Defendants got what they wanted, they each consciously and recklessly undertook efforts to sabotage 4D's investment. This coverup violated the Manager Defendants' duty of disclosure. And Long then set up 4D's equity for significant dilution upon launching *Shrapnel* by closing on more SAFEs without notice to or approval of the board. Long gave over a billion tokens to the Manager Defendants, and Griffin and Polychain without notice.

164.    Each Manager Defendant entered into Offer Letters with Neon Machine and Token Subscription Agreements with Argon Foundation to grant themselves millions of SHRAP Tokens not offered to 4D.  Because all services related to generating and distributing SHRAP Tokens were performed by Neon Machine, each Manager Defendant knew or should have known that, through the Token Subscription Agreements, they were essentially contracting with themselves to give

themselves SHRAP Tokens. As Neon Machine officers, each Manager Defendant had a duty to disclose that material information to 4D, who was a Neon Machine shareholder.

165.    From the appointment of the full Board on January 26, 2022, each Manager Defendant worked with Long to conceal the status of the SHRAP Tokens from 4D and withhold all of Neon Machine's vital financial and operational information from the 4D directors.  Other steps, including attempts to conceal conduct and insulate the Manager Defendants, represent more fraudulent conduct and breaches of fiduciary duty, all to cover up their wrongdoing.  In fact, aside from information provided by outside counsel Fenwick West in August, who've since resigned, each Manager Defendant continues to withhold all material information from the 4D directors. Each Manager Defendant was and participates in the scheme to defraud 4D.  This failure to disclose material information violated each Manager Defendants' duty of disclosure.

166.    The Manager Defendants' breaches of fiduciary duty went beyond just fraud and withholding material information from 4D. Nonis, the COO, breached his fiduciary duty by making an employment offer to Long that was not approved by the board. Even if agreement were approved by the board, it happened while Long was the sole director. And to the extent Long approved employment agreements containing token grants and equity grants for the other Manager Defendants, Long likewise breached his fiduciary duty to 4D. Long did not avail himself of any of the safe-harbor provisions of DGCL 144 in that he did not have disinterested directors consider the token and equity grants. He elected to not have the shareholders approve those transactions, and those transactions were not in the company's best interests. Long was not a disinterested director when ratifying the token grants and equity grants to the Manager Defendants; he was beholden to those people because each received a secret token grant that was not disclosed to 4D.

Those massive token grants, on top of the equity grants, were intended to and did line the Manager Defendants' pockets at the expense of Neon Media and 4D.

167.    As a direct, proximate, and foreseeable result of the Manager Defendants' continuing fraud against 4D, Plaintiff suffered and sustained and is entitled to recover from the Manager Defendants, jointly and severally, actual, general, compensatory and consequential damages in an amount to be proven at trial but no less than $10 million.

168.    As a direct, proximate, and foreseeable result of the Manager Defendants' breaches of their fiduciary duties, 4D Factory suffered substantial losses of equity value at Neon Machine, in an amount to be determined at trial but not less than $10 million. 4D likewise suffered from the diminution of the value of its equity stake at Neon Machine through the self-serving token grab. Alternatively, 4D is entitled to a declaration that these transactions addressed are void or voidable.

169.    Plaintiff made a demand on Neon Machine requesting that the company consider bringing this claim. Neon Machine declined the opportunity to pursue this claim.

### COUNT IV
### (Fraudulent Concealment/Breach of Fiduciary Duty of Disclosure)
### (Against Fund Defendants)

170.    Plaintiff realleges and incorporates by reference each allegation set forth in this complaint.

171.    To the extent the Fund Defendants held seats on the Neon Machine board, they were fiduciaries to Neon Machine and its shareholders, including 4D, and therefore owed a duty to disclose accurate information to it regarding board meetings and significant actions taken by Neon Machine as a result of such board meetings.

172.    The Fund Defendants knew the 4D Directors were not given notice of the scheduling or results of these meetings with Long. They deliberately concealed or disclosed no meetings they held with Long to the 4D directors. Through their respective directors, they chose

not to inform 4D's directors about these meetings so it would be unaware of and unable to take a position on any of the actions Long, and the Fund Defendants sought to perform.

173.    4D Factory, as 60% owner of Neon Machine and holder of three seats on its board, was justified in relying on the Fund Defendants' silence. Griffin and Polychain were fiduciaries of Neon Machine and obligated to follow Neon Machine's Bylaws, including as to board meetings. 4D was given no notice or information to suggest that these illicit meetings were occurring. Had it been notified of these meetings, it would've participated, obtained information about the business and 4D's investment, and prevented or at least tempered Defendants' harmful acts.

174.    This concealment allowed Long to execute significant acts on Neon Machine's behalf with the false stamp of board approval, even though each of those actions and meetings violated Neon Machine's bylaws. These actions included issuing additional SAFEs with Griffin in mid-2023.  Further, when the board sought to investigate the alleged Network Launch, the Fund Defendants obstructed the board from launching the investigation—knowing it could result in their SAFEs being deemed unconverted. And when the board sought to retain professionals to raise financing for Neon Machine, the Fund Defendants ignored the board's attempts, and sought with Long to cram down a flawed equity investment to accelerate the SAFEs' conversion.

175.    The Fund Defendants, through their directors, breached their fiduciary duty of care by withholding key financial and operational information about Neon Machine from 4D's board directors. They knew or had reason to know Long was deliberately excluding the other 4D directors from important meetings and decisions about Neon Machine's fate by the lack of notices being sent to the full board and the 4D directors' absence from these meetings. Rather than alert their fellow board members (and indeed the majority shareholder) about the operations and financials of Neon Machine, they facilitated the obstruction of Long and his team.

176.    The Fund Defendants have since refused to engage with the 4D directors in any way, except to obstruct legitimate board oversight in board meetings. And they openly declared at the January 12, 2024 board meeting that they voted for and elected different directors after the November 13, 2023 board meeting. Given the lack of visibility to the full board regarding the financials and management at Neon Machine, it appears the Fund Defendants are continuing to authorize the Manager Defendants' actions and operate the business with Long completely detached from board knowledge or authorization.

177.    Because of this silence, and the Fund Defendants' prior and continued breaches of their fiduciary duties, Long and the Manager Defendants, with the Fund Defendants' endorsement, engaged in their bad acts without 4D's knowledge. 4D Factory was unable (and remains unable) to determine the status of its negotiated-for SHRAP Tokens. The 4D directors have been unable to access (and remain unable to access) Neon Machine's vital financial and operational information on Neon Machine and the project. 4D has been rendered unable to even discover, let alone act to prevent, Long's wrongful actions at Neon Machine. 4D's equity in Neon Machine is now subject to significant dilution because of the agreements for future stock Long entered Neon Machine into with the Fund Defendants' approval but without notice or approval of the full board. And the Fund Defendants had refused even to acknowledge the 4D board members' legitimate positions on the board. 4D has incurred substantial costs, including legal fees, to address the Fund Defendants' breaches.

178.    4D Factory is entitled to recover from the Fund Defendants, jointly and severally, actual, general, compensatory and consequential damages in an amount to be proven at trial but no less than $10 million.

## COUNT V
### (Breach of Fiduciary Duties of Loyalty and Care)
### (Against Manager Defendants)

179.    Plaintiff realleges and incorporates by reference each allegation set forth in this complaint.

180.    The Manager Defendants, as managers, officers and directors of Neon Machine and those controlling Neon Machine, owed fiduciary duties of care, disclosure, and loyalty to Neon Machine's shareholders, including majority stockholder 4D Factory.

181.    The Manager Defendants breached their fiduciary duty of loyalty to Neon Machine and its shareholders by—without notice to or consent of the full board of Neon Machine—significantly diluting 4D's equity by issuing unauthorized SAFEs, snatching up hundreds of millions of SHRAP Tokens for themselves, entering into the Token Subscription Agreements without notice to, or approval by, shareholders (knowing or having reason to know Argon Foundation was a shell), and deliberately misrepresenting the nature of 4D's SHRAP Tokens.

182.    Neon Machine is not subject to the same control applicable to Neon Media and the Manager Defendants exploited those differences for their personal benefit or to raise capital on terms that were not permissible under Neon Media's framework, the Manager Defendants breached their fiduciary duty of loyalty by, among other things, usurping a corporate opportunity that belonged to Neon Media.

183.    The Manager Defendants who were employed at Neon Media acted in concert because they could not take the *Shrapnel* opportunity to a new entity without Neon Media's permission (or its controlling member's, 4D). Throughout the events described in this complaint, and in particular those events giving rise to this claim, the Manager Defendants acted as a group to breach their duties to Neon Media, Neon Machine, and the majority shareholder of both—4D.

184.    The Manager Defendants breached their fiduciary duty of care and disclosure by misrepresenting the SHRAP Token capitalization to 4D and withholding vital financial and operational information about Neon Machine from 4D's board directors. Long in particular entered into significant additional SAFE financing without notice to or consent of the board and conducted improper "Board meetings" without notice to 4D's two directors. Each other Manager Defendant worked directly with Long to cause these breaches.

185.    As a result of the Manager Defendants' breaches of fiduciary duties, Plaintiff was wrongfully induced into allowing the transfer of its subsidiary's valuable IP to Neon Machine. The Manager Defendants' breaches have caused 4D Factory to receive no proceeds from Neon Machine, despite the millions of dollars and valuable IP it provided to support the Manager Defendants. 4D Factory has incurred substantial costs, including legal fees, to address the Manager Defendants' breaches. And the Manager Defendants' refusal to recognize 4D's rights in the face of the debts 4D took on to fund their projects is a primary precipitator of this bankruptcy.

186.    4D Factory is entitled to recover from the Manager Defendants, jointly and severally, actual, general, compensatory and consequential damages in an amount to be proven at trial but no less than $10 million. Alternatively, it's entitled to a declaration that the transactions addressed here are void or voidable.

## COUNT VI
### (Aiding & Abetting Breaches of Fiduciary Duty)
### (Against Foran, Lackaff, Nonis, Norbury, Yeend, Zhou)

187.    Plaintiff realleges and incorporates by reference each allegation set forth in this complaint.

188.    Long, a CEO and former board director of Neon Machine, owed fiduciary duties of care and loyalty to Neon Machine's shareholders, including 4D, and breached those duties.

189.     To the extent any of the Manager Defendants Foran, Lackaff, Nonis, Norbury, Yeend, and Zhou are not fiduciaries, they had actual or constructive knowledge that Long was breaching his fiduciary duties. Defendants Foran, Lackaff, Nonis, Norbury, Yeend and Zhou worked with Long daily in developing the Shrapnel game and operating Neon Machine while shutting 4D out from oversight of the company.  Defendants Foran, Lackaff, Nonis, Norbury, Yeend, and Zhou knew or should've known the Argon entities were shells created by Long because Neon Machine was responsible for generating and distributing SHRAP Tokens.

190.     Therefore, Defendants Foran, Lackaff, Nonis, Norbury, Yeend and Zhou knowingly participated in Long's breaches by executing the Offer Letters and the Token Subscription Agreements, generating the contradictory February 2022 Cap Table and the Internal Cap Table, and withholding virtually all information about the financials and operations of Neon Machine while Long was seated on the Board.

191.     Because of Long's breaches of fiduciary duties, as aided and abetted by Defendants Foran, Lackaff, Nonis, Norbury, Yeend, and Zhou, 4D Factory transferred the *Shrapnel* IP to Neon Machine. These defendants aided and abetted Long's breaches to ensure 4D would receive no proceeds from Neon Machine, despite the millions of dollars 4D provided to fund their work. 4D Factory has incurred substantial costs, including legal fees, to address Long's ultra vires actions and breaches of fiduciary duty. His refusal to recognize 4D's rights given the debts it incurred to fund the project is a primary precipitator of this bankruptcy.

192.     4D Factory is entitled to recover from Defendants Foran, Lackaff, Nonis, Norbury, Yeend, and Zhou, jointly and severally, actual, general, compensatory and consequential damages in an amount to be proven at trial but no less than $10 million.

## COUNT VII
### (Aiding and Abetting Breach of Fiduciary Duties of Loyalty and Care)
### (Against Fund Defendants)

193.    Plaintiff realleges and incorporates by reference each allegation set forth in this complaint.

194.    As established, Long as the CEO and former board director of Neon Machine, at all relevant times owed fiduciary duties of care and loyalty to the shareholders of Neon Machine, including Plaintiff, and breached those fiduciary duties.

195.    Each of Fund Defendant had actual or constructive knowledge that Long was breaching his fiduciary duties. They routinely met or communicated with Long without 4D's other board members in 2022 and 2023 and onward. The Fund Defendants knew or should've known Long was excluding the other 4D directors from significant developments at Neon Machine.

196.    Therefore, the Fund Defendants knowingly participated in Long's breaches by holding invalid meetings and making invalid decisions with Long to facilitate his commandeering of Neon Machine. And then, when 4D appropriately and legally removed Long from its board seat, the Fund Defendants rejected his removal and claimed the 4D directors were illegitimate.

197.    As a result of Long's breaches of his fiduciary duties, as aided and abetted by the Fund Defendants, 4D Factory has incurred substantial costs, including legal fees, to address Long's ultra vires actions and breaches of fiduciary duty. 4D is thus entitled to recover from the Fund Defendants, jointly and severally, actual, general, compensatory, and consequential damages in an amount to be proven at trial but no less than $10 million.

## COUNT VIII
### (Promissory Estoppel)
### (Against Neon Machine and the Manager Defendants)

198.    Plaintiff realleges and incorporates by reference each allegation set forth in this complaint.

199.    To the extent any of the elements of any of the following contracts were not met, such that no valid contract exists, 4D hereby pleads this claim in the alternative.

200.    To induce 4D to transfer the *Shrapnel* IP and enter into SAFEs with Griffin and Polychain, Long made clear and unambiguous promises to 4D that (1) it would maintain 60% control of equity in Neon Machine, (2) it would hold three of five seats on the Board that was subject to the same governance terms; (3) it would receive SHRAP Tokens as holder of 60% equity in Neon Machine, in proportion to its equity; and (4) it would recoup its investment through the Manager Defendants' share of dividends. Indeed, under the Recoupment Agreements, the Manager Defendants made clear and unambiguous promises to 4D that they would assign to it their portion of any dividends by Neon Machine until it was repaid for its capital contribution into Neon Media.

201.    4D Factory reasonably and justifiably relied to its detriment on Neon Machine's and the Manager Defendants' promises in approving the IP Transfer Agreement and the SAFEs and incurring substantial legal fees and other costs.

202.    But Neon Machine's and the Manager Defendants' promises were hollow. By simultaneously arranging the Token Giveaway, locking 4D's tokens into treasury tokens, and setting up 4D's equity interests in Neon Machine for future dilution without notice or authorization, Neon Machine and the Manager Defendants worked concertedly to ensure that Plaintiff would never receive a return on its investment. Meanwhile, each Manager Defendant has received massive payouts in SHRAP Token, which they granted themselves.

203.    As a proximate and foreseeable result of Neon Machine's and the Manager Defendants' promises, Plaintiff hasn't seen any return on its risk capital investment into Neon Media and Neon Machine, and has incurred damages and lost opportunity costs proximately caused by Plaintiff's reasonable and justifiable reliance on these promises. Justice requires that Neon Machine's and the Manager Defendants' promises to 4D be enforced. 4D is therefore entitled to actual, general, compensatory and consequential damages in an amount to be proven at trial but no less than $10 million.

### COUNT IX
### (Declaratory Relief)
### (Against Defendants)

204.    Plaintiff realleges and incorporates by reference each allegation in this complaint.

205.    An actual and substantial controversy has arisen and now exists between 4D on one hand and Defendants on the other. 4D contends, as stated, that the parties agreed in exchange for the transfer of the *Shrapnel* IP to Neon Machine that it would be entitled to (1) receipt of SHRAP Tokens in direct correlation to Plaintiff's equity in Neon Machine; (2) assignment of Manager Defendants' rights to dividends in Neon Machine; and (3) oversight and control through three seats on the five-seat Board of Neon Machine; and (4) a 60% ownership interest in Neon Machine. 4D also contends it would be inequitable and unjust if the integrated agreements surrounding the transfer of the *Shrapnel* IP were not enforced in accordance with their terms.

206.    Defendants contest and dispute Plaintiff's contentions regarding the agreements and promises that induced 4D to transfer the *Shrapnel* IP.

207.    The transactions entered into without Plaintiff's knowledge as described in in this compliant, including those entered into by Long in his alleged capacity as sole director, are void or voidable because they were undertaken without requisite corporate authority or approval. 4D is therefore entitled to a declaration that these transactions lack form or effect.

208.    This controversy is of sufficient immediacy to warrant judicial relief under the Declaratory Judgment Act, 28 U.S.C. §§ 2201–2202.

209.    4D is entitled to a declaration that the agreements and promises set forth in this complaint in connection with the transfer of the *Shrapnel* IP to Neon Machine are enforceable in accordance with their terms, that Plaintiff may receive the SHRAP Tokens in direct proportion to its equity interests, totaling 480,927,488 SHRAP Tokens as well as its *pro rata* share of the Managers' special 2021 distribution to "Founders", i.e., an additional 331,561,208 SHRAP Tokens, that Manager Defendants committed fraud and breached their fiduciary duties in violating the agreements and promises made to 4D, that Fund Defendants committed fraudulent concealment and breached their fiduciary duties in concealing the occurrence of purported board meetings and invalidly authorizing actions on behalf of Neon Machine under those meetings; and that such purported board meetings were invalid and therefore any actions or directives taken by Long and the Fund Defendants then were invalid and unauthorized. 4D is entitled to a determination of the appropriate allocation of SHRAP Tokens between Plaintiff and Defendants.

**COUNT X**
**(Conversion)**
**(Against Manager Defendants, Neon Machine, Argon Protocol Foundation, and Argon Asset Ventures Corp.)**

210.    Plaintiff realleges and incorporates by reference each allegation set forth in this complaint.

211.    4D Factory has a legal right to 60% of the distributed SHRAP Tokens as 60% owner. The SHRAP Tokens were promised to it by Neon Machine, through Long, in proportion to 4D's equity in Neon Machine. The promise of the SHRAP Tokens was a necessary condition to 4D allowing Neon Media to transfer the *Shrapnel* IP to Neon Machine.

212.    The Manager Defendants wrongfully disposed of and converted 4D's promised SHRAP Tokens as if they were their own. Despite 4D's demands for distribution of its SHRAP Tokens, they refuse to distribute them and have misrepresented to 4D the status of the tokens.  The Manager Defendants now take the position that no SHRAP Tokens are allocated to 4D.  If there are in fact no SHRAP Tokens to be distributed to it, then the Manager Defendants distributed to themselves SHRAP Tokens that should've been reserved for distribution to 4D. The Manager Defendants seized and used 4D's interests in the available SHRAP Tokens at their whim.

213.    And Neon Machine or its agents, Argon Protocol Foundation and Argon Asset Ventures Corp., control the SHRAP tokens.

214.    Neon Machine has already distributed hundreds of millions of SHRAP tokens to the Manager Defendants. These distributions represent 100% of SHRAP distributions to Neon Machine shareholders, meaning that 60% of the tokens held by the Manager Defendants belong to 4D (and therefore have been converted).

215.    As a result of Manager Defendants' and Neon Machine, Argon Protocol Foundation, and Argon Asset Ventures Corp.'s unlawful withholding of 4D's SHRAP Tokens, and their unlawful dominion over the SHRAP tokens generally, 4D has received none of the SHRAP Tokens promised to it, or any of the tokens it had a right to as 60% shareholder at the time of the distribution. As a result, 4D has missed an incredible amount of value in its investment. And the unlawful dominion over the SHRAP tokens by the Manager Defendants, Neon Machine, Argon Protocol Foundation, and Argon Asset Ventures Corp. has been solely for the purpose of their own self-enrichment at the cost of 4D as the majority shareholder.

216.    Further, to the extent any of the elements of the contract described above between Neon Machine and 4D were not met, such that no valid contract exists, 4D pleads this claim in the alternative as it relates to those claims.

217.    4D Factory is entitled to a judgment against the Defendants directing them to transfer to Plaintiff 480,927,488 SHRAP Tokens, as well as its pro rata share of the Managers' special 2021 distribution to "Founders," *i.e.,* an additional 331,561,208 SHRAP Tokens.

## COUNT XI
### (Fraudulent Transfer)
### (Against Defendant Neon Machine and the Manager Defendants)

218.    Plaintiff realleges and incorporates by reference each allegation set forth in this complaint.

219.    A transfer made or obligation incurred by a debtor is fraudulent as to a creditor if the debtor made the transfer or incurred the obligation with actual intent to hinder, delay or defraud any creditor of the debtor.  6 Del. C. § 1304(a)(1).

220.    Plaintiff is a "creditor" to Neon Machine, as the term is defined under 6 Del. C. § 1301(4).  Neon Machine is a "debtor" to Plaintiff, as the term is defined under 6 Del. C. § 1301(6).  Each Manager Defendant is an "insider" of Neon Machine, as the terms is defined under 6 Del. C. § 1301(7)(b).

221.    Neon Machine was insolvent based on its balance sheet showing negative shareholder equity at the time of the November 2021 transfer of the 552 million SHRAP Tokens to the Manager Defendants.

222.    Long approved the transfer of more than 552,602,013 SHRAP Tokens to them with actual intent to hinder, delay, or defraud 4D, a creditor. The Manager Defendants intended to prevent 4D from recovering its share of tokens. The Manager Defendants granted the SHRAP Tokens to themselves, and then represented to 4D that its promised tokens did not belong to it.

223.    As far as the Token Giveaway constituted dividends to the Manager Defendants, Long willfully approved the distribution to the Manager Defendants to avoid paying 4D amounts due to it under agreements and as Neon Machine's majority stockholder.

224.    4D Factory is therefore entitled to a judgment against the Manager Defendants directing the return to 4D of those tokens.

**COUNT XII**
**(Unjust Enrichment)**
**(Against Manager Defendants)**

225.    Plaintiff realleges and incorporates by reference each allegation set forth in this complaint.

226.    The Manager Defendants have received over 552,602,013 SHRAP Tokens because of their control of Neon Machine, Argon Foundation, and Argon Corp.

227.    Plaintiff, as 60% stockholder, was entitled to 60% of the Distribution, or 331,561,208 SHRAP Tokens.

228.    By distributing the full amount of 552,602,013 SHRAP Tokens to themselves, each Manager Defendant took for themselves SHRAP Tokens intended for 4D, and therefore were enriched at its expense. 4D has a legal and equitable interest in the SHRAP Tokens they're holding.

229.    Neither the Manager Defendants nor Neon Machine have made any payments to 4D to compensate it for receiving any of the unauthorized SHRAP Tokens belonging to it.

230.    Equity requires the Manager Defendants to return the 331,561,208 SHRAP Tokens.

## COUNT XIII
## (Fraudulent Transfer)
## (Against Neon Machine, Inc)

231.    Plaintiff realleges and incorporates by reference each allegation set forth in this complaint.

232.    Long, Foran, Lackaff, Nonis, Norbury, and Yeend (each a "Neon Media Employee") each executed member/employment agreements with Neon Media around July 24, 2020.[41]

233.    The Neon Media Employees each received ownership units of Neon Media.

234.    While each Neon Media Employee agreed to keep their employment at Neon Media after they started working at Neon Machine, all eventually reneged and stopped working there.

235.    In April 2023, Grossman sent Javarone agreements where the Neon Media Employees would forfeit their shares in Neon Media ("Neon Media Forfeiture Agreements").[42]

236.    When the release agreements were presented to Javarone (4D's manager), Grossman was 4D's general counsel. He was also, and still is, Neon Machine's lawyer. He did not disclose the potential conflict to Javarone as to the Neon Media Forfeiture Agreements.

237.    The Neon Media Forfeiture Agreements each contain a provision that would, on its face, release Neon Media's claims, known and unknown, against the Neon Media Employees and, if read overly broad, Neon Machine.

238.    As discussed below, the release provision in the Neon Media Forfeiture Agreements is unconscionable and unenforceable.

---

[41] Exhibit Q.

[42] A copy of a representative forfeiture agreement is attached as **Exhibit R**.

239.    At no point did Javarone or Neon Media request the forfeiture agreements. They were proposed to him by Grossman as part of an "clean up" at Neon Media.

240.    These agreements binding Neon Media and releasing such claims were secured through the deceptive and disloyal actions of a conflicted attorney, Andrew Grossman.

241.    At the time the Neon Media Forfeiture Agreements were executed, 4D Factory was a creditor of an insolvent Neon Media within the meaning of California's Uniform Voidable Transactions Act and the Bankruptcy Code.[43]

242.    And, within the meaning of these authorities, when Neon Media released the Neon Media Employees and, potentially Neon Machine (each of whom are insiders), it received less than reasonably equivalent value for potentially releasing valuable claims.[44]

243.    Because no claims were released for reasonably equivalent value while Neon Media was insolvent, the releases are constructive fraudulent transfers under § 548 of the Bankruptcy Code and California's Uniform Voidable Transactions Act.[45]

244.    As a Neon Media creditor, then, 4D Factory may avoid the releases and receive any other relief available under these fraudulent-transfer statutes and any applicable other law.[46]

---

[43] *See generally* Cal. Civ. Code § 3439; *see e.g.,* 11 U.S.C. §§ 101(32), 548.

[44] Plaintiffs do not believe that Neon Media released claims against Neon Machine in the Neon Media Forfeiture Agreements. But to the extent the Court disagrees, those claims were not released in exchange for reasonably equivalent value and are thus constructive fraudulent transfers under the Bankruptcy Code and California's fraudulent-transfer statute.

[45] *See generally* Cal. Civ. Code § 3439; *see e.g.,* 11 U.S.C. § 548.

[46] To the extent another state's fraudulent-transfer statute applies instead, 4D Factory reserves the right to assert a fraudulent-transfer claim under that state's statute.

**COUNT XIV**
**(Violation of the Automatic Stay, 11 U.S.C. § 362(k))**
**(Against Neon Machine, Inc.)**

245.    Plaintiff realleges and incorporates by reference each allegation set forth in this complaint.

246.    4D Factory is the Debtor in this bankruptcy, which was filed on October 10, 2023.

247.    Following the petition date, Neon Machine, Inc., through Long and others, including Norbury, made multiple attempts to cause the SAFEs to convert so that 4D's interest in Neon Machine would be diluted and its controlling position eliminated. For example, in December 2023, Neon Machine attempted to enter into a qualified financing round with Griffin and Polychain for only $2 million, less than one month's expenses. Norbury threatened to sign that financing proposal over the board's objections. A qualified financing round, even a small one like that which was proposed, would have caused the Griffin and Polychain SAFEs to convert.

248.    Around that same time, Neon Machine announced it was launching a pre-alpha (i.e., a very early version) of Shrapnel in December that presumably would have allowed players to use SHRAP tokens as part of the game—an activity that, depending on how it was implemented, may have triggered "Network Launch" such that the SAFEs would have eventually converted.

249.    Finally, around March 24, 2024, Neon Machine launched the *Shrapnel* Marketplace, an online market that lets users buy "skins" for game characters using tokens. While Plaintiff has been unable to access this feature to determine whether all aspects required to establish Network Launch are actually present, the technical aspects appear likely to have been met (though it is not clear that such an effort would be "bona fide" as is required by the definition).

250.    Neon Machine, through Long, knew 4D had petitioned for bankruptcy protection. Yet it aggressively worked to reduce 4D's equity in Neon Machine. Its actions violated the automatic stay and injured 4D.

251.    Because of Neon Machine's willful violation of the automatic stay, 4D seeks actual damages, costs, attorney's fees, and punitive damages in the Court's discretion.

## COUNT XV
### (Declaratory Judgment of Unenforceability of Contract Provision)
### (Against Mark Long)

252.    Plaintiff realleges and incorporates by reference each allegation set forth in this complaint.

253.    Before he was CEO of Neon Machine or Neon Media, and before his stint at HBO, Long worked for Javarone as an employee of The 4D Factory, LLC. Under his employment agreement, Long was to receive equity in 4D.

254.    Long's tenure at 4D was short. He took a position at HBO in early 2019. Long informed Javarone that he was abandoning his equity in 4D when he took that position.

255.    Around October 1, 2021, Javarone received a forfeiture agreement from his general counsel, Andrew Grossman ("4D Forfeiture Agreement").[47] This declaratory-judgment action seeks a judicial determination that release in that agreement be rescinded or held unenforceable.

256.    When the release agreements were presented to Javarone, Grossman was 4D's general counsel. Grossman had already begun to provide legal advice to Neon Machine and was eventually named Neon Machine's general counsel. He did not disclose the potential for a conflict to Javarone regarding the 4D Forfeiture Agreement.

---

[47] Exhibit R.

257.    The 4D Forfeiture Agreement contains a release essentially identical to the one in the Neon Media Forfeiture Agreements. That release would, on its face, release 4D's claims, known and unknown, against Long and, if read overly broad, Neon Machine.

258.    The release in the 4D Forfeiture Agreement is unconscionable and unenforceable. It was secured through the deceptive and disloyal actions of a conflicted attorney, Grossman. In agreeing to the 4D Forfeiture Agreement, Javarone relied on Grossman's advice as counsel.

259.    At no point did Javarone or 4D request the forfeiture agreements. Just as he did in April 2023, Grossman described the 4D Forfeiture Agreement to Javarone as merely part of a last-minute clean up during the October 1, 2021 4D/Neon Media/Neon Machine transaction.

260.    Public policy disfavors an attorney like Grossman being involved in a contract negotiation that implicates the interests of two clients. Here, he convinced his client to agree to a release that allegedly releases claims, including claims that implicate many of the disloyal and fraudulent acts by Long that are asserted in this Second Amended Complaint. And, of course, Grossman did so on behalf of Defendants including Neon Machine and the Manager Defendants.

261.    He was almost certainly aware of the facts surrounding Long's disloyalty, breaches of contract, and breaches of fiduciary duties at Neon Machine, yet he failed to disclose any of those events or implication of the release on those claims to 4D.

262.    Javarone, who is not a lawyer, wouldn't have agreed to the release if he'd been informed of the actual facts or the implication of the release. Grossman, who should've been conflicted out of the entire transaction, used his influence over Javarone to secure an unconscionable release to the benefit of Grossman's other client, Neon Machine.

263.    Given the factual circumstances that led to the 4D Forfeiture Agreement, 4D respectfully asks that the Court declare the releases unenforceable.

**NEON MEDIA LLC'S ORIGINAL CLAIMS**

**COUNT XVI**
**(Breach of Contract)**
**(Against Neon Machine, Inc.)**

264.    Plaintiff realleges and incorporates by reference each allegation set forth in this complaint.

265.    Neon Media LLC owned the intellectual property rights to *Shrapnel*, including all works related to the *Shrapnel* game and project, including, without limitation, the first-person shooter game, the SHRAP token, and any other crypto assets, as well as various trademarks.

266.    To facilitate the Manager Defendants' fraudulent scheme, Mark Long negotiated for the transfer of all *Shrapnel* intellectual property rights to Neon Machine Inc.

267.    Neon Media LLC and Neon Machine Inc. formalized the transfer of Neon Media's *Shrapnel* IP rights in an Intellectual Property Sale Agreement executed on October 1, 2021.[48]

268.    The IP Transfer Agreement provided that Neon Media would sell, assign, and transfer the IP described in that agreement to Neon Machine. And in exchange, Neon Machine would pay $500 to Neon Media within five business days.

269.    Neon Media upheld its end, transferring the *Shrapnel* IP to Neon Machine.

270.    But Neon Machine never paid the $500 to Neon Media.

271.    Within the four corners of the IP Transfer Agreement, the $500 payment was the only consideration for Neon Media's transfer of the valuable *Shrapnel* IP.

272.    Neon Machine's failure to pay the $500 was a material breach and represented a complete failure of consideration.

---

[48] The IP Transfer Agreement is attached as **Exhibit P**.

273.     Long knew of the breach, as he was at that time CEO of both Neon Machine and Neon Media.

274.     After Neon Machine obtained the *Shrapnel* IP, Neon Machine granted licenses and assigned the ownership of other aspects of that IP, including licenses to Long's Argon Asset Ventures Corp. Argon relied on the licensed and assigned IP to develop the SHRAP tokens.

275.     Because of Neon Machine's material breach of the IP Transfer Agreement, and the failure of consideration, Neon Media seeks all remedies available to it, including rescission of the contract granting that intellectual property to Neon Machine, along with attorney's fees.

276.     Full rescission of the IP granted by Neon Media to Neon Machine, including the white paper and the IP embodied in the SHRAP tokens, will be difficult or impossible because Neon Machine granted that IP to Argon. Moreover, hundreds of millions of SHRAP tokens, which are among the IP listed in the IP Transfer Agreement, are circulating worldwide. Neon Media therefore seeks restitution for the diminished value of any IP that cannot be rescinded to Neon Media.

277.     Neon Media also seeks a permanent injunction to stop Neon Machine (and those under Neon Machine or the Manager Defendants' control) from further distribution, whether by license, assignment, or otherwise, of Neon Media's valuable intellectual property.

**COUNT XVII**
**(Breach of Fiduciary Duty)**
**(Against Mark Long)**

278.     Plaintiff realleges and incorporates by reference each allegation set forth in this complaint.

279.     Neon Media is a Washington LLC. It has a board of directors tasked with reviewing all material actions by the company. In 2021, Mark Long was a director at Neon Machine.

280.    As a director, Long owed Neon Media the fiduciary duties of loyalty and care. Long's fiduciary duty of loyalty required him to account to Neon Media and for it any property, profit, or benefit derived by Long in the conduct of Neon Media's activities or derived from a use by Long of company property, including the appropriation of a Neon Media opportunity.

281.    Long's fiduciary duty of loyalty also required him to refrain from dealing with Neon Media on behalf of a party having an interest adverse to Neon Media and to refrain from competing with Neon Media in the conduct of Neon Media's business activities.

282.    During the time Long was a director of Neon Media, he intentionally devised a scheme to create a separate company into which he would move the *Shrapnel* IP, which was the property of Neon Media, so that he could take that opportunity for himself and his colleagues rather than continue to develop it for the benefit of Neon Media and its members.

283.    While Long was a director of Neon Media, he intentionally formed the Delaware company Neon Machine, appointed himself the sole director, adopted bylaws that were favorable to his personal interests, and intentionally engaged in fundraising activities with outside investors like Griffin and Polychain, using and contingent on him acquiring the rights to, the *Shrapnel* IP, which was then property of Neon Media. Long never disclosed to Neon Media the details of that fundraising until the deals were essentially completely negotiated. Long never disclosed to Neon Media his appointment as Neon Machine's sole director or the bylaws that contained terms favorable to him, and unfavorable to Neon Media's interests, until well after the fact.

284.    While Long was a director of Neon Media, he induced then-employees of Neon Media—Colin Foran, Naomi Lackaff, Aaron Nonis, Don Norbury, and Mark Yeend—to join Neon Machine. Long, while still a director of Neon Media, facilitated a giveaway of over 522 million

SHRAP tokens to himself and those employees. He never disclosed to Neon Media this massive token giveaway when he undertook those disloyal negotiations.

285.    While Long was a Neon Media director, he brokered side agreements with Griffin and Polychain that granted them hundreds of millions of SHRAP tokens. When those deals were negotiated and signed, the tokens were Neon Media's intellectual property. Yet he never disclosed to Neon Media the SHRAP giveaway to Griffin and Polychain while he was negotiating it.

286.    While Long was a Neon Media director, he took actions on Neon Machine's behalf, a company that had interests adverse to Neon Media's—like intentionally holding secret board meetings and taking secret board actions that harmed Neon Media's business but enriched him and his team and entrenched their position of control at Neon Machine.

287.    Around September 2021, while Long was a director of Neon Media, Long took actions, alone and through Neon Machine, to form Argon Protocol Foundation and Argon Asset Ventures, Panama entities tasked with creating and issuing SHRAP token, which at that time was Neon Media's property. Long later had Neon Machine enter into a services agreement where parts of the *Shrapnel* IP were licensed or assigned to Argon Asset Ventures. Long never disclosed to Neon Media that he'd had the Argon entities formed or his ownership or control over those entities.

288.    Neon Media was of course damaged by these breaches of fiduciary duty by Long.

**289.**    Long should not be entitled to retain any financial benefit obtained as a result of his disloyalty. Neon Media is therefore entitled to damages in an amount to be determined at trial, as well as attorney's fees and equitable remedies including disgorgement of his ill-gotten gains.

## COUNT XVIII
### (Breach Of Contract)
### (Against Mark Long, Colin Foran, Naomi Lackaff, Aaron Nonis, Don Norbury, and Mark Yeend)

290.    Plaintiff realleges and incorporates by reference each allegation set forth in this complaint.

291.    Long, Foran, Lackaff, Nonis, Norbury, and Yeend (each a "Neon Media Employee") each executed member/employment agreements with Neon Media around July 24, 2020.[49]

292.    Each Neon Media Employee was paid an annual salary ranging from $120,000 to $200,000.

293.    Each Neon Media Employee was also granted equity in Neon Media on a vesting schedule described in the Neon Media Member Agreements.

294.    Each Neon Media Employee's agreement barred the employee from (1) using or disclosing Neon Media's confidential information for any non-company purpose without the written consent of a senior executive officer of Neon Media; and (2) competing with Neon Media.

295.    But each Neon Media Employee used and disclosed confidential information belonging to Neon Media for noncompany business, like forming Neon Machine and soliciting outside financing for Neon Machine from Griffin and Polychain, among others.

296.    In particular, the Neon Media Employees disclosed one or more White Paper regarding the *Shrapnel* game to individuals and entities not authorized to receive those documents, including Neon Machine. Neon Media's Shrapnel white papers bore the following confidentiality

---

[49] Exhibit R.

designation: "This document is strictly confidential and intended to be viewed exclusively by those recipients ('Recipients') specifically authorized by the Company."

297.    Neon Media was harmed by these breaches of contract. The Neon Media Employees used its confidential information to start a new company and obtain financing from Griffin and Polychain in exchange for hundreds of millions of SHRAP tokens. Once those pieces were in place, Long essentially forced Neon Media and 4D to capitulate to the transfer of IP to a separate company, Neon Machine.

298.    That was not the only breach by the Neon Media Employees. Each Neon Media Employee also remained employed by Neon Media, even while they competed with Neon Media through what became Neon Machine.

299.    Each of the Neon Media Member Agreements states:

Member therefore agrees that he or she will not at any time during his or her employment with the Company, engage in any activity that competes with or is directly related to the business of the Company, and will not directly or indirectly own an interest in, join, operate, or participate in or be connected with, in any manner whatsoever, any person or entity engaged in developing, producing, designing, selling, distributing or marketing products or services that compete with the Company's products, services or other business, in any markets in which the Company does business or contemplates doing business.

300.    Each Neon Media Employee breached that provision by working on behalf of, taking an interest in, participating in, and being connected with, Neon Machine while employed by Neon Media.

301.    For example, Long incorporated Neon Machine in early August 2021. He appointed himself the company's sole director. By then he was operating and participating in Neon Machine, a company that competed with Neon Media in developing a blockchain-based video game. Long had not yet disclosed to Neon Media that he'd formed a new corporation or that he and his fellow Neon Media Employees had engaged in a massive token giveaway to themselves.

302.    The other Neon Media Employees have alleged that they invested hundreds of thousands of dollars in their own money to form Neon Machine. They did so in the form of alleged loans to the company, some of which are still on the books. They also received token grants as a partial repayment of the loans. When those loans were made to Neon Machine (or what became Neon Machine), each had an interest in a company that competed with Neon Media.

303.    Neon Media was harmed by these breaches. But for the Neon Media Employees' violating their employment agreements, Neon Machine would have never had access to the *Shrapnel* IP or the team tasked with developing *Shrapnel* at Neon Media.

304.    Through each of these actions, the Neon Media Employees each breached their employment agreements with Neon Media.

305.    As a result, Neon Media has been damaged in an amount equal to the value of the confidential information wrongfully disclosed by the Neon Media Employees. Neon Media has been damaged by the Neon Media Employee's breach of their noncompete agreements in an amount to be determined at trial. In addition, Neon Media seeks to disgorge all profits obtained by the Neon Media Employees from their breaches, together with all other damages or remedies available to it, including rescission, attorney's fees, and costs.

### COUNT XIX
### (Intentional Interference with Contract)
### (Against Colin Foran, Naomi Lackaff, Aaron Nonis, Don Norbury, and Mark Yeend)

306.    Plaintiff realleges and incorporates by reference each allegation set forth in this complaint.

307.    Foran, Lackaff, Nonis, Norbury, and Yeend each knew that Long had an membership/employment agreement with Neon Media that contained non-compete provisions.

308.    Foran, Lackaff, Nonis, Norbury, and Yeend assisted Long in forming and operating Neon Machine, knowing this was a breach of Long's noncompete clause with Neon Media.

309.    Neon Media was harmed by Foran, Lackaff, Nonis, Norbury, and Yeend's efforts to interfere with Neon Media's contract with Long.

310.    Neon Media is therefore entitled to damages in an amount to be determined at trial, as well as attorney's fees and any available equitable remedies.

## COUNT XX
### (Breach Of Duty Of Loyalty)
### (Against Colin Foran, Naomi Lackaff, Aaron Nonis, Don Norbury, and Mark Yeend)

311.    Plaintiff realleges and incorporates by reference each allegation set forth in this complaint.

312.    Long, Foran, Lackaff, Nonis, Norbury, and Yeend were each employees of Neon Media in 2021, including during the months leading to Neon Machine's formation in August 2021.

313.    As employees, they each owed Neon Media a fiduciary duty of loyalty.

314.    Each violated that duty of loyalty by assisting each other, and each individually working, on behalf their own self-interests and self-enrichment on *Shrapnel* at Neon Machine, and in a manner contrary to the best interests of their employer, Neon Media.

315.    Neon Media was harmed by these defendants' disloyal conduct.

316.    Each of these employees received a financial benefit from their disloyalty, including shares in Neon Machine, a salary at Neon Machine, and hundreds of millions of SHRAP tokens. Neon Media is entitled to damages in an amount to be determined at trial, as well as attorney's fees and equitable remedies including disgorgement of the disloyal employees' ill-gotten gains.

## COUNT XXI
## (Intentional Interference With Contract)
## (Against Neon Machine, Inc.)

317.    Plaintiff realleges and incorporates by reference each allegation set forth in this complaint.

318.    Each Neon Media Employee executed membership/employment agreements with Neon Media, LLC on or around July 24, 2020.

319.    Each Neon Media Employee remained employed by Neon Media in 2021, including in the months leading to Neon Machine's formation in August 2021.

320.    Their Neon Media Member Agreements forbade them from competing with Neon Media and disclosing Neon Media confidential information to unauthorized recipients.

321.    Neon Machine was formed on August 3, 2021 by Long. Long thereafter appointed himself CEO and the sole director of Neon Machine.

322.    Long was certainly aware of the restrictions in the Neon Media Member Agreements, because he himself was subject to those restrictions. Despite his personal knowledge of those restrictions, Neon Machine induced each Neon Media Employee to violate the non-disclosure and non-compete provisions of their respective Neon Media Employment Agreements.

323.    Neon Media was harmed by Neon Machine's interference with its contractual relationships with the Neon Media Employees. Each of those employees competed with Neon Media, to Neon Media's detriment. Moreover, Neon Machine caused those employees to share confidential Neon Media information, including information about the *Shrapnel* project then being developed at Neon Media, with recipients who were not authorized to receive that information.

324.    Neon Media is therefore entitled to damages in an amount to be determined at trial, as well as attorney's fees and any available equitable remedies.

**COUNT XXII**
**(Declaratory Judgment Of Unenforceability Of Contract Provision)**
**(Against Mark Long, Colin Foran, Naomi Lackaff, Aaron Nonis, Don Norbury, and Mark Yeend)**

325.    Plaintiff realleges and incorporates by reference each allegation set forth in this complaint.

326.    The Neon Media Employees each received ownership units of Neon Media as part of their employee-compensation packages.

327.    While each Neon Media Employee agreed to keep their employment at Neon Media after they started working at Neon Machine, all eventually reneged and stopped working there.

328.    In April 2023, Grossman sent Javarone agreements where the Neon Media Employees would forfeit their shares in Neon Media ("Neon Media Forfeiture Agreements"). This declaratory-judgment action seeks a judicial determination that the release provision of those agreements be rescinded or otherwise held unenforceable.

329.    When the release agreements were presented to Javarone (4D and Neon Media's manager), Grossman was 4D's general counsel. He was also, and still is, Neon Machine's lawyer. Grossman did not disclose his conflict of interest to Javarone as it related to the Neon Media Forfeiture Agreements.

330.    The Neon Media Forfeiture Agreements each contain a provision that would, on its face, release Neon Media's claims, known and unknown, against the Neon Media Employees and, if read overly broad, Neon Machine.

331.    The release provision in the Neon Media Forfeiture Agreements is unconscionable and unenforceable. It was secured through the deceptive and disloyal actions of a conflicted attorney, Andrew Grossman. In agreeing to the Neon Media Forfeiture Agreements, Javarone relied on the advice of his counsel, Grossman.

332.    At no point did Javarone or Neon Media request the forfeiture agreements. They were proposed to him by Grossman as part of a purported "clean up" at Neon Media.

333.    Public policy disfavors an attorney like Grossman from being involved in a contract negotiation that implicates the interests of two clients. Here, Grossman convinced one client, Javarone, to agree to a release that allegedly releases claims that would otherwise negatively impact his other client or clients, including many of the Neon Media claims asserted in this Second Amended Complaint, before Javarone started to discover the depths of disloyalty by Long and the other Neon Media Employees.

334.    Grossman, who as general counsel to Neon Machine was aware of the facts surrounding the Neon Media Employees' disloyalty and breaches of contract, failed to disclose to Javarone the impact the release would have on potential claims against Neon Machine and the Neon Media Employees.

335.    Javarone, who is not a lawyer, would not have agreed to the release if he had been informed of the actual facts or the impact of the release to that situation. Grossman, who should have been conflicted out of the entire transaction, used his influence as 4D's lawyer to secure an unconscionable release to the benefit of Grossman's other client, Neon Machine, and its officers and employees.

336.    Given the factual circumstances that led to the Neon Media Forfeiture Agreement, Neon Media respectfully asks that the Court declare the releases unenforceable.

**CONCLUSION**

To say 4D was taken advantage of goes without saying. Mark Long and the Manager Defendants started Neon Media after they were laid off by HBO. And when that fledgling business needed funding, Long urged 4D Factory to invest in its life support. Yet just as 4D's investment

started showing signs it would bear fruit with *Shrapnel*, Long and his team cut 4D out. 4D Factory invested over $6 million toward Neon Media—all while generously sharing 40% of the company with Long and his team, who'd contributed no assets to their startup. The Manager Defendants have faced no consequence for their betrayal. They continue to develop *Shrapnel* at Neon Machine, while 4D pleads for debt relief in bankruptcy. And the ones that continue to suffer the harm are its creditors.

For these reasons**,** 4D Factory, Neon Media, Javarone, Honour, and Horowitz respectfully seek a judgment against Defendants as follows:

(1) On Count 1: a judgment for Plaintiff and against Neon Machine Inc. for breach of contract with an order rescinding the contract, and any and all actual and circumstantial damages, attorney's fees, and costs that may be awarded.

(2) On Count 2: a judgment for Plaintiff and against Manager Defendants, Neon Machine, Inc., Argon Protocol Foundation, and Argon Asset Ventures Corp., under 11 U.S.C. § 541(a) and 542(a), compelling (i) immediate turnover of (a) 480,927,488 SHRAP Tokens to Plaintiff and (b) Plaintiff demands turnover of 331,561,208 SHRAP Tokens, and (ii) an accounting of the Total Network Tokens; (ii) an accounting of the Total Network Tokens; and (iii) to the extent Manager Defendants have sold any SHRAP Tokens that constitute property of the estate, a judgment in the amount of 60% of the proceeds received for those sales;

(3) On Count 3: a judgment for Plaintiff and against Manager Defendants, jointly and severally, in an amount to be proven at trial but no less than $10,000,000, together with an equitable accounting; or alternatively a declaration in favor of Plaintiff and against Manager Defendants that the transactions addressed in Count 4 are void or voidable;

(4) On Count 4: a judgment for Plaintiff and against Fund Defendants, jointly and severally, in an amount to be proven at trial but no less than $10,000,000, together with an equitable accounting;

(5) On Count 5: a judgment for Plaintiff and against Manager Defendants, jointly and severally, in an amount to be proven at trial but no less than $10,000,00, together with equitable accounting, or alternatively a declaration in favor of Plaintiff and against Manager Defendants that the transactions addressed in Count 5 are void or voidable;

(6)     On Count 6: a judgment for Plaintiff and against Defendants Foran, Lackaff, Nonis, Norbury, Yeend and Zhou, jointly and severally, in an amount to be proven at trial but no less than $10,000,000, together with an equitable accounting;

(7)     On Count 7: a judgment for Plaintiff and against Fund Defendants, jointly and severally, in an amount to be proven at trial but no less than $10,000,000, together with an equitable accounting;

(8)     On Count 8: a judgment for Plaintiff and against Manager Defendants, jointly and severally, in an amount to be proven at trial but no less than $10,000,000;

(9)     On Count 9: a judgment for Plaintiff and against Defendants declaring that:

  a.  the agreements and promises made to Plaintiff set forth in this Complaint in connection with the transfer of the *Shrapnel* IP to Neon Machine are enforceable in accordance with their terms;

  b.  Plaintiff is entitled to receipt of the SHRAP Tokens in direct proportion to Plaintiff's equity interests, totaling 480,927,488 SHRAP Tokens;

  c.  Plaintiff is entitled as a Founder to receipt of 331,561,208 SHRAP Tokens, its pro rata share of the special 2021 Token Giveaway to Founders;

  d.  Plaintiff is entitled to a determination of the appropriate division of SHRAP Tokens between Plaintiff and Defendants;

  e.  Manager Defendants committed fraud and breached their fiduciary duties in violating the agreements and promises made to Plaintiff;

  f.  Fund Defendants committed fraudulent concealment and breached their fiduciary duties in concealing the occurrence of purported Board meetings and invalidly authorizing actions on behalf of Neon Machine under those meetings; and

  g.  Such purported Board meetings were invalid and therefore any actions or directives taken by Long and Fund Defendants at such meetings were invalid and unauthorized.

(10)    On Count 10: a judgment for Plaintiff and against Manager Defendants directing the return to Plaintiff of 480,927,488 SHRAP Tokens, as well as its pro rata share of the Managers' special 2021 distribution to "Founders," i.e., an additional 331,561,208 SHRAP Tokens;

(11)    On Count 11: a judgment in favor of Plaintiff and against Defendant Neon Machine and the Manager Defendants directing the return to Plaintiff of 552,602,013 SHRAP Tokens.

(12)    On Count 12: a judgment for Plaintiff and against Manager Defendants directing the return to Plaintiff of 331,561,208 SHRAP Tokens, representing 60% of SHRAP Tokens distributed to Founders, collectively from Manager Defendants;

(13)    On Count 13: a judgment in favor of Plaintiff and against Defendant Neon Machine avoiding the releases, together with any other relief the Court finds just and reasonable;

(14)    On Count 14: a judgment in favor of Plaintiff and against Neon Machine, Inc., for damages in an amount to be proven at trial, together with costs and attorney's fees, and punitive damages in the Court's discretion;

(15)    On Count 15: a judgment in favor of 4D Factory, LLC against Mark Long declaring that the releases are unenforceable;

(16)    On Count 16: a judgment for Neon Media LLC against Neon Machine, Inc., for rescission of the IP transfer agreement and immediate transfer and return of the Shrapnel IP to Neon Media LLC, as well of restitution for the value of any IP that cannot be returned to Neon Media;

(17)    On Count 17: a judgment in favor of Neon Media against Mark Long for damages in an amount to be proven at trial, together with costs and attorney's fees, and equitable remedies including disgorgement of his ill-gotten gains;

(18)    On Count 18: a judgment in favor of Neon Media against Mark Long, Colin Foran, Naomi Lackaff, Aaron Nonis, Don Norbury, and Mark Yeend, for damages in an amount to be proven at trial, together with costs and attorney's fees, and equitable remedies including disgorgement of their ill-gotten gains, and recission;

(19)    On Count 19: a judgment in favor of Neon Media against Colin Foran, Naomi Lackaff, Aaron Nonis, Don Norbury, and Mark Yeend for damages in an amount to be proven at trial, together with costs and attorney's fees, and any equitable remedies that may be available;

(20)    On Count 20: a judgment in favor of Neon Media against Mark Long, Colin Foran, Naomi Lackaff, Aaron Nonis, Don Norbury, and Mark Yeend for damages in an amount to be proven at trial, together with costs and attorney's fees, and equitable remedies including disgorgement of their ill-gotten gains.

(21)    On Count 21: a judgment in favor of Plaintiff against Neon Machine Inc., for damages in an amount to be proven at trial, together with costs and attorney's fees, and any equitable remedies that may be available;

(22)    On Count 22: a judgment in favor of Neon Media and against Mark Long, Colin Foran, Naomi Lackaff, Aaron Nonis, Don Norbury, and Mark Yeend, declaring that the releases are unenforceable.

(23)    For reasonable litigation expenses and attorneys' fees; and

(24)    Any other relief that this Court deems just and proper.


Dated: August 9, 2024

**LAWSON & MOSHENBERG PLLC**
**Attorneys for Plaintiff, Cort Javarone, Scott**
**Honour, Steve Horowitz, and Neon Media**
**LLC**

By:        */s/ Avi Moshenberg*
Avi Moshenberg
avi.moshenberg@lmbusinesslaw.com
Nicholas R Lawson
nick.lawson@lmbusinesslaw.com
Telephone: (832) 280-5670
801 Travis Street, Suite 2101 #838
Houston, Texas 77002


Roslyn, New York

SPENCE LAW OFFICE, P.C.
Attorneys for Plaintiff

By:        */s/ Robert J. Spence*
Robert J. Spence, Esq.
55 Lumber Road, Suite 5
Roslyn, New York 11576
Tel.: (516) 336-2060

**Verification**

I, Cort Javarone, declare as follows:

I am the representative for the Debtor, and a Claimant, in this Adversary case, a citizen of the United States of America, and a resident of the State of Florida.

I have personal knowledge of myself, my activities, and my intentions, including those set out in the foregoing Second-Amended Complaint, Original Counterclaims, and Original Complaint, and if called on to testify I would competently testify as to the matters stated in them.

I have personal knowledge of my own efforts to ignite board action, including the activities described in this Second Amended Complaint, Original Counterclaims, and Original Complaint, and if called to testify I would competently testify as to those matters.

I verify under penalty of perjury under the laws of the United States of America that the factual statements in this Complaint concerning myself, my activities, and my intentions are true and correct, as are the factual statements concerning board action as described herein. 28 U.S. § 1746.

Executed on August 9, 2024

_____

Cort Javarone